## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

GUY L. DAVIS, TERESITA R. DAVIS, AYLA M.
DAVIS, E.D., BY AND THROUGH HER NEXT
FRIEND AYLA M. DAVIS, CHRISTOPHER J.
DAVIS, MONICA MERCHANT, PAULETTE
MARTONE, AGOSTINE MARTONE JR., PAMELA
BEERY, ROGER BEERY, JOEL BEERY, TOBEY
BEERY, APRIL HESS, KATHERINE MEEKS,
PREINA DAVIS, ALYSSA DAVIS, E.D., BY AND
THROUGH HIS NEXT FRIEND PREINA DAVIS,
EDWARD DAVIS JR.,  PRISCILLA SANDOVAL
SMITH, DANNA PALMER INDIVIDUALLY AND
ON BEHALF OF ESTATE FOR CORY PALMER,
DALE DERAPS, CEDAR DERAPS, DAWN CASSIL,
REGINA BAEPLER, SHANTI JOHNSON, SUSAN
JAENKE, RITA ZOUCHA, SHERRI LASKA,
MARJORIE BENSON, STEVEN BENSON, JACQUE
KEESLAR, VANESSA KEESLAR, STACY
BRIDGES, MARK NOYES, GAYLE THARP,
DONNA THARP, KAREN THARP,  JOHN DARGA,
KATHLEEN HANSON, ROBERT HANSON,
KATHRYN HARTMAN, CHRISTINE STANTON,
MAUREEN WALSH, ERIN WATSON,  JOSEPH
WALSH, MEGHAN TURNER, PATRICK WALSH,
MELISSA ADAMS, ADDRIN ADAMS, MARK
ADAMS, LEROY CAIN JR., ROBERT RODDY JR.,
PHILLIP HALE, LYNN JOHNSON, STANLEY
JOHNSON, ELIZA BACOT, OLIVIA HARDEN, JILL
PUCKETT, ASHLEY BELLOT,  RICHARD
FENIELLO, ERICA BOOTH, G.B., BY AND
THROUGH HER NEXT FRIEND ERICA BOOTH,
T.B., BY AND THROUGH NEXT FRIEND ERICA
BOOTH, DEBRA BOOTH, MARY BROZOVICH,
RYAN BROZOVICH, TERESA ELROD, TIMOTHY
ELROD, SHANNON EURY, RUTH HOLLER, JOHN
HOLLER JR., JOSEPH HOLLER, LETICIA ROMO,
JESSE VEGA, MELISSA WARNER, SCOTT
WARNER INDIVIDUALLY AND ON BEHALF OF
ESTATE FOR CHANDLER WARNER, ASHTON
WARNER, VIOLET KAYLOR, JIM KAYLOR, CHAD
WATSON, ROBERT LOVE SR., EVELYN FORD,
KERBY MILLER, KIM MILLER, RACHELE
PALMER, BRAD PALMER, DUSTIN PALMER,
BRADLEY KRYST, LLOYD MORRIS JR., ELAINE

JURY TRIAL DEMANDED


Case No.: 1:22-cv-829

FRAZIER, ELLEN LEACH, SHERRI SPRINGATE,
SUSAN WEST, CHRISTOPHER BOREA, KIM
BOREA, LAURALEE BISSON, RICHARD BISSON,
ANDREW BISSON, CHRISTOPHER BISSON,
MARLA VAN CANNON, MICHAEL VAN
CANNON, BARBARA PARSONS, KRISTEN
SWANSON, JERICA JOHNSON, RANDALL
JOHNSON, MARYBETH LAGUNA, ERIN
CALVERT, SHERI ADAMS, TAMI ZERILLI, LYDIA
LAGUNA, ANNETTE LAGUNA-BATES, DANIEL
LAGUNA JR., LINDA LAGUNA-GRIFFIN, MILO
LAGUNA, SARAH PARKER, VICTORIA JOHNSON,
JOAN SHANNON, DANIEL SHANNON, JOSHUA
PFISTER, BARBARA SABA, ANTHONY SABA SR.,
ANTHONY SABA JR., MARY SABA, LYNN SHAW,
BRANDON CLEVENGER, NANCY CLEVENGER,
ROGER KURTZ, STEPHANIE KURTZ, CONNIE
MADORE, RONNIE MADORE, DARLENE
SEIGART, RICHARD WITTEVEEN, HEATHER
KAUFMAN, TRENT WITTEVEEN, KRISTEN
SIMON, RICHARD GERVASI II, DIANE SALYERS,
KELLI WINKLER, NORMA ESTES, DANIEL
SEBBAN, JANICE RIEWER, RICHARD RIEWER,
JOSEPH CANTRELL III, SONDRA ADKINS,
PATRICIA GRASSBAUGH, BELINDA BREWSTER,
CHASSITY MCCANDLESS, RONALD SUMNER,
KIMBERLY SCHMIT, ROBIN WALLACE, RICKEY
WALLACE, RACHEL TUCKER, SARAH
WALLACE, KENNETH LOCKER SR., CARMON
PETTERS, LESLIE WHITE, JEREMY PEARSON,
LORIE SOUTHERLAND, APRIL HARKINS,
ROBERT HARKINS JR., C.Y., BY AND THROUGH
HIS NEXT FRIEND DANA YOUNG, TERESA
PINNER, JAMES WALKER, KASEY WALKER,
KELLY MURRAY, ANSELMO MARTINEZ JR.,
GALDINA IBARRA, MICAH MONTGOMERY,
CHRISTINA BAKER,  MICHAEL SUMMERS,
NANETTE WEST, CLARK WEST, KELLI
ANDERSON, KARA WEST, CARTER WEST,
LILLIAN COSTELLO, DEBRA SPRINGMAN,
DAVID DEHN JR., ASHLEY RAWLINGS, K.L., BY
AND THROUGH HER NEXT FRIEND ASHLEY
RAWLINGS, GLENNA LEGRAND, M.L., BY AND
THROUGH HER NEXT FRIEND ASHLEY
RAWLINGS, DARRYL LINDER, SHIRLEY WADE,
GARY WADE, SHAWNA WESTBROOK, MICHAEL

LYNCH III, LYNN ZINDARS, KENNETH ZINDARS,
LINDA BALOGA, SHANNON OWENS, ANN
SCHEIBNER, TYLER SCHEIBNER, LOUISE
SCHEIBNER, DAVID SCHEIBNER, DIANE
COTTRELL, JOHN HERNANDEZ, ANGELA
HERNANDEZ, HEATHER NIED, KATHERINE
WAGONER, M.O., BY AND THROUGH HER NEXT
FRIEND KEVIN HARRINGTON, RAYMOND
OLSON, ASHLEY MONSCHKE, PATTY JETT,
SHELIA TOWNS, CHARLES BOOKER, BRENDA
BOOKER, DEBORAH RAY, WALTER RAY, JILL
FREDERIKSEN, MARTHA CABE, LAURA
MCBRIDE, MARSHALL MCBRIDE, SARAH
LAMBERT, MELANIE PIONK, ASHLEY PIONK,
B.P., BY AND THROUGH HIS NEXT FRIEND
MELANIE PIONK, DILLON PIONK, JOSHUA
PIONK, THOMAS LLOYD, NATALIE JACKSON,
PHYLLIS CRAIG, JOEL SEXTON-CRAIG, KELLY
INMAN, MENESIA SPADE, RACHAEL PUTMAN,
SHEILA MARSHALL, ANDREW MARSHALL,
BRANDI YANEZ, KENNETH ANDERSON, ROBIN
MALLARD, MOSE MALLARD III, TERRENCE
MALLARD, XIOMARA HALL, G.H., BY AND
THROUGH HER NEXT FRIEND XIOMARA HALL,
MILDRED HALL, DOLORES WILSON, MARGIE
BELL, CRISTIAN ARIAS, XAVIER ARIAS, ANGIE
CAPRA, ANTHONY CAPRA, SR., SHARON
CAPRA, MARK CAPRA, VICTORIA CAPRA, A.C.,
BY AND THROUGH HER NEXT FRIEND ANGIE
CAPRA, J.C., BY AND THROUGH HIS NEXT
FRIEND ANGIE CAPRA, S.C., BY AND THROUGH
HIS NEXT FRIEND ANGIE CAPRA, DANIELLE
CAPRA, EMILY CAPRA, JACOB CAPRA, JOANNA
CAPRA, JOSEPH CAPRA, JULIA-ANNE CAPRA,
MICHAEL CAPRA, RACHEL LEE, SARAH
JOHNSON, DONNA OPICKA, DANIEL OPICKA,
I.O. BY AND THROUGH HIS NEXT FRIEND JULIA
WARD, ELIA DOMINGUEZ, ANTONIO
DOMINGUEZ, ELIA ORTIZ, GLADYS ISAIJAH
ORTIZ, ELIA ORTIZ, KATHERINE SHRADER,
MARY ALLEN, JOHN SAVAGE, STEPHANIE
FORREST, B.F., BY AND THROUGH HIS NEXT
FRIEND STEPHANIE FORREST, J.F., BY AND
THROUGH HIS NEXT FRIEND STEPHANIE
FORREST, RACHEL HALL, A.H., BY AND
THROUGH HER NEXT FRIEND RACHEL HALL,

JOSEF PAUTSCH, BECKY JOHNSON, BRITTENY
WOODS, ALEX RUNYAN, AMBER DAWN
MORELAND, T.D.C., BY AND THROUGH HIS
NEXT FRIEND AMBER DAWN MORELAND,
HALLIE MAY COMBS, MEGAN HELEN
STEPHENS, S.M.S., BY AND THROUGH HER
NEXT FRIEND MEGAN STEPHENS, KIMBERLY
ROBIN BLAMIRES, D.L.B., BY AND THROUGH
HER NEXT FRIEND KIMBERLY ROBIN
BLAMIRES, KALLI BRIANNA BLAMIRES, CRAIG
ALLEN BLAMIRES, SANDRA LEE BLAMIRES,
BEAU ALLEN BLAMIRES, ERIC SHAWN ALLEN
BLAMIRES, ETHAN ALLEN BLAMIRES, NEIL
ALLEN BLAMIRES, JULIE JEANNE MCGRAW,
TIFFANY WALLACE, C.W., BY AND THROUGH
HIS NEXT FRIEND TIFFANY WALLACE, DARRYL
WALLACE, JAMES D. HENDERSON, CYNTHIA
HENDERSON, ATHENA GORDON, SYLVIA
MCGEE, THOMAS MCGEE, COREY MCGEE,
LAVETTE CURRY, NIKI MARTIN, TRACY LEE
CARRICO, TIMOTHY DAVIS, STEPHANIE
FRANCES BOVA, BILLIE SHOTLOW, MICHAEL
SHOTLOW, WRAYJEAN CARNES, AMANDA
NICOLE MANASRA, WRENITA Y. RANDALL,
EDIENA C. MCGEE, NANCY ROUGLE, HARVEY
LANE WALLS, GINGER KUTSCHBACH, B.T.K.,
BY AND THROUGH HIS NEXT FRIEND GINGER
KUTSCHBACH, ROBERT A. BIRD, CARMEN
LOUISE O'LEARY, CHARLES EDWARD BLANEY,
DIANNE BELK MASSEY, CARLEY BLANEY,
JANE BERRETTINI, VINCENT BERRETTINI,
CHRISTOPHER JOSEPH BERRETTINI, NELLO
JAMES BERRETTINI, MICHAEL BOWEN,
ANTOINETTE DRAKULICH, JOSEPH DANA
DRAKULICH, JOSEPH DANA DRAKULICH, DANA
RENEE DRAKULICH-KING, MAREN HESLA,
BRUCE M. YELNER, ELMA GARZA PALOMAREZ,
CANDIDO PALOMAREZ III, OMAR PALOMAREZ,
RENE PALOMAREZ FOR THE ESTATE CANDIDO
PALOMAREZ JR., LORI DEYSIE, ERISA DEYSIE,
SIDNEE DEYSIE, HELEN DEPRIMO, JOSEPH
DEPRIMO, JODI CALABRO, DANIELLE FEDIW,
NANCY M. TRIMBLE, TIMOTHY M. TRIMBLE,
ROSANNA ANTONIA TRIMBLE, MICAELA
MARIE TRIMBLE, STEFFANI ROSE TRIMBLE,
GERALD W. FINLEY, JOHN M. FINLEY, JOSHUA

M. FINLEY, JENNIFER M. LEFORS, LYNNE
MARIE FARMER, KEVIN MCCLOSKEY, JOY L.
RETMIER, STEVEN C. RETMIER, MASON D.
RETMIER, MATTHEW S. RETMIER, SARAH
MOSCHLER WALTON, MARY HILTON, JEANINE
HILTON, BRENT C. ROBINSON, MICHAEL DEE
PLUGER, CHRISTOPHER ALEXANDER
PALMATEER, MARJORIE VAIL, LYDA NIESHE,
LEAH A. TURNER, ROBYN YOUNG, CARLENE
RENEE CROSS, MICAEL D. BOGAR, CARISE
MARTINDALE, MICHAEL DEAN BOGAR, DAVID
BROSTROM, MARY JOSEPHINE BROSTROM,
BLAKE D. BROSTROM, JASE DAVID BROSTROM,
LESLY YOHANA GARCIA, MARICRUZ GARCIA
VELASQUEZ, VICTOR GARCIA, RAMSSES
GARCIA, JENNA RENAE VANOSDALE, RENDA
LYNN RAINEY RIGGINS, ALEXANDER EDWARD
ZWILLING, KATHY GAYLE LAY FOR THE
ESTATE KURT E. ZWILLING, DENISE JOANNE
WILSON, CINDY JEANNE LOHMAN, GARY
EDWARD LOHMAN, MARIA L. AVNERI,
EDUARDO G. GARCIA, JACOB AVNERI,
CRYSTAL DELEO, JOSE ANTONIO VAZQUEZ SR.,
JANICE VAZQUEZ, JOSE ANTONIO VAZQUEZ
SR., HANNAH COX, MICHELLE M. NICHOLAS,
CHARLOTTE ALLEN, AUSTIN NELAMS,
MATTHEW ALLEN, CESAR G. ROBLES,
YOLANDA ROBLES, LINDA K. GRIECO, RALPH
GRIECO, JENNIFER GRIECO BURCH, LAUNA LEE
CHAVEZ, CHARLES LYNN STILES, CHARLES
LYNN STILES II,  KENNETH J. STILES, NATALIE
MICHELLE SCHOENING, CECILIA STILES, JESSIE
HERNANDEZ, GARLAND RICHARD PARSONS,
CATHY ANN PARSONS, REGINA BYTHER, N.W.,
BY AND THROUGH HER NEXT FRIEND REGINA
BYTHER, EVA FARR-WALLACE, CALVIN D.
JAMISON, ATARAH WRIGHT, CHRISSY PRADO,
N.W., BY AND THROUGH HER NEXT FRIEND
REGINA BYTHER, A.M.S., BY AND THROUGH
HER NEXT FRIEND CHRISSY PRADO, C.S.S., BY
AND THROUGH HER NEXT FRIEND CHRISSY
PRADO, OWEN M. SOUTHWORTH, LOGAN M.
SOUTHWORTH, KIMBERLY SOUTHWORTH,
ROBERT SOUTHWORTH, CHRISTINA NIKOLE
GUERRERO, M.S. BY AND THROUGH HER NEXT
FRIEND CHRISSY PRADO, ROBERT WATSON JR.,

JULIE BESSA, BRYANA ELYSE BESSA, JOEL D.
BESSA, LISA MURAWSKI-DUPONT, MARK P.
DUPONT, BRIGETTE PETERSON, T.C., BY AND
THROUGH HIS NEXT FRIEND BRIGETTE
PETERSON, ANDREW BOWER, F.S., BY AND
THROUGH HER NEXT FRIEND BRIGETTE
PETERSON, ROBERT NOEL SCHULTE, SUSIE
LITTMANN SCHULTE, TODD LITTMANN
SCHULTE, JANICE COCHRAN YORK, FRANKLIN
LITTLE, MICHAEL STRATTON, STEVEN
MICHAEL STRATTON, DEBORAH YOUNG,
JACQUELINE O'NEILL BRINGS CLAIMS IN BOTH
HER PERSONAL CAPACITY AND HER
REPRESENTATIVE CAPACITY ON BEHALF OF
SPC O'NEILL'S ESTATE, ROBERT ANTHONY
O'NEILL, BRIAN KEITH O'NEILL, KAITLYN
MURIEL O'NEILL, MATTHEW ROBERT O'NEILL,
LACEY M. JORDAN, T.J.J., BY AND THROUGH
HIS NEXT FRIEND LACEY JORDAN, PAUL
MICHAEL SCHAUS, KIM SMITH, SARAH
NGIRAIBIOCHEL, BENJIMAN SMITH,
DONNA BLAIR, DALLAS BRYANT, GEORGIA
PRIEST, FREDDA LYNN JONES, J.J., BY AND
THROUGH HIS NEXT FRIEND FREDDA LYNN
JONES, K.J., BY AND THROUGH HIS NEXT
FRIEND FREDDA LYNN JONES, I'KEMEYON
CROW, M.R.W., BY AND THROUGH HIS NEXT
FRIEND CECILIA WASHINGTON, SHEILA
MCCARY, JASMINE JONES, REUBEN ERIC
SHARP, ANGELA DAWN PRESTON, A.P., BY AND
THROUGH HIS NEXT FRIEND ANGELA
PRESTON, GUS PRESTON, TRISTYN ANTHONY
VINSON-HOSFORD, FELICIA WILLIAMS,
DERLYSA JORDAN WILLIAMS, VANECIA
MITCHELL, VICTORIA BOYD, JEFFREY SCOTT
KUYKENDALL, LARRY ANTHONY
KUYKENDALL, MARK ROUGHTON, DONNA
RIMER, JAMES RIMER, SHANNON DANIELLE
FENTON, STEVEN WALLS SR., LISA ROWE
HICKS, MICHAEL JAMES SKOUFALOS, HASSON
GRANADO, LISA LEE FREEMAN, VIRGINIA LEE
WIEDOWER, L.D., BY AND THROUGH HIS NEXT
FRIEND BRITANI LEE, JERRY RANDALL EVANS
SR., MARTHA ANN EVANS, LARISSA ANN
BARNHART, BRITTANY EVANS, CRYSTAL
NICOLE EVANS, JONATHAN DEWAYNE

ROGERS, DONNA MAE ROUSH, ROBERT
GRAHAM ROUSH JR., KYLE ROUSH, ROBERT
GRAHAM ROUSH III, RUSSELL GLENN YANNEY,
CHELSEY PELLERIN, HOLLY AMBER INGRAM,
C.A.I., BY AND THROUGH HER NEXT FRIEND
HOLLY INGRAM, CLINT COLEMAN WILDES,
JAMIE E. SURLES, DAWN VIETTI, DANIEL
VIETTI, PAUL VIETTI, ERIC ALLEN VIETTI,
ROBERT ANDREWS, SONDRA ANDREWS, RANA
GOODRICH ALLEN, AMY LYNETTE ALLEN,
DANIEL BRUCE ALLEN, KIM B. COX, SHARON J.
COX, SHANNON BUTLER, REGINA MICHELE
WRIGHT, JAMIE SMITH, ROBERT EARL SMITH,
THELMA SMITH, ANNETTE PARRISH,
DEANNDREA LUNEY, DEIONTAY WELCH,
STEVEN FLOWERS JR., CRAIG ANTHONY SMITH,
GWENDOLYN FRENCH, LAQUITTA FRENCH,
LATOYA FRENCH, JALANE ARDITH ADAMS,
PETER ADAMS, AMANDA BOONE, GLORIA JEAN
CAULEY, RICHARD ALLEN CAULEY, CLIFFORD
TAYLOR, KYLE TAYLOR, JILL MYERS, ALYSSA
MARIE STYER, JOHN ANDERSON HALL,
ALMUTH CORNELIUS GREEN JR., PATRICIA C.
GREEN, JESSE JAMES GREEN, CAROLINE
RUDZINSKI R.A.R., BY AND THROUGH HIS NEXT
FRIEND CAROLINE RUDZINSKI, PATRICIA
DAHL, ANGEL DAHL, MARK BAKER, MARK
DAVID BAKER, TAYLOR GENOVESE, REBECCA
E. BAKER, MASHELLE LYNN LEMBKE, ROBERT
ROLAND LEMBKE, ALEXIS MARIE LEMBKE,
T.N.L., BY AND THROUGH HIS NEXT FRIEND
MASHELLE LEMBKE, RACHEL HUMPF, DENNIS
STEFFEY, ANDREA E. STEFFEY, HEATHER
JACKSON, DAVID HUMPF, A.G.S., BY AND
THROUGH HER NEXT FRIEND ANDREA
STEFFEY, ENJOLIE BATES, B.B., BY AND
THROUGH HIS NEXT FRIEND ENJOLIE BATES,
R.B., BY AND THROUGH HER NEXT FRIEND
ENJOLIE BATES, MARLINE TULLY, ROLANDO
DE LA ROSA, CHRISTAL A. THOMAS-KARIKER,
JEREMY JACKSON, LARRY JACKSON, EDWARD
KARIKER, LEON WILLIAMSON III, SYBIL B.
WILLIAMSON, GINA BERISFORD, M.B., BY AND
THROUGH HER NEXT FRIEND GINA BERISFORD,
SHELLEY GUTHRIE, ROBIN HEFNER, BRANDON
DALE HEFNER, JESSICA MEAGAN HEFNER,

ANTOINETTE MARY COFFLAND, DAVID LEE
COFFLAND JR., LAURIE ANN BARTLETT, KAREN
ANN BRESNAHAN, DAVID LEE COFFLAND JR.,
LYNN MARIE COFFLAND, KIM SOLA, AIDAN
CLEAVER, COLLIN CLEAVER, DANA ATLAS,
S.A.A., BY AND THROUGH HER NEXT FRIEND
DANA ATLAS, S.R.A., BY AND THROUGH HER
NEXT FRIEND DANA ATLAS, JOHANNES ATLAS,
AIMEE WOOD,  J.M., BY AND THROUGH HER
NEXT FRIEND AIMEE WOOD, BARBARA HANKE,
GREGORY MCLEOD, JACQUELINE MCLEOD,
JUSTIN MCLEOD, ALBERT W. PUCINO JR.,
KATHRYN M. PUCINO, LISA M. HAGLOF,
MELISSA A. PUCINO,

                Plaintiffs,

       v.

MTN IRANCELL TELECOMMUNICATIONS
SERVICES COMPANY, MTN GROUP LIMITED,
PHUTHUMA NHLEKO, and IRENE CHARNLEY,

                Defendants.

## COMPLAINT FOR VIOLATION
## <u>OF THE ANTI-TERRORISM ACT</u>

Ryan R. Sparacino (D.C. Bar No. 493700)
Eli J. Kay-Oliphant (D.C. Bar No. 503235)
Shuman Sohrn (*pro hac vice* pending)
SPARACINO PLLC
1920 L Street, NW, Suite 835
Washington, DC 20036
Tel: 202.629.3530
ryan.sparacino@sparacinopllc.com
eli.kay-oliphant@sparacinopllc.com
shuman.sohrn@sparacinopllc.com

# TABLE OF CONTENTS

Page

A.     THE MTN DEFENDANTS ................................................................ 17

B.     THE INDIVIDUAL DEFENDANTS .................................................. 18

I.     SINCE THE ISLAMIC REVOLUTION IN 1979, THE ISLAMIC
       REVOLUTIONARY GUARD CORPS, INCLUDING THE QODS FORCE, HAS
       FOMENTED AND SUSTAINED ANTI-AMERICAN TERRORISM ........................... 20

A.     THE ISLAMIC REVOLUTIONARY GUARD CORPS HAS LONG
       SUPPORTED ANTI-AMERICAN TERRORISM AS PART OF IRAN'S
       FOREIGN POLICY ............................................................................ 20

       1.     Islamic Revolutionary Guard Corps ...................................... 22

       2.     Hezbollah ................................................................................ 32

       3.     Qods Force .............................................................................. 39

II.    AFTER 9/11, THE ISLAMIC REVOLUTIONARY GUARD CORPS,
       INCLUDING HEZBOLLAH AND THE QODS FORCE, ALLIED WITH AL-
       QAEDA, AL-QAEDA-IN-IRAQ, ANSAR-AL-ISLAM, AND THE TALIBAN,
       INCLUDING ITS HAQQANI NETWORK, TO WAGE A DEADLY
       TERRORIST CAMPAIGN AGAINST AMERICANS IN IRAQ AND
       AFGHANISTAN IN ORDER TO DRIVE THE UNITED STATES OUT OF
       THE MIDDLE EAST ........................................................................... 43

A.     THE AL-QAEDA-TALIBAN SYNDICATE ......................................... 53

B.     AL-QAEDA-IN-IRAQ ...................................................................... 61

C.     ANSAR AL-ISLAM .......................................................................... 69

III.   THE ISLAMIC REVOLUTIONARY GUARD CORPS AND ITS TERRORIST
       PROXIES DEPENDED UPON ROBUST ACCESS TO UNITED STATES
       TECHNOLOGY, FINANCIAL MARKETS, AND PERSONS TO CARRY OUT
       ATTACKS AGAINST AMERICANS IN THE MIDDLE EAST ................................. 72

A.     AFTER THE U.S. INVASIONS OF AFGHANISTAN AND IRAQ, THE
       IRGC CONCLUDED THAT IT NEEDED TO REVOLUTIONIZE ITS
       ACCESS TO SENSITIVE AMERICAN TECHNOLOGIES THROUGH
       CORRUPT CORPORATE ALLIES ...................................................... 72

B.     THE ISLAMIC REVOLUTIONARY GUARD CORPS SECURED
       TERRORIST FUNDS, LOGISTICS, AND OPERATIONAL SUPPORT BY
       MILITARIZING THE IRANIAN TELECOMMUNICATIONS INDUSTRY

        AND SEIZING CONTROL OF IRAN'S LARGEST
TELECOMMUNICATIONS COMPANIES....................................................... 81

    1.     MTN Irancell ......................................................................................... 82

    2.     Telecommunications Company Of Iran (TCI).................................... 85

  C.    THE ISLAMIC REVOLUTIONARY GUARD CORPS RELIED UPON A
TRANSNATIONAL NETWORK OF TERRORIST FINANCE, LOGISTICS,
OPERATIONS, AND COMMUNICATIONS CELLS TO FUND, ARM,
LOGISTICALLY SUSTAIN, AND FACILITATE ATTACKS AGAINST
AMERICANS IN IRAQ ........................................................................................ 86

    1.     United States ........................................................................................ 86

    2.     U.A.E.; Iraq; Iran; Lebanon; Yemen; Syria; Afghanistan; Pakistan..................... 88

    3.     South Africa ........................................................................................ 89

    4.     Europe ................................................................................................. 91

    5.     The Americas ...................................................................................... 92

    6.     Southeast Asia .................................................................................... 92

IV.    DEFENDANTS TRANSACTED BUSINESS WITH FRONTS, OPERATIVES,
AND AGENTS CONTROLLED BY THE ISLAMIC REVOLUTIONARY
GUARD CORPS, INCLUDING HEZBOLLAH AND THE QODS FORCE ................ 93

  A.    THE ISLAMIC REVOLUTIONARY GUARD CORPS, HEZBOLLAH, AND
THE QODS FORCE OPERATE AS AN INTEGRATED
TRANSNATIONAL TERRORIST ORGANIZATION WITH A COMMON
DOCTRINE, STRATEGY, FINANCIAL STRUCTURE, LOGISTICS
STRUCTURE, AND COMMAND-AND-CONTROL ............................................. 93

    1.     The Islamic Revolutionary Guard Corps' Transnational Terrorist Strategy,
Doctrine, And Tactics Emphasizes The Deployment Of Joint Cells Of
Terrorists Led By Hezbollah, Funded And Resourced By The Qods Force,
And Supported By Local Iranian Terrorist Proxies .............................................. 93

    2.     The Islamic Revolutionary Guard Corps, Including Its Hezbollah Division
And Qods Force, Follow Common Terrorist Techniques, Tactics, And
Procedures And Use The Same Terrorist Tradecraft To Ensure
Concealment And Cover Around The World ........................................................ 94

        i.   Concealment........................................................................................ 96

        ii.  Cover................................................................................................... 98

   iii. Slush Funds For "Off-Books" Terrorist Finance ........................................... 99

   iv. Corruption As Terrorist Tactic And Tool ................................................... 100

   v. Required Donations (*Khums*) From All IRGC Members............................. 101

 B. THE TERRORIST TRADECRAFT AND DOCTRINE OF THE ISLAMIC REVOLUTIONARY GUARD CORPS, INCLUDING ITS HEZBOLLAH DIVISION AND QODS FORCE, HAS HISTORICALLY RELIED ON FRONTS, OPERATIVES, AGENTS, CUT-OUTS, AND ORBITS TO FUND, ARM, AND OPERATIONALLY SUPPORT IRAN'S ANTI-AMERICAN TERRORIST PROXY ATTACKS AGAINST AMERICANS ......... 102

 C. THE ISLAMIC REVOLUTIONARY GUARD CORPS', INCLUDING HEZBOLLAH'S AND THE QODS FORCE'S, TRANSNATIONAL TERRORIST ENTERPRISE DEPENDED UPON COMPLICIT MULTINATIONAL CORPORATIONS' WILLINGNESS TO TRANSACT WITH KNOWN ISLAMIC REVOLUTIONARY GUARD CORPS FRONT COMPANIES OPERATING IN IRAN'S MOBILE PHONE, LANDLINE, INTERNET, AND NETWORK COMPUTING SECTORS .................................... 105

  1. The Bonyad Mostazafan Was, And Remains, A Front For The Islamic Revolutionary Guard Corps, Including Hezbollah And The Qods Force........... 106

  2. Iran Electronics Industries Was, And Remains, A Front For The Islamic Revolutionary Guard Corps, Including Hezbollah And The Qods Force........... 109

  3. MTN Irancell Was, And Remains, A Front For The Islamic Revolutionary Guard Corps, Including Hezbollah And The Qods Force.................................... 110

  4. The Telecommunications Company Of Iran Was, And Remains, A Front For The Islamic Revolutionary Guard Corps, Including Hezbollah And The Qods Force ................................................................................................... 111

  5. Exit40 Was A Front For Hezbollah .................................................................. 113

V. DEFENDANTS' TRANSACTIONS WITH FRONTS, OPERATIVES, AND AGENTS OF THE ISLAMIC REVOLUTIONARY GUARD CORPS, INCLUDING ITS HEZBOLLAH DIVISION AND QODS FORCE, PROVIDED WEAPONS, FINANCING, LOGISTICAL, AND OPERATIONAL SUPPORT TO THE IRGC'S SUNNI TERRORIST PROXIES IN IRAQ AND AFGHANISTAN ........................................................................................... 114

 A. THE ISLAMIC REVOLUTIONARY GUARD CORPS, INCLUDING HEZBOLLAH AND THE QODS FORCE, SOURCED ARMS, RAISED FUNDS, AND OBTAINED LOGISTICAL AND OPERATIONAL SUPPORT THROUGH ILLICIT CORPORATE TRANSACTIONS IN THE

TELECOM, COMMUNICATIONS, AND INFORMATION TECHNOLOGY SECTORS ................................................................................ 114

B.   DEFENDANTS MADE ILLICIT DEALS WITH FRONTS, OPERATIVES, AGENTS, AND CUT-OUTS OF THE ISLAMIC REVOLUTIONARY GUARD CORPS, INCLUDING ITS HEZBOLLAH DIVISION AND QODS FORCE, THAT CAUSED SECURE AMERICAN SMARTPHONES, ENTERPRISE LEVEL SERVERS, NETWORK COMPUTING TECHNOLOGIES, AND WEAPONS TO FLOW THROUGH THE IRGC FRONTS TO REACH HEZBOLLAH, THE QODS FORCE, REGULAR IRGC, AND THEIR SUNNI TERRORIST PROXIES IN IRAQ AND AFGHANISTAN ................................................................................ 117

C.   DEFENDANTS MADE ILLICIT DEALS WITH FRONTS, OPERATIVES, AGENTS, AND CUT-OUTS OF THE ISLAMIC REVOLUTIONARY GUARD CORPS, INCLUDING ITS HEZBOLLAH DIVISION AND QODS FORCE, THAT CAUSED FUNDS TO FLOW THROUGH THE IRGC FRONTS TO HEZBOLLAH, THE QODS FORCE, AND THEIR SUNNI TERRORIST PROXIES IN IRAQ AND AFGHANISTAN ................................... 120

1.   Procurement Bribery ...................................................... 120

2.   "Free Goods" ................................................................ 122

3.   Exit40 ........................................................................... 124

i.   Exit40 Was An Islamic Revolutionary Guard Corps Finance And Logistics Front For Hezbollah And The Qods Force......................................... 124

ii.   Defendants Knowingly Used, Or Concealed The Use Of, Exit40 To Finance Hezbollah And The Qods Force ........................................... 125

VI.   DEFENDANTS PROVIDED DIRECT AID TO COUNTERPARTIES WHOM DEFENDANTS KNEW WERE STRUCTURED TO FINANCE, ARM, AND/OR OPERATIONALLY SUPPORT HEZBOLLAH, THE QODS FORCE, AND THE ISLAMIC REVOLUTIONARY GUARD CORPS'S TERRORIST PROXIES IN IRAQ AND AFGHANISTAN ..................................................................... 127

A.   MTN GROUP KNOWINGLY SERVED, AND STILL SERVE, AS A JOINT VENTURE PARTNER WITH MTN IRANCELL AND ITS IRANIAN SHAREHOLDERS, THE ISLAMIC REVOLUTIONARY GUARD CORPS, INCLUDING HEZBOLLAH AND THE QODS FORCE, THROUGH MTN GROUP'S PARTICIPATION IN MTN IRANCELL ............................. 128

1.   In 2005, MTN Group, Through Phuthuma Nhleko, Promised To Provide "Security" "Cooperation" To Hezbollah, The Qods Force, And Regular IRGC On Behalf Of MTN Group, Himself, And Every MTN Entity

iv

Worldwide When He Executed The IRGC's Security Cooperation
Agreement On Behalf Of MTN Group and its affiliates .................................... 131

2.    After Executing The Islamic Revolutionary Guard Corps' Security
Cooperation Agreement In 2005, MTN Group, Phuthuma Nhleko, and
Irene Charnley Routinely Acted On Behalf Of, Or For The Benefit Of,
Hezbollah, The Qods Force, And Regular IRGC ................................................ 139

B.    DEFENDANTS KNOWINGLY ASSUMED A FINANCIAL, LOGISTICAL,
AND OPERATIONAL ROLE IN THE ISLAMIC REVOLUTIONARY
GUARD CORPS', INCLUDING HEZBOLLAH'S AND THE QODS
FORCE'S, TERRORIST ENTERPRISE AGAINST AMERICANS
WORLDWIDE THAT FUNDED, ARMED, AND LOGISTICALLY
SUSTAINED IRGC SUNNI TERRORIST PROXY ATTACKS IN IRAQ
AND AFGHANISTAN ........................................................................................... 150

1.    Defendants Assumed A Financial Role In The Terrorist Enterprise ................. 155

i.    Defendants Used "Orbits" To Transmit Bribes to Hezbollah, The
Qods Force, And The Regular IRGC Through Payoffs To Purportedly
Unrelated Third Parties ........................................................................................ 155

ii.    Defendants Caused a $300 Million "License Fee" Payment To The
Islamic Revolutionary Guard Corps Fronts That Controlled MTN
Irancell, Flowing Tens Of Millions Of U.S. Dollars Through Such IRGC
Fronts To Hezbollah, The Qods Force, And Their Sunni Terrorist
Proxies In Iraq And Afghanistan ........................................................................ 156

iii.    Defendants Caused Regular Large Cash Transfers To Flow
Through MTN Irancell And Benefit Hezbollah And The Qods Force's
Sponsorship Of Sunni Terrorist Proxies In Iraq And Afghanistan .................... 156

2.    Defendants Assumed An Operational Role In The Terrorist Enterprise ............ 158

C.    DEFENDANTS KNOWINGLY ASSUMED A FINANCIAL, LOGISTICAL,
AND OPERATIONAL ROLE IN THE TALIBAN'S, INCLUDING THE
HAQQANI NETWORK'S, TERRORIST ENTERPRISE IN
AFGHANISTAN THAT FUNDED, ARMED, AND LOGISTICALLY
SUSTAINED IRGC SUNNI TERRORIST PROXY ATTACKS IN IRAQ
AND AFGHANISTAN ........................................................................................... 173

1.    Defendants Facilitated Protection Payments To The Taliban............................. 174

2.    Defendants Supported The Taliban, Including Its Haqqani Network, By
Deactivating MTN's Cellular Towers At Night ................................................. 181

3.    Defendants' Assistance To The Taliban, Including Its Haqqani Network, Substantially Assisted Islamic Revolutionary Guard Corps' Sunni Terrorist Proxy Attacks Against Americans In Iraq ........................................... 188

D.    DEFENDANTS' ASSISTANCE TO THE ISLAMIC REVOLUTIONARY GUARD CORPS INCLUDING HEZBOLLAH AND THE QODS FORCE, AND THEIR SUNNI TERRORIST PROXIES AL-QAEDA, AL-QAEDA-IN-IRAQ, ANSAR AL-ISLAM, AND THE TALIBAN, INCLUDING ITS HAQQANI NETWORK, COMPORTS WITH MTN'S HISTORICAL BUSINESS PRACTICES IN INTERNATIONAL MARKETS ............................. 191

1.    MTN Aided the Regular Islamic Revolutionary Guard Corps's Terroristic Violence Against Peaceful Iranian Pro-Democracy Demonstrators................... 191

2.    MTN Aided Terrorists in Nigeria ...................................................... 192

E.    DEFENDANTS' ASSISTANCE TO THE ISLAMIC REVOLUTIONARY GUARD CORPS, INCLUDING ITS HEZBOLLAH DIVISION AND QODS FORCE, HAD A SUBSTANTIAL NEXUS TO THE UNITED STATES............. 193

1.    Defendants' Conduct Targeted The United States............................................... 193

2.    Defendants' Conduct Relied On American Contacts ......................................... 197

i.    From 2012 Through 2019, Defendants Regularly Reached Into America To Unlock The U.S. Financial System So That Defendants Could Aid MTN Group's Attempts To Repatriate Hundreds Of Millions Of Dollars Out Of MTN Irancell ......................................................................... 198

ii.    Defendants Facilitated A $400,000 Bribe That Flowed Through The New York Financial System To A Cut-Out For The Islamic Revolutionary Guard Corps And Into The Budget Of The IRGC ................................................ 201

iii.    Defendants Conspired To Provide, And Did Provide, A Stable, Robust, And Devastating Pipeline Of Illicitly Acquired State-of-the-Art American Technologies To The Islamic Revolutionary Guard Corps, Including Hezbollah And The Qods Force, Including Untraceable American Smartphones.................................................................................... 202

iv.    Defendants Worked Directly With Hezbollah And Qods Force Operatives To Facilitate Hezbollah's And the Qods Force's Illicit Acquisition Of U.S. Technology To Benefit Their Terrorist Enterprise ............................................. 204

v.    Defendants Facilitated Illicit Efforts By Hezbollah And Qods Force Fronts To Obtain Essential U.S. Services That Was Vital To Hezbollah's, The Qods Forces, And Their Proxies' Terrorist Campaign. ...................................... 204

VII.    DEFENDANTS KNEW THAT THEIR SECRET SECURITY COOPERATION AGREEMENT WITH THE IRGC, INCLUDING ITS HEZBOLLAH DIVISION AND QODS FORCE, WAS AN ACT OF INTERNATIONAL TERRORISM THAT SUBSTANTIALLY ASSISTED TERRORIST ATTACKS AGAINST AMERICANS BY HEZBOLLAH, THE QODS FORCE, AND TERRORIST PROXIES ................................................................................................................ 206

    A.    DEFENDANTS KNEW THAT THEIR SECRET SECURITY COOPERATION AGREEMENT WITH THE IRGC WAS AN ACT OF INTERNATIONAL TERRORISM BECAUSE DEFENDANTS KNEW THAT IRAN'S "SECURITY" MISSION COMPRISED INTERNAL AND EXTERNAL ATTACK OPERATIONS AGAINST AMERICANS BY HEZBOLLAH, THE QODS FORCE, AND THEIR PROXIES ............................. 206

    B.    DEFENDANTS KNEW THAT THEIR SECRET SECURITY COOPERATION AGREEMENT WITH THE IRGC WAS AN ACT OF INTERNATIONAL TERRORISM BECAUSE DEFENDANTS KNEW THAT THE AMERICAN SMARTPHONES AND OTHER U.S.-ORIGIN COMMUNICATIONS TECHNOLOGIES THAT DEFENDANTS ILLICITLY ACQUIRED FOR, AND TRANSFERRED TO, THE IRGC SUBSTANTIALLY ASSISTED TERRORIST ATTACKS AGAINST AMERICANS ........................................................................................................ 220

    C.    DEFENDANTS KNEW THAT THEIR SECRET SECURITY COOPERATION AGREEMENT WITH THE IRGC WAS AN ACT OF INTERNATIONAL TERRORISM BECAUSE DEFENDANTS KNEW THAT THE ILLICIT COMMERCIAL TRANSACTIONS THAT DEFENDANTS FACILITATED WITH, ON BEHALF OF, OR FOR THE BENEFIT OF, IRGC FRONTS, OPERATIVES, AGENTS, AND CUT-OUTS SUBSTANTIALLY ASSISTED TERRORIST ATTACKS AGAINST AMERICANS ........................................................................................................ 223

    D.    DEFENDANTS KNEW THAT THEIR SECRET SECURITY COOPERATION AGREEMENT WITH THE IRGC WAS AN ACT OF INTERNATIONAL TERRORISM BECAUSE DEFENDANTS KNEW THAT THEIR SERVICE AS A KEY GLOBAL FACILITATOR, MANAGEMENT CONSULTANT, FINANCIAL PLANNER, WEAPONS PROCURER, LOGISTICIAN, CELL PHONE AND COMPUTING TECHNOLOGY PROVIDER, RECRUITER, FUNDRAISER, STRATEGIC COMMUNICATIONS PROVIDER, AND DISINFORMATION AGENT FOR THE IRGC, INCLUDING ITS HEZBOLLAH DIVISION AND QODS FORCE, WHICH DEFENDANTS KNEW SUBSTANTIALLY ASSISTED ATTACKS AGAINST AMERICANS ................................................................... 228

        1.    Defendants Knew That Their Secret Security Cooperation Agreement Revolutionized The IRGC's Command, Control, Communications, And Intelligence Capabilities ...................................................................... 234

2.      Defendants Knew That Their Secret Security Cooperation Agreement Helped The IRGC Finance Terrorist Attacks Against Americans...................... 237

      i.   Defendants Knew That Their Secret Security Cooperation Agreement Helped The IRGC Finance Terrorist Attacks Against Americans Through The Illicit Cash Flow That Defendants Caused To Course Through MTN Irancell To The IRGC For Its Terrorist Operations Budgets........................................................................................... 237

      ii.   Defendants Knew That Their Secret Security Cooperation Agreement Helped The IRGC Finance Terrorist Attacks Against Americans Through Illicit Off-Books Cash Flow From Fundraising Campaigns, Procurement Bribes, Khums, Financial Management, And Fronts Like Exit40 .............................................................................. 242

3.      Defendants Knew That Their Secret Security Cooperation Agreement Helped The IRGC Source Weapons To Commit Terrorist Attacks Against Americans ........................................................................................... 243

      i.   Defendants Knew That Their Secret Security Cooperation Agreement Helped The IRGC Source Improvised Explosive Devises (IEDs)...................................................................................................... 243

      i.   Defendants Knew That Their Secret Security Cooperation Agreement Helped The IRGC Source Rockets .................................................. 244

4.      Defendants Knew That Their Secret Security Cooperation Agreement Amplified The IRGC's Recruiting, Fundraising, Strategic Communications, And Disinformation Campaigns, Which Defendants Knew Facilitated IRGC Terrorist Operations Against Americans ..................... 244

      i.   Defendants Knew That Their Secret Security Cooperation Agreement Aided The IRGC's Recruiting and Fundraising Campaigns............ 245

      ii.   Defendants Knew That Their Secret Security Cooperation Agreement Aided The IRGC's Strategic Communications and Disinformation .................................................................................. 248

VIII.   THE FUNDS, ARMS, TECHNOLOGIES, AND SERVICES THAT DEFENDANTS ILLICITLY TRANSFERRED TO HEZBOLLAH AND THE QODS FORCE THROUGH MTN IRANCELL FLOWED ON, THROUGH HEZBOLLAH AND THE QODS FORCE, TO AL-QAEDA, AL-QAEDA-IN-IRAQ, AND ANSAR-AL-ISLAM, AND CAUSED THE ATTACKS IN IRAQ THAT KILLED AND INJURED PLAINTIFFS........................................................ 254

A.     THE IRGC PROVIDED MATERIAL SUPPORT AND RESOURCES TO AL-QAEDA-AFFILIATED SUNNI TERRORISTS TARGETING AMERICANS IN IRAQ TO UNDERMINE THE U.S. MISSION THERE .......... 257

B.     THE IRGC PROVIDED MATERIAL SUPPORT AND RESOURCES TO AL-QAEDA TO FACILITATE AL-QAEDA-RELATED TERRORIST ATTACKS AGAINST AMERICANS IN IRAQ AND AFGHANISTAN ............. 259

    1.    The IRGC Established Al-Qaeda's Capabilities Before 9/11, Prevented Its Collapse After 9/11, And Ensured Its Status As An IRGC Sunni Terrorist Proxy In Iraq From 2001 Through Today ........................................... 259

    2.    The IRGC Established Al-Qaeda-In-Iraq As An Iranian Sunni Terrorist Proxy In Iraq ....................................................................................... 268

    3.    The IRGC Established Ansar Al-Islam As An Iranian Sunni Terrorist Proxy In Iraq ....................................................................................... 273

C.     THE IRGC, INCLUDING ITS HEZBOLLAH DIVISION AND QODS FORCE, PROVIDED IRGC SUNNI TERRORIST PROXIES WITH WEAPONS, EXPLOSIVES, AND LETHAL SUBSTANCES .............................. 275

D.     THE IRGC, INCLUDING ITS HEZBOLLAH DIVISION AND QODS FORCE, PROVIDED IRGC IRAQI SUNNI TERRORIST PROXIES WITH LODGING, TRAINING, EXPERT ADVICE OR ASSISTANCE, SAFEHOUSES, PERSONNEL, AND TRANSPORTATION ................................. 280

E.     THE IRGC, INCLUDING ITS HEZBOLLAH DIVISION AND QODS FORCE, PROVIDED IRGC IRAQI SUNNI TERRORIST PROXIES WITH FINANCIAL SUPPORT ........................................................................ 291

IX.    THE FUNDS, ARMS, TECHNOLOGIES, AND SERVICES THAT DEFENDANTS ILLICITLY TRANSFERRED TO HEZBOLLAH AND THE QODS FORCE THROUGH MTN IRANCELL FLOWED ON, THROUGH HEZBOLLAH AND THE QODS FORCE, TO AL-QAEDA, AND THE TALIBAN, AS DID DEFENDANTS' PROTECTION PAYMENTS TO SIRAJUDDIN HAQQANI, AND CAUSED THE ATTACKS IN AFGHANISTAN THAT KILLED AND INJURED PLAINTIFFS ............................ 293

A.     THE IRGC PROVIDED MATERIAL SUPPORT AND RESOURCES TO SUNNI TERRORISTS TARGETING AMERICANS IN AFGHANISTAN TO UNDERMINE THE U.S. MISSION THERE ................................................... 293

B.     THE IRGC PROVIDED THE TALIBAN WITH WEAPONS, EXPLOSIVES, AND LETHAL SUBSTANCES ................................................................ 301

C.     THE IRGC PROVIDED THE TALIBAN WITH LODGING, TRAINING, EXPERT ADVICE OR ASSISTANCE, SAFEHOUSES, PERSONNEL, AND TRANSPORTATION ...................................................................... 305

D.     THE IRGC, INCLUDING ITS HEZBOLLAH DIVISION AND QODS FORCE, PROVIDED THE TALIBAN WITH FINANCIAL SUPPORT ............... 309

E.     THE IRGC PROVIDED MATERIAL SUPPORT TO AL-QAEDA TO ENCOURAGE THE GROWTH OF ITS SYNDICATE AND FACILITATE TERRORIST ATTACKS BY THE AL-QAEDA-TALIBAN SYNDICATE IN AFGHANISTAN ................................................................. 312

X.     THE ISLAMIC REVOLUTIONARY GUARD CORPS, AL-QAEDA, AND THEIR AFFILIATES KILLED AND INJURED PLAINTIFFS AND THEIR FAMILY MEMBERS THROUGH ACTS OF INTERNATIONAL TERRORISM IN IRAQ THAT RELIED UPON THE MATERIAL SUPPORT OF THE ISLAMIC REVOLUTIONARY GUARD CORPS, AL-QAEDA, AL-QAEDA-IN-IRAQ, AND THE TALIBAN ............................................................. 314

A.     THE JULY 4, 2007 GRENADE ATTACK IN BAGHDAD (THE STEVEN A. DAVIS FAMILY) ................................................................. 316

B.     THE MARCH 1, 2006 RPG ATTACK IN AL ANBAR (THE CHRISTOPHER S. MERCHANT FAMILY) ......................................... 317

C.     THE MARCH 7, 2006 IED ATTACK IN AL ANBAR (THE JUSTIN R. MARTONE FAMILY) ................................................................. 318

D.     THE MARCH 23, 2006 IED ATTACK IN AL ANBAR (THE BROCK A. BEERY FAMILY) ................................................................. 319

E.     THE APRIL 11, 2006 SUICIDE ATTACK IN AL ANBAR (THE KENNETH D. HESS FAMILY) ................................................................. 320

F.     THE APRIL 28, 2006 IED ATTACK IN AL ANBAR (THE EDWARD G. DAVIS, III FAMILY) ................................................................. 320

G.     THE MAY 1, 2006 EXPLOSION ATTACK IN AL ANBAR (THE CORY L. PALMER FAMILY) ................................................................. 322

H.     THE MAY 6, 2006 IED ATTACK IN AL ANBAR (THE LEON B. DERAPS FAMILY) ................................................................. 322

I.     THE JUNE 5, 2006 IED ATTACK IN AL ANBAR (THE JAIME S. JAENKE FAMILY) ................................................................. 323

J.     THE JUNE 9, 2006 IED ATTACK IN AL ANBAR (BRENT B. ZOUCHA FAMILY) ................................................................. 324

K.     THE JUNE 17, 2006 IED ATTACK IN AL ANBAR (JOHNATHAN L. BENSON FAMILY) ................................................................. 325

L.     THE JUNE 27, 2006 IED ATTACK IN AL ANBAR (JACQUE J. KEESLAR FAMILY) ................................................................. 326

M.  THE JULY 2, 2006 IED ATTACK IN AL ANBAR (JUSTIN L. NOYES FAMILY) ........................................................................................ 327

N.  THE JULY 12, 2006 IED ATTACK IN AL ANBAR (JERRY A. THARP FAMILY) ........................................................................................ 327

O.  THE AUGUST 22, 2006 IED ATTACK IN AL ANBAR (JOHN J. DARGA FAMILY) ........................................................................................ 328

P.  THE AUGUST 30, 2006 IED ATTACK IN AL ANBAR (JOSHUA R. HANSON FAMILY) ............................................................................... 329

Q.  THE SEPTEMBER 2, 2006 MORTAR ATTACK IN BABYLON (JUSTIN W. DREESE FAMILY) .................................................................... 330

R.  THE SEPTEMBER 3, 2006 IED ATTACK IN NINEVEH (RICHARD J. HENKES, II FAMILY) ....................................................................... 331

S.  THE SEPTEMBER 4, 2006 IED ATTACK IN AL ANBAR (CHRISTOPHER WALSH FAMILY) ..................................................................... 331

T.  THE SEPTEMBER 13, 2006 IED ATTACK IN AL ANBAR (JEFFREY P. SHAFFER FAMILY) ...................................................................... 332

U.  THE SEPTEMBER 13, 2006 SUICIDE ATTACK IN BAGHDAD (THE MARCUS A. CAIN FAMILY) ........................................................... 333

V.  THE SEPTEMBER 16, 2006 IED ATTACK IN AL ANBAR (DAVID S. RODDY FAMILY) ........................................................................... 334

W.  THE OCTOBER 6, 2006 IED ATTACK IN AL ANBAR (THE FAMILIES OF JOHN E. HALE AND STEPHEN F. JOHNSON) ........................... 335

    1.  The John E. Hale Family ................................................................. 335

    2.  The Stephen F. Johnson Family ....................................................... 336

X.  THE OCTOBER 9, 2006 IED ATTACK IN AL ANBAR (THE FAMILIES OF JON E. BOWMAN AND SHELBY J. FENIELLO) ......................... 337

    1.  The Jon E. Bowman Family ............................................................. 337

    2.  The Shelby J. Feniello Family ......................................................... 338

Y.  THE OCTOBER 17, 2006 SNIPER ATTACK IN AL ANBAR (JOSHUA L. BOOTH FAMILY) ....................................................................... 338

Z.  THE OCTOBER 18, 2006 IED ATTACK IN DIYALA (DANIEL A. BROZOVICH FAMILY) ........................................................................ 339

xi

AA.	THE OCTOBER 21, 2006 IED ATTACK IN AL ANBAR (NATHAN R. ELROD FAMILY) ................................................................................ 340

BB.	THE NOVEMBER 2, 2006 IED ATTACK IN AL ANBAR (LUKE B. HOLLER FAMILY) ................................................................................ 341

CC.	THE NOVEMBER 5, 2006 IED ATTACK IN AL ANBAR (JOSE A. GALVAN FAMILY) ................................................................................ 342

DD.	THE NOVEMBER 22, 2006 IED ATTACK IN AL ANBAR (HEATH D. WARNER FAMILY) .............................................................................. 343

EE.	THE NOVEMBER 28, 2006 IED ATTACK IN AL ANBAR (JON-ERIK LONEY FAMILY) ................................................................................. 344

FF.	THE NOVEMBER 29, 2006 IED ATTACK IN AL ANBAR (CHAD WATSON FAMILY) .................................................................................. 345

GG.	THE DECEMBER 1, 2006 IED ATTACK IN AL ANBAR (ROBERT L. LOVE, JR. FAMILY) ............................................................................... 345

HH.	THE DECEMBER 11, 2006 IED ATTACK IN AL ANBAR (CLINTON J. MILLER FAMILY) ............................................................................... 346

II.	THE DECEMBER 16, 2006 SNIPER ATTACK IN AL ANBAR (NICKLAS J. PALMER FAMILY) ........................................................................... 347

JJ.	THE DECEMBER 18, 2006 MORTAR ATTACK IN AL ANBAR (KEVIN M. KRYST FAMILY) .............................................................................. 348

KK.	THE DECEMBER 24, 2006 IED ATTACK IN AL ANBAR (STEPHEN L. MORRIS FAMILY) ............................................................................... 349

LL.	THE JANUARY 15, 2007 IED ATTACK IN NINEVEH (THE FAMILIES OF IAN C. ANDERSON AND JOHN E. COOPER) ............................................ 349

	1.	The Ian C. Anderson Family ............................................................ 350

	2.	The John E. Cooper Family .............................................................. 351

MM.	THE JANUARY 19, 2007 IED ATTACK IN NINEVEH (RUSSELL P. BOREA FAMILY) ................................................................................. 351

NN.	THE JANUARY 20, 2007 IED ATTACK IN AL ANBAR (JEFFREY D. BISSON FAMILY) ................................................................................. 352

OO.	THE JANUARY 20, 2007 HELICOPTER ATTACK IN DIYALA (MARILYN L. GABBARD FAMILY) ................................................................. 353

PP.   THE JANUARY 23, 2007 HELICOPTER ATTACK IN BAGHDAD (THE
      FAMILIES OF CASEY CASAVANT, STEVEN A. GERNET, RONALD
      JOHNSON, AND ARTHUR LAGUNA) ............................................................ 354

   1.   The Casey Casavant Family ................................................................. 354

   2.   The Steven A. Gernet Family ............................................................... 355

   3.   The Ronald Johnson Family ................................................................. 355

   4.   The Arthur Laguna Family ................................................................... 356

QQ.   THE JANUARY 26, 2007 IED ATTACK IN DIYALA (ALAN R.
      JOHNSON FAMILY) ................................................................................ 357

RR.   THE JANUARY 31, 2007 ROCKET ATTACK IN AL ANBAR (STEPHEN
      D. SHANNON FAMILY) ........................................................................... 358

SS.   THE FEBRUARY 7, 2007 HELICOPTER ATTACK IN AL ANBAR (THE
      FAMILIES OF TRAVIS D. PFISTER, THOMAS E. SABA, AND JAMES R.
      TIJERINA) .............................................................................................. 359

   1.   The Travis D. Pfister Family ................................................................ 359

   2.   The Thomas E. Saba Family ................................................................ 360

   3.   The James R. Tijerina Family .............................................................. 360

TT.   THE FEBRUARY 8, 2007 IED ATTACK IN AL ANBAR (ROSS A.
      CLEVENGER FAMILY) ........................................................................... 361

UU.   THE FEBRUARY 11, 2007 IED ATTACK IN AL ANBAR (RUSSELL A.
      KURTZ FAMILY) .................................................................................... 362

VV.   THE FEBRUARY 14, 2007 IED ATTACK IN DIYALA (THE FAMILIES
      OF RONNIE G. MADORE, JR. AND CARL L. SEIGART) ............................... 363

   1.   The Ronnie G. Madore, Jr. Family ...................................................... 363

   2.   The Carl L. Seigart Family .................................................................. 364

WW.  THE FEBRUARY 18, 2007 IED ATTACK IN AL ANBAR (BRETT A.
      WITTEVEEN FAMILY) AND KELLY D. YOUNGBLOOD) ............................ 364

XX.   THE FEBRUARY 18, 2007 SNIPER ATTACK IN AL ANBAR (KELLY D.
      YOUNGBLOOD FAMILY) ......................................................................... 365

YY.   THE MARCH 5, 2007 IED ATTACK IN SALADIN (JUSTIN M. ESTES
      FAMILY) ............................................................................................... 366

xiii

ZZ.     THE MARCH 17, 2007 IED ATTACK IN DIYALA (BENJAMIN L.
        SEBBAN FAMILY) .................................................................................... 367

AAA.   THE MARCH 23, 2007 IED ATTACK IN AL ANBAR (GREG N. RIEWER
        FAMILY) ................................................................................................... 368

BBB.   THE APRIL 4, 2007 IED ATTACK IN BAGHDAD (JOSEPH H.
        CANTRELL, IV FAMILY) ......................................................................... 369

CCC.   THE APRIL 7, 2007 IED ATTACK IN DIYALA (THE FAMILIES OF
        JONATHAN D. GRASSBAUGH, LEVI K. HOOVER, AND RODNEY L.
        MCCANDLESS) ........................................................................................ 369

    1.      The Jonathan D. Grassbaugh Family ................................................. 370

    2.      The Levi K. Hoover Family .................................................................. 370

    3.      The Rodney L. McCandless Family ..................................................... 371

DDD.   THE APRIL 14, 2007 IED ATTACK IN AL ANBAR (THE FAMILIES OF
        JOSHUA A. SCHMIT AND BRANDON L. WALLACE) .................................... 372

    1.      The of Joshua A. Schmit Family .......................................................... 372

    2.      The Brandon L. Wallace Family .......................................................... 373

EEE.   THE APRIL 23, 2007 IED ATTACK IN AL ANBAR (THE FAMILIES OF
        KENNETH E. LOCKER, JR. AND BRICE A. PEARSON) ................................. 373

    1.      The Kenneth E. Locker, Jr. Family ..................................................... 374

    2.      The Brice A. Pearson Family ............................................................... 374

FFF.   THE APRIL 23, 2007 IED ATTACK IN DIYALA (MICHAEL J.
        RODRIGUEZ FAMILY) ............................................................................. 375

GGG.   THE MAY 6, 2007 IED ATTACK IN DIYALA (JASON R. HARKINS
        FAMILY) ................................................................................................... 376

HHH.   THE MAY 14, 2007 SNIPER ATTACK IN AL ANBAR (JEFFREY D.
        WALKER FAMILY) ................................................................................... 377

III.    THE MAY 18, 2007 IED ATTACK IN BAGHDAD (ANSELMO
        MARTINEZ, III FAMILY) ......................................................................... 378

JJJ.    THE MAY 22, 2007 IED ATTACK IN BAGHDAD (ROBERT J.
        MONTGOMERY, JR. FAMILY) .................................................................. 379

KKK.  THE MAY 28, 2007 IED ATTACK IN DIYALA (THE FAMILIES OF
      ZACHARY D. BAKER, JAMES E. SUMMERS, III, AND KILE G. WEST) ....... 380

    1.      The Zachary D. Baker Family .......................................................................... 380

    2.      The James E. Summers, III Family.................................................................... 381

    3.      The Kile G. West Family ................................................................................. 381

LLL.   THE JUNE 2, 2007 IED ATTACK IN NINEVEH (JEREMIAH D.
       COSTELLO FAMILY) ...................................................................................... 382

MMM.     THE JUNE 2, 2007 IED ATTACK IN SALADIN (DARIEK E. DEHN
         FAMILY)........................................................................................................... 383

NNN. THE JUNE 12, 2007 RPG ATTACK IN DIYALA (DAMON G. LEGRAND
     FAMILY)............................................................................................................... 384

OOO.  THE JUNE 19, 2007 IED ATTACK IN DIYALA (DARRYL W. LINDER
      FAMILY)............................................................................................................... 385

PPP. THE JULY 17, 2007 IED ATTACK IN SALADIN (PATRICK L. WADE
     FAMILY)................................................................................................................ 385

QQQ. THE JULY 20, 2007 IED ATTACK IN DIYALA (RHETT A. BUTLER
     FAMILY)................................................................................................................ 386

RRR.  THE JULY 24, 2007 IED ATTACK IN DIYALA (THE FAMILIES OF
      ROBERT A. LYNCH AND MATTHEW R. ZINDARS)....................................... 387

    1.      The Robert A. Lynch Family ........................................................................... 387

    2.      The Matthew R. Zindars Family....................................................................... 388

SSS. THE JULY 26, 2007 IED ATTACK IN DIYALA (MICHAEL A. BALOGA
     FAMILY)................................................................................................................ 388

TTT. THE AUGUST 11, 2007 IED ATTACK IN BAGHDAD (WILLIAM D.
     SCATES FAMILY)................................................................................................ 389

UUU. THE AUGUST 30, 2007 IED ATTACK IN NINEVEH (DANIEL E.
     SCHEIBNER FAMILY)........................................................................................ 390

VVV. THE SEPTEMBER 7, 2007 IED ATTACK IN NINEVEH (JASON J.
     HERNANDEZ FAMILY) ...................................................................................... 391

WWW. THE SEPTEMBER 14, 2007 IED ATTACK IN BAGHDAD (JONATHAN
     RIVADENEIRA FAMILY)..................................................................................... 392

XXX. THE SEPTEMBER 14, 2007 IED ATTACK IN DIYALA (TERRY D. WAGONER FAMILY) ............................................................................ 393

YYY. THE SEPTEMBER 18, 2007 IED ATTACK IN DIYALA (NICHOLAS P. OLSON FAMILY)................................................................................ 394

ZZZ. THE OCTOBER 14, 2007 IED ATTACK IN BAGHDAD (JUSTIN S. MONSCHKE FAMILY) ............................................................................ 395

AAAA. THE OCTOBER 24, 2007 IED ATTACK IN NINEVEH (ROBIN L. TOWNS, SR. FAMILY)................................................................................ 395

BBBB. THE NOVEMBER 14, 2007 IED ATTACK IN DIYALA (KENNETH R. BOOKER FAMILY) ........................................................................ 396

CCCC. THE DECEMBER 20, 2007 SUICIDE ATTACK IN DIYALA (JEREMY E. RAY FAMILY) ................................................................................ 397

DDDD. THE JANUARY 5, 2008 IED ATTACK IN DIYALA (JASON F. LEMKE FAMILY)....................................................................................... 398

EEEE. THE JANUARY 9, 2008 IED ATTACK IN DIYALA (THE FAMILIES OF JONATHAN K. DOZIER, ZACHARY W. MCBRIDE, AND MATTHEW I. PIONK).................................................................................................. 399

    1.    The Jonathan K. Dozier Family .................................................... 399

    2.    The Zachary W. McBride Family ................................................. 400

    3.    The Matthew I. Pionk Family ...................................................... 400

FFFF. THE JANUARY 12, 2008 IED ATTACK IN NINVEH (KEITH E. LLOYD FAMILY)....................................................................................... 401

GGGG. THE JANUARY 28, 2008 IED ATTACK IN NINEVEH (THE FAMILIES OF JAMES E. CRAIG, EVAN A. MARSHALL, AND JOSHUA A.R. YOUNG)................................................................................................ 402

    1.    The James E. Craig Family ........................................................... 402

    2.    The Evan A. Marshall Family ....................................................... 403

    3.    The Joshua A.R. Young Family..................................................... 404

HHHH. THE MARCH 10, 2008 IED ATTACK IN DIYALA (THE FAMILIES OF PHILLIP R. ANDERSON AND TORRE R. MALLARD)..................................... 404

    1.    The Phillip R. Anderson Family ................................................... 405

2. The Torre R. Mallard Family ............................................................. 405

IIII. THE MARCH 30, 2008 IED ATTACK IN AL ANBAR (WILLIAM G. HALL FAMILY) ................................................................................................... 406

JJJJ. THE APRIL 9, 2008 IED ATTACK IN SALADIN (ANTHONY L. CAPRA, JR. FAMILY) .......................................................................................... 407

KKKK. THE APRIL 14, 2008 IED ATTACK IN AL ANBAR (DEAN D. OPICKA FAMILY) ............................................................................................... 409

LLLL. THE JUNE 25, 2008 IED ATTACK IN NINEVEH (ALEJANDRO A. DOMINGUEZ FAMILY) ...................................................................... 410

MMMM. THE SEPTEMBER 24, 2008 SUICIDE ATTACK IN DIYALA (MICHAEL J. MEDDERS FAMILY) ................................................... 411

NNNN. THE NOVEMBER 14, 2008 IED ATTACK IN AL ANBAR (AARON M. ALLEN FAMILY) ................................................................................... 412

OOOO. THE DECEMBER 4, 2008 SUICIDE ATTACK IN NINEVEH (JOHN J. SAVAGE FAMILY) ............................................................................... 413

PPPP. THE APRIL 10, 2009 SUICIDE ATTACK IN NINEVEH (THE FAMILIES OF EDWARD W. FORREST, JR., BRYAN E. HALL, JASON G. PAUTSCH, AND GARY L. WOODS, JR.) .......................................... 413

1. The Edward W. Forrest, Jr. Family .................................................. 414

2. The Bryan E. Hall Family ................................................................. 414

3. The Jason G. Pautsch Family ........................................................... 415

4. The Gary L. Woods, Jr. Family ....................................................... 415

QQQQ. THE JULY 21, 2010 IED ATTACK IN DIYALA (MICHAEL L. RUNYAN FAMILY) ............................................................................................... 416

XI. THE ISLAMIC REVOLUTIONARY GUARD CORPS, AL-QAEDA, AND THEIR AFFILIATES KILLED AND INJURED PLAINTIFFS AND THEIR FAMILY MEMBERS THROUGH ACTS OF INTERNATIONAL TERRORISM IN AFGHANISTAN THAT RELIED UPON THE MATERIAL SUPPORT OF THE ISLAMIC REVOLUTIONARY GUARD CORPS, AL-QAEDA, AL-QAEDA-IN-IRAQ, AND THE TALIBAN ................................................. 417

A. THE APRIL 12, 2007 IED ATTACK IN GHAZNI (THE FAMILIES OF CASEY D. COMBS AND DAVID ALEXANDER STEPHENS) ......... 418

1. The Casey D. Combs Family ............................................................ 418

xvii

2.      The David Alexander Stephens Family .............................................................. 419

B.      THE MAY 30, 2007 ROCKET PROPELLED GRENADE ATTACK IN
HELMAND (THE JESSE BLAMIRES FAMILY)...................................................... 420

C.      THE JUNE 9, 2007 IED ATTACK IN KHOST (THE DARRYL WALLACE
FAMILY)................................................................................................................ 421

D.      THE JUNE 17, 2007 IED ATTACK IN KANDAHAR (THE CHRISTOPHER
D. HENDERSON FAMILY)..................................................................................... 422

E.      THE JULY 6, 2007 IED ATTACK IN PAKTIKA (THE THOMAS P.
MCGEE FAMILY)................................................................................................. 423

F.      THE JULY 23, 2007 IED ATTACK IN KABUL (THE FAMILIES OF
MICHAEL S. CURRY, ADAM J. DAVIS, AND TRAVON T. JOHNSON)......... 424

1.      The Michael S. Curry Family ............................................................... 424

2.      The Adam J. Davis Family ................................................................... 425

3.      The Travon T. Johnson Family.............................................................. 425

G.      THE AUGUST 26, 2007 ATTACK IN PAKTIKA (THE NICHOLAS R.
CARNES FAMILY)............................................................................................... 426

H.      THE AUGUST 28, 2007 IED ATTACK IN PAKTIA (THE CORY CLARK
FAMILY)................................................................................................................ 426

I.      THE OCTOBER 23, 2007 ATTACK IN KUNAR (THE LARRY I. ROUGLE
FAMILY)................................................................................................................ 427

J.      THE NOVEMBER 2, 2007 ATTACK IN URUZGAN (THE JOHNNY C.
WALLS FAMILY)................................................................................................. 428

K.      THE NOVEMBER 10, 2007 ATTACK IN KAPISA (THE PATRICK F.
KUTSCHBACH FAMILY)..................................................................................... 429

L.      THE NOVEMBER 12, 2007 ATTACK IN PAKTIKA (THE ADRIAN E.
HIKE FAMILY) .................................................................................................... 429

M.      THE DECEMBER 9, 2007 ATTACK IN HELMAND (THE TANNER J.
O'LEARY FAMILY) ............................................................................................. 430

N.      THE DECEMBER 12, 2007 ATTACK IN PAKTIKA (THE JOSHUA C.
BLANEY FAMILY)............................................................................................... 431

O.      THE JANUARY 2, 2008 ATTACK IN KHOST (THE FAMILIES OF
RICHARD J. BERRETTINI AND COLLIN J. BOWEN)....................................... 432

     1.      The Richard J. Berrettini Family ...................................................... 433

     2.      The Collin J. Bowen Family .............................................................. 433

P.     THE JANUARY 9, 2008 ATTACK IN HELMAND (THE DAVID
      DRAKULICH FAMILY) ............................................................................ 434

Q.    THE JANUARY 14, 2008 ATTACK IN KABUL (THE THOR HESLA
      FAMILY) ........................................................................................................ 435

R.     THE APRIL 29, 2008 ATTACK IN PARWAN (THE JONATHAN YELNER
      FAMILY) ........................................................................................................ 436

S.     THE MAY 9, 2008 ATTACK IN KAPISA (THE ISAAC PALOMAREZ
      FAMILY) ........................................................................................................ 437

T.     THE MAY 9, 2008 ATTACK IN PAKTIKA (THE ARA T. DEYSIE
      FAMILY) ........................................................................................................ 438

U.     THE MAY 20, 2008 ATTACK IN GHAZNI (THE JEFFREY F. DEPRIMO
      FAMILY) ........................................................................................................ 439

V.     THE MAY 28, 2008 ATTACK IN PAKTIA (THE CHAD M. TRIMBLE
      FAMILY) ........................................................................................................ 440

W.    THE MAY 31, 2008 ATTACK IN NANGARHAR (THE JAMES M.
      FINLEY FAMILY) ........................................................................................ 441

X.     THE JUNE 3, 2008 ATTACK IN PAKTIA (THE SCOTT HAGERTY
      FAMILY) ........................................................................................................ 442

Y.     THE JUNE 8, 2008 ATTACK IN LOGAR (KEVIN MCCLOSKEY) .................... 443

Z.     THE JUNE 18, 2008 ATTACK IN PAKTIKA (THE MARC A. RETMIER
      FAMILY) ........................................................................................................ 443

AA.  THE JUNE 21, 2008 ATTACK IN KANDAHAR (THE JAMES J. WALTON
      FAMILY) ........................................................................................................ 444

BB.  THE JUNE 26, 2008 ATTACK IN LOGAR (THE FAMILIES OF
      MATTHEW L. HILTON AND MARK C. PALMATEER) ................................... 445

     1.      The Matthew L. Hilton Family ......................................................... 446

     2.      The Mark C. Palmateer Family......................................................... 446

CC.  THE JUNE 28, 2008 ATTACK IN ZABUL (THE ESTELL L. TURNER
      FAMILY) ........................................................................................................ 447

DD.    THE JULY 13, 2008 ATTACK IN HELMAND (THE MITCHELL W. YOUNG FAMILY) ............................................................................ 448

EE.    THE JULY 13, 2008 ATTACK IN NURISTAN (THE JASON M. BOGAR, JONATHAN P. BROSTROM, ISRAEL GARCIA, JASON D. HOVATER, PRUITT A. RAINEY, AND GUNNAR ZWILLING FAMILIES) ........................ 449

    1.    The Jason M. Bogar Family ............................................................... 449

    2.    The Jonathan P. Brostrom Family ...................................................... 450

    3.    The Israel Garcia Family ................................................................... 450

    4.    The Jason D. Hovater Family ............................................................ 451

    5.    The Pruitt A. Rainey Family .............................................................. 451

    6.    The Gunnar Zwilling Family ............................................................. 452

FF.    THE JULY 21, 2008 ATTACK IN HELMAND (THE IVAN WILSON FAMILY) ............................................................................................. 452

GG.    THE AUGUST 1, 2008 ATTACK IN KHOST (THE RYAN P. BAUMANN FAMILY) ............................................................................................. 453

HH.    THE AUGUST 1, 2008 ATTACK IN KUNAR (THE JAIR DE JESUS GARCIA FAMILY) ................................................................................ 454

II.    THE AUGUST 22, 2008 ATTACK IN GHAZNI (THE BRIAN STUDER FAMILY) ............................................................................................. 455

JJ.    THE SEPTEMBER 17, 2008 ATTACK IN PAKTIKA (THE JASON A. VAZQUEZ FAMILY) ............................................................................ 456

KK.    THE SEPTEMBER 20, 2008 ATTACK IN KUNAR (THE NATHAN M. COX FAMILY) ..................................................................................... 457

LL.    THE SEPTEMBER 29, 2008 ATTACK IN HELMAND (THE JAMIE S. NICHOLAS FAMILY) ............................................................................ 458

MM.    THE OCTOBER 14, 2008 ATTACK IN KUNAR (THE CORY J. BERTRAND FAMILY) ............................................................................ 459

NN.    THE OCTOBER 22, 2008 ATTACK IN HELMAND (THE ADRIAN ROBLES FAMILY) ................................................................................ 460

OO.    THE OCTOBER 27, 2008 ATTACK IN BAGHLAN (THE KEVIN D. GRIECO FAMILY) ................................................................................ 461

PP.    THE NOVEMBER 13, 2008 ATTACK IN NANGARHAR (THE JONNIE L.
       STILES FAMILY) ................................................................................................... 462

QQ.    THE JANUARY 9, 2009 ATTACK IN ZABUL (THE FAMILIES OF
       JOSEPH M. HERNANDEZ AND JASON R. PARSONS) .................................... 464

   1.      The Joseph M Hernandez Family .................................................... 464

   2.      The Jason R. Parsons Family ............................................................ 465

RR.    THE JANUARY 17, 2009 ATTACK IN KABUL (THE SIMONE A.
       ROBINSON FAMILY) ........................................................................................... 465

SS.    THE JANUARY 17, 2009 ATTACK IN KUNAR (THE EZRA DAWSON
       FAMILY) ................................................................................................................. 466

TT.    THE FEBRUARY 8, 2009 ATTACK IN HELMAND (THE JARED W.
       SOUTHWORTH FAMILY) .................................................................................... 467

UU.    THE FEBRUARY 10, 2009 ATTACK IN KHOST (THE JASON R.
       WATSON FAMILY) ................................................................................................ 469

VV.    THE FEBRUARY 20, 2009 ATTACK IN URUZGAN (THE JEREMY E.
       BESSA FAMILY) .................................................................................................... 470

WW.    THE MARCH 8, 2009 ATTACK IN PAKTIKA (THE KEVIN A. DUPONT
       FAMILY) ................................................................................................................. 471

XX.    THE MARCH 15, 2009 ATTACK IN HELMAND (THE NORMAN L. CAIN
       III FAMILY) ............................................................................................................ 472

YY.    THE MARCH 20, 2009 ATTACK IN KABUL (THE ROSLYN SCHULTE
       FAMILY) ................................................................................................................. 473

ZZ.    THE MARCH 26, 2009 ATTACK IN KAPISA (THE MARK E. STRATTON
       II FAMILY) ............................................................................................................. 474

AAA.   THE JUNE 2, 2009 ATTACK IN PAKTIA (THE JONATHAN O'NEILL
       FAMILY AND ESTATE) ........................................................................................ 476

BBB.   THE JUNE 4, 2009 ATTACK IN ZABUL (THE JEFFREY JORDAN
       FAMILY) ................................................................................................................. 477

CCC.   THE JUNE 5, 2009 ATTACK IN HELMAND (PAUL MICHAEL SCHAUS) ..... 478

DDD.   THE JUNE 19, 2009 ATTACK IN KANDAHAR (THE PAUL G. SMITH
       FAMILY) ................................................................................................................. 479

EEE.   THE JUNE 20, 2009 ATTACK IN KHOST (THE JOHN D. BLAIR
       FAMILY)................................................................................................ 480

FFF.   THE JUNE 21, 2009 ATTACK IN PARWAN (THE RICKY D. JONES
       FAMILY)................................................................................................ 481

GGG.  THE JULY 2, 2009 ATTACK IN HELMAND (THE CHARLES SETH
       SHARP FAMILY).................................................................................. 482

HHH.  THE JULY 6, 2009 ATTACK IN KUNDUZ (THE FAMILIES OF
       CHESTER W. HOSFORD AND DERWIN WILLIAMS) ...................................... 483

       1.      The Chester W. Hosford Family........................................................ 484

       2.      The Derwin Williams Family ............................................................ 484

III.   THE JULY 7, 2009 ATTACK IN HERAT (THE CHRISTOPHER M.
       TALBERT FAMILY)............................................................................. 485

JJJ.   THE JULY 20, 2009 ATTACK IN WARDAK (THE ANDREW JAY
       ROUGHTON FAMILY) ......................................................................... 486

KKK.  THE JULY 22, 2009 ATTACK IN ZABUL (THE JOSHUA J. RIMER
       FAMILY)................................................................................................ 487

LLL.   THE AUGUST 1, 2009 ATTACK IN KANDAHAR (THE JONATHAN
       MICHAEL WALLS FAMILY)............................................................... 488

MMM. THE AUGUST 2, 2009 ATTACK IN WARDAK (THE ALEJANDRO
       GRANADO III FAMILY)....................................................................... 489

NNN.  THE AUGUST 7, 2009 ATTACK IN KAPISA (THE MATTHEW
       FREEMAN FAMILY)............................................................................ 489

OOO.  THE AUGUST 7, 2009 ATTACK IN WARDAK (THE JERRY RANDALL
       EVANS JR. FAMILY) ........................................................................... 490

PPP.   THE AUGUST 16, 2009 ATTACK IN HERAT (THE NICHOLAS R.
       ROUSH FAMILY) ................................................................................ 491

QQQ.  THE AUGUST 18, 2009 ATTACK IN KANDAHAR (THE JONATHAN
       CHRISTOPHER YANNEY FAMILY)................................................... 492

RRR.   THE AUGUST 20, 2009 ATTACK IN WARDAK (THE JUSTIN R.
       PELLERIN FAMILY)............................................................................. 493

SSS.   THE AUGUST 21, 2009 ATTACK IN KUNAR (THE MATTHEW
       INGRAM FAMILY)................................................................................ 494

TTT.  THE AUGUST 27, 2009 ATTACK IN KANDAHAR (THE MATTHEW E.
WILDES FAMILY) ................................................................................................ 495

UUU.  THE AUGUST 31, 2009 ATTACK IN KANDAHAR (THE TYLER R.
WALSH FAMILY) ................................................................................................. 496

VVV.  THE SEPTEMBER 4, 2009 ATTACK IN PAKTIKA (THE DARRYN D.
ANDREWS FAMILY) ............................................................................................ 497

WWW. THE SEPTEMBER 12, 2009 ATTACK IN WARDAK (THE NEKL B.
ALLEN AND DANIEL L. COX FAMILIES) ......................................................... 498

    1.      The Nekl B. Allen Family .................................................................... 499

    2.      The Daniel L. Cox Family ................................................................... 499

XXX.  THE SEPTEMBER 14, 2009 ATTACK IN HELMAND (THE DAVID T.
WRIGHT II FAMILY) .......................................................................................... 500

YYY.  THE SEPTEMBER 24, 2009 ATTACK IN ZABUL (THE EDWARD
BERNARD SMITH FAMILY) ............................................................................... 500

ZZZ.  THE SEPTEMBER 30, 2009 ATTACK IN KHOST (THE ALEX FRENCH
IV FAMILY) .......................................................................................................... 502

AAAA. THE OCTOBER 2, 2009 ATTACK IN LOGAR (THE RYAN C. ADAMS
FAMILY) ............................................................................................................... 503

BBBB. THE OCTOBER 7, 2009 ATTACK IN HELMAND (THE GEORGE W.
CAULEY FAMILY) ............................................................................................... 504

CCCC. THE OCTOBER 9, 2009 ATTACK IN HELMAND (THE AARON J.
TAYLOR FAMILY) ............................................................................................... 505

DDD. THE OCTOBER 15, 2009 ATTACK IN KANDAHAR (THE BRANDON M.
STYER FAMILY) ................................................................................................... 506

EEEE. THE OCTOBER 16, 2009 ATTACK IN GHAZNI (THE ANTHONY G.
GREEN FAMILY) .................................................................................................. 507

FFFF. THE OCTOBER 16, 2009 ATTACK IN KANDAHAR (THE
CHRISTOPHER RUDZINSKI FAMILY) .............................................................. 508

GGGG. THE OCTOBER 17, 2009 ATTACK IN KANDAHAR (THE MICHAEL A.
DAHL JR. FAMILY) .............................................................................................. 509

HHHH. THE OCTOBER 20, 2009 ATTACK IN HELMAND (THE DAVID R.
BAKER FAMILY) ................................................................................................. 510

IIII.   THE OCTOBER 23, 2009 ATTACK IN KANDAHAR (THE ERIC N.
        LEMBKE FAMILY) ............................................................................. 511

JJJJ.  THE OCTOBER 25, 2009 ATTACK IN LAGHMAN (THE BRANDON K.
        STEFFEY FAMILY) ........................................................................... 512

KKKK. THE OCTOBER 27, 2009 ATTACK IN KANDAHAR (THE BRIAN
        BATES JR. FAMILY) .......................................................................... 513

LLLL. THE OCTOBER 27, 2009 ATTACK IN KANDAHAR (THE FAMILIES OF
        FERNANDO DE LA ROSA, ISSAC B. JACKSON, AND PATRICK O.
        WILLIAMSON) ................................................................................. 514

    1.      The Fernando De La Rosa Family .................................................. 515

    2.      The Issac B. Jackson Family ........................................................ 515

    3.      The Patrick O. Williamson Family ................................................ 516

MMMM. THE NOVEMBER 4, 2009 ATTACK IN PAKTIKA (THE JULIAN L.
        BERISFORD FAMILY) ...................................................................... 516

NNNN. THE NOVEMBER 13, 2009 ATTACK IN HELMAND (THE SHAWN P.
        HEFNER FAMILY) ............................................................................ 517

OOOO. THE NOVEMBER 13, 2009 ATTACK IN WARDAK (THE
        CHRISTOPHER J. COFFLAND FAMILY) ........................................... 518

PPPP.  THE NOVEMBER 19, 2009 ATTACK IN ZABUL (THE JOHN J.
        CLEAVER FAMILY) .......................................................................... 520

QQQQ. THE NOVEMBER 22, 2009 ATTACK IN KANDAHAR (THE MARCUS
        A. TYNES FAMILY) .......................................................................... 521

RRRR.  THE NOVEMBER 23, 2009 ATTACK IN KANDAHAR (THE JASON A.
        MCLEOD FAMILY) ........................................................................... 522

SSSS.  THE NOVEMBER 23, 2009 ATTACK IN ZABUL (THE MATTHEW A.
        PUCINO FAMILY) ............................................................................. 523

**INTRODUCTION**

1.       This lawsuit seeks damages under the federal Anti-Terrorism Act (the "ATA") on behalf of American service members and civilians, and their families, who were killed or wounded while serving their country in Iraq between 2006 and 2010.  Plaintiffs seek to hold five defendants affiliated with a South African telecom company, MTN Group, accountable for their substantial assistance to multiple Foreign Terrorist Organizations targeting Americans in Iraq.

2.       Plaintiffs' allegations are based on information derived from confidential witnesses with direct and indirect knowledge of the alleged facts, internal company documents, declassified military-intelligence reporting, congressional testimony and reports, press accounts, and Plaintiffs' recollections.

3.       MTN Group is a large multinational company that had lucrative business with Iranian entities that MTN knew served as fronts for terrorist finance and logistics, and MTN engaged in illicit, terrorism-sanctions-busting transactions with known terrorist fronts in order to boost their profits.  Those transactions aided and abetted terrorism by directly funding, arming, and logistically supporting a terrorist campaign that stretched for more than a decade, killing and injuring thousands of Americans.

4.       This case reveals conduct that is far more depraved than even the ordinarily culpable ATA defendant.  No other ATA defendant has ever been credibly accused of the full spectrum of behavior identified in this Complaint.  MTN directly contracted with known fronts for designated terrorist organizations.  In serving as a full-spectrum telecommunications and computing partners for Iran's Islamic Revolutionary Guard Corps (the "IRGC"), and thereby the world's worst terrorist groups, Defendants aided *every* facet of the IRGC's terrorist enterprise.

5.       Since 2005, MTN Group has served as the junior partner in a joint venture with Iran's Islamic Revolutionary Guard Corps, including Hezbollah and the Qods Force, through the

1

MTN Irancell consortium between MTN Group (through an MTN corporate buffer) and the Hezbollah and the Qods force (through two notorious IRGC fronts).

6.      For 17 years, MTN Group happily, openly, and notoriously aided the IRGC even while understanding that it was a United States-designated terrorist group.  The U.S. designated the Qods Force – one of MTN Group's effective joint venture partners in MTN Irancell – a Specially Designated Global Terrorist ("SDGT") in 2007; MTN Group responded by expanding its joint venture and publicly lecturing the United States.  From 2009 through 2012, the U.S. intensified the counter-terror sanctions against the IRGC, Hezbollah and the Qods Force; MTN Group responded by devising workarounds for the IRGC to keep the cash flowing.

7.      In 2019, the United States designated MTN's true joint venture partner, the IRGC, as a Foreign Terrorist Organization ("FTO").  Yet MTN Group persists in its aid to MTN Irancell even now.  Today, MTN Group defiantly continues to openly partner with an FTO in an unprecedented act of defiance towards the Anti-Terrorism Act.

8.      MTN Group, Phuthuma Nhleko, and Irene Charnley provided material support to the terrorists and committed themselves, and every MTN entity worldwide, to serving as a global logistics, financial, operational, and technical super-cell for MTN's terrorist business partners, including Hezbollah, the Qods Force, Regular IRGC, and their proxies, by agreeing to assure MTN's provision of "Security" "Cooperation" to their "Iranian Shareholders" – which Defendants knew to be a euphemism that meant supporting the IRGC's industrial scale exportation of terror targeting Americans around the world, but most of all, in the two countries flanking Iran to its west (Iraq) and east (Afghanistan)

9.      MTN Group, Phuthuma Nhleko, and Irene Charnley aided Hezbollah, the Qods Force, and their proxies each time they supplied the IRGC and its proxies with money and cash

2

equivalents, technical goods like cell phones and telecom infrastructure, technical support as joint ventures with and contractual counterparties to known IRGC fronts, techniques for evading U.S. sanctions in order to do so, as well as each time Defendants attempted to obfuscate their (or other MTN Group persons') respective roles.  When Defendants engaged in such conduct, they facilitated IRGC-sponsored attacks against Americans in Iraq and Afghanistan and furthered the terrorists' shared goal to expel Americans from Iraq and Afghanistan.

10.     MTN Group, Phuthuma Nhleko, and Irene Charnley acted in furtherance of the IRGC's terrorist scheme in open, obvious, programmatic, and enduring ways for well over a decade.  In so doing, MTN Group, Phuthuma Nhleko, and Irene Charnley were one in spirit with their IRGC terrorist partners because each calculated that if they remained aligned with the interests of their partners' "Iranian Shareholders" – fronts for the IRGC – MTN Group would reap billions in easy profits by seizing a monopoly in one of the world's fastest-growing and youngest potential subscriber pools, and Mr. Nhleko and Ms. Charnley, in turn, would collectively earn at least tens of millions (in U.S. Dollar value) of compensation from MTN Group and its affiliates.

11.     Seasoned investors, however, know that any time one shareholder's investment does well, that means somewhere out there is another shareholder on the opposite side of the issue, for whom the investment went badly.  For every shareholder who wins, there must be another shareholder in the world who loses.  But this is not a case about trading shares on the NASDAQ.  In this case, while the Iranian Shareholders "won," the "shareholders" who "lost" were not day traders who got crushed making an unwise stock pick.  They were the Plaintiffs, and others:  patriotic American servicemembers and civilians who volunteered for hard, thankless jobs on the other side of the world in Iraq and Afghanistan.  Some returned, badly

injured.  Some never came back at all.  None will ever be the same again.  Defendants played an enormous role in the sequence of events that led to this outcome.  Plaintiffs are among the victims. This lawsuit followed.

12.     MTN Group, Phuthuma Nhleko, and Irene Charnley knew that their outsized profits came at a price—the vast amounts of American bloodshed in Iraq and Afghanistan that was sure to follow Defendants' decision.  Given their history, Defendants plainly concluded that scores of American deaths and grievous injuries every month in Iraq and Afghanistan for nearly two decades was an acceptable price to pay to yield a profitable outcome for MTN's own shareholders, the "Iranian Shareholders" with whom MTN Group was partnered, and Mr. Nhleko and Ms. Charnley individually.

13.     It is impossible to overstate the magnitude of MTN Group's, Phuthuma Nhleko's, and Irene Charnley's defilement of the Anti-Terrorism Act.  MTN Group's conduct reflects most depraved, expansive, deceitful, and persistent international corporate conspiracies since the end of World War II.  There is little doubt that Defendants changed the trajectory of Afghanistan, Iraq, and countless other countries.

14.     This Anti-Terrorism Act lawsuit outlines the unprecedented nature of MTN Group's conduct, and Plaintiffs' allegations likely remain the tip of the iceberg.  Simply put, no corporate or individual defendant in the history of the Anti-Terrorism Act has ever engaged in conduct as comprehensively violative, for more money, over a longer period, with a more violent counterparty, in a more open and notorious manner, with more devastating consequences, while demonstrating a greater sense of corporate impunity than Defendants.  During all (with respect to the MTN corporate defendants) and most (with respect to the individual defendants) of the seventeen (17) years since 2005 when Defendants MTN Group, funded, partnered with, and

helped develop the technical capabilities for the world's worst terrorist organization – the IRGC – by entering into deals with notorious fronts for the IRGC and pledging to assist with Iran's "security" agenda – all while fraudulently concealing it from MTN Group's shareholders.

15.     MTN Group is one of the worst corporate sponsors of terrorism in the history of the ATA.  As a result, this case is likely to be different than a typical ATA case because of what Defendants have done, and this Complaint is longer than many ATA complaints.  MTN each funneled hundreds of millions in value to the terrorists in nearly every conceivable modality of terrorist fund transfer:  direct transactions with FTO fronts while knowing (and not caring) about the FTO relationship; illicit acquisition of valuable American technologies; procurement bribes; "free goods" kickbacks; black market purchasing; cash flow from the companies; and so on.

16.     The evidence regarding Defendants' intent is even worse.  Defendants made shocking admissions in writing, and then destroyed everything to try to cover their tracks (none succeeded completely).  Some Defendants lied to federal law enforcement.  Witness intimidation was common.  Innocent Canadians were kidnapped to extort the United States and Canada.

17.     MTN's conduct, spending amount, and terrorist tradecraft is startlingly like how a State Sponsor of Terrorism acts—hundreds of millions of dollars in direct funding to terrorists, critical technical support that aids their victory, given with the hope that it will occur, and a commitment to never-ending lies, falsehoods, and deceptions no matter how much evidence accumulates or how ridiculous it becomes.

18.     MTN may have learned this "never stop lying" tactic at the feet of their client, the IRGC, which is notorious amongst national security professionals for, in effect, being some of the world's most persistent long-term liars, capable of sustaining a lie for decades.  MTN made similar choices.

19.     MTN Group continues to openly conspire with multiple FTOs in plain sight.  This is not normal, nor is it acceptable, but it is damning proof that MTN Group, Phuthuma Nhleko, and Irene Charnley intended to provide material support to designated terrorists all along.

20.     MTN Group is currently the joint venture partner of known fronts for an FTO so committed to terror that it midwifed, and controlled thereafter, a mine run of additional FTOs: Hezbollah (FTO); Jaysh al-Mahdi Special Group Ka'taib Hezbollah (FTO); Jaysh al-Mahdi Special Group Asaib Ahl al-Haq (FTO); al-Qaeda-in-Iraq (FTO); and Ansar-al-Islam (FTO).

21.     MTN Group, Phuthuma Nhleko, and Irene Charnley, are unrepentant about their embrace of FTO terrorist fronts for cash, even though: (i) on March 28, 2012, a whistleblower heroically exposed Defendants' secret Security Cooperation Agreement with the IRGC and associated illicit transactions, through a lawsuit filed by MTN's competitor, Turkcell, which resulted in MTN Group's public humiliation in South Africa after the formerly iconic company became a subject of national mockery that year; (ii) in 2019, being sued by hundreds of American victims of terrorist attacks in Afghanistan under the ATA concerning MTN's protection payments in Afghanistan; and (iii) in 2021, being sued by more than 50 American victims of terrorist attacks in Iraq from 2011 through 2015 before (iv) being sued by Plaintiffs in the instant case.

22.     Why would a publicly traded South African company like MTN Group do this? Money.  MTN Irancell, the joint venture at issue, is MTN Group's cash cow and is, depending on metrics, either the second or third largest subscriber market in MTN Group's entire global portfolio.  MTN Group concluded that it and its shareholders could reap billions of dollars in profits and lock in the single best international telecoms market opportunity in decades if it could achieve a meeting of the minds with the Iranian Shareholders who controlled Irancell.

23.    To make billions of dollars running the phone and internet system in partnership with these people, MTN Group had to fully commit itself worldwide to corporate criminality on an almost impossible to comprehend scale.  MTN provided unprecedented aid to terrorists:

- a secret, undisclosed, direct, written, terrorist joint venture agreement signed by an active, senior-ranking Iranian terrorist, on the one hand, and the CEO of one of Africa's largest publicly traded companies, on the other;

- direct contractual obligations with Iranian entities known to be owned and controlled by fronts for the IRGC, whereby substantial banned technology useful to terrorists was transferred, and entire telecommunication systems used by the terrorist conspirators were assembled, used, and maintained;

- a nearly two decade-long terrorist scheme that operationalized the secret deal into a technological, financial, services, and communications supply chain for the world's worst transnational terrorist organization;

- a large publicly traded company that refuses, even now, to exit its agreement with the IRGC, even after it has been publicly outed and even after the IRGC was designated as an FTO; and

- shocking bribery including tens of millions of "free goods" bribes designed to be diverted by terrorists to the black market, and large U.S. Dollar wire transfers after the bribe recipient performed his or her illicit deed.

24.    After the U.S.-led invasions of Afghanistan in 2001 and Iraq in 2003, an alliance of Shiite terrorists led by Hezbollah and its Iraqi proxy, Jaysh al-Mahdi, and funded and armed by the IRGC including its subordinate international "security" branch Qods Force and its subordinate Lebanese Hezbollah Division ("Hezbollah Division" or "Division"), combined forces to pursue a shared terrorist campaign against Americans in Iraq.

25.    The IRGC's ambitions did not stop at Iraq.  As the IRGC grew, it intensified the terror campaign in Afghanistan as well, led by al-Qaeda and its long-time ally, the Taliban.

26.    To attack the citizens protected by the world's most powerful military in Iraq and Afghanistan after 2003, the IRGC, including the Hezbollah Division and Qods Force, organized

a transnational terrorist alliance – a NATO for terrorists – that included both Shiite and Sunni groups, and stretched throughout the Middle East, from Syria to Afghanistan.

27.     In Iraq, the IRGC's Hezbollah Division was responsible for standing up a grand Iraqi Shiite terror group explicitly modeled after Lebanese Hezbollah; Hezbollah succeeded and midwifed what became Jaysh al-Mahdi (or the Mahdi Army), the notorious Shiite terrorist group and Hezbollah proxy in Iraq that was led by Muqtada al-Sadr and responsible, along with Hezbollah and the Qods Force – with whom Jaysh al-Mahdi was effectively fused, through the Joint Cells, in key geographies like Baghdad and Basra – for killing more than 500 Americans in Iraq.  Thereafter, IRGC-backed Shiite terrorists in Iraq formed joint cells comprised of operatives from Jaysh al-Mahdi, Hezbollah, and Qods Force terrorists ("Joint Cells"), which attacked civilians indiscriminately; conducted kidnappings, torture, and executions; and refused to comply with the Geneva Conventions.

28.     The IRGC's terrorist ambitions against Americans in Iraq did not end with the Joint Cells.  Instead, the IRGC unleashed a second terrorist campaign against Americans throughout the country, which was conducted by al-Qaeda, al-Qaeda-in-Iraq, and Ansar al-Islam. Qassem Soleimani's "sinister genius" was his recognition that the universal hatred of Americans and Israelis among Islamist terrorists in the Middle East could, when properly wielded, be turned into a sharp weapon for the IRGC to wield against the U.S. in the Middle East by furnishing a large additional source of terrorists to deploy against Americans throughout the region.

29.     In Afghanistan, the IRGC sponsored a nationwide terrorist campaign targeting Americans there by funding, arming, training, logistically sustaining, and providing havens to, among others, al-Qaeda and the Taliban, including its Haqqani Network.  Like Hezbollah and the

Qods Force, al-Qaeda, the Taliban, and their allies also followed a similar Joint Cells approach in their efforts to form their own terrorist analogue to NATO.

30.     In the twenty years between 9/11 and the American withdrawal from Afghanistan, Islamist terrorists formed their own grand alliance:  a NATO for terrorists.  This terrorist alliance comprised nearly a dozen FTOs and SDGTs associated with Iraq, Iran, Lebanon, the U.A.E., Afghanistan, and Pakistan, which Plaintiffs identify by designation and year:  **Hezbollah** (FTO-1997); **Qods Force** (SDGT-2007; FTO-2019), and **Regular IRGC** (FTO-2019), which collaborated closely with long-time allies  **al-Qaeda** (FTO-1999), **Ansar al-Islam** (FTO-2001), the **Taliban** (SDGT-2001), including its **Haqqani Network** (SDGT-2001, FTO-2012) – both of which were substantially led by dual-hatted al-Qaeda/Taliban terrorist Sirajuddin Haqqani (individually designated an SDGT-2008), and **al-Qaeda-in-Iraq** (FTO-2004), all in order to pursue their shared goal of killing as many Americans as possible in Iraq and Afghanistan in order to drive the U.S. out of the Middle East.

31.     To prosecute a grinding, global terrorist campaign against Americans in Iraq and Afghanistan, Hezbollah, the Qods Force, al-Qaeda, the Taliban, and the IRGC's other FTO proxies above operated a latticework of cells arrayed across six continents.  The grim result: more than 4,000 Americans were killed in terrorist attacks in Iraq and Afghanistan by designated terrorist groups that were funded, armed, and logistically sustained by Hezbollah, the Qods Force, Regular IRGC, al-Qaeda, al-Qaeda-in-Iraq, Ansar al-Islam, and the Taliban, including its Haqqani Network.

32.     While Plaintiffs, or their loved ones, worked to stabilize Iraq nearly a decade after the U.S. invasion, and Afghanistan on the eve of the terrorists' victory there, they were attacked by U.S. Government-designated terrorist organizations that participated in an Iran-backed,

Hezbollah-led terrorist campaign that MTN's transactions helped finance, arm, logistically support, conceal, and upgrade.

33.     MTN helped revolutionize the efficiency of the Big Data management practices and capabilities of Hezbollah and the Qods Force, in addition to the "regular" IRGC inside of Iran.  It is impossible to overstate the scale of the carnage that followed Defendants' decision to midwife the IRGC into the modern, networked, Big Data world.

34.     Prior to Defendants, the IRGC had the will but not the modern gear.  While the IRGC had the scale of a global multinational corporate behemoth – tens of thousands of personnel, consultants, agents, and partners, distributed across dozens of countries on six continents – the IRGC lacked even rudimentary network and computing technologies.

35.     By 2004, the IRGC was surrounded on both flanks by "the Great Satan," and the enormous technological gap between the IRGC and its mortal enemy – the "Big Data Gap" – forced the IRGC to do something drastic, which it had never done before:  bring in foreign companies to revolutionize Iran's computing and telecommunications infrastructure.

36.     Two problems, however, still confronted the IRGC.  *First*, the IRGC knew that most large technology companies would have nothing at all to do with them.  The IRGC also knew what any intelligence operative knows:  that large telecom and networking computing companies come from an exceptionally ethical industry that has never experienced a major terrorist finance scandal and are internationally notorious within the telecoms industry for being unabashed patriots.

37.     *Second*, and worse still, if the IRGC wanted to acquire the key technologies that it had determined were essential to prosecuting its terror campaign, it could not avoid an outcome in which the IRGC, indirectly, needed to reach into America's markets, and acquire embargoed

10

dual-use technologies on an industrial scale while surmounting three separate detection hurdles, in a race where any stumble would likely result in the exposure of the entire scheme.

38.     The solution to both?  Find some corporate criminals, bring them all the way into the circle of trust, and count on their limitless greed.  Enter, Defendants.  Since 1979, the IRGC has always sought to kill Americans in large numbers.  What it lacked was not the will, but the capability.  After 9/11, the story remained the same – until MTN answered the IRGC's call for multinational corporate assistance to the "security" operations of Hezbollah Division and the Qods Force.

39.     What the IRGC had never had – until Defendants – were true, established multinational corporate criminal partners.  And Defendants furnished the IRGC with three: MTN Group (a criminal Multinational Corporation partner), Phuthuma Nhleko (a criminal CEO partner), and Irene Charnley (a criminal Commercial Director partner).  One has been raided (MTN Group), and the other two (Mr. Nhleko and Ms. Charnley), on information and belief, were and/or are the subject of one or more law enforcement investigations concerning their conduct while employed by MTN Group.

40.     After 9/11, the IRGC coordinated a grand alliance of Islamist terrorists to attack Americans in the Middle East.  On the eve of the U.S. invasion of Iraq, the IRGC and Hezbollah agreed to prepare, instigate, and sustain a nationwide campaign of terror against Americans in Iraq, which was planned and authorized by the IRGC's lead foreign terror agent, Hezbollah.  To sustain an ever-escalating terrorist campaign against the United States in Iraq, and later Afghanistan, Iran relied upon Hezbollah, which, in turn, depended upon IRGC funding and illicitly sourced gear from a constellation of IRGC, including Qods Force, and Hezbollah terrorist fundraising and logistics cells scattered across dozens of countries on every continent

but Antarctica, which the IRGC, including Qods Force, and Hezbollah relied upon to fund and equip forward-deployed Hezbollah, Qods Force, and local Jaysh al-Mahdi proxies in Iraq.

41.    To sustain their insurgency, the terrorists relied upon three substantial funding streams: sources from within Iraq, most of all, the river of cash and free goods that Jaysh al-Mahdi obtained from corrupt companies doing business with the Iraqi Ministry of Health, sources from within Iran, and sources from the latticework of IRGC, including Qods Force, and Hezbollah logistics and fundraising cells that stretch the globe from Dubai to South Africa, Houston to Syria, and countless other geographies.

42.    This case is about those second and third sources of funding; while the Iraqi Ministry of Health was the largest overall single source of funding for the terrorists, the second and third streams were equally potent.  Cash flow from the telecom company Irancell was either the largest or second largest source of cash flow from any IRGC front and caused hundreds of millions per year to flow to the IRGC, including $4.2 billion between 2005, when MTN Group bribed its way to the license, and 2013 – approximately $500 million per year, every year.  Similarly, the fundraising and logistics cells around the world coordinated cash flows from narcotics smuggling, and the Qods Force's and Hezbollah's various transnational criminal rackets, e.g., collecting 10%-20% "taxes" known as *khums* from allied businesspeople in Dubai, U.A.E., or Pretoria, South Africa.

43.    Given the transnational nature of the terrorist campaign they sponsored, Hezbollah and the Qods Force depended upon illicitly sourced, embargoed American communications and information technologies, and related management consulting white collar services, which they acquired through Defendant MTN Group, Defendant Nhleko, and Defendant Charnley.  Defendants' conduct changed the trajectory of the entire terrorist campaign

in Iraq by revolutionizing the communications capabilities of both the IRGC, including the Qods Force, and Hezbollah, in Iraq and throughout the Middle East and crippling the ability of U.S. forces in Iraq to detain Qods Force and Hezbollah operatives in the country – because we could almost never find them.  Plaintiffs suffered the consequences.

44.     In 2005, Phuthuma Nhleko and Irene Charnley, acting on behalf of Defendant MTN Group, executed a secret Security Cooperation Agreement with senior IRGC leadership, under which MTN Group, Defendant Nhleko, and Defendant Charnley personally guaranteed to the IRGC, including its Hezbollah Division and Qods Force, that MTN Group, Defendant Nhleko, and Defendant Charnley, would materially aid the "defensive, security, and political" operations conducted by the "Iranian Shareholders," i.e., the IRGC (the "Security Cooperation Agreement").  MTN Group, through Defendant Nhleko, executed the secret Security Cooperation Agreement, on behalf of MTN Group's corporate family.  MTN's "Iranian Shareholder" counterpart, in turn, similarly signed the Agreement on behalf of the entire IRGC, necessarily including its external terrorist arms, the Qods Force and Hezbollah Divisions.  *See infra* § VI.A.2 (detailed discussion of Agreement).

45.     After MTN Group, Defendant Nhleko, and Defendant Charnley executed the secret Security Cooperation Agreement, they fraudulently concealed MTN's literal terrorism joint venture agreement with the IRGC from MTN Group's shareholders by keeping MTN Group's copy of the Agreement locked in a safe, concealed from the world (until a whistleblower bravely exposed it).  Ever since, publicly, MTN Group, Defendant Nhleko, and Defendant Charnley, variously lied, dissembled, intimidated witnesses, and/or destroyed evidence, all to avoid admitting the obvious:  that they themselves committed acts of international terrorism that directly armed, funded, logistically supported, and enabled the concealed and secure

13

communications of the IRGC and their terrorist proxies, promoting attacks against Americans by IRGC proxies around the world. Even today, MTN Group remains, effectively, in a joint venture with two fronts for an FTO through its participation in MTN Irancell.

46.     MTN Group, Defendant Nhleko, and Defendant Charnley were one in spirit with the terrorists. Each pledged, orally or in writing, their commitment to aiding the IRGC's "security" – which all involved understood to be a euphemism for anti-American terror. They did this because IRGC domination of the Middle East made each of them more money and if the wholesale slaughter of Americans was the necessary price, it was a price each Defendant was willing to impose on unknown Americans serving in Iraq. Plaintiffs bore the consequences.

47.     Pursuant to its secret Security Cooperation Agreement with the IRGC, MTN Group, Defendant Nhleko, and Defendant Charnley caused MTN Group and its agents, affiliates, and subsidiaries to illicitly transact business with known IRGC fronts, Irancell and the Telecommunications Company of Iran ("TCI"), through partnerships with notorious fronts for Hezbollah and the Qods Force, like the Bonyad Mostazafan. Through such business and conduct MTN Group, Defendant Nhleko, and Defendant Charnley provided direct financial support, revenue, U.S.-origin embargoed technology and equipment, and training and expertise – all of which the IRGC provided to their terrorist allies operating in Iraq and Afghanistan – and all of which was used to target to kill and injure Americans, including Plaintiffs.

48.     The IRGC used its relationships with MTN Group, and the high-end management consulting provided to the Iranian Shareholders by Phuthuma Nhleko and Irene Charnley to optimize Iran's terrorist enterprise by bolstering the financial and technical capacities of the IRGC's terrorist proxies in Iraq and Afghanistan.

14

49.     Through the IRGC's transactions with MTN Group, and the various acts of assistance provided by Phuthuma Nhleko and Irene Charnley, Defendants helped Hezbollah, the Qods Force, and the IRGC's terrorist proxies worldwide to evade the international sanctions regime to source weapons for terror, modernize their communications systems to better encrypt signals traffic, improve their surveillance and intelligence capabilities, and generate tens of millions in annual revenue to fund IRGC-supported acts of international terrorism that were committed by the IRGC and the IRGC's Sunni terrorist proxies, all of which Hezbollah, the Qods Force, and their Sunni terrorist proxy allies, used to attack Americans in Iraq from 2005 through 2010.

50.     The total value of the money, technology, and services that the IRGC and the IRGC's Sunni terrorist proxies, obtained via MTN Group's, Defendant Nhleko's, and Defendant Charnley's illicit business with the IRGC collectively extracted likely ranges into the hundreds of millions of U.S. Dollars in cash and cash equivalents – and the terrorists used those resources to aid every facet of the nationwide terrorist campaign against Iraq that the IRGC midwifed in 2003, and then bankrolled ever since, in close partnership with its terrorist proxy allies in Afghanistan (al-Qaeda and the Taliban) and Syria (the Assad Regime and al-Qaeda-in-Iraq/ISIS), both of whom MTN Group also paid.  The IRGC facilitated violence by all, fueled by Defendants' aid.

51.     But this case is not just about terrorist finance; the technology that MTN Group, provided to the IRGC, which then flowed through its Hezbollah Division and Qods Force to al-Qaeda, al-Qaeda-in-Iraq, and Ansar al-Islam, for use by them in Iraq, was uniquely important to the terrorists, enabling them to inflict maximum damage because, among other things, it allowed them to spy on Americans, avoid detection, clandestinely communicate, travel freely, and build

and detonate more effective bombs.  And on top of the money and the technology, Defendants also provided substantial ongoing logistical and operational aid for the IRGC's terrorist enterprise, which also flowed through to support acts of international terrorism by al-Qaeda, al-Qaeda-in-Iraq, and Ansar al-Islam.

52.     This is not a case about one or two alleged rogue employees who engaged in a frolic and detour that resulted in a company's money reaching terrorists.  Here, MTN Group's senior executives ran the entire scheme.  Indeed, the two who are most culpable – Phuthuma Nhleko and Irene Charnley – are co-Defendants alongside MTN because Mr. Nhleko and Ms. Charnley were each critical to the success of the IRGC's ability to convert its relationship with MTN Group into a financial, operational, and logistical super-cell that benefited IRGC-backed terrorists worldwide.

53.     Indeed, Defendant Nhleko even mocked those who raised concerns about the risks of becoming joint venture partners with two notorious Iranian terror fronts:  When queried by investors about the "risk of doing business with Iran," Mr. Nhleko "laughed off" such questions, joking that "[MTN] hadn't budgeted for bomb shelters or anything like that."

54.     MTN's transactions, and the terrorist attacks they funded, were acts of "international terrorism."  18 U.S.C. § 2333(a).

55.     Plaintiffs are U.S. citizens, and their family members, who served in Iraq between 2005 and 2010, and who were killed or wounded in terrorist attacks committed by one or more of al-Qaeda, al-Qaeda-in-Iraq, Ansar al-Islam, Hezbollah, and/or the Qods Force, who worked with one another to facilitate a devastating Sunni terrorist campaign against Americans in Iraq from 2005 through 2010 that was nearly as potent as the parallel Shiite terrorist campaign that Hezbollah, the Qods Force, and Jaysh al-Mahdi executed at the same time and for the same

16

purpose (kill Americans to drive the U.S. out of the Middle East). As alleged below, Plaintiffs are entitled to recover for their injuries under the federal Anti-Terrorism Act. MTN Group, MTN Irancell, Defendant Nhleko, and Defendant Charnley are liable under the ATA, 18 U.S.C. § 2333(a), because they provided material support to the IRGC, including its Hezbollah Division and Qods Force, al-Qaeda, al-Qaeda-in-Iraq, Ansar al-Islam, and the Taliban, including its Haqqani Network, in violation of 18 U.S.C. § 2339A. Each Plaintiff was killed or injured by an international act of terrorism that was committed by designated terrorists who received direct funding, weapons, weapons components, communications technology, and/or operational support made possible by MTN's conduct.

## DEFENDANTS

### A.    The MTN Defendants

56.    Defendant MTN Group Limited ("MTN Group," together with its subsidiaries, "MTN") is a South African telecommunications company whose stock trades publicly on the Johannesburg Stock Exchange under the ticker symbol MTN:SJ. Its principal place of business is in Roodepoort, South Africa.

57.    Defendant MTN Irancell is a joint venture between MTN Group, which has a 49% stake and is not in charge, and the Bonyad Mostazafan and Iran Electronics Industries ("IEI"), which collectively own a 51% stake and are fronts for the IRGC (sometimes abbreviated "IRGC-QF"). MTN Irancell is an Iranian company and its principal place of business is in Tehran, Iran. MTN Irancell operates as, and MTN Irancell's employees and agents work as operatives for, a front for the IRGC.

17

**B.     The Individual Defendants**

58.     Defendant Phuthuma Nhleko is a South African national who served as President of MTN Group Limited at all relevant times and directly aided every facet of the IRGC's terrorist enterprise.  Mr. Nhleko currently resides in South Africa.

59.     Defendant Irene Charnley is a South African national who served as Commercial Director of MTN Group Limited at all relevant times and directly aided every facet of the IRGC's terrorist enterprise.  Ms. Charnley currently resides in South Africa.

<u>JURISDICTION AND VENUE</u>

60.     This Court has subject-matter jurisdiction under 18 U.S.C. § 2338 and 28 U.S.C. § 2331.

61.     This Court has personal jurisdiction over each of the Defendants under Federal Rule of Civil Procedure 4(k)(1)I and/or 4(k)(2), and 18 U.S.C. § 2334(a).

62.     MTN Group's, MTN Irancell's, Phuthuma Nhleko's, and Irene Charnley's acts in the United States, including but not limited to, obtaining U.S.-origin phones, computing technologies, internet equipment, and information technology and management consulting services, all exported to the IRGC in Iran, and targeting the United States, including by each Defendant agreeing to the terms of the MTN's secret Security Cooperation Agreement with the IRGC, by each Defendant sponsoring direct payments by MTN to al-Qaeda and the post-FTO-designation Haqqani Network (when Sirajuddin Haqqani was a senior leader of both groups), and by each Defendant entering into transactions with fronts, operatives, and agents for the IRGC that were intent on harming United States nationals in Iraq, make appropriate this Court's jurisdiction over MTN Group, MTN Irancell, Phuthuma Nhleko, and Irene Charnley.

63.     MTN Group, Phuthuma Nhleko, and Irene Charnley, do business in New York, including by procuring U.S.-origin goods and services from companies located in the U.S.,

including New York, for the IRGC's fronts, agents, and operatives, maintaining accounts with financial institutions located in New York, including, on information and belief, a loan facility with Citibank and a depositary account with the Bank of New York, using the New York-based financial system and institutions to manage cash flow for MTN Group, MTN Irancell, utilizing a bank account in New York to wire funds to an agent of the Hezbollah and the Qods Force, to consummate a bribe relating to MTN's acquisition of the Irancell license, and working with a New York-based financial institution to issue a sponsored American depositary receipt (ADR).

64.    Venue is proper in this District under 18 U.S.C. § 2334(a), because Plaintiffs Todd L. Schulte and Maren Hesla reside in the District of Columbia.

19

## FACTUAL ALLEGATIONS

I. **SINCE THE ISLAMIC REVOLUTION IN 1979, THE ISLAMIC REVOLUTIONARY GUARD CORPS, INCLUDING THE QODS FORCE, HAS FOMENTED AND SUSTAINED ANTI-AMERICAN TERRORISM**

A. **The Islamic Revolutionary Guard Corps Has Long Supported Anti-American Terrorism As Part Of Iran's Foreign Policy**

65.    Iran is politically and ideologically hostile to the United States and its allies.  Iran often acts through its lead terrorist agent, Hezbollah – a designated Foreign Terrorist Organization since 1997 – which Iran funds, arms, and logistically supports.

66.    Iran has been designated as a State Sponsor of Terrorism since 1984.[1]  Iran has remained designated continuously since then.

67.    The 1979 Iranian Revolution was fueled in large part by militant anti-Americanism.  Eliminating the United States' role in the geographic region surrounding Iran – including through violence – was and remains a central tenet of Iranian foreign policy.[2]  Since the Iranian Revolution, Iran has engaged in and supported acts of terrorism directed at the United States and its allies as an instrument of Iran's foreign policy.

68.    Iran's support of terrorist proxies like Hezbollah, Hamas, the Taliban, and al-Qaeda is well-documented.[3]  Iran's support for such groups is especially prevalent in areas where Iran abstains from open conflict.  As a result of Iran's consistent and longstanding support of

---

[1] Iran was designated as a State Sponsor of Terrorism on January 19, 1984, pursuant to section 6 of the Export Administration Act of 1979 (50 U.S.C. § 4605), section 620A of the Foreign Assistance Act of 1961 (22 U.S.C. § 2371), and section 40 of the Arms Export Control Act (22 U.S.C. § 2780).

[2] Col. (ret.) Richard Kemp and Maj. (ret.) Charles Driver-Williams, *Killing Americans and Their Allies: Iran's Continuing War against the United States and the West*, Jerusalem Ctr. For Public Affairs (2015) ("*Killing Americans and Their Allies*"), http://jcpa.org/killing-americans-allies-irans-war/.

[3] *See* Alireza Nader, Joya Laha, *Iran's Balancing Act in Afghanistan* at 9 (RAND Corp. 2011) ("*Iran's Balancing Act*").

anti-American terrorism, the U.S. State Department formally designated Iran as a State Sponsor

of Terrorism in 1984.[4]  It has maintained that designation at all times since.[5]  In 2007, the U.S.

State Department described Iran as "the most active state sponsor of terrorism" in the world and

"a threat to regional stability and U.S. interests in the Middle East because of its continued

support for violent groups."[6]

69.     Iran carries out its support of terrorism largely through the IRGC.

70.     The IRGC "has a relatively strict command-and-control protocol and answers

directly to the Supreme Leader, Ayatollah Ali Khamenei."[7]  The Supreme Leader serves as head

of the IRGC and routinely employs the IRGC to further Iran's global terrorist agenda.

71.     As the U.S. Treasury Department noted in 2010 when it designated certain IRGC

officials pursuant to Executive Order 13224, "Iran also uses the . . . IRGC . . . to implement its

foreign policy goals, including, but not limited to, seemingly legitimate activities that provide

cover for intelligence operations and support to terrorist and insurgent groups."[8]

72.     Iran is politically and ideologically hostile to the United States and its allies.

Enmity toward America is foundational for the Iranian regime in general, and most of all, for

Grand Ayatollah Khamenei, who is the effective leader of the IRGC, including Hezbollah

Division and the Qods Force, both of which report to him personally.  At a 2005 rally, Khamenei

---

[4] *See* 49 Fed. Reg. 2836–02 (Jan. 23, 1984) (statement of Sec'y of State George P. Shultz designating Iran); U.S. State Dep't, *State Sponsors of Terrorism*, https://www.state.gov/j/ct/list/c14151.htm.

[5] *Id.*

[6] U.S. State Dep't, *Country Reports on Terrorism 2007* at 172 (Apr. 2008).

[7] *Iran's Balancing Act* at 10.

[8] Press Release, U.S. Treasury Dep't, *Fact Sheet: U.S. Treasury Department Targets Iran's Support for Terrorism Treasury Announces New Sanctions Against Iran's Islamic Revolutionary Guard Corps-Qods Force Leadership* (Aug. 3, 2010).

explained, "Our people say 'Death to America,' and this is like the saying 'I seek God's refuge from the accursed Satan,' which is recited before any chapter of the Koran, even before 'In the name of Allah the Compassionate, the Merciful.'"  Khamenei said the routine chanting of "Death to America" is designed so that Iranians "will never forget, even for a moment, that Satan is ready to attack him. . . .  The saying 'Death to America' is for this purpose."[9]

### 1.    Islamic Revolutionary Guard Corps

73.    The 1979 Iranian Revolution was fueled in large part by militant anti-Americanism.  Eliminating the United States's role in the geographic region surrounding Iran – including through violence – was and remains a central tenet of Iranian foreign policy.[10]

74.    The IRGC was established to safeguard the revolution, meaning, to pursue violence inside of Iran, i.e., terrorism against its own people, and external to Iran, i.e., terrorism against the United States and Israel, whom the IRGC considered to be the "Great Satan" and "Little Satan," respectively.  As Monika Gill, a defense researcher, explained in an analysis published by NATO in 2020: "The aphorism that 'war made the state and the state made war' applies to the IRGC; war made the Guard and the Guard made war."[11]

75.    Enmity toward America is foundational for the Iranian regime in general, and most of all, for Grand Ayatollah Khamenei, who is the effective leader of the IRGC, all of which are responsible to him personally.  At a 2005 rally, Khamenei explained, "Our people say 'Death

---

[9] Ali Khamenei, Channel 1, Iranian TV (Mar. 14, 2005).

[10] Col. (ret.) Richard Kemp and Maj. (ret.) Charles Driver-Williams, *Killing Americans and Their Allies: Iran's Continuing War against the United States and the West*, Jerusalem Ctr. For Public Affairs (2015) ("*Killing Americans and Their Allies*").

[11] Monika Gill, *Capitalism, Communications, and the Corps: Iran's Revolutionary Guard and the Communications Economy*, Defence Strategic Communications: The Official Journal of the NATO Strategic Communications Centre of Excellence, at 97 (Autumn 2020) ("Gill, *Capitalism, Communications, and the Corps*").

to America,' and this is like the saying 'I seek God's refuge from the accursed Satan,' which is recited before any chapter of the Koran, even before 'In the name of Allah the Compassionate, the Merciful.'"  Khamenei said the routine chanting of "Death to America" is designed so that Iranians "will never forget, even for a moment, that Satan is ready to attack him.  . . .  The saying 'Death to America' is for this purpose."[12]

76.     Article 176 of the Iranian Constitution provides that Iran's "security policies" sought to "preserv[e] the Islamic revolution" (i.e., export Iran's Islamist revolution abroad through proxy terrorism), through the "[e]xploitation of materialistic and intellectual resources of the country" (i.e., Iranian funds, arms, and training for terror proxies), "for **facing the** internal and **external threats**" (meaning, to target the United States for terrorist violence).

77.     Article 176 is widely understood, in Iran and worldwide, to explicitly enshrine the IRGC's anti-American terrorist mission into Iran's constitution because the IRGC is directed to "fac[e]" (i.e., target) "the" (i.e., an identified object) "external threats" (i.e., the U.S. and Israel).

78.     In her analysis of MTN Irancell, as published by NATO, Ms. Gill explained that under the IRGC's official, publicly-communicated security doctrine, the IRGC's "security" interests are defined as "leading an ongoing resistance" in a zero-sum fight the United States:

> [T]here is a strong feeling of shared Shi'a victimhood driving the IRGC worldview. Ayatollah Khomeini in particular, held the view … This sense of being surrounded by enemies of Iran and therefore, enemies of Shi'ism pervades the strategic narrative of both the neoconservative clerical establishment and the IRGC. Paradoxically, the IRGC's strategic narrative is well served by maintaining enemies and continually reinforcing the notion that the Islamic Republic is under attack. It allows the IRGC to define Iran in **diametric opposition to the enemies of the revolution** and to profess that it is **leading an ongoing resistance**. In this view, the IRGC strategic narrative is a **narrative of resistance**, expressing defiance against threats to the revolution, externally imposed hard and soft war, and the enemies of the Iranian state.[13]

---

[12] Ali Khamenei, Channel 1, Iranian TV (Mar. 14, 2005).

[13] Gill, *Capitalism, Communications, and the Corps* at 97 (emphasis added).

79.     As a result of the IRGC's consistent and longstanding support of anti-American terrorism, Iran was designated as a State Sponsor of Terrorism on January 19, 1984, pursuant to section 6 of the Export Administration Act of 1979 (50 U.S.C. § 4605), section 620A of the Foreign Assistance Act of 1961 (22 U.S.C. § 2371), and section 40 of the Arms Export Control Act (22 U.S.C. § 2780).  The United States has maintained that designation at all times since.

80.     On October 29, 1987, President Ronald Reagan issued Executive Order 12613 based upon his finding "that the Government of Iran is actively supporting terrorism as an instrument of state policy," and also as a result of Iran's "aggressive and unlawful military action against U.S.-flag vessels.  Exec. Order 12813, 52 Fed. Reg. 4194D (Oct. 30, 1987).

81.     In 1990, the IRGC transferred activities outside of Iran to its subordinate branch, the Qods Force, which translates to "Jerusalem Force," in reference to the IRGC's desire to destroy the state of Israel and take back Jerusalem.

82.     On March 15, 1995, President Clinton announced that "the actions and policies of the Government of Iran constitute an unusual and extraordinary threat to the national security … of the United States. …"  Exec. Order 12957, 60 Fed. Reg. 14615 (Mar. 17, 1995).

83.     On August 21, 1997, President Clinton issued Executive Order 13059 to consolidate and clarify Executive Orders 12957 and 12959, and comprehensively prohibit trade intended to benefit, among other things, the IRGC.  Exec. Order 13059, 62 Fed. Reg. 44531 (Aug. 21, 1997).  (That same year, the U.S. also designated Iran's lead terror agent, Hezbollah, as an FTO.)

84.     In 1998, Brigadier General Qassem Soleimani was appointed head of the Qods Force, a role in which he served continuously until his death in a U.S. airstrike in 2020.

24

85.     The Department of the Treasury implemented regulations pursuant to these Executive Orders which, in general, broadly prohibit any economic transactions with any entities that are controlled by the Government of Iran.  31 C.F.R. § 560.304 (defining "Government of Iran"), 31 C.F.R. § 560.313 (defining "entity owned or controlled by the Government of Iran"); 31 C.F.R. § 560.314 (defining "United States person").

86.     In 2007, the U.S. State Department described Iran as "the most active state sponsor of terrorism" in the world and "a threat to regional stability and U.S. interests in the Middle East because of its continued support for violent groups."[14]

87.     On May 27, 2009, the U.S. Treasury Department announced additional IRGC-related sanctions further reflecting the long-standing U.S. conclusion that the IRGC used its revenue to pay for Hezbollah's operations and training activities:

> The U.S. Department of the Treasury [] designated … two Africa-based supporters of the Hizballah terrorist organization, under E.O. 13224. E.O. 13224 targets ***terrorists and those providing support to terrorists or acts of terrorism*** by … prohibiting U.S. persons from engaging in any transactions with them.
>
> "We will continue to take steps to protect the financial system from the threat posed by ***Hizballah and those who support it***," said Under Secretary for Terrorism and Financial Intelligence Stuart Levey. …  Iran … provide[s] significant support to Hizballah, giving money, weapons and training to the terrorist organization.  In turn, Hizballah is closely allied with and has an allegiance to [Iran].  ***Iran is Hizballah's main source of weapons and uses its Islamic Revolutionary Guard Corps to train Hizballah operatives in Lebanon and Iran.***  Iran provides hundreds of millions of dollars per year to Hizballah.[15]

88.     The U.S. State Department has observed that "Iran used the [Qods Force] to implement foreign policy goals, provide cover for intelligence operations, and create instability in the Middle East.  The Qods Force is Iran's primary mechanism for cultivating and supporting

---

[14] U.S. State Dep't, *Country Reports on Terrorism 2007* at 172 (Apr. 2008).

[15] Press Release, U.S. Treasury Dep't, *Treasury Targets Hizballah Network in Africa* (May 27, 2009) (emphases added).

terrorists abroad."[16]  The Qods Force is the driving force behind Iran's activities in Iraq, as well as in Syria, Afghanistan, and elsewhere in the Middle East.

89.     The IRGC has a long and well-documented history of assassinations, kidnappings, bombings, and arms dealing.  It also regularly trains foreign terrorist proxies whose attacks promote Iran's political goals, often working side-by-side with Hezbollah.

90.     The Qods Force is responsible to and directed by the Supreme Leader of Iran. Major General Qassem Soleimani was the chief of the Qods Force for more than twenty years and oversaw the Qods Force's support for Hezbollah and its proxies to promote Iran's policies throughout the region.  Soleimani took his directions from Khamenei, with whom he shared a close personal relationship.  Soleimani was killed in a U.S. airstrike in Baghdad, Iraq on January 3, 2020.  Khamenei then appointed General Esmail Ghaani to replace Soleimani.

91.     The IRGC provides weapons, funding, and training for terrorist operations targeting American citizens, including for Hezbollah and, through Hezbollah, for Jaysh al-Mahdi.  Iran's Supreme Leader and central government are aware of and encourage those acts. Applying pressure against the United States by funding and supplying Hezbollah and other terrorist proxies in the Middle East and Central Asia is an official component of IRGC, including Qods Force, policy.

92.     The Qods Force has four regional commands, with each focused on implementing Iran's foreign policy in a neighboring region.  The First Corps focuses on Iraq, the Second Corps on Pakistan, the Third Corps on Turkey and Kurdistan, and the Fourth Corps on Afghanistan.

93.     The Qods Force's leader until his death, Qassem Soleimani, infamously boasted about his ability to threaten American lives in Iraq by relaying a message, through an

---

[16] U.S. State Dep't, *Country Reports on Terrorism 2015* at 300 (June 2, 2016).

26

intermediary, directly to U.S. General David Petraeus, who commanded U.S. forces in Iraq at the time, in which Soleimani taunted: "Dear General Petraeus, You Should know that I, Qassem Soleimani, control the policy for Iran with respect to Iraq, Lebanon, Gaza, and Afghanistan." Soleimani taunted General Petraeus after Iran-backed, Hezbollah-trained Jaysh al-Mahdi terrorists in Baghdad and elsewhere launched an especially brutal wave of terrorist attacks against Americans in Iraq that relied upon using IRGC-manufactured advanced rockets and IEDs built with IRGC-sourced components, which caused the U.S. government to protest Iranian terrorist activity in Iraq.

94.     The IRGC has used Hezbollah and its proxies to commit terrorist attacks.  While it is a Lebanese-based terrorist group, Hezbollah has pledged fealty to Iran's Supreme Leader. Each year the IRGC provides Hezbollah approximately $100 million to $200 million in funding and weapons.  As Ali Akbar Mohtashemi (a Hezbollah founder, former Iranian Ambassador to Syria and Lebanon, and former Iranian Minister of Interior) explained, "[Hezbollah] is part of the Iranian rulership; [Hezbollah] is a central component of the Iranian military and security establishment; the ties between Iran and [Hezbollah] are far greater than those between a revolutionary regime with a revolutionary party or organization outside its borders."[17]

95.     The IRGC intentionally used Hezbollah to lead every aspect of its terrorist campaign against Americans in Iraq, at least in part, because the IRGC wanted "plausible deniability" of Iranian involvement based upon the Iranian propaganda that IRGC Sunni Terrorist Proxies in Iraq, like al-Qaeda, were not Iranian agents.  To that end, when Defendants MTN Group, Phuthuma Nhleko, and Irene Charnley facilitated the flow of embargoed technology, secure phones, and funds to their Hezbollah, Qods Force, and Regular IRGC

---

[17] *Killing Americans and Their Allies*.

counterparties, such value chains created, funded, and managed by each Defendant flowed

through the IRGC to ultimately reach forward-deployed Hezbollah and Qods Force terrorist

operatives and logisticians – in the United States, Iraq, Syria, Lebanon, the U.A.E., Afghanistan,

Pakistan, and other geographies from which the IRGC facilitated terrorist attacks against

Americans in the Middle East – who, in turn, distribute the IRGC's terrorist finance, phones and

technologies, arms, and services to al-Qaeda, al-Qaeda-in-Iraq, Ansar al-Islam, and the Taliban,

including its Haqqani Network, who used such resources to facilitate attacks against Americas in

Iraq and Afghanistan. the IRGC Sunni Terrorist Proxies in Iraq.  In this way, Hezbollah, the

Qods Force, and Regular IRGC, influenced the IRGC Sunni Terrorist Proxies' attack campaigns

in Iraq and Afghanistan while simultaneously delegating the tactical details of such attacks to

their Sunni proxies.

96.     On April 15, 2019, the U.S. State Department designated the IRGC as a Foreign

Terrorist Organization.[18]  Announcing the designation, President Trump explained that "the

IRGC **actively participates in, finances, and promotes terrorism as a tool of statecraft**."[19]

According to the U.S. State Department's public statement explaining the designation, the IRGC

have "been directly involved in terrorist plotting; its support for terrorism is **foundational and**

**institutional**, and it has killed U.S. citizens."[20]  Through the IRGC's support for terrorist

organizations throughout the region, "[t]he Iranian regime has made a clear choice not only to

fund and equip, but also to fuel terrorism, violence, and unrest across the Middle East."[21]

---

[18] *See* 84 Fed. Reg. 15,278-01 (Apr. 15, 2019).

[19] Statement from the President on the Designation of the Islamic Revolutionary Guard Corps as a Foreign Terrorist Organization (Apr. 8, 2019) (emphasis added).

[20] U.S. State Dep't, *Fact Sheet: Designation of the Islamic Revolutionary Guard Corps* (Apr. 8, 2019) (emphasis added).

[21] *Id.*

97.     When the U.S. State Department designated the IRGC a Foreign Terrorist

Organization, Secretary of State Michael R. Pompeo stated:

> This is the first time that the United States has designated a part of another government as an FTO. … ***[T]he Iranian regime's use of terrorism as a tool of statecraft makes it fundamentally different from any other government.*** …
>
> For 40 years, the [IRGC] has actively engaged in terrorism and created, supported, and directed other terrorist groups. The IRGC … regularly violates the laws of armed conflict; it plans, organizes, and executes terror campaigns all around the world. …
>
> The IRGC institutionalized terrorism shortly after its inception, directing horrific attacks against the Marine barracks in Beirut in 1983 and the U.S. embassy annex in 1984 alongside ***the terror group it midwifed, Lebanese Hizballah***. Its operatives have worked to destabilize the Middle East from Iraq to Lebanon to Syria and to Yemen. …
>
> The IRGC … supports: Lebanese Hizballah, Palestinian Islamic Jihad, Hamas, Kata'ib Hizballah, among others, all of which are already designated as foreign terrorist organizations. …
>
> Our designation makes clear … that [the] Iranian regime not only supports terrorist groups, but engages in terrorism itself. This designation also brings unprecedented pressure on figures who lead the regime's terror campaign, individuals like Qasem Soleimani. … He ***doles out the regime's profits to terrorist groups across the region and around the world***.
>
> ***The blood of the 603 American soldiers the Iranian regime has found to have killed in Iraq is on his hands and on the hands of the IRGC more broadly***.[22]

98.     As the world's worst sponsor of terrorism, Iran is unique.  It is not a "normal"

country, but a place where the IRGC rely upon their corporate allies to directly enable violence

in an open and shocking manner.[23]

---

[22] Secretary of State Michael R. Pompeo, U.S. Department of State, *Remarks to the Press* (Apr. 8, 2019) (emphasis added).

[23] According to Ambassador Mark D. Wallace, the CEO of United Against Nuclear Iran ("UANI"): "International organizations must also realize that their relationship with Iran is not just … 'business as usual,' …  Put bluntly, Iran is in violation of many of its international treaty obligations, and it should not be treated like a member in good standing of international bodies."

99.     The IRGC's terrorist doctrine emphasizes the reliance upon charities, corporations, and endowments, and other ostensibly "civilian" or "economic" entities as covers for the IRGC.

100.     IRGC operatives follow sophisticated tradecraft designed to maximize the IRGC's ability to route funds, materials, and arms obtained through IRGC fronts, including Hezbollah and Qods Force fronts, through Hezbollah to IRGC proxies like the Taliban in Afghanistan and Jaysh al-Mahdi in Iraq.

101.     One such tactic known as the IRGC's **"Orbit" Strategy**, pursuant to which the IRGC, including its Hezbollah Division and the Qods Force, ordinarily structures transactions so that the IRGC is behind one side, one step removed, but fully in control.  This IRGC tradecraft is designed to give the IRGC, and its corrupt corporate and financial enablers, the ability to falsely claim that the IRGC did not directly benefit from an otherwise suspect transaction because the counterparty itself was "not IRGC."

102.     In 2020, NATO confirmed the IRGC's "Orbit" Strategy in Ms. Gill's analysis of the IRGC, which NATO published in *Defence Strategic Communications*, "[t]he official journal of the NATO Strategic Communications Centre of Excellence."[24]  According to Ms. Gill's study of the IRGC's terrorist finance and logistics strategies, the IRGC's practices while exercising control of Iran's heavy construction industry show the IRGC's "Orbit" strategy as being part of their terrorist tradecraft, because the entire point of the strategy is to enable a future accomplice –

---

Statement of the Honorable Mark D. Wallace, CEO United Against Nuclear Iran before the U.S. U.S. House of Representatives Committee on Foreign Affairs, *Iran Sanctions*, Congressional Testimony via FDCH (May 17, 2012) (emphasis added) ("Wallace May 17, 2012 Testimony"), 2012 WLNR 10405070.

[24] *Id*.

like a company that gets caught red-handed – to protest that there is no direct linkage between them and the IRGC:

> The IRGC-CF is comprised of a complex network of Orbit 1 companies and Orbit 2 companies. In Orbit 1 companies, the IRGC-CF is directly represented on the board of directors, whilst in Orbit 2 companies, there **appears to be no direct representation and therefore, seemingly no links** to the IRGC-CF. Whilst Orbit 2 companies appear independent of the IRGC, they maintain ties to the directly affiliated companies, and therefore remain under indirect IRGC influence. Baharahn Gostar Kish for example, is an information technology and communications company that has no formal links to the IRGC-CF, with no IRGC members on the board of directors. However, two board members represent Baharahn and Mowj Nasr Gostar, which are both Orbit 1companies, **meaning that the company still effectively falls under the IRGC economy**.[25]

103. When NATO published Ms. Gill's "Orbit" Strategy discussion, NATO essentially vouched for her conclusions because NATO would not have published an article that NATO believed to contain implausible or conclusory assertions.[26]

104. Ms. Gill's analysis leaves no doubt as to the true nature of MTN Group's, Phuthuma Nhleko's, and Irene Charnley's counterparties. Indeed, it compels the conclusion that, even now, MTN Group's public proclamations that MTN conducts its business in a compliant manner materially supports the IRGC's ability to conduct terrorist attacks against Americans around the world by obscuring the sources of IRGC finances, logistics, personnel, and objectives. Simply put, it is textbook IRGC terrorist tradecraft to structure deals that are designed to route value to the IRGC even when both sides to the transaction are **not** IRGC,

---

[25] *Id.* at 101-102 (emphasis added).

[26] On information and belief, NATO would have only published Ms. Gill's study of the IRGC if the professional staff at NATO, on behalf of NATO, believed that such article: (1) accurately characterized the facts to avoid misleading the contemplated primary audience or making any assertions that are implausible, *e.g.*, a government official working for NATO to defend the U.S. and Europe from, *inter alia*, terrorism; (2) offered reasonable opinions worthy of consideration by responsible parties; and (3) strengthened NATO's ability to fight terrorism, as that was NATO's primary mission for the two decades after 9/11.

which is a long-standing IRGC practice from transactions involving companies the IRGC effectively controls even when the IRGC is not a party to the transaction.

### 2.   Hezbollah

105.   Hezbollah is a Lebanon-based terrorist group that has pledged fealty to Iran's Supreme Leader.  The IRGC has long used Hezbollah (in collaboration with the Qods Force), to establish, expand, and oversee nationwide terror campaigns targeting Americans in the Middle East, doing so in Afghanistan, Iraq, Lebanon, Yemen, Syria, Israel, and elsewhere.

106.    Hezbollah "first emerged as a militia in opposition to the 1982 Israeli invasion of Lebanon,"[27] when the IRGC established Hezbollah as a subordinate part of the IRGC known as the IRGC's "Hezbollah Division,"[28] which IRGC status Hezbollah has maintained ever since.

107.   Hezbollah was and is the IRGC's lead terrorist proxy throughout the world, including in the U.S., Europe, and Dubai, serving, in effect, as the IRGC's external terrorist operations arm in conjunction with the Qods Force.

108.   Articles 150 and 154 of the Iranian Constitution enshrines Hezbollah's anti-American terrorist mission by ordering the IRGC to specifically target Americans in order to export Iran's Islamic Revolution.  Article 150 empowers the IRGC with the responsibility for

---

[27] Marc Lindemann (Captain, New York National Guard), *Laboratory of Asymmetry: The 2006 Lebanon War and the Evolution of Iranian Ground Tactics*, Military Review (May 1, 2010), 2010 WLNR 28507137 ("Lindemann, *Laboratory of Asymmetry*").  "Although Iran was engaged in the Iran-Iraq War at the time of the Israeli occupation, Iran's [IRGC] took the lead in organizing, training, and equipping Hezbollah. … 2,500 members of the IRGC [] enter[ed] Lebanon and set up training camps among the Shi'ite population in the Beqa'a Valley … Training at the IRGC camps became a prerequisite for membership in Hezbollah." *Id.*

[28] Michael Knights, *The Evolution of Iran's Special Groups in Iraq*, Combating Terrorism Center at West Point, CTC Sentinel, Vol. 3, No. 11 (Nov. 2010) ("Knights, *The Evolution of Iran's Special Groups in Iraq*").

"guarding the revolution and its achievements," (meaning, exporting the Islamist revolution),[29] while Article 154 confirms that Iran "supports the just struggles of the *mustad'afun* [downtrodden] against the *mustakbirun* [oppressors] in every corner of the globe." Thus, Iran's constitution directly embraces Hezbollah proxy terror (i.e., "the just struggles of the downtrodden") targeting the United States (i.e., "against the oppressors").[30]

109. Hezbollah's activities have stretched far beyond Lebanon's borders. Hezbollah's primary stated goal is the destruction of the United States and Israel, which it calls the "Great Satan" and the "Little Satan," respectively.[31] Hezbollah also frequently functions as a terrorist proxy for the IRGC committing and orchestrating terrorist attacks abroad with the IRGC's support. Hezbollah's 1985 manifesto proclaims that the "first root of vice is America" and explains that "Imam [Ruhollah] Khomeini, our leader, has repeatedly stressed that America is the cause of all our catastrophes and the source of all malice."[32]

---

[29] Under Iran's revolutionary doctrine, the Iranian government posits that it must always remain on the attack with respect to its promotion of insurgents against the Great Satan because, if Iran were to fall back (according to this paranoid theory), the U.S. would overrun Iran. Consequently, inside Iran and around the world, people familiar with Iran and the IRGC understand that references to "guarding the revolution" are *not* defense, but rather, are *offensive* because, under the paranoid Iranian view, the only way to "guard the revolution" is to go on the attack outside of Iran, through proxy terror campaigns. Any suggestion to the contrary is, quite literally, IRGC terrorist propaganda.

[30] When the Iranian government references "the oppressors" without any specification as to whom, that *exclusively* means only two countries: the United States and Israel. This is so because the Iranian regime was founded in direct opposition us and our ally, and Iran's founding documents mention no other hostile actor beyond the U.S. and Israel. Any suggestion to the contrary is, literally, Iranian propaganda designed for a western audience.

[31] *See* Times of Israel, *Nasrallah Proud that PM, Obama Discussed Hezbollah* (Nov. 11, 2015); Ariel Ben Solomon, *Nasrallah 'Proud' that Netanyahu and Obama Discussed Hezbollah in White House Meeting*, Jerusalem Post (Nov. 11, 2015).

[32] Hezbollah Manifesto, *reprinted in Anti-American Terrorism and the Middle East: A Documentary Reader* 50 (Barry Rubin & Judith Colp Rubin eds., Oxford Univ. Press 2002).

110.    In 2003, Hezbollah Secretary-General Hassan Nasrallah proclaimed:  "Let the entire world hear me.  Our hostility to the Great Satan [America] is absolute . . . .  Regardless of how the world has changed after 11 September, Death to America will remain our reverberating and powerful slogan:  Death to America."[33]

111.    Hezbollah has coordinated terrorist attacks around the world primarily by acting through terrorist proxies.  As Dr. Matthew Levitt has explained, "Hezbollah is extremely adept at recruiting members from local populations in areas where they have networks on the ground."[34] Hezbollah has trained and equipped these local terrorist proxies to carry out terrorist attacks on Hezbollah's behalf.  Hezbollah has successfully employed this strategy to facilitate attacks by its proxies in (among other places) Paris, France (1985-86); Buenos Aires, Argentina (1992); Khobar, Saudi Arabia (1996); Iraq (2005-present); and Yemen (2012-present).

112.    On January 25, 1995, the United States designated Hezbollah as a Specially Designated Terrorist.

113.    On October 8, 1997, the United States designated Hezbollah as an FTO, and it has retained that designation ever since.

114.    Richard Armitage, the Deputy Secretary of State under President George W. Bush, has described Hezbollah as "the 'A-Team of Terrorists,'"[35] and former CIA director

---

[33] Sept. 27, 2002 Al-Manar broadcast, *quoted in* "Hassan Nasrallah:  In His Own Words," Committee for Accuracy in Middle East Reporting in America (July 26, 2006).

[34] Matthew Levitt, *Hezbollah:  A Case Study of Global Reach*, Remarks to a Conference on "Post-Modern Terrorism:  Trends, Scenarios, and Future Threats" at 4 (Sept. 8, 2003).

[35] Ed Bradley, *Hezbollah:  "A-Team of Terrorists"*, CBS News (Apr. 18, 2003).

George Tenet has opined that Hezbollah "is [al-Qaeda's] equal if not far more capable organization."[36]

115.    Hezbollah was and is the IRGC's lead terrorist proxy in Iraq and the broader Middle East, serving, in effect, as the IRGC's external terrorist operations arm in conjunction with Hezbollah's close ally and patron, the Qods Force.

116.    Hezbollah's activities have stretched far beyond Lebanon's borders.  Hezbollah's primary stated goal is the destruction of the United States and Israel, which it calls the "Great Satan" and the "Little Satan," respectively.[37]  Hezbollah also frequently functions as a terrorist proxy for the IRGC, including its Qods Force, committing and orchestrating terrorist attacks abroad with the IRGC's support.  Hezbollah's 1985 manifesto proclaims that the "first root of vice is America" and explains that "Imam [Ruhollah] Khomeini, our leader, has repeatedly stressed that America is the cause of all our catastrophes and the source of all malice."[38]  In 2003, Hezbollah Secretary-General Hassan Nasrallah proclaimed:  "Let the entire world hear me. Our hostility to the Great Satan [America] is absolute . . . .  Regardless of how the world has changed after 11 September, Death to America will remain our reverberating and powerful slogan:  Death to America."[39]

---

[36] *Current and Future Worldwide Threats to the National Security of the United States:  Hearing Before the S. Comm. on Armed Services*, 108th Cong.  60 (Feb. 12, 2003) (testimony of George J. Tenet).

[37] *See* Times of Israel, *Nasrallah Proud that PM, Obama Discussed Hezbollah* (Nov. 11, 2015); Ariel Ben Solomon, *Nasrallah 'Proud' that Netanyahu and Obama Discussed Hezbollah in White House Meeting*, Jerusalem Post (Nov. 11, 2015).

[38] Hezbollah Manifesto, *reprinted in Anti-American Terrorism and the Middle East:  A Documentary Reader* 50 (Barry Rubin & Judith Colp Rubin eds., Oxford Univ. Press 2002).

[39] Sept. 27, 2002 Al-Manar broadcast, *quoted in* "Hassan Nasralah:  In His Own Words," Committee for Accuracy in Middle East Reporting in America (July 26, 2006).

117.    Hezbollah has coordinated terrorist attacks around the world primarily by acting through terrorist proxies.  As Dr. Matthew Levitt has explained, "Hezbollah is extremely adept at recruiting members from local populations in areas where they have networks on the ground."[40] Hezbollah has trained and equipped these local terrorist proxies to carry out terrorist attacks on Hezbollah's behalf.  Hezbollah has successfully employed this strategy to facilitate attacks by its proxies in (among other places) Paris, France (1985-86); Buenos Aires, Argentina (1992); and Khobar, Saudi Arabia (1996).

118.    Hezbollah is, and has always been widely understood in the U.S., Europe, Middle East, and Asia to be Iran's purpose-built anti-American and anti-Israeli Arabic Shiite terrorist division, which the IRGC designed to integrate within the IRGC's terror architecture, including, but not limited to, its financial, operational, and logistics networks in order to ensure that Hezbollah was inseparable from the Regular IRGC and Qods Force and always remained a formal part of the IRGC.  The IRGC built Hezbollah this way because the IRGC wanted to be able to control Hezbollah's every move while simultaneously maintaining the fiction that Hezbollah were merely "resistance" fighters.  The IRGC's ploy was key to facilitating its worst terrorist plots because the IRGC's primary purpose when it created its Hezbollah Division was to secure the IRGC's plausible deniability on a structural level by interposing a buffer – Hezbollah – between the IRGC and the Americans whom the IRGC wanted to murder.

---

[40] Matthew Levitt, *Hezbollah:  A Case Study of Global Reach*, Remarks to a Conference on "Post-Modern Terrorism:  Trends, Scenarios, and Future Threats" at 4 (Sept. 8, 2003).

119.    The IRGC has long relied on Hezbollah to aid the Qods Force's efforts to supply al-Qaeda, al-Qaeda-in-Iraq, Ansar al-Islam, and their Taliban terrorist allies,[41] all of whom were targeting Americans in Afghanistan and Iraq:

(i)    The IRGC has relied upon Hezbollah and the Qods Force to aid attacks against Americans by al-Qaeda and its allies since the early 1990s (in the case of al-Qaeda and Ansar al-Islam) and/or shortly after 9/11 (in the case of al-Qaeda-in-Iraq and the Taliban).

(ii)   Before 9/11, the IRGC, al-Qaeda, al-Qaeda-in-Iraq, Ansar al-Islam, and their respective affiliates, worked together to broker combined Islamist terrorist training activities at Taliban sites in Afghanistan, during which time terrorists from Hezbollah, the Qods Force, al-Qaeda, the Taliban, Hamas, and Palestinian Islamic Jihad trained, prayed, and studied together in order to develop the long-term skills and relationships that bin Laden demanded under his corporate "always be closing" model of terror, which emphasized cross-pollination with every possible Islamist terrorist group as long as such group wanted to help al-Qaeda and its allies kill Americans.[42]

(iii)  After 9/11, al-Qaeda, the IRGC, and their respective affiliates, intensified their transnational terrorist alliance; the IRGC acted primarily through its Hezbollah and Qods Force operatives distributed in cells worldwide, while al-Qaeda, al-Qaeda-in-Iraq, Ansar al-Islam, and the Taliban, for their part, acted primarily through al-Qaeda-related "polyterrorists" who served both al-Qaeda and another organization, e.g., Zarqawi was a member of al-Qaeda, al-Qaeda-in-Iraq, and Ansar al-Islam.

---

[41] The IRGC was essential to enabling trans-Sunni Islamist cooperation between Afghanistan/Pakistan and Iraq, and maximizing the ability of IRGC Sunni FTO Proxies in Iraq to leverage the personnel, funding streams, resources, and trainers available in Afghanistan and Pakistan in order to enhance the lethality of IRGC Sunni FTO Proxy Attacks in Iraq.  For example, al-Qaeda, al-Qaeda-in-Iraq, and Ansar al-Islam relied upon the funding and logistical support provided by the IRGC to source CAN fertilizer from Pakistan (to use for bombs in Iraq and Afghanistan), secure cell phones from America (to be used for communications or as a cash equivalent "free good" valued at $2,000 per phone), and critical narcotics trafficking and laundering assistance, which funded attacks against Americans in Iraq, including Plaintiffs and their loved ones, by al-Qaeda, al-Qaeda-in-Iraq, and Ansar al-Islam.

[42] *See*, *e.g.*, Hal Bernton, Mike Carter, David Heath and James Neff, *Going To Camp*, Seattle Times (Aug. 4, 2002) ("By [1998], al-Qaida training was formalized. There was even a textbook, available in Arabic, French and other languages. … Trainees practiced with small arms, assault rifles and grenade launchers provided by the Taliban …. They learned about explosives and land mines. Representatives of terrorist groups, including Hamas, Hezbollah and Islamic Jihad, gave lectures on their organizations."), 2002 WLNR 2584645.

120.    It would be improper to suggest that the IRGC's Hezbollah Division is not a part of the IRGC, does not benefit from IRGC funds and resources, and/or does not help flow through such IRGC resources to IRGC proxies like al-Qaeda, al-Qaeda-in-Iraq, and Ansar al-Islam. IRGC leaders, structures, doctrines, other sources confirm the broad understanding amongst Iran-led terrorists that Hezbollah was a part of the IRGC and benefited accordingly:

(i)     **IRGC Structure.**   The IRGC embedded Hezbollah within the IRGC as the IRGC's Hezbollah Division when the IRGC created Hezbollah in the 1980s, maintained the IRGC's "Hezbollah Division" within the IRGC ever since.[43]

(ii)    **Direct IRGC Funding.**  The IRGC directly funds its Hezbollah Division like its Qods Force, as they are two sides of the same IRGC external terror coin.  As the Defense Intelligence Agency ("DIA") concluded with "high confidence" in 2010, "Iran has methodically cultivated a network of sponsored terrorist surrogates capable of conducting effective, plausibly deniable attacks against … the United States," and the DIA "judge[d]" that "Tehran provide[d] support to terrorist and militant groups to support Iran's strategic interests in each situation."[44]  DIA concluded: "[e]lements of Iran's Islamic Revolutionary Guard Corps []have provided direct support to terrorist groups, assisting in the planning of terrorist acts or enhancing terrorist group capabilities."[45]

(iii)   **Hezbollah Founder Statements.**  Ali Akbar Mohtashemi (a Hezbollah founder, former Iranian ambassador to Syria and Lebanon, and former Iranian Minister of Interior) confirmed that "[Hezbollah] is part of the Iranian rulership; [Hezbollah] is a central component of the Iranian military and security establishment; the ties between Iran and [Hezbollah] are far greater than those between a revolutionary regime with a revolutionary party or organization outside its borders."[46]

(iv)    **Common IRGC Terrorist Tradecraft.**  The IRGC long practiced common terrorist tradecraft[47] across every component of the IRGC (regular, Hezbollah Division, and Qods

---

[43] *See, e.g.*, Knights, *The Evolution of Iran's Special Groups in Iraq*.

[44] Defense Intelligence Agency, *Unclassified Report on Military Power of Iran* (Apr. 2010).

[45] *Id*.

[46] *Killing Americans and Their Allies*.

[47] "Tradecraft" refers to the methodologies and philosophies of engaging in covert operations (including killings) and general espionage.  Terrorists and clandestine intelligence operatives both practice tradecraft.

Force) – including the use of Hezbollah as the cell leader and Qods Force as cell funder and logistician – and every geography in which the IRGC or any of its proxies operate.[48]

(v)  **Emphasis on Joint Hezbollah/Qods Force Cells.**  IRGC doctrine ordinarily calls for Hezbollah and Qods Force terrorists to be co-located out of joint cells when conducting IRGC terrorist operations outside of Iran.  The IRGC's joint cell approach is the foundation of the IRGC's terrorist doctrine and the cornerstone of the Hezbollah Division's entire terrorism "business model" when, as in most use cases, the Hezbollah Division and Qods Force are being deployed outside of Iran, or are being deployed inside of Iran but specifically to target Americans.  The common practice of Hezbollah and the Qods Force nearly always following the joint cell model when they are within striking distance of American – i.e., when the IRGC perceives its odds of success, and risk of danger, to both be at the highest level – also confirms the Hezbollah-IRGC integration.

(vi)  **Hezbollah's Public Declarations.**  Like the IRGC, Hezbollah considers itself a part of the IRGC.  In 1985, "Hezbollah publicly acknowledged its reliance on Iran," and publicly pledged their loyalty to the IRGC.[49]

(vii)  **Hezbollah Operatives' Loyalty Oaths to IRGC.**  Hezbollah operatives swear a personal oath of loyalty to Iran's Supreme Leader (and head of the IRGC), Ayatollah Khamenei, and personally pledge to carry out their terrorist missions in his name.

### 3.  Qods Force

121.  The IRGC has a special foreign division called the Qods Force.  The U.S. State Department has observed that "Iran used the Islamic Revolutionary Guard Corps-Qods Force (IRGC-QF) to implement foreign policy goals, provide cover for intelligence operations, and create instability in the Middle East.  The Qods Force is Iran's primary mechanism for

---

[48] The IRGC's tradecraft rules governing the IRGC, Hezbollah Division and the Qods Force, are ironclad, inflexible, widely known, and universally applied worldwide, befitting the IRGC's status as the world's largest, most globally distributed, professionalized transnational terrorist organization.  IRGC tradecraft emphasizes concealment and cover above all else.

[49] In its 1985 Statement, Hezbollah publicly proclaimed, among other things:  "We view the Iranian regime as the vanguard and new nucleus of the leading Islamic State in the world. We abide by the orders of one single … leadership, represented by 'WaIi Faqih' [rule of the jurisprudent] and personified by [Grand Ayatollah] Khomeini," who led Iran's Islamic Revolution and, as such, also served as the head of the IRGC and Hezbollah's sworn leader.

cultivating and supporting terrorists abroad."[50]  The Qods Force is the driving force behind Iran's activities in Iraq, as well as in Afghanistan and elsewhere in the region.

122.    The Qods Force is responsible to and directed by the Supreme Leader of Iran. Major General Qassem Soleimani, who was the chief of the Qods Force for more than twenty years, oversaw the Qods Force's support for terrorist groups to promote Iran's policies throughout the region.  Soleimani took his directions from Khamenei, with whom he shared a close personal relationship.  Soleimani was killed in a U.S. airstrike in Baghdad, Iraq on January 3, 2020.  Khamenei then appointed General Esmail Ghaani to replace him.

123.    Qassem Soleimani infamously boasted about his ability to threaten American lives in Iraq by relaying a message, through an intermediary, directly to U.S. General David Petraeus, who commanded U.S. forces in Iraq at the time, in which Soleimani taunted: "Dear General Petraeus, You Should know that I, Qassem Soleimani, control the policy for Iran with respect to Iraq, Lebanon, Gaza, and Afghanistan."  Soleimani taunted General Petraeus after Iran-backed, Hezbollah-trained terrorists launched an especially brutal wave of terrorist attacks against Americans in Iraq that relied upon using IRGC-manufactured weapons.

124.    The Qods Force has four regional commands, with each focused on implementing Iran's foreign policy in a neighboring region.  The First Corps focuses on Iraq, the Second Corps on Pakistan, the Third Corps on Turkey and Kurdistan, and the Fourth Corps on Afghanistan.

125.    The Qods Force provides weapons, funding, and training for terrorist operations targeting American citizens in Iraq, including by supporting terrorist organizations such as al-Qaeda.  As the U.S. government's Joint Improvised Explosive Device Defeat Organization ("JIEDDO") concluded:  "Iran's use of weapons smuggling networks is fairly predictable and

---

[50] U.S. State Dep't, *Country Reports on Terrorism 2015* at 300 (June 2, 2016).

meant to shape the manner in which foreign countries deal with Iran."[51]  For that reason, the

Qods Force varies the quantity, rate, and types of weapons provided to its proxy terrorist

organizations depending on the amount of pressure Iran wants to exert on a particular country.

Applying pressure against the United States by funding and supplying terrorist proxies in the

Middle East and Central Asia is thus an official component of Iran's foreign policy.

126.    The Qods Force operates a broad global network of front companies, often co-

located with Hezbollah.  Indeed, in recognition of the central role of cover to IRGC doctrine, the

IRGC created the Qods Force's Unit 400, which was tasked with the mission of facilitating the

IRGC's terrorist finance and logistics activities through illicit commercial transactions conducted

by a global network of IRGC fronts.[52]

127.    In October 2007, the U.S. Treasury Department designated the Qods Force as a

SDGT under Executive Order 13224 for providing material support to the Taliban and other

terrorist organizations, including Hezbollah and terrorist groups in Iraq.[53]  The U.S. Treasury

Department also designated multiple Qods Force members as Specially Designated Nationals

---

[51] Eric Parks, *Iranian Weapons Smuggling Activities in Afghanistan* at 9, JIEDDO J2 Open
Source Augmentation and Analysis Cell (Sept. 3, 2009) ("*JIEDDO Report*").

[52] *See.*, *e.g.*, Shahriar Kia, *Global Terrorist Activities Of The Iranian Mullah Regime*, Weekly
Blitz (Bangladesh) (Dec. 4, 2021) ("Unit 400 has a network of facilitators and proxies, including
elements in organized crime syndicates. These individuals collect information, make preliminary
logistical preparations, and carry out operations if necessary. These individuals sometimes are
trained inside Iran and sometimes in the Quds Force's training camps across the globe.  Unit 400
has various front companies that both provide cover and money for this terrorist entity to operate.
Two companies, Arash Zoobin, and Aria Navid, are used to secretly transfer weapons for Unit
400. Besides, the IRGC uses its vast network of front companies, religious or charitable
organizations around the world to recruit facilitators."), 2021 WLNR 39679934.

[53] Press Release, U.S. Treasury Dep't, *Fact Sheet: Designation of Iranian Entities and
Individuals for Proliferation Activities and Support for Terrorism* (Oct. 25, 2007).

pursuant to Executive Order 13224, based on their activities in Afghanistan.[54] Announcing the

Qods Force's SDGT-related designations, Treasury confirmed that "[t]he Qods Force":

(i)    "provide[d] material support to the Taliban, Lebanese Hizballah, Hamas, [and] Palestinian Islamic Jihad";

(ii)    "[was] the [IRGC's] primary instrument for providing lethal support to the Taliban";

(iii)    "provide[ed] weapons and financial support to the Taliban to support anti-U.S. and anti-Coalition activity in Afghanistan";

(iv)    "support[ed] Hizballah's military, paramilitary, and terrorist activities, providing it with guidance, funding, weapons, intelligence, and logistical support";

(v)    "operate[d] training camps for Hizballah in Lebanon" "and" "trained more than 3,000 Hizballah fighters at IRGC training facilities in Iran";

(vi)    "provide[d] roughly $100 to $200 million in funding a year to Hizballah and" "assisted Hizballah in rearming in violation of UN Security Council Resolution 1701"; and

(vii)    "provide[d] lethal support in the form of weapons, training, funding, and guidance to select groups of Iraqi Shi'a militants who target[ed] and kill[ed] Coalition [] forces."[55]

128.    In light of the foregoing, the Treasury Department confirmed, on behalf of the

U.S. government, that "[t]hrough Qods Force material support" the United States "believe[d]

Iran [was] seeking to inflict casualties on U.S." "forces" in the Middle East.[56]

129.    Moreover, the Treasury Department emphasized that the U.S. government

intended the Qods Force's newly announced SDGT designation to signal to multinational

corporations and their C-Suites – like Defendants – that they could no longer do business with

the IRGC's commercial fronts.  Among other things, Treasury stated:

(i)    "The U.S. Government is taking [] major actions today to counter Iran's … support for terrorism by exposing Iranian … companies and individuals that have been involved in these dangerous activities and by cutting them off from the U.S.

---

[54] *Id.*

[55] *Id.* (emphases added).

[56] *Id.*

financial system. … The Treasury Department [] designated the IRGC-Qods Force (IRGC-QF) under E.O. 13224 for providing material support to … terrorist organizations…"

(ii)    "Last week, [] Treasury [] issued a warning to U.S. banks setting forth the risks posed by Iran…. Today's actions are consistent with this warning, and provide additional information to help [] institutions protect themselves from deceptive [] practices by Iranian entities and individuals engaged in or supporting … terrorism."

(iii)   "As a result of our actions today, all transactions involving any of the designees and any U.S. person will be prohibited … Today's designations also notify the international private sector of the dangers of doing business with … the many IRGC-affiliated companies that pervade several basic Iranian industries. …"

(iv)   "Support for Terrorism -- Executive Order 13224 Designations E.O. 13224 is an authority aimed at freezing the assets of terrorists and their supporters, and at isolating them from the U.S. financial and commercial systems." [57]

130.    The U.S. State Department designated the Qods Force as an FTO in April 2019, along with the IRGC. [58]

## II.    AFTER 9/11, THE ISLAMIC REVOLUTIONARY GUARD CORPS, INCLUDING HEZBOLLAH AND THE QODS FORCE, ALLIED WITH AL-QAEDA, AL-QAEDA-IN-IRAQ, ANSAR-AL-ISLAM, AND THE TALIBAN, INCLUDING ITS HAQQANI NETWORK, TO WAGE A DEADLY TERRORIST CAMPAIGN AGAINST AMERICANS IN IRAQ AND AFGHANISTAN IN ORDER TO DRIVE THE UNITED STATES OUT OF THE MIDDLE EAST

131.    The IRGC's "security" agenda is the same in both Iraq and Afghanistan:  kill Americans to drive the United States out of the Middle East.  JIEDDO recognized in a 2009 report that "Iran's intentions are the same in both Iraq and Afghanistan:  to develop, fund and arm proxy networks to leverage against the perceived U.S. aim of pursuing an active regime change doctrine in Iran." [59]

---

[57] *Id.*

[58] *See* 84 Fed. Reg. 15278-01 (Apr. 15, 2019).

[59] *JIEDDO Report* at 5.

132.     The IRGC pursues its security agenda through the "IRGC Shareholders" whom Defendants materially aided comprised the three constituent parts of the IRGC, i.e., the IRGC's Hezbollah Division, the IRGC's Qods Force, and the Regular IRGC (hereinafter, collectively, the "IRGC Shareholders").[60]  The IRGC Shareholders sought to accomplish their "security" mission of expelling the United States from the Middle East, including Iraq and Afghanistan.

133.     On information and belief, at all relevant times, each of the three IRGC Shareholders made a roughly co-equal contribution to the terrorist campaign with respect to funds, equipment, weapons, terrorist personnel, technologies, and logistics.

134.     **The IRGC's Hezbollah Division**, has the same meaning as Lebanese Hezbollah, and was one of the IRGC's leaders in terror (hereinafter, "Hezbollah Division" or "Hezbollah").

(i)     **Role:**  At all relevant times, Hezbollah was a designated FTO based upon its service as the IRGC's External Security Organization, meaning, Hezbollah's service as the IRGC's lead agent for conducting "External Security" operations (i.e., anti-American terrorism) worldwide.  At all relevant times, Hezbollah served as the IRGC's "security" proxy specialist worldwide and, as such, was tasked with organizing anti-American "resistance" attack campaigns in, among other places, Iraq, Syria, Lebanon, and Afghanistan.

(ii)    **Leadership:**  At all relevant times, Hezbollah was commanded by **Hassan Nasrallah** ("Nasrallah").  At all relevant times, Nasrallah was internationally notorious (as covered by the media) around the world for being a terrorist, known within Iran for being a terrorist, and, on information and belief, understood by each Defendant to be an IRGC terrorist operative who served as the head of the Hezbollah Division and commanded some of the largest and most important IRGC terrorist finance, logistics, communications, weapons, narcotics, and operations fronts.

135.     **The IRGC's Qods Force,** meaning the IRGC's Iranian-staffed external "Security" Operations Division, which at all relevant times worked in close partnership with the IRGC's Hezbollah Division.

---

[60] The IRGC Shareholders are one and the same with the Iranian Shareholders, defined above, because the Iranian Shareholders were merely fronts for the IRGC Shareholders.

(i)   **Role:**  At all relevant times, the Qods Force was a designated SDGT based upon its service as the IRGC's Iranian-located terror organization that is the flip side of the coin of Hezbollah's External Security Organization and designed to work with Hezbollah through the IRGC's joint cell approach.  At all relevant times, the Qods Force served alongside Hezbollah as the IRGC's "security" proxy specialist worldwide and, as such, was tasked, alongside Hezbollah, with organizing anti-American "resistance" attack campaigns in, among other places, Iraq, Syria, Lebanon, and Afghanistan.

(ii)  **Leadership:**  Until his death in 2020, the Qods Force was commanded by **Brigadier General Qassem Soleimani** ("Soleimani").  At all relevant times, Soleimani was internationally notorious (as covered by the media) around the world for being a terrorist, known within Iran for being a terrorist, and, on information and belief, understood by each Defendant to be an IRGC terrorist operative who served as the head of the Qods Force and commanded some of the largest and most important IRGC terrorist finance, logistics, communications, weapons, narcotics, and operations fronts, and worked closely with Hezbollah pursuant to the IRGC's joint cell model.

136.   **Regular IRGC**, meaning the IRGC's Internal Security Division (hereinafter as an organization, "Regular IRGC," and as individual members, "IRGC Regulars").

(i)   **Role:**  At all relevant times, Regular IRGC and the IRGC Regulars who served within it operated ***exclusively*** within the geographic borders of Iran and served primarily as fronts for IRGC's terrorist finance, logistics, illicit technology acquisition, and intelligence activities, in order to coordinate the logistics and supply chain needs for the other two IRGC Shareholders, i.e., the IRGC's Hezbollah Division and Qods Force, through Regular IRGC's maintenance of various fronts and cover companies, charities, and foundations, inside Iran, including, but not limited to, the Bonyad Mostazafan, IEI, IEDC, and TCI.

(ii)  **Leadership:**  At all relevant times, Regular IRGC was commanded by the IRGC terrorist, **IRGC Chief of Staff Mohammad Forouzandeh** ("Forouzandeh").  At all relevant times, Forouzandeh was internationally notorious (as covered by the media) around the world for being a terrorist, known within Iran for being a terrorist, and, on information and belief, understood by each Defendant to be an IRGC terrorist operative who served as the IRGC Chief of Staff and commanded the largest and most important IRGC terrorist finance, logistics, and operations front, the Bonyad Mostazafan.

137.   After 9/11, the IRGC organized a transnational terrorist alliance – the Islamists' answer to NATO – to marshal efficiencies across the anti-American terrorists, thereby maximizing the lethality of their shared terrorist campaign.  The IRGC's global terrorist alliance comprised a litany of allied Shiite and Sunni terrorist groups.  Generally, such groups could be

45

divided between, on the one hand, transnational groups which seek to attack Americans anywhere, or regional groups, which focus on a geography.

138.    In all cases, however, the terrorists: (a) sought to attack and kill Americans to force the United States to withdraw from the Middle East, including Iraq and Afghanistan; and (b) relied upon a network of terrorist allies – a Terrorist NATO – necessary to counteract the U.S.-led coalitions in Iraq and Afghanistan, which organized the world's most powerful militaries and intelligence services to confront these terrorists.

139.    Simply put, the IRGC and its terrorist allies in Iraq and Afghanistan knew they needed their own transnational alliance with all the same functionalities as NATO to successfully prosecute a global terror campaign against Americans on multiple continents for decades.

140.    After 9/11, the IRGC's Hezbollah Division and Qods Force led the IRGC's support for this scheme.  With respect to the Hezbollah Division, Hezbollah's terrorist mastermind, Imad Mugniyeh, led this effort until the U.S. and Israel killed him in 2008, after which Mugniyeh was replaced by other well-trained and experienced Hezbollah Division terrorist operatives.  With respect to the Qods Force, the IRGC's terrorist mastermind, Qassem Soleimani, led the Qods Force-related aspects of the scheme until his own death at the hands of an American drone strike in 2020.

141.    To operationalize the various nodes of the scheme – including transnational logistics, financial relationships, arms pipelines, smuggling routes, and the like – Hezbollah and the IRGC worked together with each other globally (as they have since the IRGC "midwifed" Hezbollah).  Hezbollah and the Qods Force followed the same terrorist playbook and tradecraft around the world, which essentially breaks down into two modes of support.

142.     By 2007, under the leadership of Hassan Nasrallah and Qassem Soleimani, Hezbollah and the Qods Force had organized anti-American and anti-Israeli "resistance" (i.e., terror) cells in dozens of countries on six continents.

143.     If Hezbollah and the Qods Force did *not* have a decades-long alliance with the terrorist proxy and were also not sectarian co-religionists, then the IRGC and Hezbollah followed a different approach, which was the terrorist equivalent to President Ronald Reagan's famous maxim: "trust but verify."  Under this approach, Hezbollah and the Qods Force, backed by all the money and logistics the IRGC could provide, identified Sunni terrorist groups that could serve as allies of convenience for their shared terrorist agenda against the United States.  The IRGC terrorist proxies who depended upon the IRGC's material support under this approach included:

(i)     **al-Qaeda**, which Hezbollah and the Qods Force supported through their global network of cells with respect to their logistics, funding, transportation, arms supply, and which Hezbollah and the Qods Force supported inside of Iran, Iraq, Afghanistan, and Pakistan, through the provision of funds, safe haven, communications, and logistical support;

(ii)    **the Taliban and its Haqqani Network**, which Hezbollah and the Qods Force supported through their global network of cells with respect to their logistics, funding, transportation, arms supply, and which Hezbollah and the Qods Force supported inside of Iran, Iraq, Afghanistan, and Pakistan, through the provision of funds, arms, training, safe-haven, communications, and logistical support;[61]

(iii)   **al-Qaeda-in-Iraq**, which Hezbollah and the Qods Force supported through their global network of cells with respect to their logistics, funding, transportation, arms supply, and which Hezbollah and the Qods Force supported inside of Iran, Iraq, Syria, and Turkey, through the provision of funds, arms, training, safe-haven,

---

[61] Hezbollah, the Qods Force, al-Qaeda, and the Taliban, including its Haqqani Network, sometimes combined forces to jointly commit an attack against Americans in Iraq, Afghanistan, or another geography to which every organization could contribute or network connections.  On information and belief, all these groups coordinated – in a plot led by Brigadier General Esmail Ghaani of the Qods Force and Sirajuddin Haqqani of al-Qaeda and the Taliban, including its Haqqani Network – to facilitate one or more joint Qods Force/Haqqani Network attacks in Afghanistan in 2020 and/or 2021 as explicit retaliation for the January 2020 U.S. drone strike in Iraq that killed Qassem Soleimani (head of Qods Force) and Abu Muhandis (head of Jaysh al-Mahdi Special Group Kataib Hezbollah).

communications, and logistical support, other than the period from on or about 2013 through on or about 2016 (when they halted all cooperation to kill each another), before resuming on or about 2017;[62] and

(iv) **Ansar al-Islam**, which Hezbollah and the Qods Force supported through their global network of cells with respect to their logistics, funding, transportation, arms supply, and which Hezbollah and the Qods Force supported inside of Iran, Iraq, Syria, and Turkey, through the provision of funds, arms, training, safe-haven, communications, and logistical support, other than the period from on or about 2013 through on or about 2016 (when they halted all cooperation to kill each another), before resuming on or about 2017; which Hezbollah and the Qods Force supported in Iraq; and (collectively, **"IRGC Sunni Terrorist Proxies"**).

144.    The IRGC materially aided every aspect of the IRGC Sunni Terrorist Proxies' terrorist campaigns against Americans in Iraq.

145.    To facilitate terrorist attacks against Americans by IRGC Sunni Terrorist Proxies, the IRGC depended upon the large flow of money, equipment, weapons, and logistical support, as well as the "cover" provided by the corporate entity, from the complicit corporate partners, including MTN Group, MTN Dubai, MTN Irancell, Defendant Nhleko, Defendant Charnley, and any corporate allies that conspired with the IRGC to create and operate these terrorist fronts.

---

[62] One of the signal mistakes that Western analysts routinely make is to assume that terrorist groups in the Middle East are not willing to cooperate with one another while other arms of the same organization are murdering each other.  The examples of this phenomenon are legion, and the common glue binding it all together is the Islamists' universal hatred of the United States and Israel, which typically motivates the leading Islamist groups in the Middle East to put aside their differences to kill a common foe.  This pattern asserted itself in Iraq after the U.S. departure in 2011.  Even at the height of the Sunni-Shiite violence in Iraq from 2012 through 2016, Sunni and Shiite groups still routinely cooperated with one another.  For example, ISIS and Jaysh al-Mahdi operatives were reputed for negotiating cease fires so that they could barter with one another and replenish their stocks before resuming the slaughter (e.g., a Jaysh al-Mahdi terrorist trading a few thousand dollars' worth of "free goods" in the form of a pharmaceuticals that serve as pre-attack stimulants to get the terrorist jacked up and ready to kill) with an ISIS terrorist, who trades his own lucrative "free goods" (in the form of an untraceable American smartphone that has a black market street resale value of $2,000).  Opposing terrorists did this because they often had differing strengths and weaknesses in their respective supply lines and bartering with even a hated enemy was better than any other alternative.

146.     Iran's support of terrorist proxies like Hezbollah, Hamas, the Taliban, and al-Qaeda is well-documented.[63]   The IRGC's and its Qods Force's support for such groups is especially prevalent in areas where Iran abstains from open conflict.

147.     While Americans worked to rebuild post-war Iraq, they were attacked by al-Qaeda, al-Qaeda-in-Iraq, and Ansar al-Islam terrorists.   The IRGC sponsored those terrorist attacks to undermine American foreign policy in Iraq.   To that end, the IRGC supported al-Qaeda's regional efforts in the Middle East, including al-Qaeda's most radical part, al-Qaeda-in-Iraq, by, among other things, training al-Qaeda terrorists how to attack Americans effectively, providing arms, funding, communications, transportation, haven, and logistical support, and paying bounties to terrorists who killed Americans in Iraq.

148.     The "sinister genius" of IRGC terrorist mastermind Qassem Soleimani keyed the burgeoning Sunni terrorist campaign against Americans in Iraq. This insurgency was led by a litany of IRGC assets, including two of the top al-Qaeda terrorists relevant to Iraq: (i) **Saif al-Adel**, al-Qaeda's military chief who coordinated its campaign, including support for al-Qaeda-in-Iraq, from his Qods Force-provided safe haven in Iran; and (ii) **Abu Musab al-Zarqawi**, the al-Qaeda operative who led al-Qaeda-in-Iraq on the ground and co-led Ansar al-Islam with Mullah Krekar, another IRGC asset.   Al-Qaeda, al-Qaeda-in-Iraq (or "AQI"), and Ansar al-Islam, between them, accounted for essentially all Sunni terrorist attacks on Americans in Iraq from 2004 through the present, with AQI ultimately becoming ISIS.   The common goal connecting all Iranian strategy

---

[63] *See* Alireza Nader, Joya Laha, *Iran's Balancing Act in Afghanistan* at 9 (RAND Corp. 2011) ("*Iran's Balancing Act*").

was that, as one analyst explained, "Iran would do everything it could to ensure that America's experiment [in Iraq] turned into a smoldering failure."[64]

149.    It is likely that Qassem Soleimani's support of Shiite and Sunni terrorists in Iraq collectively accounted for more Americans killed or injured in terrorist violence after 9/11 than any other single terrorist.  As Karim Sadjadpour of the Carnegie Endowment for International Peace explained in an interview, given Soleimani's support for anti-American terror,

> That's why you have … one, if not two, generations of American military forces whom if you were to ask them, who is your worst adversary in the world, the person you see as the greatest threat to the United States? Even when Osama bin Laden was living and Baghdadi [the leader of ISIS] was living, they would have still said Qassem Soleimani.[65]

150.    Since 2003, Sunni terrorists have repeatedly attacked American service members and civilians working to rebuild Iraq and support its elected government.  The IRGC provided material support for those attacks, which killed or injured Plaintiffs.

151.    The IRGC's multi-faceted support for Sunni terrorists in Iraq is consistent with bin Laden's "grand alliance" approach to anti-American terror.  In fact, bin Laden himself portrayed al-Qaeda as the leader of a broader coalition drawing from other terrorist organizations in Pakistan and Afghanistan and supported by a latticework of jihadist affiliates and allies around the world.[66]

152.    Iran's support for multiple components of bin Laden's "syndicate" ensured that its support for Sunni terrorist groups had maximum effect.  Due to the mutually reinforcing ties

---

[64] Karim Sadjadpour, *The Sinister Genius of Qassem Soleimani*, Wall St. J. (Jan. 10, 2020) ("Sadjadpour, *Sinister Genius*").

[65] Karim Sadjadpour, *quoted in* National Public Radio, *'Throughline': The Origins Of Iran's Gen. Qassem Soleimani* (Jan. 30, 2020) ("NPR, *Throughline*").

[66] *The al Qaeda-Taliban Connection*.

between the IRGC, al-Qaeda, AQI, and Ansar al-Islam, support for any one benefited the others – and vice versa.

153.    Iran recognized those interrelationships and so spread its support across multiple Sunni terrorist groups targeting Americans in Iraq.  In doing so, Iran was able to achieve its intended effect:  wide-ranging terrorist attacks against Americans, executed mostly by the Sunni terrorist group AQI, but supported by (and sometimes jointly committed with) other Iranian terrorist allies (e.g., AQI jointly committing a suicide bombing attack with al-Qaeda).

154.    Like Iran's use of Shiite proxies, the IRGC's use of Sunni proxies was consistent with Iran's twin strategic goals: to impose maximum terrorist violence against Americans in Iraq while simultaneously maintaining "plausible deniability" by reducing the public Iranian role inside Iraq.  Rather than openly engage in armed conflict with the U.S. or other Coalition Forces, Iran usually attempted to present an Iraqi face to its efforts to undermine U.S. peacekeeping efforts by supporting terrorism and sectarian violence there.

155.    From 2003 through the present, Iran was responsible for increasingly lethal attacks on U.S. forces in Iraq and, as one example, provided Sunni terrorist proxies with the capability to assemble explosives designed to defeat armored vehicles.

156.    Against that backdrop, Plaintiffs identify below the principal Iraqi terrorist groups, subgroups, and cells that committed the attacks that killed and injured them.

157.    The IRGC's support for al-Qaeda complemented its support for other IRGC Sunni Terrorist Proxies, like Ansar al-Islam in Iraq and the Taliban in Afghanistan, because of the close relationship between al-Qaeda and its Sunni allies.  Although al-Qaeda and allies like Ansar al-Islam and the Taliban were nominally separate groups, al-Qaeda effectively operated as joint venture partners with Ansar al-Islam in Iraq, Iran, and Turkey, and with the Taliban in

Afghanistan and Pakistan.  In both examples, al-Qaeda's cooperative model facilitated the

efficient planning, authorization, and commission of terrorist attacks against Americans in Iraq

and Afghanistan.  Al-Qaeda's joint ventures with its terrorist partners involved mafia-style

meetings between leaders of the various FTOs and provided a superstructure that organized and

facilitated a range of terrorist attacks in Iraq and Afghanistan, as well as the cross-pollination of

best practices, resources, smuggling routes, and the like between Islamists in both countries,

which the IRGC facilitated.[67]

158.    Within the Afghanistan/Pakistan region, al-Qaeda and the Taliban organized a

"Syndicate" of al-Qaeda affiliated terrorists, which further amplified the power of the IRGC's

material support to Iranian terrorist allies in Afghanistan and Pakistan, as well as al-Qaeda and

Taliban material support for their own Sunni Islamist allies in Iraq, such as Ansar al-Islam,

which was also an Iranian proxy.

159.    By funneling material support to al-Qaeda and, in effect, all of Qaeda's allies in

Iraq and Afghanistan, the IRGC ensured that its policy of sponsoring anti-American terror in Iraq

and Afghanistan achieved maximum effect.  Due to the mutually reinforcing ties between al-

Qaeda, al-Qaeda-in-Iraq, Ansar al-Islam, the Taliban, and Iran, in Iraq and Afghanistan, support

for any group in either country benefited the others everywhere one benefited the others

everywhere – and vice versa.  The IRGC recognized those interrelationships and so spread its

---

[67] *See*, *e.g.*, U.N. Security Council, *Fifth Report of the Analytical Support and Sanctions Monitoring Team Appointed Pursuant to Resolution 1526 (2004) Concerning Al-Qaida and the Taliban and Associated Individuals and Entities* ¶ 11 (Sept. 20, 2006) ("The Taliban [] continued to benefit from a close relationship with Al-Qaida and related foreign groups. … Al-Qaida attack techniques have also become more evident in Afghanistan… New explosive devices are now used in Afghanistan within a month of their first appearing in Iraq. And while the Taliban have not been found fighting outside Afghanistan/Pakistan, there have been reports of them training in … Iraq….").

support across essentially every major Sunni terrorist group operating in the Middle East.  In doing so, the IRGC was able to achieve its intended effect:  wide-ranging IRGC Sunni Terrorist Proxy attacks against Americans in Iraq.

160.    Consistent with the alliance between Iran, Hezbollah, and al-Qaeda, and pursuing Soleimani's terrorist vision, Iran provided material support to the three primary Sunni terrorist groups that were committing attacks against Americans in Iraq:  al-Qaeda, al-Qaeda-in-Iraq, and Ansar al-Islam.  These groups committed attacks on their own, and in combination with one (or both) of the other groups.  In so doing, al-Qaeda, al-Qaeda-in-Iraq, and Ansar al-Islam formed a grand alliance of Sunni terrorists targeting Americans in Iraq with the support of Iran.

161.    Plaintiffs identify below several terrorist groups, subgroups, and partnerships responsible for the specific attacks that killed and injured them.  Each worked in concert with the IRGC and their sectarian allies and shared resources, personnel, and operational plans.  Plaintiffs also identify how the IRGC facilitated terrorist attacks by al-Qaeda, al-Qaeda-in-Iraq, Ansar al-Islam, and their allies against Americans in Iraq.

### A.    The Al-Qaeda-Taliban Syndicate

162.    The IRGC and al-Qaeda have cooperated so effectively for decades because they share a common doctrinal emphasis on cooperation amongst terrorist groups. Since its inception, al-Qaeda doctrine has emphasized terrorist strategy that borrows heavily from cooperative game-theoretic principles, including concepts such as cooperation theory, franchising, and joint ventures.  Al-Qaeda's post-9/11 strategy reflected bin Laden's long-standing vision of al-Qaeda (and him, specifically) as the leader of a grand terrorist coalition across Iraq, Afghanistan, and

Pakistan.[68]  Due to the mutually reinforcing ties between al-Qaeda and its Sunni allies –

including their practice of cross-donations to each other – support for one benefited all.

163.    Al-Qaeda's doctrines concerning cooperation with other jihadists and the need for

interoperability substantially mirrors that of the IRGC.

164.    Al-Qaeda's interdependence and joint venture with its allies in Iraq, Afghanistan,

and Pakistan continued throughout the period in which Plaintiffs were killed and injured.

165.    Starting in 2002, al-Qaeda and its affiliated clerics began calling for jihad against

the United States in the event of an American invasion of Iraq.  For example, al-Qaeda terrorist

"thought leader" Abu Qatada publicly boasted to international media that al-Qaeda and its affiliates

would launch a jihad against Americans and their Iraqi allies just as al-Qaeda had launched a

similar jihad against America and its Afghan allies following the U.S. invasion of Afghanistan

after 9/11, and stated:  "The growth of American tyranny … and its plan to attack Iraq and establish

an 'Iraqi Karzai' will necessitate an even fiercer battle."

166.    Al-Qaeda's leaders messaged to its terrorists and sympathizers that the American

presence in Iraq was an American "plot" to kickstart a religious war between Sunnis and Shiites

to divide the Muslim world so that the "Crusaders" (the United States) and "Jews" (Israel) could

divide and conquer it.

167.    Following the U.S. invasion of Iraq, al-Qaeda escalated its support for the Sunni

terrorist insurgency in Iraq from its safe havens in Iran, Afghanistan, and Pakistan.  For example,

on March 24, 2004, an al-Qaeda spokesman issued a call for Muslims "to take part in jihad against

---

[68] *See* Bill Roggio & Thomas Joscelyn, *The al Qaeda – Taliban Connection*, Weekly Standard
(July 4, 2011) ("*The al Qaeda – Taliban Connection*").

the United States in Iraq."  Demonstrating how the Sunni groups worked together on their shared jihad against Americans in Iraq, Ansar al-Islam's website widely repeated al-Qaeda's message.

168.    By the mid-2000s, al-Qaeda's partnership with the Haqqani Network – a part of the Taliban that was a long-standing ally of al-Qaeda in Pakistan and Afghanistan, and that also received material support from Iran – had facilitated the emergence of a network of al-Qaeda training camps in North Waziristan, Pakistan, near the Afghan-Pakistan border, less than a week's overland travel to Iran.  According to a declassified 2008 Defense Intelligence Agency intelligence report:

> [Sirajuddin] Haqqani is also affiliated with the several foreign fighter (ff) training facilities that are controlled by or associated with al Qaeda (AQ) in North Waziristan. . . .  A list and brief description of each facility follows . . .
>
> A. Mohammad Taher ((Yuldashov)), leader of the Islamic Movement of Uzbekistan (IMU), and his 60 bodyguards are staying at an AQ training center in Miram Shah Dand.
>
> B.  There is an al-Qaeda training center located at the Miskeen and Khaisur in Miram Shah.  Approximately 45 U/I Arabs and Uzbeks receive training there.
>
> C.  An AQ training facility called "Shaki Massod" is located in Miram Shah and over 200 AQ members (NFI) reside there; Usama bin Laden has been seen in this center (NFI).
>
> D.  Another AQ training facility is located at Spin-Qamar in Masood District of Northern Waziristan.  Over 80 Arabs receive training there (NFI).[69]

169.    Al-Qaeda also established multiple training camps within Afghanistan reportedly "hosted by the Taliban."[70]  One such camp covered nearly 30 square miles and contained heavy weapons, IED-making material, anti-aircraft weapons, rocket-propelled grenade systems, machine

---

[69] Defense Intelligence Agency, *Location and Activities of the Training Centers Affiliated with the Haqqani Network, Taliban, and al-Qaeda in Northern Waziristan and Future Plans and Activities of Sarajuddin ((Haqqani))*, Intelligence Information Report (Apr. 16, 2008).

[70] Thomas Joscelyn and Bill Roggio, *Trump's Bad Deal With The Taliban*, Politico (Mar. 18, 2019).

guns, pistols, rifles, and ammunition.  Al-Qaeda used these camps, in part, to help run what amounted to a "continuing education" program for senior terrorist commanders and operatives that provided instruction in the above-described al-Qaeda camps in Afghanistan and Pakistan for operations against Americans in Iraq.

170.    Al-Qaeda forward deployed a significant number of operatives and planners into Iraq, who were often dual-hatted terrorists who served as members of both al-Qaeda and al-Qaeda-in-Iraq.  Most famously, Zarqawi was a dual-member, serving as both a member of al-Qaeda as well as the founder and leader of al-Qaeda-in-Iraq.  Al-Qaeda-forward-deployed terrorists in Iraq were essential force multipliers for al-Qaeda-in-Iraq's terrorist campaign against Americans there. Al-Qaeda operatives served in a similar role as American Green Berets, helping to "train the trainer" and scale up AQI's terrorist capabilities.

171.    Through al-Qaeda's use of training camps in Afghanistan and Pakistan – which al-Qaeda, al-Qaeda-in-Iraq, and Ansar al-Islam all accessed through the terrorist land bridge provided by Iran – terrorists from all three groups obtained the training, technical expertise, and indoctrination essential to executing the signature al-Qaeda attack types used by all three groups in Iraq, including suicide bombings, improvised explosive devices (or "IEDs") derived from fertilizer, and attacks against helicopters.  Al-Qaeda thus helped its Iraqi affiliates, including al-Qaeda-in-Iraq and Ansar al-Islam, bring its signature tactics to the Iraqi theater.  They proved highly effective at countering American defenses.

172.    Al-Qaeda training and expertise, in combination with that of the IRGC, was also essential to the successful adaptation of sophisticated IED types and attack strategies by Sunni terrorists in Iraq.  Al-Qaeda developed sophisticated techniques for refining fertilizer into ammonium nitrate, marrying the ammonium nitrate with a lethal triggering device and delivery

system, and training terrorists how to move, deploy, and maximize the lethality of the resulting fertilizer bombs, which were delivered via IED or suicide bomber. As Senator Charles Schumer stated in 2004, "truck bombs using [calcium ammonium nitrate ("CAN") fertilizer] are the weapon of choice of al-Qaida."

173.    At all relevant times, al-Qaeda was the world leader amongst Sunni terrorist groups with respect to building sophisticated bombs, including through the process of converting CAN fertilizer into bombs to attack Western targets, having used the technique in every major area of operations for al-Qaeda-affiliated terrorists since 9/11, including, but not limited to, attacks in Indonesia, Turkey, Syria, Yemen, Iraq, Afghanistan, and Pakistan. After 9/11, al-Qaeda supported fertilizer-based bomb strategies in every theater in which it engaged in terrorist attacks against America and its allies. As one journalist wrote in 2007, "[i]n the new age of Islamist terrorism, [CAN] fertilizer packed into a truck with plastic explosive as a detonator has also become an al Qaida trademark."[71]

174.    Al-Qaeda regularly instructed terrorist operatives from its Iraqi affiliates, in person (at camps in Afghanistan, Pakistan, and Iran) and in writing, regarding CAN fertilizer bombs. For example, a 39-page al-Qaeda memo recovered from an al-Qaeda laptop in Pakistan in 2004 instructed how military explosives were often impractical to acquire, and instructed jihadists to instead use home-made explosives, including ammonium nitrate bombs derived from CAN fertilizer.

175.    From 9/11 through today, al-Qaeda's terrorist enterprise benefited from al-Qaeda operatives who were "polyterrorists," *i.e.*, al-Qaeda terrorist operatives who **also** simultaneously

---

[71] David Barrett, *Deadly Fertiliser Bombs Used By Terrorists Worldwide*, Press Association News (Apr. 30, 2007).

served as a terrorist operative for one or more al-Qaeda affiliates.  By design, al-Qaeda

operatives in Pakistan were often members of other Pakistan-based al-Qaeda affiliates, most

commonly, the Haqqani Network and Lashkar-e-Taiba, and al-Qaeda operatives in Iraq were

often members of al-Qaeda-in-Iraq, Ansar al-Islam, or some combination thereof.  Typically, al-

Qaeda's polyterrorist operatives or agents served the group's transnational terrorist activities in

support of the attack campaign against Americans in Iraq and Afghanistan.  Former Assistant

Treasury Secretary for Terrorist Finance Juan C. Zarate explained in 2013:

> Treasury's [counter-terror] strategy … aimed at targeting networks of key
> financial actors and nodes in the terrorist support system.  The point was … to
> make it harder for individuals who were financing terrorists to access the formal
> financial system.  Our analyses therefore focused on the networks of actors and
> institutions providing the financial backbone to terrorist enterprises.  Interestingly,
> we found that there were all-purpose financiers who would give to multiple
> causes—"polyterror" supporters.[72]

176.    Since the mid-2000s, Sirajuddin Haqqani was – and remains today – the signal

example of an al-Qaeda "polyterrorist" operative who killed Americans.  Sirajuddin Haqqani

was the son of bin Laden's long-standing ally, mentor, and protector, Jalaluddin Haqqani.  By

2008, Sirajuddin Haqqani was simultaneously:  (1) a senior al-Qaeda operative, leader, and

attack planner, who served as the most important member of al-Qaeda's military council

(essentially, its terrorist planning committee); (2) the Haqqani Network's top operative, attack

planner, and leader; and (3) a senior leader of the Quetta Shura Taliban, which would eventually

make him its number two leader (Deputy Emir).

177.    On February 29, 2008, the U.S. State Department designated Sirajuddin Haqqani

an SDGT for "acts of terrorism that threaten the security of U.S. nationals or the national

---

[72] Juan C. Zarate, *Treasury's War: The Unleashing of a New Era of Financial Warfare* 41
(Public Affairs 2013) ("Zarate, *Treasury's War*").

security, foreign policy, or economy of the United States" and the U.S. Congress specifically identified Sirajuddin Haqqani as "the overall leader of the Haqqani Network as well as the leader of the Taliban's Mira shah Regional Military Shura" in 2012.[73]

178.    When the U.S. Treasury Department designated Sirajuddin Haqqani's uncle Khalil Al-Rahman Haqqani as an SDGT, it noted that he "has also acted on behalf of al-Qa'ida and has been linked to al-Qa'ida military operations."[74] The Treasury Department likewise has repeatedly recognized links between Haqqani Network leaders and al-Qaeda.

179.    Sirajuddin Haqqani facilitated al-Qaeda members' efforts to join and fight with the Haqqani Network and the rest of the Taliban. According to U.S. intelligence officers, Sirajuddin Haqqani acts as a member of al-Qaeda's military council. U.S. officials have described him as al-Qaeda's top facilitator in Afghanistan.

180.    Sirajuddin Haqqani was also, like his father Jalaluddin, famous for his pragmatism in defense of his extremism.  Sirajuddin was willing to do deals and make trades with people, groups, and governments whom he may otherwise wish to kill if the deal in question made it more likely that al-Qaeda and the Taliban, including its Haqqani Network, could kill Americans in Afghanistan.

181.    Sirajuddin Haqqani was the most important transnational Syndicate leader and played a vital role in harmonizing the various strategies and tactics, as well as promoting

---

[73] Public Notice, *In the Matter of the Designation of Sirajuddin Haqqani, aka Sirajuddin Haqani, aka Siraj Haqqani, aka Siraj Haqani, aka Saraj Haqqani, aka Saraj Haqani, as a Specially Designated Global Terrorist Pursuant to Section 1(b) of Executive Order 13224, as Amended*, 73 Fed. Reg. 12,499 (Mar. 7, 2008); Pub. L. 112-168, 126 Stat. 1299, § 2(a)(8) (Aug. 10, 2012).

[74] Press Release, U.S. Dep't of Treasury, *Treasury Targets the Financial and Support Networks of Al Qa'ida and the Taliban, Haqqani Network Leadership* (Feb. 9, 2011).

network efficiencies and cooperation with FTOs from across the Middle East.[75]  Thus, for example, if a Qods Force "security" operative needed secure travel into Paktika Province (a Haqqani Network stronghold), the Qods Force terrorist could contact someone from the Haqqani clan and make the necessary arrangements.

182.    When Plaintiffs were attacked, Sirajuddin Haqqani, and the al-Qaeda and Taliban organizations he led, promoted deep cooperation amongst al-Qaeda, the Taliban (including its Haqqani Network), and the IRGC (including its Hezbollah Division and Qods Force), which funded al-Qaeda, al-Qaeda-in-Iraq, and Ansar-al-Islam attacks against Americans in Iraq by, among other things, helping grow the pool of funds available to all through their shared narcotics enterprises.  Simply put, when the Haqqani Network makes money through transnational crime, al-Qaeda usually receives a share, which supports al-Qaeda's ability to sponsor attacks in Iraq and Afghanistan from al-Qaeda's planning hubs in Iran and Pakistan.

183.    When Plaintiffs were injured between 2005 and 2012, Sirajuddin Haqqani served as the top al-Qaeda/Taliban "polyterrorist" responsible for coordinating key transnational-facing aspects of al-Qaeda's terrorist campaign against Americans in the Middle East including, but not limited to, coordinating with Hezbollah and the Qods Force to share financial relationships, trade weapons, exchange intelligence, profit from mutually beneficial narcotics relationships, and pay taxes to one another for use of smuggling routes and the like.

--------

[75] *See*, *e.g.*, U.N. Security Council, *Twelfth Report of the Analytical Support and Sanctions Monitoring Team Submitted Pursuant to Resolution 2557 (2020) Concerning the Taliban and Other Associated Individuals and Entities Constituting a Threat to the Peace, Stability and Security of Afghanistan* ¶ 28 (June 1, 2021) ("The Haqqani Network" "[had] a highly skilled core of members who specialize[d] in" "provid[ing] technical skills, such as [IED] and rocket construction[] [and] [t]he Haqqani Network remain[ed] a hub for outreach and cooperation with regional foreign terrorist groups and [was] the primary liaison between the Taliban and Al-Qaida.").

### B.    Al-Qaeda-In-Iraq

184.    Bin Laden always viewed al-Qaeda as the leader of a terrorist joint venture in which al-Qaeda led a broader anti-American jihadist coalition.  As a result, while al-Qaeda sometimes committed attacks itself, it most often acted through its Iraqi affiliates, al-Qaeda-in-Iraq and/or Ansar al-Islam, who themselves often worked together.

185.    Al-Qaeda-in-Iraq was a Sunni terrorist group and al-Qaeda affiliate that was established in 1999.  Though it had many names,[76] al-Qaeda-in-Iraq had one consistent mission: killing Americans and others who opposed al-Qaeda's agenda.

186.    Al-Qaeda-in-Iraq was founded and originally led by a Jordanian national who was a senior member of al-Qaeda:  Ahmad Fadil Nazzal Al-Khalayleh, better known by his *nom de guerre*, Abu Musab al-Zarqawi.  Until his death, Zarqawi was a notorious anti-American terrorist who, among other things, was a known senior member of al-Qaeda, and known to have personally decapitated at least one American hostage in Iraq on camera.

187.    Zarqawi joined al-Qaeda in Afghanistan in the late 1990s.

188.    According to a confidential document of the Spanish antiterrorist agency the *Unidad Central de Información Exterior* ("UCIE"), Zarqawi joined the senior ranks of al-Qaeda's leadership in the summer of 1999, becoming one of the small circle of terrorists who served as a direct "lieutenant" of bin Laden himself.  As such, the UCIE concluded that Zarqawi was

---

[76] Zarqawi's al-Qaeda affiliate has had various names since its creation, including Tawhid wal Jihad, aka al-Tawhid & al-Jihad (from inception to October 2004), al-Qaeda in the Land of Two Rivers, aka al-Qaeda-in-Iraq (from October 2004 through January 2006), the Mujahideen Shura Council (from January 2006 through October 2006), the Islamic State of Iraq (from October 2006 through April 2013), Islamic State in Iraq and Syria, aka ISIS (from April 2013 through June 2014) and finally the Islamic State (from June 2014 through present).  While the names changed, at all relevant times, the organization built by Zarqawi with Iran's backing pursued attacks against Americans in Iraq.  In this Complaint, Plaintiffs collectively refer to all such groups, prior to al-Qaeda's split from Islamic State in 2014, as "al-Qaeda-in-Iraq."

responsible for planning al-Qaeda's operations and commanded dozens of al-Qaeda terrorists to that end.

189.    An obvious terrorist mastermind and leader, he moved rapidly up al-Qaeda's ranks, becoming a member of al-Qaeda's managerial staff in Afghanistan only a few months after moving there.   By 2000, Zarqawi had established himself as al-Qaeda's most indispensable terrorist operator and was a critical al-Qaeda leader in Afghanistan.

190.    In 2001, Zarqawi took the oath of allegiance to al-Qaeda and Osama bin Laden. Written by bin Laden himself, Zarqawi declared as his oath to al-Qaeda and bin Laden personally: "I recall the commitment to God, in order to listen to and obey my superiors, who are accomplishing this task with energy, difficulty, and giving of self, and in order that God may protect us so God's words are the highest and his religion victorious."

191.    Having sworn an oath of allegiance to al-Qaeda and bin Laden in 2001, Zarqawi had to follow al-Qaeda's instructions and advance al-Qaeda's terrorist agenda.   Indeed, this was the point of the oath in the first instance:  to ensure Zarqawi's fidelity to al-Qaeda and its jihad for the rest of his life with a public commitment to God to fight under al-Qaeda's banner, advance its jihad, and avoid any conflict of interest with al-Qaeda.  Though he would sometimes spar with his al-Qaeda masters in later years, Zarqawi was always, until his death in 2006, a senior al-Qaeda terrorist.

192.    By the summer of 2001, Zarqawi was a well-known senior al-Qaeda operative, and was equally well-versed in every aspect of the al-Qaeda terrorist playbook that he later imported into Iraq.  Indeed, he was so well-established that a 30-page guide to al-Qaeda in Afghanistan for new al-Qaeda recruits specifically identified Zarqawi as one of the al-Qaeda leaders there who

could be contacted by recruits in order to help them with respect to religious, logistical, or lodging needs in country.

193.    Less than a year after joining al-Qaeda, Zarqawi had so demonstrated his terrorist talent and trustworthiness that the group permitted him to establish his own al-Qaeda training camp near the border with Iran in Herat, Afghanistan, which Zarqawi did with al-Qaeda's financial and logistical support.  In less than two years, Zarqawi's presence in Herat quickly grew from a dozen al-Qaeda personnel in 2000 to several thousand terrorists and supporters by the time they evacuated the camp prior to U.S. airstrikes in October 2001.

194.    After the set up al-Qaeda's camp in Herat, Zarqawi regularly traveled between Herat and Kabul on behalf of al-Qaeda.  Herat was known then (as it is today) as a key site of terrorist activity, as the hub that opens the way to Iraqi Kurdistan through Iran.  Accordingly, Iran's consulate in Herat – which also serves as a hub for IRGC-QF terrorist activities – kept records of the travels of terrorists associated with al-Qaeda and its affiliates, Zarqawi and his cell in particular. As a result, Zarqawi's operations for al-Qaeda were known to Iranian authorities before and after 9/11.

195.    Zarqawi's frequent travels back and forth between Herat, Afghanistan, and Iraqi Kurdistan – accomplished every time via Iran – was to secure al-Qaeda's survival after 9/11.  Bin Laden anticipated, correctly, that the United States would expel al-Qaeda and its Taliban protectors from Afghanistan after 9/11 and planned for a "progressive redeployment" of al-Qaeda to two locations: Pakistan (where bin Laden and Zawahiri planned to regroup) and Iraqi Kurdistan (where bin Laden contemplated Zarqawi and his cell would regroup).

196.    Before and after 9/11, Zarqawi also effectively controlled Ansar al-Islam by installing Jordanian allies from his hometown of Zarqa into key operational positions throughout

Ansar al-Islam, including, but not limited to, Khaled Al-Aruri (alias Abu Ashraf) and Abdel Hadi Ahmad Mahmoud Daghlas (alias Abu Ubaydah), both of whom were living in Iran at the time, on the border with Iraqi Kurdistan.  In this capacity, Zarqawi's Ansar al-Islam lieutenants coordinated Ansar al-Islam operations, taking orders from Zarqawi, their commander.

197.     Zarqawi's Ansar al-Islam cell grew to include more than a dozen Jordanian terrorists recruited by Zarqawi. These lieutenants ensured Zarqawi's effective control over Ansar al-Islam, in combination with al-Shami (in Iraqi Kurdistan) and Mullah Krekar (from his Norwegian refuge).  While Ansar al-Islam operated in Iraqi Kurdistan, under Zarqawi's lead, Ansar al-Islam's network was based in Iran and was comprised nearly entirely of Zarqawi's men.

198.     Months after 9/11, Zarqawi was injured in an American airstrike in Afghanistan. Needing to elude capture by American forces and obtain urgent medical care, Zarqawi fled Afghanistan in an escape that was organized by Iran.  When he fled to Iran for safe haven and medical treatment, Zarqawi was already a widely known al-Qaeda terrorist who was understood to be a key lieutenant of bin Laden. His terrorist career was already quite familiar to the IRGC and Soleimani, who knew his reputation as one of the few al-Qaeda commanders who could plan and conduct large-scale, mass-casualty attacks, and that he had established himself as a de facto head of operations for al-Qaeda.

199.     On or about 2002, with the support of Iranian operatives under the direction of Qassem Soleimani, Zarqawi founded al-Qaeda-in-Iraq.  By the onset of the U.S. presence in Iraq in 2003, Zarqawi turned al-Qaeda-in-Iraq into the primary Sunni terrorist threat against Americans there by working with al-Qaeda to mobilize the coalition of anti-American Sunni terrorists in Iraq under al-Qaeda's banner – carried in Iraq by AQI – and conducting a series of mass-casualty strikes against prominent U.S. and international targets in Iraq in 2003.

200.     Assessing his first nine months of jihad against Americans in Iraq in a January 2004 letter, Zarqawi claimed credit for nearly all of the suicide attacks against Americans in Iraq:

> We have been the key for all the suicide missions that have taken place, except in the north.  By the grace of God, I have conducted twenty-five operations … against … the Americans and their soldiers and the forces of the coalition.

201.     As 2004 began, Zarqawi accelerated his efforts to rally Sunnis to join his "resistance" against the United States in Iraq, leaning into his deep al-Qaeda rolodex and celebrity in jihadist circles.   In a January 2004 letter to al-Qaeda attributed to Zarqawi by the U.S. government, Zarqawi asked for al-Qaeda's aid and support for his terrorist campaign against Americans in Iraq, and wrote:

> We need to create armies of mujahidin … to fight the enemy—the Americans, the police, the soldiers. … We are continuing to train ourselves and strengthen our ranks.  We will strike at them with suicide operations and car bombs. … If you are of the same opinion, if you adopt it as your program, … and you are convinced by the idea of fighting the infidels, we will be your soldiers, under your banner, obeying your orders and taking a public oath of allegiance to you.

202.     Zarqawi also began broadcasting messages in various media in which he urged Muslims to join the violent campaign against Americans in Iraq, citing his warped view of Islam as justification for mass violence against Americans throughout the country.

203.     Zarqawi at all times believed it served al-Qaeda's and al-Qaeda-in-Iraq's interests to mobilize public opinion in Iraq and throughout the Muslim world against the U.S. presence in Iraq.  As a result, al-Qaeda-in-Iraq prioritized targeting Americans to drive the U.S. out of Iraq.

204.     By the spring of 2004, Zarqawi had fully unified violent Sunni extremists against Americans in Iraq into one grand coalition of terror, playing off his al-Qaeda credentials, leadership of Ansar al-Islam, and status as a broadly respected operational leader amongst the Sunni terrorist community.

205.    Zarqawi cemented his leadership of Sunni terrorists in Iraq through his gruesome murder of an American contractor, Nicholas Berg, whom al-Qaeda-in-Iraq kidnapped west of Baghdad on April 9, 2004.  On May 11, 2004, Zarqawi beheaded Mr. Berg in a videotaped murder of unspeakable barbarity.[77]   For Zarqawi and al-Qaeda-in-Iraq, barbarity was the entire point: Through his murder of Mr. Berg, Zarqawi was communicating to other Sunni extremists in Iraq that they should join the fight under his leadership in Iraq.

206.    Demonstrating the interconnections between al-Qaeda, al-Qaeda-in-Iraq, and Ansar al-Islam, Zarqawi's beheading of Mr. Berg was widely broadcast on websites linked to al-Qaeda and its affiliates.  For example, the video was published on Ansar al-Islam's website with the title "Sheikh Abu Musab Zarqawi Slays an American Infidel."

207.    In May 2004, Zarqawi branded his al-Qaeda affiliate, which he had turned into a trans-Sunni terrorist coalition against Americans in Iraq, under the banner Tawhid wal Jihad (meaning "Monotheism and Jihad").  Ansar al-Islam, Ansar al-Sunna, Jaysh Mohammed, al-Jamaa Salafiya, Takfir wal Hirja, and Jund al-Sham all joined Zarqawi's campaign.  (Several of these groups, including Ansar al-Islam and Jund al-Sham, were also groups Zarqawi himself helped establish.)  While some continued to exist under their own names, all these groups were controlled by al-Qaeda and al-Qaeda-in-Iraq (then known as Tawhid wal Jihad), through Zarqawi, from that point.  Boasting about his ability to transit between Iran, Iraq, and Syria in support of his attacks

---

[77] In the video, Mr. Berg was bound, forced to kneel, and dressed in an orange jumpsuit like those worn by Guantanamo Bay detainees.  Zarqawi read an anti-American screed that called Americans the enemy and demanded a broad Sunni jihad against Americans in Iraq, stating: "You are tired of the oratorical squabbling and public debates. … The time has now come to make jihad and brandish the sword that the prophet has sent us. … You will see your warrior brothers hang the head of this infidel from one of the bridges in Baghdad so that no one will forget the way we treat infidels.  May he bear witness to the honor of the Muslims."  Zarqawi then beheaded Mr. Berg.

against Americans there, on May 25, 2004, Zarqawi declared: "I am global, and no land is my country."

208.     By 2004, Zarqawi had well more than 1,000 well-trained al-Qaeda-in-Iraq terrorists under his command throughout the country.  While his grand Sunni terrorist coalition conducted attacks throughout Iraq, their primary area of operations was the Sunni Triangle, which was "a central region in Iraq that supplied the power base of Saddam's Baath party," and "mainly comprised of Sunni Muslims," and which was "outlined by Tikrit in the north, Ramadi in the southwest and Baghdad in the southeast."[78]

209.     Falluja served as the Zarqawi group's headquarters in the Sunni Triangle (commanded by Zarqawi lieutenant Abu Nawras Al-Faluji).  Al-Qaeda-in-Iraq also maintained large cells throughout Iraq, which were in each instance commanded by hand-selected Zarqawi lieutenants, including in Baghdad (Umar Bazyani), northern Iraq (Husain Salim), Anbar (Abu Azzam Abdallah), and Mosul (Abu Talha).  Zarqawi also prioritized building cells at key transport and smuggling nodes for al-Qaeda and al-Qaeda-in-Iraq and stood up al-Qaeda-in-Iraq cells in an array of other Iraqi cities and provinces including Samarra (on the approach to Baghdad), Diyala (near the border with Iran, and a critical waypoint on the road to Lebanon), and al-Qaim (on the border of Syria).

210.     On October 16, 2004, the U.S. military launched a comprehensive offensive to oust Zarqawi's terrorists from their Falluja stronghold in the Sunni triangle.  The day after the start of the American operation, Tawhid wal Jihad publicly declared that it was joining al-Qaeda in order to coordinate the Sunni campaign against Americans in Iraq under one leader in theater (Zarqawi) who was acting on behalf of, and supported by, al-Qaeda, whose leader (bin Laden) they, in turn,

---

[78] Bill Roggio, *The Battle of the Sunni Triangle*, FDD's Long War Journal (Oct. 22, 2004).

swore fealty to.  Zarqawi did so in a boldly titled public oath, entitled "The Tawhid wal Jihad Movement, its Emir [Zarqawi], and its Fighters Have Joined the Cause of al-Qaeda and Sworn Allegiance to Sheikh Osama bin Laden," which he signed "Abu Musab Al-Zarqawi, commander of the Tawhid wal Jihad movement."  Unambiguously and publicly confirming the Tawhid wal Jihad's status as an al-Qaeda affiliate, Zarqawi announced that Tawhid wal Jihad would now be known as "al-Qaeda in the Land of Two Rivers," i.e., al-Qaeda-in-Iraq.  In his declaration, Zarqawi recognized bin Laden's authority, publicly embraced al-Qaeda's terrorist campaign against Americans in Iraq, and urged all Iraqi Sunnis to do so as well:

> O Sheikh of the mujahidin, if you cross the sea, we shall cross it with you.  If you give orders, we shall listen; if you forbid, we shall obey.  You are the designated leader for the armies of Islam against all infidels, Crusaders, and apostates.

211.    Shortly after Zarqawi's announcement, al-Qaeda formally accepted his public declaration of fealty and commitment of al-Qaeda-in-Iraq to al-Qaeda's banners.

212.    As a practical matter, Zarqawi's declaration was immaterial because he was already a long-standing member of al-Qaeda who had sworn fealty to bin Laden, and Tawhid wal Jihad was already al-Qaeda's widely recognized affiliate in Iraq.  The date chosen for the announcement, however, demonstrated the tight nexus between al-Qaeda and al-Qaeda-in-Iraq with respect to Sunni extremists' efforts to rally against the U.S. presence in Iraq.

213.    On December 17, 2004, the U.S. government designated al-Qaeda-in-Iraq as a Foreign Terrorist Organization, which designation it has maintained ever since.

214.    At all times, al-Qaeda-in-Iraq carried out al-Qaeda's agenda in Iraq with ruthless efficiency.  Using al-Qaeda's personnel (including Zarqawi), money, expertise, and training infrastructure, al-Qaeda-in-Iraq consolidated essentially all non-Kurdish Sunni terrorists in Iraq under one banner, led by Zarqawi and his followers.

215.     Al-Qaeda and al-Qaeda-in-Iraq worked closely with one another to execute a comprehensive campaign of terrorism against Americans serving in Sunni strongholds in Iraq, including, but not limited to, Ramadi, Falluja, Mosul, and other geographies where al-Qaeda and al-Qaeda-in-Iraq had a monopoly on anti-American terror.  In so doing al-Qaeda and al-Qaeda-in-Iraq aggressively pursued every signature al-Qaeda attack type: suicide bombings, IED attacks, attacks against helicopters, kidnappings, sniper attacks, and complex attacks.

216.     Even after being rebranded as the ISIS, the group formally known as al-Qaeda-in-Iraq continued to be an al-Qaeda affiliate until on or about 2014, when al-Qaeda and ISIS formally separated.

### C.     Ansar Al-Islam

217.     Ansar al-Islam, translated as "supporters, partisans or followers of Islam," was a primarily Kurdish Salafist terrorist group based in northern Iraq in Iraqi Kurdistan.

218.     Ansar al-Islam was initially organized in Iraqi Kurdistan on September 1, 2001, under its previous name Jund al-Islam (soldiers of Islam).  It was formally founded three months later through the merger of several other Kurdish terrorist groups, including Kurdish Hamas, Tawhid, and the Al-Tawid Islamic Front, the Second Sorand Unit, the Reformist Group, and Jund al-Islam.

219.     Ansar al-Islam was a Salafist group that followed the teachings of al-Qaeda terrorists, including bin Laden, Zawahiri, and Zarqawi.

220.     Although Ansar al-Islam was initially comprised mainly of Kurds, it grew to include Sunni Arabs who lived in, or traveled to, northern Iraq, including Palestinians, Iranians, Jordanians, Afghans and Arabs from other countries.

221.    Ansar al-Islam focused its terrorist activities in northern Iraq.  At all times, Ansar al-Islam sought to impose an Islamic caliphate in Kurdistan and has conducted a campaign of terror against Americans in Iraq to drive the U.S. out of Iraq.

222.    From before 9/11 through 2003, Ansar al-Islam was led by Mullah Krekar, Najim al-Din Faraj Ahmad (also known as Faraj Ahmad Najmuddin) of the Reformist Group.  Mullah Krekar studied Islamic jurisprudence under Osama bin Laden's mentor, Abdullah al-Zam, and generally adopted a theological viewpoint similar to al-Qaeda's.

223.    In November 2001, Mullah Krekar publicly celebrated Osama bin Laden and expressed his desire to see the creation of a grand alliance of jihadist groups in Kurdistan.

224.    In 2002, Zarqawi and his lieutenants met in Kurdistan with Mullah Krekar and his associate Abu Abdullah Al-Shafii, the founder of Jund al-Islam.  During this meeting, Zarqawi, on behalf of al-Qaeda and his own al-Qaeda affiliate (then known as Tawhid wal Jihad), Ansar al-Islam, and Jund al-Islam all agreed to effectively merge as allies in order to share weapons, personnel, safehouses, and other logistical resources.

225.    By the eve of the U.S. invasion of Iraq, Zarqawi's command of Ansar al-Islam had grown such that Zarqawi now commanded hundreds of Arab fighters who fought for Ansar al-Islam under Zarqawi's leadership.

226.    Shortly after the U.S. invasion, Mullah Krekar fled to Norway.  Thereafter, Ansar al-Islam was operationally led by Zarqawi (traveling between Iran, Iraq, and Syria) and Abu Abdullah al-Shafi (also known as Warba Holiri al-Kurdi), who was based in Iran, until Shafi's arrest in 2010, while Mullah Krekar supported the group from his refuge in Norway.

227.    In June 2003, Ansar al-Islam issued a public statement calling for terrorist attacks against Americans in Iraq by imploring Muslims in the region to "volunteer[] to join the ranks [of

Ansar al-Islam] to fight the Americans," and threatening to use "the weapons of urban guerilla warfare" in order to "confront the American infidels with the aim of destroying them throughout Iraq." Referencing Ansar al-Islam's close alliance with Iran, the statement further explained that "the zones of entry and exit in the territory had been secured so as to ensure the flow of supplies for the fighters."

228.    On March 22, 2004, the U.S. government designated Ansar al-Islam as a Foreign Terrorist Organization, which designation it has maintained ever since.

229.    On April 15, 2004, Ansar al-Islam escalated its calls for violence against Americans in Iraq by issuing a statement urging Iraqis to embrace violent jihad against Americans in Iraq in order to combat "the band of traitors and criminals" through suicide attacks and other "heroic operations" against Americans. In the same statement, Ansar al-Islam also embraced its status as an al-Qaeda affiliate: "We strongly support the heroes who are undertaking difficult missions, such as the members of the al-Qaeda organization under the leadership of the venerable and courageous companion, the standard-bearer of jihad, the brave Osama Bin Laden."

230.    In 2006, a Joint Special Operations Command Task Force 16 member concluded that "Al Qaeda and Ansar al-Islam are working hand in hand."

231.    On December 7, 2006, the U.S. Department of the Treasury designated Mullah Krekar as a Specially Designated Global Terrorist and stated as follows:

> Apart from the instances of direct facilitation of terrorist groups which form the basis for his designation, Krekar has exhorted others to violence and supplied religious justifications for murder. In a 2004 interview, Krekar supported holy war in Iraq and identified legitimate targets, stating "Not just the officers, but also the civilians who help the Americans. If anyone so much as fetches them a glass of water, he can be killed. ... Everyone is a target. If an aid organization gives the Americans as much as a glass of water, they will become a target."[79]

---

[79] U.S. Dep't of the Treasury, *Treasury Designations Target Terrorist Facilitators* (Dec. 7, 2006).

232.     From 2003 through at least 2010, Ansar al-Islam cooperated closely with al-Qaeda and al-Qaeda-in-Iraq, sometimes working together to jointly commit attacks, share bombs or other terrorist supplies, and provide logistical support and safehouses for each other's mutual benefit. For example, an al-Qaeda operative traveling from Afghanistan to Iraq to train and instruct al-Qaeda-in-Iraq operatives would depend upon Ansar al-Islam operatives, safehouses, and ratlines, for part of his journey, or an Ansar al-Islam operative would receive training in an al-Qaeda camp in Afghanistan.  Similarly, an al-Qaeda-in-Iraq operative would detonate a suicide bomb that was built by a forward-deployed al-Qaeda bombmaker in Iraq using materials provided by Ansar al-Islam.

233.     By 2003, Ansar al-Islam was a recognized al-Qaeda "surrogate" and the groups maintained a close relationship with one another (including al-Qaeda-in-Iraq) based upon their shared terrorist agenda, common Salafist beliefs, and history of close cooperation.

## III.   THE ISLAMIC REVOLUTIONARY GUARD CORPS AND ITS TERRORIST PROXIES DEPENDED UPON ROBUST ACCESS TO UNITED STATES TECHNOLOGY, FINANCIAL MARKETS, AND PERSONS TO CARRY OUT ATTACKS AGAINST AMERICANS IN THE MIDDLE EAST

### A.   After The U.S. Invasions Of Afghanistan And Iraq, The IRGC Concluded That It Needed To Revolutionize Its Access To Sensitive American Technologies Through Corrupt Corporate Allies

234.     In the decade prior to the U.S. invasion of Iraq in 2003, the technological gap between IRGC, including Hezbollah and Qods Force, "security" operatives, on the one hand, and the counter-terrorist forces hunting them (and protecting against their threats), on the other, grew from large (in the 1980s) to vast (in the 1990s).

235.     The "Revolution in Military Affairs" or "RMA" refers to a widely accepted military hypothesis that emerged in the 1990s and posited that Western militaries needed to prepare for future asymmetrical threats by maximizing the technological gap between Western

militaries and local hostile forces, e.g., terrorist cells in Iraq, in order to achieve objectives such as increasing the speed with which forces can maneuver, increasing the flow of intelligence to troops, facilitating real-time information sharing amongst allied friendly forces, and promoting "interoperability" between the militaries of different nations, e.g., making sure that British forces in southern Iraq can communicate on the same channels as their American counterparts.

236.    By 2003, the U.S. finished its own Revolution in Military Affairs, and the tech-gap between the "security" operatives deployed by the IRGC on the one hand, and American counter-terrorists, law enforcement, and intelligence officers, on the other, was so vast it was as if Americans and the IRGC "security" operatives targeting them lived on two different technological planets: "Earth 1" and "Earth 2".

237.    After the fall of Saddam Hussein in 2003, U.S. personnel in the Middle East practiced their counter-terror tradecraft on **Earth 1** where Americans wielded 24/7 surveillance powers that were difficult to overstate, possessed unparalleled intelligence networks, and had real-time data analytic abilities that played a key role in reducing the threat of Islamist terror. The single most important contributor to America's dominant technological edge – and greatest barrier to the IRGC's terrorist scheme succeeding – was the fact that America could count on achieving close, reliable, and robust cooperation from the iconic, well-capitalized, and patriotic American telecommunications and network computing companies, which have historically worked as responsible partners with the U.S. government to prevent terror.

238.    Meanwhile, on **Earth 2** – where IRGC "security" operatives practiced their tradecraft – the world was upside down and terrifying.  A sloppy phone call could result in a precision American airstrike a few minutes later.  An errant text message could enable the "Great Satan" to take down a Joint Cell.  A carelessly documented transaction could reveal an important

laundering scheme. Most of all, the "security" operatives of the IRGC were caught in a digital cage from which they could not carry out their religious, and constitutionally prescribed duty – attack and kill Americans.

239.    The IRGC knew that the U.S. telecom and network computing industry would not solve their problem – if anything, the American industry would only widen the gap even more between the IRGC and the Americans it wanted to kill. For decades, large U.S. telecom and network computing companies have been reliable partners of the U.S. government with respect to reducing the threat from terrorism. Indeed, the anti-terrorism track records of America's telecommunications and network computing companies have been among the best of any industry anywhere in the world.[80]

240.    This matters because the robust commitment of American telecom and network computing companies to anti-terrorism compliance was known to the IRGC (and all other industry participants), which meant that the terrorists knew they would be unable to count on their normal strategy for illicitly acquiring something – pay a bribe, threaten extortion, engage in fraud – because none of those strategies held the promise of working at the industrial scale that the IRGC required for their global terrorist plot against American.

241.    By 2003, the IRGC knew that Hezbollah and Qods Force operatives would never be able to sustain the global terrorist attack campaign it had planned against America after 9/11 unless the IRGC could find a way to break out of the digital detention cell that was effectively created by the wall of compliance offered by America's telecommunications and network computing companies.

---

[80] Plaintiffs are not aware of any federal criminal terrorism-related prosecutions, civil Anti-Terrorism Act allegations, or analogous anti-terrorism matter brought by any government against any such companies.

242.     By 2003, the IRGC had tasked Hezbollah[81] with solving a riddle:  how do they, the terrorists, establish the reliable, secure, and covert pipeline needed to illicitly acquire the tens of thousands of state-of-the-art U.S. smartphones and network computing technologies *each year* necessary to sustain their decades-long, global terrorist campaign against America? The answer: Identify potential multinational corporate partners who would be willing to provide the American technology, finances, and services needed by the IRGC.

243.     As the IRGC spun up its own Revolution in Terrorist Affairs, the leadership of Regular IRGC, the Qods Force, and Hezbollah worked together to develop a comprehensive plan to revolutionize their respective terrorist capabilities to prepare for a decades-long terrorist campaign against Americans throughout the Middle East.  The IRGC faced two critical requirements to eject the United States from the entire Middle East through a campaign of terror.

244.     *First*, the IRGC and its terrorist proxies needed a generational upgrade in the security of their computer systems and network technologies, especially the state-of-the-art American servers that were *the* condition precedent for the IRGC's ability to execute its Revolution in Terrorist Affairs, and without which, the IRGC's efforts would be less effective, would be less efficient, would be more expensive, and would produce, ultimately, fewer dead Americans.  Given the sheer scale of the IRGC's terrorist mission targeting Americans in Iraq, Afghanistan, Syria, Yemen, Israel, and elsewhere, even marginal improvements in IRGC computing power translated to more plots being shared, more fundraising solicitations, more recruits, and ultimately, more attacks.

---

[81] Lebanese Hezbollah ordinarily serves as the IRGC's illicit procurement agent of choice for a litany of reasons including, but not limited to, deniability, cultural affinities, and the presence of a Lebanese diaspora broadly dispersed around the world, upon which Hezbollah, like most Islamist groups, heavily relies.

245.     *Second*, the IRGC and its terrorist allies needed a reliable, replenishable, untraceable source of suppliers for illicit high-quality American-manufactured mobile phones sold in markets inside the United States, and then illegally reexported to eventually flow through the Qods Forces logistics channels – as intended – before reaching Hezbollah, who relied upon American phones to coordinate the IRGC's global terrorist operations, logistics, cash flows, communications, and media, all of which substantially assisted the IRGC's ability to facilitate terrorist attacks by the IRGC Sunni Terrorist Proxies against Americans in Iraq.

246.     Given the transnational nature of the IRGC's terrorist architecture, Hezbollah, the Qods Force, and the leadership of IRGC terrorist proxies like al-Qaeda (in Iraq and Afghanistan) and the Taliban (in Afghanistan), faced a simple, but potentially fatal, problem confronting their post-9/11 terrorist enterprise against America: how to facilitate the free movement of key terrorist leaders, attack planners, fundraisers, and logisticians between the various hubs of the IRGC's scheme to facilitate attacks against Americans, who were located throughout the Middle East, by the IRGC's Shiite and Sunni proxies, who were also located throughout that region, all while avoiding detection by U.S. military and intelligence agencies.

247.     While most people think of false identification papers as being the most indispensable thing to freely traveling, that's analog thinking.  The IRGC understood that, in the modern terrorist era, their operatives were at one critical disadvantage:  Hezbollah and the Qods Force lacked the industrial scale supply, and re-supply, of secure mobile phones, and therefore Hezbollah and the Qods Force were at an enormous disadvantage because their operatives were hemmed in with Americans in Iraq and Afghanistan and unable to freely travel where they needed to be for fear their cell phones, laptops, and other electronic devices were compromised by the Americans (as they likely were).

76

248.     Consider the case of a hypothetical senior Hezbollah operative who is tasked with global logistics responsibilities.  Over the course of a few months, this Hezbollah operative must depart Beirut, Lebanon (where he, and Hezbollah, are based, and where he receives his instructions), safely travel undetected to the Syrian side of the Iraqi/Syrian border crossing near al-Qaim, Iraq (where Hezbollah, the Qods Force, and the Assad Regime maintain a joint listening post to spy on Americans in Iraq), before secretly entering Iraq and safely traveling on to Kirkuk, in Northern Iraq (to meet with long-standing IRGC proxy Ansar al-Islam), before moving south Diyala (to meet an al-Qaeda-in-Iraq logistician to exchange useful information or materials), and then further south to Baghdad (where Joint Cells of Hezbollah, Qods Force, and Jaysh al-Mahdi terrorists widely operated), before continuing on to Najaf (to meet with more Jaysh al-Mahdi leaders) and then onto the southern port city of Basra (a Shiite terrorist stronghold dominated by Joint Cells), before entering Dubai, U.A.E. (to solicit donations to fund attacks), after which traveling from the U.A.E. to Pakistan by boat, where the Haqqani Network has facilitated the Hezbollah operative's travel and meetings with the Taliban and al-Qaeda (whom the Haqqani Network were hosting).  After that terrorist roadshow, the hypothetical Hezbollah operative must now safely travel back to Lebanon, either retracing the same steps, or taking an overland route through Afghanistan, over the western border crossing at Herat, and continuing through Iran, Iraq, Syria, and finally returning to Beirut.

249.     This hypothetical isn't the plot of a spy movie: it describes the relatively ordinary travel patterns of senior IRGC-related terrorists, including Hezbollah, Qods Force, al-Qaeda, and others, every year, and shorter versions of similar journeys (e.g., a three- or four-country trip) were common for thousands of IRGC-supported terrorists each year.

250.    Worse, the IRGC lacked any easy solutions because America dominated the mobile phone industry and was not open for business to the IRGC.  Shut off from the U.S. marketplace, the IRGC was unable to build their own phones and unwilling to place the lives of their most prized operatives – the people who led Joint Cells and coordinated operations – in the hands of the junky, unreliable, and often prone-to-failure mobile phones being made outside of the United States at the time.

251.    Thus, the IRGC embarked on a comprehensive strategy designed to achieve its Revolution in Terrorist Affairs, obtain reliable industrial scale supplier relationships that could source American mobile phones, close the communications gap with the "Great Satan," and enhance the lethality of its global terrorist campaign against America.  To do so, the IRGC needed to source tens of thousands of untraceable mobile phones *every year* to ensure the secure and untraceable communication lines between combined cells of Hezbollah, Qods Force, and local proxy terrorist allies operating in dozens of countries worldwide and, among other people, their local organized crime allies (e.g., narco-traffickers), corrupt politicians (essential for things like passports and permits), and terrorist headquarters, as examples.[82]

252.    Unfortunately for the IRGC who were responsible for the scheme's transnational logistics, weapons, financial, personnel flows, they could not source the tens of thousands of advanced American smartphones they needed every year with a few purchase orders on Bonyads Mostazafan letterhead, because the terrorists were sanctioned.  Even if the IRGC were not

---

[82] Standard terrorist tradecraft practiced broadly by the IRGC, al-Qaeda, and groups instructs that their terrorist operatives, especially leadership, (a) should always have a large assortment of mobile phones (5-10 or more) from which to rotate; and (b) should completely overhaul their phone supply on a regular basis. As a result, even sustaining the phone needs of 1,000 IRGC, Hezbollah, and IRGC Sunni Proxy Group terrorists (a tiny fraction of their collective labor pool) likely required – at least – tens of thousands of untraceable cell phones every year.  And these numbers do not account for the IRGC's voracious need for cell phones to commit IED attacks.

sanctioned, as a matter of IRGC terrorist tradecraft, lawful purchases of American phones inside U.S. markets by the precious Hezbollah or Qods Force assets inside the United States (for whom exposure was not to be risked lightly), while viable in small increments, was impossible at the commercial scale necessary for the terrorist campaign to succeed.  Moreover, direct purchases by Hezbollah or Qods Force assets themselves would leave an evidentiary paper trail and risk the terrorists' operatives being rolled up by law enforcement or intelligence operatives – a potential catastrophe for the IRGC.

253.    Logically, that left the IRGC in a predicament.  The IRGC could only satisfy its various operational requirements through the bulk acquisition of thousands of high-end American mobile phones every year but if the IRGC attempted to do so directly, even using IRGC front companies, the terrorist enterprise would not be nearly as effective or yield nearly as many American phones, because the black-market cell phone trade is a volume business where deals and goods must move rapidly.  Thus, the IRGC needed front companies that offered the agility, resources, global networks, and executives with willingness to aid the world's worst terrorists for profit.[83]

254.    Accordingly, the IRGC's ability to prosecute a global terrorist campaign against the United States required the services of corrupt multinational corporate partners, with deep resources, large logistics chains, and a willingness to conspire with anti-American terrorists.  The

---

[83] Because the global market for the sale of illegal American smartphones was vulnerable to law enforcement shocks that could rapidly suppress (temporarily) the supply chain – e.g., a raid in Detroit that removed one of the largest dealers from servicing the black market – it was imperative for the IRGC that its purchasing agents have the agility, financial resources, and global assets to source illicit American-exported cell phones in black markets worldwide, including, but not limited to, illicit cell phone markets on every continent but Antarctica.

following characteristics keyed the IRGC's ability to operationalize illicit commercial

transactions into anti-American terrorist violence in Iraq:

(i)   **New terrorist cash flow** generated by taking over a "civilian" company, to make it ***easier*** to illicitly acquire American technology (that's the point of being a cover) and make it ***harder*** for the IRGC's enemies to mobilize effective sanctions against the funding source (because IRGC apologists, like MTN Group, could publicly spread disinformation to undermine any pressure campaigns (as MTN Group did, and continues to do to this day);

(ii)  **Illicit acquisition of critical American technologies**, including secure American smartphones, computer networks, and sensitive dual-use American technologies to accomplish the IRGC's own Revolution in Terrorist Affairs; and the

(iii) **Robust logistics capabilities** befitting the operation of the IRGC as a multinational terrorist corporation that had a constant need to manage and rationalize the flow of illicit funds, arms, communications, narcotics, and personnel across six continents, all in support of the shared terrorist enterprise stretching from Syria to Iraq to Afghanistan.

255.   At bottom, decrepit telecommunications, network computing, and associated

technologies posed an immediate, and dire, threat to Iran's ability to kill as many Americans as

possible in Iraq and Afghanistan because they were generations behind the United States on

virtually every key class of communications and computing technologies necessary to sustain a

modern transnational terrorist campaign stretching from Syria to Afghanistan.

256.   By early 2004, the IRGC's terrorist alliance with al-Qaeda and its affiliates in Iraq

and Afghanistan was in full bloom.  Hezbollah, the Qods Force, and Regular IRGC embraced its

own take on the Revolution in Military Affairs but repurposed RMA principles for use by Iran-

backed terrorists.  Hezbollah, the Qods Force, and Regular IRGC concluded that the IRGC

needed to overhaul IRGC terrorists' – and IRGC proxies' – communications, computing,

internet, and cyber capabilities to enable the IRGC and its al-Qaeda allies (and guests inside their

Iranian haven) to continue facilitating attacks against Americans in Iraq and Afghanistan.

257.   Hezbollah, the Qods Force, and Regular IRGC had no choice but to seek U.S.

technology because America held the dominant position with respect to the world's computers,

mobile phones, servers, routers, and the like, and the IRGC understood that it needed to illicitly acquire vast amounts of embargoed American technologies to commit terrorist attacks.

258.    By late 2004, the IRGC was desperate to upgrade its telecommunications because it understood that its ability to help kill and maim Americans at scale in Iraq, Afghanistan, and elsewhere depended upon the ability of its Hezbollah and Qods Force operatives, and their proxies to solve their American mobile phone access crisis.  The IRGC's terrorist proxy Jaysh al-Mahdi was routed by U.S. forces twice that year.  Moreover, the escalating gap between American counter-terrorists and IRGC "security" operatives, i.e., Hezbollah and Qods Force terrorists, threatened to eviscerate the ability of the IRGC to facilitate terrorist violence against the United States in Iraq and Afghanistan.

259.    Indeed, the IRGC watched, with escalating alarm, as its communications and computing gap widened, and threatened its ability to attack and kill Americans in Iraq and Afghanistan and, viewed the need to find a long-term technology supply fix as on par with Iran's purported need to build a nuclear weapon and was one of the highest priorities of the IRGC.

**B.    The Islamic Revolutionary Guard Corps Secured Terrorist Funds, Logistics, And Operational Support By Militarizing The Iranian Telecommunications Industry And Seizing Control Of Iran's Largest Telecommunications Companies**

260.    In 2004, the IRGC embarked on a two-step solution.  ***Step One:*** the IRGC seized Iran's large state-owned telecom companies and converted them into tools of terrorist finance, logistics, propaganda, recruiting, and operations.  As Ms. Gill explained, "just prior to [Mahmoud] Ahmadinejad's election in 2005":

> Ayatollah Khamene'i issued a decree … ordering 25% of state-owned assets to be privatised within 5 years.  $120 billion worth of government assets were sold … Yet, the ***largest purchaser of privatised government assets was the IRGC***, which

received favourable terms from the Ahmadinejad regime. Under the **_guise_** of de jure privatisation, state-owned assets were **_de facto militarised_**.[84]

261.     **_Step Two_:** the IRGC secured the agreement of complicit, corrupt telecommunications companies, including Defendants MTN Group, Phuthuma Nhleko, and Irene Charnley, which were willing to do business with fronts for the IRGC's transnational terrorist logistics, technology, and financial enterprise and help the terrorists illicitly source the comprehensive suite of state-of-the-art American technologies that the IRGC determined were necessary to the ability of its own Revolution in Terrorist Affairs, so that Hezbollah and the Qods Force could do what they ended up doing: launch a devastating wave of violence against Americans throughout Iraq and Afghanistan.

262.     The IRGC's two most important telecom front company targets were Irancell and TCI, and the IRGC quickly assumed full control of both companies, completely converting each to its terrorist enterprise.

### 1.     MTN Irancell

263.     In 2004, the IRGC negotiated with Turkcell, a mobile phone company based in Turkey, hoping Turkcell would be the corrupt corporate partner the IRGC required in order to extract a vast digital armory of embargoed American technologies. As negotiations progressed, however, Turkcell made it clear that they would not enable the IRGC's "security" agenda. Among other things, Turkcell refused to act as a communications technology logistics front for the IRGC. While Turkcell was willing to help build a modern Iranian phone system, it was not willing to provide direct "security" assistance to the IRGC.

---

[84] Gill, *Capitalism, Communications, and the Corps*, at 104 (emphasis added).

82

264.    MTN Group, Phuthuma Nhleko, and Irene Charnley had no such scruples. Sensing weakness in the IRGC's negotiations with Turkcell, MTN Group, Phuthuma Nhleko, and Irene Charnley hatched a comprehensive plan, which they internally called "Project Snooker," designed to steal the Irancell license from Turkcell – and the billions of dollars in profits that would flow to MTN Group thereafter.  Ms. Gill explained the result:

> the **IRGC asserted their role** in the communications economy through two significant developments in telecommunications infrastructure involving MTN Irancell and TCI. MTN Irancell was launched in 2005, at the start of Ahmadinejad's presidency, as a … joint venture between … MTN Group and the Iran Electronic Development Company (IEDC).  A subsidiary company of the Iranian Ministry of Defence, IEDC maintained **close ties with the Revolutionary Guard**.  **Following the IRGC's opposition** to foreign involvement in Iran's strategic telecommunications sector, IEDC negotiated 51% ownership of the MTN Irancell joint venture, ensuring that **the military had a majority stake in the newly formed telecommunications infrastructure**.[85]

265.    In her article documenting how the IRGC converted MTN Irancell and TCI into tools of terrorist finance and logistics, published by NATO, Ms. Gill explained:

> Communications infrastructure, particularly media and telecommunications licenses, are a source of state revenue. … [T]he communications economy is lucrative for those involved. Ahmadinejad's regime faced a dichotomy between reaping the 'business benefits of a modern information infrastructure', whilst simultaneously preventing the communication of political criticism of the regime or of the broader Islamic revolutionary system.  Therefore, communications infrastructure was treated as a political asset. Whilst the regime de jure separated telecommunications providers and regulators from the direct control of the Iranian state, de facto control was 'rarely surrendered by privatisation'.  Khamene'i's Article 44 decree shows that the legal separation between state and assets allowed leaders to remain influential in the communications economy by appointing politically like-minded affiliates.  By **militarising, rather than privatising the economy**, the regime transferred ownership from 'relatively transparent parts of the public sector to **other parts of the public sector shielded from public scrutiny', such as the Revolutionary Guard**.  It is in this **fictional separation between the public and private sector in Iran that the invisible hand of the IRGC can be assessed**.  **Power projection and realpolitik** remained central to the Guard's strategic thinking to the same extent as their ideological devotion.[86]

---

[85] *Id.* at 105 (emphasis added).

[86] *Id.* at 108-109 (emphasis added).

266.     The IRGC's takeover of MTN Irancell and TCI produced a financial windfall for

the IRGC.  Ms. Gill explained that:

> From a business perspective, the IRGC … create[ed] a military-commercial
> complex in which the Guard benefitted from the construction of a perceived and
> persistent threat. … Whilst publicly promoting rhetoric about national **security**
> and the defence of Shi'ite Islamic culture, the IRGC was **sustaining a military-
> commercial complex that benefited them financially**. The IRGC and the Iranian
> communications economy maintained a **close partnership**, with both taking
> advantage of the articulation of a soft war. …[T]here [was] a notably profit-driven
> motive to the Guard's economic involvement. … the involvement of the IRGC in
> the communications economy under Ahmadinejad was reflective of an
> ideological, but also increasingly opportunistic Revolutionary Guard.[87]

267.     "[T]he IRGC became a moneymaking machine" after it deliberately blended the

commercial and terrorist functions of MTN Irancell and TCI in order to ensure that the IRGC

could use MTN Irancell and TCI revenues to furnish off-books cash to, among other things, keep

former members of the IRGC on the IRGC's payroll.  According to Ms. Gill:

> The IRGC acts as a business fraternity within which members of the Guard can
> progress along a prescribed career path.  Following active service, IRGC
> members are offered senior positions in state-affiliated media organisations and
> telecommunications networks **such as IRIB, TCI, and MTN Irancell**.
> **Accordingly, 'no one ever leaves the IRGC'**; its senior officers are viewed as an
> Iranian 'freemasonry' and 'Ivy League network', signalling that the IRGC
> exceeds ideological devotion. … When 'privatising' the national media and
> telecommunications infrastructure, the Ahmadinejad regime sold its majority
> stake to the IRGC, **blending its mission of national security with 'investor
> profits'.** In holding senior economic positions in communications infrastructure
> companies and accruing profits, **the IRGC became a 'moneymaking machine** …
> The IRGC's opportunistic and exploitative involvement in the communications
> economy facilitated a system of military crony capitalism within Ahmadinejad's
> Iran. … The IRGC **grew to depend on the communications economy to support
> the personal and financial endeavours of the Guard**, who valued safeguarding
> their own self-interest to the same extent as they valued safeguarding the
> revolution.[88]

---

[87] *Id.* at 110-111 (emphasis added).

[88] *Id.* at 111-12 (emphasis added).

268.    In sum, according to Ms. Gill, "the IRGC as an institution was reliant on the communications economy as a source of capital gain" and "the IRGC used the fictional separation between the public and private sectors in Iran to facilitate its rise as an economic conglomerate."[89] At bottom, the IRGC's control over MTN Irancell and TCI was not just about propaganda – the IRGC depended upon such control to support its "security" agenda, i.e., anti-American terror by using the fronts to raise money:

> whilst the Guard relied on the communications economy to propagate their ideology, they also ***acquired and monopolised*** communications infrastructure as a ***source of capital gain***. The Guard's involvement with the communications economy moved beyond the projection of revolutionary ideology, becoming equally a matter of realpolitik and of ***accruing military capital***.[90]

### 2.    Telecommunications Company Of Iran (TCI)

269.    In 2009 – four years after the IRGC's strategy to illicitly source terrorist material through Irancell relied upon "using IEDC as a front" in the IRGC's 2005 agreement with MTN Group – the IRGC emerged from its previous position of cover on Irancell to publicly assume a majority stake in Iranian telecom company, TCI:

> In addition to rejecting foreign majority ownership in Iranian telecommunications infrastructure, IRGC telecommunications activity was driven largely by 'lucrative no-bid contracts awarded by the Iranian government'. Testament to this, in September 2009, shortly after the violent protests following Ahmadinejad's re-election, the government announced plans to privatise TCI. Amongst the investors were ***numerous IRGC-backed institutions***, including the IRGC-CF, the Mostazafan Foundation, and the Execution of the Imam's Order company. Minutes after TCI was privatised, ***the IRGC acquired 51% of the company*** in a $5 billion deal—the 'largest trade in the history of the Tehran Stock Exchange'. This represented ***'yet another calculated step' in the IRGC's campaign to dominate Iran's communications economy***. Rather than using IEDC as a front, as they had done in 2005, the ***IRGC had overtly purchased a majority stake*** in TCI's monopoly over Iranian telecommunications.[91]

---

[89] *Id.* at 112.

[90] *Id.* at 112 (emphasis added).

[91] *Id.* at 105-06 (emphasis added).

C.   **The Islamic Revolutionary Guard Corps Relied Upon A Transnational Network Of Terrorist Finance, Logistics, Operations, And Communications Cells To Fund, Arm, Logistically Sustain, And Facilitate Attacks Against Americans In Iraq**

270.   The IRGC relies upon a global network of cells, operatives, cover companies, and allied criminals in the corporate world (like Defendants) and the criminal world (like narcotraffickers and transnational crime organizations).

271.   The IRGC operated the scheme in the same manner as a multinational corporation, seeking to leverage geographic efficiencies, networks, and distributed competencies to maximize the lethality of the IRGC-sponsored terrorist campaigns against Americans in Iraq, Yemen, Syria, Europe, Afghanistan, Pakistan, and elsewhere.  This section briefly outlines how the IRGC leveraged terrorist finance, logistics, technical and communications support from around the world to directly aid the terror campaign against Americans in Iraq, Yemen, Syria, Europe, Afghanistan, Pakistan, and elsewhere.

1.   **United States**

272.   The IRGC depended upon its ability to access technologies, markets, and systems that were found exclusively in the United States to execute key parts of the scheme.  Simply put, they needed as much access to America as possible to kill as many Americans as possible.

273.   **American Technologies.**  The IRGC relied upon American-designed, protected, manufactured, and/or assembled technologies, including but not limited to, mobile phones, smartphones, enterprise level servers, computer networking technologies, and software, because they have been the gold standard from 9/11 through today.  No other country made a credible version of a competing device, that is available for sale to the public as opposed to their own "security" agencies at any point in time between 2001 and 2022, e.g., enterprise level servers and

secure encrypted smartphones that can access the full panoply of universally sought-after "apps", at any point in time between 2001 and 2022.

274.  **American Markets.**  The IRGC relied upon in-person and online sales markets in the United States, including but not limited to currency markets (relying upon the U.S. Dollar as the IRGC's preferred currency), technology markets (relying on U.S. goods as the IRGC's preferred technology source), financial markets (relying on U.S. financial markets because U.S. banks have connectivity to the 50+ countries on six continents in which Hezbollah and the Qods Force operates), labor markets (relying on skilled laborers, particularly information technology consultants, to service the IRGC's illicitly acquired U.S. technologies), and black markets (relying on the ability to acquire some of the above items that can only be purchased in the U.S.).

275.  In every instance, the IRGC depended upon its ability to access American markets at home to kill Americans abroad because such U.S. markets have unique power to set the terms and pricing for the world, and were often also the only location where the IRGC could acquire a key item in the covert manner needed under the IRGC's terrorist tradecraft.  For example, the IRGC did not have the ability to source large amounts of U.S. Dollars or access state-of-the-art American technologies without the IRGC, or one of its corporate co-conspirators, reaching into the United States to secure resources and services key to the success of the entire scheme.  This case concerns the various nodes and modalities by which the IRGC accomplished that.

276.  **American Systems.**  The IRGC relied upon its ability to access certain financial, technical, and knowledge systems that were stored exclusively inside the United States.  For example, the IRGC depended upon the ability of its terrorist computer programmers to be able to access certain proprietary databases located inside of the United States in order to complete the design of a particular part necessary for a new type of bomb being developed by the IRGC.

2.      **U.A.E.; Iraq; Iran; Lebanon; Yemen; Syria; Afghanistan; Pakistan**

277.    From 9/11 through the present, attack planners, logisticians, and financiers for the IRGC as well as nearly every other major Islamist terrorist group, including but not limited to al-Qaeda, the Taliban (including its Haqqani Network), and others, have relied upon the U.A.E., especially Dubai, as a logistical, financial, and operational hub, from which they could organize their terrorist campaigns in Iraq, Iran, Lebanon, Yemen, Syria, Afghanistan, and Pakistan.

278.    With respect to the IRGC Shiite Terrorist Proxies' terrorist campaign against Americans in Iraq, Iran, Lebanon, Yemen, and Syria in furtherance of the IRGC's scheme, the U.A.E. served as a logistical, financial, and operational hub for the campaign, and the U.A.E. was functionally part of one interlocking geography of extreme terrorist finance and logistics risk and hub of activity,[92] comprised for purposes of the IRGC Shiite Terrorist Proxies' terror campaign of the U.A.E., Iraq, Iran, Lebanon, Yemen, and Syria.

279.    With respect to the IRGC Sunni Terrorist Proxies' terrorist campaign against Americans in Iraq, Iran, Lebanon, Syria, Europe, Afghanistan, and Pakistan in furtherance of the IRGC's scheme, the U.A.E. served as a logistical, financial, and operational hub for the campaign, and the U.A.E. was functionally part of one interlocking geography of extreme terrorist finance and logistics risk and hub of activity, comprised for purposes of the IRGC Sunni Terrorist Proxies' terror campaign of the U.A.E., Iraq, Iran, Lebanon, Yemen, and Syria.

---

[92] For the avoidance of all doubt, the government of the U.A.E. was, and remains, an ally of the U.S. in the fight against terrorism.  The terrorists' use of the U.A.E. as a hub was based on a range of other factors, including, but not limited to, geography, history, particular trading networks, transportation channels, and an advanced infrastructure for conducting transactions and moving goods and monies throughout the Middle East.  The terrorists, like many multinational corporations, set up their regional headquarters in Dubai for these reasons.

280.     Simply put, the terrorists did not respect the borders of any of these countries –

other than Iran and Syria, with whom they were allied rendering the issue moot – and viewed the

entire geography as one combined theater.

### 3.     South Africa

281.     "While Iran may seem diplomatically isolated, in Africa it has used

unconventional tactics to support its terror network" and "success[fully] plant[ed] footholds the

for the Islamic Revolutionary Guard Corp and Hezbollah."[93]

282.     The IRGC relied upon illicit commercial transactions and relationships in Africa

to facilitate the provision of IRGC assistance to Shiite and Sunni terrorist proxies in the Middle

East, including its IRGC Sunni Terrorist Proxies.  According to the Israeli publication *Tower*

*Magazine* in 2013:

(i)     "In Africa, as in the Middle East, … [e]ven in the absence of any solid diplomatic
        alliances or victories, Iran is using its relationships … to organize and advance its
        ambitious aims and terrorist networks. With its traditional diplomacy stifled, Iran has
        exhibited a worrying ability to overcome … setbacks — to accumulate asymmetrical
        victories for its aggressive, anti-western agenda. …"

(ii)    "[Iran] clearly understands the need for alliances outside of its immediate neighborhood
        — and it appreciates the opportunities embodied in developing countries in need of cheap
        oil, foreign investment and powerful friends. …"

(iii)   "Iran has gotten exactly what it needs out of Sudan … Sudan is a beachhead for
        the IRGC — a transit point for weaponry [to flow to] Hezbollah …, and Hamas to
        rain Fajr 5s on … Israel's civilian population. …"

(iv)    "All across the continent, Iran's expansionist foreign policy is in direct conflict
        with its economic and soft power outreach—and Iran has succeeded is using
        Africa to advance its interests anyway. …"

(v)     "Iran and the IRGC are still leveraging their relationship with South Africa …
        [A]ccording to Mark Dubowitz of the Foundation for Defense of Democracies,

---

[93] Armin Rosen, *Desperate For Allies and Secret Assets, Iran Penetrates Africa*, The Tower
(Aug. 2013), http://www.thetower.org/article/desperate-for-allies-and-secret-assets-iran-
penetrates-africa/.

[South Africa] is 'a very hospitable place for Iranian sanctions-busting.' In early June, the U.S. Treasury Department added 37 Iranian front companies to its sanctions list. Three were based in South Africa. …"

(vi)   "In Africa, Iran has also found a way of overcoming its pariah status. The Islamic Republic is using Africa to extend Hezbollah's reach, … and arm its proxies."[94]

283.   Indeed, the IRGC has long operated openly and notoriously in South Africa. "Iran and South Africa have cooperated on a number of fronts in recent decades, including at the U.N., where South Africa has at times advocated for Iran" and "[t]he pair also have a military relationship."[95]

284.   The IRGC's freedom of movement in South Africa is a legacy of Ayatollah Khomeini, who stood against the Apartheid regime while, unfortunately, the United States (for a time) did not.  For decades, the IRGC leveraged Iran's historical feat of standing up to Apartheid, in much the same way that the Soviet Union exploited Jim Crow to undermine the America's image as a bastion of liberty during the Cold War.  Both messages were effective.

285.   Because of this unique Iranian-South African history, the IRGC has viewed South Africa as a veritable home away from home for the IRGC, as South Africa was one of the few major democracies to have abstained from joining the sanctions regime against Iran and to afford the IRGC relatively unfettered freedom of movement.  As a result, the IRGC has operated clandestine fundraising, logistics, and operations networks in South Africa for decades.

286.   In an interview with *Politico*, American intelligence officials confirmed on background that "[t]he Iranian government [] operate[d] clandestine networks in South Africa,"

---

[94] *Id*.

[95] Nahal Toosi and Natash Bertrand, *Officials: Iran Weighing Plot To Kill U.S. Ambassador To South Africa*, Politico (Sept. 13, 2020).

"and has had a foothold there for decades."[96]  "In 2015, *Al Jazeera* and *The Guardian* reported on leaked intelligence documents that detailed an extensive secret network of Iranian operatives in South Africa."[97]

287.    According to leaked documents from the South African intelligence service, Hezbollah and the Qods Force operate cells in South Africa showing "confirmed" links between Iranian operatives in overseas embassies and "terrorists."

288.    In or about 2020, American intelligence services detected that the IRGC was planning a terrorist attack in South Africa to kill the U.S. ambassador there as retaliation for the killing of Qassem Soleimani earlier that year.

289.    Hezbollah's choice of South Africa as the potential attack site is revealing, as the terrorists had the chance to survey the entire world to choose the best location to kill an American ambassador.  As *Politico* noted, the U.S. ambassador to South Africa "may also [have] be[en] an easier target than U.S. diplomats in other parts of the world, such as Western Europe, where the U.S. ha[d] stronger relationships with local law enforcement and intelligence services."[98]

### 4.    Europe

290.    Europe has long been a hub for terrorist finance, logistics, and operational support for the IRGC as well as al-Qaeda, the Taliban, including its Haqqani Network, and their allied Syndicate terror partners in Afghanistan and Pakistan.  Europe's proximity to many of the attack theaters and ease of travel make it a key site for the terrorist campaign.

---

[96] *Id.*

[97] *Id.*

[98] *Id.*

### 5.    The Americas

291.    The IRGC, through Hezbollah and the Qods Force, maintains a substantial presence in the Americas, including, but not limited to, in Venezuela, Colombia, Paraguay, and other nations.

292.    Hezbollah and the Qods Force maintained operational, finance, and logistics cells throughout multiple nations in the Americas, through which Hezbollah operated an array of money-making criminal schemes, e.g., narcotics trafficking, in order to repatriate money back to the terrorist campaign.

293.    Hezbollah and the Qods Force support the terrorist campaign in the Middle East from their cells in the Americas.  Indeed, that is the purpose of the cells far from Hezbollah's home in Beirut – cash and logistics flow for the terror campaign.

### 6.    Southeast Asia

294.    The IRGC, through Hezbollah and the Qods Force, maintains a substantial presence in Southeast Asia.  Hezbollah and the Qods Force maintain operational, finance, and logistics cells throughout multiple Southeast Asian nations, including Malaysia and Singapore.

295.    Hezbollah and the Qods Force support the terrorist campaign in the Middle East from their Southeast Asian cells.  Indeed, that is the purpose of the cells far from Hezbollah's home in Beirut – cash and logistics flow for the terror campaign.

IV.  **DEFENDANTS TRANSACTED BUSINESS WITH FRONTS, OPERATIVES, AND AGENTS CONTROLLED BY THE ISLAMIC REVOLUTIONARY GUARD CORPS, INCLUDING HEZBOLLAH AND THE QODS FORCE**

A.  **The Islamic Revolutionary Guard Corps, Hezbollah, And The Qods Force Operate As An Integrated Transnational Terrorist Organization With A Common Doctrine, Strategy, Financial Structure, Logistics Structure, And Command-And-Control**

1.  **The Islamic Revolutionary Guard Corps' Transnational Terrorist Strategy, Doctrine, And Tactics Emphasizes The Deployment Of Joint Cells Of Terrorists Led By Hezbollah, Funded And Resourced By The Qods Force, And Supported By Local Iranian Terrorist Proxies**

296.  The IRGC has long followed a common terrorist strategy and doctrine, which deploys common tactics across every component of the IRGC (Regular, Hezbollah Division, and Qods Force) – including the use of Hezbollah as the cell leader and Qods Force as cell funder and logistician – and every geography in which the IRGC or any of its proxies operate.

297.  The IRGC adheres to an integrated global terror strategy, and follows the same rules for terrorist tradecraft, out of a recognition that the IRGC and its proxies were likely to always suffer from a resource deficit, which meant that the intelligent deployment of its human assets was paramount because unlike, say, China, the IRGC did not have limitless resources or an enormous pool of human capital from which to draw.  Given these "equipment and logistical constraints, Hezbollah – with the guidance of Iranian advisors – adopted a doctrine of guerrilla warfare against the Israeli occupation."[99]

298.  The Joint Cell approach is the foundation of the IRGC's terrorist doctrine and the cornerstone of the Hezbollah Division's entire terrorism "business model" when, as in most use cases, the Hezbollah Division and Qods Force are being deployed outside of Iran, or are being

---

[99] Lindemann, *Laboratory of Asymmetry*.

deployed inside of Iran but specifically to target Americans, e.g., to torture an American hostage being held in Iran, or to plan for a raid targeting Americans from a site in Iran.

> **2.** **The Islamic Revolutionary Guard Corps, Including Its Hezbollah Division And Qods Force, Follow Common Terrorist Techniques, Tactics, And Procedures And Use The Same Terrorist Tradecraft To Ensure Concealment And Cover Around The World**

299. "Tradecraft" refers to the methodologies and philosophies of engaging in covert operations (including killings) and general espionage. Terrorists and clandestine intelligence operatives both practice tradecraft.

300. The tradecraft rules that govern the IRGC are ironclad, inflexible, widely known, and universally applied worldwide, befitting the IRGC's status as the world's largest, most globally distributed, professionalized transnational terrorist organization. IRGC tradecraft emphasizes concealment and cover above all other operational imperatives.

301. While Islamist terrorists and western intelligence officials do not agree on much, they concur on the core doctrinal point that the two *absolute requirements* for nearly any successful operation by terrorists or intelligence operatives are **(i) Concealment**, i.e., something or someone that protects something (or someone) else from being identified; and **(ii) Cover**, i.e., something that provides protection or shelter to someone otherwise at risk.

302. Amongst counter-terror professionals, it is axiomatic that "cover" and "concealment" are a necessary ingredient to any successful long-term terrorist finance and logistics strategy that depends upon commercial transactions to facilitate terror.

303. Nearly everything a terrorist does requires cover and concealment in some form: meeting with cell members, communicating with leadership, surveilling targets, traveling across an international border to attend a training camp, and so on.

304.    Since its founding, the security doctrine followed by the IRGC has consistently emphasized cover and concealment as the essential aspect of any successful terrorist operation in light of the unique, violent, and affirmative need for the IRGC to "go on offense" and attack Americans abroad.

305.    The IRGC adheres to cover and concealment as the two most important principles in terrorist tradecraft for a simple reason:  from inception, and ever since, the IRGC's security policy was specifically built on paranoid, antisemitic, Islamist aggression that explicitly targeted America (sometimes by name, sometimes in code), and posited that an alliance between Christians (Americans) and Zionists (Israelis) was bent on taking over the Middle East and defiling Islam, and thus each member of the IRGC (including its Hezbollah Division and Qods Force) must always be attacking Americans, and always focusing specifically on targeting the United States for terror.

306.    The IRGC (including its Hezbollah Division and Qods Force) was built purposely for the specific task of attacking America and Israel in order to protect Iran's Islamic Revolution by staying on a perpetual state of "offense," i.e., a never ending campaign of terror against Americans and their allies in the Middle East and around the world designed to strike the "infidels" on their own ground – rather than fight on Iranian soil – via terrorist attacks usually carried out through a Joint Cell approach that outsources much of the violence to local IRGC proxies, but always under the control of Hezbollah and the Qods Force.

307.    The IRGC adhered to the above-described security policy for the purported purpose of preventing "Christians" and "Zionists" from overrunning the Middle East, ending Iran's Islamic Revolution, and forcibly converting every Muslim in the world to Christianity and

Judaism.[100]  At all times, and continuing to this day, the Iranian Shareholders with whom MTN Group, Phuthuma Nhleko, and Irene Charnley conspired, i.e., fronts for the IRGC (including its Hezbollah Division and Qods Force), have adhered to this doctrine.

308.    The ability of the IRGC to depend upon the reliability of its covers – corrupt corporate partners – was essential to the scheme's ability to obtain the vast storehouse of high-tech American smartphones, network computing technologies.

### i.    Concealment

309.    Every principle of terrorist tradecraft practiced by the IRGC begins with concealment.  While every Foreign Terrorist Organization, like the IRGC, prioritizes concealment, few have more practical experience accomplishing concealment.  And, from experience, organizations grow (for good or ill).  The IRGC has decades of terrorist experience and is the most experienced, practiced terrorist organization in the world today with respect to concealment, a status it earned in the 1990s and has maintained ever since.

310.    Under the "security" doctrine universally practiced at all times by the IRGC, including Hezbollah and Qods Force, IRGC terrorists are taught as a matter of terrorist tradecraft that, if they are faced with a choice between: (a) possibly blowing the concealment of an IRGC, including Hezbollah and Qods Force, cover, plot, operative, or transaction, and exposing the IRGC asset in question to capture by the hated "Great Satan," i.e., the U.S., and "Little Satan," i.e., Israel, or detection by the "Christians," i.e., the United States, and/or the "Zionists," i.e., Israel, or (b) simply lying, cheating, stealing, defrauding, burning, kidnapping, or murdering

---

[100] The last point reflects a particularly ominous aspect of the theological doctrine underpinning the "security" doctrine adhered to by the IRGC, including Lebanese Hezbollah and Qods Force. Under the theology espoused by Iran's radical clerics, a Muslim conversion to Christianity (forcibly or not) is viewed as an apostasy, the worst possible thing someone can do, and the worst possible fate that could befall someone in return.

your way out of the problem, there is ***no choice at all*** for any terrorist who is a member of the IRGC.  For such a terrorist, IRGC doctrine commands them to maintain concealment of the asset to prevent discovery by the U.S.

311.    To be clear, Plaintiffs do not allege that the IRGC, including Hezbollah and Qods Force, have any discretionary authority in the immediately preceding hypothetical.  ***Just the opposite***:  a well-trained terrorist following the tradecraft of the IRGC is ***affirmatively compelled*** to lie, cheat, defraud, kidnap, torture, rape, and murder – whatever is necessary to maintain concealment – as a religious duty, analytically no different from other pious acts because the crime in question was purportedly in service of the Islamic Revolution and the IRGC's holy mandate to "preserve" the Revolution since 1979 by conducting waves of terror campaigns coordinated by Hezbollah's External Security Organization.

312.    The IRGC's obsession with preserving concealment underpins this case.  Because the IRGC prioritizes concealment above all else, an operative of the IRGC would never truthfully reveal their "security"-related status – i.e., that they were a terrorist operative assigned to the IRGC's Hezbollah Division's External Security Office or through the IRGC's Qods Force and currently on a mission.

313.    The ordinary "use case" for most Foreign Terrorist Organizations, including the IRGC, assumes that the FTO's forward deployed terrorists worked in-country with local proxies to attack Americans nearby, and that the FTO's operatives are often highly motivated, but isolated and poorly resourced.  IRGC (including Hezbollah and Qods Force) tradecraft emphasizes the intense vulnerability of Iranian terrorists considering America's military power, intelligence capabilities, surveillance prowess, dominance of the global financial system through New York banks, and status as the world's most technologically advanced country.

314.    IRGC (including Hezbollah Division and Qods Force) "security" operatives (i.e., terrorists) were (and are) paranoid about their concealment and went to extreme lengths to preserve it.

315.    When a forward-deployed intelligence operative or terrorist is operating under concealment, as most do, one key challenge involves how to develop reliable partners outside of the terrorist group (e.g., a partner who helps Hezbollah but is not himself a member) or intelligence service (e.g., a source).

316.    The IRGC does not lightly accept foreigners in their terrorist "circle of trust." And the IRGC did not do so here.

317.    To earn – and keep – the trust of the IRGC the IRGC insisted that MTN Group sign the same IRGC template, in which each Defendant pledged to facilitate the "security" operations of the IRGC, i.e., Hezbollah and Qods Force attacks against Americans worldwide.

318.    IRGC concealment doctrine emphasizes an "Orbit" strategy under which the IRGC, including its Hezbollah Division and the Qods Force, structures transactions so that the IRGC is behind one side, one step removed, but fully in control.  This IRGC tradecraft is designed to give the IRGC, and its corrupt corporate and financial enablers, the ability to falsely claim that the IRGC did not directly benefit from an otherwise suspect transaction because the counterparty himself was not a member of the IRGC.  NATO confirmed the IRGC's orbit strategy in a 2020 analysis that NATO published.  *Supra* § I.A.1 (discussion of article).

       **ii.    Cover**

319.    The IRGC's terrorist doctrine emphasizes the reliance upon charities, corporations, and endowments, and other ostensibly "civilian" or "economic" entities as covers for the IRGC.

320.     In recognition of the central role of cover to IRGC doctrine, the IRGC created

Unit 400 within the Qods Force.  As one regional newspaper explained in 2021:

> Unit 400 has a network of facilitators and proxies, including elements in organized crime
> syndicates. These individuals collect information, make preliminary logistical
> preparations, and carry out operations if necessary. These individuals sometimes are
> trained inside Iran and sometimes in the Quds Force's training camps across the globe.
> Unit 400 has various front companies that both provide cover and money for this terrorist
> entity to operate. Two companies, Arash Zoobin, and Aria Navid, are used to secretly
> transfer weapons for Unit 400. Besides, the IRGC uses its vast network of front
> companies, religious or charitable organizations around the world to recruit facilitators.[101]

321.     As a consequence, the IRGC, including its Hezbollah Division and the Qods

Force, relied upon the importance of using crooked corporate partners to provide "cover" to

facilitate, among other things:  **(i) illicit financial transactions to acquire and distribute U.S.**

**Dollars**, e.g., laundering and recycle U.S. Dollar-denominated drug profits to finance Hezbollah

operations; **(ii) illicit purchases of embargoed American technology**, e.g., bulk purchasing

thousands of black market secure American mobile phones; **(iii) illicit movement of terrorist**

**operatives**, e.g., a Hezbollah attack planner whose need to visit Europe requires a visa supplied

by a credible front company; **(iv) illicit safe havens**, e.g., a fictitious company used as cover for

an al-Qaeda safehouse in Afghanistan; and **(v) illicit cache sites**, e.g., Hezbollah attack planner

whose need to visit Europe requires a visa supplied by a credible front company.

### iii.        Slush Funds For "Off-Books" Terrorist Finance

322.     Given the IRGC's programmatic emphasis on deception and the use of "slush

funds," core IRGC doctrine emphasizes that the IRGC, including its Hezbollah Division and the

Qods Force, must draw a substantial portion of the funds, arms, personnel, and logistical support

---

[101] Shahriar Kia, *Global Terrorist Activities Of The Iranian Mullah Regime*, Weekly Blitz
(Bangladesh) (Dec. 4, 2021), 2021 WLNR 39679934.

for anti-American terrorism globally from "off-books" sources, with the Bonyad Mostazafan being the most notorious – and important – terrorist slush fund of them all.

323.    Moreover, "all the IRGC's economic activities are monitored only by internal IRGC auditors and that the corps pays no taxes."[102]

### iv.    Corruption As Terrorist Tactic And Tool

324.    The terrorist tradecraft practiced and taught by the IRGC has long used corruption, bribery, kickbacks, "taxes," and protection money as a core strategy to facilitate terrorist attacks against Americans in Iraq, Afghanistan, and elsewhere through:  (1) terrorist finance, including raising funds, concealing funds, converting funds to U.S. Dollars (the currency of choice for all terrorists), and moving the Dollars to the necessary terrorist cell; (2) terrorist logistics, including acquiring the embargoed technologies necessary to improve the bombs, rockets, communications, and surveillance capabilities necessary to kill or kidnap Plaintiffs; and (3) terrorist freedom of movement, including securing visa and other government papers necessary to a plot, bribing law enforcement to prevent the roll-up of a cell, and the like.

325.    Decades of Hezbollah operations, investigations, and prosecutions confirm how the IRGC converted income from the transnational corruption economy for terror, including, but not limited to, examples ranging from Hezbollah's role in the Lebanese banking system (Hezbollah dominated it), to Hezbollah's sponsorship of narcotics trafficking (Hezbollah serves as an elite global management consulting company for narcotraffickers), to Hezbollah's involvement in transnational organized crime worldwide (where Hezbollah serves as both partner, client, and management consultant).

---

[102] Rasool Nafisi, *Iran's Revolutionary Guard Has A Lot To Lose*, Radio Free Europe Documents (Sept. 18, 2009), 2009 WLNR 18604289.

326.    By 2004, the IRGC had spent more than two decades developing and refining their shared tradecraft, networks, strategies, and tactics relevant to using corruption as a tool for terror.  As a result, the IRGC already had a purpose-built transnational infrastructure enabling to convert the economic profits they derive from the "corruption economy" in one country into attacks in that country, but also others.

### v.    Required Donations (*Khums*) From All IRGC Members

327.    Shiite theological traditions call for donations (*khums*), usually equal to twenty percent (20%) of a person's income on every transaction, to support the cause.  The IRGC, however, has twisted this religious tradition, like tithing in Christianity, into something far different.

328.    Under the longstanding IRGC doctrine that Hezbollah teaches to Iranian proxies like Jaysh al-Mahdi, the IRGC emphasizes the need to consistently collect donations (or taxes) as something that is universally required from all profit-generating activities and transactions – *without exception* – including, but not limited to, profits generated through official business, criminal rackets, bribery and kickbacks, and a broad array of other illicit cash flow schemes. The IRGC's "no exceptions" rule ensures that the terrorist have an administratively simple scheme (analogous to a terrorist flat tax), which ensures ease of implementation, and comports with the broader IRGC emphasis on its terrorists and proxies embracing administrative simplicity in their jihad.

329.    Under IRGC doctrine, *khums* donations are mandatory on multiple different transaction types, all of which ultimately flow back to fund the IRGC, including its Hezbollah Division and the Qods Force.  *First*, if income flows through an IRGC-controlled front (i.e., MTN Irancell) to the IRGC shareholders behind that front (i.e., the IRGC, including its Hezbollah Division and the Qods Force), the respective shareholders provide a donation to the

others.  Thus, for example, if MTN Irancell flowed through $100 million to the IRGC, one may infer that the IRGC would, in turn, donate approximately twenty percent (20%) – $20 million – to its Hezbollah Division and the Qods Force in order to export Iran's Islamist revolution abroad through anti-American terror.

330.     *Second*, if a member of the IRGC – or a cutout acting on their behalf – receives a substantial economic benefit, such as a $400,000 bribe, IRGC doctrine mandates that the bribe recipient kickback, mafia-style, twenty percent of their income to the IRGC.  Thus, for example, an IRGC member (or cut-out) who received a $400,000 bribe could ordinarily be expected to kickback $80,000 to the IRGC, or likely meet the same fate that would befall a captain in the Gambino crime family who tried to keep a nearly half-million-dollar score from the Don (death).

**B.   The Terrorist Tradecraft And Doctrine Of The Islamic Revolutionary Guard Corps, Including Its Hezbollah Division And Qods Force, Has Historically Relied On Fronts, Operatives, Agents, Cut-Outs, And Orbits To Fund, Arm, And Operationally Support Iran's Anti-American Terrorist Proxy Attacks Against Americans**

331.     The terrorist tradecraft and doctrine of the IRGC has a long and notorious history of relying on fronts, operatives, and agents to obtain funding, weapons, and operational support to benefit the IRGC's terrorist operations and Anti-American proxies around the world, most of all Hezbollah.

332.     On February 10, 2010, the U.S. Treasury Department announced additional IRGC front-related designations and stated that the IRGC were using illicit commercial transactions to bolster Iran's terrorist enterprise:

> The U.S. Department of the Treasury [] took further action to implement existing U.S. sanctions against Iran's [IRGC] by designating an individual and four companies affiliated with the IRGC … "As the ***IRGC consolidates control over broad swaths of the Iranian economy***, … ***it is hiding behind companies … to maintain vital ties to the outside world***," said Under Secretary for Terrorism and Financial Intelligence Stuart Levey.  "Today's action … will help ***firms worldwide avoid business that ultimately benefits the IRGC and its dangerous***

*activities*." …  The U.S. has previously acted against the IRGC and the IRGC-Qods Force for their involvement in proliferation and terrorism support activities, respectively. In joint actions on October 25, 2007, the State Department designated the IRGC, under E.O. 13382, for having engaged, or attempted to engage, in proliferation-related activities, and ***Treasury designated the IRGC--Qods Force pursuant to E.O. 13224 for providing material support to … terrorist organizations***. …[103]

333.    On August 3, 2010, the U.S. Treasury Department announced additional IRGC-and Qods Force-related terrorist designations that bolstered the U.S. message that the "IRGC and IRGC-QF" provided "Support for Terrorist Organizations," including Hezbollah, and relied upon illicit commercial transactions to fund and arm the Hezbollah-led terrorist campaign against Americans in Iraq:

> The U.S. Department of the Treasury announced [] a set of designations targeting the Government of Iran's support for terrorism and terrorist organizations, including Hizballah … Iran is the primary funder of Hizballah and has long been recognized as the most active state sponsor of terrorism. Today's designations expose Iran's use of its state apparatus – including the Islamic Revolutionary Guard Corps-Qods Force – and state-run social service organizations to support terrorism under the guise of … economic development …

> **IRGC and IRGC-QF Support for Terrorist Organizations:**
> The IRGC-QF is the Government of Iran's primary arm for executing its policy of supporting terrorist and insurgent groups. The IRGC-QF provides material, logistical assistance, training and financial support to militants and terrorist operatives throughout the Middle East and South Asia. It was designated by Treasury pursuant to E.O. 13224 in October 2007 for its support of terrorism.

> The Government of Iran also uses the Islamic Revolutionary Guard Corps (IRGC) and IRGC-QF to implement its foreign policy goals, including, but not limited to, ***seemingly legitimate activities that provide*** cover for intelligence operations and ***support to terrorist and insurgent groups***. ***These activities include economic investment … implemented by companies and institutions that act for or on behalf of, or are owned or controlled by the IRGC and the Iranian government***.

> • … In Iraq, the Government of Iran trains, equips, and funds Iraqi Shia militant groups.

---

[103] U.S. Treasury Dep't, *Treasury Targets Iran's Islamic Revolutionary Guard Corps* (Feb. 10, 2010) (emphasis added).

- In the Levant, the IRGC-QF continues to support designated terrorist groups such as Hizballah…[,] the largest recipient of Iranian financial aid, training, and weaponry; and Iran's senior leadership has cited Hizballah as a model for other militant groups.[104]

334.    On December 21, 2010, the U.S. Treasury Department announced additional

IRGC-related designations, and stated once again that IRGC relied upon illicit commercial

transactions, including through the Bonyads like Bonyad Mostazafan, to facilitate Iran's terrorist

enterprise:

> The U.S. Department of the Treasury announced [] a set of designations targeting the financial networks of the Islamic Revolutionary Guard Corps (IRGC) … Today's actions further expose the continued engagement of the IRGC … in illicit activities and deceptive behavior.
>
> "[T]he IRGC … [is a] major institutional participant[] in Iran's illicit conduct and in its attempts to evade sanctions.  We will therefore continue to target and expose [its] networks," said Under Secretary for Terrorism and Financial Intelligence Stuart Levey. …  The IRGC continues to be a primary focus of U.S. and international sanctions against Iran because of the central role it plays in Iran's … support for terrorism ….  The U.S., UN, EU, Japan, South Korea and others have all targeted the IRGC for sanctions because of this illicit activity. With the IRGC's expanding influence and control over broader segments of the Iranian economy … increasing numbers of Iranian businesses are subsumed under the IRGC's umbrella and identified with its illicit conduct.
>
> … Iranian bonyads are opaque, quasi-official organizations controlled by key current and past government officials and clerics. Bonyads receive benefits from the Iranian government but are not required to have their budgets publicly approved. They account for a significant portion of Iran's non-petroleum economy. …  Treasury has designated 14 IRGC-affiliated individuals and entities since June 2010 for facilitating Iran's nuclear and ballistic missile program or support for terrorism.[105]

---

[104] U.S. Treasury Dep't, *Fact Sheet: U.S. Treasury Department Targets Iran's Support for Terrorism Treasury Announces New Sanctions Against Iran's Islamic Revolutionary Guard Corps-Qods Force Leadership* (Aug. 3, 2010) (emphasis added).

[105] U.S. Treasury Dep't, *Fact Sheet: Treasury Designates Iranian Entities Tied to the IRGC and IRISL* (Dec. 21, 2010).

335.    On June 23, 2011, the U.S. Treasury Department announced additional IRGC-related designations that reinforced the U.S. message that illicit transactions with IRGC commercial fronts directly aided terrorism against Americans by Iranian terrorist proxies:

> ***Treasury Targets Commercial Infrastructure of IRGC, Exposes Continued IRGC Support for Terrorism***
>
> Today, the U.S. Department of the Treasury took action to designate … Iranian commercial entities … owned by [IRGC] … The IRGC continues to be a primary focus of U.S. and international sanctions against Iran because of the central role it plays in all forms of Iran's illicit conduct, including Iran's … support for terrorism …  As Iran's isolation has increased, the IRGC has expanded its reach into critical sectors of Iran's economic infrastructure – to the detriment of the Iranian private sector – ***to generate revenue and conduct business in support of Iran's illicit activities***.  Today's actions target core commercial interests of the IRGC, while also undermining the IRGC's ability to continue using these interests to facilitate its … illicit conduct. …  The IRGC has a growing presence in Iran's financial and commercial sectors and extensive economic interests …, controlling billions of dollars in corporate business.  Given its increased involvement in commercial activity, imposing financial sanctions on commercial enterprises of the IRGC has a direct impact on revenues that could be used by the IRGC to facilitate illicit conduct.[106]

**C.    The Islamic Revolutionary Guard Corps', Including Hezbollah's And The Qods Force's, Transnational Terrorist Enterprise Depended Upon Complicit Multinational Corporations' Willingness To Transact With Known Islamic Revolutionary Guard Corps Front Companies Operating In Iran's Mobile Phone, Landline, Internet, And Network Computing Sectors**

336.    The IRGC controlled the entire Iranian telecom sector from top to bottom.  The following IRGC, including Hezbollah and Qods Force, fronts, operatives, and agents played especially prominent roles in ensuring that any telecom transactions that flowed cash to the IRGC's "Orbit" fronts benefited Hezbollah's and the Qods Force's global terrorist agenda.

---

[106] U.S. Treasury Dep't, *Fact Sheet: Treasury Sanctions Major Iranian Commercial Entities* (June 23, 2011) (emphasis added).

1.    **The Bonyad Mostazafan Was, And Remains, A Front For The Islamic Revolutionary Guard Corps, Including Hezbollah And The Qods Force**

337.    The Bonyad Mostazafan, also known as the *Bonyad Mostazafan va Janbazan*, Mostazafan Foundation, and Alavi Foundation (herein, the "Bonyad Mostazafan"), was established after the Islamic Revolution to steal and manage property, including that originally belonging to religious minorities in Iran such as Baha'is and Jews, to fund the export of the Iran's Islamist Revolution around the world.

338.    The Bonyad Mostazafan was and is a front for Hezbollah, the Qods Force, and Regular IRGC.  The Bonyad Mostazafan's purpose was and is to raise funds and obtain weapons (including weapons components) for the IRGC's terrorist operatives and proxies, including Hezbollah.  As a front for the IRGC funds and weapons (including weapons components) provided to the Bonyad Mostazafan through its commercial transactions inevitably flowed through the Bonyad Mostazafan to Hezbollah (through the IRGC) and Jaysh al-Mahdi (through Hezbollah) to fund and arm the Joint Cell terrorist attacks against Americans in Iraq from 2011 through 2016.

339.    At all times, the Bonyad Mostazafan has been led by an agent or cut-out for the IRGC and has served as a central hub of IRGC fund raising, weapons development and acquisition, computing, and communications infrastructure for Iran's terrorist enterprise, which value has flowed through to Hezbollah and, through Hezbollah, to Jaysh al-Mahdi.

340.    The Bonyad Mostazafan is currently led by IRGC Brigadier General Parviz Fattah, who is also, on information and belief, a Qods Force operative.

341.    Serious counter-terrorism scholars have publicly confirmed that the Bonyad Mostazafan serves as an IRGC front for directly funding Iranian terrorist proxies in the Middle East.  For example, in 2014, Jonathan Schanzer, the Vice President of Research at the

Foundation for Defense of Democracies, testified that "[t]he Bonyad-e Mostazafan" was "a splinter of Iran's IRGC" and had "reportedly opened its coffers to Hamas, providing critical financial support."[107]

342.    Indeed, South Africa's own intelligence service concluded that the Bonyad Mostazafan funded and logistically sustained both local Islamist terrorists operating in the same South African city where MTN Group was headquartered, and the IRGC's globally-oriented terrorist proxies and allies, who often used South Africa's permissive financial crime environment as a "home away from home."[108]

343.    On November 18, 2020, the U.S. Treasury Department designated the Bonyad Mostazafan, observed that it served as a "bridge to the IRGC," and announced as follows:

> The U.S. Department of the Treasury's Office of Foreign Assets Control (OFAC) took action today against a key patronage network for the Supreme Leader of Iran, the Islamic Revolution Mostazafan Foundation (Bonyad Mostazafan, or the Foundation) …  While Bonyad Mostazafan is ***ostensibly*** a charitable organization charged …, its holdings are expropriated from the Iranian people and are used by [Ayatollah] Khamenei to …  enrich his office, reward his political allies, and persecute the regime's enemies. …  "Iran's Supreme Leader uses Bonyad Mostazafan to reward his allies under the ***pretense of charity***," said Secretary Steven T. Mnuchin. …
>
> **PARVIZ FATTAH, BONYAD MOSTAZAFAN'S BRIDGE TO THE IRGC**
> Bonyad Mostazafan maintains close ties to the IRGC, personified by current Foundation president and former IRGC officer **Parviz Fattah**.  Appointed to the presidency of the Foundation by the Supreme Leader in July 2019, Fattah previously . . . . served as head of the Imam Khomeini Relief Committee, whose Lebanon branch was designated pursuant to ***counterterrorism authorities in 2010 for being owned or controlled by, and for providing financial and material***

---

[107] Statement of Jonathan Schanzer, Vice President of Research at the Foundation for Defense of Democracies, Committee on House Foreign Affairs Subcommittee on Terrorism, Nonproliferation, and Trade. Subcommittee on the Middle East and North Africa, *Hamas and Terrorism*, Congressional Testimony via FDCH (Sept. 9, 2014), 2014 WLNR 24926764.

[108] A broad array of Islamist terrorist groups, both Shiite and Sunni, have long relied upon South Africa as a financial, logistical, and operational hub for supporting terrorist attacks in Africa, the Middle East, Europe, and Asia.  Such FTOs include, but are not limited to, Hezbollah, the Qods Force, al-Qaeda, and the Haqqani Network.

***support to, Hizballah***.  Known for his loyalty to the Supreme Leader, Fattah has also forged ties to senior IRGC-Qods Force (IRGC-QF) officials.  According to Fattah, former IRGC-QF commander Qassem Soleimani sought Fattah's assistance to finance the Fatemiyoun Brigade, an IRGC-QF-led militia composed of Afghan migrants and refugees in Iran coerced to fight in Syria under threat of arrest or deportation. . . .  The Fatemiyoun Brigade, like the IRGC-QF itself, is designated pursuant to [] counterterrorism … authorities. …

**SANCTIONS IMPLICATIONS**
As a result of today's action, … OFAC's regulations generally prohibit all dealings by U.S. persons or within (or transiting) the United States that involve any property or interests in property of blocked or designated persons.  In addition, persons that engage in certain transactions with the individuals or entities designated today may themselves be exposed to sanctions. …[109]

344.    The Bonyad Mostazafan primarily serves as a front for terror and performs little legitimate charitable work.  As the Treasury Department found when it imposed sanctions, "[w]hile the Supreme Leader enriches himself and his allies, the Foundation's primary mission to care for the poor has ***become a secondary objective***. According to the Foundation's previous president, in past years as little as ***seven percent of the Foundation's profit*** has been spent on projects aimed at reducing poverty."[110]

345.    The Bonyad Mostazafan directly funds Iranian terrorist proxy military activities outside of Iran.  Fattah, who currently runs the Bonyad Mostazafan, has publicly admitted it.

346.    Fattah was separately designated for his terrorism-related connections in 2010.[111]

---

[109] U.S. Treasury Dep't, *Treasury Targets Vast Supreme Leader Patronage Network and Iran's Minister of Intelligence* (Nov. 18, 2020) (emphases added).

[110] *Id*. (emphases added).

[54] U.S. Treasury Dep't, *Fact Sheet: Treasury Designates Iranian Entities Tied to the IRGC and IRISL* (Dec. 21, 2010) ("Parviz Fattah, the Executive Director of Bonyad Taavon Sepah was designated today for acting on behalf of, and providing services to, Bonyad Taavon Sepah.").

347.    The Bonyad Mostazafan's participation in Irancell helped persuade the State Department to conclude (as published online) that Irancell was "fully owned by the IRGC."[112]

348.    Apart from its key role in Irancell, the Bonyad Mostazafan is also a key shareholder in TCI and MCI, using the IRGC's Orbit strategy to exercise its control of TCI and MCI in furtherance of the IRGC's terrorist agenda.

### 2.    Iran Electronics Industries Was, And Remains, A Front For The Islamic Revolutionary Guard Corps, Including Hezbollah And The Qods Force

349.    Iran Electronics Industries, also known as IEI, Sanaye Electronic Iran, Sasad Iran Electronics Industries, or Sherkat Sanayeh Electronics Iran ("IEI"), was and is a front for the IRGC.

350.    IEI's express purpose was and is to raise funds and obtain weapons (including weapons components) for the benefit of the IRGC's terrorist operatives and proxies, including Hezbollah.  Funds and weapons (including weapons components) obtained by IEI through its commercial transactions inevitably flowed through IEI to Hezbollah (through the IRGC) and Jaysh al-Mahdi (through Hezbollah) to fund and arm the Joint Cell terrorist attacks against Americans in Iraq from 2011 through 2016.

351.    Since the 1990s, IEI has been widely understood in business, diplomatic, military, and media circles to be a front for Iranian terrorism through the IRGC.

352.    On or about 2006, a Treasury official, Stuart Levin, told representatives of MTN's competitor, Turkcell, that IEI was "fully owned" by the IRGC.

---

[112] U.S. State Dep't Cable, *U/S Levey Seeks Turkish Cooperation Against Iranian Terrorism Finance & Nuclear Proliferation* (Dec. 18, 2006).

353.    On information and belief, Undersecretary Levin communicated to MTN Group that IEI was "fully owned" by the IRGC and that economic interactions with IEI foreseeably aided Iranian proxy terrorist attacks against Americans.

354.    Beginning in the mid-2000s, U.S. federal criminal investigations and prosecutions also linked Irancell and IEI to the procurement of sensitive weapons technologies that were found in IEDs in Iraq and Afghanistan.

355.    On September 17, 2008, the U.S. Treasury Department designated IEI and explained that it builds weapons intended for use against the U.S. military.[113]

356.    IEI's participation in Irancell helped persuade the State Department to conclude (as published online) that Irancell was "fully owned by the IRGC."[114]

### 3.    MTN Irancell Was, And Remains, A Front For The Islamic Revolutionary Guard Corps, Including Hezbollah And The Qods Force

357.    MTN Irancell is a joint venture between two IRGC, including Qods Force, fronts, the Bonyad Mostazafan and IEI, which collectively own 51% of MTN Irancell, and MTN Group Ltd., which owns 49% of MTN Irancell ("MTN Irancell").

358.    MTN Irancell was and is a front for the IRGC.

359.    MTN Irancell's express purpose was and is to raise funds and obtain weapons (including weapons components) for the benefit of the IRGC's terrorist operatives and proxies, including Hezbollah.  Funds and weapons (including weapons components) obtained by MTN Irancell through its commercial transactions inevitably flowed through MTN Irancell to

---

[113] U.S. Treasury Dep't, *Treasury Designates Iranian Military Firms* (Sept. 17, 2008).

[114] U.S. State Dep't Cable, *U/S Levey Seeks Turkish Cooperation Against Iranian Terrorism Finance & Nuclear Proliferation* (Dec. 18, 2006).

Hezbollah (through the IRGC) and Jaysh al-Mahdi (through Hezbollah) to fund and arm the Joint Cell terrorist attacks against Americans in Iraq from 2011 through 2016.

360.    The U.S. State Department purportedly referred to Irancell (as published online) as being "fully owned by the IRGC."

361.    IRGC specialists agree.  For example, in 2015, Dr. Emanuele Ottolenghi, of the Foundation for Defense of Democracies, identified "telecommunications" as a "sector where the IRGC [was] bound to reap economic benefits" because "all three mobile operators in Iran" – including MTN Irancell – "are directly or indirectly partners with IRGC-affiliated companies."[115]

### 4.    The Telecommunications Company Of Iran Was, And Remains, A Front For The Islamic Revolutionary Guard Corps, Including Hezbollah And The Qods Force

362.    The Telecommunications Company of Iran (or TCI) was and is a front for the IRGC.

363.    TCI is the parent company of MTN Irancell's nominal competitor in Iran, MCI.

364.    TCI's express purpose was and is to raise funds and obtain weapons (including weapons components) for the benefit of Iran's terrorist operatives and proxies, including Hezbollah.  Funds and weapons (including weapons components) obtained by TCI through its commercial transactions inevitably flowed through TCI to Hezbollah (through the IRGC) and Jaysh al-Mahdi (through Hezbollah) to fund and arm the Joint Cell terrorist attacks against Americans in Iraq from 2011 through 2016.

---

[115] Statement of Dr. Emanuele Ottolenghi Senior Fellow Foundation for Defense of Democracies, Committee on House Foreign Affairs Subcommittee on Middle East and North Africa, *Iran Nuclear Deal*, Congressional Testimony via FDCH (Sept. 17, 2015), 2015 WLNR 27612447 ("Dr. Ottolenghi Sept. 17, 2015 Testimony").

365.    TCI is known to be an IRGC, including Qods Force, front.  The *Economist*'s due diligence unit, the *Economist Intelligence Unit*, reported in 2009 that "[t]he question of possible IRGC involvement in the TCI acquisition was raised in subsequent discussion in the Iranian majlis (parliament)," where "[t]he speaker, Ali Larijani, [was] quoted by Aftab-e Yazd, an Iranian newspaper, as saying that the IRGC was a direct party to the deal."[116]  The same report also noted the  "[b]lurred distinctions" between the IRGC and Iranian telecom companies:

> [In 2006,] the Supreme Leader, Ayatollah Ali Khamenei, lent his personal support to the proposed asset sales. As with many other privatisation programmes in authoritarian states, there are strong grounds to suspect that elite groups are manipulating the process to advance their own interests unfairly. It is clear that over the past few years much political and economic power has flowed towards the IRGC. … The telecoms sector in Iran has expanded rapidly over the past five years, in particular in the mobile segment, which recorded a compound annual growth rate of 65% between 2003 and 2008. There is still room for expansion of mobile telephony as the penetration rate is only about 70%, and broadband services are notably underdeveloped. ***This makes telecoms one of the most attractive targets for investment in Iran***. At the same time, telecoms is a critical sector for the security forces, as the Islamic Republic faces unprecedented domestic opposition along with growing external threats. ***If the IRGC is indeed behind the TCI deal, it would make sense from both the commercial and the security perspective.***[117]

366.    IRGC specialists concur.  For example, when Dr. Ottolenghi identified "telecommunications" as "[a]nother sector where the IRGC [was] bound to reap economic benefits," Ottolenghi also noted that "[t]he IRGC control[led] Iran's largest telecom company, the Telecommunication Company of Iran or TCI," which the "[t]he Guards bought … in September 2009 in a controversial bid that at the last minute disqualified the only non-IRGC offer."[118]  As Dr. Ottolenghi further explained:

---

[116] Economist Intelligence Unit, *Iran Telecoms: Dial I for IRGC?*, Telecoms and Technology Forecast (Oct. 12, 2009), 2009 WLNR 20135393.

[117] *Id.* (emphasis added).

[118] Dr. Ottolenghi Sept. 17, 2015 Testimony.

TCI's main shareholder is now Toseye Etemad Mobin (50%), a company ***controlled by the IRGC*** jointly with the supreme leader's financial network, through two companies - the Tadbir Group-owned Gostaresh Electronic Mobin and Shahriar Mahestan Company.  TCI has a monopoly over Iran's landlines, and thus controls much of the country's Internet traffic.  As *Al-Monitor* reported in August 2013, ***all three mobile operators in Iran are directly or indirectly partners with IRGC-affiliated companies***.[119]

367.    The Bonyad Mostazafan was (and is) also a member of the TCI consortium.  As a result, Defendants routed money and technology to the IRGC's terrorist proxies through the Bonyad Mostazafan's involvement in the TCI consortium.

### 5.    Exit40 Was A Front For Hezbollah

368.    The IRGC have active cells in India, Switzerland, and the U.A.E., and rely upon all three as critical geographies to flow through precious U.S. Dollars and illicitly acquired American technologies, ultimately flowing back to the IRGC's Hezbollah Division and Qods Force, to be used to aid the attack campaigns in Iraq, Afghanistan, and elsewhere in furtherance of the IRGC's scheme.

369.    Exit40 was a company with letter box offices in the U.A.E., Florida, India, and Switzerland.  On information and belief, Exit40 was a front company created by or for Hezbollah and the Qods Force, and owned, controlled, and operated by Hezbollah.

370.    On information and belief, Exit40 was purpose-built by Hezbollah and the Qods Force, following IRGC terrorist tradecraft, to serve as a Hezbollah front for illicit fundraising and acquisition of embargoed U.S. technologies including American smartphones and servers.

371.    On information and belief, Exit40 supplied the described Security Aid to Hezbollah, the Qods Force, and other IRGC-affiliated terrorists and/or proxies in order to, among other things, aid attacks by the IRGC Sunni Terrorist Proxies in Iraq.

---

[119] *Id*. (emphasis added).

372.    On information and belief, Hezbollah and the Qods Force used Exit40 to extract millions of U.S. Dollars and tens of millions worth of American technologies, from inside the United States, through a hub location overseas (e.g., Singapore) before reaching the relevant terrorist cell in Iraq, Afghanistan, Iran, Pakistan, or the U.A.E.

**V.    DEFENDANTS' TRANSACTIONS WITH FRONTS, OPERATIVES, AND AGENTS OF THE ISLAMIC REVOLUTIONARY GUARD CORPS, INCLUDING ITS HEZBOLLAH DIVISION AND QODS FORCE, PROVIDED WEAPONS, FINANCING, LOGISTICAL, AND OPERATIONAL SUPPORT TO THE IRGC'S SUNNI TERRORIST PROXIES IN IRAQ AND AFGHANISTAN**

**A.    The Islamic Revolutionary Guard Corps, Including Hezbollah And The Qods Force, Sourced Arms, Raised Funds, And Obtained Logistical And Operational Support Through Illicit Corporate Transactions In The Telecom, Communications, And Information Technology Sectors**

373.    As Western sanctions clamped down on Iranian terror fronts, the IRGC responded by expanding its efforts to obtain funds, purchase arms, and manage illicit logistics chains vital to the IRGC's ability to fund its proxies in Iraq through illicit transactions in the United States, U.A.E., Germany, South Africa, and Iran.

374.    In so doing, the IRGC relied on transactions with multinational corporations, like Defendants MTN Group, supported by corrupt and complicit members of the C-Suite, like Defendants Nhleko and Charnley, which operated in key sectors for the dual-use technologies that were essential to the IRGC's, including Hezbollah's and the Qods Force's, communications, surveillance, bombmaking, rocket attacks, intelligence gathering, and project management – everything a transnational terrorist group needs to coordinate attacks against Americans in the Middle East.

375.    Sadegh Zibakalam, a professor of political science at the University of Tehran, explained to the BBC in 2012 that "[d]uring the past decade Iran has come up with various ways

of getting around international sanctions."[120]  Per the BBC, Professor Zibakalam "said Iranian companies had been able to source many American … goods through international markets, especially companies based in Dubai … He added that international companies have been eager to assist Iran with equipment it needs."[121]

376.    The IRGC relied upon the use of concealment and corporate covers to illicitly acquire the technologies necessary to sponsor IRGC Sunni Terrorist Proxy attacks against Americans in Iraq at the nationwide scale necessary to potentially drive the U.S. out of the region as is the IRGC's Iranian constitutional duty.  At all relevant times, the IRGC has operated purpose-built units designed to extract American technology for use by Hezbollah and the Qods Force by coordinating with organized crime and facilitators.  Indeed, the IRGC's use of crooked corporations as fronts is consistent with longstanding IRGC terrorist doctrine, which emphasizes the use of mafia-like "buffers," cut-outs, and fraud schemes designed to route value and services without leaving a paper trail: in short, IRGC terrorist tradecraft.

377.    It is widely understood globally that illicit transactions that route money or technology to the IRGC inevitably result in the IRGC's Hezbollah Division and Qods Force receiving money, technology, or services that it can use in its terrorist enterprise, and vice versa.

378.    Scholars who have studied the IRGC concur that both benefit from illicit transactions and that the purported distinction between them is largely immaterial when it comes to Iran's terrorist enterprise and support for terrorist proxies.  British researcher Ben Smith studied the IRGC for the House of Commons and identified telecoms as a key area that financially benefits all:

---

[120] BBC News, *Iran Mobile Operator Irancell 'Secures US Technology'* (June 6, 2012).
[121] *Id.*

[T]he Revolutionary Guards, have **large and expanding business interests** … The Iranian economy is "marked by a bloated, inefficient state sector".  That has allowed the president to appoint allies and old colleagues from the Revolutionary Guard into key positions in the public sector, and to award government contracts to companies owned **or** controlled by Guard members, many of which are involved in dual use technology … **including telecommunications** … The **al-Quds force is thought to be no less involved in the business world than the rest of the Revolutionary Guard**, and analysts suspect that these growing business interests provide **clandestine sources of funding to be channelled to overseas groups and individuals, hidden from [] scrutiny** …[122]

379.     Prominent media reports also support this conclusion.  According to a 2007 report in the *New York Times*, "[s]ome specialists even question whether the Quds Force exists as a formal unit clearly delineated from the rest of the Revolutionary Guard."[123]  As one such Iran specialist, Vali R. Nasr of the Naval Postgraduate School, explained to the *Times*, "[i]t could be that anyone with an intelligence role in the Revolutionary Guard is just called Quds."[124]

380.     Moreover, any lines between the IRGC and the Qods Force blur when it comes to Iran's support for Islamist terrorists outside of Iran.  As the same *New York Times* report noted in 2007, "[w]hether properly identified as part of the Quds Force or not, members of the Revolutionary Guard mobilized intelligence and paramilitary agents in Lebanon in the 1980s, where they trained the Shiite militia Hezbollah; in Afghanistan, during the anti-Soviet jihad in the 1980s and episodically since then; in the former Yugoslavia, supporting the Bosnian Muslims against Serbian forces; and in other trouble spots."[125]

---

[122] Ben Smith (International Affairs and Defence Section of the UK House of Commons Library), *The Quds Force of the Iranian Revolutionary, Guard -- Standard Note: SN/IA/4494*, UK House of Commons Library Standard Note (Oct. 30, 2007) (emphasis added).

[123] Scott Shane, *Iranian Force, Focus of U.S., Still a Mystery*, N.Y. Times (Feb. 17, 2007).

[124] *Id*.

[125] *Id*.

381.     As the Foundation for Defense of Democracies similarly concluded, given the

tight nexus between IRGC commercial activity and violence by Iranian proxies, that any

transaction with IRGC fronts benefits Iran's terrorist enterprise – even when it does not result in

the IRGC or Qods Force directly obtaining any embargoed arms or technology:

> IRGC front companies … have stakes in telecommunications ….   of which Iran
> is the largest manufacturer in the Middle East. … Many IRGC projects are
> military in nature, and the group ***diverts much of the technology and expertise it
> acquires from Western companies for seemingly innocuous projects to unsavory
> ends***. … Any company that does business in Iran risks becoming an unwitting
> accomplice to the IRGC's nefarious activities … Yet ***even when companies
> provide services and technologies that cannot be diverted to illicit projects,
> partnering with the IRGC entails some complicity with its activities.*** In June
> 2006, [the head of an IRGC-owned company] confirmed in an interview with a
> local daily that the ***organization's funds finance various national defense
> projects, including arming and training Hezbollah***.[126]

**B.     Defendants Made Illicit Deals With Fronts, Operatives, Agents, And Cut-
Outs Of The Islamic Revolutionary Guard Corps, Including Its Hezbollah
Division And Qods Force, That Caused Secure American Smartphones,
Enterprise Level Servers, Network Computing Technologies, And Weapons
To Flow Through The IRGC Fronts To Reach Hezbollah, The Qods Force,
Regular IRGC, And Their Sunni Terrorist Proxies In Iraq And Afghanistan**

382.     Beginning in 2005, after the IRGC had intensified its support of the terrorist

campaign in Iraq, MTN Group, Phuthuma Nhleko, and Irene Charnley made illicit deals with

IRGC fronts, operatives, agents, cut-outs, and Orbits in the telecom, communications, and

network computing sectors.  Those deals directly benefited MTN Group and its subsidiaries and

affiliates, Phuthuma Nhleko, and Irene Charnley and caused tens of millions of dollars' worth of

embargoed American technologies to flow into the IRGC's (including its Hezbollah Division's

and Qods Force's) terrorist enterprise each year.

---

[126] Mark Dubowitz and Emanuele Ottolenghi (Foundation for Defense of Democracies), *The
Dangers Of Doing Business With Iran's Revolutionary Guards*, Forbes (June 15, 2010)
(emphasis added).

383.     The IRGC leveraged Defendants' insatiable appetite for Iran's telecom market, which was widely understood to represent a unique opportunity.  As the *Economist* explained in 2004, "[w]ith a population of some [70 million people] and a mobile-phone penetration rate of below 5%, ***Iran offers a unique opportunity for telecommunications investors***. … However, the wrangles with … Turkcell illustrate the difficulties in assessing the political risk associated with trying to enter the Iranian market."[127]

384.     MTN Group's, Phuthuma Nhleko's, and Irene Charnley's transactions provided financial, technical, logistical, and operational support to the Hezbollah, the Qods Force, and Regular IRGC worth tens of millions of U.S. dollars per Defendant each year, which funds flowed to their terrorist proxies including, but not limited to, Jaysh al-Mahdi in Iraq, al-Qaeda (worldwide), and the Taliban, including its Haqqani Network, in Afghanistan.

385.     MTN Group, Phuthuma Nhleko, and Irene Charnley furthered the scheme by ensuring its concealment for years through their rigorous adherence to the core principles of terrorist tradecraft specifically practiced by the IRGC, including its Hezbollah Divisions and Qods Force, while performing "security"-related operations, e.g., Joint Cell attacks against Americans in Iraq, or Qods Force facilitation of al-Qaeda/Taliban attacks in Afghanistan. Defendants' rigorous adherence to IRGC terrorist tradecraft furthered the terrorist scheme because it provided concealment to the fronts, operatives, and illicit transactions that channeled millions through to the IRGC and through them, to the IRGC's Shiite and Sunni Terrorist proxies worldwide.

---

[127] Economist Intelligence Unit, *Iran: Putting Up The Shutters*, Business Middle East (Sept. 1, 2004) (emphasis added), 2004 WLNR 10893473.

386.     MTN Group, Phuthuma Nhleko, and Irene Charnley deployed numerous illicit strategies to covertly transfer embargoed American smartphones, servers, network computing systems, and the associated technical support services without which their high-end gear was of little value.  While the strategies differed over time, each shared a common specific intent:  to cause tens of millions in valuable state-of-the-art American technologies, services, and currency to flow from the United States to the IRGC and through them, to the IRGC's Shiite and Sunni Terrorist Proxies worldwide, in order to sustain the terrorist campaigns in Iraq, Afghanistan, Yemen, Syria, and Europe.

387.     While Defendants pursued several different strategies for flowing terrorist finance through the MTN Irancell and TCI fronts to the IRGC terrorists standing behind it, two had the greatest impact.

388.     Defendants' illicit deals with the IRGC fell into three broad categories of deal type: (1) weapons procurement through sham deals; (2) financing through illicit transactions; and (3) operational support obtained through the legitimacy of the companies helping the IRGC.

389.     Defendants also knowingly helped the IRGC source hundreds of distinct items of state-of-the-art embargoed American technology that were illicitly acquired within the U.S. and then re-exported to Defendants' respective IRGC-front counterparties, to be given to terrorists. Plaintiffs offer representative examples of the "security" assistance that Defendants provided MTN Irancell and TCI (including MCI).

390.     For decades, the IRGC have recognized the centrality of cell phones to the modern terrorist.  Hezbollah has long widely deployed mobile phones as a tool of terror.

391.    MTN Group, Phuthuma Nhleko, and Irene Charnley deliberately engaged in complex schemes to acquire sensitive American technologies on the black market and route the "security" assistance to the IRGC.

392.    As one strategy, MTN Group instructed its cut-outs to **out-spend** the other black market cell phone buyers – meaning that MTN Group, under Mr. Nhleko's lead, was literally willing to pay **above black market rates** to acquire the sheer volume of high-tech American phones demanded by Defendants' key business partner, the IRGC, to facilitate anti-American terror attacks by Hezbollah, the Qods Force, and their proxies in Iraq and Afghanistan.

## C.    Defendants Made Illicit Deals With Fronts, Operatives, Agents, And Cut-Outs Of The Islamic Revolutionary Guard Corps, Including Its Hezbollah Division And Qods Force, That Caused Funds To Flow Through The IRGC Fronts To Hezbollah, The Qods Force, And Their Sunni Terrorist Proxies In Iraq And Afghanistan

393.    Beginning in 2005, after the IRGC had intensified its support of the terrorist campaign in Iraq, MTN Group, Phuthuma Nhleko, and Irene Charnley made illicit deals with IRGC fronts, operatives, agents, cut-outs, and Orbits in the telecom, communications, and network computing sectors.  Those deals directly benefited MTN Group, Phuthuma Nhleko, and Irene Charnley, and caused tens of millions of U.S. dollars to flow into the IRGC's (including Hezbollah's and the Qods Force's) terrorist enterprise each year.

### 1.    Procurement Bribery

394.    At all relevant times, the IRGC operated one of the most corrupt procurement environments in the world.

395.    The IRGC's approach was not out of line with prevailing Iranian corruption practices.  As one trade publication explained, "[c]orruption" is [a] [k]ey [c]oncern," in Iran "[a]nd [w]ill [l]ikely [w]orsen" because "[a]n endemic culture of corruption appears to pervade all areas of society in Iran, presenting a major obstacle for private and foreign-owned

120

businesses."[128]   Indeed, "Iran provides a highly conducive environment for corruption to flourish, primarily due to the opaque and complex nature of government, and the convoluted process of completing bureaucratic procedures."[129]

396.    Under official IRGC policy, the IRGC follows a mafia-style financial approach under which all IRGC components share a percentage of all income they realize with the IRGC – like how a mafia lieutenant kicks up a portion of his earnings to the mob boss.  For example, in 2003, the IRGC issued a directive decreeing those profits realized by IRGC fronts, operatives, and agents must be shared with the broader IRGC organization, i.e., its Hezbollah Division and Qods Force.  The IRGC issued this directive as it was ramping up for a long multi-front terrorist campaign against the United States, and the point of the directive was to escalate the flow of funding supporting the IRGC's proxies in Iraq and Afghanistan.

397.    The IRGC have long emphasized weaponizing their control (directly or indirectly) of procurement processes to generate cash flow.

398.    Acting through its Hezbollah Division, the IRGC has long counseled its terrorist proxies about the utility of seizing government ministries, state-owned-enterprises, and private commercial businesses in order to convert them into tools of terrorist finance.

399.    IRGC Shiite Terrorist Proxies made this a calling card of IRGC-backed terror, having deployed the strategy in every IRGC-backed terror campaign since the Islamic Revolution in 1979, including Hezbollah's control of social services in Lebanon, Jaysh al-Mahdi's control of the Iraqi Ministry of Health, and the Houthis' control of certain geographies in Yemen, as three examples.

---

[128] Emerging Monitor Online, *Iran: Major Barriers To Investment* (Feb. 19, 2016), 2016 WLNR 5299681.

[129] *Id*.

400.    From the perspective of an operative, agent, cut-out, cover, or proxy ally of the IRGC the IRGC's procurement bribery tradecraft usually calls for the following principles:

(i)    for ordinary procurement projects, e.g., a captive ministry purchasing a supply of commodities, the terrorist should extract a bribe or kickback of ten percent or more, often styled as a *khums* and delivered in cash (U.S. Dollars required) or "free goods";

(ii)    for mega-blockbuster procurement projects, e.g., build the complete nationwide infrastructure for a communications device, the terrorist should extract whatever the terrorist can get, but should not get greedy or let the perfect be the enemy of the good (the terrorist analogue to the maxim "pigs get fat, hogs get slaughtered"); and

(iii)    regardless of project type, follow similar terrorist tradecraft, including, but not limited to, emphasis on concealment and covers.

### 2.    "Free Goods"

401.    The IRGC have long emphasized manipulation of local and regional black markets as an ideal source of cash flow.

402.    The IRGC has long preferred "free goods" bribes as a tool of terrorist finance because "free goods" serve as cash equivalents given the ease of black-market access throughout the region, and "free goods" do not leave as large (or any) of a paper trail.

403.    The IRGC, and every IRGC Shiite Terrorist Proxy, has deep experience monetizing every conceivable type of "free good" on the black market because every such terrorist group draws most of its members from geographies where black markets have been endemic for decades, including several where certain goods could only be acquired on the black market (e.g., medicine in Syria).

404.    The IRGC specifically trained its operatives with respect to terrorist tradecraft concerning cell phones, including, but not limited to, how a terrorist can treat cell phones as cash equivalents to be sold or traded like any other precious commodity, e.g., gold, to facilitate attacks against Americans in the Middle East.

405.     The IRGC also taught its operatives that they could use their mobile phones as cash equivalents.

406.     This is important because each Defendant caused thousands, if not tens of thousands, of secure American mobile phones, to flow through MTN Irancell and/or TCI to the terrorists.

407.     The going rate for a "clean" American cell phone on the black market is a 10-fold markup.  The phones that get busted out into this market are ordinarily priced at around $200 per phone (because the annual contract heavily subsidizes the device itself).  Thus, when black market sellers flip an ordinary American cell phone, they can expect to earn about $2,000 per black market cell phone.

408.     The IRGC's historic preference for "free goods" as a form of terrorist finance was met by Defendants' willingness to spend their own money to buy American mobile phones for the IRGC.  Each Defendant understood that it could curry favor with its IRGC business partner by flooding the zone with untraceable American smartphones.

409.     On information and belief, Defendants supplied free mobile phones to the IRGC because Defendants understood that the IRGC, as well as Shiite terrorist proxies like Jaysh al-Mahdi, have long emphasized the exploitation of black markets to derive untraceable terrorist cash flow.  Such a view comports with the IRGC's intense doctrinal focus on concealment as the first virtue of a "security" operatives, and the paranoia that IRGC personnel could be detected by the "Great Satan."  Black markets are safely anonymous.

410.     Moreover, for decades, corrupt companies in the Middle East have leveraged "free goods" schemes to route bribes to Iran-backed terrorists, and as a result, at all relevant times there has been a thriving "corruption economy" that roughly traces the "Shia crescent"

from Iran through Iraq into Syria and terminating in Lebanon.  Given the pervasive black markets that flourish here, and throughout the Middle East, Asia, and Africa, so-called "free goods" bribery schemes offer several ideal features for the hardened corporate criminal (or terrorist), including built-in cover if detected (e.g., "we are just a civilian phone company").

411.    Indeed, free goods are an especially potent form of terrorist finance for the IRGC because free goods (in the form of technologies like mobile phones) are usually compact, lucrative, odorless, valuable, and easy to unload on the black market.  Moreover, free goods offer an enormous tradecraft benefit for terrorists – no paper trail and no electronic or data signature for the Americans to capture.

### 3.    Exit40

#### i.    Exit40 Was An Islamic Revolutionary Guard Corps Finance And Logistics Front For Hezbollah And The Qods Force

412.    The IRGC have active cells in India, Switzerland, and the U.A.E., and rely upon all three as critical geographies to flow through precious U.S. Dollars and illicitly acquired American technologies, ultimately flowing back to the IRGC's Hezbollah Division and Qods Force, to be used to aid the attack campaigns in Iraq, Afghanistan, and elsewhere in furtherance of the IRGC's scheme.

413.    Exit40 was a company with letter box offices in the U.A.E., Florida, India, and Switzerland.  On information and belief, Exit40 was a front company created by or for Hezbollah and the Qods Force, and owned, controlled, and operated by Hezbollah.

414.    On information and belief, Exit40 was purpose-built by Hezbollah and the Qods Force, following IRGC terrorist tradecraft, to serve as a Hezbollah front for illicit fundraising and acquisition of embargoed U.S. technologies including American smartphones and servers.

415.     On information and belief, Exit40 supplied the described Security Aid to Hezbollah, the Qods Force, and other IRGC-affiliated terrorists and/or proxies in order to, among other things, aid attacks by the IRGC Sunni Terrorist Proxies in Iraq.

416.     On information and belief, Hezbollah and the Qods Force used Exit40 to extract millions of U.S. Dollars and tens of millions worth of American technologies, from inside the United States, through a hub location overseas (e.g., Singapore) before reaching the relevant terrorist cell in Iraq, Afghanistan, Iran, Pakistan, or the U.A.E.

### ii.  Defendants Knowingly Used, Or Concealed The Use Of, Exit40 To Finance Hezbollah And The Qods Force

417.     MTN Group had a business relationship with Exit40.

418.     On information and belief, on or about 2005, MTN Group, Phuthuma Nhleko, and Irene Charnley caused Exit40 to be hired as a consultant or a distributor on behalf of MTN Group, MTN Irancell, and/or another MTN subsidiary.

419.     MTN Group, Phuthuma Nhleko, and Irene Charnley have gone to extreme lengths to conceal MTN's relationships and transactions with Exit40.  Among other things, one or more of MTN Group's and/or MTN's affiliates,' officers, directors, employees and/or agents have been instructed not to mention Exit40 over the phone or in an email.

420.     On information and belief, one or more of MTN Group's officers, employees, or agents discouraged any telephonic or email discussions concerning Exit40 because such person (whose knowledge was imputed to MTN Group) knew that MTN Group's relationship with Exit40 was illegal because Exit40 was acting, directly or indirectly, on behalf of Hezbollah and the Qods Force to enable large value transfer chains between MTN Group and MTN Irancell, on the one hand, and Hezbollah, the Qods Force, among other FTOs, on the other hand.

125

421.     On information and belief, an operative, employee, agent, or cut-out from MTN Irancell, TCI, the Bonyad Mostazafan, or another IRGC-controlled entity, made MTN Group aware that MTN Group should use Exit40 in order to help source the U.S. Dollars and American technologies, including secure cell phones and encrypted communications technologies, that Hezbollah and the Qods Force deployed to facilitate IRGC proxy terrorist attacks against Americans in Iraq, Afghanistan, Yemen, and elsewhere.

422.     On information and belief, MTN Group, Phuthuma Nhleko, and Irene Charnley caused the retention of Exit40 by MTN Group, MTN Dubai, or MTN Mauritius, or a cut-out acting on their behalf, so that Exit40 would serve as MTN Group's, MTN Dubai's, MTN Irancell's and TCI's agent or cut-out in order to intentionally route U.S. Dollars and embargoed American technologies through the MTN-related entities (or cut-outs for MTN-related entities), so that some or all of the associated funds or technologies flowed through to Hezbollah and the Qods Force to be deployed in furtherance of the IRGC's sponsored attack campaigns against Americans in Iraq, Afghanistan, Yemen, and elsewhere.

423.     On information and belief, MTN Group, Phuthuma Nhleko, and Irene Charnley caused MTN Group personnel, MTN Dubai, or an MTN subsidiary, affiliate, agents, cut-out, or business partner to pay millions of U.S. Dollars to Exit40 in order to cause Exit40 to procure the embargoed American technologies identified by the IRGC in order to support the IRGC's sponsored terrorist campaigns against Americans in Iraq, Afghanistan, Yemen, and elsewhere.

424.     On information and belief, Exit40 routed tens of millions of U.S. Dollars in value (in cash, goods, and services) through MTN Group, MTN Dubai, MTN Irancell or another MTN entity, at the direction of MTN Group, Phuthuma Nhleko, and Irene Charnley, which flowed through these entities to Hezbollah from 2005 until on or about 2012.  Hezbollah, in turn, shared

such resources to facilitate, among other things, IRGC Sunni Terrorist Proxy attacks against Americans in Iraq and Afghanistan intended to expel the U.S. from the Middle East.

425.    On information and belief, such Exit40 transactions and services facilitated by MTN Group, Phuthuma Nhleko, and Irene Charnley, routed millions of U.S. Dollars' worth of value in U.S. Dollar currency and embargoed American technologies and services from the United States to Hezbollah, the Qods Force, and the IRGC Sunni Terrorist Proxies overseas from on or about 2005 through on or about 2012, which discovery should reveal.

## VI.   DEFENDANTS PROVIDED DIRECT AID TO COUNTERPARTIES WHOM DEFENDANTS KNEW WERE STRUCTURED TO FINANCE, ARM, AND/OR OPERATIONALLY SUPPORT HEZBOLLAH, THE QODS FORCE, AND THE ISLAMIC REVOLUTIONARY GUARD CORPS'S TERRORIST PROXIES IN IRAQ AND AFGHANISTAN

426.    MTN Group, Phuthuma Nhleko, and Irene Charnley provided material support to Hezbollah, the Qods Force, Regular IRGC, al-Qaeda, and the Taliban, including its Haqqani Network through transactions entered, or facilitated by, MTN Group and MTN Irancell.   MTN Group held itself, and Phuthuma Nhleko, out as responsible for how MTN Group affiliates worldwide manage "security" issues.

427.    MTN Group follows a hub-and-spoke business model where the Group headquarters in South Africa provides a substantial amount of financial, operational, technical, and personnel support to every other MTN subsidiary and affiliate.[130]   Indeed, MTN Group regularly loaned large sums of money to Irancell, roughly equal to Irancell's paper profits, and as

---

[130] In such a business model, one can ordinarily infer a reasonable estimate regarding the range of monies the hub (here, MTN Group) can be presumed to be reinvesting back into the spoke (here, MTN Irancell), so that the latter can sustainably grow.  On information and belief, MTN Group reinvests at least five percent (5%) of MTN Group's net income derived directly or indirectly from MTN Irancell back into MTN Irancell.

a result, MTN Group loaned monies to Irancell in other currencies (e.g., Iranian riyals) equal to more than one hundred million U.S. Dollars on an annual basis.

428.    MTN Group worked closely to coordinate the technical buildout of MTN Irancell, and senior executives from MTN Group regularly coordinated their financial, technical, and logistical support to MTN Irancell.

429.    Plaintiffs use the term "MTN" in this section to refer collectively to the MTN family of companies.  Unless otherwise specified, when Plaintiffs use that term to describe MTN's conduct in Afghanistan, "MTN" refers to conduct that was implemented on the ground by MTN Afghanistan and approved by both MTN Group, and when Plaintiffs use that term to describe MTN's conduct in Iraq and concerning Irancell, "MTN" refers to conduct that was implemented on the ground by MTN Irancell and approved by both MTN Group.

430.    MTN Group also provided strategic communications services to, and/or for the benefit of, the Regular IRGC, Hezbollah, and the Qods Force, which provided concealment for the IRGC's terrorist activities by reaching into the United States to communicate IRGC disinformation concerning, among other things, whether MTN Irancell is an IRGC front (it is, and MTN Group sponsored disinformation suggesting the opposite).

A.    **MTN Group Knowingly Served, And Still Serve, As A Joint Venture Partner With MTN Irancell And Its Iranian Shareholders, The Islamic Revolutionary Guard Corps, Including Hezbollah And The Qods Force, Through MTN Group's Participation In MTN Irancell**

431.    MTN Group's business model depends on MTN Group's ability to remain well-resourced in order to make significant investments as necessary.  This model recognizes that many MTN joint ventures and subsidiaries may have capital expenditures ("CapEx") challenges as they scale their business – a classic corporate function where MTN Group can, and ordinarily does, contribute funds and personnel.

128

432.     During the 2010s, MTN Irancell tore through its CapEx.  In a business model similar to that of MTN Group, MTN Irancell's CapEx issues were beneficial for MTN Group as it reflected growth and profit.  On information and belief, MTN Group provided one or more infusions of cash to MTN Irancell.

433.     From 2003 through 2018, MTN Group served in an over-sized role compared to other competitors' parents:  Global CEO (recall that MTN Group's CEO committed every MTN entity to the Security Cooperation Agreement); Global Logistics and Supply Chain, Global Back-Office; and Global Financier.  Simply put, MTN Group did it all.

434.     From 2004 through 2018, MTN Group operated in a top-down manner that regularly disregarded the corporate form when necessary to support the IRGC and fulfill MTN Group's, Phuthuma Nhleko's, and Irene Charnley's obligations to the IRGC pursuant to Defendants' performance of MTN's obligations to Hezbollah, the Qods Force, and Regular IRGC under the Security Cooperation Agreement.  Examples include, but are not limited to:

- MTN Group disregarded the corporate form when MTN Group's President & CEO executed the secret Security Cooperation Agreement with the IRGC, *infra*, including Hezbollah and the Qods Force, on behalf of every "MTN" entity worldwide.

- MTN Group and MTN Mauritius disregarded the corporate form when MTN Group's President & CEO instructed another MTN executive to approve a $400,000 "necessary payment" (i.e., a bribe) out of the MTN Mauritius account after MTN Group secured the Irancell license.  The decision by MTN Group's President and CEO to take the key $400,000 bribe off MTN Group's books reflected the MTN Group President and CEO's consciousness of guilt.

- MTN Group disregarded the corporate form when MTN Group routinely made decisions on behalf of MTN Nigeria while the Nigerian government investigated allegations concerning allegation that MTN Nigeria facilitated operations by Boko Haram.

435.     Beginning in 2004, MTN Group, Phuthuma Nhleko, and Irene Charnley pursued an aggressive expansion in the Middle East, in which Defendants worked together to dominate the "virgin" mobile markets of Iran, Afghanistan, Lebanon, Syria, and Yemen.

129

436.     By 2004, few "virgin" market opportunities remained in the world.  The collective market share attributed to this Iranian-dominated "Shiite crescent" of Iran, Syria, and Lebanon, combined with the two other nations where Iran actively fomented terrorist proxies (Afghanistan and Yemen), was by far the most lucrative "virgin" mobile phone market opportunity in the world at the time.

437.     MTN Group, Phuthuma Nhleko, and Irene Charnley knew that the IRGC, through its subordinate divisions, Hezbollah and the Qods Force, actively sponsored anti-American terrorism in all five of the markets they coveted:  Iran, Syria, Lebanon, Afghanistan, and Yemen.

438.     Mobile phone companies like MTN Group are heavily dependent upon infrastructure vulnerable to terrorist attacks.  As a result, MTN Group, Phuthuma Nhleko, and Irene Charnley knew they would have to reach an agreement with the IRGC, which was the only way MTN Group, Phuthuma Nhleko, and Irene Charnley could win the business, not just in Iran, but also in its client states (e.g., Syria, Lebanon), or where it played a spoiler role (e.g., Afghanistan).  This meant MTN Group, Phuthuma Nhleko, and Irene Charnley knew that MTN Group had to make a deal with the IRGC as the latter exercised a de facto veto over the telecoms' procurement decisions in Syria and Lebanon (among other places).[131]

---

[131] Defendants MTN Group, Phuthuma Nhleko, and Irene Charnley each have deep experience doing business throughout Africa and the Middle East.  As such, they knew of the widespread, and often reported, practice of the IRGC, through Lebanese Hezbollah and the Qods Force, to regularly interfere in the ministerial decisions of countries in both geographies concerning commercial, military, and political matters.  MTN Group, Phuthuma Nhleko, and Irene Charnley therefore knew that all roads to the business in Lebanon, Syria, Afghanistan, and Yemen traveled through the "Iranian Shareholders," i.e., the IRGC, including its Lebanese Hezbollah division and the Qods Force.

1.    **In 2005, MTN Group, Through Phuthuma Nhleko, Promised To Provide "Security" "Cooperation" To Hezbollah, The Qods Force, And Regular IRGC On Behalf Of MTN Group, Himself, And Every MTN Entity Worldwide When He Executed The IRGC's Security Cooperation Agreement On Behalf Of MTN Group and its affiliates**

439.    In 2004, Iran awarded a cellular-phone license to MTN's competitor, Turkcell. MTN then engaged in a corrupt scheme to take the license away from Turkcell and enter the Iranian market itself.  MTN's efforts were successful and led it to acquire a 49% stake in Irancell – a joint venture with an Iranian government-controlled consortium.  MTN internally called its corrupt scheme to enter the Iranian market "Project Snooker".[132]

440.    MTN threw itself into Project Snooker with abandon, dedicating senior MTN Group executives to the mission, including, but not limited to, its President and CEO, Commercial Director, and the regional head responsible for the Middle East.

441.    On November 16, 2004, MTN's Commercial Director, Irene Charnley, documented MTN's aggressive support for the terrorist agenda of the IRGC.  In a fax to Iranians, Ms. Charnley provided MTN's help to Iranian efforts to violate terror-related sanctions against the IRGC by sourcing "major components" for American-made "Bell" and "Sikorsky" helicopters that were intended, in part, for "military use" by the IRGC.

442.    Project Snooker required close cooperation between MTN and the Iranian government.  On July 5, 2005, MTN sent a letter from its CEO to two Iranian terrorists, one of whom was the former Chief of Staff of the IRGC who had led the Bonyad Mostazafan and the IEI, which were the two terrorist fronts with which MTN was attempting to join in the Irancell

---

[132] *See* Memorandum from Phuthuma Nhleko to Sifiso Dabengwa *et al.*, *Overview & Way Forward – Project Snooker* (Sept. 21, 2005) ("*Project Snooker Mem.*").

joint venture (the "July 5, 2005 Letter").  In the July 5, 2005 Letter, MTN Group wrote to its

prospective IRGC, including Qods Force, joint venture partner:

> We appreciated the very hospitable manner that you received the MTN Group
> executive team.  During the course of my visit it became clear to me that your
> organisations play a very important role in the economy of the Islamic Republic
> of Iran.  I was also convinced that your organizations together with MTN could
> create a partnership that would be ***mutually beneficial*** in ***meeting all our
> objectives*** in the telecommunications sector in Iran.
>
> I would be honoured if you could find the time to pay a visit to the MTN Group
> Head Office in … South Africa … [in] July 2005. … [D]uring your visit, … [t]he
> two key discussion points are:
>
> > 1.  The nature and extent of ***financial assistance that the MTN Group could
> >     provide to the Iranian partners*** in the Second Mobile licence in Iran.
> >
> > 2.  The nature and extent of the co-operation between your esteemed
> >     organizations and the MTN Group in current and future
> >     telecommunications projects in Iran.  [Emphases added.]

443.    The negotiations were successful.  On September 18, 2005, MTN Group signed a

Security Cooperation Agreement with the IRGC and Qods Force fronts with whom MTN had

been negotiating.   It gave MTN the right to participate in the MTN Irancell joint venture as a

junior partner with a 49% stake, leaving 51% collectively – and all decision-making authority –

to MTN's two partners that MTN knew were IRGC and Qods Force fronts (hereinafter, the

"Security Cooperation Agreement" or "Agreement").  MTN's Security Cooperation Agreement

with the IRGC is attached hereto as Exhibit A.

444.    The Security Cooperation Agreement was drafted by the IRGC and constitutes the

IRGC's "template" for the terms under which IRGC terrorist fronts in industries vital to the

terrorist enterprise were permitted to enter joint ventures with foreign companies like MTN.  The

Security Cooperation Agreement is replete with indicia that it was drafted by the IRGC rather

than a sophisticated multinational corporation like Defendants.  Such indicia include but are not

limited to: (1) the reference to God at the start of the Agreement; (2) the inclusion of the Islamic calendar date (27/06/1384) in the Agreement; (3) the generic reference to "Iranian shareholders," rather than any specific reference to any specific Iranian entity; and (4) the inclusion of a blank space for the handwritten insertion of certain terms.[133]  Here is how the Agreement begins:

> *In the Name of God*
>
> **Letter Agreement**
>
> On September 18, 2005 (27/06/1384)  this letter agreement is concluded between local shareholders of Irancell Consortium and MTN, regarding the manner and conditions of transfer of 49% of Irancell Consortium shares to MTN.  Parties herein agreed as follows:

445.    The Security Cooperation Agreement pledged broad cooperation between MTN Group and its IRGC, including Qods Force, partners in furtherance of Iran's terrorist agenda. Section 8 obligated MTN Group to assure that, with respect to its new "Iranian shareholder[]" partners, "[t]he cooperation between MTN and Iranian shareholders should be in the line of defensive, security and political cooperation."  Notably, Section 8 expressly contemplated that MTN would work with new IRGC partners outside of Iran: "MTN shall fully support cooperation regarding the aforementioned issues in South Africa."

446.    Thus, MTN officers, employees, and agents directly partnered with Qods Force operatives because when MTN "fully" cooperated on "security" matters with IRGC operatives

---

[133] Plaintiffs do not allege that the Security Cooperation Agreement's reference to God or use of the Islamic calendar is in any way wrong or suggestive of terrorism, simply that it demonstrates that the template reflected by the Security Cooperation Agreement was one created by its "Iranian Shareholders" (i.e., the IRGC) rather than MTN Group, because the religious indicia is consistent with the templates of the former but not the latter.

and agents outside of Iran as it contractually promised to do, MTN was directly aiding Qods Force terrorists because IRGC personnel acting outside of Iran are Qods Force.

447.    MTN Group executed the Security Cooperation Agreement with the Iranian Shareholders on behalf of the entire MTN corporate family.  MTN Group, acting through Defendant Nhleko, in his capacity as the President of MTN Group, was compelled to do so during an in-person meeting at the Bonyad Mostazafan office in Tehran, Iran, when an IRGC Regular Brigadier General communicated to MTN Group's President, Mr. Nhleko, that the Iranian Shareholders insisted that MTN Group execute the Security Cooperation Agreement on behalf of the entire MTN corporate family.

448.    The Security Cooperation Agreement reflects the Iranian Shareholders' template "Security Aid" agreement, and the Iranian Shareholders specifically styled MTN Group as "MTN" in the Security Cooperation Agreement to reinforce to MTN Group and its President, that he was committing the entire MTN corporate family to the deal.

449.    It would not be proper to interpret the reference to MTN Group's performance of its "security" related services for the Iranian Shareholders to be limited to being "in South Africa."  That passage was a reference by the Iranian Shareholders to their prior frustration with Turkcell, whose C-Suite leadership, on information and belief, refused to commit to providing "security" services to the Iranian Shareholders.

450.    Separately, Hezbollah and the Qods Force rely heavily on South Africa-to-Middle East routes, networks and relationships to manage the IRGC's transnational financial, logistics, and technical enterprise.  Funds and technology sourced by Hezbollah and the Qods Force in South Africa will ordinarily follow back to the IRGC to be shared with the IRGC's proxy

terrorists, including the IRGC Sunni Terrorist Proxies in Iraq and the al-Qaeda/Taliban Syndicate in Afghanistan.

451.    The Security Cooperation Agreement's deliberate ambiguity through its repeated generalized references to "Iranian shareholders," rather than the Iranian entities with which MTN Group was reportedly partnering, was itself an indication of, and evidence that, the Iranian shareholders in MTN Irancell were fronts, operatives, and agents for the IRGC.  Indeed, the execution of the Agreement was deliberately designed to obscure each signatory:



452.    The Security Cooperation Agreement did not merely obligate MTN Group to help the IRGC source weapons in furtherance of the IRGC's "security" agenda.  It also obligated MTN to both pay its new IRGC front partners as well as serve in effect as their financial manager:

- Section 2 required that MTN Group "agreed to put in trust twenty-one (21) percent of Irancell Consortium before Bank Melli as trustee."  Bank Melli is another IRGC, including Qods Force, front and has been sanctioned by the U.S. government.

- Section 3 required that MTN pay the IRGC hundreds of millions of dollars in up-front license fees as a condition for becoming the new junior partner in the Irancell joint venture, and that "MTN and Bank Melli shall be responsible for arranging project financing."

- Section 7 set forth an additional catch-all provision designed to route additional money from MTN Group to the IRGC and provided that:  "[t]he costs and expenses incurred by Iranian shareholders" – i.e., Irancell's two IRGC, including Qods Force, fronts – "if any, due to transfer of Irancell's share to MTN shall be compensated by MTN."  On information and belief, MTN routed millions of additional dollars to the IRGC under Section 7.

453.    Although MTN was the IRGC's junior partner in the MTN Irancell joint venture, the Security Cooperation Agreement nonetheless empowered MTN with the legal authorities it needed to effectively shut down the IRGC's ability to weaponize MTN Irancell as an instrument of terror.  Most directly, MTN could immediately and unconditionally announce its plans to rapidly exit the joint venture.

454.    MTN is also responsible for MTN Irancell's conduct because MTN had (and continues to have) veto power over most of the major decisions at MTN Irancell, similar to the veto possessed by its joint venture partners, the terrorist fronts Bonyad Mostazafan, and IEI.  For example, Section 5.1 of the Agreement provides that:

> The resolutions on the below mentioned issues require the affirmative votes of MTN:
>
> - Annual business plans and budgets of [MTN Irancell], including, but not limited to, medium and long term financing;
>
> - Major acquisitions, partnerships, formation of joint ventures or consortiums;
>
> - Discontinuation of business activities;
>
> - Entering into any agreement with persons, individuals or entities that are directly or indirectly related to Non-Iranian or Iranian Shareholders;
>
> - Charging the assets of the Company in any manner which could have significant impact on the Company's ability to use or benefit from its assets in its ordinary course of business;
>
> - Profit appropriates and dividend policy; and
>
> - Approval of annual accounts.

455.    The Security Cooperation Agreement confirmed that MTN promised to provide other "off-the-books" value to the Iranian Shareholders with whom MTN had partnered in MTN Irancell, which was itself another obvious reference to MTN's support for the IRGC's terrorist enterprise.  Section 9 provides, "for this agreement to be effective, it is necessary that the above-

mentioned documents and related agreements be signed by MTN as well as to pay license fee and equity as provided in item 3 above [i.e., Section 3 of the Agreement] within 20 days from the signature of Addendum No. 1 to [sic] license agreement, simultaneously, the parties try to finalize the other relevant operational agreements."[134]

456.    MTN Group, Phuthuma Nhleko, and Irene Charnley, and MTN's "Iranian shareholder[]" joint venture partners went to great lengths to keep the Security Cooperation Agreement a secret.  The Security Cooperation Agreement was a "close hold" document at MTN Group and was only known to a select group of senior MTN Group executives because MTN understood that it memorialized an obviously illegal scheme between MTN Group and two fronts for the IRGC.  MTN Group also conspicuously failed to obtain any sign-off from any of MTN's elite, white-shoe global law firms, none of which would have approved the Security Cooperation Agreement.

457.    Before MTN Group, through Phuthuma Nhleko, executed the Security Cooperation Agreement, a senior official on behalf of the IRGC stated to MTN Group, in sum and substance, that the Security Cooperation Agreement was the standard template that the Iranian Shareholders used when a counter-party agreed to assist, among other things, the Iranian Shareholders' "security" operations.

458.    MTN Group, Phuthuma Nhleko, and Irene Charnley knew this statement to be a direct reference to IRGC proxy terrorist attacks targeting Americans around the world.

459.    MTN Group, Phuthuma Nhleko, and Irene Charnley deliberately concealed the fact that Mr. Nhleko signed the Security Cooperation Agreement.  On information and belief,

---

[134] In the Security Cooperation Agreement, the number "1" in this sentence is handwritten into what was obviously a placeholder.

MTN Group, Phuthuma Nhleko, and Irene Charnley never publicly admitted that Mr. Nhleko signed the Security Cooperation Agreement until MTN Group was compelled to by another.

460.    MTN Group's, Phuthuma Nhleko's, and Irene Charnley's attempts to conceal the Security Cooperation Agreement, and the fact that Phuthuma Nhleko signed the Security Cooperation Agreement, reflects consciousness of MTN Group's guilt and MTN Group's recognition that its promise to assist the Iranian Shareholder's "security" operations, i.e., anti-American terrorism, was illegal.

461.    One MTN executive later stated that MTN recognized that it was dealing with a counterparty that was comprised of violent killers (referencing the "Iranian Shareholders") whom MTN Group knew ordinarily went around making people mafia-like an "offer they could not refuse," which referred to the negotiating strategy of a violent mafia crime family in the iconic mafia movie, *The Godfather*, in which Don Vito Corleone secured favorable commercial terms that advanced his mafia empire by making a counterparty "an offer he could not refuse," in which he promised to murder the counterparty if he did not give Don Corleone what he desired.[135]   On information and belief, officers, managers, employees, and agents of MTN Group regularly expressed similar sentiments.

462.    MTN Group, Phuthuma Nhleko, and Irene Charnley secured its joint venture with the IRGC – i.e., MTN Irancell – through MTN Group's and Phuthuma Nhleko's direct contractual promise to the IRGC, including its Hezbollah Division and Qods Force.  This was done to aid the IRGC and Qods Force terrorist enterprise and MTN's corrupt payments to one or more IRGC and Qods Force agents.

---

[135]   In the movie, a recalcitrant counterparty refuses to sign a contract demanded by Don Corleone, who dispatches his muscle to communicate to the counterparty that "either his brains or his signature" will be on the contract, which causes the contract to be executed.

463.     A leaked report from a South African intelligence agency confirmed MTN Group's terrorism quid-pro-quo with the IRGC.  One month after the September 2005 – when MTN Group's CEO signed the secret Security Cooperation Agreement pledging "security" assistance to the "Iranian shareholders" (i.e., the IRGC) – an Iranian delegation led by the head of Iran's Supreme National Security Council, Hassan Rouhani, traveled to South Africa and met with MTN Group executives.  Thereafter, South African intelligence confirmed the existence of MTN's secret "security" deal with the IRGC in a memorandum that was later publicly leaked.

> **2.     After Executing The Islamic Revolutionary Guard Corps' Security Cooperation Agreement In 2005, MTN Group, Phuthuma Nhleko, and Irene Charnley Routinely Acted On Behalf Of, Or For The Benefit Of, Hezbollah, The Qods Force, And Regular IRGC**

464.     MTN Group's executives quickly got to work after MTN Group executed the Security Cooperation Agreement.  Three days later, on September 18, 2005, Phuthuma Nhleko, acting as President and CEO of MTN Group, circulated a memorandum from himself to five senior MTN Group executives, including Irene Charney (the "September 18, 2005 Memo"), which captioned "**STRICTLY CONFIDENTIAL**" with the subject "**OVERVIEW AND WAY FORWARD – PROJECT SNOOKER**," and provided, in part, as follows:

1. **OPPORTUNITY**
   Project Snooker still presents ***one of the most significant "virgin" mobile opportunities in the world***.  … [N]otwithstanding the significant challenges that lie ahead, [MTN] must continue to pursue this opportunity vigorously.

2. **CURRENT STATUS**
   ***The signing of the various agreements this week [under duress]*** was to "book our place at the foot of the mountain – we still need to scale it to get to the peak."  It was a choice between inheriting an advanced arrangement [Turkcell revenue share and various negotiated agreements] or taking the chance that the window of opportunity may close on us whilst we try to reconstruct the deal and arrangements from scratch.  We chose the former.

3. **RISK AND REWARD**
   ***Snooker is "no normal country"***.  The Ministry of Defense, Government controlled banks and companies, together with Government ***essentially***

***control all the commercial activity in the country***.  ***Consequently, a conventional mindset, orthodox financial and operational approach to this project is unlikely*** to provide us with an outcome that I would feel comfortable to recommend to the board on an investment of over €400 million [license fee and working capital] into Snooker.  It is therefore imperative to ***think laterally on how we can secure the investment*** … in a manner that allows us to penetrate the market achieving an acceptable IRR [i.e., "internal rate of return," a measure of investment profitability]. …

4. **TIMING**
   The expectation is that the license fee should be paid within weeks and the operation launched commercially within a six month period. … The implied time scale can only be achieved through a well thought out and coordinated project management structure up …

5. **PROJECT MANAGEMENT**
   ***Given the size of the market***, limited time to launch and all that has to be reviewed and completed before the MTN Group board ratifies the revised business plan, ***a special project structure must be put in place***. …

   5.1.2 **Finance Structure, project funding and ancillary loan agreements**
   The Group CFO should take responsibility for this area, primarily in the following categories:
   - Flow of license fee and working capital
   - Appropriate security arrangements for funding of local partners together with the loan agreements
   - Arranging the project finance …

6. **PROJECT STEERING COMMITTEE** [sic]
   I will chair a project steering committee that will have the responsibility of meeting regularly to oversee both Phase I and Phase II until the project is passed onto the MD / COO.  The Steering Committee shall comprise of:
   CEO
   COO
   CFO
   CTO
   Commercial Director
   Group Executive HR …

8. **CONCLUSION**
   ***This is one of the most significant opportunities the Group will undertake*** and will require teamwork to achieve these objectives.  [Emphases added; formatting adjusted.]

465.    After MTN's executive team successfully executed Project Snooker, the conservative-dominated and Qods Force-applauding Iranian parliament determined that MTN's operation of Irancell would improve Iran's "security."

466.    Project Snooker was successful not only because MTN pledged strategic cooperation with the Iranian government, but also because MTN made corrupt payments to government officials, at least one of which it structured as a sham consultancy payment.

467.    On December 11, 2006, MTN Group, acting through Phuthuma Nhleko, instructed MTN Group's CFO to "finalise all agreements with the consultants" who had "assisted the Company" in securing its joint venture with the IRGC via the Irancell license.  The first agreement called for MTN Group to make a $400,000 payment for the benefit of an Iranian government operative.  The payment was effectuated through an MTN Group subsidiary, MTN International (Mauritius) Limited, and sent to a consulting firm owned by the Iranian operative's associate.  Both steps reflected the parties' desire to conceal the transaction, as it did not rest on MTN Group's books, which was another example of MTN Group following the IRGC's "Orbit" tradecraft strategy.  On April 4, 2007, MTN Group executed Mr. Nhleko's instruction and wired the $400,000 bribed to the putative "consultant."  Defendants have never proffered a legitimate explanation for that payment.

468.    MTN Group's second corrupt payment was to South Africa's ambassador to Iran. MTN Group's former Iran Director has admitted to paying the Ambassador $200,000 in cash out of his own funds, which he tied to cooperation in helping MTN Group secure its equity interest in Irancell.

469.    MTN Group's senior executives, including Phuthuma Nhleko and Irene Charnley, knew of, and approved, MTN Group's bribes to the Qods Force agents who helped MTN Group

secure the Irancell joint venture.  For example, on December 11, 2006, Phuthuma Nhleko, on

behalf of MTN Group, wrote a memorandum to Irene Charnley in which Mr. Nhleko authorized

the bribes that MTN Group paid to steal the Irancell license (the "December 11, 2006 Memo"):



# MEMORANDUM

| TO | : | IRENE CHARNLEY |
| DATE | : | 11 DECEMBER 2006 |
| FROM | : | PHUTHUMA NHLEKO |
| **SUBJECT** | : | **CONSULTANCY AGREEMENTS** |

Dear Irene

With reference to the process in terms of which MTN International (Mauritius) Limited
acquired a 49% equity interest in Irancell, you are authorized to finalise all
agreements with the consultants that assisted the Company during the run up to and
actual negotiating period, and to effect the necessary payments.

Kind regards

**PHUTHUMA F. NHLEKO**
**GROUP PRESIDENT & CEO**

470.   The phrase "necessary payments" in the December 11, 2006 Memo was a direct admission that the consultancy payments were bribes.  Indeed "necessary payments" has long been understood to refer to bribery.

471.   A host of other highly confidential internal MTN Group documents, leaked by a whistleblower, also confirm that Phuthuma Nhleko, Irene Charnley, and other MTN Group executives directed MTN's financial, technological, and operational support for Hezbollah, the Qods Force, and their terrorist proxies, through transactions with fronts that controlled Irancell. For example, a March 25, 2007 memorandum from MTN's regional manager responsible for Iran, Chris Kilowan, and Phuthuma Nhleko extensively documented MTN Group's, Phuthuma Nhleko's, and Irene Charnley's illicit activities (the "March 25, 2007 Memo").

472.   The March 25, 2007 Memo was intended to remain highly confidential, as reflected by what is set forth at the top of it:



**MTN GROUP LIMITED**

# MEMORANDUM – HIGHLY CONFIDENTIAL

**To:**      Phuthuma Nhleko

**From:**   Chris Kilowan

**Date:**   25 March 2007

**Re:**      Ambassador Briefing: Larijani, Mottaki and MTN

473.   In the March 25, 2007 Memo, Chris Kilowan, MTN's regional director responsible for Iran and later whistleblower, confirmed to MTN Group, through Phuthuma Nhleko, that "it was the [President of South Africa's] view that the matter of MTN has nothing to

143

do with the Government of South Africa as it is a private business in which the Government of South Africa plays no role."

474. In the March 25, 2007 Memo, Chris Kilowan confirmed to Phuthuma Nhleko that Mr. Kilowan had met with "Mr. Motakki" on behalf of the "Minister of Foreign Affairs." On information and belief, "Mr. Motakki" was an IRGC, including Qods Force, cut-out who was either relaying a message from the IRGC or acting as an IRGC operative himself. In the Memo, Mr. Kilowan relayed to Mr. Nhleko that Mr. Motakki "re-iterated [the IRGC's] understanding that MTN Group was allowed to replace Turkcell in exchange for defence co-operation," and that "the office of the Supreme Leader" had personally intervened based upon the conclusion by the IRGC "that there are significant defence benefits in it for [the IRGC] were MTN to be allowed into the process. On that basis [the IRGC] withdrew their objections [to a foreign company playing a role in the Iranian telecom sector] and allowed the process to proceed in MTN's favour."

475. In the March 25, 2007 Memo, Chris Kilowan confirmed to Phuthuma Nhleko that MTN had only become a candidate for the Irancell joint venture after it had promised to pledge to aggressively support the "security" needs of the IRGC fronts that controlled the Bonyad Mostazafan and IEI. He noted, as a "brief recap of history," that "MTN only seriously got back into the [bidding] process" after its Iranian counterparties perceived that MTN would affirmatively aid their "security" needs.

476. In the March 25, 2007 Memo (emphases added), Chris Kilowan underscored to MTN Group, through Phuthuma Nhleko, that MTN would need to serve as a weapons supplier for its Iranian counterparties if it wanted to win and maintain its position in the joint venture:

> It would seem clear that the issue of ***defence co-operation*** has become a pressing matter with the government of Iran.

If regard is had to the latest UNSC [i.e., U.N. Security Council] Resolution there is a clear move towards dealing with Iran's conventional weapons capability. … Russia has traditionally played the ***role of key weapons supplier*** to Iran. Given recent developments …, [Russia] is actively looking at more secured suppliers of defence materials. … Because the entire political situation has now deteriorated significantly it is highly unlikely that the Government of South Africa will be prepared to sign any defence agreements or deliver defence materials to Iran.

Given the ***clear linkage that the Government of Iran has drawn between the defence assistance and allowing MTN into the country the likelihood that there will be serious blowback for MTN is increasing***.

Because there has been a recognition of the ***non-business imperatives that drove MTN's entry into Iran***, the Distant Thunder … projects have been developed to deepen MTN's position, as opposed to and distinct from Irancell, inside Iran so that MTN would be able to rely on broad popular support for its continued presence. More recently a more mid to long range strategy has been proposed to ensure that MTN puts in place an exit strategy that would ensure that it not be caught in a situation where it loses its entire investment in the country. …

I am preparing a document that spell out the range of actions that can be taken against MTN and will submit that to you as soon as it is complete. In summarized form it can be said that there is every possibility that MTN could be effectively isolated from Irancell with very little negative effect on Irancell.

While 1 million subscribers will act as a defensive buffer for Irancell, it does not provide the same protection for MTN. This is because these subscribers are reflected locally as Irancell subscribers and not MTN. ***All the innovations are not sold as MTN innovations but as Irancell's***. …

To give MTN a realistic chance to navigate through what is potentially going to be a difficult few months (if not years until the end of the current presidency in 2009), I make the following recommendations:

1. Implementation of Project Distant Thunder at the earliest opportunity. We could pre-empt some of the activity that is almost certain to be started in the public sphere against MTN. … (Dimension 1)

2. Approval of the creation of the committee to pursue mid to long term strategies for MTN's investment in Iran. (Dimension 2)

3. Finalisation of the diplomatic support initiative. The ***first consultant is still waiting for the transfer of the agreed amount. This is causing considerable anxiety in his mind and going forward we are going to need his support.*** We still have not given the second consultant any indication whether we are

seriously considering his request.  He too is developing some anxiety and I
have to field almost daily questions on it. (Dimension 3)

477.    A November 10, 2007 memorandum from Chris Kilowan to Phuthuma Nhleko,

further documented MTN Group's open support for the illicit activities conducted by the fronts

operating on behalf of the IRGC with whom MTN had partnered in Irancell, including MTN

partners whom MTN nicknamed "Short John" and "Long John" (the "November 10, 2007

Memo").  On information and belief, the Iranian operative whom MTN derisively nicknamed

"Short John" was an agent for the IRGCs.

478.    The November 10, 2007 Memo was labeled "**STRICTLY CONFIDENTIAL**"

in bright red bolded all-caps font and was titled "**SUBJECT: OUTSTANDING ISSUES**" in

bolded all-caps black font.  In it, MTN's executive for Iran communicated to MTN's CEO that:

> Pursuant to [our] last communication … I set out below the issues that I believe
> are still outstanding [] and will have an impact … on MTN's investment. …

### 2.    FINALISATION OF CONTRACT WITH SHORT JOHN

> Subsequent to our last discussion on this matter [in early 2007] I did not do
> anything about the agreement, preferring to wait until December [2007] to do
> an agreement … I can certainly state that [Short John] has ***come to the party
> on every occasion that I called upon him***.  The fact that the ***quid pro quo that
> has threatened at one stage to be the primary stick with which we could be
> hit has now largely disappeared*** because of his efforts.
>
> The initial concessions on promised support for the revenue share issue was
> ***because of his direct involvement*** … With me out of the picture he will
> probably be the only friendly source of information and interaction for MTN
> on this side.  I would recommend that ***MTN finalise arrangements with him
> and offer fair compensation commensurate with the huge role he has played
> right from the outset***.

### 3.    RENEWED APPROACH BY LONG JOHN

> I have communicated this to you a few weeks ago and recently forwarded an
> SMS from him.  The background to this new approach is centered in planned
> developments within the area that he is currently working.  Whatever his
> motivations, it is not something that should be ignored.  While he has very

little power to do anything positive, ***he can be a destructive force*** or simply an unnecessary distraction. …

### 6.  PERSISTENT NEGATIVE VIEWS ABOUT SOME MTN EXPATS

I beg your forgiveness if I sound like a record with a stuck needle but I … alert[] you to a serious risk to MTN's investment. … In [Mr. Mokhber's] view MTN made a mistake and inflicted a huge insult on Iran by placing [a woman] here [as Chief Operating Officer of MTN Irancell].  …

(Bolded all-caps emphases in original; bolded italicized emphases added.)

479.    In June 2018, South Africa's anti-corruption police – called the "Hawks" – raided the offices of MTN and its outside counsel as part of an investigation into Irancell-connected bribery.  Roughly eight months later, the Hawks also arrested the former Ambassador whom MTN had bribed.  On information and belief, that investigation remains ongoing.

480.    One reason MTN chose to become the IRGC's joint venture partner was the potential for enormous profits.  As the *Financial Times* reported at the time in 2013, "[a]s the international community was weighing whether to impose yet more sanctions on Iran over its nuclear programme, [MTN President and CEO] Phuthuma Nhleko was making other plans. Instead of seeing a country with mounting political problems, Mr Nhleko saw a nation with relatively few mobile phone users.  Iran, he reckoned, could quickly add 2.5m-3m new customers for MTN Group, the mobile phone company he was running in 2006."[136]

481.    After MTN secured its joint venture with two fronts for the IRGC, MTN's President and CEO, Defendant Phuthuma Nhleko, "laughed off questions about the political risk of doing business with Iran."[137]  As he chuckled in a discussion with investors after closing the

---

[136] Lina Saigol and Andrew England, *Telecoms: Dealings in the Danger Zone; MTN of South Africa's Ventures in Iran and Syria Have Dented Its Reputation and Rattled Shareholders*, Financial Times (July 2, 2013) ("Saigol and England, *Telecoms: Dealings in the Danger Zone*").
[137] *Id.*

deal with the Iranians, he stated "[MTN] hadn't budgeted for bomb shelters or anything like that."[138]  MTN's CEO's choice to literally "laugh off" questions about the obviously dire risks associated with MTN's new joint venture in Iran typifies MTN's deliberate choice to align itself with anti-American terrorists as the cost of doing business as the IRGC's junior partner in the MTN Irancell joint venture.

482.    MTN continued to pursue Project Snooker even after the U.S. Undersecretary of the Treasury told Turkish officials that Irancell was "fully owned" by the IRGC.  Undersecretary Levey did so as part of a campaign in which he alerted every major western business and financial partner of the IRGC about the inherent terrorism risks attendant to any transactions with fronts for the IRGC.  On information and belief, Undersecretary Levey told MTN Group that Irancell was "fully owned" by the IRGC and, by extension, when Irancell operated outside of Iran, Qods Force operatives were in charge.

483.    MTN's bribes and alliance with the IRGC "is a saga that illustrates the extraordinary risks MTN has taken to profit from doing business with pariah states."[139]

484.    MTN Group, Phuthuma Nhleko, and Irene Charnley committed MTN Group (and themselves) to the Security Cooperation Agreement more than 16 years ago, in 2005, when Mr. Nhleko, acting in his capacity as MTN Group's President and CEO, executed the IRGC's terrorist template contract on behalf of all MTN entities worldwide.  In so doing, MTN Group, through Mr. Nhleko, committed MTN Group, its CEO, Mr. Nhleko, Irene Charnley, and every other MTN entity or person globally to provide "Security" "Cooperation" aid to the "Iranian Shareholders," which Defendants knew meant Hezbollah, Qods Force, and Regular IRGC.

---

[138] *Id*.

[139] *Id*.

485.     After MTN Group, Phuthuma Nhleko, and Irene Charnley agreed to aid the IRGC under the Security Cooperation Agreement, each Defendant acted as an international financial, logistics, technical, and management agent who knowingly acted on behalf of, or to ultimately benefit, Hezbollah, the Qods Force, Regular IRGC, and their Sunni terrorist proxies in Iraq and Afghanistan. In doing so, MTN Group, Phuthuma Nhleko, and Irene Charnley, acted within the scope of the instruction from MTN Group (the principal) in the Security Cooperation Agreement from the "Iranian Shareholders," committing the MTN Group to assist the "security" operations (i.e., terrorist attacks) of Hezbollah and the Qods Force.  Indicia of MTN Group's service as an agent for the IRGC include, but are not limited to:

(i)     MTN Group represented the Iranian Shareholders as their purchasing agent, and coordinated efforts to obtain vital U.S. technology that aided bomb and rocket construction and terrorist surveillance, as requested by IRGC-QF and Hezbollah, reaching into U.S. to acquire such gear;

(ii)     MTN Group repeatedly sourced precious U.S. dollars to funnel to IRGC-QF as bribes ($400,000) or to pay to others as bribes in order to help further conceal IRGC-QF front companies, including pursuing a scheme to bribe the South African UN delegation in order to successfully kill a UN resolution that would have sanctioned IRGC-QF front companies necessary to the terrorist enterprise;

(iii)     MTN Group provided public relations support and crisis management services designed to benefit the IRGC-QF front, MTN Irancell, by coordinating the strategic communications response to media stories, government investigations, and/or lawsuits that exposed MTN Irancell as an IRGC-QF front;

(iv)     MTN Group organized IRGC-QF finances and managed IRGC-QF assets through Irancell, and MTN Group had to reach into the United States to do so because of the complicated technology that MTN used, which relied on purloined American technology;

(v)     MTN Group coordinated the secret use of U.S. IT experts to handle sensitive tasks that Irancell personnel could not, knowing that such contractors were performing their work from the U.S. (indeed that was the point, since MTN needed people who had U.S. tech expertise); and

(vi)     MTN Group prepared detailed studies at the request of the IRGC-QF that were designed to improve Iranian weapons capabilities, with a specific understanding that the IRGC-

QF's primary target was the United States, and therefore that the weapons studies they were sharing would target the U.S.

**B. Defendants Knowingly Assumed A Financial, Logistical, And Operational Role In The Islamic Revolutionary Guard Corps', Including Hezbollah's And The Qods Force's, Terrorist Enterprise Against Americans Worldwide That Funded, Armed, And Logistically Sustained IRGC Sunni Terrorist Proxy Attacks In Iraq And Afghanistan**

486.    For more than fifteen years, MTN Group, Phuthuma Nhleko, Irene Charnley served as a reliable joint venture partner for the world's worst terrorist organization, the IRGC.

487.    Phuthuma Nhleko and Irene Charnley were instrumental in operationalizing the latticework of terrorist finance, logistics, and operational support that MTN Group and its affiliates and agents routed to Hezbollah, the Qods Force, and their terrorist proxies, like al-Qaeda.  Through their careful construction and maintenance of the latticework of value streams flowing from MTN Group through MTN Irancell and ultimately being received and deployed by Hezbollah, the Qods Force, and the IRGC's terrorist proxies, Phuthuma Nhleko and Irene Charnley ensured that the terrorists received regular flows of funds, weapons and parts, secure cell phones and American smartphones, information technologies, transnational logistical support, and professional services.

488.    MTN Group, Phuthuma Nhleko, and Irene Charnley coordinated with MTN Dubai, and representatives and agents of the IRGC, among others, to manage the procurement scheme.  MTN Group directed the conduct of the purported "third parties" in the U.A.E. who were, in fact, shared corporate covers acting on behalf of both MTN Group, MTN Irancell, and the IRGC.  On information and belief Phuthuma Nhleko and Irene Charnley coordinated these activities while knowing that MTN's counterparties were fronts, operatives, agents, or cut-outs for Hezbollah and the Qods Force.

489.     MTN Group, Phuthuma Nhleko, and Irene Charnley specifically decided that MTN Group, through Phuthuma Nhleko, Irene Charnley and other MTN Group officers, managers, employees, or agents, would closely coordinate to extract vast amounts of state-of-the-art U.S. technologies from the American marketplace on behalf of MTN Group's, Phuthuma Nhleko's, and Irene Charnley's IRGC partners.  In its Special Report, *Reuters* explained, "[a]ccording to a person familiar with the matter, ***MTN [Group] was determined that MTN Irancell procure substantial amounts of U.S. equipment***:  The U.S. products had ***performed well in its other networks***, and the ***company's technicians were familiar with them***."[140]

490.     MTN Group, Phuthuma Nhleko, Irene Charnley, and MTN employees and agents acting at their instruction deliberately set out to source items requested by Hezbollah and the Qods Force while evading America's IRGC-related terrorism sanctions.  According to *Reuters*, "internal [MTN Group] documents" "show that MTN [Group] employees created presentations for meetings and wrote reports that openly discussed circumventing U.S. sanctions to source American tech equipment for MTN Irancell."[141]

491.     MTN Group, Phuthuma Nhleko, Irene Charnley, and MTN's employees understood that their transaction activities on behalf of the IRGC were illegal.  According to *Reuters*, "internal [MTN Group] documents" "show that MTN [Group] employees" "address[ed] the potential consequences of getting caught" in written MTN Group documents.[142]

---

[140] Steve Stecklow, *Special Report: Documents Detail How MTN Funneled U.S. Technology to Iran*, Reuters (Aug. 30, 2012).

[141] *Id.*

[142] *Id.*

492.    MTN Group, Phuthuma Nhleko, Irene Charnley, and other MTN executives and

employees, reported *Reuters*, knew that Defendants and other MTN persons faced potential

"civil and criminal consequences" if their scheme were exposed – and still pressed forward:

> **"CIVIL AND CRIMINAL CONSEQUENCES"**
> According to [] internal procurement documents, right from the start MTN was
> well aware of what it termed "embargo issues" and the ***inherent risks involved***.
> A December 2005 PowerPoint presentation marked confidential and emblazoned
> with MTN's logo noted that the ***"Consequences of non compliance" included
> "Civil and criminal consequences."***  The PowerPoint slide added that the U.S.
> government could blacklist MTN, "which could result in all MTN operations
> being precluded from sourcing products/services from U.S. based companies."[143]

493.    *Reuters* concluded that MTN Group's C-Suite, including Phuthuma Nhleko and

Irene Charnley, directed MTN's support for the IRGC's terrorist scheme, and continued doing so

even after MTN Group finished pilfering the Irancell license from Turkcell in 2005:

> The new MTN documents appear to detail an ***intentional effort to evade
> sanctions***.  For example, a January 2006 PowerPoint presentation prepared for the
> project steering committee - ***comprised of then top-level MTN executives*** -
> includes a slide titled "Measures adopted to comply with/bypass US embargoes."
> It discussed how the company had decided to outsource Irancell's data centre after
> receiving legal advice.  "In the absence of applicable U.S. consents, it is a less
> risky route to MTN for Irancell to outsource data centre than it is to purchase
> restricted products," the PowerPoint slide says.[144]

494.    MTN Group, Phuthuma Nhleko, Irene Charnley, and other MTN employees had

actual knowledge of the scheme.  MTN Group personnel routinely prepared or received written

materials that memorialized the illicit importation of embargoed U.S. technologies, for the

specific purpose of flowing the technology through to Iran, where MTN Group, Phuthuma

Nhleko, Irene Charnley, and other MTN personnel knew there would be only one end recipient:

the IRGC, including its Hezbollah and Qods Force.  According to *Reuters*:

---

[143] *Id*.

[144] *Id*.

A delivery schedule also dated June 2006 lists U.S. equipment needed for "value-added services," including voice mail and a wiretapping system. The schedule states that the equipment would be "Ready to Ship Dubai" that July and August. It estimates it would take two weeks to arrive in the southern Iranian port of Bandar Abbas by "Air or Sea/Road," and then up to 30 days to clear Iranian customs. According to a person familiar with the matter, the equipment ultimately arrived by boat. "It all showed up," this person said.[145]

495.     MTN Group maintained "a lengthy spreadsheet of '3rd Party' equipment dated June 2006 that list[ed] hundreds of U.S. components - including servers, routers, storage devices and software - required for a variety of systems."[146]  On information and belief, Phuthuma Nhleko and Irene Charnley regularly received such spreadsheets, or briefings relaying details contained in such spreadsheets, as part of their close oversight of the rollout of MTN Irancell, which depended upon copious illicit technology acquisition activities in the United States.

496.     MTN Group, Phuthuma Nhleko, and Irene Charnley remained committed to its Hezbollah, Qods Force, and Regular IRGC partners even after withering U.S. pressure.  For example, in or around 2010 or 2011, MTN Group representatives met with senior executive officials from the U.S. government.  During these meetings, MTN representatives falsely assured the U.S. government that they were not helping the IRGC or supplying it with any embargoed U.S. technology in violation of U.S. sanctions against Iran that were intended to deprive the IRGC of the money and technology useful to their terrorist proxies' attack campaigns.  MTN Group provided the U.S. such false assurances even after "MTN ha[d] carried out orders from the regime to shut off text messaging and Skype during times of political protest, and reportedly ha[d] a floor in its Tehran headquarters controlled by Iranian security officials."

---

[145] *Id.*

[146] *Id.*

497.    As the IRGC joint venture partner responsible for sourcing the most important

technological items for modern terrorism – the communications, computing, and encryption

technologies that were vital to attacking Americans – MTN Group assumed a key financial and

operational role in Hezbollah's, the Qods Force's, and the Regular IRGC's terrorist enterprise,

including their technological support of Hezbollah's efforts to build sophisticated new computer

networks, data centers, and media sites.

498.    Under the structure of the MTN Irancell joint venture, the two fronts for the IRGC

that exercised 51% control of MTN Irancell – the Bonyad Mostazafan and IEI – had the mandate

to promote the IRGC's "security" agenda, including the obligation to block any significant MTN

Irancell-related transaction or commercial relationship unless it improved the IRGC's terrorism

capabilities.  Given the IRGC's view that MTN Irancell was essential to IRGC, including Qods

Force, "security" operations, the terrorist fronts that controlled MTN Irancell (Bonyad

Mostazafan and IEI) would not have approved any material MTN Irancell transaction unless they

determined that, on balance, the particular transaction improved the IRGC's ability to execute

terror operations as the central element of the IRGC's "security" agenda.  As a result, one may

infer that every significant commercial transaction and business relationship that MTN Irancell

entered into was: (1) vetted by the IRGC; and (2) determined by the IRGC to advance the

IRGC's "security"-related capabilities, which was a specific Iranian euphemism for external

terror operations.

499.    From 2005 through the present, MTN's joint venture with MTN Irancell, and

MTN's illicit transactions with MTN Irancell, the Bonyad Mostazafan, IEI, TCI, and the Akbari

Fronts, each provided tens of millions of dollars annually in illicit funds, weapons, and

operational support to Hezbollah, Jaysh al-Mahdi, and the IRGC which the Joint Cells used to attack Americans in Iraq, including Plaintiffs and their loved ones.

### 1. Defendants Assumed A Financial Role In The Terrorist Enterprise

500. MTN assumed a financial role in the terrorist enterprise by, among other things, bribing its IRGC, including Qods Force, joint venture partners to win the Irancell license in the first instance, paying large license fees, and generating revenue for MTN Irancell throughout the operation of the joint venture.

501. "In Iran, MTN has been accused of paying bribes to South African and Iranian officials to secure a licence there in 2005."[147]

### i. Defendants Used "Orbits" To Transmit Bribes to Hezbollah, The Qods Force, And The Regular IRGC Through Payoffs To Purportedly Unrelated Third Parties

502. On information and belief, the recipient of MTN's $400,000 wire acted as a front, operative, or agent for the IRGC. On information and belief, the recipient of MTN's $400,000 wire was a cut-out for MTN to route value to "Iranian shareholders" who were the IRGC. The IRGC ensures that all economic value is shared amongst constituent parts of the organization, and would not have permitted such value transfer here relating to a contract decision-making process the IRGC controlled without obtaining their share of the payment under the IRGC's mafia-like revenue sharing practices.

503. MTN knew, or recklessly disregarded, that the recipient of MTN's $400,000 wire was acting as a cut-out to allow money to flow through for the benefit of the IRGC which had proved vital to MTN's successful campaign to steal Turkcell's license.

---

[147] Agence France Presse English Wire, *South African Telecom MTN Gains Clients Despite Scandals* (Mar. 7, 2019).

504.    MTN also knew, or recklessly disregarded, that the recipient of MTN's $400,000 wire instructed MTN to wire the money, in U.S. Dollars, to a bank account in the U.A.E., and therefore that the recipient of MTN's $400,000 wire was specifically acting as a pass-through for the benefit of the Qods Force because MTN's $400,000 wire instruction, on information and belief, caused a bank in the United States to send $400,000 to a bank account controlled by a cut-out for the IRGC acting in Dubai, which was the Qods Force's most notorious financial and logistical hub in the Middle East outside of Iran.

505.    On information and belief, MTN regularly makes similar sham "consulting" payments like one that MTN used to attempt to justify MTN's $400,000 wire. Such payments benefitted fronts, operatives, or agents for the IRGC in their MTN Irancell-related terrorist fundraising efforts from 2005 through today.

> **ii.    Defendants Caused a $300 Million "License Fee" Payment To The Islamic Revolutionary Guard Corps Fronts That Controlled MTN Irancell, Flowing Tens Of Millions Of U.S. Dollars Through Such IRGC Fronts To Hezbollah, The Qods Force, And Their Sunni Terrorist Proxies In Iraq And Afghanistan**

506.    After it corruptly secured the 15-year Irancell license, MTN Group Ltd. paid the IRGC, through the Bonyad Mostazafan and IEI, an approximately $300 million license fee when it secured its 49% status as the junior partner in the MTN Irancell joint venture.  This money benefited the IRGC's terrorist enterprise, and the Qods Force received a substantial amount per standard practice by the IRGC, including Qods Force.

> **iii.    Defendants Caused Regular Large Cash Transfers To Flow Through MTN Irancell And Benefit Hezbollah And The Qods Force's Sponsorship Of Sunni Terrorist Proxies In Iraq And Afghanistan**

507.    MTN reaped enormous profits from its involvement in MTN Irancell, and sourced copious amounts of dual-use technology to benefit MTN Irancell and the IRGC.  Indeed, by

156

2013, "MTN has faced a huge headache in seeking to get dividends out of Iran because stringent sanctions prevent[ed] banks from moving cash easily in and out of the country. MTN … ***was virtually printing money in Iran***, where it has a 46% share of the market."[148]

508.     Under MTN's joint venture with its two IRGC, including Qods Force, front partners in MTN Irancell, for every dollar (or Iranian Rial) MTN generated for the joint venture, MTN's terrorist partners received 51 cents to invest in their terrorist enterprise. Indeed, during periods when MTN Irancell was "printing money" but could not repatriate it, MTN Group made "loans" to MTN Irancell to ensure that Irancell – and therefore the IRGC – obtained 100% of the profits that were owed to MTN Irancell's Iranian Shareholders, i.e., the IRGC, and therefore, the MTN Group's "loans" to MTN Irancell ensured the IRGC received 100% of its profits as working capital for the duration of the sanctions.  Thus, every dollar in profit for MTN Irancell inevitably helped fund Hezbollah's coordination of a nationwide insurgency against Americans in Iraq, the IRGC's industrial-scale production of EFP components, advanced rockets, and other high-tech weapons for use by Shiite terrorists against Americans in Iraq, and the aggressive forward deployment of IRGC, including Qods Force, operatives throughout Iraq to partner with Hezbollah and Jaysh al-Mahdi to maximize the effectiveness of the Joint Cells maintained by the terrorist groups in Sadr City, Basra, and elsewhere.

509.     Through its participation in MTN Irancell, MTN caused the IRGC to realize tens of millions of dollars per year in income that the IRGC used to fund terrorist operations against Americans in Iraq including, among other things, by funding Hezbollah and Jaysh al-Mahdi, including Jaysh al-Mahdi Special Groups Asaib Ahl al-Haq and Ka'taib Hezbollah.

---

[148] Business Day Live, *Iran Deals Forced MTN Boss to Quit* (July 28, 2013) (emphasis added).

### 2.    Defendants Assumed An Operational Role In The Terrorist Enterprise

510.    MTN Group, Phuthuma Nhleko, and Irene Charnley deliberately provided "security" assistance to its JV partners, the "Iranian Shareholders," i.e., the IRGC.

511.    MTN Group, Phuthuma Nhleko, and Irene Charnley extensively collaborated with other sanctions busters in Iran, by sharing U.S.-origin technology between 2007 and the present day.  As early as 2004, MTN Group created a UK-based shell company called Surizon. Surizon's co-owners, its CEO, and "head of international business development" were previously members of MTN Group's founding board, including its General Counsel and the architect of its international expansion.

512.    Surizon's primary products were two software applications: Fast Access to Content, Trends and Statistics ("FACTS") and Network Management System ("NMS").  FACTS was, and still is, an "intelligence system."  NMS enables companies to manage and monitor networks like Irancell's and TCI's, which have a mix of incompatible US, European, and Chinese-supplied hardware, enabling them to supply meaningful data to FACTS.

513.    According to statements by Surizon and multiple MTN and Irancell employees, Surizon's products were, in essence, interfaces and data manipulation scripts wrapped around U.S.-origin technologies created by, *inter alia*, Oracle, Roambi, and BMC.  On information and belief, between 2006 and 2007, Surizon and MTN Group 'negotiated' a "21-country deal" to provide "FACTS… across all MTN Group operators."

514.    Surizon and MTN Group customized and deployed FACTS and NMS to each and every one of MTN Group's operating companies, including Sudan, Syria, and Iran, and specifically including the companies whose facilities are integrated into Iran's transnational signals intelligence network.

158

515.    On information and belief, MTN continues to use and share FACTS and NMS software with third parties.

516.    The U.S.-origin technologies used by MTN Irancell and supplied by MTN, enabled the IRGC to collect surveillance data and deliver intelligence in real time to terrorist agents in the field via smart phone applications.  Use of the U.S.-origin technology, as provided by MTN, allowed the terrorists to monitor, track, and target Americans.  Indeed, the U.S.-origin technologies enabled FACTS users and Iranian third parties to receive text message alerts under user-specified conditions, and to access network data, including interactive maps of subscriber activity using their smart phones, and to query and mine the data its network operations centers collected (which themselves were also based on U.S.-origin technologies).

517.    On information and belief, MTN also provided FACTS to TCI and MCI, and to its local Iranian partners, as well as to agents of the IRGC. FACTS and NMS enabled the partnership to manage its highly complex multi-vendor network, and to collaborate seamlessly, avoiding serious compatibility issues that would have arisen from using their own in-house applications.

518.    A series of blockbuster reports by *Reuters* corroborates Plaintiffs' allegations.  In its blockbuster Special Report breaking one MTN Group scandal, *Reuters* revealed that "internal documents seen by *Reuters*," showed that "MTN Group" "***plotted to procure embargoed U.S. technology products for an Iranian subsidiary through outside vendors*** to circumvent American sanctions on the Islamic Republic."[149]

---

[149] Steve Stecklow, *How A Telecom Gian Got Round Sanctions On Iran*, Reuters (Aug. 30, 2012).

519.    According to *Reuters*, "[h]undreds of pages of internal documents reviewed by *Reuters* show that MTN employees created presentations for meetings and wrote reports that openly discussed circumventing U.S. sanctions to source American tech equipment for MTN Irancell. … [and] also address[ed] the potential consequences of getting caught."[150]  Indeed, "[t]he documents show that MTN was well aware of the U.S. sanctions, wrestled with how to deal with them and ultimately decided to circumvent them by relying on Middle Eastern firms inside and outside Iran."[151]

520.    On August 30, 2012, MTN Group issued a statement to *Reuters*, in which "MTN denied any wrongdoing."[152]  According to *Reuters*, "Paul Norman, MTN Group's chief human resources and corporate affairs officer," issued a statement to *Reuters*:

> MTN denies that it has ever conspired with suppliers to evade applicable U.S. sanctions on Iran or had a policy to do so.  MTN works with reputable international suppliers.  Our equipment is purchased from turnkey vendors and all our vendors are required to comply with U.S. and E.U. sanctions.  We have checked vendor compliance procedures and continue to monitor them and we are confident they are robust.[153]

521.    MTN Group's denial was a lie, and MTN Group, Phuthuma Nhleko, and Irene Charnley (all of whom, on information and belief, were involved in the statement) intended to conceal MTN Group's, Mr. Nhleko's, and Ms. Charnley's direct assistance to, and secret Security Cooperation Agreement with, the IRGC, which MTN Group has faithfully honored – while concealing such frauds from MTN Group's shareholders – for about 17 years.

---

[150] *Id*.

[151] *Id*.

[152] *Id*.

[153] *Id*.

522.    Moreover, MTN Group's public denials, including public denials by Phuthuma

Nhleko, among others, aided Hezbollah's and the Qods Force's terrorist finance and logistics

scheme by engaging in strategic communications targeted at the United States, which maintained

MTN Group's, Phuthuma Nhleko's, and Irene Charnley's statuses as viable "covers" for the

illicit fundraising and acquisition of embargoed American technologies by the IRGC while MTN

Group was under close scrutiny.  Essentially, MTN Group, Mr. Nhleko, and Ms. Charnley

helped reputation-wash IRGC fronts by imbuing them with the credibility of MTN Group which,

while terrible, remains superior to that of a Foreign Terrorist Organization like Hezbollah and the

broader IRGC organization in which it sits.

523.    As the IRGC's chief outside telecommunications partner and service provider,

MTN helped the IRGC grow their cellular-phone capabilities, evade American sanctions, and

acquire embargoed U.S.-made communications technology.

524.    From 2005 through the present, MTN has illegally sourced embargoed dual-use

U.S. technology at the request of the IRGC in coordination with MTN's Qods Force handlers in

the U.A.E., where MTN and the IRGC coordinate their technical collaboration.  Plaintiffs' belief

is based upon, among other things, information and inferences based upon statements made by

one or more witnesses, MTN's own internal documents, financial records, and investigations by

major global media outlets.

525.    For example, on June 4, 2012, *Reuters* reported on MTN leading efforts to

illegally acquire hundreds of dual-use, military-grade embargoed communications, telecom, and

computer technologies for the IRGC:

> A fast-growing Iranian mobile-phone network managed to ***obtain sophisticated
> U.S. computer equipment despite sanctions that prohibit sales of American
> technology to Iran***, interviews and documents show.  MTN Irancell, a joint
> venture between MTN Group Ltd of South Africa and an Iranian government-

controlled consortium, sourced equipment from Sun Microsystems Inc, Hewlett
Packard Co and Cisco Systems Inc, the documents and interviews show.  MTN
owns 49% of the joint venture but provided the initial funding. …

Chris Kilowan, who was MTN's top executive in Iran from 2004 to 2007, said in
an interview … [that] ***MTN's parent company, MTN Group, was directly
involved in procuring U.S. parts for MTN Irancell***, which launched in 2006 and
is now Iran's second-largest mobile-phone operator.  ***"All the procedures and
processes around procurement were established by MTN,"*** he said.  He said the
company ***agreed to allow its Iranian partners and MTN Irancell*** to set up a local
Iranian company with the ***"basic" purpose of evading sanctions on Iran.*** …

*Reuters* provided MTN with the names of four current MTN Group executives
believed to have knowledge of the procurement of U.S. parts by MTN Irancell.
MTN declined to make any of them available for interviews. …

Kilowan's claims regarding how MTN Irancell obtained U.S. parts for its network
… were supported in documents and numerous interviews conducted by *Reuters*.
For example, *Reuters* reviewed an 89-page MTN Irancell document from 2008
that shows the telecom carrier was specifically interested in acquiring embargoed
products.  … In a section on managing product-support agreements for third-party
equipment, ***the MTN Irancell document states, "This should include embargo
items."***  The document also includes ***lists of network equipment, including Cisco
routers, Sun servers and products from HP***. …[154]

526.    *Reuters* "documented … how Iranian telecoms - including the MTN joint venture

– [] managed to obtain embargoed U.S. computer equipment through a network of Chinese,

Middle Eastern and Iranian firms."[155]  As *Reuters* put it, "[t]he Turkcell-MTN case offers further

evidence that there are always companies willing to do business with a country even when it

becomes an international pariah."[156]

527.    MTN's technical assistance to the IRGC had a devastating impact on the U.S.

government's ability to protect Americans in Iraq from IRGC proxy terrorist attacks in Iraq and

---

[154] Steve Stecklow, *Exclusive:  Iranian Cell phone Carrier Obtained Banned U.S. Tech*, Reuters
(June 4, 2012) (emphasis added; formatting adjusted).

[155] Steve Stecklow and David Dolan, *Special Report: How An African Telecom Allegedly Bribed
Its Way Into Iran*, Reuters (June 15, 2012).

[156] *Id.*

Afghanistan.  By helping to revolutionize the IRGC's communications capabilities, MTN helped the IRGC better conceal their communications with their Hezbollah and Qods Force operatives and, through Hezbollah, to the IRGC's proxies in Iraq and Afghanistan, which made it nearly impossible for American counter-terror forces in Iraq and Afghanistan to monitor the IRGC-backed cells attacking Americans in both countries – and crossing borders to magnify the impact of the other's campaign (e.g., the Haqqani Network hosting bombmakers from Ansar al-Islam).  By making it easier for Hezbollah and its proxies to securely communicate with one another, MTN Group, MTN Irancell, Phuthuma Nhleko, and Irene Charnley made it easier for IRGC-backed terrorists to attack Americans – and they did.  Defendants accomplished this "communications concealment" assistance to the IRGC which flowed through to Hezbollah and, through Hezbollah, to IRGC proxy terrorists in Iraq and Afghanistan, in at least three ways.

528.    *First*, Defendants facilitated MTN Group's illicit acquisition and transfer of acquired advanced American-made encryption technologies to the IRGC and their agent, Hezbollah, for sharing with their proxies in Iraq and Afghanistan.  The terrorists used the MTN-acquired, U.S.-manufactured and embargoed technologies to encrypt their communications.

529.    *Second*, MTN sourced more than one thousand (1,000) advanced, encrypted American smart phones each year from 2006 through 2017 that were intended to be used, and were in fact used, by the IRGC and Hezbollah, for terrorism targeting Americans.  The American smart phones sourced by MTN for the IRGC and Hezbollah, were used to increase the effectiveness of Hezbollah-designed, IRGC-funded (including and Qods Force-funded) IEDs and EFPs in Iraq and Afghanistan by making it easier for terrorists to detonate them and harder for American counter-IED technologies to prevent their detonation by "jamming" them.

530.     *Third*, MTN lied to the U.S. government about its ongoing cooperation with and work on behalf of the IRGC and Hezbollah.  This furthered the Joint Cells' terrorist campaign by preventing the U.S. government from knowing and understanding what technology the terrorists had, and when it was obtained.

531.     Even as of the date of this Complaint, MTN continues to dissemble about its relationship with the IRGC.  Even after the United States designated the IRGC as a Foreign Terrorist Organization on April 19, 2019, MTN stubbornly refused to acknowledge any need to change its business practices in Iran for more than a year, instead rolling out a host of new offerings designed to ***increase revenue*** flowing to MTN Irancell and, by extension, the two newly-designated-FTO-fronts that controlled MTN Irancell.

532.     Finally, on August 6, 2020 – ***475 days after the IRGC's FTO designation*** – MTN announced that it was exiting the Middle East.  Even then, however, MTN refused to condemn the IRGC refused to promise a rapid withdrawal from its terrorist joint venture, MTN Irancell, and merely offered a blithe promise that MTN would eventually exit MTN Irancell in four or five years (i.e., sometime in 2024 or 2025).

533.     On information and belief, MTN declined to immediately exit its joint venture with two FTO fronts after the IRGC's FTO designation because MTN determined that MTN would lose, at least, hundreds of millions of dollars if MTN rapidly withdrew from its MTN Irancell joint venture with the Bonyad Mostazafan and IEI.

534.     As alleged, MTN knew, or recklessly disregarded, that it was dealing with Qods Force fronts, but given the IRGC's designation as an FTO in 2019, MTN's ongoing relationship with two widely recognized IRGC fronts proves MTN deliberately chose to join the IRGC's

terrorist enterprise against the United States, which MTN self-evidently views as an acceptable cost of doing business.

535.    MTN's ongoing refusal in 2022 to immediately and unconditionally (as in weeks, not months or years) exit its joint venture with fronts for the IRGC even after the IRGC had been designated as an FTO in 2019, and nearly every other multinational corporation had withdrawn from such joint ventures with Iranian fronts nearly a decade earlier, further confirms that MTN meant to support Iran-backed terror all along.

536.    On March 12, 2012, MTN Group issued a press release that stated, in part:  "On human rights, the [MTN] group takes direction from and adheres to the policies of both the South African government and the United Nations.  South Africa has human rights enshrined as fundamental principles within its Constitution."  MTN then shamefully invoked South Africa's history of apartheid to suggest that it was a responsible corporate citizen, stating:  "Given South Africa's own recent history and our struggle against apartheid, the centrality of civil rights is at the core of our culture as a company and as individuals."  MTN further defiantly – and absurdly – claimed that there was no "evidence that the Iranian government has used the data [MTN] collected [and shared with the IRGC via Irancell] to identify and locate citizens or dissidents."

537.    After issuing its press release, MTN subsequently scrubbed any presence of it from MTN's websites.  On information and belief, MTN did so because it knew that its statement was a damaging admission that MTN believed that although it was violating U.S. law, it could not be held accountable under U.S. law regardless of what it did with Iranian terrorist fronts like the IRGC.

538.    On March 28, 2012, Turkcell filed suit against MTN Group in United States District Court for the District of Columbia.  *See* Complaint [Dkt. 1], *Turkcell İletişim Hizmetleri*

*A.Ş. and East Asian Consortium B.V v. MTN Group, Ltd. and MTN International (Mauritius) Ltd.*, No. 1:12-cv-00479-RBW, (D.D.C. Compl. Filed Mar. 28, 2012) ("*Turkcell v. MTN*").[157]  In its complaint (at 1), Turkcell alleged that MTN "violat[ed] … the law of nations through bribery of sitting Iranian … officials and trading influence to steal the first private Iranian Global System for Mobile Communications ("GSM") license (the "License") from Turkcell," which included MTN's "promis[e] [to] Iran [MTN would source] defense equipment otherwise prohibited by national and international laws" and MTN's "outright bribery of high-level government officials in both Iran and South Africa," which "acts … deliberately resulted in Turkcell losing its rightfully-won valuable telecommunications opportunity and in MTN's taking over the License."

539.    In its complaint (at ¶ 9), Turkcell alleged that, "[b]etween the end of 2004 and receiving the License in November 2005, MTN through 'Project Snooker' made at least five illegal bribes and trades in influence to government officials with the intention and belief that the bribes would cause the Iranian government to grant the License to MTN rather than Turkcell."

(i)    Paragraph 9(B) – labeled "Illicit Arms for the GSM License" – alleged that "MTN struck a deal to deliver 'The Fish' the Iranian Ministry of Defense in August 2004.  'The Fish' was a code name for a combination of military cooperation and big ticket defense equipment, including … frequency hopping encrypted military radios, sniper rifles, … radar technology, … and other defense articles—particular items including U.S. systems or components.  This equipment was unavailable to Iran through legitimate means because of U.S. and international restrictions at the time.  MTN officials … promise[d] delivery of the elicit [i.e., illicit] arms and technology in exchange for the License."

(ii)    Paragraph 9(C) – labeled "Bribe of Iranian Deputy Foreign Minister" – alleged that "MTN promised in May 2005, and later paid through a sham consultancy, the Iranian Deputy Foreign Minister, Javid Ghorbanoghli, $400,000 in U.S. dollars for his efforts to politically undermine and destroy Turkcell's position as the license-holder and to deliver the License to MTN."

---

[157] Turkcell subsequently voluntarily dismissed the case to pursue the matter in South Africa. *See* Notice of Voluntary Dismissal (Dkt. 47) and Minute Order (Dkt. 48) in *Turkcell v. MTN*, No. 1:12-cv-00479-RBW (D.D.C. May 1, 2013).

(iii)   Paragraph 9(D) – labeled "<u>Bribe of South African Ambassador to Iran</u>" – alleged that, "[i]n June 2005, MTN promised, and later paid, the South African Ambassador to Iran, Yusuf Saloojee, the equivalent of U.S. $200,000 to help MTN deliver on the nuclear vote and the weapons trafficking and to support MTN within the Iranian government. Ambassador Saloojee was integral to MTN's ultimate success in securing the License."

(iv)   Paragraph 9(E) – labeled "<u>Bribes of Iranian Defense Organizations</u>" – alleged that, "MTN promised the Iranian Ministry of Defense through its state-owned defense company Sairan (also known as Iran Electronics Industries or 'IEI') and the 'Bonyad' (one of the five Iranian quasi-independent 'Charitable Foundations,' an organization integral to the Iranian defense establishment), that MTN would pay all of Sairan [i.e., the IEI's] and the Bonyad's 51% share of the €300 million license fee, plus its entire capitalization cost and a share transfer tax, in exchange for their assistance within the Ministry of Defense and with the Supreme Leader.  MTN later paid these amounts. These promises and payments, made through sham loans MTN knew at the time would not be repaid, were essential to MTN's takeover of Turkcell's License."

540.   Turkcell's complaint against MTN also specifically alleged that MTN had engaged with an IRGC-controlled company.  For example, Turkcell alleged that to

establish[] itself within Iran[,] … [MTN] reached out to … Mr. Mohammed Mokhber, the Deputy President of a major "charitable foundation" controlled by the Supreme Leader of Iran, known as the Bonyad Mostazafan ("the Bonyad"), which is … ***controlled by the Iran Revolutionary Guard Corps***, the Iranian military complex formed by Iran's Supreme Leader Ayatollah Ali Khamenei, which is believed to control approximately one third of the Iranian economy. … The Bonyad ***reports directly to the Supreme Leader*** and MTN was confident that its relationship with Mr. Mokhber and the Bonyad he controlled provided direct access to the Supreme Leader.  ***The Bonyad is well known for engaging in "Iran's shadow foreign policy."***[158]

541.   Turkcell's complaint against MTN alleged that MTN's senior executives, including its CEO, met with Iranian agents in South Africa (whom, Turkcell alleged, MTN

---

[158] *Id.* ¶ 65 (emphasis added; citations omitted). Similarly, Turkcell also alleged (at ¶ 86), that "[t]hroughout 2004 and 2005, MTN regularly met with … the Bonyad [Mostazafan] and Sairan [i.e., IEI]," during which time MTN's "goal was to entice those entities to support MTN and abandon Turkcell, on the promise that MTN had more to offer than Turkcell." *Turkcell v. MTN* Complaint at ¶ 86.  Turkcell continued: "The Bonyad and [IEI] responded exactly as MTN planned:  They not only used political leverage to increase delay and shift Turkcell's regulatory requirements, but also they directly began disengaging from their relationship with Turkcell. After mid-2005, the Bonyad and [IEI]'s involvement with Turkcell was merely a charade along the path to forming its venture with MTN." *Id.* ¶ 86.

invited to South Africa on a "trip" that "MTN funded"), during which time MTN's executives "[t]ogether [] promised [the Iranian agents] that South Africa would deliver 'heaven, earth, and the fish,' meaning whatever military equipment [Iran] desired." *Id.* ¶ 93. Turkcell continued: "The entire trip was organized and coordinated by MTN so that they could corruptly induce the Iranian government to eliminate Turkcell … and replace it as the owner of the GSM opportunity." *Id.*

542. On April 5, 2012, the *Mail & Guardian* Centre for Investigative Journalism in South Africa published a detailed expose on MTN's partnership with Iranian terrorists, titled "Iran 'Puts the Screws' on MTN," which reported that MTN "fac[ed] a storm over claims that it helped the Iranian government in 2009 and 2010," and reported that:

> Sources close to MTN's Iranian business have [] described ***an Orwellian environment in the company's Tehran headquarters***, where it allegedly ***gave military intelligence officials "open" access*** …. [S]ources claimed:
>
> - Because MTN Irancell and its data centre were part-owned by the Iranian military, subscriber data was shared "on a collegial basis" with the intelligence sector;
>
> - A shadowy ***"second floor" in MTN's building was populated by military intelligence officials***, the volunteer militia known as the Basij ("morality police") and clerics;
>
> - During the 2009 and 2010 Green movement protests, men from the second floor, accompanied by Irancell chief executive Alireza Dezfouli, allegedly approached data warehouse staff regularly to demand detailed records for individuals;
>
> - In one case, they demanded the number of a known Green Party activist, who could not be reached after his information had been given to military intelligence; and
>
> - Third parties listened in to staff calls over Irancell SIMs and would intervene and demand that the staff speak in English and not in other South African languages. …

[Turkcell's lawsuit] accuses MTN of bribing South African and Iranian officials, facilitating weapon trade agreements between the two countries and influencing South African foreign policy … in a bid to stop Turkcell from being awarded a second cellular network licence in Iran. …  MTN is a 49% shareholder in Iran-cell.  Fifty-one percent is held by an Iranian state-linked consortium, which is dominated by a subsidiary owned by the defence ministry known as Sairan, or Iran Electronics Industries.  Sairan is subject to US and European Union sanctions that target proliferators of "weapons of mass destruction".  It also holds a share in consortium Arya Hamrah, which owns and runs MTN Irancell's data centre that houses the company's servers and hardware. …

**Military intelligence**
The sources familiar with MTN's Iranian operations said that, because of these ownership structures, Irancell readily gave information about subscribers to intelligence officials. …  One of the sources said:  ***"MTN's data centre in Iran is effectively run by the military and military intelligence.  None of the intelligence organisations needs to go through normal procedures to access subscriber data and track individuals."***

Describing the climate at MTN's headquarters, a senior official said it was ***dominated by the presence of Iran's military intelligence officials and the "morality police".***

"There was a tea lady who just stood at the printer all day. Her job was to watch us."  The woman, understood to be a member of the "morality police", would scold female staff whose clothing was considered too revealing and signaled her displeasure over "inappropriate" behaviour.

Communicating by email, the source said:  "The people on the second floor are from military intelligence and the Basij and some clerics.  They oversee the intelligence and moral activities of the employees of Irancell. All emails, telephone conversations and SMSes of employees are monitored on an ongoing basis.  This is then exposed to MTN against the threat that they will kick out MTN when they need concessions from it."

The staffer described how men from the second floor would accompany Dezfouli to collect data on individuals and political dissidents:  "On several occasions someone from the second floor and [Dezfouli] would come to the managed services group and say 'give us all the details for this number', and they would have to."  The staffer said subscription and location data and call and SMS histories were handed over. …[159]

---

[159] Craig McKune and Sharda Naidoo, *Iran 'Puts the Screws' on MTN*, Mail & Guardian (Apr. 5, 2012) (emphases added).

On information and belief, the *Mail & Guardian*'s investigative report accurately described operations at MTN Irancell.

543.    Shortly before the *Mail & Guardian*'s investigative piece was published, MTN issued a written statement to the *Mail & Guardian* from MTN Human Resources Head Paul Norman that was replete with falsehoods designed to conceal MTN's ongoing joint venture with the IRGC including MTN's awareness that such a business partnership could conceivably result in violence.  In that statement, MTN's head of HR stated:

> MTN's role in Iran is mostly as a technical partner.  It is a non-controlling shareholder.  Fewer than 30 MTN expats (not all South African) are employed in Irancell, out of around 2000. … MTN works hard, with international legal advisors, to ensure that it is sanctions compliant. … Civic and human rights are vital to the company …  We expect all our business partners to abide by our code of ethics.  Mobile telecoms has been a force for political and economic liberation …  But we accept the ethical complexities around telecoms in this new environment, and the potential for their manipulation for unethical means.[160]

544.    MTN remained defiant even though nearly every other major multinational corporation exited their own joint ventures with fronts for the IRGC after the Bush and Obama administration ramped up sanctions enforcement in the 2000s.  As Ambassador Wallace explained in May 2012,

> despite the action of other responsible telecommunication companies, South African telecom company MTN continues to openly partner with sanctioned Iran entities affiliated with the brutal Iranian regime.  ***Companies like MTN deserve the condemnation of the American public and concerned citizens worldwide as well as the attention of this Congress, which should investigate MTN`s collaboration with the Iranian regime***.  Nevertheless, UANI will continue to educate citizens and apply pressure against recalcitrant companies that pursue short-term profits at the expense of global security.[161]

---

[160] *Id.*

[161] Wallace May 17, 2012 Testimony (emphasis added).

545.     Even after a decade of Iran-backed terrorism against the United Sates, MTN's President and CEO told interviewers in 2013 that the company had no regrets about doing business with the Iranian and Syrian regimes that sponsored anti-American terror.  As the *Financial Times* reported at the time, "[y]et [MTN's CEO] Mr Dabengwa says MTN has few regrets about entering Iran or Syria and includes them among countries that will be important to MTN's growth.  'The starting point for entering frontier markets is the business case.  ***The other risks, we can manage***,' he says."[162]  This view reflected MTN's corporate DNA that emphasizes taking risks that the rest of the industry thinks are too great:  "Venturing into areas where others might fear to tread is a characteristic that has been at the heart of MTN's rapid expansion since it was established in 1994, the year South Africa held its first democratic election."[163]

546.     As the *Financial Times* reported in 2013, even the prospect of "deadly conflict" did "little to diminish MTN's appetite for risk."[164]  Indeed, MTN's CEO admitted, in effect, that MTN believed that American lives in Iraq and Afghanistan did not count in MTN's calculations.  Specifically, commenting on how MTN operates in conflict zones, MTN's President and CEO stated: "I would say, is our presence there enhancing anybody's position in this conflict? That, for me, would be the test.  If you could turn around and say our presence there is enhancing the government's position or it's enhancing the other side's position, then I guess it's an issue.  Walking out today is not an option."[165]

547.     On or about November 2012, the Treasury Department announced additional sanctions targeting the IRGC's use of the telecommunications industry to help inflict violence

---

[162] Saigol and England, *Telecoms: Dealings in the Danger Zone*.

[163] *Id*.

[164] *Id*.

[165] *Id*.

upon innocent civilians.  As was reported in real time by the South African media, MTN understood that these new Treasury sanctions punished MTN's counterparty for its support of terrorism.  For example, according to the South African financial publication Fin24, these "[s]anctions announced … by the US treasury against Iranian individuals and companies have led to panic at mobile operator MTN," because MTN "believed" that the Treasury announcement "target[ed] 17 individuals believed to be related to human rights abuses by the Iranian government, as well as to supporting terrorism and the Islamic Revolutionary Guard."[166]  As *Fin24* reported at the time, "the mobile operator [was] concerned sanctions will cause a hardening of attitudes in the US against the company," which was problematic for it as "MTN [was] being sued in the US for allegedly bribing Iranian officials to obtain an operating licence, while it [was] negotiating with the US treasury to allow the operator to expatriate its cash profits from Iran before the Iranian rial completely bottom[ed] out."[167]

548.    Incredibly, even after MTN understood the Treasury Department to be sanctioning its business partners in Iran for sponsoring terror, MTN sources still complained to the media about the audacity of the United States expecting MTN to follow U.S. law.  As one anonymous "MTN source[]" complained to *Fin24* that "[t]his is a [South African] company that ***should not be subjected to US foreign policy decisions***."[168]

549.    By the end of 2012, MTN was nearly alone as one of the few large multinational corporations that remained willing to work – openly or surreptitiously – as an IRGC, including Qods Force, joint venture partner.  As Nathan Carleton, communications director for UANI,

---

[166] Fin24, *Panic at MTN Over US Treasury Sanctions* (Nov. 11, 2012).

[167] *Id.*

[168] *Id.* (emphasis added).

summed it up at the time, "MTN stands out as one of the single most irresponsible businesses in the world and should be ashamed of the depths it has gone to in pursuit of profit."[169]

550.    MTN is virtually alone in the corporate world as a multinational corporation that rarely explicitly and unambiguously condemns terrorist violence against Americans, for the obvious reason that openly condemning anti-American terror would anger MTN's joint venture partners in Iran.  Instead of expressing any sympathy for Americans killed and maimed in Iraq and Afghanistan – which, on information and belief, MTN never publicly did prior to being sued by victims of Taliban terrorism in 2019 – MTN instead showered its business partner, Ayatollah Khamenei, with adulation.  For example, MTN Irancell was the lead sponsor of an Ayatollah-backed contest, which MTN Irancell as offering a chance "to visit the Supreme Leader of the Islamic Revolution Ayatollah Seyyed Ali Khamenei during [the competitors'] stay in Tehran."[170]

**C.  Defendants Knowingly Assumed A Financial, Logistical, And Operational Role In The Taliban's, Including The Haqqani Network's, Terrorist Enterprise In Afghanistan That Funded, Armed, And Logistically Sustained IRGC Sunni Terrorist Proxy Attacks In Iraq And Afghanistan**

551.    The transnational alliance between the IRGC, including its Hezbollah Division and Qods Force, on the one hand, and al-Qaeda and its allies, including the Taliban and Haqqani Network (in Afghanistan) and al-Qaeda-in-Iraq/ISIS and Ansar al-Islam (in Iraq), on the other hand, ensured that MTN Group's material support to an FTO in one country directly aided acts of terrorism that the same FTO sponsored in another.  For example, payments made by MTN Gorup to a senior al-Qaeda terrorist in Afghanistan (Sirajuddin Haqqani) benefited al-Qaeda's terrorist enterprise in Iraq as well as Afghanistan and therefore aided attacks in both countries.

---

[169] *Id*.

[170] Tehran Times, *Reciters From 75 Countries to Participate in Tehran Quran Competition* (May 14, 2015), 2015 WLNR 14128237.

In this section, Plaintiffs first outline the financial and operational support that MTN Group provided to al-Qaeda and the Taliban before then detailing how MTN's aid to Sunni terrorists in Afghanistan benefited their sectarian allies in Iraq.

### 1.   Defendants Facilitated Protection Payments To The Taliban

552.   MTN has become one of the world's most valuable telephone companies by "wading into nations dealing with war, sanctions and strife."[171]  Success in unstable markets, including Afghanistan, has yielded profits.  MTN is now, due to this business model, "bigger by some measures than its U.S. counterparts."[172]

553.   MTN followed that model in Afghanistan.  In mid-2006, MTN Group bought Areeba, a Lebanese telephone company that had recently won a license to provide cellular-telephone service in Afghanistan.  MTN entered the Afghan market shortly thereafter and began as the country's third-largest provider (consistent with its status as the third entrant), well behind the two incumbents.  But MTN grew quickly, and by late 2010 it had obtained an estimated 32% market share – the largest of Afghanistan's then-five cellular-phone providers.  As MTN grew, it rebranded Areeba as MTN Afghanistan, and it expanded its geographical footprint throughout the country.  By 2012, MTN had a presence in virtually every province in Afghanistan, including many that were under Taliban control or influence.

554.   MTN Group keyed MTN's rapid growth in Afghanistan by sponsoring a vast stream of payoffs to the Haqqani Network from 2006 through today.  Under Sirajuddin Haqqani's leadership, the Haqqani Network was responsible for collecting "taxes" from Afghanistan's telecom companies, which were the single largest (legal) industry and tax base in

---

[171] Alexandra Wexler, *Telecom Giant Pushes Into Dangerous Areas*, Wall St. J. (Aug. 10, 2019).

[172] *Id.*

174

Afghanistan – and thus a key source of funding and power for the Taliban and al-Qaeda, both of which were effectively led by Sirajuddin Haqqani in Afghanistan and Pakistan.

555.    The logic behind MTN's payoffs to the Haqqani Network matched the logic motivating MTN's joint venture with the IRGC.  MTN Group, Phuthuma Nhleko, and Irene Charnley intended to harm American interests in Afghanistan (like Iraq), and supporting the Taliban allowed them to do so.  MTN Group, Phuthuma Nhleko, and Irene Charnley caused MTN Group, through MTN Dubai, MTN Mauritius, MTN Afghanistan and/or other MTN subsidiaries and affiliates, to route monthly protection payments to al-Qaeda (via Sirajuddin Haqqani and his immediate family members) and the Taliban or face the risk that terrorists commanded by Sirajuddin Haqqani would destroy some of MTN's cell phone towers.  Ordinarily, the going protection payment rate was usually around $2,000 per cell tower per month.  In some areas, MTN caused payments to be made to local Taliban, including Haqqani Network, commanders.  In other places, where MTN operated in a Taliban-controlled environment, the payments would have to be sent to the Taliban's Quetta Shura for southern Afghanistan, e.g., Helmand, or the Taliban's Miram Shah Shura for eastern Afghanistan, e.g., Paktia (Sirajuddin was involved in the former and led the latter).

556.    Even by hyper-corrupt Afghan standards, MTN was a particularly aggressive practitioner of protection payments.  Rather than invest in expensive security for its transmission masts, MTN purchased cheaper "security" by buying it from the Taliban.  Indeed, MTN declined to use armed guards to protect its towers.  Without paying for physical security, MTN both had the free cash flow and the incentive to buy peace with the Taliban.

557.    MTN's practice of making protection payments to the Taliban extended to the Haqqani Network.  From at least 2010 through today, MTN operated towers in Haqqani-

controlled territory in southeast and eastern Afghanistan, and it purchased security for those

towers by paying the Haqqani Network.  The Network's chief financial operative, Nasiruddin

Haqqani, oversaw those payments, and they typically occurred on a semi-annual basis.

558.    MTN negotiated its protection payments in direct discussions between MTN

Afghanistan's security department and Taliban commanders.  MTN's security department

consisted of roughly 600 total staff in Afghanistan, which included both local Afghan employees

of MTN Afghanistan and a South African security component from MTN Group.  The security

department consisted of three different layers:  provincial, regional, and a Tactical Operations

Center in Kabul.  Security personnel throughout those levels orchestrated pay offs to the Taliban.

For example, one high-ranking MTN Afghanistan official conducted at least 38 telephone

negotiations (which he recorded) with Taliban officials from 2007-2014, in which he engaged in

so-called "security coordination" with the insurgency.  The MTN employees who witnessed

those conversations knew they were illegal, so they typically went to the roof of MTN

Afghanistan's Kabul headquarters building – where they could maintain absolute privacy – to

conduct their Taliban negotiations in secret.  In addition, on at least one occasion, MTN

negotiated its payments at an in-person meeting held with Taliban officials near Quetta, Pakistan.

MTN employees in Afghanistan understood that those negotiations involved MTN agreeing to

make both cash payments and in-kind bribes (including equipment) to the Taliban.

559.    The Afghan Threat Finance Cell (or "ATFC") gathered evidence from 2008-2012

confirming MTN Afghanistan's practice of paying off the Taliban.  The ATFC generated

intelligence products, memorialized in DEA Form 6's and Intelligence Information Reports,

describing the common practice among Afghan telecommunications firms of paying the Taliban.

According to the ATFC's evidence, MTN Afghanistan was the worst offender of all the

companies.  The ATFC confirmed MTN Afghanistan's frequent insurgent payments both in interviews with MTN employees and in wire intercepts collected by the Afghan government's Sensitive Investigative Unit.  In witness interviews with ATFC investigators, MTN employees admitted that MTN Afghanistan paid insurgents not to threaten its cell towers.  They justified those payments by appealing to MTN's commercial interests:  MTN sources told the ATFC that it was cheaper to pay the Taliban than it would have been to rebuild the towers in the face of Taliban threats.

560.    The U.S. government strongly opposed MTN's practice of paying the Taliban. International Security Assistance Force Afghanistan ("ISAF")'s leadership was aware of cell phone companies making protection payments to the Taliban and pressured the companies to stop.  On information and belief, the U.S. government exerted that pressure in direct discussions between the U.S. government and MTN, and also through the Afghan Ministry of Communications.  On one occasion, an ISAF commander raised the issue directly with President Karzai.  In such conversations, ISAF's leadership specifically rejected the argument that protection payments represented an acceptable price of MTN maintaining its network in Afghanistan.  ISAF and the Afghan government warned MTN Afghanistan that its business practices were supporting the insurgency and were threatening Coalition forces, and both entities instructed MTN to stop.  MTN refused.

561.    MTN supplied the Taliban with more substantial assistance than its competitors did.  MTN's 2006 entry into Afghanistan set the stage for the Taliban's cellular-tower rackets by adding another participant to the Afghan cellular marketplace.  Until that point, the Taliban's ability to extract money from the two incumbent providers had been limited.  Once MTN emerged in 2006, it became the third cellular company in Afghanistan, which gave the Taliban

additional leverage to execute on its protection racket.  That is because, with MTN agreeing to pay the Taliban, the Taliban was free to follow through on its threats against other companies without the risk that doing so would cut off all cellular service in Afghanistan – service on which the Taliban itself relied.  Indeed, because Taliban fighters commonly preferred to use MTN's network for their own communications, the Taliban did not want to destroy MTN's network.

562.   A review of available cell-tower attack data supports the same conclusion. Plaintiffs have analyzed all of the available purported U.S. military Significant Activities reports, as published online, that describe attacks between 2004 and 2010 against or in the immediate vicinity of a cellular tower in Afghanistan.  The data shows a clear disparity between MTN and its two main competitors, Roshan and Afghan Wireless Communication Company ("AWCC"). From 2004 to 2009, AWCC and Roshan suffered at least 6 and 7 "significant" attacks on their towers, respectively, whereas MTN – which did not even pay guards to protect its towers – faced only 1 (non-lethal) attack.  The disparity is consistent with Roshan's accusation that MTN paid protection money to the Taliban.

563.   That attack disparity existed despite MTN's and Roshan's deployment of transmission masts at similar times in similar locations.  For example, in May 2008, the Taliban attacked one of Roshan's towers in Wardak Province, yet two similar nearby towers (including one belonging to MTN) were not attacked.  The most likely explanation for the difference is that MTN had paid protection money, whereas Roshan had not.  Indeed, in 2009, Roshan maintained company rules that prohibited it from paying off terrorists.  Because Roshan refused to pay, the Taliban destroyed 18 of Roshan's towers in and around the 2009 Afghan elections.

564.     MTN Group knowingly oversaw and authorized MTN Afghanistan's practice of providing support to the Taliban, as well as MTN Group 's aid routed through MTN Irancell, Exit40, and the other sources of MTN Irancell-related cash-flow alleged in this Complaint.

565.     MTN Group maintained direct contact with the MTN Afghanistan security official responsible for interfacing with the Taliban, and MTN Group officials encouraged and approved MTN Afghanistan's practice of paying off the Taliban.

566.     The senior MTN Afghanistan security official who oversaw many of MTN Afghanistan's protection payments to the Taliban reported directly to the head of MTN Group's head of business risk management, in Johannesburg, South Africa.  MTN Group was specifically aware of, and approved, MTN Afghanistan's practice of paying the Taliban for security.  In fact, MTN Group compensated MTN Afghanistan's security team with cash bonuses reflecting its success at resolving "security issues" involving the Taliban.  Those bonuses typically had three levels:  Level 1 ($1,500, for local operatives); Level 2 ($5,000, for regional operatives); and Level 3 ($10,000, for national operatives).  The head of MTN Afghanistan's security group received roughly $66,000 in such bonuses during the relevant timeframe, which specifically compensated him for negotiating with the Taliban successfully.  MTN Group even gave him an award for best "display[ing] the Group's values in MTN Afghanistan."

567.     MTN Group, MTN Afghanistan, and Phuthuma Nhleko, among others, have effectively admitted that MTN Group, and those acting on its behalf, paid off the Taliban, including its Haqqani Network, through statements that manifested an understanding that MTN was not a target of the Taliban and did not have any reason to fear the security environment in Afghanistan or Iran included, but were not limited to:

(i)      MTN Group regularly assured its shareholders that MTN Group and its affiliates could successfully manage the security climate in every part of Afghanistan as to MTN Group's

(inclusive of its subsidiaries and affiliates) risks in a manner that was legal and compliant, which MTN Group could only do because MTN Group fraudulently concealed from MTN Group's shareholders that MTN Group and its affiliates sponsored regular direct payments to an FTO (the Haqqani Network) in violation of the laws of the U.S. and a host of other nations.

(ii)     MTN Group and MTN Afghanistan publicly stated that they understood that the Taliban did not target MTN and its personnel and it was enough for an MTN person to show the terrorists a note on MTN letterhead that confirmed MTN had made the necessary payments to the Taliban, which MTN Group could only do because MTN Group fraudulently concealed from MTN Group's shareholders that MTN Group was a large regular monthly taxpayer to the Taliban, including its Haqqani Network (and FTO) in violation of the laws of the U.S. and a host of other nations.

(iii)    After Sirajuddin Haqqani led the Taliban's takeover of Afghanistan, MTN Group stated that MTN could continue to operate inside Afghanistan successfully and profitably, which MTN Group and its affiliates could only do because MTN Group fraudulently concealed from its shareholders that MTN Group and its affiliates had a long-term, and illegal, practice of paying off the Taliban, including its Haqqani Network.

(iv)     Phuthuma Nhleko, in his capacity as President and CEO of MTN Group, admitted that MTN had purchased its security when he joked about not needing protection from bomb blasts, which joke presumably was only amusing (to Mr. Nhleko) given that he knew MTN was protected because MTN had bribed the Haqqani Network and therefore was not in any danger from the Taliban, which protection payment relationship Mr. Nhleko fraudulently concealed from MTN's shareholders.

(v)      Even after it was sued for paying off the terrorists in 2019, MTN Group repeatedly assured its shareholders that it could continue to invest in Afghanistan in a compliant manner, which assurance MTN Group could only make because MTN Group fraudulently concealed its regular payments to the Taliban from MTN Group's shareholders.

568.     In total, MTN Group approved hundreds of millions of U.S. dollars in overall payments to the Taliban.  Applying the standard rate of $2,000 per tower per month to MTN's collection of roughly 1,300 towers yields an estimated payment of $2.6 million per month.  At that rate, MTN's total payments to the Taliban from 2007 through 2022 surpassed $400 million.

569.     MTN Group caused a substantial percentage of the $400 million in protection money – on information and belief, at least 20%, if not more – to be directly paid to the Haqqani Network after the U.S. designated the Haqqani Network as an FTO in September 2012.

Applying the standard rate of $2,000 per tower per month to MTN's towers in geographies controlled or contested by the Haqqani Network yields an estimated payment of $1 million per month directly to the post-FTO-designation Haqqani Network. At that rate, MTN's total payments to the post-FTO-designation Haqqani Network in the 114 months from the September 2012 designation and present well surpassed $100 million.

### 2. Defendants Supported The Taliban, Including Its Haqqani Network, By Deactivating MTN's Cellular Towers At Night

570.    MTN Group also provided material support to the Taliban by deactivating MTN Afghanistan's cell towers at the Taliban's request. In or about 2008, the Taliban began demanding that Afghanistan's major cellular-phone providers switch off their towers at night. The Taliban justified that demand by arguing that Coalition forces were "using the cellular networks to track its insurgents throughout the war-torn country."[173]  Coalition forces, a Taliban spokesman stated, were "misusing the cell towers for their intelligence works."[174]  Because the Taliban believed that shutting down nighttime service would impede Coalition intelligence efforts, it demanded that the cellular-phone companies deactivate their towers from 5 p.m. until 3 a.m. Later, the Taliban ordered that the companies keep their masts deactivated until 6:30 a.m.

571.    MTN granted the Taliban's requests. In early 2008, MTN Group issued a statement that it was "aware of reports of the Taliban communicating a need for mobile operations to be suspended at certain times during the night in sensitive areas. We are evaluating

---

[173] Paul Vecchiatto, *MTN Concerned By Afghanistan Threats*, ITWeb Cape Town (Feb. 28, 2008) ("*MTN Concerned By Afghanistan Threats*"), https://www.itweb.co.za/content/dgp45MaYRYZMX9l8.

[174] Indira A.R. Lakshmanan, *Fighting The Taliban With Cellphones*, N.Y. Times (Mar. 23, 2010).

the situation and liaising with our executives and the relevant authorities in Afghanistan."[175]   The

"executives" apparently decided to accommodate the Taliban's "need" and shut down MTN's

transmission masts at night.  When the Taliban ordered cellular-phone companies to "switch off

the signal," MTN Afghanistan's head of legal and government affairs told the media:  "We

decided to obey the orders and we have been shut down since yesterday."[176]   Since 2008, MTN's

policy has remained consistent:  it has followed the Taliban's, including its Haqqani Network's,

directives and switched off its transmission masts for the Taliban's benefit – typically at night.

572.     MTN Group specifically instructed MTN Afghanistan to comply with the

Taliban's directives to switch off its cell towers at night.   On information and belief, Phuthuma

Nhleko personally decided on behalf of MTN Group to instruct MTN Afghanistan to make

protection payments to the Taliban, including its Haqqani Network.

573.     MTN Group, under Phuthuma Nhleko leadership, shut down its towers for the

same reason it paid protection money:  to maintain good relations with the Taliban, including its

Haqqani Network.  MTN Group and Mr. Nhleko, through MTN Afghanistan, made no effort to

hide their shared motivation in that regard.  When asked about shutting down its network, MTN

Afghanistan's head of legal and government affairs publicly stated that MTN could not be seen

as taking sides between the Afghan government and the Taliban, including its Haqqani Network,

but instead, MTN believed that it must remain purportedly "neutral" between the two.

574.     Even MTN's claims of "neutrality" between the Afghan government and the

Taliban terrorists targeting were another lie orchestrated by MTN Group:  MTN explicitly

favored its ally, the Taliban, and its IRGC sponsor (and MTN's joint venture partner), over the

---

[175] *MTN Concerned By Afghanistan Threats.*

[176] Agence France Presse, *Taliban Shut Down Cell Phones In Afghan Province* (Mar. 24,
2011).

United States and the Afghan government.  *First*, MTN Group and its affiliates were solicitous of the Taliban, including its Haqqani Network, but scornful of America.  MTN Group personnel and/or agents regularly followed the Taliban's instructions (e.g., by shutting down towers), and routinely met with Taliban personnel when requested.  When it came to America, however, MTN Group refused U.S. entreaties to halt its aid to the Taliban and could not even be bothered to attend a U.S. military-hosted meeting with Afghanistan's cell companies to even discuss the Taliban threat.  *Second*, on information and belief, MTN Group caused MTN to pay ***more*** in protection "taxes" to the Taliban than MTN paid in legal taxes to Afghanistan's lawful government—simply put, discovery is likely to reveal that MTN made far more regular, and larger, tax payments to the terrorists than the Afghan government.

575.     MTN went to great lengths to maintain its purported "neutrality" and do what the Taliban asked of it.  Even in 2011, after President Karzai issued a decree formally demanding that MTN (and its competitors) reactivate their towers at night, MTN refused the recognized government's directive and continued to follow the Taliban's requests.  One executive summed up MTN's (and others') refusal to follow President Karzai's directive:  "We're not going to turn on our masts and become part of the army of the Afghan government."[177]  By shutting down its towers, MTN decided, it could reduce the risk that the Taliban would threaten MTN's commercial interests.

576.     MTN Group and its affiliates could act this way because MTN's personnel in Afghanistan supported the Taliban and the IRGC more than the United States and the Afghan government.  During the decade prior to the Haqqani Network's seizure of Kabul in 2021,

---

[177] Jon Boone, *Taliban Target Mobile Phone Masts To Prevent Tipoffs From Afghan Civilians*, The Guardian (Nov. 11, 2011).

MTN's professional staff in Kabul conspicuously mirrored Taliban cultural behaviors, including Talban-inspired attire and facial hair, even while most professionals in Kabul did not maintain similar appearances, and discovery is likely to reveal that MTN personnel in Kabul often dressed and acted like Taliban because they were regularly meeting with Taliban to pay them, sympathetic to the Taliban, and/or were members of the Taliban themselves. On information and belief, one or more MTN employees in Kabul is a member of the Taliban.

577.    The ATFC gathered evidence confirming that MTN was switching off its transmission masts at night to comply with Taliban demands. Based on intelligence reporting, wire intercepts, and interviews with MTN sources, the ATFC concluded that MTN Afghanistan was deactivating its cell towers in coordination with the Taliban. The justification offered by MTN Afghanistan employees was, again, financial: turning off the towers helped MTN save money by avoiding the need for MTN to invest in expensive security or to rebuild its towers. The ATFC observed that the security threat MTN faced was not primarily to its employees; it was to equipment that MTN did not want to spend the money to protect or rebuild.

578.    MTN Afghanistan implemented tower shutdowns through a secretive process that originated with its security team. The head of MTN Afghanistan's security division would negotiate with the Taliban to determine which towers (called "Base Transceiver Stations" by MTN's technical team) to shut down, and at which times. Then, based on information received from the Taliban, MTN's security team relayed instructions to MTN Afghanistan's technical team directing them to implement the shutdowns. The instructions pinpointed the particular quadrant(s) within particular MTN towers' coverage areas in which Taliban operatives were located, specifying that MTN should turn off the signal within those quadrants. That enabled MTN to satisfy the Taliban's demands while also allowing MTN to continue earning revenue

from customers in the other quadrants – and also to deceive the government about the extent of its shutdown.  MTN employees further avoided memorializing these instructions over company email or in memos; they instead used phone calls or text messages with the purpose of avoiding a paper trail that would document their cooperation with the Taliban.

579.    At all relevant times, MTN Group was aware of, and approved, MTN Afghanistan's practice of shutting down its towers to comply with the Taliban's requests.  MTN Afghanistan would not have maintained that policy without specific buy-in from MTN Group's senior management in South Africa.

580.    MTN's conduct strengthened the Taliban and undermined U.S. counterinsurgency efforts.  By 2010, the Taliban was deploying MTN's cell phone network as a terrorist weapon against Americans in Afghanistan.  The insurgents, one Army officer told the *New York Times*, used MTN's cell towers "as a weapons system" against Coalition forces.[178]  Indeed, cell phones were crucial to the Taliban – they provided a convenient form of communication and helped insurgents coordinate attacks – but they also came with two major downsides.  *First*, U.S. intelligence tracked the Taliban's phone signals and used them to locate high-level targets for capture-or-kill missions.  *Second*, cell phones provided Afghan civilians with the ability to call Coalition tip lines and provide valuable human intelligence.

581.    Nighttime deactivation was the Taliban's solution to both problems.  U.S. Special Forces typically execute high-value raids at night, and deactivated cell signals impeded those missions by making the insurgent targets harder to track.  That was the Taliban's stated rationale for demanding nighttime signal deactivation:  its spokesman argued that Taliban fighters had

---

[178] Indira A.R. Lakshmanan, *Fighting The Taliban With Cellphones*, N.Y. Times (Mar. 23, 2010).

185

"been increasingly targeted by foreigners recently and we know they are using the services of these phone companies against us.'"[179]  As another Taliban spokesman explained publicly, the Taliban viewed the "cutoffs as a line of defense," in which its "'main goal is to degrade the enemy's capability in tracking down our mujahedeen.'"[180]  Consistent with that statement, *AFP* reported that "Taliban militants regularly demand that mobile phone companies switch off their networks at night, fearing that NATO-led forces can track them through phone signals."[181]

582.    Similarly, nighttime deactivation obstructed Coalition efforts to gather human intelligence.  Cell phones provided a key conduit for Afghan civilians to pass intelligence to Coalition personnel.  But, as the U.S. military director of the Telecommunication Advisory Team explained, "[i]f the masts are off Afghans can't report anything . . . If you see an insurgent you can't call the police to say check this out."[182]  And Afghan informants were usually scared to phone in tips during the day when they could be seen by Taliban supporters.  Human intelligence thus typically flowed to the Coalition at night.  By agreeing to shut down its transmission masts, MTN knowingly deprived Coalition forces of that vital intelligence.

583.    MTN's tower shutdowns substantially contributed to the Taliban's ability to commit the attacks that killed and injured Plaintiffs.  The Taliban targeted its shutdown orders at key districts and provinces with tactical importance for ongoing Taliban operations.  As MTN knew, tower deactivation in those areas impeded Coalition forces from locating Taliban

---

[179] Agence France Presse, *Taliban Shut Down Cell Phones In Afghan Province* (Mar. 24, 2011) ("*Taliban Shut Down Cell Phones*").

[180] Alissa J. Rubin, *Taliban Using Modern Means To Add To Sway*, N.Y. Times (Oct. 4, 2011).

[181] *Taliban Shut Down Cell Phones*.

[182] Jon Boone, *Taliban Target Mobile Phone Masts To Prevent Tipoffs From Afghan Civilians*, The Guardian (Nov. 11, 2011).

operatives and degraded the Coalition's ability to interdict Taliban ongoing attacks.  Indeed, the

U.S. intelligence benefits gleaned from active cell towers were so potent that ISAF often

executed operations designed specifically to induce Taliban operatives to use their phones.  By

the same token, the operational impact of MTN's tower-shutdown policy was so extreme that

ISAF, U.S. Embassy, and Afghan government personnel repeatedly pressured MTN to stop.

ISAF command considered such shutdowns to be a significant threat to U.S. counterinsurgency

efforts.  And those shutdowns occurred in the key provinces and districts in which Plaintiffs (or

their family members) were operating when they were killed and injured.  By defying the U.S.

government and obeying the Taliban in the contested areas in which the insurgents were fighting

Americans, MTN materially supported the Taliban attacks that killed and injured Plaintiffs.

584.    The U.S. government tried to address those problems by encouraging

Afghanistan's cellular-phone providers to move their transmission masts onto secure U.S. bases.

As the U.S. government explained in proposing the idea, securely located transmission masts

would be difficult for the Taliban to attack – and could thus eliminate the putative reason MTN

was deactivating its cell towers when the Taliban told it to.  Roshan, according to a purported

2009 U.S. State Department cable (as published online), was "keen to develop this partnership

with the USG and sees it as a way to promote mutual security, communications, and commercial

strategies for Afghanistan."[183]  MTN, by contrast, refused to participate and declined even to join

Roshan and AWCC at the U.S. government-brokered meeting to discuss the idea.

585.    Neither the U.S. government nor the Afghan government ever condoned or

conveyed approval of MTN's tower-shutdown policy.  Although news reports on occasion

---

[183] U.S. State Dep't Cable ¶ 11, *Using Connection Technologies To Promote US Strategic Interests In Afghanistan* (July 23, 2009).

quoted individual Afghan government officials suggesting a resignation to the reality of MTN's

shutdown policy, the official Afghan government position – conveyed at in-person meetings held

with MTN, including at least one with President Karzai himself – was that cell phone companies

must keep their towers active at night.  The U.S. government was even more strongly committed

to that position.  ISAF leadership especially rejected the suggestion that MTN's conduct

represented an acceptable way of protecting its network.  ISAF expected MTN to keep its towers

on, invest in security to protect them itself rather than paying the Taliban, and ultimately rebuild

them if necessary.  ISAF considered that course of action not only feasible, but mandatory for a

company like MTN reaping profits in an insurgency-afflicted country like Afghanistan.

> **3.**  **Defendants' Assistance To The Taliban, Including Its Haqqani Network, Substantially Assisted Islamic Revolutionary Guard Corps' Sunni Terrorist Proxy Attacks Against Americans In Iraq**

586.    When MTN Group and its agents and affiliates aided the Taliban, including its

Haqqani Network, MTN substantially assisted al-Qaeda's, al-Qaeda-in-Iraq's, and Ansar al-

Islam's terrorist attacks against Americans in Iraq for a host of reasons.

587.    *First*, when MTN Group authorized payments to Sirajuddin Haqqani – a dual-

hatted al-Qaeda/Taliban terrorist – MTN caused millions of dollars to flow to al-Qaeda

leadership (Sirajuddin sat on al-Qaeda's military council), which aided al-Qaeda's regional and

global capabilities, which were needed to sustain the al-Qaeda-led terrorist campaign in Iraq that

was executed by al-Qaeda-in-Iraq and Ansar al-Islam.

588.    *Second,* MTN's payments to the Taliban, including its Haqqani Network, funded,

among other things, the network of terrorist training camps in Afghanistan and Pakistan that

Sirajuddin Haqqani ran to instruct al-Qaeda's Islamist terrorists in Afghanistan, Iraq, and

globally.  From 2005 through 2022, hundreds, Sirajuddin's network of MTN-funded terrorist

training camps trained hundreds, if not thousands, of al-Qaeda, al-Qaeda-in-Iraq, and Ansar al-

Islam terrorist leaders, field operatives, logisticians, bombmakers, financiers, and propagandists in order to facilitate their attacks against Americans in Iraq.

589.    *Third,* when MTN Group and Defendant Nhleko approved MTN's policy of siding with the Taliban, including its post-FTO-designation Haqqani Network, and shutting down MTN cell towers upon Taliban demand, MTN and Mr. Nhleko helped build a digital express-lane for use by the Taliban and its IRGC allies to travel back and forth from Pakistan through Afghanistan for ultimate arrival in Iran or Iraq.  MTN Group's policy of tower shutdowns directly aided the IRGC and *every other terrorist group* that needed or wanted to travel inside Afghanistan because any such group knew that, in effect, they could travel without leaving any digital footprint at night.  When MTN Group blinded the U.S. military to the nighttime movements of the Hezbollah and Qods Force operatives inside Afghanistan responsible for coordinating the movement of terrorists, funds, and arms between Iraq and Afghanistan/Pakistan, through Iran – all the while concealing such activity from the world's most powerful military and intelligence service – MTN Group provided devastating, impossible-to-overstate assistance to Hezbollah, the Qods Forced, and their Sunni terrorist proxies in Iraq.

590.    *Fourth*, the Taliban, including its Haqqani Network, maintained a vast logistics, training, and safe haven program for allied terrorists groups worldwide, including al-Qaeda, Lashkar-e-Taiba, Hezbollah, the Qods Force, that increased the lethality and unit cohesion of the terrorist cells they trained by imparting al-Qaeda and Haqqani Network expertise to Iraqi terrorists who did not have nearly the same level of tactical knowledge of experience upon which to draw.  Moreover, the al-Qaeda/Taliban Syndicate sites *in Afghanistan/Pakistan* keyed the rapid upward scaling of al-Qaeda's terrorist enterprise *in Iraq* by allowing the al-Qaeda/Taliban Syndicate to apply a "train-the-trainer" paradigm to instruct al-Qaeda's Iraqi terrorist affiliates

(all of whom were IRGC Sunni Terrorist Proxies like al-Qaeda-in-Iraq and Ansar al-Islam), who received training at al-Qaeda/Haqqani sites in Afghanistan and Pakistan, and then returned to Iraq to use their new skills to attack Americans more effectively.

591.   Large networks of terrorist training camos that cater to hundreds of terrorists at a time – universities for terror – cost a lot of money, and requires the best logistics.  Thus, the IRGC provided substantial financial and logistical aid to al-Qaeda's, al-Qaeda-in-Iraq's, and Ansar al-Islam's terrorist attacks against Americans in Iraq by helping these FTOs operating in Iraq by, among other things, facilitating their movement of money and logistical pipeline to al-Qaeda's leadership in Pakistan in order to provide them training and bombmaking classes at Sirajuddin Haqqani's network of al-Qaeda/Haqqani Network bomb factories and training camps in Afghanistan and Pakistan.  The IRGC also worked with the Haqqani Network to promote the development of mutually beneficial logistics pipelines and swaps, for example, trading commodities useful for bombmaking logistics (like trading commercial CAN fertilizer from Pakistan for specific electronics from Iran).  Thus, when MTN Group provided hundreds of millions of dollars and logistical aid to the Taliban, including its Haqqani Network, millions of dollars of such aid to the Taliban flowed through to facilitate terrorist violence by al-Qaeda, al-Qaeda-in-Iraq, and Ansar al-Islam by supporting such FTO's training, travel, and logistics.

592.   *Fifth,* the Taliban, including its Haqqani Network, were key to the ability of IRGC Sunni Terrorist Proxies in Iraq to access industrial-scale amounts of the high-quality commercial grade calcium ammonium nitrate ("CAN") fertilizer that al-Qaeda craved for its signature fertilizer bombs, which terrorists in Iraq could only cheaply and reliably for al-Qaeda's nationwide bombing campaign in Iraq from one place and one company—Pakistan and Fatima Fertilizer, including its affiliate, Pakarab Fertilizer), both of which were openly and notoriously

aligned with the Haqqani Network and supplied all or nearly all the CAN fertilizer used by al-Qaeda and its allies in Afghanistan and, on information and belief, Iraq.

593.     MTN's assistance to the Taliban and its Haqqani Network directly assisted the IRGC Sunni Terrorist Proxies' bomb pipeline for the campaign against Americans in Iraq for a host of reasons, including, but not limited to:  (i) by funding the Taliban operatives who coordinated with their Iraqi terrorist allies in the first instance; (ii) by providing the secure cell phones to all sides to the communication (IRGC and Taliban both), improving the terrorists' concealment; and (iii) by blinding the U.S. military at night through MTN Group's policy of "obeying" the instructions of the Taliban, including its Haqqani Network, MTN facilitated the terrorists' ability to reliably smuggle the CAN fertilizer and other terrorist material that flowed from Pakistan to Iraq through Afghanistan and Iran.

**D.      Defendants' Assistance To The Islamic Revolutionary Guard Corps Including Hezbollah And The Qods Force, And Their Sunni Terrorist Proxies Al-Qaeda, Al-Qaeda-In-Iraq, Ansar Al-Islam, And The Taliban, Including Its Haqqani Network, Comports With MTN's Historical Business Practices in International Markets**

594.     MTN's conduct above reflected a willingness to facilitate unspeakable violence, or support America's enemies, as a way to increase profits in Iran.

**1.      MTN Aided the Regular Islamic Revolutionary Guard Corps's Terroristic Violence Against Peaceful Iranian Pro-Democracy Demonstrators**

595.     MTN enabled the terroristic violence deployed by IRGC agents against peaceful pro-democracy and human rights protestors in Iran during the 2009 uprising popularly known as the "Green Revolution."

596.     As the *L.A. Times* explained at the time, while Iran "brac[ed] for further confrontations between security forces and supporters of Mousavi …[,] [o]ne of the country's main cellphone operators, Irancell, co-owned by South Africa's MTN, warned customers [] that

it would be suffering unspecified 'technical' problems over the next three days, which coincide[d] with the anticipated unrest."[184]  MTN was lying to its customers and the world – there were no "technical" problems but, rather, simply the IRGC's desire to shut down any avenue for mass democratic mobilization against it – which MTN happily obliged.

597.    MTN went beyond merely lying to its customers when it shut down its network at the request of the IRGC.  MTN actively aided the IRGC by helping it develop sophisticated tools for monitoring, eavesdropping, and surveilling targets.  MTN's technical services for the IRGC did not merely benefit its domestic regime suppression; the exact same functions also benefit foreign intelligence gathering, surveillance, and communications – critical competencies relevant to the success of a terrorist attack against Americans in Iraq.

### 2.    MTN Aided Terrorists in Nigeria

598.    MTN also aided terrorists in Nigeria.  On or about October 26, 2015, the Nigerian Communication Commission fined MTN Group $5.2 billion for failing to meet a deadline to disconnect 5.1 million unregistered subscribers in Nigeria.  Nigeria imposed the deadline on all cellular operators in the country due to evidence that unregistered phones were facilitating the activities of criminal gangs and terrorists, including Boko Haram.  The requirements that MTN violated, the *Wall Street Journal* reported, were "meant to combat terrorism."[185]  MTN eventually negotiated the criminal fine down to $1.67 billion and agreed to pay it in seven installments.

---

[184] Borzou Daragahi, *Iran Court Warns Against Criticizing Proceedings*, L.A. Times (Aug. 3, 2009), 2009 WLNR 14945080.

[185] Alexandra Wexler, *Nigeria Reduces MTN Group Fine By $1.8 Billion*, Wall St. J. (Dec. 3, 2015).

E.  **Defendants' Assistance To The Islamic Revolutionary Guard Corps, Including Its Hezbollah Division And Qods Force, Had A Substantial Nexus To The United States**

1.  **Defendants' Conduct Targeted The United States**

599.   MTN's joint venture with the IRGC and its related assistance for Hezbollah and Jaysh al-Mahdi, relied on significant contacts with the United States.  MTN Group was a key player in orchestrating both those U.S. contacts and MTN's material support to the IRGC Hezbollah, and Jaysh al-Mahdi, as well as MTN's direct payments to al-Qaeda and the Haqqani Network via their payoffs to dual-hatted al-Qaeda/Taliban terrorist Sirajuddin Haqqani.

600.   MTN employs a top-down management structure in which MTN Group centralizes operational control over the functions performed by its various subsidiaries.  During the relevant timeframe, MTN Group divided responsibility for its subsidiaries into six business groups; MTN Irancell (and Afghanistan) fell under the purview of the Middle East and North Africa ("MENA") group.  The MENA group's functional units resided in Dubai and reported directly to senior management in South Africa.

601.   MTN Group made the decision to enter a joint venture with the IRGC in 2004, when it began plotting "Project Snooker" to eject Turkcell from the existing deal.  As part of "Project Snooker" – negotiated and executed by MTN Group's senior management – MTN ejected Turkcell from Irancell.  MTN Group later rebranded Irancell as MTN Irancell.

602.   Because MTN's business model depends on unstable countries, including Iran, one of MTN Group's core management responsibilities is to manage operational and political risk in the countries MTN enters.  Assessments of those risks occur both before the decision to enter a market – here, as MTN entered Afghanistan in the mid-2000s – and on an ongoing basis. In mitigating those risks – which here included designing a strategy for coordinating MTN's operational support for the IRGC in Dubai and Iran – MTN Group implemented a number of

measures, including the "appointment of a Group crisis manager"; the implementation of "physical and staff security measures"; and "[c]ontinual monitoring of the political environment in operating countries."[186]  MTN Group, not its operating subsidiaries, decided to do business with the IRGC, and Qods Force, fronts, and developed MTN's strategy related thereto.

603.    Those policies required MTN Group's close supervision of MTN's payments to Qods Force fronts, operatives, and agents, and MTN Irancell's joint venture with the IRGC.  As explained above, MTN Group made the decision – and instructed its subsidiary – to enter into a joint venture with the IRGC.  MTN Group also approved its subsidiary's practice of providing payments and operational support to the IRGC including sourcing hundreds of sensitive dual-use items for IRGC, including Qods Force fronts, operatives, and agents inside and outside Iran in Dubai to benefit the Iranian IRGC's terrorist enterprise.  Those decisions had a substantial connection to the United States for the reasons explained below.

604.    MTN's provision of material support to the IRGC (including its Hezbollah Division and Qods Force), Hezbollah, and Jaysh al-Mahdi, was expressly aimed at the United States.  At all relevant times, MTN knew that the IRGC (including its Hezbollah Division and Qods Force), Hezbollah, and Jaysh al-Mahdi were targeting the United States.  The Joint Cells operated by the Qods Force, Hezbollah, and Jaysh al-Mahdi did not conduct an indiscriminate terrorist campaign that merely injured Americans by chance.  Instead, these Joint Cells directed attacks at *Americans* with the specific intent of killing *Americans* in particular – so that they could inflict pain in the United States and influence U.S. policy.  As the Treasury Department stated when it announced the Qods Force's designation as a SDGT in 2007, "the Qods Force provides lethal support in the form of weapons, training, funding, and guidance to select groups

---

[186] *Id.*

of Iraqi Shi'a militants who target and kill Coalition … forces…."[187]   The Qods Force's, Hezbollah's, and Jaysh al-Mahdi's ultimate, shared, publicly-stated goal was to effect a withdrawal of American forces from Iraq.  Each terrorist attack that killed and injured Plaintiffs was part of that campaign of anti-American terrorism.

605.    MTN's decision to reach into the United States to obtain embargoed dual-use technology to aid the IRGC's terrorist enterprise was also expressly aimed at the United States. MTN knew, based on conversations with IRGC, including Qods Force, agents that the IRGC viewed MTN's assistance to the IRGC as vital to Iran's ability to protect the "security" of its Islamist revolution, *i.e.*, external terror operations aimed to spread the revolution and counteract the Great Satan (the United States).  MTN knew that the IRGC's understanding of what was needed to protect Iranian "security" inherently involved terrorist violence against Americans as part of Iran's effort to export its Islamist revolution and drive the U.S. out of the Middle East.

606.    MTN also knew, based on conversations with U.S. officials, that it was assuming an active role in an IRGC, including Qods Force, plot to develop cash flow and to source vital dual-use components for the IRGC and its proxies.  MTN further knew of the key importance that communications and computing technology plays for terrorists.

607.    When MTN sourced embargoed technology that the United States had publicly declared could benefit IRGC's, including Qods Force's, efforts to kill others, it intentionally helped arm terrorists it knew were targeting the United States.  Indeed, the IRGC's direct statement in their contract with MTN obligated MTN to help the IRGC protect Iran's "security." MTN at all times knew or recklessly disregarded that "security" was a euphemism for IRGC,

---

[187] U.S. Treasury Dep't, *Fact Sheet: Designation of Iranian Entities and Individuals for Proliferation Activities and Support for Terrorism* (Oct. 25, 2007).

including Qods Force, terrorist operations outside of the territorial borders of Iran.  When MTN obtained the technology requested by its partners in the IRGC MTN targeted the United States by helping the terrorists improve their bombs, rockets, communications, and intelligence gathering.

608.    Although MTN's primary motivation for assisting the IRGC was financial, it also intended to harm Americans in Iraq.  One reason MTN cooperated with the IRGC was to align itself with their effort to drive Americans out of the country.  MTN had two distinct but related reasons for desiring that outcome.

609.    *First*, MTN intended to harm Americans because it decided that was the necessary price of maintaining a good relationship with the Ayatollah and the IRGC.  The Ayatollah and the IRGC were explicit – both in public, and in conversations with MTN – that it wanted MTN's financial and technical help in fighting against U.S. forces in particular.  Thus, for MTN to achieve its business objectives vis-à-vis its joint venture partners the Ayatollah and the IRGC MTN needed to disassociate itself from the United States and prove that it could deliver value to the Shiite terrorist campaign against U.S. forces in Iraq.

610.    *Second*, MTN Group's support for attacks against U.S. citizens by the Joint Cells advanced the foreign policy interests of MTN Group's most important business partner, the Bonyad Mostazafan and IEI, which MTN at all times knew to be IRGC fronts.

611.    MTN Group depends on its partnership with the Ayatollah and the IRGC.  As of 2012, Iran was MTN's fastest-growing market and its third-largest source of revenue overall.  Today, Iran is MTN's second-biggest market by subscribers.  MTN Group's financial incentive to satiate the Ayatollah and its IRGC, including Qods Force, partners has led it to take a number of illegal steps to assist the Iranian regime.

612.    MTN Group cooperates with the Ayatollah, and the IRGC, and including the

Qods Force, despite knowing that the Ayatollah, and the IRGC, and including the Qods Force,

are collectively the world's worst sponsor of anti-American terrorism.

613.    MTN Group's agreement to aid the IRGC served the IRGC's agenda of inflicting

death and injury on U.S. forces.  It also fulfilled MTN Group's contractual obligation to engage

in "defensive, security and political cooperation" with its IRGC, including Qods Force,

partner.[188]  Such cooperation offered MTN Group additional motivation for becoming joint

venture partners with the IRGC.  MTN's support for the IRGC did not merely grow its profits by

allowing it to obtain the Irancell business in the first instance; it also benefited MTN's business

by inflicting harm on an enemy (the United States) of MTN's most lucrative business partner

(the IRGC fronts that controlled MTN Irancell) in order for MTN to curry Iranian favor to gain

market share for a potentially uniquely lucrative telecom and communications market in Iran.

## 2.    Defendants' Conduct Relied On American Contacts

614.    Defendants also connected MTN Group's support of the Hezbollah, the Qods

Force, Regular IRGC, and Jaysh al-Mahdi, to the United States by obtaining technology and vital

operational support in reliance on U.S. contacts.  MTN Group orchestrated a complex scheme to

surreptitiously supply technology and operational support for MTN Irancell through various U.S.

agents.  In doing so, MTN Group tied MTN's unlawful conduct to the United States in several

ways.

615.    Even while MTN Group was reaching into the United States to launch a

multifaceted campaign to facilitate the flow of U.S. dollars to and from MTN Irancell, its CEO

---

[188] MTN-Irancell Consortium Security Cooperation Agreement § 8 (Sept. 18, 2005), attached as
Exhibit A.

continued expressing his contempt for the United States.  Instead of exiting MTN Group's secret Security Cooperation Agreement and alliance with the IRGC, Phuthuma Nhleko, as MTN Group's President and CEO, defiantly pronounced that "U.S. sanctions should not have unintended consequences for non-U.S. companies."[189]  MTN Group's, and Phuthuma Nhleko's, public statement furthered the terrorist's scheme, and fraud on MTN Group's shareholders, because MTN Group, through Mr. Nhleko, spread IRGC disinformation while simultaneously fraudulently concealing the existence of MTN Group's illicit deal with its Hezbollah, Qods Force, and Regular IRGC counterparts, i.e., the "Iranian Shareholders," from MTN Group's own shareholders.

> **i.      From 2012 Through 2019, Defendants Regularly Reached Into America To Unlock The U.S. Financial System So That Defendants Could Aid MTN Group's Attempts To Repatriate Hundreds Of Millions Of Dollars Out Of MTN Irancell**

616.      MTN Group regularly engaged in large six- and seven-figure U.S. dollar transactions that flowed through the New York financial system before leaving the United States to flow into accounts controlled by an IRGC "buffer" such as an agent, operative, cut-out, front, and Orbit company.

617.      MTN Group's, Phuthuma Nhleko's, and Irene Charnley's use of the New York financial system was not incidental.  On information and belief, beginning on or about 2012 and continuing through on or about 2019, MTN Group, MTN Irancell, Phuthuma Nhleko, and Irene Charnley routinely relied upon banks in New York to manage the cash flow of MTN Group, MTN Dubai, and MTN Irancell, the latter of which was MTN Group's most important (and cash-intensive) investment in the Middle East – and, on information and belief, an important

---

[189] Steve Stecklow, *How A Telecom Gian Got Round Sanctions On Iran*, Reuters (Aug. 30, 2012).

component of the compensation earned by Phuthuma Nhleko and Irene Charnley while they served at MTN Group.

618.    MTN Group established banking relationships with U.S. financial institutions and multinational financial institutions with U.S.-based subsidiaries or offices no later than 2013.

619.    For example, MTN Group disclosed that it has a relationship with the Bank of New York, located at 101 Barclay Street, New York, NY 10286, as its depository bank. Similarly, in 2015, MTN Group disclosed its relationship with Citibank, whereby it guaranteed a syndicated loan facility worth $1 billion, the same facility from which MTN International (Mauritius) Limited, the MTN Group subsidiary used to make corrupt payments to Iranian officials, had drawn $670 million.

620.    Following the easing of sanctions, in January 2016, MTN focused on repatriating funds from Iran.  Indeed, Defendants saw the easing of sanctions as an opportunity to "normalize" its repatriation of monies from MTN Irancell.

621.    On October 24, 2016, MTN Group admitted that "MTN has commenced the repatriation of funds from MTN Irancell to MTN Group."[190]  On December 14, 2016, "Bloomberg report[ed] that MTN Group … extract[ed] several hundred million dollars with the help of European banks, and it [was] looking to take a total of around USD1 billion by the end of March 2017," which "include[d] a *USD430 million loan repayment from MTN* Irancell."[191]

622.    The MTN Irancell profits that MTN Group withdrew covered the period when nearly every Plaintiff was injured.  When MTN Group coordinated a global strategy to facilitate

---

[190] MTN Group Ltd., Mtn Group Limited - Quarterly Update For The Period Ended 30 September 2016, South African Company News Bites – Stock Report (Oct. 24, 2016).

[191] CommsUpdate, *MTN Extracts First Cash From Iran* (Dec. 14, 2016), (emphasis added) 2016 WLNR 38124973.

the repatriation of its MTN Irancell profits, MTN Group reached into the United States to obtain

an enormous benefit – the money it made – that was itself the motivation for the terrorist finance

that killed and injured Plaintiffs.

623.    On information and belief, MTN Group utilized its banking relationships with

U.S. financial institutions and/or financial institutions with U.S. subsidiaries or offices, including

but not limited to the Bank of New York and Citibank, to facilitate the repatriation of funds from

MTN Irancell to MTN Group.

624.    Each time MTN Group used New York's financial system, they did so in a

context where they benefited from the New York financial system, and New York laws, and they

knew that the New York financial system imparted extra value to every transaction based upon

its stability and reputation.

625.    MTN Group also maintained a long-term relationship with Deutsche Bank in New

York.  From the mid-2000s through at least 2017, Deutsche Bank served as one of MTN Group's

primary bankers and provided a comprehensive suite of financial services to MTN Group,

including, but not limited to:

(i)     Deutsche Bank provided financial advisory services to MTN Group from the United
        States that directly increased the profitability and efficiencies of MTN Group and MTN's
        most important investments, including MTN Irancell;

(ii)    Deutsche Bank personnel and entities in the United States sponsored key acquisitions by
        MTN Group that facilitated MTN Group's expansion in the Middle East, which Deutsche
        Bank knew was intended to increase, and did increase, the income that flowed to MTN
        Irancell through MTN Group; and

(iii)   Deutsche Bank worked with MTN Group to facilitate MTN Group transactions in the
        United States that were necessary to preserve the cash stockpiles necessary for MTN
        Group to continue financing MTN Irancell's breakneck expansion.

626.    MTN Group, Phuthuma Nhleko, and Irene Charnley regularly reached into the

United States to transact business with Deutsche Bank so that MTN could take advantage of

200

Deutsche Bank's access to the New York financial markets, expert personnel, strong legal

protections, and unmatched international credibility given New York's status as the world

financial capital.  Through this conduct, Defendants repeatedly leveraged their contacts with the

United States to obtain more resources to fund the IRGC's terrorist mission.

> **ii.**  **Defendants Facilitated A $400,000 Bribe That Flowed Through The New York Financial System To A Cut-Out For The Islamic Revolutionary Guard Corps And Into The Budget Of The IRGC**

627.    MTN Group's U.S. contacts were essential to the initial bribe that allowed MTN

Group to pilfer the Irancell license from Turkcell in the first instance and was the proximate and

but-for cause of MTN Group's subsequent ability thereafter to assist the IRGC's, terrorist

enterprise, and facilitate IRGC proxy attacks against Americans in Iraq and Afghanistan.

628.    MTN Group relied upon bank accounts in New York to complete the $400,000

wire that MTN Group sent to a recipient in 2007 who acted on behalf of the IRGC.  That

payment depended upon MTN Group's use of bank accounts in New York, which cleared the

dollar transaction.

629.    MTN Group caused the issuance of the $400,000 wire to the cutout for the IRGC

also aided the IRGC's efforts to covertly obtain U.S. dollars – the vital common currency of

terrorist finance – to fund Joint Cell attacks against Americans in Iraq.

630.    It would be improper to suggest that the absence of a direct on-paper linkage

between the IRGC's cutout and the IRGC plausibly suggests that the $400,000 did not flow

through to the IRGC.

      **iii.**    **Defendants Conspired To Provide, And Did Provide, A Stable, Robust, And Devastating Pipeline Of Illicitly Acquired State-of-the-Art American Technologies To The Islamic Revolutionary Guard Corps, Including Hezbollah And The Qods Force, Including Untraceable American Smartphones**

631.    MTN Group's co-conspirators have already confessed to the crimes they committed in coordination with MTN Group's joint offenses with MTN Group.  For example, Mohammad Hajian testified "that he sold super-computers worth about $14-million to 'a South African cellphone company in Iran [a reference to MTN]', rather than to the regime itself."[192]  At the time, his "alleged co-conspirator [was] also on trial in the US on charges that he serviced embargoed US technology for a 'front company' of MTN Irancell."[193]

632.    Like MTN Group , Mr. Hajian's legal "memorandum" "stated that the network was geared solely for a deal with MTN Irancell: 'All the merchandise was for non-military use and was intended to facilitate a joint venture between a South African cellphone company and a non-governmental Iranian entity related to the provision of civilian cellular telephone service within Iran.'"

633.    United States District Judge Virginia Hernandez-Covington rejected the suggestion that MTN Irancell was a civilian phone company that was not under the control of the IRGC, and "ruled that the ["[e]nterprise level server"] equipment sold to MTN Irancell in 2009 'could be dangerous' in Iran, whether controlled by the government or by MTN Irancell."[194]

634.    Federal "[p]rosecutors" also rejected the suggestion that MTN Irancell was a civilian phone company that was not under the control of the IRGC, and told the district court"

---

[192] Rowan Philp and Craig McKune, *US Trial Turns Heat On MTN*, Mail & Guardian (Feb. 15, 2013), https://mg.co.za/article/2013-02-15-00-us-trial-turns-heat-on-mtn-1/.

[193] *Id*.

[194] *Id*.

"that the ['[e]nterprise level server'] equipment sold to MTN Irancell in 2009 could have military applications and be used to spy on citizens."[195]  Prosecutors explained:  "Even if used by [MTN] Irancell now, Iran could redeploy the equipment at any time …  The equipment is capable of being used by Irancell, or others, to access private information about subscribers and possibly communications content."[196]  Indeed, "[t]he equipment Hajian was found to have illegally sold included a Sun Microsystems M9000 'enterprise level server, the largest and most powerful Unix processor that Oracle Sun sells," and a "Hitachi Data Systems array," which prosecutors "described as having the capacity to support various applications and 'store vast amounts of data useful for large companies and [defense] departments.'"[197]

635.    After pointedly noting Judge Hernandez-Covington's ruling that the provision of U.S.-sold enterprise level server equipment to MTN Irancell "could be dangerous," the *Mail & Guardian* journalists who followed Mr. Hajian's trial also rejected the suggestion that MTN Irancell was a civilian company rather than an IRGC front:

> In any event, Hajian's assertion that Irancell was a civilian, non-governmental partnership was ***inaccurate***.  Although MTN owns 49% of the company, the balance is held by a consortium owned by two state-linked partners.  The first, the purportedly charitable Bonyad Mostazafan Foundation, is ***understood to be controlled by the Iran Revolutionary Guard*** and the second, the state-owned defence company Sairan, reports directly to Iran's minister of defence.[198]

---

[195] *Id.*

[196] *Id.*

[197] *Id.*

[198] *Id.* (emphasis added)

> iv. **Defendants Worked Directly With Hezbollah And Qods Force Operatives To Facilitate Hezbollah's And the Qods Force's Illicit Acquisition Of U.S. Technology To Benefit Their Terrorist Enterprise**

636.    MTN's U.S. contacts were essential to the technological assistance it provided to the IRGC and Hezbollah and, through Hezbollah, to Jaysh al-Mahdi.  At all relevant times, MTN relied upon U.S. agents to illegally source dual-use technology from the United States that benefited the Joint Cells' terrorist enterprise.

637.    As a condition of its contract with the IRGC MTN promised to obtain embargoed U.S. technology to benefit the IRGC's terrorist enterprise.

638.    Between 2009 and 2012, one or more purchasing agents working for the IRGC in the U.A.E. and elsewhere, spending money provided by MTN Group, and acting at the direction of MTN Group and its IRGC, including Qods Force, ally, collectively wired more than $5 million into America to associates in the U.S. who purchased embargoed technology for the IRGC's, including the Qods Force's benefit, which was then shipped from the U.S. to the U.A.E., where the IRGC assumed possession of the technology for use in its terrorist enterprise.

639.    On information and belief, MTN and/or MTN's agents routed millions of dollars each year to its U.S. agents to pay for the embargoed dual-use U.S. technology it illegally obtained for the IRGC via transactions through the New York banking system, by causing money to be wired to MTN's U.S. agents to pay for MTN's U.S. agents to illegally obtain embargoed dual-use U.S. technology for the benefit of the Qods Force's terrorist enterprise.

> v. **Defendants Facilitated Illicit Efforts By Hezbollah And Qods Force Fronts To Obtain Essential U.S. Services That Was Vital To Hezbollah's, The Qods Forces, And Their Proxies' Terrorist Campaign.**

640.    MTN's U.S. contacts were also key to its ability to obtain technical support from U.S. persons operating inside America, without which the IRGC could not have derived the

terrorist benefits they did from MTN Irancell, including the cash flow, network reliability, and enterprise computing benefits.

641. Between 2009 and 2012, and on information and belief ever since the mid-2000s, MTN Irancell relied upon one or more U.S. persons to service MTN Irancell's enterprise-level computers and associated networks, relying on one or more U.S. persons to maintain MTN Irancell's network remotely from the U.S. and, on at least one occasion, having such U.S. person travel to meet with MTN's IRGC, including Qods Force, allies in the U.A.E. to provide training to the Qods Force. MTN, or agents acting at MTN's direction, sourced embargoed technology for the IRGC's benefits from, among others, Akbari, Patco, MSAS, and TGO.

642. MTN routed millions of dollars each year to its U.S. agents, and sourced the sensitive dual-use U.S. technology, via transactions through the New York banking system, by causing money to be wired to MTN's U.S. agents to pay for MTN's U.S. agents to provide services, or obtain sensitive dual-use U.S. technology, to aid the IRGC's terrorist enterprise.

643. On information and belief, MTN and/or MTN's agents routed millions of dollars each year to its U.S. agents in order to pay for the technology support services it illegally obtained for the IRGC via transactions through the New York banking system, by causing money to be wired to MTN's U.S. agents to pay for MTN's U.S. agents to illegally provide technological support to maintain MTN Irancell for the benefit of the IRGC's terrorist enterprise.

VII.   **DEFENDANTS KNEW THAT THEIR SECRET SECURITY COOPERATION AGREEMENT WITH THE IRGC, INCLUDING ITS HEZBOLLAH DIVISION AND QODS FORCE, WAS AN ACT OF INTERNATIONAL TERRORISM THAT SUBSTANTIALLY ASSISTED TERRORIST ATTACKS AGAINST AMERICANS BY HEZBOLLAH, THE QODS FORCE, AND TERRORIST PROXIES**

    A.   **Defendants Knew That Their Secret Security Cooperation Agreement With The IRGC Was An Act Of International Terrorism Because Defendants Knew That Iran's "Security" Mission Comprised Internal And External Attack Operations Against Americans By Hezbollah, The Qods Force, And Their Proxies**

644.   Defendants knew that their secret Security Cooperation Agreement with the IRGC, Hezbollah, and Qods Force, and on behalf of those terrorists and their proxies, like al-Qaeda, was an act of international terrorism that was illegal under U.S. and South African law, and violated their own, and their co-Defendants' legal, contractual, and fiduciary obligations to MTN Group and its shareholders.

645.   From when Defendants completed their secret Security Cooperation Agreement with the IRGC in 2005, to when their fraudulently concealed secret deal was publicly exposed to the world on March 28, 2012, Defendants further knew that the IRGC, and the proxy terrorists whose attacks against Americans the IRGC facilitated, depended upon each Defendant's concealment of the Security Cooperation Agreement to maximize the terroristic utility of the Agreement to the IRGC and its proxies.  Simply put, Defendants knew that the IRGC terrorists needed MTN Group, Mr. Nhleko, and Ms. Charnley to keep their mouths shut and hide the Security Cooperation Agreement from MTN Group's shareholders.  When Defendants did so for approximately seven years from 2005 through 2012, they knew that their concealment of the Security Cooperation Agreement directly facilitated terrorist operations targeting Americans by keeping secret their key logistical, financial, and operational relationship.

646.   Indeed, that was the entire point of why the IRGC brought Defendants to the table:  to give the IRGC and those it helped the cover and concealment provided by the ability

conduct their activities through purportedly responsible commercial fronts (concealment) and then, if caught, to protest that they were merely "nothing but a phone company" rather than what they are: a financial, logistical, and operational super-cell for the IRGC. In this way, Defendants knew that the IRGC would use MTN Group, Defendant Nhleko, and Defendant Charnley to camouflage the IRGC's ongoing (then and now) terrorist campaign against Americans around the world.

647.     Moreover, South African law enforcement raided one or more of MTN Group's outside lawyers and/or law firms in connection with their investigation of MTN Group's illicit conduct relating to Irancell. South African law enforcement raided the office of MTN's lawyers because MTN Group, acting through Phuthuma Nhleko and Irene Charnley, attempted to conceal key aspects of MTN Group's aid to terrorists by burying it through sham work with a compromised lawyer and/or law firms—i.e., the lawyer and firms who were raided. This is so because South African law enforcement could not have conducted the raid unless law enforcement had a good faith basis to believe the raided lawyers were not just involved but serially implicated in the scheme. MTN Group, Mr. Nhleko, and Ms. Charnley followed most of the classic European and Middle Eastern strategies for concealing bribery and money laundering, and near the top of the playbook in both regions is to use tainted lawyers to negotiate, paper over, and move, dirty money (e.g., complicit in-house or complicit captive outside counsel), and then to invoke attorney-client privilege and confidentiality protections to conceal their crime.

648.     Defendants knew that their secret Security Cooperation Agreement to guarantee the Security Cooperation demanded by the IRGC facilitated IRGC terrorist operations targeting Americans worldwide because Defendants knew that Iran's "Security" agenda comprised the use of violence against internal and external enemies to spread Iran's Islamic Revolution by Regular

IRGC (inside Iran) and Hezbollah, the Qods Force, and their proxies (outside of Iran).

Defendants also knew that "Cooperation" with the IRGC's "Security" agenda meant that

Defendants agreed to, and intended to, facilitate Regular IRGC, Hezbollah, Qods Force, and

IRGC Proxy operations targeting Americans worldwide.

649.    Defendants knew the foregoing points in this section based on their own

observations, experiences, and communications.  Indeed, the only way Defendants could not

have known is if they undertook an elaborate 17-year long effort to avoid interacting with their

counterparty, being exposed to the media, or learning about Iran. By 2005, Defendants knew that

Iran's "security" was controlled by the IRGC, Hezbollah, and the Qods Force, and that

"security" was widely known as a euphemism for terrorism generally, and IRGC terrorist

operations targeting Americans in particular.

650.    *First*, Defendants' **direct in-person communications with IRGC terrorists**

alerted Defendants that their "Security Cooperation" Agreement with the "Iranian Shareholders"

aided terrorist attacks sponsored by the IRGC.  Under standard principles of IRGC terrorist

tradecraft, each of the "Iranian Shareholders," including but not limited to each Defendants'

handlers and contacts at the IRGC, including its Hezbollah Division and the Qods Force,

communicated to Defendants the core price of doing business with Irancell and TCI:  that they

would have to aid the "security" agenda of Iran, and in particular, Iran's transnational terrorist

logistics enterprise.  MTN Group's, Defendant Nhleko's, and Defendant Charnley's experience

negotiating with the IRGC from 2004 through 2005 proves it.  As a result, MTN Group, Mr.

Nhleko, and Ms. Charnley knew the deal.

651.    *Second*, Defendants' knowledge of **common understandings concerning Iran's**

**Constitution** alerted Defendants that their "Security Cooperation" Agreement with the "Iranian

Shareholders" aided terrorist attacks sponsored by the IRGC.  Defendants knew that Iran's constitution[199] distinguishes "security" from other Iranian governmental functions consistent with what Defendants knew – that "security" in Iran means "terror" against Americans outside of it.  Examples drawn from Iran's constitution include, but are not limited to:

(i)   <u>Preamble</u>:  "[T]he Islamic Revolutionary Guards Corps are to be … responsible …for fulfilling the ***ideological mission of jihad*** in God's way; that is, ***extending the sovereignty of God's law throughout the world*** (this is in accordance with the Qur'anic verse 'Prepare against them whatever force you are able to muster, and strings of horses, striking fear into the enemy of God and your enemy, and others besides them' [8:60])."[200]

(ii)  <u>Article 145</u>:  "No foreigner will be accepted into the Army ***or security forces*** of the country."

(iii) <u>Article 172</u>:  "Military courts will be established by law to investigate crimes committed in connection with military ***or security duties*** by members of the Army, the Gendarmerie, the police, and the Islamic Revolution Guards Corps."

652.    *Third*, Defendants' knowledge of **basic facts about Iran's National Security Council** alerted Defendants that their "Security Cooperation" Agreement with the "Iranian Shareholders" aided terrorist attacks sponsored by the IRGC.  Among other things, Iran's National Security Council is responsible for its terrorist agenda, including the IRGC's routine deployment of proxies like Hezbollah to coordinate attack campaigns against Americans globally.[201]

---

[199] https://www.constituteproject.org/constitution/Iran_1989.pdf?lang=en.

[200] The emphasized passages are widely understood, inside Iran and around the world, to refer to the IRGC's foundational mission of attacking the United States around the world in order to advance the Iranian Islamic Revolution.

[201] *See, e.g.*, Ali Reza Nader (Senior International Policy Analyst at RAND Corp.), *Iran Vote is Cause for Optimism, Realism*, Star Tribune (June 19, 2013) ("A 20-year parliamentarian, Rowhani formerly led ***Iran's security council***, so he has had direct knowledge and/or involvement in Iran's internal repression and ***external support of terrorist organizations like Hezbollah.***"), (emphasis added), 2013 WLNR 15146323.

653.   *Fourth*, Defendants' knowledge of **broadly-known facts about Hezbollah** alerted Defendants that their "Security Cooperation" Agreement with the "Iranian Shareholders" aided terrorist attacks sponsored by the IRGC.  Among other things, Hezbollah's organizational chart confirmed that Defendants knew that "security" was a euphemism for terror.  As the "Hezbollah Division" of the IRGC, Hezbollah was (and is) a subordinate branch of the IRGC, and therefore because the IRGC is in charge of "security" in Iran, it necessarily follows that "security" matters in Iran also include Hezbollah and the Qods Force.  Moreover, from the 1990s through the present, the structure of Hezbollah's purported "terrorist wing"[202] has always been officially and publicly referred to as Hezbollah's "External *Security* Organization."

654.   *Fifth*, Defendants' knowledge of **basic points about IRGC doctrine** alerted Defendants that their "Security Cooperation" Agreement with the "Iranian Shareholders" aided terrorist attacks sponsored by the IRGC. Unlike nearly every other terrorist group, the IRGC was founded and explicitly committed to anti-American terror as a matter of Iranian national security doctrine, targeting the United States (the "Great Satan") for external terrorist attacks in order to advance Iran's Islamic Revolution globally.  As Dr. Mark Silinsky, a 36-year veteran military intelligence analyst of the U.S. Department of Defense and an affiliated professor at the University of Haifa, explained in 2019:

> The third *major goal* of the IRGC is *combatting Iran's declared enemies, the most reviled of whom are the United States*, Israel, and Saudi Arabia. A leading IRGC-controlled media outlet claims that those three countries "finance terrorists and provide them with weapons."  Iranian hatred of the United States is deep and enduring. Early in his adulthood, Khomeini named the United States the "Great Satan," a moniker that endures today. … Iranian leaders often clamor that the United States has dominated weaker countries for centuries and proclaim that the

---

[202] Like its IRGC overlords, and Iranian terror proxies like Jaysh al-Mahdi, Lebanese Hezbollah maintains a fictional separation between their "terrorist" and "political" wings, but this is just terrorist tradecraft designed to provide concealment for Hezbollah operatives, and there is no meaningful firewall between the two wings.

United States intends to destroy Islam and the Islamic Republic of Iran. In Iran, there are broadcasts, television shows, movies, songs, and video games with the theme of destroying America.[203]

655.     *Sixth*, Defendants' awareness of the **widely-known views of Iran scholars**

alerted Defendants that their "Security Cooperation" Agreement with the "Iranian Shareholders"

aided terrorist attacks sponsored by the IRGC. Defendants knew that Iran scholars broadly

understood that "security" ordinarily was understood, by anyone familiar with Iran's special

context, to refer to IRGC-related terror operations against Americans carried out by Hezbollah,

the Qods Force, and associated IRGC terrorist proxies.  For example:

(i)     Tony Badran, September 2011:  "[T]he Qataris also ran their initiative by Tehran, in order to … assure the Iranians that Syria's ***'security doctrine'*** meaning its policy of ***support for so-called 'resistance movements' sponsored by Iran*** would remain intact."[204]

(ii)    Ambassador R. Nicholas Burns, January 2016:  "[T]he people who ***actually run Iran's security policies***, their intelligence networks, their ***support to the terrorist groups like Hezbollah and Hamas, are in the Iranian Revolutionary Guard Corps***. That group of people has a ***fundamentally more anti-American***, cynical, brutal view of the future of Middle East politics."[205]

(iii)   Nakhleh Emile, June 2017:  "Iran has supported Sunni and Shia terrorist organizations over the years … in the service of its national interest.  ***Supporting proxy terrorist groups has been a principle of Iran's security doctrine for years***, especially during the period when Iran was threatened with the possibility of regime change."[206]

---

[203] Dr. Mark Silinsky, *Iran's Islamic Revolutionary Guard Corps: Its Foreign Policy and Foreign Legion*, Marine Corps University, Expeditions with MCUP (Digital Journal) (Jan. 2019) (emphasis added), https://www.usmcu.edu/Outreach/Marine-Corps-University-Press/Expeditions-with-MCUP-digital-journal/Irans-Islamic-Revolutionary-Guard-Corps/.

[204] Tony Badran (Research Fellow Foundation for Defense of Democracies), *U.S. Human Rights Policy in Iran and Syria*, Congressional Testimony via FDCH (Sept. 22, 2011) (emphasis added), 2011 WLNR 24786203.  Syria and Iran share a common "security doctrine," which is dictated by the IRGC, including Lebanese Hezbollah and the Qods Force.

[205] R. Nicholas Burns, *quoted in interview with* Ashish Kumar Sen (Atlantic Council), *Dealing with Iran: A Policy of Engagement and Deterrence*, Harvard Belfer Center for Sci. & Int'l Affairs, States News Service (Jan. 19, 2016).

[206] Nakhleh Emile, *Aligning With Iran Necessary to Combat Sunni Extremism*, Iran Times International (June 9, 2017) (emphasis added), 2017 WLNR 23277897.

(iv)  Dr. Ronen Bergman and Dr. Raz Zimmt, July 2018:  "While the Iranian nuclear program isn't under the ***IRGC's command***, its ***security definitely is***."[207]

(v)  Seth Frantzman, July 2020:  "Iran said it hoped Iraq would play a greater role in ***regional security, apparently meaning*** helping Iran work with Syria and perhaps be a conduit for Iran's weapons trafficking to Syria.  Iran has sent ballistic missiles to Iraq in 2018 and 2019 and trafficking precision guided munitions via Iraq's Al-Qaim border area with Syria. Iraq has recently tried to replace some units on the border to make the border more secure. ***Regional security, for Iran, means regional Iranian hegemony***. Iraq is Iran's 'near abroad' in this equation. The pressure on Kadhimi was intense during the recent visit and ***Iran showed it means business in terms of pressuring the US to leave Iraq***."[208]

(vi)  Ariane Tabatabai, November 2020:  "[Qassem] Soleimani and [Mohsen] Fakhrizadeh," the "head of research and innovation at Iran's Ministry of Defense," "were the architects of ***two pillars*** of ***Iran's security policy***: its ***proxy*** and nuclear programs … Both helped ***create the infrastructure*** and develop the programs. But their deaths won't lead to a fundamental change, as institutions will continue the projects."[209]

656.  *Seventh*, Defendants' awareness of the **public statements by IRGC terrorists** alerted Defendants that their "Security Cooperation" Agreement with the "Iranian Shareholders" aided terrorist attacks sponsored by the IRGC.  Examples of IRGC, Hezbollah, and the Qods Force terrorists' public statements indicating that "security" was an IRGC euphemism for the IRGC's, Hezbollah's, and the Qods Force's anti-American terrorist operations in the Middle East, included, but were not limited to:

(i)  BBC, July 2013:  "Iran's MP on ***security*** and foreign affairs denounce[d] an EU decision to include Hezbollah military wing in the list of terrorist organizations."[210]

---

[207] Dr. Ronen Bergman and Dr. Raz Zimmt, *Israel's Most Dangerous Enemy: Who Are You, Hajj, Qasem Soleimani?*, Yedioth Ahronoth (Israel) (July 3, 2018) (emphasis added), 2018 WLNR 20323696.

[208] Seth J. Frantzman, *Iran's Maximum Pressure on Iraq to Remove US Forces*, Jpost.com (Jerusalem Post online) (July 22, 2020) (emphasis added), 2020 WLNR 20379547.

[209] *Quoted in* Arkansas Democrat Gazette, *Iran Claims Israel, U.S. Linked To Slaying Of Key Nuclear Scientist* (Nov. 28, 2020) (emphasis added), 2020 WLNR 34141033.

[210] BBC International Reports (Central Asia), *Programme Summary of Iranian Gorgan Radio News 1600 gmt 24 Jul 13* (July 25, 2013) (emphasis added).

(ii)     <u>Fars News Agency (Iran), February 2014</u>:  "An Iranian deputy foreign minister blasted Washington for raising baseless allegations against Tehran, and said the US which supports terrorist groups with financial, political and arms aids cannot accuse others of advocating terrorism. … '***The Hezbollah is strongly fighting terrorism in support of the country's security and stability***,' the Iranian official added."[211]

(iii)    <u>IRIB World Service (Iran), March 2016</u>:  "Iran says a decision by Persian Gulf Arab states to brand Lebanon's Hezbollah as a terrorist group is a 'new mistake' that will undermine peace in the region and unity in Lebanon. … '***Those who call Hezbollah terrorists***, have intentionally or unintentionally targeted the unity and ***security*** of Lebanon,' Iran's Deputy Foreign Minister Hossein Amir-Abdollahian said."[212]

(iv)    <u>Naharnet (Lebanon), March 2016</u>:  "A top Iranian security official … hailed … 'Hizbullah has played a key role in … protecting Lebanon's ***security***,' said Ali Shamkhani, the head of the Supreme National Security Council of Iran."[213]

(v)     <u>Seth Frantzman, July 2020</u>:  "The Ayatollah stressed that while Iran does not interfere in Iraq, it is the 'corrupt' Americans who are interfering in Iraq and who only sow destruction in the region. … [Iraqi Prime Minister] Kadhimi also met with Ali Shamkhani, the head of the Supreme National ***Security*** Council. Shamkhani has visited Iraq earlier this year to ***pressure Iraq to expel US forces.*** …  Shamkhani's meeting with Kadhimi was meant to be yet another piece of Iran's ***maximum pressure to get US forces out of Iraq. Shamkhani said the Us was 'evil' and that it was a 'malicious, terrorist' element in Iraq that was leading to insecurity***."[214]

657.    *Eighth*, Defendants' awareness of the **Iran-related "Security" media coverage** alerted Defendants that their "Security Cooperation" Agreement with the "Iranian Shareholders" aided terrorist attacks sponsored by the IRGC. Regular media discussions also specifically alerted Defendants that "security" was a code word for anti-American terror operations by the IRGC, Hezbollah, and the Qods Force, including, but not limited to:

---

[211] Fars News Agency (Iran), *Iran Raps US Double-Standard Policy Towards Terrorism* (Feb. 12, 2014) (emphasis added).

[212] IRIB World Service (Iran), *[P]GCC Branding of Hezbollah as Terrorist a New Mistake: Iran* (Mar. 3, 2016), (emphasis added), 2016 WLNR 6748676.

[213] Naharnet (Lebanon), *Iran: Hizbullah Played Key Role in Eradicating Terror in Syria*, Protecting Lebanon (Mar. 17, 2016), (emphasis added), 2016 WLNR 8288436.

[214] Seth J. Frantzman, *Iran's Maximum Pressure on Iraq to Remove US Forces*, Jpost.com (Jerusalem Post online) (July 22, 2020), (emphasis added), 2020 WLNR 20379547.

(i)     *Denver Rocky Mountain News*, April 1992:  "Imad Mughniyeh, **chief of security** for Hezbollah, the Iranian-sponsored Party of God, and **head of its terrorist arm**, Islamic Jihad (Holy War)."[215]

(ii)    *San Francisco Chronicle*, September 2001:  "… Arranges security for meeting between bin Laden and Imad **Mughniyeh, security chief for the Iran-sponsored terrorist group Hezbollah**."[216]

(iii)   *Washington Post*, November 2001:  "Iran's foreign and **security policies** … back terrorist groups such as Hezbollah and Hamas … Ayatollah Mahmoud Hashemi Shahroudi, the head of Iran's judiciary, recently summed up the view of this wing of the government: '**Our national interests lie with antagonizing the Great Satan**,' he stated. … It would be a mistake for the Bush administration to warm relations without serious progress in reining in Iran's … terrorist links."[217]

(iv)    *Jerusalem Post*, June 2002:  "Once in southern Lebanon, the 1992 Palestinian deportees, like Jenin Islamic Jihad leader Sheikh Bessam Sa'adi learned **bomb-making and terror techniques** from Hizbullah militants and **Iranian security agents**."[218]

(v)     *Boston Herald*, March 2004:  "All this would be news for Iranians and specialists were it not for [the] fact[] [that] **Iran's security agencies … are the biggest backers of terrorism in the Middle East**, notably through … Hezbollah…."[219]

(vi)    *Newsweek*, June 2004:  "While the link to Iran has been publicly known for some time, the 9/11 commission has uncovered evidence that in the mid-1990s Osama bin Laden cast aside religious differences with the Iranians and arranged to have his terror operatives conduct training in explosives and **security at Iranian-backed camps run by Hizbullah in Lebanon**."[220]

---

[215] Holger Jensen, *Sanctions Target Libya, Ignore Other Terrorist Regimes*, Denver Rocky Mountain News (Apr. 16, 1992), (emphasis added), 1992 WLNR 425546.

[216] Lance Williams and Erin McCormick, *Bin Laden's Man in Silicon Valley*, San Francisco Chronicle (Sept. 21, 2001), (emphasis added), 2001 WLNR 5755282.

[217] Washington Post (Op-Ed), *The Irony of Iran* (Nov. 11, 2001), (emphasis added), 2001 WLNR 13678266.

[218] Matthew Gutman, *Packing Up Our Troubles*, Jerusalem Post (June 28, 2002), (emphasis added), 2002 WLNR 164656.

[219] Boston Herald (Op-Ed), *Taking First Steps in Iran* (Mar. 21, 2004), (emphasis added), 2004 WLNR 393400.

[220] Michael Isikoff and Mark Hosenball, *Terror Watch: Friends of Al Qaeda*, Newsweek Web Exclusives (June 16, 2004), 2004 WLNR 3641416.

(vii)  *Express on Sunday*, March 2005:  "[T]he terrorist group Hezbollah and [] ***Iranian security chiefs*** … are ***key sponsors of international terrorism***."[221]

(viii)  *AP Worldstream*, August 2006:  "State Department spokesman Sean McCormack … denounced Iran as a ***supporter of terror groups*** in defiance of U.N. resolution.  That support, he said, was '***an integral part***' of Iran's foreign and national ***security policy***."[222]

(ix)  *Khaleej Times*, September 2009:  "The Middle East Times reported … that the [U.S.] was stepping up scrutiny of ***Iranian security*** and military personnel in the Lebanese communities of Latin America. … US officials said that in addition to boosting rates of recruitment, Hezbollah agents, supported by Iran, are using ***very effective routes to smuggle drug profits to the Middle East to aid anti-US counterparts*** …"[223]

(x)  *Australian*, April 2010:  "An ASIO assessment included in the [Australian] federal government's recent counter-terrorism white paper drew attention to the presence in Australia of the Hezbollah ***External Security*** Organisation (ESO), an Iranian-sponsored group described on the federal government's national security website as '***among the best-organised terrorist networks in the world***' … ASIO pinpointed ESO as a group 'with a long history of engaging in terrorist acts.'"[224]

(xi)  *American Forces Press Service*, April 2010:  "Defense officials have described the ***security threats*** posed by Iranian proxies operating in the Middle East -- Hamas in Gaza and Hezbollah in Lebanon -- which the United States and Israel consider terrorist organizations."[225]

(xii)  *Reuters*, October 2017:  "The Revolutionary Guards (IRGC) are Iran's most powerful internal and external security force."[226]

---

[221] Tim Shipman, *How Real is Terror Threat to Britain?*, Express on Sunday (UK) (Mar. 6, 2005), (emphasis added), 2005 WLNR 3482170.

[222] Barry Schweid, *U.S. Foresees Further Defiance By Iran To U.N. Demands On Uranium Enrichment*, AP Worldstream (Aug. 8, 2006), (emphasis added).

[223] Khaleej Times, *The Enemy at the Gates - Fear of the Unknown in Latin America* (Sept. 27, 2009), 2009, (emphasis added), WLNR 19020314.

[224] Australian, *Iranian Embassy 'Spying on Activist Students'* (Apr. 6, 2010), (emphasis added), 2010 WLNR 7047177.

[225] John J. Kruzel, *Gates Satisfied with U.S. Planning to Counter Iran*, American Forces Press Service, Defense Department Documents (Apr. 27, 2010), (emphasis added), 2010 WLNR 8757413.

[226] Reuters, Yedioth Ahronoth (Israel), *Iran Warns US Against Imposing Further Sanctions* (Oct. 8, 2017), (emphasis added), 2017 WLNR 30811998.

658.    *Ninth*, Defendants' awareness of the **"Security" euphemisms in media and culture** alerted Defendants that their "Security Cooperation" Agreement with the "Iranian Shareholders" aided terrorist attacks sponsored by the IRGC.  Defendants could not possibly have missed the meaning of "security" in their dealings with the IRGC because decades of media discussions, television, and film events across a broad array of cultures, religions, and languages in the U.S., Europe, the Middle East, and Africa, where Defendants' employees and agents live and work, alerted Defendants that "security" was a famously common euphemism for "terrorism" in unstable environments or uncertain times, including, but not limited to:

(i)     *Miami Herald*, July 1992:  "[T]he FMLN has created what the government calls *'terror squads' euphemistically* named '*security commissions.*'"[227]

(ii)    *Journal of Commerce*, November 2002:  "The Maritime Transportation Security Act gives us a new *euphemism*. Inside the Beltway, a '*terrorist* attack' is now a 'transportation *security* incident.'"[228]

(iii)   *Aberdeen American News*, June 2004:  "'On the roller coaster ride that Iraq has become, …[w]hat's *euphemistically* referred to as '*security concerns*' … *would be referred to as violent, bloody terrorism* in most other parts of the world.'"[229]

(iv)    *Jerusalem Post*, August 2004:  "'The term '*security* prisoners' is … a *euphemism* for ideologically motivated murderers convicted of *terrorist* activities against Israelis.'"[230]

(v)     *Toronto Star*, May 2005:  "In an extraordinary trip to Abu Ghraib prison … she encounters the now-notorious U.S. Army General Janis Karpinski, who tells her that

---

[227] Miami Herald, *Peace on a Razor's Edge* (July 30, 1992), (emphasis added), 1992 WLNR 2253569.

[228] R. G. Edmonson, *Washington View: Port Security Bill a Good Start*, Journal of Commerce (Nov. 18, 2002), (emphasis added), 2002 WLNR 1291549.

[229] Aberdeen American News (SD), *U.N. Vote Brings Glimmer of Hope* (June 10, 2004), (emphasis added), 2004 WLNR 18926896.

[230] Efraim Inbar (Professor of Political Studies at Bar-Ilan University), *Let Them Starve*, Jerusalem Post (Aug. 22, 2004), (emphasis added), 2004 WLNR 237090.

'*security* detainees,' the **euphemism for terrorism** suspects held by the U.S. forces, are 'relaxed, comfortable, and had everything they need.'"[231]

(vi)     *Times of India*, November 2006:  "To paraphrase Chesterton, there are an infinity of angles at which Anglo-Pakistani relations fall but there is only one - *security* - at which they stand.  **The 'S' word is a euphemism for the 'T' word.  Terrorism, as sponsored by Pakistan**."[232]

(vii)    *New American*, April 2008:  "Lieutenant General Keith Dayton, the Bush administration's Security Coordinator for Palestine, testified … on the supposed need to fund President Abbas' **'security forces,' a euphemism for the collection of terrorist thugs** from the al-Aqsa Martyrs Brigades, Islamic Jihad, Force 17, and various other PLO/Fatah militias."[233]

(viii)   *Birmingham Post*, October 2008:  "[A]n event … sought to consider **'security and community cohesion' a euphemism for extremism and terrorism, natch**)."[234]

(ix)     *BBC International Reports (Latin America)*, October 2013:  "Although paramilitary forces could serve the interests of the State, its members act as mercenaries, assault squads, thugs, and private **security groups**, the latter a **euphemism for terrorists**."[235]

(x)      *Electronic Intifada (Palestine)*, August 2021:  "The term 'ISF' – which stands for 'Israeli security forces' – is a total misnomer and euphemism for occupation forces who provide anything but 'security.'  Their job, rather, is to terrorize and repress."[236]

---

[231] Olivia Ward, *Finding Dignity Amid the Chaos; Iraq Journal*, Toronto Star (May 22, 2005), (emphasis added), 2005 WLNR 8118912.

[232] Rashmee Roshan Lal, *TomKat Nuptials Like Blair-Mush Compact*, Times of India (Nov. 19, 2006), (emphasis added), 2006 WLNR 27474749.

[233] William F. Jasper, *A Bad Investment: U.S. Support For So-Called "Moderate" Terrorists as the Alternative to Worse Terrorists, as we have Given in Palestine, is a Recipe for Disaster*, New American (Apr. 28, 2008), (emphasis added), 2008 WLNR 25511423.

[234] Chris Allen, *Freedom of Expression is Built on the Right to Offend*, Birmingham Post (UK) (Oct. 16, 2008), (emphasis added), 2008 WLNR 19647906. "Natch" means "naturally; as may be expected."

[235] BBC International Reports (Latin America), *Costa Rican Daily Warns Caution Over Alleged Presence of Paramilitary Group* (Oct. 3, 2013) (emphasis added).

[236] Electronic Intifada (Palestine), *Video Shows Israeli Shooting That Killed 11-Year-Old Boy* (Aug. 4, 2021), (emphasis added), 2021 WLNR 25165762.  Plaintiffs categorically reject the antisemitic bile displayed in this quotation and offer it merely to show the widespread euphemistic use of "security."

(xi)  *Canada Stockwatch*, September 2014:  "[I]n the Democratic Republic of the Congo … a … '***security incident***[]' … is one of several ***euphemisms for an 'act of terror,*** ' 'war,' or even a spontaneous hacking."[237]

659.    *Tenth*, each Defendant's **consciousness of guilt** confirmed Defendants knew that their "Security Cooperation" Agreement with the "Iranian Shareholders" aided terrorist attacks sponsored by the IRGC.  The conduct of MTN Group, Phuthuma Nhleko, and Irene Charnley, among other MTN-related persons, manifested obvious guilt concerning their relationship with the Iranian Shareholders.  All three, for example, concealed the secret Security Cooperation Agreement from MTN Group's shareholders to whom they owed a legal duty of disclosure.

660.    Defendants' consciousness of guilt can ***only*** be explained by each Defendants' knowledge that the IRGC's "security" assistance needs comprised knowing provision of material support for the terrorist agenda of the IRGC for the specific purpose of facilitating the anti-American terror "security" operations of the IRGC:  (a) **inside of Iran**, e.g., joint training camps funded by the IRGC and staffed by Hezbollah, through which the IRGC's Shiite Terrorist Proxies and Sunni Terrorist Proxies received essential training, safe haven, and logistical support designed to facilitate their terrorist attacks against Americans in Iraq, Afghanistan, Syria, Yemen, Israel, and Europe; and (b) **outside of Iran**, including, but not limited to, though IRGC proxies in Iraq, Afghanistan, Syria, Yemen, Israel, and Europe e.g., a Joint Cell in Basra that specializes in kidnapping and was comprised of Hezbollah, the Qods Force, and Jaysh al-Mahdi, as well as a Joint Cell in Syria that provides communications and smuggling support for the IRGC's Shiite Terrorist Proxies.

---

[237] Canada Stockwatch, *MKTDIAM Diamonds & Specialty Minerals Summary for Sept. 22, 2014* (Sept. 22, 2014) (emphasis added).

661.    This conclusion is ineluctable.  With respect to the phrase "defensive, security, and political cooperation," the first and third of those items were unquestionably legal in Defendants' home country of South Africa.  At all relevant times, South African companies could legally sell weapons to Iran, and therefore it is implausible that Defendants were worried about the criminal risk of facilitating weapons sales from South Africa because however disgusting such conduct was, it was not illegal under South African law (and MTN Group did not have any U.S. affiliates).

662.    Moreover, the South African government was a longstanding close ally of Iran based upon their unique historical bond, and in such context, it is implausible that Defendants were concerned about breaking South African law by promoting "political cooperation" between their respective countries and Iran, since "political cooperation" with Iran was a perfectly acceptable thing in South Africa at all relevant times.

663.    *Only* Defendants' knowledge that "security" meant "Hezbollah, Qods Force, and anti-American terror" explains the totality of each Defendant's conduct, as well as the parallel nature of their crimes, e.g., rampant document destruction.  For Defendants to facilitate a helicopter sale to the regular Iranian Army (not the IRGC), or help broker political cooperation, was not only legal, but in furtherance of South Africa's economic and political agendas.  For MTN Group, Phuthuma Nhleko, and Irene Charnley to agree to guarantee MTN's "Security" "Cooperation" to the Hezbollah and the Qods Force, however, was a totally different matter.

664.    For MTN Group, Phuthuma Nhleko, and Irene Charnley, directly assisting the "security" operations of Hezbollah and the Qods Force plainly ran the risk of committing a litany of crimes under U.S. and South African law (e.g., terrorism crimes, espionage), and created obvious – and dire – potential risk to any MTN Group executive, employee, or agent who agreed

219

to support the secret Security Cooperation Agreement between MTN Group and the IRGC without making a noisy withdrawal from the scheme.  Indeed, to this date, MTN Group, Phuthuma Nhleko, Irene Charnley, and their implicated agents, have yet to disavow the terrorist finance, and associated fraud on MTN Group's shareholders, which occurred on their watch (in the case of Mr. Nhleko and Ms. Charnley) and continues today (in the case of MTN Group).

> **B.      Defendants Knew That Their Secret Security Cooperation Agreement With The IRGC Was An Act Of International Terrorism Because Defendants Knew That The American Smartphones And Other U.S.-Origin Communications Technologies That Defendants Illicitly Acquired For, And Transferred To, The IRGC Substantially Assisted Terrorist Attacks Against Americans**

665.     Defendants knew that their illicit provision of American smartphones, computing technologies, and other key items requested by the IRGC, including its Hezbollah Division and Qods Force, was an act of international terrorism because Defendants knew that such phones, supplied in such volumes to such terrorists, would fund, and logistically support, thousands of terrorists every year.

666.     Defendants knew that Hezbollah, the Qods Force, and IRGC proxies like al-Qaeda, depended upon reliable supplies of cell phones as a key growth engine for expanding the shared global terrorist enterprise they needed to effectively counter the U.S. and NATO and kill Americans in Iraq and Afghanistan.  For example, as the *Montreal Gazette* reported at the time:

> Under [] Ahmadinejad [], U.S. officials said, the [IRGC] has moved increasingly into commercial operations, ***earning profits*** and extending its influence in Iran in areas involving big government contracts, including … ***providing cell phones***. Washington has claimed the Revolutionary Guard's Quds Force wing is responsible for the growing flow of explosives, roadside bombs, rockets and other arms to Shiite militias in Iraq and the Taliban in Afghanistan.  Quds Force has also been blamed for supporting Shiite allies such as Lebanon's Hezbollah and to such Sunni movements as Hamas and the Palestinian Islamic Jihad.[238]

---

[238] Montreal Gazette (Canada), *What is the Revolutionary Guard?* (Aug. 16, 2007), 2007 WLNR 28659733.

667.    Defendants knew that, since 9/11, *every* major transnational Islamist terrorist organization that has targeted Americans has prioritized providing its operatives with a robust, reliable, and covert supply of two material items above all else:  stockpiling vast quantities of secure, untraceable American mobile phones, and obtaining as much U.S. currency as possible. This maxim holds true for Shiite and Sunni groups alike, including, but not limited to, the IRGC (including its Hezbollah Division and Qods Force) Jaysh al-Mahdi, al-Qaeda, the Taliban (including its Haqqani Network), ISIS, al-Nusra Front, and every other major group.

668.    Decades of media coverage alerted Defendants to Hezbollah's specific reputation for using cell phones to help commit terrorist violence, including, but not limited to:

(i)     *L.A. Times*, November 1997:  "Hezbollah us[ed] ***mobile phones to coordinate attacks*** and roadside bombs camouflaged as rocks."[239]

(ii)    *Montreal Gazette*, March 2001:  "Two men … were accused of aiding the Islamic extremist group Hezbollah in an indictment … They are said to have conspired to provide Hezbollah with cash, night-vision goggles, global-positioning devices, mine-detection equipment, ***cell phones*** and blasting equipment."[240]

(iii)   *Globe & Mail*, July 2006:  "Air strikes took out relay towers belonging to Lebanon's three main cellular phone companies, Hezbollah's al-Manar television network … Such communications channels are traditional targets ahead of military action."[241]

(iv)    *Detroit Free Press*, July 2006:  "Capt. Jacob Dallal, an Israeli army spokesman, said the targets of the strikes were Al-Manar and Al-Nour, Hizballah's TV and radio stations, respectively. He said five of the radio station's antennas were hit.  'It's important to understand why the attack was carried out,' Dallal said. 'This will disrupt their ability to

---

[239] Marjorie Miller, *Hezbollah Battles to Shed Extremist Image in Lebanon*, Los Angeles Times (Nov. 28, 1997) (emphasis added), 1997 WLNR 5640765.

[240] Montreal Gazette (Canada), *B.C. Men Accused of Aiding Hezbollah* (Mar. 29, 2001) (emphasis added), 2001 WLNR 6561271.

[241] Carolynne Wheeler, *Israeli Troops Enter Village in Lebanon*, globeandmail.com (Toronto), (July 22, 2006), 2006 WLNR 27225853.

communicate,' he said, adding that **cell phones were a 'key communication link' for Hizballah**."[242]

(v) *Daily Mail*, November 2007:  "Back at base, [Chris] Hunter [a "veteran 'ammunition technical officer' or counterterrorist bomb-disposal expert"] looks for patterns in the way that bombs are made and laid. At first his main opponent is a Sunni bomb-making gang, who are happy to slaughter scores of Shia civilians along with Coalition soldiers. Then, in the spring of 2004 comes the Shia militia uprising. **They increasingly receive high-tech help from Iran and even Hezbollah in using devices such as mobile phones ....... to detonate bombs by remote control**."[243]

(vi) *Washington Times*, March 2009:  "Almost everyone I met warned me about using my cell phone. It was **common knowledge that Hezbollah officers in the security forces were regularly intercepting phone calls** and **tracking their human targets** by triangulating the signals the phones send out to cell phone towers around the city."[244]

(vii) *Derby Evening Telegraph*, November 2009:  "Mr Godsmark told the jury that a video clip found on an external hard-drive at Lusha's home gave instructions on how to turn a mobile phone into a bomb trigger. The prosecutor also said video clips produced by organisations undertaking "fundamentalist violent jihad in Iraq, Afghanistan and Chechnya … Mr Godsmark said 14 mobile phones were also found at Lusha's home. Documents found on computers or drives include the Hezbollah Military Instruction Manuals; Middle Eastern Terrorist Bomb Design; Improvised Radio Detonation Techniques; Radnar's Detonators; The Mujahideen Explosives Handbook and The Bomb Book. A video film entitled "mobile detonators" was also discovered."[245]

669.    Indeed, Defendants should have been alerted by Hezbollah's own public statements taunting the United States concerning a purported "US 'request' for information on mobile phones."[246]

---

[242] Detroit Free Press, *Israeli Push Deepens Conflict* (July 23, 2006) (emphasis added), 2006 WLNR 25249492.

[243] Jonathan Foreman, *Defusing the Iraqi Conflict*, Daily Mail (UK) (Nov. 2, 2007) (emphasis added), 2007 WLNR 21680052.

[244] Kenneth Timmerman, *Fear Grips Democracy in Lebanon*, Washington Times (Mar. 2, 2009) (emphasis added), 2009 WLNR 4034008.

[245] *Id*.

[246] Al-Sharq al-Awsat, BBC International Reports (Middle East), *Lebanese Hezbollah Reacts to US "Request" For Information on Mobile Phones* (Mar. 3, 2010) ("Lebanese Hezbollah reacts to US "request" for information on mobile phones.  Accusations against the US Embassy in Beirut

**C.**   **Defendants Knew That Their Secret Security Cooperation Agreement With The IRGC Was An Act Of International Terrorism Because Defendants Knew That The Illicit Commercial Transactions That Defendants Facilitated With, On Behalf Of, Or For The Benefit Of, IRGC Fronts, Operatives, Agents, And Cut-Outs Substantially Assisted Terrorist Attacks Against Americans**

670.   Defendants knew or recklessly disregarded that their transactions with fronts, operatives, and agents for the IRGC financed, armed, and operationally supported Iranian proxy terrorist attacks against Americans in Iraq.

671.   Defendants knew that "'[c]ompanies doing business in Iran face substantial risks…,' said Sigal Mandelker, Treasury Department undersecretary for terrorism.  She added:

> …. "deceptive" Iranian transactions that ultimately channel money to terrorists. The Iranian government "uses shell and front companies to conceal its tracks" as part of an elaborate scheme designed to procure cash for the Quds Force of Iran's militant Islamic Revolutionary Guard Corps, which the U.S. designates as a terrorist organization.

672.   By early 2005, it was widely understood in diplomatic, business, and military circles that the IRGC had seized control of Iran's telecom, communications, and information technology sectors.  Before they transacted with IRGC, including Qods Force, fronts, operatives, and agents, Defendants were aware that the IRGC had seized control of these sectors.

673.   Defendants were aware of the IRGC's capture of Iran's telecom, communications, and information technology companies in part through their local agents and affiliates, whom Defendants relied upon to keep abreast of Iranian market conditions; these agents (who were subject to Defendants' control and whose knowledge is imputed to Defendants) knew that the IRGC controlled Iran's telecom, communications, and information technology sectors and used that control to raise money, obtain weapons, and source operational support for terrorism.  As a

---

that it seeks to obtain sensitive information on the mobile phone networks raised doubts within Hezbollah. Hezbollah has doubts that this information might be used by the US intelligence in infiltrating the communications network and tracking Lebanese figures.").

general matter, those agents spoke fluent Farsi, had relationships with people throughout Iranian government and industry, and were well-informed about Iranian politics and economics. They could not have remained ignorant of the common understanding that the Iranian telecom, communications, and information technology sectors were controlled by the IRGC.

674.    Defendants knew, or recklessly disregarded, that the IRGC routinely used commercial transactions to raise money and acquire key weapons and weapons components in support of the IRGC's lead terrorist agent, Hezbollah, as well as Hezbollah's Iraqi proxy, Jaysh al-Mahdi. As a regional studies professor explained, "Dubai … maintains crucial avenues for the IRGC … to generate money" and serves as "the gate to the world for" Iranian terrorist front company efforts.[247]

675.    Defendants knew, or recklessly disregarded, that as American sanctions increasingly sought to choke off IRGC, including Qods Force, access to the global financial system, the IRGC responded by using IRGC, including Qods Force, front companies and agents in the United Arab Emirates, Iraq, and elsewhere to raise money through criminal enterprise, facilitate terrorist finance through the banking system, and maintain the steady supply of key telecom, communications, and information technologies necessary to continue to prosecute a terrorist campaign against Americans in Iraq and elsewhere. Per *Reuters*, the IRGC has:

> long proved successful in defending [its] economic interests, including in recent years when the sanctions … effectively exclude[ed] Iran from the global financial and trading system. "Even under very difficult economic circumstances, the funds for the IRGC's activities, whether domestic or overseas, remained intact," said a former official close to the [Iranian] government… As the U.S. and EU sanctions on Iran's oil and finance sectors in 2012 started to bite, the [IRGC] responded by setting up complex operations involving the likes of Dubai ….
> "***The IRGC started to buy hundreds of … companies around the [U.A.E.] to use as front companies,***" said a trader involved in … the oil industry. ***"These***

---

[247] TRT World (Turkey), *Amid Soleimani Crisis, Iran Threatens to Level Dubai and Israel. But Why?* (Jan. 8, 2020), 2020 WLNR 663153.

***companies partnered with some foreign companies to bypass sanctions.  Most of the time cash was delivered to a foreign account in a neighbouring country***."[248]

676.    At all relevant times, Defendants understood that the U.S. government believed that IRGC, including Qods Force, activities in the U.A.E. supported anti-American terrorism in Iraq and Afghanistan.  For example, in 2008, President George W. Bush gave a widely-reported speech to U.A.E. government and business leaders in which he called Iran "the world's leading sponsor of terrorism" and stressed that illicit transactions in the U.A.E. were important to the IRGC's ability to provide "support for Islamist groups and militants in Afghanistan, Iraq, Lebanon and the Palestinian territories."[249]  Press reports concerning President Bush's speech emphasized the U.S. government's efforts "to enforce US sanctions against … the Quds Force of the IRGC" because "Dubai in particular ha[d] become a financial centre handling substantial Iranian investments which the administration want[ed] to restrict."[250]

677.    From 2005 through 2016, accounts from prominent Western media sources also reported on the direct link between the Iranian telecom, communications, and information technology sectors and the IRGC.

678.    On information and belief, Defendants were aware of these reports documenting the link between their Iran-related counterparties and the IRGC.  Each Defendant generally maintained a corporate security group responsible for supervising their global supply chains, doing counterparty diligence, and preventing the theft or diversion of the devices or services they sold, including in the Middle East.  As part of such efforts, Defendants' standard practice would

---

[248] Parisa Hafezi, *RPT-INSIGHT-Iran's Elite Guards to Gain Regional, Economic Power in Post-Sanctions Era*, Reuters News (Jan. 20, 2016) (emphasis added).

[249] APS Diplomat Redrawing the Islamic Map, *Bush Says Iran Poses Threat To Global Security* (Jan. 14, 2008), 2008 WLNR 25283869.

[250] *Id*.

have been to conduct basic open-source research on the Iranian telecom market and the

mechanics of making telecom deals in Iran – even a modicum of which would have uncovered

the reports discussing the Iranian front entities' terrorist ties set forth above.[251]

679.    After 2005, Defendants could not have conducted credible due diligence that

would have "cleared" their transactions with their counterparties controlled by the IRGC.

Defendants also knew or recklessly disregarded the IRGC's control of their business partners

based upon the statements set forth in prominent due diligence materials concerning Iran.

680.    MTN's collusion against Turkcell with the conservatives who controlled the

IRGC fronts responsible for the Irancell contract itself became a notable "red flag" about the

highly risky Iranian business environment that Defendants knew of, and ignored.  For example,

as the *Economist*'s flagship due diligence report, the *Economist Intelligence Unit*, explained in

June 2005:

> There is considerable doubt that [] Turkish investment projects … will proceed
> after facing opposition from the new conservative-dominated [Iranian parliament,
> the] Majlis. The Majlis in late 2004 passed a law giving it a veto over foreign
> investment and in early 2005 ruled that Turkcell … should reduce its stake in []
> Irancell … to 49% from 70% [and] … that a majority of Iranian shareholders
> would have to support any management decisions and that security issues be
> referred to the intelligence ministry and the Supreme National Security Council.
> … The Majlis's opposition to the projects … is sure to cause nervousness among
> foreign investors who will see it as calling into question the value of contracts in
> the Islamic Republic and as a sign of arbitrariness in governance.[252]

---

[251] This allegation applies to all Defendants except MTN Irancell.  Plaintiffs allege that MTN
Irancell relied upon the IRGC, including the Qods Force, to conduct diligence on the
counterparties with whom MTN Irancell conducted business, and that the IRGC, including Qods
Force, fronts, operatives, and agents that owned and managed MTN Irancell would not have
approved any significant investment or hire by MTN Irancell if the IRGC, including the Qods
Force, believed that such proposed deal did not benefit the "security" agenda of the IRGC,
including the Qods Force.

[252] Economist Intelligence Unit, *Iran Risk: Legal & Regulatory Risk*, Risk Briefing (June 29,
2005), 2005 WLNR 26571496.

681.     After MTN had finished off Turkcell and secured the Irancell license from the

IRGC, including Qods Force, fronts who controlled Irancell, the *Economist* updated its standard

diligence briefing concerning Iran to warn potential investors, including Defendants, against the

"High Risk" of doing business with Iranian entities:

> ***Foreign investors are deterred by the nationalist stance of the Majlis towards
> foreign investment (High Risk)***.  The Majlis in late 2004 passed a law giving it a
> veto over foreign investment which it has used to ... severely tighten up on the
> terms of a project by Turkcell … ***The conditions imposed on Turkcell have seen
> its bid superseded by a South African company, MTN.*** The episodes caused
> nervousness among foreign investors who fear that they called into question the
> value of contracts in [Iran] and indicated arbitrariness in government decision-
> making. President Mahmoud Ahmadinejad's presidency (until at least 2009, when
> fresh elections will take place) will ***continue to heighten such concerns***. …[253]

682.     Public statements made by prominent Members of Congress also alerted

Defendants to the IRGC's control of the Iranian telecom sector.  For example, on February 10,

2011, a bipartisan group of United States Senators and Representatives confirmed the

widespread understanding that the IRGC's (and by extension, the Qods Force's) control of the

"Iran telecom sector, of which the Iranian Revolutionary Guard Corps owns a significant

stake."[254]  These Members' letter received widespread coverage in the global media.

683.     Defendants also knew that most of their multinational peers had already chosen to

exit ventures in which they participated alongside Iranian entities that could potentially be fronts

for the IRGC.  By 2012, the roster of companies that announced an intention to depart Iran

included such prominent multinationals as Siemens, Ingersoll Rand, Hitachi, ABB, Porsche,

---

[253] Economist Intelligence Unit, *Iran Risk: Legal & Regulatory Risk*, Risk Briefing (Nov. 9,
2006) (emphasis added), 2006 WLNR 26677912.

[254] Letter from U.S. Senators Jim Webb, Jon Kyl, and Richard Burr, and U.S. Representatives
Ileana Ros Lehtinen and Sue Myrick, *Sens. Webb, Kyl: Sale of U.S. Computer Technology to
Chinese Firm Poses Serious Risk Chinese Firm Has History of Illegal Behavior and Ties with
the People's Liberation Army, Taliban and Iranian Revolutionary Guard*, States News Service
(Feb. 10, 2011).

Komatsu, and others.  Regardless of whether Defendants' other multinational peers, in fact, exited these Iranian relationships, their public announcement of their intention to do so further alerted Defendants to the extreme risk posed by their continued economic relationships with their Iranian counterparties.

684.    On April 24, 2016, the *Washington Post* published an opinion written by Senator Joseph I. Lieberman, and Amb. Mark D. Wallace in which the authors warned multinational corporations of the severe financial and reputational risk attendant upon doing business with a notorious IRGC front, like MTN Irancell, presciently warning Defendants that, "[s]evere risks exist for companies thinking about investing with the [A]yatollah, including doing business with the wide array of front companies tied to the IRGC, a terrorist organization sanctioned by the United States and the international community."[255]

> **D.      Defendants Knew That Their Secret Security Cooperation Agreement With The IRGC Was An Act Of International Terrorism Because Defendants Knew That Their Service As A Key Global Facilitator, Management Consultant, Financial Planner, Weapons Procurer, Logistician, Cell Phone and Computing Technology Provider, Recruiter, Fundraiser, Strategic Communications Provider, And Disinformation Agent For The IRGC, Including Its Hezbollah Division And Qods Force, Which Defendants Knew Substantially Assisted Attacks Against Americans**

685.    MTN Group and MTN Irancell, from at least 2005 through the present, and Phuthuma Nhleko and Irene Charnley, from at least 2005 through 2015, knowingly structured their transactions to facilitate the IRGC's fundraising, weapons procurement, and operational support from their IRGC-controlled counterparties – which the IRGC used to support Hezbollah's, al-Qaeda's, al-Qaeda-in-Iraq's, Ansar al-Islam's, and the Taliban's, including its Haqqani Network's, acts of international terrorism against Americans in Iraq.  Senior Iranian

---

[255] Sen. Joseph I. Lieberman (I-NY) and Amb. Mark D. Wallace, *Why Iran Is Arming Up*, Washington Post (Apr. 24, 2016).

entity officials involved in the Defendants' transactions were avowed, well-known fronts, operatives, and agents for the Regular IRGC, Hezbollah, and Qods Force.

686.    Defendants knew or recklessly disregarded that their corrupt transactions, overseen by a counterparty that the IRGC had totally commandeered, delivered resources directly to the IRGC which they provided to Hezbollah in the form of funds, weapons, logistical support, and other aid to jointly commit terrorist attacks against Americans in Iraq through their Joint Cells.

687.    The IRGC's control over the Iranian telecom, communications, and computer sector was so complete that by 2004, there was no longer any meaningful distinction between any of the large Iranian telecom, communications, or computer companies and the IRGC. Because the IRGC had effectively captured the Iranian telecom, communications, and computer sectors and was using such control to fund and arm Hezbollah as Hezbollah led the Joint Cell attacks against Americans in Iraq, transactions with Iranian telecom, communications, and information technology companies directly benefited the Hezbollah campaign targeting Americans in Iraq.

688.    Defendants' transactions with their IRGC-controlled, including Qods Force-controlled, Iranian counterparties supplied Hezbollah, and through Hezbollah, Jaysh al-Mahdi, with resources critical to the Joint Cells' terrorist operations.  The IRGC's control over these critical Iranian economic sectors – and the enormous cash flow that came with it, both from normal revenue as well as corrupt payments from foreign companies – was a key source of the IRGC's power.

689.    Indeed, the telecom, communications, and information technology sectors were (and remain) controlled by the IRGC precisely because such control allows the IRGC to make

groups like Hezbollah more effective at attacking the enemies of Iran, both foreign and domestic, through the substantial funding for the IRGC which flows through to Hezbollah in its capacity as a constituent member of the IRGC.  The IRGC's complete conversion of the telecom, communications, and computer sectors of the Iranian economy as direct tools of terrorism further strengthened the potency of Defendants' illicit transactions as a means of financing, arming, and operationally supporting attacks.

690.    Defendants provided fungible funds to the IRGC that inevitably flowed through the Hezbollah Division to Jaysh al-Mahdi for attacks against Americans in Iraq. As Ambassador Mark D. Wallace explained in 2012, "[a]bsent *economic support from international businesses*, the Iranian regime would *not have the financial wherewithal to … support terrorism*."[256]

691.    Writing in the *Eurasia Review*, a foreign affairs analyst specializing in Iran explained the tight nexus between economic transactions with the Bonyad Mostazafan and Hezbollah-led terrorist attacks against Americans in Iraq and elsewhere:

> The question is, where does the revenue go? …  Since US sanctions caused a sharp decline in Iran's official revenues, the regime is facing financial difficulties and cannot fund its proxies to meddle in the region or as the mullahs' call it "expand its strategic scope". *Iran cannot fund its proxies including Hezbollah, and its multitude of militia forces in Iraq* and Yemen, or its Afghan Fatemiyoun Division and Pakistani Zainebiyoun militias in Syria using its official annual budget. *The millions of dollars used to fund these group must be provided from other financial sources*. …[B]onyads such as Bonyad-e-Mostazafan, are among the organizations that have *directly assisted the Quds Force in this regard*. Iranian opposition sources have previously stated that the Quds Force receives *most of its funds* from [Bonyads]. … The US's decision to sanction [Bonyads] will definitely be welcomed by Iranians who are tired of having their *stolen wealth used for terrorism*.[257]

---

[256] Wallace May 17, 2012, Testimony (emphasis added).

[257] Cyrus Yaqubi, *Recently Sanctioned Iran Foundation Is Regime's Slush Fund For Terrorism*, Eurasia Review (Jan. 24, 2021) (emphasis added). While Mr. Yaqubi primarily focused on a separate bonyad, his claims apply equally to Bonyad Mostazafan.  *See id.* ("[B]onyads such as Bonyad-e-Mostazafan, … have directly assisted the Quds Force in this regard.").

692.     Indeed, the Qods Force has a direct share of the Bonyads Mostazafan, and therefore the Qods Force shares a portion of every dollar of profit realized by the Bonyads Mostazafan, including the Bonyads Mostazafan profits from MTN Irancell, TCI, and MCI.

693.     Moreover, when the Treasury Department designated one of the Bonyad Mostazafan's American shell companies, Assa, in 2008, and Treasury noted the direct link to the flow of funds and logistical support to the Qods Force and Hezbollah, as well as their terrorist proxies, including the Taliban.[258]

694.     Juan C. Zarate, former Deputy National Security Advisor for Combatting Terrorism from 2005 through 2009, previously testified about the key role played by IRGC, including Qods Force, front companies in funding and arming anti-American terrorist attacks committed by Iranian terrorist proxy groups:

> We have limited tools to address … terrorism … And the use of financial power and the power to exclude from the global system is one of our principal if not most effective tools …. [W]e have to have a comprehensive strategy with the use of all tools of national power. No doubt. But the reality is at the end of the day, these tools are the ones that prove to be most effective.… So we are going to have to, *if we are honest about what's happening in the international financial commercial order, we are going to have to crack down on Qods Force front companies*.…. That's the nature of the Iranian economy in the way that they do business, and the way they have reached precisely what we have cut off that hardened them so much.[259]

695.     On April 23, 2012, the Treasury Department announced new sanctions against Iran that recognized that the IRGC's control of the telecommunications sector was inextricably linked with violence, and stated, in part, as follows:

> The Order targets …information and communications technology that facilitates computer or network disruption, monitoring or tracking that could assist in or

---

[258] U.S. Treasury Dep't, *Treasury Designates Bank Melli Front Company in New York City* (Dec. 17, 2008).

[259] Testimony of Juan Zarate, *Sen. Bob Corker Holds a Hearing on Sanctions and the Joint Comprehensive Plan of Action*, SEC Wire (July 31, 2015) (emphasis added).

enable human rights abuses by or on behalf of the … Government of Iran.
Pursuant to this order sanctions were imposed on … Iran's Islamic
Revolutionary Guard Corps (IRGC) … The IRGC's Guard Cyber Defense Command (GCDC)
includes a special department called the Center for Inspecting Organized Crimes
(CIOC). … The IRGC's CIOC has openly admitted that it would forcefully
suppress anyone seeking to carry out "cultural operations" against the Islamic
Republic via the Internet … Individuals arrested by the IRGC have been subjected
to severe mental and physical abuse …."[260]

696.    The nexus between Defendants' illicit transactions in the Iranian telecom sector

and terrorist violence by Iranian proxies was especially tight.  As Ali Alfoneh of the American

Enterprise Institute explained, the IRGC pushed their way into the telecom sector mafia-style,

and relied upon the funds and technology they acquired through their telecom front companies to

fund IRGC, including Qods Force, operations:

**Telecommunications**
The ***IRGC has also muscled its way into the Iranian telecommunications sector***.
In February 2002, Turkish cell phone company Turkcell … won a bid to
inaugurate a second mobile phone network for Iran … ***The Iranian government
welcomed Turkcell.  That is, Turkcell was welcome until the IRGC complained.***
Turkcell would have been in direct competition with IRGC communications
technology and electronics firms.  The Council of Guardians–an executive body
close to the IRGC and the supreme leader–protested that Iranians would have only
30 percent ownership of the new company.  Even after the National Bank of Iran
bought out foreign investors to achieve a 51 percent Iranian stake, ***the IRGC was
not satisfied***.  The IRGC-operated [IEI] and the [Bonyad Mostazafan]–an
independent financial body ***traditionally run by a retired IRGC commander and
used by the state as a proxy to fund off-the-books IRGC operations***–erected a
cascade of legal and practical obstacles leading Turkish investors to retreat from
the Iranian market.

The IRGC rooted its rhetoric on Turkcell in national security.  …  ***the IRGC
expects to maintain its dominant position not only on the battlefield, but in
civilian sectors as well.*** …  Because some of the Iranian economy's most
advanced technological undertakings occur under the aegis of the IRGC and
within the framework of the Iranian arms industry, the IRGC can monopolize the
transfer and adaptation of high technology to civilian applications … The
homepage of [IEI] … display[s] many consumer goods produced by the arms
industry for sale in the Iranian market. The list includes personal computers,

---

[260] U.S. Treasury Dep't, *Fact Sheet: New Executive Order Targeting Human Rights Abuses Via
Information Technology* (Apr. 23, 2012).

scanners, telephone sets and intercoms, mobile phones, and telephone sim cards. These ***purchases support … IRGC operations*** ….[261]

697.     As national security analysts Elliot Hen-Tov and Nathan Gonzalez wrote in the *Washington Quarterly* in 2011, the IRGC "'cashed in' since 2005."[262]  Describing the "dramatic increase" in the IRGC's "economic importance" since 2005, they explained that:

> [T]he Guards [i.e., the IRGC] controlled less than five percent of GDP shortly after the end of the Iran-Iraq War in 1989.  Now, they directly or indirectly oversee … about 35 percent and growing. … Prior to 2005, the Guards … occasionally ***used raw power to reverse high-profile tenders in their favor***.  One of the ***most notable examples*** is when it nullified Turkcell's winning bid to operate a second mobile-phone network as part of a consortium [in favor of Defendant MTN]. Upon ***pressure by the Guards*** and their patrons, the Majles was ***forced to change the terms of the deal and revoke Turkcell's majority share in the consortium***. After Turkcell's departure, an Iranian-led consortium ***under the ownership of a Guards' subsidiary*** [i.e., Defendant MTN Irancell] received the license for the network.[263]

698.     Defendants also helped the IRGC arm their terrorist proxies in Iraq by providing embargoed dual-use technology from the United States.  Defendants' contribution to the terrorist enterprise was essential, as the embargoed American technology that Defendants provided to Hezbollah Division and the Qods Force, through IRGC front transactions, directly improved the efficacy of the bombs deployed against Americans in Iraq from 2005 through 2010

699.     As a result of the foregoing, each time Defendants publicly touted how each had helped improve the technical capabilities of the phones and other network devices supplied to MTN Irancell, TCI, or MCI, MTN were also admitting that they were bolstering the

---

[261] Ali Alfoneh, *How Intertwined Are the Revolutionary Guards in Iran's Economy?*, American Enterprise Institute (Oct. 22, 2007) (emphasis added).

[262] Elliot Hen-Tov and Nathan Gonzalez, *The Militarization of Post-Khomeini Iran: Praetorianism 2.0*, The Washington Quarterly (Winter 2011).

[263] *Id*. (emphasis added).

communications networks, technologies, and operative phones relied upon by the IRGC to sponsor Hezbollah's terrorist attacks against Americans in Iraq.

700.     The technology Defendants provided also helped the IRGC communicate with Hezbollah and Jaysh al-Mahdi (through Hezbollah) in Iraq by sourcing embargoed dual-use technology from the United States.  Indeed, the IRGC's desire to ensure that it could securely communicate with Hezbollah and Jaysh al-Mahdi in Iraq was what initially motivated it to instruct MTN to obtain the embargoed U.S. technology.  And for good reason:  for a terrorist alliance seeking to evade the surveillance of the world's greatest military so that it could plan its attacks unmolested, sensitive communications technology from the United States offered an almost impossible-to-overstate communications advantage to the terrorists by arming them with state-of-the-art communications and encryption technology.  As the RAND Corporation explained:

> For security forces monitoring terrorist communication, such mode nimbleness can *increase the challenges of successfully using terrorist communication traffic*. … *Terrorist access to easy-to-use devices with multiple modes of communication present challenges for security forces* attempting to intercept or track communications … Such communication networks can bypass security forces' centralized monitoring at switches or through the intermediate organization that manages the network infrastructure, *and thereby provide fairly secure communication* …[264]

### 1. Defendants Knew That Their Secret Security Cooperation Agreement Revolutionized The IRGC's Command, Control, Communications, And Intelligence Capabilities

701.     Command, Control, Communications, and Intelligence (or C3i) are a fundamental cornerstone to all military operations.[265]  Without C3i, military operations cannot be

---

[264] *Id*. at 35-36 (emphasis added).

[265] Lieutenant Colonel Dale E. Fincke, *Principles of Military Communications for C3i*, Army War College School of Advanced Miliary Studies (May 20, 1986), https://apps.dtic.mil/sti/pdfs/ADA174214.pdf.

synchronized to effect combat operations at a specific time and place.  These principles apply not only to legitimate military operations, but are necessary to effect terrorist operations as well.

702.    As General George W. Casey explained in 2009:  "Technology is [a] double-edged sword. Inexpensive access to information enables entrepreneurs and innovators to **collaborate in developing new technologies** and improving existing ones. Yet our adversaries can **exploit these same technologies to export terror around the globe**."[266]  He continued:

> The Israeli-Hezbollah conflict also illustrates the potential impact of hybrid threats. Hezbollah employed modern civil technology (secure cell phones, computers and video telecommunications systems) combined with military means (antitank, surface-to-air and antiship missiles, rockets, mortars and unmanned aerial vehicles) and improvised explosive devices in an innovative array of unanticipated patterns.[267]

703.    Defendants' sourcing of illicit technologies for the IRGC enabled the IRGC to accomplish its Revolution in Terrorist Affairs, to devastating effect.

704.    "In future operational environments," General Casey warned, "where the tactical environment and strategic environment will often be seamless, it is the network that will provide the ability to gain and maintain the operational advantage."[268]  When General Casey wrote this, the IRGC was already well on its way to becoming the world's first fully networked terrorist organization, resourced by Defendants' multi-national corporate muscle.

705.    Indeed, in 2010, General Casey called attention to Hezbollah's use of cell phones and secure computers for command and control, which allowed Hezbollah to inflict far higher casualties on their Israeli enemies: "[Hezbollah] had **secure cell phones, used secure computers**

---

[266] General George W. Casey, Jr., *The Army of the 21st Century*, Army (Oct. 1, 2009), 2009 WLNR 30869494.

[267] *Id.*

[268] *Id.*

*for command and control and got their message out* on local television, and about 3,000

Hezbollah operatives basically held off 30,000 well-armed, well-equipped Israeli soldiers."[269]

706.    **Interoperability.**  Defendants also ensured that the IRGC realized enormous

gains in terrorist effectiveness and lethality based upon the unique interoperability advantages

that MTN Group, Phuthuma Nhleko, and Irene Charnley, afforded to the IRGC and its terrorist

allies.

707.    **Intelligence.**  Defendants also ensured that the IRGC achieved a generational

improvement in their intelligence collection.  As one analyst told the *Christian Science Monitor*,

"[m]obile phone networks and how they connect is one of the IRGC's key priorities because it's

one of the key tools for opponents," and concluded the IRGC was "improving its connectivity

and information-sharing."[270]

708.    MTN Group, MTN Irancell, Phuthuma Nhleko, and Irene Charnley served as

corporate "covers" for the IRGC and intentionally structured transactions, supplier relationships,

and pricing decisions, among other things, for the specific purpose of illicitly obtaining state-of-

the-art American technology, like enterprise level servers.  The end goal: transfer the illicitly

obtained goods to the IRGC for their use in the terrorist campaign against Americans around the

world.  By serving as corporate "covers" for the IRGC each Defendant significantly increased

the potency of the scheme, as demonstrated by how long it has endured.

---

[269] J.D. Leipold, *CSA Addresses Worldwide Challenges at Brookings Institution*, Defense
Department Documents (Feb. 2, 2010), 2010 WLNR 2196129.

[270] Iason Athanasiadis, *How Iranian Dissidents Slip Through Tehran's Airport Dragnet*,
Christian Science Monitor (Feb. 8, 2010), 2010 WLNR 2676528.

### 2. Defendants Knew That Their Secret Security Cooperation Agreement Helped The IRGC Finance Terrorist Attacks Against Americans

#### i. Defendants Knew That Their Secret Security Cooperation Agreement Helped The IRGC Finance Terrorist Attacks Against Americans Through The Illicit Cash Flow That Defendants Caused To Course Through MTN Irancell To The IRGC For Its Terrorist Operations Budgets

709. The IRGC derived substantial terrorist funding from the billions of dollars in MTN Irancell and TCI-related cash flows, and at least hundreds of millions of dollars annually.

710. From 2005 through the present, MTN Group's, Phuthuma Nhleko's, and Irene Charnley's illicit transactions with MTN Irancell, the Bonyad Mostazafan, IEI, TCI (including MCI), Exit40, and/or the Akbari Fronts, provided millions, annually, in illicit funds, weapons, and operational support to Hezbollah, Jaysh al-Mahdi, and the IRGC which the Joint Cells used to attack Americans in Iraq, including Plaintiffs and their loved ones.

711. MTN Group, Phuthuma Nhleko, and Irene Charnley significantly increased the cash flowing through MTN Irancell and TCI, and ultimately deployed by the IRGC. They did so by illicitly supplying the state-of-the-art American technologies, like servers, to MTN Irancell and TCI, and by extension the IRGC (including its Hezbollah Division and Qods Force) needed to attack Americans abroad.

712. By illicitly helping MTN Irancell expand the footprint of its network, MTN Group, Phuthuma Nhleko, and Irene Charnley generated new cash flow by connecting more customers to MTN and therefore more money to flow through MTN Irancell to the IRGC.

713. As a matter of economic first principles, MTN Group's, Phuthuma Nhleko's, and Irene Charnley's participation in MTN Irancell caused the latter to become more profitable, because MTN Group was able to bring its networking expertise to the table.

714.     MTN's logic compels this conclusion.  According to Gordon Kyomukama, Chief Technical Officer of MTN, "[a]t MTN, extending the footprint of our network and services to **ensure that we connect more people** has been and remains a high priority for our company."[271]

715.     On information and belief, on or about 2012, MTN Group began discussions with one or more components of the U.S. government concerning MTN Group's desire to repatriate hundreds of millions of dollars from MTN Irancell.

716.     The financial, technical, communications, intelligence, and operational support that that MTN Group, Phuthuma Nhleko, and Irene Charnley, and their respective U.S. manufacturers provided to their IRGC-controlled, including Qods Force-controlled, counterparties flowed through to the Joint Cells that committed each attack that injured each Plaintiff through some channels that were "official" and some that were "off-the-books."

717.     From 2003 through the present, the IRGC supplied the Joint Cells – at a Cell level and directly to each constituent member (i.e., Hezbollah, the Qods Force, and Jaysh al-Mahdi) – with substantial and regular arms deliveries, financial aid, training, logistical support, communications technology (including secure American mobile phones), safe haven assistance, and aid with narcotics trafficking (conspiring with, among others, al-Qaeda and the Taliban, including its Haqqani Network), each form of aid facilitated their shared terrorist enterprise against America (i.e., their agreement to attack Americans in Iraq and Afghanistan to drive the U.S. out of the Middle East), which al-Qaeda, al-Qaeda-in-Iraq, Ansar al-Islam used to execute the nationwide attack campaign in Iraq that killed and injured Plaintiffs.

---

[271] Intelsat, *Press Release: Uganda Joins Forces with Intelsat, ITSO and MTN to Accelerate 3G Network Infrastructure Deployment in Rural Areas* (May 4, 2018), https://investors.intelsat.com/news-releases/news-release-details/uganda-joins-forces-intelsat-itso-and-mtn-accelerate-3g-network.

718.     MTN Group, Phuthuma Nhleko, and Irene Charnley transferred (or facilitated the transfer of) embargoed dual-use American technology, included the annual funneling of thousands of secure American smartphones, supplied hundreds of millions of U.S. Dollars' worth of cash flow, and facilitated a vast network of logistical and operational support for the Irancell and TCI fronts that were controlled by the IRGC. This technology, money, and services flowed through to al-Qaeda, al-Qaeda-in-Iraq, and Ansar al-Islam, who committed each attack that injured each Iraq Plaintiff, through transfers made by the IRGC to the IRGC Sunni Terrorist Proxies, and flowed through to facilitate attacks against Americans in Afghanistan by the al-Qaeda/Taliban Syndicate.

719.     With respect to MTN Group's, Phuthuma Nhleko's, and Irene Charnley's "official" transactions with Hezbollah, Qods Force, and Regular IRGC front counterparties – which, though open and notorious, were still illegal – flowed through the IRGC into the specific terrorist organizations upon which the IRGC relied to conduct Iranian "security" operations outside of Iran including, but not limited to:

  **(A)**   **Hezbollah's External Security Organization Budget:** In order to fund, arm, train, equip, and logistically support designated terrorist groups, or forward-deployed Hezbollah terrorists, who sought to attack Americans including, but not limited to:

    (i)  Hezbollah's forward-deployed operatives worldwide, including but not limited to, Hezbollah attack planners, bomb makers, logisticians, trainers, attack cells, fundraisers, financiers, propagandists, and videographers, all of whom were regularly forward deployed, under IRGC doctrine, to help commit and plan terrorist attacks alongside local proxy groups (e.g., Jaysh al-Mahdi in Iraq or the Taliban in Afghanistan) wherever Americans were found, including, but not limited to, Iraq, Iran, Lebanon, Syria, Yemen, Bahrain, the U.A.E.,  Afghanistan; and

    (ii) The other members of the Joint Cells (through forward-deployed in-country Hezbollah cell leaders) that committed each attack that injured each Plaintiff in Iraq, and to support Iranian terrorist proxies worldwide, including, but not limited to, al-Qaeda, the Taliban (including its Haqqani Network), and the Houthis.

(B)   **The Qods Force's "Security" Budget:**  In order to fund, arm, train, equip, and logistically support designated terrorist groups that specifically targeted Americans including, but not limited to:

   (i)   **IRGC Shiite FTO/SDGT Proxies:**  Hezbollah and, through Hezbollah, Jaysh al-Mahdi, including Jaysh al-Mahdi Special Group Asaib Ahl al-Haq, and Jaysh al-Mahdi Special Group Ka'taib Hezbollah, in order to facilitate terrorist attacks against Americans in Iraq or Afghanistan on their own or through cooperation with al-Qaeda and the Taliban, including its Haqqani Network; and

   (ii)   **IRGC Sunni Terrorist Proxies:**  al-Qaeda, al-Qaeda-in-Iraq (which later became ISIS), Ansar al-Islam, and the Taliban (including its Haqqani Network), among other al-Qaeda affiliates, to facilitate terrorist attacks against Americans in Iraq, Syria, Yemen, Afghanistan, and Europe, through cooperation with one another.

720.   From 2005 until the present, MTN Group, Phuthuma Nhleko, and Irene Charnley, each showered (or caused to be showered) millions in value upon the IRGC each year.  Their official transactions flowed through Hezbollah to the terrorist(s) that committed each attack against each Plaintiff.

721.   MTN Group's, Phuthuma Nhleko's, and Irene Charnley's covert "off-the-books" assistance to the terrorists was no less important.  The IRGC has provided tens of millions of dollars "off-the-books" to Hezbollah and (through Hezbollah) to local terrorist proxies since Hezbollah's inception.  Defendants' "off-the-books" financial-, technology-, and services-related transactions with their IRGC, including Hezbollah Division and Qods Force, front counterparties also flowed through the IRGC, its Hezbollah Division and Qods Force, into their proxies' terrorist budgets in order to fund the attacks committed by the al-Qaeda-related cells comprised of IRGC Sunni Terrorist Proxies in Iraq that committed each attack that injured each Plaintiff. MTN Group's, Phuthuma Nhleko's, and Irene Charnley's illicit transactions with the Bonyad Mostazafan, IEI, MTN Irancell, TCI (including MCI), and/or the Akbari Fronts provided millions in illicit "off-the-books" income, often in U.S. dollars, to the IRGC each year, which the

240

IRGC then provided to Hezbollah so that the Joint Cells could commit each attack that injured each Plaintiff, which they did.

722.    On information and belief, from 2005 through on or about 2010, the IRGC diverted approximately twenty percent (20%) of its net income cash flow from MTN Group and MTN Irancell to the IRGC, Qods Force, and Hezbollah, with each receiving a similar amount each year.  At those rates, MTN Group, Phuthuma Nhleko, and Irene Charnley caused, at least: (i) more than $30 million dollars to flow through Irancell to the Qods Force each year; (ii) more than $30 million dollars to flow through the IRGC to Hezbollah each year; and (iii) more than $30 million dollars to flow to the Regular IRGC each year.  Such cash flows were delivered in regular, predictable amounts, and supported Qods Force and Hezbollah operations, weapons purchases, and personnel costs, among other expenses, in support of anti-American terrorist operations by Qods Force and Hezbollah throughout the Middle East including, but not limited to, Iran, Iraq, Lebanon, Afghanistan, Syria, and Yemen.

723.    On information and belief, MTN Group's and MTN Irancell's cash flows to the IRGC began in earnest by no later than the summer of 2005.  Based on MTN Group and MTN Irancell cash flows (from MTN Group loans) in 2005, MTN Group caused approximately $75 million to flow through to Hezbollah, the Qods Force, and Regular IRGC during the final six months of 2005 alone, split roughly evenly between these three IRGC components.[272]

724.    On information and belief, after economic sanctions began to hammer the IRGC in or about 2010, the IRGC responded by cutting spending across the board in half, and therefore cut the cash flow through from MTN Irancell to the IRGC, Qods Force, and Hezbollah from

---

[272] In 2005, MTN Group caused the initial 300 million Euro payment made to the Iranian Shareholders, which was valued at approximately $375 million in 2005 dollars; 20% of that was approximately $75 million.

twenty percent (20%) to ten percent (10%), with each receiving a similar amount each year. At those rates, MTN Group, Phuthuma Nhleko, and Irene Charnley caused, at least: (i) more than $15 million dollars to flow through the IRGC to the Qods Force each year; (ii) more than $15 million dollars to flow to Hezbollah each year; and (iii) more than $15 million dollars to flow through to Regular IRGC each year. Moreover, MTN Group also caused additional enormous cash flows to course through Irancell and flow through to the IRGC's terrorist enterprise when MTN Group regularly made large additional loans worth tens of millions of dollars to Irancell after the sanctions intensified. The above-described cash flows were delivered in regular, predictable amounts, and supported Qods Force and Hezbollah operations, weapons purchases, and personnel costs, among other expenses, in support of anti-American terrorist operations by Hezbollah, the Qods Force, and the IRGC Sunni Terrorist Proxies in Iraq and Syria.

> **ii.** **Defendants Knew That Their Secret Security Cooperation Agreement Helped The IRGC Finance Terrorist Attacks Against Americans Through Illicit Off-Books Cash Flow From Fundraising Campaigns, Procurement Bribes, Khums, Financial Management, And Fronts Like Exit40**

725. Defendants knew that their **technical assistance** facilitated terrorist fundraising campaigns by the IRGC that directly supported attacks by IRGC Sunni Terrorist Proxies in Iraq by supplying resources to such terrorists through the IRGC.

726. Defendants knew that their **procurement bribes** facilitated terrorist fundraising campaigns by the IRGC that directly supported attacks IRGC Sunni Terrorist Proxies in Iraq by channeling resources to such terrorists through the IRGC.

727. Defendants knew that their **indirect donations (*khums*)**, meaning the cash flow that Defendants triggered when they paid the IRGC (e.g., when they bribed an IRGC cutout in Dubai), facilitated terrorist fundraising campaigns by the IRGC that directly supported attacks in Iraq and Afghanistan by channeling resources to the IRGC and its terrorist allies.

728.     Defendants knew that their **management consulting assistance** aided the IRGC by revolutionizing their financial management capabilities, which meant that the terrorists had more resources upon which to draw for killing Americans.

**3.      Defendants Knew That Their Secret Security Cooperation Agreement Helped The IRGC Source Weapons To Commit Terrorist Attacks Against Americans**

**i.      Defendants Knew That Their Secret Security Cooperation Agreement Helped The IRGC Source Improvised Explosive Devises (IEDs)**

729.     Defendants also supported the terrorist campaign through their financial support of fronts acting for the IRGC which provided Hezbollah and the Qods Force the funds, bomb parts, and other necessary material vital to the IRGC Sunni Terrorist Proxies' ability to conduct a nationwide IED campaign targeting Americans in Iraq.  The IRGC manufactured and/or sourced key components for the IRGC Sunni Terrorist Proxies' IED attacks, including, but not limited to:

(i)      military- and factory-grade explosives;

(ii)     calcium ammonium nitrate ("CAN") fertilizer (smuggled from Pakistan, through Iran, into Iraq), for use by al-Qaeda and al-Qaeda-in-Iraq in their signature fertilizer bombs;

(iii)    secure cell phones and other embargoed communications technologies, which al-Qaeda, al-Qaeda-in-Iraq, and Ansar al-Islam used to safely and securely communicate with one another, as well as with their IRGC sponsors, including Hezbollah and the Qods Force;

(iv)     embargoed bomb components necessary to produce the large volumes of reliable IEDs needed by the IRGC Sunni Terrorist Proxies to sustain their nationwide campaign against Americans in Iraq; and

(v)      fully-built IEDs, including, but not limited to, roadside bombs, vehicle-borne IEDs, and suicide vests.

730.     MTN also supported the terrorist campaign through their financial support of fronts acting for the IRGC which funded the IRGC Sunni Terrorist Proxy attacks as well as the weapons, resources, communications technologies (including the American smartphones

Defendants helped source), which also flowed through to the same IRGC proxies so they could attack Americans around the world, including Iraq.

> i.   **Defendants Knew That Their Secret Security Cooperation Agreement Helped The IRGC Source Rockets**

731.   Defendants' assistance directly improved the lethality and accuracy of the rockets deployed by the IRGC.

> 4.   **Defendants Knew That Their Secret Security Cooperation Agreement Amplified The IRGC's Recruiting, Fundraising, Strategic Communications, And Disinformation Campaigns, Which Defendants Knew Facilitated IRGC Terrorist Operations Against Americans**

732.   IRGC doctrine emphasizes the centrality of orchestrated propaganda campaigns to drive recruiting and fundraising, strategic communications to deliver custom messages to custom audiences, and broad disinformation campaigns to conceal the terrorists' schemes and facilitate the continued flow of material support from the IRGC's corporate sponsors, like each Defendant, which flowed through to the IRGC's terrorist proxies targeting Americans in the Middle East. The terrorists devoted so much time to these efforts for an obvious reason:  they played a vital role in fueling the terrorists' campaigns and maximizing the number of Americans the terrorists could kill in Iraq, Afghanistan, and throughout the Middle East.  "Based on their extensive reach in the communications economy," according to Ms. Gill, "the IRGC orchestrated a 'comprehensive messaging strategy' using radio and television broadcasts, newspapers, websites, and social media accounts to amplify the message that the Islamic Republic was under attack from the West.  Using media infrastructure … and telecommunications infrastructure …, the IRGC actively engaged the communications economy in defending the Islamic Republic against the soft war tactics of the West.[273]

---

[273] Gill, *Capitalism, Communications, and the Corps*, at 110.

733.    In so doing, Hezbollah, the Qods Force, and their proxies, leveraged the explosion of information technologies and computing power since 2000.  As the United Nations Office on Drugs and Crime ("UNODC") documented in 2012:

> Technology is one of the strategic factors driving the increasing use of the Internet by terrorist organizations and their supporters for a wide range of purposes, including recruitment, financing, propaganda, training, incitement to commit acts of terrorism, and the gathering and dissemination of information for terrorist purposes. While the many benefits of the Internet are self-evident, it may also be used to facilitate communication within terrorist organizations and to transmit information on, as well as material support for, planned acts of terrorism, all of which require specific technical knowledge for the effective investigation of these offences.[274]

### i.    Defendants Knew That Their Secret Security Cooperation Agreement Aided The IRGC's Recruiting and Fundraising Campaigns

734.    Islamist terrorists have widely relied upon antisemitic appeals to raise money, recruit followers, and gain other advantages.  The Anti-Defamation League observed in 2015:

> Fourteen years after 9/11, terrorist groups motivated by Islamic extremist ideology, from Al Qaeda to the Islamic State of Iraq and Syria (ISIS), continue to rely on depictions of a Jewish enemy – often combined with violent opposition to the State of Israel – to recruit followers, motivate adherents and draw attention to their cause. Anti-Israel sentiment is not the same as anti-Semitism. However, terrorist groups often link the two, exploiting hatred of Israel to further encourage attacks against Jews worldwide and as an additional means of diverting attention to their cause.[275]

735.    Few terrorists are more committed to this strategy than the IRGC who have long used baldly antisemitic propaganda as a core part of their terrorist recruitment strategy, by

---

[274] United Nations Office on Drugs and Crime, *The Use of the Internet for Terrorist Purposes* at 1 (Sept. 2012), https://www.unodc.org/documents/frontpage/Use_of_Internet_for_Terrorist_Purposes.pdf.

[275] Anti-Defamation League, *Anti-Semitism: A Pillar of Islamic Extremist Ideology* at 1 (2015), https://www.adl.org/sites/default/files/documents/assets/pdf/combating-hate/Anti-Semitism-A-Pillar-of-Islamic-Extremist-Ideology.pdf.

spreading the hateful slur that the United States and Israel are part of a Jewish-led cabal seeking to take over Muslim lands.

736.    The IRGC's campaign to spread hateful antisemitic propaganda about Israel, the United States, and people of the Jewish faith were not the idle musings of disorganized radical Islamists blogging out of their parents' basements.  These were industrial scale, IRGC- and Hezbollah-administered propaganda campaigns that sought to strengthen the terrorist conspirators' ability to attack Americans worldwide by, among other things:  (1) **bolster terrorist fundraising** by increasing the potency of the terrorists' online fundraising appeals, and thereby drive more dollars to the terrorist campaign; (2) **recruit more terrorists** by creating the initial touchpoints for new recruits, e.g., a 16-year old watches a splashy Hezbollah video and decides to join the group; and (3) **enhance the terrorists' concealment** by flooding the zone with propaganda designed to persuade the population to support the terrorists (ideal) or, at least, not rat them out to the Americans nearby (almost as good), by portraying a common enemy.

737.    Regular media discussions also specifically alerted Defendants that the IRGC, including its Hezbollah Division and the Qods Force, deployed antisemitic propaganda to raise money and recruit terrorists.

738.    In furtherance of the IRGC's recruiting efforts, MTN Group, Phuthuma Nhleko, and Irene Charnley were one in spirit with the antisemitic terrorist recruiting messaging of the IRGC, including Hezbollah, and the Qods Force, as well as their co-conspirators in Syria (like the Assad regime) and Afghanistan (like al-Qaeda and the Taliban, including its Haqqani Network).

739.    *First*, MTN Group, while led by Phuthuma Nhleko and Irene Charnley, regularly enabled the creation, uploading, distribution, downloading, and propagation of a near-constant

24/7 river of terrorist recruitment appeals by, among others, Hezbollah, the Qods Force, Regular IRGC, the Assad regime, and the Taliban, including its Haqqani Network, through Defendants' provision of technical, financial, operational, and personnel support to MTN Irancell and MTN Syria, both of which reinforced the recruiting campaigns.

740.   *Second*, MTN Group never publicly condemned the antisemitic terrorist propaganda MTN Group enabled in Iran (through MTN Irancell), Syria (through MTN Syria), Yemen (through MTN Yemen), and Afghanistan (through MTN Afghanistan).  In every country where the IRGC sponsored terrorist proxy attacks against Americans, MTN Group, Phuthuma Nhleko, and Irene Charnley facilitated the local MTN subsidiary's direct and indirect assistance to the recruiting campaigns, all of which followed the Hezbollah playbook of using over-the-top bile to raise awareness for recruiting drives, fundraising solicitations, and more.

741.   MTN Group was (and remains) one in spirit with the IRGC's, including Hezbollah's and the Qods Force's, antisemitic terrorist recruiting message.  Most obviously, MTN Group is the but-for cause of the terrorists' ability to spread their recruitment pitches so effectively through the litany of terrorist-enabling services that MTN Group committed every MTN subsidiary and affiliate to provide to all "Iranian Shareholders," i.e., the IRGC, including its Hezbollah Division and the Qods Force, which substantially bolstered the terrorists' antisemitic recruiting and fundraising pitches.

742.   Since 2005, MTN Group, Phuthuma Nhleko, and Irene Charnley facilitated Irancell's broadcasts of the terrorists' antisemitic recruiting propaganda throughout the Middle East while never once publicly stating that: (a) Israel has a right to exist; (b) bomb attacks against Americans in Iraq by Iranian proxies are wrongful; or (c) the Holocaust should be

remembered.  The reason is obvious:  MTN Group, Phuthuma Nhleko, and Irene Charnley agree with their terrorist business partner:  they are one in spirit.[276]

> ii.    Defendants Knew That Their Secret Security Cooperation Agreement Aided The IRGC's Strategic Communications and Disinformation

743.    After 9/11, the IRGC was keenly aware how an effective strategic communications (or "stratcoms") campaign could directly aid their transnational terrorist campaign.  Indeed, no major global terrorist organization has a longer, more prolific, or more impactful record of turning effective strategic communications campaigns into new sources of funds, personnel, safehouses, and the litany of other functions that required an ever-growing group of allies and enablers.

744.    The U.S. military concluded long ago that there was a direct relationship between effective strategic communications and overall probability of success on a given venture.  This reflects a recognition, that, as General George W. Casey, Jr., explained, "Conflicts will continue to take place under the unblinking scrutiny of the 24-hour media cycle and the World Wide Web…. Adversaries will have many forums in which to disseminate their messages worldwide."[277]

---

[276] A Westlaw News search designed to obtain any media report containing the phrases "MTN Group" or "MTN Dubai" within 100 words of the roots for Israel and antisemitism (Westlaw News "MTN Group" or "MTN Dubai" /100 Israel! Antisem! Holocaust!) reveals approximately 300 documents as responsive hits.  Nothing.  A comprehensive Google search similarly reveals no statement.  MTN Group could, of course, cease broadcasting terrorist propaganda, publicly issue a sweeping defense of Israel's right to exist, and unequivocally condemn roadside bomb attacks supported by Iran.  MTN Group's obvious refusal to do so in nearly two decades flies so contrary to international corporate norms, only one conclusion results:  MTN Group and the IRGC are one in spirit.

[277] General George W. Casey, Jr., *The Army of the 21st Century*, Army (Oct. 1, 2009), 2009 WLNR 30869494.

745.     The IRGC also understood that effective strategic communications were necessary to facilitate terrorist operations by, among other things, promoting a disinformation campaign designed to conceal the illicit scheme by causing the spread of falsehoods relating to it, and preventing controversies that could expose co-conspirators, incentivize people to halt their support for terrorist schemes, or foreseeably cause a co-conspirator to be financially or logistically unable to continue supporting the criminal agreement, such as a threat that could cause a corporate co-conspirator to lose billions of dollars or cause an individual co-conspirator to lose their life or freedom.

746.     Writing in an official NATO journal in 2020, Ms. Gill explained, "The Invisible Hand of the IRGC" touched every transaction relating to MTN Irancell, TCI, and their associated IRGC front company shareholders and, as a result, "the reliance of the IRGC's strategic narrative on the communications economy concerns more than explicitly ideological motivations; a distinctly coercive element can also be identified.  Beyond their devotion to the Construction Jihad, the Guard relied on the communications economy as a tool of power projection."[278]

747.     MTN Group, Phuthuma Nhleko, and Irene Charnley coordinated the strategic communications and crisis prevention efforts that concealed MTN Group's explicit embrace of the terrorist campaign through the Security Cooperation Agreement, and managed MTN Irancell-related strategic communications and public branding outside of Iran.

748.     Ever since MTN Group, Phuthuma Nhleko, and Irene Charnley committed themselves, and every MTN subsidiary and affiliate, to MTN's secret Security Cooperation

---

[278] Gill, *Capitalism, Communications, and the Corps*, at 108.  Ms. Gill concluded that "[w]hilst strategic narratives construct the truth, communications economies enable control over communicative processes; both reinforce one another to create a hegemonic understanding of reality that supports a political actor's values, interests, or objectives."  *Id.* at 113.

Agreement with Hezbollah, the Qods Force, and the Regular IRGC on September 18, 2005,

MTN Group, Phuthuma Nhleko, Irene Charnley, and agents acting on their behalf, pursued an

aggressive strategic communications campaign to conceal Defendants' material support to

Hezbollah, the Qods Force, Regular IRGC, and their terrorist proxies in Iraq and Afghanistan.

749.    MTN Group, Phuthuma Nhleko, and Irene Charnley successfully suppressed any

leaks, materially negative press reporting, or public sector investigations in the United States,

Europe, Africa, or Southeast Asia concerning MTN Group's secret Security Cooperation

Agreement with Hezbollah, the Qods Force, and Regular IRGC, until on or about March 28,

2012, when Turkcell sued MTN in federal district court in Washington, D.C., at which time a

whistleblower revealed the secret Agreement to the world through Turkcell's lawsuit.  On

information and belief, MTN Group relied upon effective strategic communications and crisis

prevention services to prevent negative information from "leaking" for nearly seven years after

the Agreement was signed.

750.    MTN Group's successful communications strategy prevented any major media

scandals concerning MTN Group from between 2005 and 2010.  Ordinarily, of course, a parent

company's brand equity is of no moment in an Anti-Terrorism Act case.  But when that parent

company is, effectively, the joint venture partner of terrorists, as is the case here, and when the

point of the joint venture is to generate cash flow and serve as cover for sourcing illicit weapons

parts, then the parent company's brand and reputation are essential.

751.    Simply put, MTN Group began serving as the IRGC's telecommunications- and

computing-related financial and logistics agent worldwide in 2005, never stopped doing so, and

continues to play the same role today even after the IRGC was designated an FTO.  To

accomplish that task, MTN Group, Phuthuma Nhleko, and Irene Charnley, coordinated MTN

Group's strategy with MTN Dubai and others to engage in a series of illegal and fraudulent transactions designed to raise money and source key terrorist components from the United States.

752.     When MTN Group, Phuthuma Nhleko, and Irene Charnley, operated a worldwide campaign to, among other things, illicitly source more than ten thousand (10,000) high-tech American-manufactured smartphones from sellers within the United States to MTN Group's complicit agents, employees, and cut-outs worldwide, ***MTN Group, Phuthuma Nhleko, and Irene Charnley, were acting as a front for Hezbollah and the Qods Force***.  Through their conduct, MTN Group, Phuthuma Nhleko, and Irene Charnley, turned MTN Group itself into an "Orbit" for Hezbollah, the Qods Force, and the Regular IRGC, similar to how – as described in an analysis published by NATO – the IRGC deployed "Orbit" terrorist tradecraft to acquire money and technologies necessary to grow the IRGC and further its terrorist mission.

753.     MTN Group's, Phuthuma Nhleko's, and Irene Charnley's, continued open and notorious service as a terrorist front even after these issues surfaced repeatedly in litigation beginning on March 28, 2012 and continuing ever since.   Even now, MTN Group continues to act as a front for the IRGC (an FTO), the Qods Force (an FTO), Hezbollah (an FTO), all of whom, as constituent members of the IRGC were, and remain, parties to MTN's Security Cooperation Agreement with the IRGC.  Plainly, MTN Group, Phuthuma Nhleko, and Irene Charnley meant to serve as a terrorist front.

754.     In their capacity as long-standing joint venture allies, fundraising partners, and illicit sourcing fronts since 2005, MTN Group, MTN Irancell, Phuthuma Nhleko, and Irene Charnley knew, or were generally aware, that there was a direct, linear, and measurable relationship between MTN Group's, MTN Irancell's, Phuthuma Nhleko's, and Irene Charnley's public reputation and brand health, on the one hand, and the volume of money and illicitly

sourced technology that ultimately flowed through to the Regular IRGC, Hezbollah, Qods Force, and their terrorist proxies worldwide, on the other hand. Such knowledge, or general awareness, extended to, among others: (1) MTN Group's President and CEO; (2) MTN Group's Commercial Director; (3) MTN Group's Board of Directors; (4) MTN Group's in-house counsel and "compliance"[279] staff; and (5) MTN Group's external advisors.

755.    The better MTN Group's public reputation and brand health, the more cash to flow through MTN Irancell to the terrorists because, among other reasons: (1) the better MTN Group's brand, the better the sales for MTN Group's joint venture partner, the IRGC, through Irancell; and (2) the easier it was for MTN Group to illicitly source the technology demanded by Hezbollah and the Qods Force – especially for the higher-cost items like servers, or unusually large bulk orders of less expensive (but still costly) items, like smartphones. Often, such transactions required that MTN Group, Phuthuma Nhleko, and Irene Charnley, and the agents and cut-outs acting on their behalf, transact with suppliers who were more concerned about reputational risk in comparison to the more traditional high-tech black-market resellers for things like smartphones.

756.    From 2005 through at least 2011, MTN Group pursued a successful strategic communications campaign that prevented any catastrophic public relations scandals in the United States, Europe, Africa, or Southeast Asia concerning MTN Irancell, MTN Group, or any

---

[279] MTN Group and its agents and affiliates are actively – and defiantly – aiding multiple Foreign Terrorist Organizations through the ongoing river of cash, free goods, services, management consulting, strategic communications, and disinformation support that MTN Group and its agents and affiliates are effectively causing to flow to the IRGC, including its Lebanese Hezbollah Division and Qods Force, through MTN Irancell, which MTN Group refuses to immediately compel to wind down. As such, one may reasonably assume that "compliance" as currently practiced at MTN Group is the opposite of what it supposed to be – a program designed to conceal criminality rather than flush it out of MTN.

other MTN subsidiary or affiliate that could have undermined MTN Group's ability to serve as "cover" most effectively for the terrorist campaign's continuing efforts to illicitly source weapons and funds to enable terrorist attacks against Americans in Iraq and Afghanistan.

757.    In or about December 2010 or January 2011, MTN Group caused MTN Nigeria to hire Individual 1, a former high-level official in the Obama Administration, ostensibly to give two speeches, for which Individual 1 accepted a $100,000 speaking fee.  On information and belief, MTN Group either wired the $100,000 to Individual 1's bank account in the United States itself, or MTN Nigeria wired the $100,000 to Individual 1's bank account at the direction of MTN Group, which thereafter reimbursed MTN Nigeria.

758.    When MTN Group caused MTN Nigeria to pay Individual 1's $100,000 speaker fee, it was not because MTN Group or MTN Nigeria were interested in Individual 1's speech. Instead, on information and belief, MTN Group caused MTN Nigeria to pay Individual 1, because MTN Group knew that Individual 1 would return to the Obama Administration, and MTN Group intended to induce Individual 1's service as a backdoor communications channel with the White House.

759.    MTN Group paid Individual 1 because MTN Group knew Individual 1 would be immensely influential within the Obama Administration while it was analyzing, among other things, the geopolitical and public messaging concerns attendant to the question of whether to soften the then-existing sanctions, which were crushing the IRGC, and therefore undermining MTN Group's joint venture partner – and, by extension, MTN Group.

760.    MTN Group's retention of Individual 1 in December 2010 and indirect payment (through its captive subsidiary, MTN Nigeria) of $100,000 to Individual 1 was an act in furtherance of the scheme.  On information and belief, MTN Group wired $100,000 to Individual

1, causing it to be received by Individual 1 inside the United States, hoping that Individual 1 would, in effect, be on MTN Group's "side" (or at least, willing to take a meeting) when the Irancell-related sanctions came before the Obama Administration.

## VIII. THE FUNDS, ARMS, TECHNOLOGIES, AND SERVICES THAT DEFENDANTS ILLICITLY TRANSFERRED TO HEZBOLLAH AND THE QODS FORCE THROUGH MTN IRANCELL FLOWED ON, THROUGH HEZBOLLAH AND THE QODS FORCE, TO AL-QAEDA, AL-QAEDA-IN-IRAQ, AND ANSAR-AL-ISLAM, AND CAUSED THE ATTACKS IN IRAQ THAT KILLED AND INJURED PLAINTIFFS

761.    The IRGC has supported a broad coalition of anti-American terrorists in the countries bordering it, Iraq and Afghanistan, including virtually every prominent Shiite and Sunni terrorist group that has operated in Iraq since the fall of Saddam.  Until his death on January 2, 2020, Qassem Soleimani masterminded the IRGC's support for both Shiite and Sunni Anti-American terrorists, following the simple rule that any terrorist group that (a) was targeting the United States while (b) foregoing attacks inside Iran would (c) receive weapons, funding, training, logistical support, and safe havens courtesy of the IRGC.  This simple calculus has underscored the IRGC's terrorist agenda against America in the countries bordering Iran (Iraq and Afghanistan) for decades and continues to do so through this day.

762.    As one scholar writing in the journal published by the Combating Terrorism Center at West Point summarized the evidence in 2010, "it is clear that Iran has a proven ability to commission violence inside Iraq. … As the unclassified Iraqi government Harmony records collated by the Combating Terrorism Center at West Point illustrate, the Islamic Republic of Iran has been in the business of sponsoring Iraqi paramilitary proxies for 30 years, practically the government's entire existence."[280]

---

[280] Knights, *The Evolution of Iran's Special Groups in Iraq*.

763.    When U.S. forces arrived in Iraq, Iran's nationwide terror campaign against Americans there was assigned to the Qods Force under the command of Soleimani, who answered directly to Ayatollah Khamenei.

764.    As the Congressional Research Service reported in 2007, "DOD officials reportedly captured four Iranian terrorists in July 2007 who [were] accused of smuggling explosives and personnel from Iran into Iraq," and "Iran [was] suspected of supplying Iraq insurgents with IEDs, training, and new designs and technology for explosive devices, such as 'passive infrared' electronic sensors that [were] used for triggering roadside bombs" and were "more resistant to electromagnetic countermeasures [] employed by U.S. forces."[281]  These findings by DOD officials accord with the reality that "[a] constant feature of Iran's policy for more than 20 years has been the importance of uninterrupted cross-border resupply for Iran's proxies in Iraq."[282]

765.    According to the U.S. State Department's 2008 Country Reports on Terrorism: "The Qods Force, an elite branch of the [IRGC], is the regime's primary mechanism for cultivating and supporting terrorists abroad.  The Qods Force provided aid in the form of weapons, training, and funding to HAMAS and other Palestinian terrorist groups, Lebanese Hizballah, Iraq-based militants, and Taliban fighters in Afghanistan."[283]

766.    The First Corps of the Qods Force, one of its four regional commands, implements Iran's foreign policy in Iraq.  During the relevant timeframe, the Qods Force did so largely by providing the Shiite and Sunni terrorists with material support for terrorist attacks in Iraq.  The

---

[281] Clay Wilson (Specialist in Technology and National Security), *Improvised Explosive Devices (IEDs) in Iraq and Afghanistan: Effects and Countermeasures*, CRS Report for Congress, at 3 (Aug. 28, 2007).

[282] Knights, *The Evolution of Iran's Special Groups in Iraq*.

[283] U.S. State Dep't, *Country Reports on Terrorism 2008* at 182-83 (Apr. 2009).

First Corps' al-Ramazan Headquarters is based across several sites in Iran's largest city (and capital), Tehran, a short trip from the border with Iraq.[284]

767.    Raids conducted in Iraq by the elite U.S. Joint Special Operations Command ("JSOC") also proved that the IRGC and Qods Force directly deployed their own terrorists inside Iraq to help attack Americans there and to directly participate, on occasion, in attacks themselves. For example, in a late 2006 JSOC raid in central Iraq, U.S. forces detained Mohsen Chizari, the Qods Force's head of Operations and Training, as well as the Qods Force's station chiefs for Baghdad and Dubai.  In another raid in northern Iraq, U.S. forces captured five Qods Force terrorists.  To counter Iran's malign activities in Iraq, JSOC bifurcated its terrorist task forces and created Task Force 16 (to hunt al-Qaeda-in-Iraq) and Task Force 17 (to hunt Shiite terrorists in Iraq).  In so doing, JSOC personnel from Task Force 16 and Task Force 17 discovered that Sunni and Shiite terrorists were secretly working together. They concluded that Soleimani and the Qods Force helped al-Qaeda-in-Iraq based on the Iranian conclusion that any agent of chaos and murder in Iraq – no matter whom they were or targeted – would quicken the American exit from Iraq and therefore, on balance, advance their interests given their belief that the U.S. was their top enemy.

768.    "A consistent feature of Iran's patronage has been careful efforts to spread Tehran's bets across many different horses."[285]  As set forth below, the IRGC afforded a comprehensive program of material support to Sunni terrorists targeting Americans in Iraq, as long as such groups did not also target Iran itself.

---

[284] Joseph Felter & Brian Fishman, *Iranian Strategy in Iraq, Politics and "Other Means"* at 18, Combating Terrorism Center (Oct. 13, 2008).

[285] Knights, *The Evolution of Iran's Special Groups in Iraq*.

A.    **The IRGC Provided Material Support And Resources To Al-Qaeda-Affiliated Sunni Terrorists Targeting Americans In Iraq To Undermine The U.S. Mission There**

769.    Through the Qods Force, and other Iranian terrorist relationships, the IRGC provided material support and resources to all prominent Sunni terrorist groups targeting Americans in Iraq, supporting attacks committed directly by al-Qaeda, al-Qaeda-in-Iraq, and/or Ansar al-Islam.

770.    Although there are religious differences between the Shiite Iranian regime and the Sunni terrorist organizations that targeted Americans in Iraq, those differences have not deterred the IRGC from supporting Sunni terrorist activities.  The IRGC and their Sunni terrorist partners share a core geopolitical aim:  to inflict mass casualties on Americans in the region.  Sectarian distinctions aside, the IRGC has supported and funded attacks by Sunni terrorists on U.S. and allied forces in Iraq to harm the United States, including al-Qaeda, al-Qaeda-in-Iraq, and Ansar al-Islam.

771.    Soleimani was ready to work with any terrorist group that could grow Iran's "axis of resistance" to the U.S., even if they were Sunnis who ordinarily opposed Iran's Shiite theocracy. As Iran expert Karim Sadjadpour of the Carnegie Endowment for International Peace explained, "[u]nder Soleimani's command, Iran became the only country in the region capable of harnessing both Shiite extremism and, at times, Sunni radicalism too." Sadjadpour continued:[286]

> [Soleimani's] sinister genius in bridging sectarian divides has given Iran an enormous asymmetric advantage over its great Sunni Arab rival in the Gulf, Saudi Arabia. All Shiite extremists are willing to fight for Iran, while most Sunni extremists—including al Qaeda and Islamic State—want to overthrow Saudi Arabia, which they see as a corrupt, impious agent of the West.
>
> Soleimani conceived of using Sunni jihadists to fight the U.S. in much the same way that the U.S. used Sunni jihadists to fight the Soviet Union in Afghanistan in

---

[286] Sadjadpour, *Sinister Genius*.

the 1980s. Iran's Shiite theocracy has managed, at times, to cooperate tactically with deadly Sunni extremist groups—including the Taliban in Afghanistan and the Palestinian groups Hamas and Palestinian Islamic Jihad—against their common foes, the U.S. and Israel, even as Iran has been fighting on the front lines against the Sunni fanatics of Islamic state.[287]

772.    Federal judges have made similar findings.  For example, in a 9/11-related case against Iran, the Honorable George B. Daniels of the United States District Court for the Southern District of New York found, as a factual matter, that:

> The well-known historical religious division between Sunnis and Shi'a did not, in fact, pose an insurmountable barrier to cooperation in regard to terrorist operations by radical Islamic leaders and terrorists. Iran, which is largely Shiite, and its terrorist proxy organization, Hizballah, also Shiite, entered into an alliance with al Qaeda, which is Sunni, to work together to conduct terrorist operations against the United States during the 1990s and continuing through, and after, September 11, 2001.[288]

773.    According to Colin P. Clarke, a terrorism expert at the Soufan Center, "Iran uses sectarianism as a cudgel when it suits the regime, but is also willing to overlook the Sunni-Shia divide when it suits Iranian interests," and therefore Iran's assistance to al-Qaeda, al-Qaeda-in-Iraq, and Ansar al-Islam "would not be the first time that Iran had joined forces with Sunni militants, having supported Hamas, Palestinian Islamic Jihad and the Taliban."[289]

774.    U.S. officials concurred.  As one observed during the height of the Sunni insurgency: "I think it stands to reason that Iran is getting something out of this as well."

775.    The "election" of Mahmoud Ahmadinejad in 2005 only deepened Iran's affinity with Sunni extremists who shared a common hatred of America.

---

[287] *Id.*

[288] *In re Terrorist Attacks on Sept. 11, 2001*, No. 03 MDL 1570 (GBD), 2011 WL 13244047, at *12 (S.D.N.Y. Dec. 22, 2011) (findings of fact).

[289] Adam Goldman, Eric Schmitt, Farnaz Fassihi and Ronen Bergman, *Al Qaeda's No. 2, Accused in U.S. Embassy Attacks, Was Killed in Iran*, N.Y. Times (Nov. 13, 2020).

**B.      The IRGC Provided Material Support And Resources To Al-Qaeda To Facilitate Al-Qaeda-Related Terrorist Attacks Against Americans In Iraq And Afghanistan**

**1.      The IRGC Established Al-Qaeda's Capabilities Before 9/11, Prevented Its Collapse After 9/11, And Ensured Its Status As An IRGC Sunni Terrorist Proxy In Iraq From 2001 Through Today**

776.      The IRGC has long provided material support and resources to al-Qaeda.  The sectarian differences between the Shiite regime in Tehran and the Sunni al-Qaeda leadership have not hindered cooperation between the groups.  Whatever their religious differences, both groups share a hatred of America and support anti-American violence.

777.      Hezbollah and the Qods Force have supported al-Qaeda's terrorist activities since the early 1990s, when Osama bin Laden lived in Sudan.  As Judge Daniels found, "[i]n 1991 or 1992, discussions in Sudan between al Qaeda and Iranian operatives led to an informal agreement to cooperate in providing support for actions carried out primarily against Israel and the United States."[290]  "Thereafter, senior al Qaeda operatives and trainers traveled to Iran to receive training in explosives. Osama bin Laden also sent senior aides to Iran for training with the IRGC and to Lebanon for training with Hizballah."[291]

778.      "In 1993, in a meeting in Khartoum, Sudan, arranged by Ah Mohamed, a confessed al Qaeda terrorist and trainer now in a U.S. prison, Osama bin Laden and Ayman al Zawahiri met directly with Iran's master terrorist Imad Mughniyah and Iranian officials, including IRGC Brigadier General Mohammad Baqr Zolqadr, a multipurpose member of the Iranian terrorist structure."[292]

---

[290] *In re Terrorist Attacks on Sept. 11, 2001*, 2011 WL 13244047, at *11 (findings of fact).

[291] *Id*.

[292] *Id*. (internal citations and quotations omitted).

779.    "At the 1993 Khartoum conference, representatives of Iran, Hizballah, and al Qaeda worked out an alliance of joint cooperation and support on terrorism."[293]

780.    "Imad Mughniyah convinced Osama bin Laden of the effectiveness of suicide bombings in driving the U.S. out of Lebanon in the 1980s, and Mughniyah became a major connection point between Iran and al Qaeda."[294]  "Osama bin Laden had been a guerilla fighter in Afghanistan and it was Mughniyah who made bin Laden into an accomplished terrorist."[295]

781.    "The 1993 meeting in Khartoum led to an ongoing series of communications, training arrangements, and operations among Iran and Hizballah and al Qaeda. Osama bin Laden sent more terrorist operatives, including Saef al Adel (who would become number 3 in al Qaeda and its top 'military' commander), to Hizballah training camps operated by Mughniyah and the IRGC in Lebanon and Iran. Among other tactics, Hizballah taught bin Laden's al Qaeda operatives how to bomb large buildings, and Hizballah also gave the al Qaeda operatives training in intelligence and security."[296]

782.    "Another al Qaeda group traveled to the Bekaa Valley in Lebanon to receive training in explosives from Hizballah, as well as training in intelligence and security."[297]

783.    "Iran's *Charge d'Affaires* in Khartoum, Sudan, Majid Kamal, an IRGC commander, coordinated the training expeditions; Kamal had performed the same function in Beirut, Lebanon, in the early 1980s during the formation of Hizballah."[298]

---

[293] *Id*. (internal citations and quotations omitted).

[294] *Id*.

[295] *Id*. (internal citations and quotations omitted).

[296] *Id*. (internal citations and quotations omitted).

[297] *Id*. (internal citations and quotations omitted).

[298] *Id.* at *12 (internal citations and quotations omitted).

784.     Under its alliance with al-Qaeda, Iran also regularly hosted Ayman al-Zawahiri during al-Qaeda's formative years.  As Judge Daniels previously found, "[a]s a result of the creation of this terrorist alliance, al Qaeda's al-Zawahiri repeatedly visited Tehran during the 1990s and met with officers of MOIS [Iran's Ministry of Intelligence and Security], including chief Ali Fallahian, and Qods Force chief Ahmad Vahidi."[299]

785.     "The creation of the Iran–Hizballah-al Qaeda terrorist alliance was followed by a string of terrorist strikes directly against the U.S. and its allies," leading to the first World Trade Center attack in 1993, the Khobar Towers bombing in 1996, the African embassy bombings in 1998, the USS Cole attack in 2000, and 9/11.[300]

786.     As a result of the foregoing, Hezbollah and the Qods Force was the proximate and but-for cause of al-Qaeda's embrace of suicide bombing as a tactic.  Hezbollah and Qods Force agents originally instructed al-Qaeda in the theological, technological, and tactical aspects of suicide bombing as a terrorist strategy based upon Iran's and Hezbollah's own successful use of suicide bombers during Iran's war against Iraq and during the joint Iranian/Hezbollah terrorist campaign against Americans in Lebanon in 1983, in which Hezbollah terrorists used suicide bombers to kill hundreds of Americans serving in Lebanon.

787.     When the U.S. Department of Justice indicted Osama bin Laden for the 1998 bombings of the U.S. embassies in Kenya and Tanzania, the indictment alleged that al-Qaeda had "forged alliances" with "the government of Iran and its associated terrorist group Hezballah [sic] for the purpose of working together against their perceived common enemies in the West,

---

[299] *Id.* (internal citations and quotations omitted).

[300] *Id.*

particularly the United States."[301]   A court in this District subsequently found that Iran had caused the East Africa Embassy bombings by materially supporting al-Qaeda's operations.[302]

788.    The 9/11 Commission has also confirmed that there was solid and substantial proof of Iran's repeated willingness to support terrorist proxies targeting Americans in the Middle East, including Sunnis with whom the Iranian regime is normally hostile, which had been demonstrated by Iranian assistance to a litany of terrorists, including 9/11 hijackers.[303]

789.    After 9/11, senior al-Qaeda leadership, sheltering in Iran under the patronage and with the counsel of Qods Force operatives, explicitly modeled their post-9/11 organization and tactics on the approach of Hezbollah and the Qods Force.

790.    While al-Qaeda was re-building itself in Iran after 9/11, the Iranians were busy rejecting U.S. and allied requests to stop aiding al-Qaeda.  For example, on or about 2002 or 2003, Iran rejected a lawfully issued extradition request by the Jordanian government for Zarqawi on the preposterous grounds that Zarqawi – whom the Iranians knew well – was not Jordanian but, rather, Syrian.  Similarly, in a 2003 face-to-face meeting in Geneva, Switzerland, then-U.S. ambassador to Iraq Ryan Crocker implored Iranian officials to cease their support for al-Qaeda's terrorism targeting Americans in the Persian Gulf, which request the Iranians refused.  By then, al-Qaeda had demonstrated its usefulness to the IRGC with respect to its ability to kill Americans, and the IRGC was already sheltering and supporting al-Qaeda's military leader, Saif al-Adel (who was

---

[301] Indictment at 3, *United States v. Bin Laden*, No. 1:98-cr-00539-LAK (S.D.N.Y. filed Nov. 5, 1998), Dkt. 1, *available at* https://fas.org/irp/news/1998/11/indict1.pdf.

[302] *See Owens v. Republic of Sudan*, 826 F. Supp. 2d 128, 151 (D.D.C. 2011).

[303] *See, e.g., The 9/11 Commission Report* at 60 ("[T]he evidence of Iranian involvement" in the June 1996 truck bomb attack against Americans in Khobar Tower in Saudi Arabia was "strong" and there were "also signs that al Qaeda played some role.") (July 1, 2004); *see also id.* at 240-241 (significant Iranian transportation and logistical support for 9/11 attackers).

also al-Qaeda's manager for Zarqawi's activities in Iraq) in his Qods Force-provided Tehran safehouse.

791.     The Iranians rebuffed U.S. outreach because they had already reached a secret deal with al-Qaeda.  Following the 9/11 attacks on the United States and subsequent routing of Sunni terrorists in Afghanistan (including al-Qaeda) in late 2001, the IRGC met with senior al-Qaeda leaders who had fled Afghanistan into Iran to offer military aid to support al-Qaeda's fight against America.  The IRGC hosted these meetings for its al-Qaeda "guests" throughout 2001 and 2002. As part of this initial offer of support, the IRGC pledged to provide funds and logistical support to facilitate the development of terrorist activities targeting Americans in countries bordering Iran. While the focus at the time was on Afghanistan, all involved expected the U.S. to eventually move into Iraq and for their shared terrorist enterprise to follow us there.

792.     Under this secret deal between the IRGC and al-Qaeda after 9/11, the IRGC intensified its material support for al-Qaeda's terrorist campaign against Americans around the world.  Through the secret deal between the IRGC and al-Qaeda and the assistance that the former provided to the latter thereafter, the IRGC was the proximate and but-for cause of al-Qaeda's survival as a terrorist organization after 9/11 and the al-Qaeda-linked terrorist attacks against Americans in Iraq, including Plaintiffs, that inevitably followed.

793.     Osama bin Laden personally concluded that al-Qaeda would have collapsed after 2001 without the secret deal and Iran's key support for al-Qaeda in the years following 9/11, and al-Qaeda's subsequent ability to execute terrorist attacks depended upon the "artery" provided by the IRGC.  For example, in 2007, bin Laden criticized an al-Qaeda terrorist who had been planning to strike Iran-linked targets; in a secret internal al-Qaeda communique authored by bin Laden himself, bin Laden identified the key, organization-saving assistance that the IRGC had been

providing to al-Qaeda after 9/11, stating because of Iran's historical support for al-Qaeda's terrorist operations, Iran was al-Qaeda's "***main artery for funds, personnel, and communication***."[304]

794.    Zawahiri also emphasized close strategic cooperation between al-Qaeda and the IRGC, following a pragmatic approach under which al-Qaeda focused on expanding its presence in Iran.  Like bin Laden, Zawahiri agreed that al-Qaeda could not survive and thrive without the support it received from the IRGC.  In a letter reportedly written by Zawahiri, al-Qaeda thanked the IRGC for the Qods Force's support in setting up al-Qaeda's terrorist network in Yemen in 2008 and stated, in effect, that al-Qaeda could not have established its franchise in Yemen without the IRGC's assistance.

795.    The U.S. government has also recognized these connections through the close partnership between the IRGC and al-Qaeda after the secret deal between the two.  In July 2011, the U.S. Treasury Department designated as SDGTs six members of al-Qaeda operating in Iran under the previously described secret agreement between the IRGC and al-Qaeda.[305]  In so doing, the Treasury Department concluded that the secret deal provided that al-Qaeda terrorists "must refrain from conducting any operations within Iranian territory and recruiting operatives inside Iran while keeping Iranian authorities informed of their activities.  In return, the Government of the IRGC gave the Iran-based al-Qa'ida network freedom of operation and uninhibited ability to travel for extremists and their families" and permitted al-Qaeda to use Iran as a "critical transit point for funding to support [al-Qaeda's] activities."  The Treasury Department also found that

---

[304] October 18, 2007 translated letter from Osama bin Laden to Karim at 1, *Bin Laden's Bookshelf*, Office of the Director of National Intelligence (2016) (emphasis added).  In March 2016, the Office of the Director of National Intelligence declassified items that had been obtained by U.S. special operators in the May 2011 raid on bin Laden's compound, including this letter.  *See* Bin Laden's Bookshelf, Office of the Director of National Intelligence.

[305] Press Release, U.S. Treasury Dep't, *Treasury Targets Al-Qa'ida Funding and Support Network Using Iran as a Critical Transit Point* (July 28, 2011).

"Iran's secret deal with al-Qa'ida" facilitated a terrorist network that "serves as the core pipeline through which al-Qa'ida moves money, facilitators and operatives from across the Middle East to South Asia."[306]  Indeed, al-Qaeda has honored its commitment to the IRGC despite its attacks on Shiite Muslims elsewhere in the Middle East.

796.    The close relationship between al-Qaeda and the IRGC has continued in recent years.  In 2017, the U.S. State Department explained, "Since at least 2009, Iran has allowed [al-Qaeda] facilitators to operate a core facilitation pipeline through the country, enabling [al-Qaeda] to move funds and fighters to South Asia and Syria."[307]  It further accused Iran of remaining unwilling to bring to justice or identify al-Qaeda members in its custody.[308]  The next year, the agency reaffirmed those conclusions and reiterated Iran's close relationship with al-Qaeda.[309]

797.    The IRGC also supported al-Qaeda through its proxy, Hezbollah.  As the *Washington Post* reported at the time in 2002, Iran's lead terrorist proxy, Hezbollah, was "increasingly teaming up with al Qaeda on logistics and training for terrorist operations, according to U.S. and European intelligence officials and terrorism experts."[310]  "The new cooperation … includes coordination on explosives and tactics training, money laundering, weapons smuggling and acquiring forged documents, according to knowledgeable sources.  This new alliance, even if informal, has greatly concerned U.S. officials in Washington and intelligence operatives abroad

---

[306] *Id.*

[307] U.S. State Dep't, *Country Reports on Terrorism 2016* at Iran Section (July 2017).

[308] *Id.*

[309] *Country Reports on Terrorism 2017* at Foreword.

[310] Dana Priest and Douglas Farah, *Terror Alliance Has U.S. Worried; Hezbollah, Al Qaeda Seen Joining Forces*, Washington Post (June 30, 2002), 2002 WLNR 15332564.

who believe the assets and organization of Hezbollah's formidable militant wing will enable a hobbled al Qaeda network to increase its ability to launch attacks against American targets."[311]

798.    The "collaboration" between Iran (through Hezbollah) and al-Qaeda "illustrate[d] what analysts [said] [was] an evolving pattern of decentralized alliances between terrorist groups and cells that share[d] enough of the same goals to find common ground: crippling the United States, and forcing the U.S. military out of the Middle East and Israel out of Palestinian territory. 'There's a convergence of objectives,' said Steven Simon, a former National Security Council terrorism expert."[312]  As the *Washington Post* reported, "[a]lthough cooperation between al Qaeda and Hezbollah may have been going on at some level for years, the U.S. war against al Qaeda [] hastened and deepened the relationship. U.S. officials believe that after al Qaeda was driven from Afghanistan, leader Osama bin Laden sanctioned his operatives to ally themselves with helpful Islamic-based groups, said a senior administration official with access to daily intelligence reports."[313]  The *Post* concluded:

> European and U.S. intelligence operatives on the ground in Africa and Asia said they have been trying to convince headquarters of the new alliances but have been rebuffed.  "We have been screaming at them for more than a year now, and more since September 11th, that these guys all work together," an overseas operative said. "What we keep hearing back is that it can't be because al Qaeda doesn't work that way. ***That is [expletive]***. Here, on the ground, these guys all work together as long as they are Muslims. There is no other division that matters."[314]

799.    Al-Qaeda's alliance with Iran's lead terrorist proxy, Hezbollah, continued at all relevant times and proved the intelligence operatives on the ground had been right all along.  For example, in 2012, the Council on Foreign Relations reported that "al-Qaeda ha[d] stepped up its

---

[311] *Id.*

[312] *Id.*

[313] *Id.*

[314] *Id.*

cooperation on logistics and training with Hezbollah, a radical, Iran-backed Lebanese militia drawn from the minority Shiite strain of Islam."[315]

800.    On or about August 7, 2020, on the anniversary of the IRGC/al-Qaeda bomb attack against U.S. embassies in Africa, Israeli commandos acting at the request of the United States killed al-Qaeda's number 2 leader, Abu Muhammad al-Masri, in a covert mission in Tehran.[316] Masri was in Iran as a guest of the Iranian government and was permitted to freely plan attacks against the United States from an Iranian-provided safe haven in Tehran.  The timing of the attack was not a coincidence, but a rather a professional slap in the terrorists' face extended by the U.S. and Israeli governments to the IRGC and al-Qaeda, as the latter allies suffered an embarrassing and catastrophic loss on the anniversary of one of their greatest terrorist triumphs.

801.    The mafia-style "syndicate" of which al-Qaeda, al-Qaeda-in-Iraq, and Ansar al-Islam formed a part, made attacks by each group more lethal.  Iran's mutually-reinforcing support for al-Qaeda, AQI, and AI therefore made each group more effective.

802.    By supporting al-Qaeda, the IRGC provided material support and resources for the acts of international terrorism that killed or injured Plaintiffs or members of their families.  Al-Qaeda directly participated in many of the attacks that killed or injured Plaintiffs or their family members.  Moreover, al-Qaeda was closely intertwined with al-Qaeda-in-Iraq and Ansar al-Islam and associated terrorist groups acting in Iraq, and al-Qaeda planned and authorized the Sunni Terrorist Proxy attacks in which it did not directly participate.  Material support and resources provided to al-Qaeda thus also flowed to al-Qaeda-in-Iraq and Ansar al-Islam, causing the injury and deaths of Plaintiffs or their family members.

---

[315] *al-Qaeda (a.k.a. al-Qaida, al-Qa`ida)*, Council on Foreign Relations (June 6, 2012).

[316] Goldman at al., *Al Qaeda's No. 2, Accused in U.S. Embassy Attacks, Was Killed in Iran*.

### 2. The IRGC Established Al-Qaeda-In-Iraq As An Iranian Sunni Terrorist Proxy In Iraq

803. Iran used the IRGC to provide Zarqawi with the Iranian patronage necessary to establish al-Qaeda-in-Iraq and turn it into the terrorist killing machine it would become.

804. "When the Taliban government collapsed, a strange opportunity presented itself. Many members of al-Qaida fled Afghanistan and crossed the border into Iran."[317]

805. All told, Zarqawi was based in Iran for at least a year after his escape from Afghanistan after 9/11.   After bin Laden family members and Zarqawi joined Iran as "guests" following 9/11, Soleimani devised a successful plan to turn them into Iranian terrorist assets to carry out attacks against America.  As Mr. Sadjadpour explained:

> After the U.S. military campaign to topple the Taliban began, Iran detained hundreds of al Qaeda fighters fleeing Afghanistan, including some members of Osama bin Laden's family and Abu Musab al-Zarqawi, the future leader of al Qaeda in Iraq. Many Iranians saw these jihadists as a threat—Sunni zealots who hated overwhelmingly Shiite Iran. Yet Soleimani, the architect of the Islamic Republic's plans for regional dominance, realized that they could also be an asset. … many al Qaeda members [] spent months and even years as "guests" of Iran. Soleimani broke bread with bin Laden's sons, who affectionately called him Hajji Qassem … He appointed two senior Quds Force officers to "provide the guests with whatever they needed," including refrigerators, widescreen TVs and an "unlimited budget" to furnish a religious library. Saif al-Adel, a notorious al Qaeda explosives expert, had access to a sports complex in a posh Tehran neighborhood, where he swam laps alongside Western diplomats.[318]

806. "Now that Soleimani had these al-Qaida fighters on his side, he had to figure out exactly how to use them.  And when the U.S. invaded Iraq in 2003, he saw his opening."[319]  As Mr. Sadjadpour of the Carnegie Endowment explained, "[i]f you're Qassem Soleimani, you think to yourself - we will do everything in our power to make sure that the U.S. war in Iraq is a colossal

---

[317] NPR, *Throughline*.

[318] Sadjadpour, *Sinister Genius*.

[319] NPR, *Throughline*.

failure."[320]   Thus, under Soleimani's plan, Iran "unleashed the al-Qaida fighters into Iraq," doing

so "[w]ith the understanding that you guys, go do what you do. Go after the United States" by

deploying terrorist attacks like "car bombings, [and] suicide bombings."[321]

807.    Backed by the IRGC's material support, just a few months after Soleimani helped

unleash him into Iraq, "Abu Musab al-Zarqawi, the Jordanian al-Qaida leader, [] set[] off these

three major bombs which essentially destroy[ed] the American experiment in Iraq in its

infancy."[322]   As terrorism scholar David Blair summarized the Zarqawi-IRGC alliance:

> By 2002, an Anglo-American invasion of Iraq seemed inevitable. Sensing an
> opportunity, Iran allowed Zarqawi to travel across its territory and enter northern
> Iraq in late 2002. Just as the Kaiser's Germany transported Lenin from Switzerland
> to Russia in 1917 delivering him "like a plague bacillus", in Churchill's phrase so
> Iran conveyed the virus represented by Zarqawi to Iraq.  The Shia rulers of Iran are
> natural opponents of al-Qaeda's Sunni zealots, but the evidence suggests that the
> two have sometimes been tactical if mistrustful allies against a common Western
> enemy. So it was that al-Qaeda's plague had arrived in Saddam Hussein's domain,
> courtesy of Iran, even before the invasion. By the time that American and British
> tanks rolled across the Iraqi frontier in 2003, Zarqawi was already in position to
> organise an insurgency. Later that year, he proclaimed the birth of 'al-Qaeda in the
> Land of Two Rivers'. … From 2005 onwards, he set out to kill as many Iraqi Shias
> as possible[,] a bitter irony given that Zarqawi owed his very presence in Iraq to the
> indulgence of Shia Iran.[323]

808.    As a result, the IRGC, through Soleimani's plan, was the proximate and but-for

cause of al-Qaeda-in-Iraq's existence and ability to commit attacks targeting Americans in Iraq,

including against Plaintiffs.  As Osama bin Laden himself concluded, without Iran's key support

for al-Qaeda in the years following the 9/11 attacks, al-Qaeda would have collapsed, and al-

---

[320] Sadjadpour, *quoted in* NPR, *Throughline*.

[321] *Id.*

[322] *Id.*

[323] David Blair, *The Rise of the Fanatics that Now Control ISIL*, Sunday Independent (Apr. 12, 2015), 2015 WLNR 10684439.

Qaeda's subsequent terrorist schemes carried out in Iraq through al-Qaeda-in-Iraq would not have come to fruition.

809.    Iran's strategy recognized that the Iranians could use their sectarian enemies, including Shia-haters like Zarqawi, to harm Iran's two primary enemies, the United States and Israel, and pragmatically and ruthlessly to pursue Iranian interests throughout the world.

810.    The IRGC and Soleimani pursued this strategy towards Sunni terrorists targeting Americans in Iraq at all relevant times because it inflicted harm on America while providing Iran iron-clad protection from being attacked by these same Sunni terrorists.  Indeed, in a May 2014 message to Ayman al-Zawahiri from Abu Muhammad al-Adnani – who was once a Zarqawi ally and former al-Qaeda member but had departed with ISIS becoming its spokesman after ISIS and al-Qaeda split earlier in 2014 – Adnani reminded al-Qaeda, on behalf of ISIS, that:

> ISIS has not attacked the Rawafid [Shia] in Iran since its establishment. … It has kept its anger all these years and endured accusations of collaboration with its worst enemy, Iran, for refraining from targeting it, leaving the Rawafid [Shia] there to live in safety, acting upon the orders of al Qaeda to safeguard its interests and supply lines in Iran.  Let history record that Iran owes al Qaeda invaluably.

811.    The four intelligence services that knew Zarqawi the best (other than Iran) – those of the U.S., Iraq, Jordan, and Germany – all concluded that the IRGC deliberately helped stand up Zarqawi's terrorist network in Iraq.  Like their U.S. and Iraqi counterparts, the Jordanian and German intelligence and law enforcement communities developed overwhelming evidence as to the sustained and substantial nature of Iran's provision of material support and resources to Zarqawi.

812.    Given Zarqawi's Jordanian roots, Jordan's intelligence service, the *Mukhabarat*, knew him as well as anyone.  Jordanian intelligence concluded that the IRGC deliberately stood-up Zarqawi's terrorist network in Iraq in order to inflict pain on Americans there and advance

Iranian interests in the country, providing terrorist seed capital in the form of arms and early essential logistical support, and sustained Zarqawi's network thereafter by permitting them to travel freely between Iran and Iraq as long as they continued attacking Americans in Iraq.

813.    German intelligence and law enforcement also confirmed the close nexus between Zarqawi and the IRGC.  In 2002, the German intelligence services, the *Bundesnachrichtendienst* ("BND"), successfully wiretapped and surveilled several members of the Zarqawi network in Germany, which allowed BND agents to precisely track Zarqawi's travel patterns during and after his flight from Afghanistan.  Based on insights from these leads, German intelligence concluded that Zarqawi received refuge and medical care in Mashhad, Iran on January 5, 2002, and remained in Iran until at least April of 2002, during which time he directed the retreat of his al-Qaeda operatives from Afghanistan, through Iran, into the Kurdistan region on both sides of the Iran/Iraq border.  Thereafter, Zarqawi traveled to Tehran and Zahedan in support of his efforts to stand up al-Qaeda-in-Iraq.   During this entire time, Zarqawi benefited from Iranian patronage and protection, including his own personal team of IRGC minders provided by Soleimani himself.

814.    German law enforcement also developed solid evidence that the IRGC had provided essential material support to Zarqawi.  According to files from Germany's Federal Office of Criminal Investigation, German prosecutors concluded that the IRGC gave Zarqawi essential state-sponsored terrorist support and was a key logistical partner for his terrorist enterprise in Iraq.

815.    Other European counter-terror authorities concurred with the findings of U.S., Iraqi, Jordanian, and German governments.  For example, a noted Spanish terrorism judge, Baltasar Garzon, concluded that al-Qaeda's board of managers were operationally active from their Iranian safe haven, coordinating operations against America and its Coalition partners.  Similarly,

in 2004, French intelligence officials concluded that al-Qaeda leaders had permission to move within Iran and support terrorist operations against America from their Iranian safe haven.

816.    The IRGC – and Soleimani himself – recognized that the IRGC's support for Zarqawi advanced Iranian interests even after Zarqawi began slaughtering Shiites in Iraq.  For example, Soleimani reportedly told the audience at an Iranian military seminar that the Qods Force permitted Zarqawi and more than a dozen of his senior terrorist followers to enter Iran whenever they pleased via border crossings between Ham and Halabja.  At this same discussion, when asked why the IRGC supported Zarqawi given his anti-Shiite attacks, Soleimani reportedly replied that Zarqawi's attacks in Iraq "serve the supreme interests of Iran" by stopping the formation of pro-American government in Iraq.

817.    Even when al-Qaeda-in-Iraq began massacring Iraqi Shiites at scale in 2006, Iranian support for al-Qaeda-in-Iraq still advanced Iran's perceived self-interest in Iraq by fostering anti-American violence there and by forcing Iraqi Shiites to seek protection from Iranian Shiite terrorist proxies, like Jaysh al-Mahdi, who were also fighting al-Qaeda-in-Iraq.  As Mr. Sadjadpour explained, Zarqawi's attacks against Shiites "totally radicalized the Shiite community in Iraq" and "essentially pushed them into the arms of Iran and Qassem Soleimani, who said to the Shiites of Iraq, we can protect you."[324]   Simply put, "[i]t served the interests of the Islamic Republic to maintain Iraq in a state of controlled chaos and anarchy."[325]

818.    By supporting al-Qaeda-in-Iraq, the IRGC provided material support and resources for the terrorist attacks that killed or injured Plaintiffs or members of their families.  Al-Qaeda-in-Iraq directly participated in many of the attacks that killed or injured Plaintiffs or their family

---

[324] Sadjadpour, *quoted in* NPR, *Throughline*.

[325] NPR, *Throughline*.

members.  Moreover, al-Qaeda-in-Iraq was closely intertwined with al-Qaeda and Ansar al-Islam and associated terrorist groups acting in Iraq, and al-Qaeda-in-Iraq planned and authorized the Sunni attacks in which it did not directly participate.  Material support and resources provided to al-Qaeda-in-Iraq thus also flowed to al-Qaeda and Ansar al-Islam, causing the injury and deaths of Plaintiffs or their family members.

### 3. The IRGC Established Ansar Al-Islam As An Iranian Sunni Terrorist Proxy In Iraq

819.    To ensure Iranian influence in Kurdish communities on both sides of the Iran/Iraq border, and consistent with Iranian policy supporting anti-American terror in countries bordering Iran, Ansar al-Islam has been, and remains to this day, a longstanding terrorist proxy of the IRGC. The IRGC, through the activities orchestrated by Qassem Soleimani and those acting at his instruction, was the proximate and but-for cause of Ansar al-Islam's existence and ability to commit attacks targeting Americans in Iraq, including against Plaintiffs.

820.    The IRGC's support for Ansar al-Islam is rooted in the former's obsession over Kurdish issues and support for Sunni terrorists in Kurdistan was a foundation of Iranian efforts to exercise influence in Northern Iraq. This region had historically been beyond Baathist reach when Saddam ran Iraq, and it could provide an unbroken Iranian corridor across the "Shiite Crescent," which stretches from Iran through Iraq to Syria and Lebanon.

821.    Ansar al-Islam could not exist, let alone pose a terrorist threat to Americans in Iraq, without the key assistance provided by the IRGC through the IRGC and Qods Force.  As the anti-terrorism think tank, the Jamestown Foundation, concluded, "a significant degree of Iranian support was necessary for Ansar al-Islam to function, given that the group's military supplies came in from Iran (the mountainous region they controlled touches the Iranian border), veterans from Afghanistan joined them via Iran, and their cadres (including Mullah Krekar himself) entered and

left the area via Iran."[326]   Similarly, the International Crisis Group concluded that it was "indisputable … that [Ansar al-Islam] could not survive without the support of powerful factions in neighbouring Iran, its sole lifeline to the outside world."[327]

822.   Contemporaneous American and British intelligence reports concerning Iran and Iraq support these conclusions.

823.   Al-Qaeda was responsible for the success of Ansar al-Islam's suicide bomb attacks against Americans in Iraq.  Through its relationship with al-Qaeda and Ansar al-Islam, the IRGC was the proximate and but-for cause of Ansar al-Islam's suicide bombing attacks against Americans in Iraq.

824.   Iran's support for al-Qaeda, al-Qaeda-in-Iraq, and Ansar al-Islam was mutually reinforcing.  Zarqawi's ability to leverage safe havens on Iranian soil and his membership and leadership role in all three groups played a key role in facilitating AQI's development.  By providing leadership, training, logistical support, and instruction to al-Qaeda, AQI, and Ansar al-Islam, Zarqawi created a network of al-Qaeda-affiliated terrorists working together in a shared campaign against Americans in Iraq, which he then leveraged to attack Americans throughout Iraq.

825.   By supporting Ansar al-Islam, the IRGC provided material support and resources for the acts of international terrorism that killed or injured Plaintiffs or members of their families. Ansar al-Islam directly participated in some of the attacks that killed or injured Plaintiffs or their family members.  Moreover, Ansar al-Islam was closely intertwined with al-Qaeda, al-Qaeda-in-Iraq, and associated terrorist groups acting in Iraq, and Ansar al-Islam provided essential logistical

---

[326] David Romano, *An Outline of Kurdish Islamist Groups in Iraq* at 12, The Jamestown Foundation (Sept. 2007) ("Romano, *An Outline of Kurdish Islamist Groups in Iraq*").

[327] International Crisis Group, *Radical Islam In Iraqi Kurdistan: The Mouse That Roared?* at 1-2, IRAQ Briefing (Feb. 7, 2003).

support for the entire Sunni campaign by facilitating the smuggling of weapons into Iraq, and therefore Ansar al-Islam aided the Sunni attacks in which it did not directly participate.  Material support and resources from the IRGC provided to Ansar al-Islam thus also flowed to al-Qaeda and al-Qaeda-in-Iraq, causing the injury and deaths of Plaintiffs or their family members.

826.    Consistent with Iran's policy of material support to al-Qaeda, al-Qaeda-in-Iraq, and Ansar al-Islam (collectively, Iran's "Sunni Terrorist Proxies") described above, the IRGC provided material support or resources to al-Qaeda, al-Qaeda-in-Iraq, and Ansar al-Islam for the acts of international terrorism that killed or injured Plaintiffs or their family members.  As explained below, that support took the form of "currency . . .  lodging, training, expert advice or assistance, safehouses, false documentation or identification, communications equipment, facilities, weapons, lethal substances, explosives, personnel, . . . and transportation."[328]

### C.    The IRGC, Including Its Hezbollah Division And Qods Force, Provided IRGC Sunni Terrorist Proxies With Weapons, Explosives, And Lethal Substances

827.    The IRGC provided material support or resources for the acts of international terrorism that killed or injured Plaintiffs, or their family members, by providing (among other things) arms, explosives, and lethal substances to al-Qaeda, al-Qaeda-in-Iraq, and Ansar al-Islam.

828.    The IRGC provided a regular flow of weapons and military equipment to Sunni terrorists targeting Americans in Iraq, including al-Qaeda, al-Qaeda-in-Iraq, and Ansar al-Islam. According to a senior al-Qaeda terrorist, "the Quds Force … supplied Zarqawi with weapons" and as a result, the al-Qaeda member concluded that, if "Osama was responsible for financing the butchers of Baghdad [i.e., Zarqawi and al-Qaeda-in-Iraq], so was Tehran."

---

[328] 18 U.S.C. § 2339A(b)(1).

829.    Middle Eastern and Western intelligence services concurred with this assessment and have long documented Iran's provision of weapons and equipment to Sunni terrorists targeting Americans.   As one Jordanian intelligence professional explained, placing himself from the perspective of a Sunni extremist (paraphrased) "I go to the Saudis when I need money and I go to the Iranians when I need arms, training, or supplies."

830.    Regional Kurdish security officials also documented Iran's provision of weapons and equipment to Sunni terrorists targeting Americans in Iraq.   "[I]n the town of Tuwella, the local PUK [Patriotic Union of Kurdistan, a large political party] chief, Ismail Ameen, said [that] … [j]ust before the war, in February 2003, he saw six gray Toyota Landcruisers drive into town from the Iranian border. He said the trucks were loaded with bullets and mortar shells for [an al-Qaeda affiliate's] fighters.  'They would have run out of ammunition . . . without the supplies they got from Iran,' he said.  Two top PUK security officials, and three members of the PUK's political bureau, also contended that Iran has continued to support Islamist insurgents."[329]  As one report explained in 2004:

> For years, and with the blessing of Iranian officials, Islamist terrorist groups have smuggled weapons … into Iraq … many Kurdish intelligence and security officials said. … [H]ere in the mountains of Kurdistan … are tangible footprints of Iran's collaboration with terror and insurgent groups responsible for attacks inside Iraq. According to a half-dozen officials in the Patriotic Union of Kurdistan,… Iran has extended its network of agents inside Iraq.  Iran, the officials say, continues to aid groups like Ansar al-Islam and Abu Musab al-Zarqawi's group, now named Al Qaeda in Mesopotamia.  Even though Iran is a Shi'ite theocracy, these officials said, it helps Sunni insurgent groups because it wants to prevent a strong unified government from taking shape in Iraq.  "They go back and forth after running missions here," said Anwar Haji Othman, head of security in the area … including a long stretch of the Iranian border.[330]

---

[329] Thanassis Cambanis, *Along Border, Kurds Say, Iran Gives Boost To Uprising*, Boston Globe (Nov. 7, 2004), 2004 WLNR 6887856 ("Cambanis, *Along Border*").

[330] *Id.*

831. Regional papers in the Middle East also agree with this conclusion. As one Bahraini paper observed, Iran's decision to "transfer[] munitions to Sunni extremists fighting the Americans in Iraq," accords with similar decisions Iran made to "export[] weapons to the Taliban" and other anti-American terrorists who did not follow the Khomeneist school of Iranian theological supremacy like "the Zaidi Houthis" and "Syria's Alawites … [who] hail from significantly different schools of Islam."[331]

832. The IRGC also funneled weapons to Sunni terrorists in Iraq through its proxy, Ansar al-Islam. Given its location on both sides of the Iran/Iraq border, Ansar al-Islam could not have sourced any of its supplies or fighters without the active cooperation of the IRGC and the Qods Force. As the Jamestown Foundation concluded, Ansar al-Islam's "military supplies came in from Iran," as did the group's fighters, who had depended upon the cooperation of the IRGC to transit through Iran (between Iraq and the Afghanistan-based camps they also attended) as well as to provide a safe haven from which to plan attacks.[332]

833. After American forces destroyed Ansar al-Islam's camp in Iraqi Kurdistan in March 2003, Zarqawi and his Ansar al-Islam lieutenants fled to Iran, where they regrouped, rearmed, trained, and continued to plan operations against Americans in Iraq, all while "Iran continued to supply Ansar al-Islam and its ally, Abu Musab al-Zarqawi, smuggling supplies for the insurgency against the U.S. and its coalition partners. In this way, the Zarqawi-Iran connection was maintained from his retreat from Afghanistan to his arrival in Iraq."[333]

---

[331] DT News (Bahrain), *Why is Tehran Recruiting Daesh Jihadists?* (Nov. 5, 2018), 2018 WLNR 34281745

[332] Romano, *An Outline of Kurdish Islamist Groups in Iraq*.

[333] Dore Gold and Lt. Col. (Res.) Jonathan D. Halevi (Israel Defense Forces), *Zarqawi and Israel: Is There a New Jihadi Threat Destabilizing the Eastern Front?*, Jerusalem Center for Public Affairs, Jerusalem Issue Brief Vol. 5 No. 12 (Dec. 15, 2005) ("Gold and Halevi, *Zarqawi*").

834.     Indeed, as the *Boston Globe* reported in 2004, "[f]or years, and with the blessing of Iranian officials," Ansar al-Islam "smuggled weapons … into Iraq on this [Iranian] road [near the Iraqi border], many Kurdish intelligence and security officials said."[334]

835.     Ansar al-Islam received weapons and munitions from the IRGC, including Katyusha rocket launchers, mortar rounds, and the ubiquitous Toyota Land Cruiser SUVs used by Ansar al-Islam, which "could not have been smuggled into the area without the tacit approval of the Iranian government and security apparatus."[335]

836.     Iranian support was also key to al-Qaeda's and its affiliates' ability to execute their signature attacks.  Al-Qaeda's IEDs and suicide bomb attacks offer two examples.  With respect to the former, Iranian aid was key to the success of Sunni terrorists' campaign of IED attacks against Americans in Iraq.  Coalition personnel on the ground in Iraq concluded that the IRGC provided substantial IED-related support to Sunni terrorists targeting Americans in Iraq.  For example, by the summer of 2006, Task Force 16 members responsible for hunting al-Qaeda-in-Iraq terrorists had concluded that the IRGC was providing sophisticated IED technology to Sunni terrorists in Iraq, led by al-Qaeda, in order to inflict casualties on Americans in Iraq.  British military personnel in Iraq reached a similar conclusion a year prior when, in 2005, "a senior British general repeated a claim that bomb-making technology is crossing into Iraq from Iran."[336]  As reported at the time:

> Major-General Jim Dutton, who commands a multinational force in south-eastern Iraq, said the know-how for advanced bombs was coming 'across that border'. … Defence sources quoted independently by the BBC were more blunt, saying that

[334] Cambanis, *Along Border*.

[335] The Washington Institute for Near East Policy, *The Islamist Threat from Iraqi Kurdistan* (Dec. 1, 2001).

[336] John R. Bradley, *Real Threat From Iran Is Here, Now*, Straits Times (Singapore) (Nov. 14, 2005), 2005 WLNR 18356274 ("Bradley, *Real Threat From Iran*").

the Revolutionary Guards, an elite fighting force appointed by the country's supreme leader, were indeed giving original bomb-making training to Iraq's insurgents.  At first and even second glance, allegations of an alliance between Iran and Al-Qaeda, especially if it incorporates cells affiliated to the terror organisation presently operating in Iraq, defies all sense and logic. For a start, Iran is Persian/Shi'ite, while Al-Qaeda is Arab/Sunni. … [I]t now seems clear that Iran and Al-Qaeda generally have been drawn together, despite their obvious ideological and religious differences, by a common goal: To facilitate global jihad and help hasten American failure in Iraq.[337]

837.     The IRGC also helped provide al-Qaeda, al-Qaeda-in-Iraq, and Ansar al-Islam the "weapons" they used when they deployed suicide bombers in Iraq, as the IRGC was the original source of the groups' collective embrace of suicide bombing as a tactic, and Iranian geography was necessary for the travel of suicide bombers into Iraq, which in the case of a suicide bomber accomplished the "insertion" of the weapon into the country.

838.     Separately, Iranian territorial aid was also key to the success of al-Qaeda's IED attacks and suicide bombs because only through the IRGC could al-Qaeda and its affiliates maintain the CAN fertilizer supply chain from the Pakistani supplier upon which they relied.  As a result, al-Qaeda could not have executed its campaign of fertilizer-based suicide bomb and IED attacks against Americans in Iraq without the terrorist land bridge provided by the IRGC.  On information and belief, al-Qaeda sourced some of its fertilizer for use in their Iraqi bombs from a supplier in Pakistan and transported such fertilizer across from Pakistan to Iraq by using the terrorist land bridge offered by the IRGC, which al-Qaeda could not have accomplished without the aid of the IRGC, which controls Iran's borders with Afghanistan and Iraq, and whose permission is necessary to transport any goods overland from the above-described route from Pakistan to Iraq.

---

[337] Bradley, *Real Threat From Iran*.

D.     **The IRGC, Including Its Hezbollah Division And Qods Force, Provided IRGC Iraqi Sunni Terrorist Proxies With Lodging, Training, Expert Advice Or Assistance, Safehouses, Personnel, And Transportation**

839.     The IRGC also provided its Sunni Terrorist Proxies in Iraq with lodging, training, expert advice or assistance, safehouses, and transportation.  The IRGC taught its Sunni Terrorist Proxies attack techniques that were particularly effective against U.S. and Coalition forces. Without the training, lodging, safehouses, and transportation assistance from the IRGC and its agents, Iran's Sunni Terrorist Proxies would not have been able to launch as successful a terrorist campaign against Americans in Iraq.

840.     **Lodging, Safehouses, and Transportation.** The IRGC has maintained a decades-long travel assistance relationship with al-Qaeda as part of the terrorist alliance between the IRGC, al-Qaeda, and Hezbollah.

841.     By no later than January 2002, the Qods Force had approved a strategic plan to actively support al-Qaeda's post-9/11 terrorist attacks against Americans in the Middle East by providing sanctuary in Iran to senior al-Qaeda terrorists and their family members, directly supported and managed by the Qods Force.  To facilitate al-Qaeda members' flight from Afghanistan to their newfound Iranian safe haven, the Qods Force relied upon the assistance of Zarqawi – whom it already knew based on his travels in the region – to coordinate the travel of senior Qaeda operatives, including Saif al-Adel, from Afghanistan to Iran.

842.     Sitting between Iraq and Afghanistan and having a long history of facilitating Sunni terrorist travel and logistics, Iran was ideally suited to aid the ascendant Sunni insurgency in Iraq after March 2003 because al-Qaeda's assistance could only flow from Afghanistan to Iraq via the IRGC.  Reporting the views of Kurdish security officials, one journalist explained in 2004 that there is a long history in the Middle East "of nations giving shelter to their enemies' enemies" and thus "[t]he apparent Iranian ties to [Sunni] mujahedeen groups operating inside Iraq only

280

continue[d] this long Machiavellian tradition," and reflected Iran's willingness to "work with [Sunni] groups … whose ideology is so opposed to theirs, because they want to have a card to play in Iraq."[338]

843.    Iran's service as the "terrorist land bridge" by its provision of travel assistance to al-Qaeda and al-Qaeda-in-Iraq was essential to the terrorists' ability to conduct attacks against Americans in Iraq.  As Judge Daniels found in another case against Iran,

> Perhaps the most important form of aid Iran gave al Qaeda prior to 9/11 (and continues to give today) involves the facilitation of travel. … Travel assistance "is invaluable," not only to avoid detection and arrest, but established lines of transit make recruitment and training easier, as individuals can travel to and from training camps without fear of interference. Also, travel facilitation enables better communication and coordination. Even before 9/11, al Qaeda was aware that the United States monitored phones and other forms of communication and recognized that many sensitive deliberations are best done face-to-face. Doing so requires individuals who can travel freely from one area to another.[339]

844.    "In the mid–1990s, when the Iran–Hizballah-al Qaeda terror alliance was forming, al Qaeda operative Mustafa Hamid had 'negotiated a secret relationship with Iran that allowed safe transit via Iran to Afghanistan.'"[340]

845.    "Numerous admissions from lower level al Qaeda members who were interrogated at the detention facility at Guantanamo Bay confirm the existence of the clandestine Iran–Afghanistan passageway, managed by MOIS.  Al Qaeda had 'total collaboration with the Iranians,' and had its own organization in Iran 'that takes care of helping the mujahedin brothers cross the border.'"[341]  "By … providing safe passage through Iran and into Afghanistan, and by permitting

---

[338] Cambanis, *Along Border*.

[339] *In re Terrorist Attacks on Sept. 11, 2001*, 2011 WL 13244047, at *28 (findings of fact).

[340] *Id.* at *17 (findings of fact) (internal citations omitted).

[341] *Id.* (internal citations omitted).

Hezbollah to receive the traveling group ... Iran, in essence, acted as a state sponsor of terrorist travel."[342]  These trends have continued without interruption since the 1990s.

846.    After 9/11, the IRGC provided safehouses to many senior leaders of al-Qaeda and their families, including Osama bin Laden's sons.  The IRGC permitted these senior leaders to move freely within Iran in the early 2000s, while they continued to direct, organize, and support al-Qaeda's terrorist operations throughout the world.[343]  In essence, the IRGC provided al-Qaeda with a safe haven from which to orchestrate its terrorist activities.[344]  As Judge Daniels found:

> When the United States-led multi-national coalition attacked the Taliban regime in Afghanistan in the fall of 2001, Iran facilitated the exit from Afghanistan, into Iran, of numerous al Qaeda leaders, operatives, and their families. The Iran–Afghanistan safe passageway, established earlier to get al Qaeda recruits into and out of the training camps in Afghanistan, was utilized to evacuate hundreds of al Qaeda fighters and their families from Afghanistan into Iran for safe haven there. The IRGC knew of, and facilitated, the border crossings of these al Qaeda fighters and their families entering Iran.
>
> Osama bin Laden's friend, Gulbuddin Hekmatyar, who was then in exile in Iran near the Afghan border, was instrumental in the evacuation of al Qaeda into Iran, as were Imad Mughniyah and Iran's Qods Force commander Ahmad Vahidi.
>
> Among the high-level al Qaeda officials who arrived in Iran from Afghanistan at this time were Saad bin Laden and the man who would soon lead "al Qaeda in Iraq," Abu Mussab Zarqawi.[345]

847.    The Coalition's civilian military leadership in the United States and Iraq also concluded that the IRGC provided such safe haven support to Zarqawi and other AQI terrorists.

848.    The list of al-Qaeda-affiliated terrorists who supported al-Qaeda attacks against Americans from their post 9/11 Iranian safe haven reads like an al-Qaeda management roster,

---

[342] *Id.* (internal citations omitted).

[343] *Id.*

[344] *Id.* at 150-51 ("When a foreign sovereign allows a terrorist organization to operate from its territory, this meets the statutory definition of 'safehouse.'").

[345] *Id.* at *25 (internal citations omitted).

featuring nearly two dozen senior leaders, organizers, planners, ideologues, and terrorist operatives from around the world – comprising most of al-Qaeda's military council between from 9/11 through 2015. The following terrorists all sheltered at the Qods Force facility in Tehran, and most (all but Zarqawi, who died a year earlier) were witnessed by a person who visited the facility on or about 2007:

- **Osama bin Laden's family**, including sons Saad, Mohammad, Othman, Ladin, and Hamza (one of whom even got married in Iran), wife Najwa, and daughter Iman;

- **Abu Musab al-Zarqawi**, who launched al-Qaeda-in-Iraq's campaign against America from Iran;

- **Abu Muhammad al-Masri**, al-Qaeda's chief of foreign relations and a senior member of al-Qaeda's military council who became al-Qaeda's the number 2 overall, behind only Zawahiri, after bin Laden was killed in 2011, and who managed al-Qaeda operations from his safe haven in Iran from 9/11 until he was killed in Tehran by Mossad agents on August 7, 2020;

- **Saif al-Adel**, al-Qaeda's military chief and number 3 overall, who, among other things, personally managed al-Qaeda's support for Zarqawi and the Zarqawi/bin Laden relationship, was tasked with facilitating al-Qaeda's support for the Sunni insurgency against Americans in Iraq from Iran, and directed anti-American attacks from Iran under the wing of the Qods Force;

- **Abu Musab al-Suri**, a senior al-Qaeda strategist who was one of the most important thinkers for the group;

- **Mahfouz Ibn El Waleed**, a key member of al-Qaeda's leadership council and its sharia committee, who helped approve and justify attacks against America from his safe haven in Iran;

- **Abu Dagana al-Alemani**, a senior al-Qaeda attack planner who coordinated al-Qaeda's logistical support for its global affiliates from Iran; and

- **Sulaiman Abu Ghaith**, who served as al-Qaeda's spokesman from Iran and helped rally support for al-Qaeda's anti-American jihad from there.

849.    Among the senior al-Qaeda leaders who fled to Iran after 9/11, most remained ensconced in Iran thereafter, never leaving their Iranian safe haven while continuing to support the jihad against America. Zarqawi and his lieutenants were the one notable exception: they accepted

the Qods Force's offer of money, arms, and transportation from Kurdistan to Baghdad, all of which they used to launch their terror campaign against Americans in Iraq and launch al-Qaeda-in-Iraq's campaign against Americans there.

850.   Iran's safe haven support for al-Qaeda did not diminish in the years after 9/11.  For example, in 2011, Judge Daniels found, as a matter of law, that "[s]ince the 9/11 attacks, and continuing to the present day, the IRGC continues to provide material support and resources to al Qaeda in the form of safe haven for al Qaeda leadership and rank-and-file al Qaeda members."[346]

851.   As the *Washington Post* reported after al-Qaeda's number 2, Masri, was killed in Tehran in 2020, "[m]any of al-Qaeda's senior commanders have been sheltered in Iran, though one by one, they have been killed in recent years. With Masri's death, the only remaining member of al-Qaeda's shura council — its core leadership — with operational al-Qaeda terrorist experience is Saif al-Adel, who is believed still to be in Iran."[347]

852.   The IRGC's assistance also extended to permitting al-Qaeda and its affiliates, like al-Qaeda-in-Iraq, to use Iran as a safe haven from which to plan and prepare attacks against Americans in Iraq.  As Judge Daniels found, after 9/11, "[t]here have been numerous instances of al Qaeda operatives and leaders meeting, planning, and directing international terrorist operations from the safety of Iranian territory. Senior al Qaeda members continued to conduct terrorist operations from inside Iran."[348]

---

[346] *In re Terrorist Attacks on Sept. 11, 2001*, 2011 WL 13244047, at *41 (findings of fact).

[347] Ellen Nakashima, *Israel, At Behest of U.S., Killed al-Qaeda's Deputy in a Drive-By Attack in Iran*, Washington Post (Nov. 14, 2020), 2020 WLNR 32556539

[348] *In re Terrorist Attacks on Sept. 11, 2001*, 2011 WL 13244047, at *25 (findings of fact) (internal citations omitted).

853.     In August 2003, the IRGC facilitated a meeting in Tehran between lieutenants from al-Qaeda-in-Iraq and Ansar al-Islam, in which the participants agreed in Zarqawi's name to establish a permanent terrorist base in Kurdistan to facilitate attacks against Americans and ensure the smooth functioning of the pipeline between the Arab world and Afghanistan, which ran through the IRGC and was essential to Sunni terrorists supply of weapons, funds, and personnel.

854.     In Tehran, the Qods Force operated a facility for al-Qaeda and al-Qaeda-in-Iraq leaders and operatives that was known as "Block 300."  At Block 300, the Qods Force provided shelter, communications, training, and other assistance to al-Qaeda and al-Qaeda-in-Iraq terrorists from 2001 through the present day.  For example, in August 2007, a visitor to Block 300 saw bin Laden's sons Saad, Mohammed, Othman, Hamzah, and Ladin, as well as Saif al-Adel, Abu al-Khayr al-Masri, and Sulaiman Abu Ghaith.  The same visitor in 2007 observed that all of al-Qaeda's military council was present at Block 300 other than Zawahiri and Sheikh Saeed al-Masri. Key female members of bin Laden's family were also housed at Block 300.

855.     Soleimani personally assigned two senior Qods Force officers to see to the needs of the senior al-Qaeda leaders and their family members sheltering at Block 300.  Throughout, the Qods Force provided senior al-Qaeda leaders with everything they needed to sustain their leadership inside Iran and maintain the morale of their military council and their families, including generous residential accommodations, trips to luxury shopping destinations, gym memberships, and the finest medical care in Iran (which was otherwise only available to the clerics and senior leaders of the Iranian regime).

856.     Al-Qaeda's relationship with its Qods Force protectors was so warm that al-Qaeda's military council and bin Laden's sons invited their Qods Force handlers to break their Ramadan fast with them at Block 300.  The Qods Force responded by taking al-Qaeda's military

council out to a five-star restaurant for an *iftar* meal.  Days later, Soleimani himself arrived in person at Block 300 to celebrate Eid with bin Laden's sons, joining them to break the fast.

857.    At this time, al-Qaeda depended upon the assistance of the Qods Force to maintain al-Qaeda's Iran pipeline, through which the group moved funds and personnel between the Middle East and its home base in Pakistan.

858.    In meetings at Block 300 on or about 2007 and 2008, Iranian officials met with the designated leader of the al-Qaeda and al-Qaeda-in-Iraq terrorists who were sheltering in their Qods Force-provided safe haven.  During these meetings, the Iranian officials told al-Qaeda and al-Qaeda-in-Iraq, through their designated spokesman at Block 300, in sum and substance, that the welfare of bin Laden's family was Soleimani's personal responsibility.  By this time, Soleimani had a positive relationship with bin Laden's sons residing in Iran, who referred to Soleimani as "Hajji Qassem" and relayed to other al-Qaeda leaders that Soleimani and al-Qaeda had both been targeted by America and should therefore work together.  At these meetings, the Iranian officials and al-Qaeda agreed that they should cooperate regarding the conflict in Iraq.

859.    In one meeting at Block 300 on or about 2008, Soleimani addressed al-Qaeda's senior leaders, as well as bin Laden's family, and stated that "I did my best to serve you" and "I stopped those who wanted to hurt you."  Soleimani also made it clear on multiple occasions to al-Qaeda's leaders that the IRGC remained willing to continue helping as long as the IRGC benefited.

860.    Soleimani continued to personally tend to his al-Qaeda assets at Block 300 until Soleimani's own demise in 2020.  For example, after bin Laden was killed in 2011, to try to break the malaise that had overtaken Block 300, Soleimani instructed his Qods Force deputies to take the al-Qaeda women and children on a trip for shopping and to an amusement park, while al-Qaeda's assembled *shura* in the IRGC could discuss strategy.

861.    In 2015, an intelligence review at the Defense Intelligence Agency confirmed additional measures of Iran's support for al-Qaeda, including Iranian facilitation of al-Qaeda travel between Iraq and Pakistan.

862.    The IRGC also provided transportation assistance, lodging and safe haven assistance to al-Qaeda-in-Iraq terrorists, including Zarqawi himself and other senior leaders of the group.  In doing so, the IRGC provided similar lodging, training, expert advice or assistance, safehouses, and transportation to al-Qaeda-in-Iraq as it did for al-Qaeda.

863.    Zarqawi had deep relations in Iran owing to his status as the top terrorist and operator at al-Qaeda's training camp in Herat, Afghanistan, close to the Iranian border.

864.    After 9/11, Zarqawi took refuge in Iran and established new al-Qaeda training camps and safehouses inside Iran at sites in Zahedan, Isfahan, and Tehran.  From his new Iranian safe haven, Zarqawi invited his followers, including seasoned terrorists in Europe, to travel to Tehran to meet with him, bringing money and receiving instructions from Zarqawi.

865.    To facilitate al-Qaeda-in-Iraq's communications and attack planning, the Qods Force provided AQI with phone and facsimile numbers and facilitated AQI's use of couriers.  With respect to the former, the Qods Force provided substantial communications support to al-Qaeda-in-Iraq, including the following numbers for AQI's use courtesy of the IRGC:   0X9X-9X1X3X1X3X, 0X9X-9X1X3X9X4X, 0X9X-2X8X5X6X8, and 0X9X-9X3X1X3X9X.[349]

866.    During this time, the Qods Force also provided false documents to al-Qaeda-in-Iraq leaders and operatives to aid in their ability to move between Iran, Iraq, Afghanistan, Syria, Lebanon, and Jordan.  For example, the Qods Force arranged for special passports and false documents for Zarqawi and his fighters to be able to enter Iraq without a visa.

---

[349] Plaintiffs have redacted every other number in the numbers affiliated with Zarqawi.

867.    Zarqawi's apparent close relationship with the Syrian regime – which is Iran's closest nation-state ally – corroborates the existence of his alliance with the IRGC.  Given the Syrian regime's support for the Iraqi insurgency, the ease with which Zarqawi was able to enter and exit Syria, and the regular flow of some AQI recruits through Syria into western Iraq, it is reasonable to conclude that Zarqawi had a close and collaborative relationship with the Syrian regime.  Given Syria's status as an Iranian client, such relations further corroborate Zarqawi's receipt of support from the IRGC, as Syria would not have supported such activities without Iran's blessing.

868.    The IRGC also provided safe haven to other senior AQI leaders in addition to Zarqawi.  Based on the confession of one of Zarqawi's Jordanian associates, Ahmad Mahmud Salih Al-Riyati, who was detained by Coalition forces in March 2003, Jordanian intelligence confirmed that nearly all the senior leaders of Zarqawi's group had been sheltering and planning attacks from Iran.  Jordanian intelligence also concluded that Zarqawi himself probably directed al-Qaeda-in-Iraq's attacks against Americans in Iraq from his safe haven in Iran.

869.    **Training, Expert Advice or Assistance, and Personnel.**  Iran's (including Hezbollah's) training of the IRGC's Sunni Proxies in small unit tactics, small arms, explosives, indirect fire, and other techniques enabled the Sunni Proxies to more effectively attack Americans in Iraq.  The Sunni Proxies in Iraq used Iran's training to kill or injure Plaintiffs or their family members.

870.    Like its transportation assistance to al-Qaeda, the IRGC has also maintained a decades-long training relationship with al-Qaeda as part of the terrorist alliance between the IRGC, al-Qaeda, and Hezbollah.

871. The IRGC served as the original trainer for al-Qaeda with respect to suicide bombings, attacks against large buildings, IEDs, explosives, intelligence, and general tactics for attacks directed at American interests. For example, senior al-Qaeda operatives traveled to Iran and Lebanon during this period to camps run by Hezbollah and sponsored by the Qods Force.[350] The operatives received advanced explosives training that enabled al-Qaeda to launch large-scale terrorist attacks on American embassies in Africa.[351] According to one senior al-Qaeda official, trainers at this time were already researching how to develop shaped charges to pierce armor plating – the technology later perfected in Iranian EFPs.

872. As Judge Daniels found in another case against Iran, "[t]hroughout the 1990s, the al Qaeda–Iran–Hizballah terrorist training arrangement continued. Imad Mughniyah himself coordinated these training activities, including training of al Qaeda personnel, with Iranian government officials in Iran and with IRGC officers working undercover at the Iranian embassy in Beirut, Lebanon. At all times, Iran's Supreme Leader was fully aware that Hizballah was training such foreign terrorists."[352]

873. Through its relationship with al-Qaeda and al-Qaeda-in-Iraq, the IRGC was the proximate and but-for cause of al-Qaeda-in-Iraq's suicide bombing attacks against Americans in Iraq, because Al-Qaeda was responsible for the success of al-Qaeda-in-Iraq's suicide bomb attacks against Americans in Iraq, and al-Qaeda itself could not have survived after 9/11 without the key support provided by the IRGC.

---

[350] *Owens v. Republic of Sudan*, 826 F. Supp. 2d 128, 151 (D.D.C. 2011) ("Prior to al Qaeda members' training in Iran and Lebanon, al Qaeda had not carried out any successful large scale bombings.").

[351] *Id.*

[352] *In re Terrorist Attacks on Sept. 11, 2001*, 2011 WL 13244047, at *12.

874.     The IRGC also provided training to Zarqawi and other al-Qaeda-in-Iraq terrorists at IRGC training camps in Iran.  Indeed, on or about 2004, Soleimani reportedly boasted that Zarqawi had trained at an IRGC camp in Mehran, Iran, and that Zarqawi and his network were free to travel between Iran and Iraq through multiple IRGC-controlled border crossings.

875.     Iraqi officials also confirmed Iran's key logistical support for Zarqawi's terrorist campaign in Iraq.  For example, in December 2004, a senior Iraqi defense official publicly alleged – based on information derived from an interrogation of an al-Qaeda-in-Iraq operative who had been detained in Iraq – that the IRGC and Zarqawi were working together to train AQI terrorists at IRGC facilities in Iran.

876.     By 2004, Iran's relationship with Zarqawi grew to be so open and notorious that the "United States … warned Iran against providing any type of support to Al-Qaeda-linked foreign militant Abu Mussab al-Zarqawi and his Tawhid wal Jihad (Unity and Holy War) group, saying such backing would be a 'very, very serious matter.'"[353]

877.     As Judge Daniels found, "[t]he IRGC maintained a separate terrorist training camp especially for Saudi nationals because of their distinct cultural habits and religious practices. This training camp was located in Iraqi Kurdistan and controlled first by Iranian intelligence and later by Abu Musab Zarqawi, later to be the notorious head of 'al Qaeda in Iraq.'"[354]

878.     Iran's provision of lodging, safe harbor, and transportation to key al-Qaeda-in-Iraq leaders, including but not limited to, Zarqawi, was the but for and proximate cause of the formation of al-Qaeda-in-Iraq in the first instance.

---

[353] Agence France-Presse English Wire, *US Warns Iran Against Any Support For Zarqawi* (October 18, 2004).

[354] *In re Terrorist Attacks on Sept. 11, 2001*, 2011 WL 13244047, at *12.

879.    The IRGC also provided logistical, training, and safe haven directly to Ansar al-Islam terrorists targeting Americans in Iraq.  As documented in a U.S. intelligence report, "there were approximately 320 Ansar al-Islam terrorists being trained in Iran . . . for various attack scenarios including suicide bombings, assassinations, and general subversion against U.S. forces in Iraq."  Similarly, a British defense report noted "some elements [of Ansar al-Islam] remain in Iran.  Intelligence indicates that elements [of Iran's Islamic Revolutionary Guard Corps] are providing safe haven and basic training to Iran-based [Ansar al-Islam] cadres."

### E.    The IRGC, Including Its Hezbollah Division And Qods Force, Provided IRGC Iraqi Sunni Terrorist Proxies With Financial Support

880.    The IRGC also provided financial support to al-Qaeda, al-Qaeda-in-Iraq, and Ansar al-Islam for the purpose of causing violence against Americans in Iraq.  The IRGC accomplished this financial support through a number of direct and indirect means.

881.    In some instances, the IRGC directly paid money to Sunni terrorists.  For example, regional Kurdish security officials documented the IRGC's provision of cash to Sunni terrorists cycling back and forth between Iraq and their safe havens in Iran:

> For years, and with the blessing of Iranian officials, Islamist terrorist groups have smuggled … money into Iraq … When US special forces and Kurdish peshmerga fighters attacked Ansar al-Islam, an Al Qaeda affiliate, in March 2003, hundreds of its members fled to Iran, the officials said, and have regrouped in several towns just over this border.  There, they continue to … raise funds, and plan terrorist operations in Iraq … Iraqi and US officials have grumbled for more than a year about what they perceive as Iranian interference in Iraq. …  According to a half-dozen officials in the Patriotic Union of Kurdistan, known as the PUK, which controls the southern half of the Kurdistan region of Iraq, and commanders in the peshmerga, the force that provides security in the region, Iran has extended its network of agents inside Iraq.  Iran, the officials say, continues to aid groups like Ansar al-Islam and Abu Musab al-Zarqawi's group, now named Al Qaeda in Mesopotamia.  Even though Iran is a Shi'ite theocracy, these officials said, it helps Sunni insurgent groups because it wants to prevent a strong unified government from taking shape in Iraq.  "They go back and forth after running missions here," said Anwar Haji Othman, head of security in the area around Halabja, including a

long stretch of the Iranian border. "They bring cash from Iran to Iraq across the border."[355]

882.     When it imposed sanctions in 2011, the Obama Administration recognized the funding nexus between the IRGC and al-Qaeda.  Moreover, "Obama Administration officials have stated that senior Iranian officials know about the money transfers and allow the movement of al–Qaeda foot soldiers through Iranian territory."[356]

883.     The IRGC specifically funded Zarqawi's terrorist campaign against Americans in Iraq.  According to a senior al-Qaeda terrorist, "the Quds Force … supplied Zarqawi with … money.  If Osama was responsible for financing the butchers of Baghdad [i.e., Zarqawi], so was Tehran."

884.     As two terrorism scholars explained:

The critical point is that there is considerable evidence that Zarqawi may have developed an Iranian connection for financial and logistical support. It was not the first time Shiite Iran reached out to radical Sunni terrorist organizations. For years, Iran has sponsored Palestinian Islamist groups, particularly Islamic Jihad but also Hamas, as well. Iran had a constant interest to reach out beyond the Shiite Islamic communities of the Middle East to the much wider Sunni Muslim world, and Zarqawi had objective needs that could be met by Iran. Unlike Osama bin Laden, who could fall back on his own family's wealth and the backing of both Saudi charities and individuals, Zarqawi came from a poor background in Jordan. To wage his terrorist campaign, he needed state backing from somewhere. Indeed, *Al-Sharq al-Awsat* wrote in May 2004 that the Iranians had offered Zarqawi about $900,000 and explosives. The same Arabic source reported in August that Brig.-Gen. Qassem Suleimani of the Revolutionary Guards was asked why Iran backs Zarqawi, given his attacks on Shiites. Suleimani reportedly answered that Zarqawi's actions serve the interests of Iran by undermining the emergence of a pro-U.S. government in Iraq.[357]

---

[355] Cambanis, *Along Border*.

[356] *In re Terrorist Attacks on Sept. 11, 2001*, 2011 WL 13244047, at *26.

[357] Gold and Halevi, *Zarqawi*.

885.    Like its relationships with al-Qaeda and al-Qaeda-in-Iraq, the IRGC also provided

substantial financial assistance to Ansar al-Islam terrorists to underwrite their attacks against

Americans in Iraq.

IX.    **THE FUNDS, ARMS, TECHNOLOGIES, AND SERVICES THAT DEFENDANTS ILLICITLY TRANSFERRED TO HEZBOLLAH AND THE QODS FORCE THROUGH MTN IRANCELL FLOWED ON, THROUGH HEZBOLLAH AND THE QODS FORCE, TO AL-QAEDA, AND THE TALIBAN, AS DID DEFENDANTS' PROTECTION PAYMENTS TO SIRAJUDDIN HAQQANI, AND CAUSED THE ATTACKS IN AFGHANISTAN THAT KILLED AND INJURED PLAINTIFFS**

A.    **The IRGC Provided Material Support And Resources To Sunni Terrorists Targeting Americans In Afghanistan To Undermine The U.S. Mission There**

886.    Although there are religious differences between the Shiite Iranian regime and the

Sunni Taliban organization, those differences have not deterred the IRGC from supporting the

Taliban's terrorist activities.  Iran and the Taliban share a core geopolitical aim:  to inflict mass

casualties on Americans in the region.  As two military-intelligence scholars observed, "the

Iranian regime is ideologically and religiously opposed to the Taliban, [but] it nevertheless views

the group as a useful counterweight to the United States."[358]  Similarly, as a Taliban commander

stated in 2010 of Iran, "Our religions and our histories are different, but our target is the same –

we both want to kill Americans."[359]  Sectarian distinctions aside, the IRGC has supported and

funded attacks by the Taliban on U.S. and allied forces in Afghanistan to harm the United States.

887.    The Fourth Corps of the Qods Force, one of its four regional commands,

implements Iran's foreign policy in Afghanistan.[360]  During the relevant timeframe, the Qods

---

[358] *Iran's Balancing Act* at 5.

[359] Bill Roggio, *Taliban Commander Linked To Al Qaeda, Iran, Killed In US Strike In Western Afghanistan*, Long War J. (July 16, 2010).

[360] *JIEDDO Report* at 5.

Force did so largely by providing the Taliban (including the Haqqani Network) with material support for terrorist attacks in Afghanistan.  The Fourth Corps' al-Ansar Command Center is based in Iran's second-largest city, Mashhad, near the border with Afghanistan.[361]  Mashhad naturally serves as a stopping point between Afghanistan and Tehran, Iran's capital.[362]

888.    Following the 9/11 attacks on the United States, the IRGC met with senior Taliban officials to offer military aid to support the Taliban's fight against U.S.-led Coalition forces.  The IRGC planned that meeting and hosted it on the Iranian side of the Afghanistan border.  As part of this initial offer of support, the IRGC pledged to sell advanced military equipment to the Taliban for use against U.S. and allied forces, boasted of the IRGC's ability to track U.S. troop movements, and promised to allow terrorists entering Afghanistan to travel through Iranian territory.  The IRGC also provided safe harbor to Taliban leaders who escaped U.S. forces.

889.    Immediately following the U.S. invasion of Afghanistan, the IRGC made a pretense of professing support for the U.S. and NATO mission, but in reality was already seeking to undermine it.  In February 2002, then-CIA Director George J. Tenet testified before Congress that "initial signs of Tehran's cooperation and common cause with us in Afghanistan are being eclipsed by Iranian efforts to undermine US influence there.  While Iran's officials express a shared interest in a stable government in Afghanistan, its security forces appear bent on countering the US presence."[363]  As one scholar explained, Iran "feared the US might use

---

[361] Joseph Felter & Brian Fishman, *Iranian Strategy in Iraq, Politics and "Other Means"* at 18, Combating Terrorism Center (Oct. 13, 2008).

[362] *JIEDDO Report* at 5.

[363] *DCI Testimony:  Converging Dangers in a Post 9/11 World*, Central Intelligence Agency (Feb. 6, 2002).

Afghanistan as a base from which to launch a kinetic attack on Iran.  The Taliban insurgency thus became viewed by Tehran as a tool with which to keep American forces preoccupied."[364]

890.     The U.S. government documented the IRGC's escalating support for the Taliban terrorists over the course of the United States' involvement in Afghanistan.  In April 2007, General Peter Pace, Chairman of the U.S. Joint Chiefs of Staff, stated that Iranian explosives had been captured in Kandahar Province en route to the Taliban but acknowledged that it was not yet entirely clear who within Iran was responsible.[365]  The next day, U.S. Assistant Secretary of State Richard Boucher described "a series of indicators that Iran is maybe getting more involved in an unhealthy way in Afghanistan."[366]

891.     Those indicators rapidly grew in intensity, and soon there was little doubt that the IRGC was actively sponsoring the Taliban terrorists as a core part of its foreign policy.  A purported May 2007 U.S. State Department cable (as published online), for example, reported that Afghan President Hamid Karzai had expressed concerns "over Iranian agents engaging Taliban and supplying them with weapons."  A purported July 2007 U.S. State Department cable (as published online) similarly reported that Taliban terrorists had received "light weapons and grenade launchers [that] bore the stamps of the Iranian factories where they were manufactured, primarily in 2006 and 2007."  The same cable explained that the fighters claimed they had received training in Iran and had been promised access to antiaircraft rockets by Iranian officials.

[364] Farhad Rezaei, *Iran and the Taliban:  A Tactical Alliance?*, The Begin-Sadat Center for Strategic Studies (Jan. 15, 2019) ("*Iran and the Taliban:  A Tactical Alliance?*").

[365] Breffni O'Rourke, *Afghanistan:  U.S. Says Iranian-Made Weapons Found*, RadioFreeEurope (Apr. 18, 2007).

[366] *Id.*

A purported military-intelligence summary the next month (as published online), reported on an

"'alarmingly rapid increase' in Iranian presence in Afghanistan."

892.   When the U.S. Treasury Department designated the Qods Force as a SDGT later

in 2007, it confirmed that the "Qods Force provides weapons and financial support to the Taliban

to support anti-U.S. and anti-Coalition activity in Afghanistan."[367]  As the designation explained:

> The Qods Force is the Iranian regime's primary instrument for providing lethal support to
> the Taliban.  The Qods Force provides weapons and financial support to the Taliban to
> support anti-U.S. and anti-Coalition activity in Afghanistan.  Since at least 2006, Iran has
> arranged frequent shipments of small arms and associated ammunition, rocket propelled
> grenades, mortar rounds, 107mm rockets, plastic explosives, and probably man-portable
> defense systems to the Taliban. . . .  Through Qods Force material support to the Taliban,
> we believe Iran is seeking to inflict casualties on U.S. and NATO forces.[368]

893.   Similar observations continued in 2008.  According to the U.S. State

Department's 2008 Country Reports on Terrorism:  "The Qods Force, an elite branch of the

Islamic Revolutionary Guard Corps (IRGC), is the regime's primary mechanism for cultivating

and supporting terrorists abroad.  The Qods Force provided aid in the form of weapons, training,

and funding to HAMAS and other Palestinian terrorist groups, Lebanese Hizballah, Iraq-based

militants, and Taliban fighters in Afghanistan."[369]

894.   The U.S. government's JIEDDO recognized in a 2009 report that "Iran's

intentions are the same in both Iraq and Afghanistan:  to develop, fund and arm proxy networks

to leverage against the perceived U.S. aim of pursuing an active regime change doctrine in

Iran."[370]  Similarly, a purported January 2010 cable (as published online) explained that senior

---

[367] Press Release, U.S. Treasury Dep't, *Fact Sheet: Designation of Iranian Entities and Individuals for Proliferation Activities and Support for Terrorism* (Oct. 25, 2007).

[368] *Id.*

[369] U.S. State Dep't, *Country Reports on Terrorism 2008* at 182-83 (Apr. 2009).

[370] *JIEDDO Report* at 5.

officials from the United Arab Emirates' State Security Department had accused the IRGC of supporting the Taliban by providing money and weapons, smuggling drugs, and facilitating the movement of Taliban leaders and fighters.

895.     According to another purported February 2010 cable (as published by online), President Karzai's Chief of Staff and former Ambassador to Iran, Omar Daudzai, reported that Iranian officials were no longer denying the IRGC's support for the Taliban in Afghanistan, instead remaining silent in the face of the assertion by the Government of Afghanistan.

896.     By April 2010, the U.S. Department of Defense reported that The IRGC was "covertly" supporting the Taliban.  "Arms caches have been recently uncovered with large amounts of Iranian manufactured weapons, to include l07mm rockets, which we assess IRGC-QF delivered to Afghan militants." [371]  It further explained that "Tehran's support to the Taliban is inconsistent with their historic enmity, but fits with the IRGC's strategy of backing many groups to ensure that it will have a positive relationship with the eventual leaders."[372]

897.     On August 3, 2010, the U.S. Treasury Department – pursuant to Executive Order 13224 – designated General Hossein Musavi and Colonel Hasan Mortezavi, senior officials in the Qods Force, as SDGTs for their roles in supporting the Taliban.[373]  General Musavi was the leader of the Ansar Corps, also known as the Fourth Corps, the branch of the Qods Force responsible for carrying out activities within Afghanistan.[374]  The U.S. Treasury Department

---

[371] Unclassified Report on Military Power of Iran (Apr. 2010), https://fas.org/man/eprint/dod_iran_2010.pdf.

[372] *Id*.

[373] Press Release, U.S. Treasury Dep't, *Fact Sheet: U.S. Treasury Department Targets Iran's Support for Terrorism Treasury Announces New Sanctions Against Iran's Islamic Revolutionary Guard Corps-Qods Force Leadership* (Aug. 3, 2010).

[374] *Id*.

found that both General Musavi and Colonel Mortezavi, acting in their capacity as senior Qods

Force officers, had provided "financial and material support to the Taliban."[375]  The U.S.

Treasury Department further concluded that "the IRGC-QF provides select members of the

Taliban with weapons, funding, logistics and training."[376]

898.    General David Petraeus, then the Commander of the ISAF, testified before the

Senate Armed Services Committee in March 2011 that the IRGC "without question" supplied

weapons, training, and funding to the Taliban in order to "make life difficult" for U.S. and

NATO forces in Afghanistan.[377]

899.    When the U.S. Department of Defense provided Congress with its Annual Report

on Military Power of Iran in April 2012, it explained that, even though Iranian "support to the

Taliban is inconsistent with their historic enmity, it complements Iran's strategy of backing many

groups to maximize its influence while also undermining U.S. and [NATO] objectives by

fomenting violence."[378]  By means of "the IRGC-QF, Iran provides material support to terrorist

or militant groups such as . . . the Taliban."[379]  The U.S. Department of Defense characterized

the support as part of a "grand strategy" to "challeng[e] U.S. influence."[380]

900.    In its 2012 Report on Progress Toward Security and Stability in Afghanistan, the

U.S. Department of Defense reported to Congress that the IRGC was engaging in "covert

---

[375] *Id.*

[376] *Id.*

[377] *The Situation in Afghanistan: Hr'g Before the S. Comm. On Armed Services,* 112 Cong. 40
(Mar. 15, 2011) (statement of General David Petraeus), https://www.govinfo.gov/
content/pkg/CHRG-112shrg72295/pdf/CHRG-112shrg72295.pdf.

[378] *Annual Report on Military Power of Iran* 2 (Apr. 2012).

[379] *Id.* at 3.

[380] *Id.* at 1.

activities" in Afghanistan, including the provision of weapons and training to the Taliban.[381]  As

the report explained, "Since 2007, Coalition and Afghan forces have interdicted several

shipments of Iranian weapons.  Tehran's relationship with the insurgency, although not

ideologically based, is consistent with Iran's short- to mid-term goal of undermining Coalition

efforts and opposing the international military presence in Afghanistan."[382]

901.    Less than two years later, the U.S. Treasury Department concluded that the Qods

Force "utilized now-detained Afghan associate, Sayyed Kamal Musavi, who was designated

today, to plan and execute attacks in Afghanistan."  It further confirmed that "[t]wo IRGC-QF

officers also designated today, Alireza Hemmati and Akbar Seyed Alhosseini, provided logistical

support to this associate."[383]  Similarly, according to a Taliban commander in central

Afghanistan in 2015:  "Iran supplies us with whatever we need."[384]

902.    In 2016, Taliban leader Mullah Mansour was killed by an American drone strike

while returning to Afghanistan from Tehran, where he had been meeting with Iranian security

officials, and possibly directly with Ayatollah Ali Khameni, to discuss tactical coordination of

Taliban terrorist activities in Afghanistan.  He had made at least two visits to Iran since 2013.

903.    The IRGC's support for terrorist groups in Afghanistan has continued.  The U.S.

State Department stated in 2017 that "Iran is responsible for intensifying multiple conflicts and

undermining the legitimate governments of, and U.S. interests in, Afghanistan . . . ."[385]  The U.S.

---

[381] U.S. Dep't of Def., *Report on Progress Toward Security and Stability in Afghanistan* at 148 (Dec. 2012).

[382] *Id.*

[383] Press Release, U.S. Treasury Dep't, *Treasury Targets Networks Linked To Iran* (Feb. 6, 2014).

[384] Margherita Stancati, *Iran Backs Taliban With Cash And Arms*, Wall St. J. (June 11, 2015).

[385] *Country Reports on Terrorism 2017* at Foreword.

Department of Defense similarly confirmed that the IRGC "provides some support to the Taliban and Haqqani Network."[386]  In May 2018, U.S. Secretary of State Michael Pompeo publicly accused the IRGC of supporting the Taliban and other terrorist groups in Afghanistan.[387]

904.     In October 2018, the U.S. Treasury Department, pursuant to Executive Order 13224, designated additional Qods Force officials "for acting for or on behalf of IRGC-QF and for assisting in, sponsoring, or providing financial, material, or technological support for, or financial or other services to or in support of, the Taliban."[388]  The U.S. Treasury Department acted along with the six other member nations of the Terrorist Financing Targeting Center – a multinational, cooperative effort to combat terrorism in the Middle East.[389]

905.     The Secretary of Iran's Supreme National Security Council, Ali Shamkhani, publicly acknowledged the IRGC's support for the Taliban in January 2019, claiming that it was designed to "curb the security problems in Afghanistan."[390]

906.     Most recently, the United States has recognized the IRGC's support of the Taliban in the aftermath of Qassem Soleimani's death.  In a press conference in the days after the killing of General Soleimani, Secretary of State Michael Pompeo publicly accused the IRGC of backing the Taliban and associated groups, including the Haqqani Network.

---

[386] U.S. Dep't of Def., *Enhancing Security and Stability in Afghanistan at 21* (June 2017).

[387] *Mike Pompeo speech:  What are the 12 demands given to Iran?*, Al Jazeera News (May 21, 2018).

[388] Press Release, U.S. Treasury Dep't, *Treasury and the Terrorist Financing Targeting Center Partners Sanction Taliban Facilitators and their Iranian Supporters* (Oct. 23, 2018).

[389] *Mike Pompeo speech:  What are the 12 demands given to Iran?*, Al Jazeera News (May 21, 2018); Press Release, U.S. Treasury Dep't, *U.S. and Saudi Arabia to Co-Chair New Terrorist Financing Targeting Center* (May 1, 2017).

[390] *Iran and the Taliban:  A Tactical Alliance?*

907.     The IRGC, in turn, signaled its continued focus on destabilizing U.S. forces in Afghanistan by appointing General Esmail Ghaani ("Ghaani" or "Qaani"), the former head of Iran's Qods Force branch in Afghanistan, to be the top commander of the Qods Force.  General Ghaani traveled to Afghanistan in 2018 as the deputy ambassador of Iran to Kabul and remains focused on cultivating the IRGC's relationship with the Taliban in Afghanistan.

908.     The Taliban's reaction to Soleimani's death similarly recognized the IRGC's support for its terrorist activities.  A Taliban statement condemned American forces for the attack on Soleimani and expressed regret for his "martyrdom."  Additional details were reported in Taliban-aligned publications about Soleimani's support for the Taliban, including his meeting with Taliban delegations in Iran, personally traveling to Afghanistan, and planning attacks.

909.     Consistent with the policy described above, the IRGC provided material support or resources for the acts of international terrorism that killed or injured Plaintiffs or their family members.  As explained below, that support took the form of "currency . . .  lodging, training, expert advice or assistance, safehouses, false documentation or identification, communications equipment, facilities, weapons, lethal substances, explosives, personnel, . . . and transportation."[391]

**B.     The IRGC Provided The Taliban With Weapons, Explosives, And Lethal Substances**

910.     The IRGC provided material support or resources for the acts of international terrorism that killed or injured Plaintiffs, or their family members, by providing (among other things) weapons, explosives, and lethal substances to the Taliban.  Many of the weapons the IRGC provided were designed to be particularly effective against U.S. and allied forces

---

[391] 18 U.S.C. § 2339A(b)(1).

operating in Afghanistan.  For example, the IRGC provided the Taliban with anti-tank mines, long range rockets, explosively formed penetrators, suicide vehicle-borne improvised explosive devices, rocket-propelled grenades, and explosives, which were uniquely suited for terrorist attacks on U.S. and allied forces.

911.    U.S. and allied forces have seized large caches of Iran-made weapons and explosives in Afghanistan, many of which bore markings of Iranian origin.  A purported April 2007 military-intelligence summary (as published online) reported that "Iranian officials" were sending "to Afghanistan explosive devices and vehicles ready to be used as SVBIEDs [suicide vehicle-borne improvised explosive devices]."[392]  A purported U.S. government document from August of that year (as published online) also reported that the Afghanistan National Police had found evidence of a planning meeting for 25 suicide attacks in which it was stated that "[t]he materials for the bombs will be supplied by Iran Government . . . ."

912.    When the U.S. Treasury Department designated the Qods Force as a SDGT under Executive Order 13224 in October 2007, it specifically documented the IRGC's frequent shipments of weapons to the Taliban over at least the prior year.  A purported December 2007 military-intelligence summary (as published online) further reported that explosive samples in suicide vests seized from four suicide bombers "tasked by Taliban/Al-Qaeda leaders" with carrying out a suicide attack in Helmand Province were found to be a 92% probability of a match against a suspected sample of Iran-sourced C4.

---

[392] *Afghanistan War Logs:  Anti-aircraft Missiles Clandestinely Transported From Iran Into Afghanistan – US Report*, The Guardian (July 25, 2010) ("*Anti-aircraft Missiles Clandestinely Transported*"); *see also Afghanistan War Logs: Afghan Government Seeking to Maintain Friendly Relations With Iran,* The Guardian (July 25, 2010) (referencing Iranian-made weapons recently found in Kandahar Province).

913.     In January 2008, a raid by Afghan Police in Farah Province discovered 130 mines, of which the Afghan Police concluded 60 were Iran-made.[393]  That same month the U.S. Ambassador to Afghanistan stated that "[t]here is no question that elements of insurgency have received weapons from Iran."[394]

914.     A purported June 2008 U.S. State Department cable (as published online) detailed multiple instances of the IRGC transferring arms to the Taliban in 2007 and 2008 and concluded that analyses of the weaponry "indicate the Taliban had access to Iranian weaponry produced as recently as 2006 and 2007."  Similarly, Afghan forces discovered a large cache of Iran-made explosives hidden near the Bakhshabad Dam in Farah Province in March 2009.  That same month, a purported military-intelligence summary (as published online) indicated that Taliban commanders had obtained portable surface-to-air missiles that originated in Iran.

915.     In May 2009, 44 bricks of Iran-made explosives and dozens of Iran-made mortars were discovered in a Taliban stronghold in Helmand Province.  Also in May 2009, Afghanistan border police intercepted a shipment crossing the Iranian border with dozens of anti-tank mines bound for Afghan militants.  And in September 2009, a purported military-intelligence summary report (as published online) claimed that the Taliban had received "six very powerful anti-tank mines from Iran" to target ISAF forces or important Afghan Police Officers.  That same year, the U.S. State Department reported that, "[s]ince at least 2006, Iran has arranged arms shipments to select Taliban members, including small arms and associated ammunition, rocket-propelled grenades, mortar rounds, 107mm rockets, and plastic explosives."[395]

---

[393] *JIEDDO Report* at 10.

[394] Brian Bennett, *Iran Raises the Heat in Afghanistan*, Time (Feb. 22, 2008).

[395] U.S. State Dep't, *Country Reports on Terrorism 2009* at 192 (Aug. 2010).

916.     By 2011, Taliban terrorists were using Iran-made and -sourced long-range rockets to attack Coalition targets in Afghanistan.  In February 2011, British forces intercepted more than four dozen 122-milimeter rockets in Nimruz Province near the Iranian border, which gave the terrorists roughly double the range to attack Coalition targets.  British Foreign Secretary William Hague stated that "detailed technical analysis, together with the circumstances of the seizure, leave us in no doubt that the weaponry recovered came from Iran."[396]  The *Wall Street Journal* similarly reported that U.S. officials "said the rockets' markings, and the location of their discovery, give them a 'high degree' of confidence that they came from the Revolutionary Guard's overseas unit, the Qods Force."[397]  General Petraeus later confirmed that the Qods Force had supplied these rockets to a "known Taliban facilitator."[398]  The U.S. Department of Defense's 2011 Report on Progress Toward Security and Stability in Afghanistan similarly stated that "[f]orensics teams examined the rockets and confirmed an Iranian point of origin."[399]

917.     In June 2015, the IRGC hired smugglers to ferry supplies across the Iranian border and deliver them to Taliban units in Afghanistan.  These Iran-supplied weapons included 82mm mortars, light machine guns, AK-47 rifles, rocket-propelled grenades, and materials for making roadside bombs.

918.     The IRGC also provided the Taliban with rockets and similar weapons that were particularly effective against U.S. and Coalition forces.  A purported April 2007 military-

---

[396] Julian Borger & Richard Norton-Taylor, *British Special Forces Seize Iranian Rockets In Afghanistan*, The Guardian (Mar. 9, 2011).

[397] Jay Solomon, *Iran Funnels New Weapons to Iraq and Afghanistan*, Wall St. J. (July 2, 2011).

[398] *The Situation in Afghanistan: Hr'g Before the S. Comm. On Armed Services,* 112 Cong. 40 (Mar. 15, 2011) (statement of General David Petraeus), https://www.govinfo.gov/content/pkg/CHRG-112shrg72295/pdf/CHRG-112shrg72295.pdf.

[399] U.S. Dep't of Def., *Report on Progress Toward Security and Stability in Afghanistan* at 107 (Apr. 2011).

intelligence summary (as published online), for example, reported that the IRGC had purchased anti-aircraft missiles from Algeria in late 2006 and then smuggled them from Mashhad, Iran – where the Fourth Corps of the Qods Force is headquartered – into Afghanistan.[400]  A purported Afghanistan Police Report from the next month (as published online) claimed that the IRGC intelligence sources issued three anti-aircraft launchers and ammunition to a Taliban commander. A purported March 2009 military intelligence summary (as published online) included intelligence reports of portable surface-to-air missiles arriving in Afghanistan from Iran. Similarly, a purported July 2009 military-intelligence summary (as published online) included reports of two dozen "Stinger" style surface-to-air missiles smuggled from Iran into Afghanistan.

919.    According to a purported September 2009 military-intelligence summary (as published online), Taliban terrorists used an Iran-made rocket-propelled grenade launcher to shoot down Coalition helicopters.  The launcher was marked "Made In Iran."  The launcher was particularly effective because, unlike some other launchers, the Iran-made launcher had a scope that could be adjusted for targeting and was more accurate for shooting helicopters.

### C.    The IRGC Provided The Taliban With Lodging, Training, Expert Advice Or Assistance, Safehouses, Personnel, And Transportation

920.    The IRGC also provided members of the Taliban and its affiliated terrorist groups with lodging, training, expert advice or assistance, safe harbor, and transportation.  The IRGC taught the Taliban attack techniques that were particularly effective against U.S. and Coalition forces.  Without the training from the IRGC and its agents, the Taliban would not have been able to launch as successful a terrorist campaign against American forces.

---

[400] *Anti-aircraft Missiles Clandestinely Transported.*

921.    According to a purported June 2006 military-intelligence summary (as published online), two members of the Iranian Intelligence Secret Service had arrived in Parwan Province to help Taliban members "in carrying out terrorist attacks against the [Afghanistan] governmental authorities and the [Coalition] members, especially against the Americans forces."[401]  A purported military-intelligence summary later that year (as published online), reported that injured Taliban terrorists were evacuating to Tehran for shelter.[402]

922.    The IRGC also trained Taliban fighters at camps within Iran.  For example, a purported April 2007 military intelligence summary (as published online) reported that "Iranian officials train" members of the Taliban at an Iranian base in Birjand, Iran, near the Afghanistan border.[403] A similar purported June 2007 military intelligence summary (as published online) claimed that the IRGC was training roughly 300 foreign fighters in Iran, presumably to fight in Afghanistan.

923.    A purported military-intelligence summary (as published online) from May 2008 claimed that a Taliban commander had traveled to Iran for training and returned with 40 trained terrorists.  Similarly, a military-intelligence summary (as published online) from July 2008 referenced "trained fighters moving in from Iran."  And a purported military-intelligence summary (as published online) from October 2009 likewise reported on the return of a Taliban commander from training "in an Iran army barracks."

---

[401] *Afghanistan War Logs: US Claims Iran Spies Helping Insurgents to Attack Coalition Forces,* The Guardian (July 25, 2010).

[402] *Afghanistan War Logs: Iranians Alleged to Be Sheltering Wounded Taliban Fighters in Tehran*, The Guardian (July 25, 2010).

[403] *Anti-aircraft Missiles Clandestinely Transported.*

924.     The IRGC provided Taliban terrorists with specialized training on how best to deploy Iran-supplied weapons against U.S. and Coalition forces.  A purported December 2008 military-intelligence summary (as published online) reported on a group of 40 insurgents "who allegedly were trained in an Iranian Military base" who had plans to attack the capital of Farah Province using weapons that "Iran Intelligence could have provided."  According to a purported April 2009 military-intelligence summary (as published online), the IRGC was recruiting Taliban terrorists for training in Iran on shooting down Coalition helicopters.  And another purported April 2009 military-intelligence summary (as published online), reported on the return of a Taliban commander after receiving IED-manufacturing training in Iran.

925.     A March 21, 2010 article in London's *The Sunday Times* reported extensively on Iranian security officials training Taliban recruits to "ambush" Coalition forces, attack checkpoints, and use guns and IEDs.  The *Times* interviewed two Taliban commanders – from Wardak and Ghazni province – who had traveled to Iran with groups of Taliban terrorists for training, which improved their ability to launch lethal attacks on Coalition forces.  According to the commanders, the IRGC paid for this travel and training.  One commander who received training in Iran observed that the Taliban's and Iran's "religions and . . . histories are different, but our target is the same — we both want to kill Americans."[404]

926.     By 2009, U.S government officials were openly accusing the IRGC of training the Taliban.  In an August 2009 report, ISAF Commander General Stanley McChrystal explained that "the Iranian Qods Force is reportedly training fighters for certain Taliban groups and

---

[404] Miles Amoore, *Iranian military teaches Taliban fighters the art of ambush*, The Times (Mar. 21, 2010).

providing other forms of military assistance to insurgents."[405]  He confirmed again in May 2010

that the IRGC was training Afghan fighters in Iran.[406]  In its 2009 Country Reports on Terrorism,

the U.S. State Department reported:  "Iran's Qods Force provided training to the Taliban in

Afghanistan on small unit tactics, small arms, explosives, and indirect fire weapons . . . ."[407]

Similarly, in 2012 it explained: "the IRGC-QF trained Taliban elements on small unit tactics,

small arms, explosives, and indirect fire weapons, such as mortars, artillery, and rockets."[408]

927.    The IRGC's training of Taliban terrorists has not diminished.  By 2015, the IRGC

was operating at least four Taliban training camps within Iran.

928.    The IRGC also facilitated the Taliban's attacks by allowing the Taliban to

establish offices in Iran to serve as bases for planning terrorist attacks.  For example, the IRGC

permitted a senior leader of the Taliban to set up an office in Zahedan, Iran, near the borders with

Afghanistan and Pakistan.  In or about 2014, the Taliban also opened an office in Mashhad, Iran,

where the Fourth Corps of the Qods Force is headquartered.[409]  As of January 2019, the Taliban

maintained an office in Tehran, Iran.[410]

929.    Iranian fighters also conducted attacks alongside Taliban terrorists.  In an October

2016 Taliban attack in Farah Province, four senior Iranian commandos were killed, and many of

the other Taliban dead were taken across the border to Iran for burial.

---

[405] Quoted by Sajjan M. Gohel, in *Iran's Ambiguous Role in Afghanistan* at 13, CTC Sentinel (March 2010).

[406] *Killing Americans and Their Allies*.

[407] U.S. State Dep't, *Country Reports on Terrorism 2009* at 192 (Aug. 2010).

[408] U.S. State Dep't, *Country Reports on Terrorism 2012* at 196 (May 2013).

[409] Oved Lobel, *Afghanistan:  The Forgotten Front Against Iran*, Australia/Israel & Jewish Affairs Council (Nov. 16, 2018).

[410] *Iran and the Taliban:  A Tactical Alliance?*

930.    Mohammad Arif Shahjahan, the governor of Farah Province in western Afghanistan, told Radio Free Afghanistan in 2017 that Taliban leaders had been traveling frequently to Iran, where they received protection and support.[411]  He reported that Qods Force operatives had recently met with and advised the Taliban in Farah Province.[412]

931.    The IRGC's training of Taliban terrorists in small unit tactics, small arms, explosives, indirect fire, and other techniques enabled the Taliban to more effectively attack U.S. and Coalition forces.  The Taliban and its affiliated terrorist groups in Afghanistan used Iran's training to kill or injure Plaintiffs or their family members.

### D.    The IRGC, Including Its Hezbollah Division And Qods Force, Provided The Taliban With Financial Support

932.    Money supplied the lifeblood of the al-Qaeda/Taliban Syndicate.  Financing gave the Sirajuddin Haqqani and the terrorists he led the means to recruit and pay terrorist fighters; to acquire weapons and explosives with which to attack Coalition forces; and to maintain the vast operational infrastructure needed to sustain the insurgency.  In 2011, it cost the Taliban – when Sirajuddin Haqqani had become its most lethal terrorist and leader – an estimated $100-155 million overall to launch attacks and up to $300 million to "maintain[ ] the insurgency" generally.[413]  Those costs ballooned as the insurgency intensified.  As a U.N. Security Council report documented, from 2006-2012, the Taliban "managed to finance an ever-increasing number of attacks, reflecting a year-on-year increase in income."[414]  The Taliban's access to financing was vital to its ability to sustain its growing campaign of terrorism against the United

---

[411] Abubakar Siddique & Noorullah Shayan, *Mounting Afghan Ire Over Iran's Support For Taliban*, Gandhara (July 31, 2017).

[412] *Id.*

[413] *U.N. Financing Report* ¶ 34.

[414] *Id.*

States.  As one military historian observed in 2011, "the Taliban's most significant weapon is not its arms or its ability to mobilize jihadists but the vast sums of money that it seems to have at its disposal."[415]

933.    The IRGC supported the Taliban financially.  On an annual basis, the IRGC provided large cash payments to the Taliban.  For example, a purported February 2005 military intelligence summary (as published online) reported that the IRGC delivered 10 million Afghanis (worth roughly $212,000) to a location on Iran's border where the money was transferred to four members of a Taliban-associated terrorist group.[416]

934.    The IRGC also directly paid Taliban insurgents to kill U.S. forces.  Another purported February 2005 military-intelligence summary (as published online) reported on a Taliban group that was being paid by the Iranian government $1,740 for each Afghanistan soldier killed and $3,481 for each Government of Afghanistan official killed.  The report further explained that the group would begin attacking U.S. forces if the attacks on Afghans were successful.[417]  The IRGC paid Taliban terrorists an estimated $1,000 for each U.S. soldier murdered in Afghanistan and $6,000 for each destroyed American military vehicle.  In one specific example, Taliban fighters received $18,000 from the IRGC as a reward for an attack in 2010 than killed several Afghan forces and destroyed an American armored vehicle.[418]

935.    The IRGC also provided funding to individual Taliban commanders, often as they were returning to Afghanistan from training in Iran.  A purported May 2008 military-intelligence

---

[415] *Follow The Money*.

[416] *Afghanistan War Logs:  Iran Smuggles Money into Afghanistan to Fund Insurgents, says US Report*, The Guardian (July 25, 2010).

[417] *Afghanistan War Logs:  Iran Offers Reward for Each Afghan Official and Solider Killed, According to Coalition Report*, The Guardian (July 25, 2010).

[418] Miles Amoore, *Iran pays the Taliban to Kill US Soldiers*, The Times (Sept. 5, 2010).

310

summary (as published online) reported on a Taliban leader returning from training in Iran "along with a considerable amount of money."  A purported May 2009 U.S. State Department Cable (as published online) stated that the IRGC may provide Taliban Commander Mullah Sangin with financial support to engage Coalition forces, including U.S. contractors.

936.    The IRGC has also supported the Taliban's finances by supporting its ability to traffic narcotics, which Taliban terrorists use "to finance their acts of terror and violence."[419]  As the U.S. Treasury Department explained when it designated Iranian Qods Force General Gholamreza Baghbani as a Specially Designated Narcotics Trafficker in March 2012, General Baghbani allowed Afghan narcotics traffickers to smuggle opiates through Iran, facilitated the smuggling of chemicals necessary to produce heroin from Iran into Afghanistan, and helped "facilitate shipments of opium into Iran."[420]  General Baghbani also had narcotics traffickers deliver weapons on his behalf to the Taliban.[421]

937.    As reported in a 2015 *Wall Street Journal* article, a Taliban commander described Iran's financial support of the Taliban in the form of recruiting and paying individual terrorists. The commander explained that he had been detained for working illegally in Iran when he was approached by the IRGC and offered double his previous salary – to be paid by the IRGC – if he

---

[419] Press Release, U.S. Treasury Dep't, *Treasury Targets Taliban Shadow Governor of Helmand Afghanistan as Narcotics Trafficker* (Nov. 15, 2012).

[420] Press Release, U.S. Treasury Dep't, *Treasury Designates Iranian Qods Force General Overseeing Afghan Heroin Trafficking Through Iran* (Mar. 7, 2012).

[421] *Id.*

fought with the Taliban in Afghanistan.[422]  And in 2017, officials in Ghor Province accused the IRGC of financing a Taliban offensive.[423]

938.     Even relatively payments had an outsized effect on al-Qaeda's and the Taliban's, including its Haqqani Network's, terrorist capabilities.  Although estimates vary, the Taliban paid many of its rank-and-file fighters about $100 per month, while mid-level commanders made upwards of $350 per month.  As for many of the IEDs that the Taliban used against Coalition troops, a Pakistani security official estimated that they cost a mere $100 to make.  At those rates, even a single payment of $2,000 could finance substantial violence  by the al-Qaeda/Taliban Syndicate:  it could put ten fighters and a commander in the field for a month, and supply them with five IEDs.  And Defendants facilitated far greater value flow throughs that were many orders of magnitude higher.  Those payments materially strengthened al-Qaeda's, and the Taliban's, including its Haqqani Network's, ability to finance the attacks that killed and injured Plaintiffs in Afghanistan.

939.

**E.     The IRGC Provided Material Support to Al-Qaeda To Encourage The Growth Of Its Syndicate And Facilitate Terrorist Attacks By The Al-Qaeda-Taliban Syndicate In Afghanistan**

940.     While Americans worked to rebuild post-war Afghanistan, they were attacked by Taliban and al-Qaeda terrorists.  The IRGC, through its Hezbollah Division and Qods Force, sponsored those terrorist attacks to undermine American foreign policy in Afghanistan.  To that end, the IRGC supported the Taliban, including its most radical part, the Haqqani Network, by, among other things, training Taliban terrorists how to attack Americans effectively and paying

---

[422] Margherita Stancati, *Iran Backs Taliban With Cash And Arms*, Wall St. J. (June 11, 2015).

[423] Abubakar Siddique & Noorullah Shayan, *Mounting Afghan Ire Over Iran's Support For Taliban*, Gandhara (July 31, 2017).

terrorists who killed U.S. forces.  The IRGC also provided the Taliban with sophisticated weapons that it used to kill and injure thousands of Americans.

941.    The IRGC's support for al-Qaeda was equally potent.  That support dates back decades and has included money, weapons, training, logistical assistance, and safe harbor for key al-Qaeda leaders.  In 2007, Osama bin Laden himself referred to Iran as al-Qaeda's "main artery for funds, personnel, and communication."  The IRGC's longstanding decision to back al-Qaeda despite sectarian differences between the two reflected Iran's overriding desire to foment anti-American terrorism around the world.  That decision, like the one to provide material support to the Taliban, paid dividends.  the IRGC's support for al-Qaeda's activities in Afghanistan substantially aided the terrorist violence that killed and injured Americans there.

942.    The IRGC's support for al-Qaeda complemented its support for the Taliban because of the close relationship between the two terrorist groups.  Although al-Qaeda and the Taliban were nominally separate groups, they acted together in a terrorist "syndicate" that planned and authorized terrorist violence throughout Afghanistan.  That syndicate – which involved mafia-style meetings between leaders of the syndicate's various members – provided a superstructure that organized and facilitated a range of terrorist attacks in Afghanistan.  By funneling material support to multiple members of that syndicate, the IRGC, including its Hezbollah Division and Qods Force, ensured that its policy of sponsoring anti-American terrorism in Afghanistan achieved maximum effect.

943.    The IRGC's conspiracy succeeded.  The U.S. substantially completed its withdrawal from Afghanistan on or about August 2021, which was one of the four primary objects of the conspiracy.  Afghanistan was also, along with Iraq, one of the two central theaters where both the IRGC, including its Hezbollah Division and Qods Force, and its Sunni allies al-

Qaeda and the Taliban, regularly collaborated in a two-way manner, sharing resources, personnel, smuggling routes, financiers (in-country and around the world), and sometimes even jointly committing attacks with one another.

944.    The public reaction of the IRGC, including its Hezbollah Division and Qods Force, to the U.S. withdrawal from Afghanistan confirms that the terrorists believe they achieved one of the objects of the conspiracy:

945.    Iran's support for multiple components of this Syndicate ensured that its support had maximum effect.  Due to the mutually reinforcing ties between the Taliban and al-Qaeda in Afghanistan, support for the one benefited the other – and vice versa.  The IRGC recognized those interrelationships and so spread its support across multiple parts of the Afghan terror syndicate.  In doing so, the IRGC was able to achieve its intended effect:  wide-ranging terrorist attacks against Americans, executed mostly by the Taliban but supported by (and sometimes jointly committed with) al-Qaeda and the other components of the syndicate.

## X.    THE ISLAMIC REVOLUTIONARY GUARD CORPS, AL-QAEDA, AND THEIR AFFILIATES KILLED AND INJURED PLAINTIFFS AND THEIR FAMILY MEMBERS THROUGH ACTS OF INTERNATIONAL TERRORISM IN IRAQ THAT RELIED UPON THE MATERIAL SUPPORT OF THE ISLAMIC REVOLUTIONARY GUARD CORPS, AL-QAEDA, AL-QAEDA-IN-IRAQ, AND THE TALIBAN

946.    The **Iraq Plaintiffs** are American civilians, servicemembers, and contractors serving in Iraq and/or Syria, and their family members, who were killed or injured in terrorist attacks committed by al-Qaeda, al-Qaeda-in-Iraq (which later became ISIS), al-Nusra Front, and Ansar al-Islam, all of which were FTOs (collectively, "IRGC Sunni Terrorist Proxies"), and all of which Hezbollah, the Qods Force, and the Regular IRGC funded, armed, and logistically supported through the illicit MTN Irancell, TCI, and MCI cash and technology flows enabled by Defendants.

314

947.     Each Plaintiff who suffered injury because of an attack by IRGC Sunni Terrorist Proxies in Iraq from 2005 through 2012 was injured because of Defendants' direct aid to Hezbollah, the Qods Force, and the Regular IRGC, all of which flowed through such IRGC components to aid IRGC Sunni Terrorist Proxies in Iraq as they always conducted a nationwide anti-American terror campaign to intimidate the U.S. and Iraqi governments.

948.     Defendants also aided the Joint Cell terrorist(s) who committed each attack by transacting with notorious terrorist front counterparties, including, but not limited to, the Bonyad Mostazafan, IEI, MTN Irancell, TCI (including MCI), Exit40, and/or the Akbari Fronts, which had a widespread and specific reputation for raising money, providing logistical support, and obtaining weapons for terrorists, including Hezbollah, to use to attack Americans.  MTN Group's, Phuthuma Nhleko's, and Irene Charney's financial support and provision of embargoed American technologies and services for such IRGC-controlled, including the Qods Force-controlled, counterparties flowed through Hezbollah to the terrorist(s) that committed each attack that injured each Plaintiff.

949.     The IRGC provided key aid to IRGC Sunni Terrorist Proxies from 2003 through today.  The IRGC specifically provided al-Qaeda, al-Qaeda-in-Iraq, and Ansar al-Islam weapons, funds, training, logistical support, communications technology, safe haven, and assistance with narcotics trafficking, which raised money for their shared terrorist enterprise against America, which al-Qaeda and its allies used to further aid the IRGC Sunni Terrorist Proxies' ability to execute the attacks that injured Plaintiffs.

950.     The embargoed dual-use American technology – including thousands of secure American smartphones every year – hundreds of millions of U.S. Dollars annually, and vast network of logistical and operational support for the Irancell and TCI fronts that MTN Group

provided to their counterparties controlled by the IRGC flowed through to al-Qaeda, al-Qaeda-in-Iraq, Ansar al-Islam, and their allies that committed each attack that injured each Plaintiff through transfers made by the IRGC to al-Qaeda, al-Qaeda-in-Iraq, and Ansar al-Islam.

**A.**     **The July 4, 2007 Grenade Attack In Baghdad (The Steven A. Davis Family)**

951.     Specialist Steven A. Davis served in Iraq as a member of the U.S. Army. On July 4, 2007, SPC Davis was injured in a grenade attack in Baghdad.[424] SPC Davis died on July 4, 2007 as a result of injuries sustained during the attack. He was 23 years old.

952.     The attack was committed by IRGC Sunni Terrorist Proxies, with material support and resources from the IRGC.

953.     SPC Davis's murder would have violated the laws of war if these terrorists were subject to them because, among other reasons, the terrorist(s) who committed the attack neither wore uniforms nor otherwise identified themselves as enemy combatants.

954.     SPC Davis was a U.S. national at the time of the attack and his death.

955.     Plaintiff Guy L. "Buck" Davis is the father of SPC Davis and a U.S. national.

956.     Plaintiff Teresita R. Davis is the mother of SPC Davis and a U.S. national.

957.     Plaintiff Ayla M. Davis is the widow of SPC Davis and a U.S. national.

958.     Plaintiff E.D., by and through her next friend Ayla M. Davis, is the minor daughter of SPC Davis and a U.S. national.

959.     Plaintiff Christopher J. Davis is the brother of SPC Davis and a U.S. national.

960.     As a result of the July 4, 2007 attack and SPC Davis's injuries and death, each member of the Davis Family has experienced severe mental anguish, emotional pain and suffering, and the loss of SPC Davis's society, companionship, and counsel.

---

[424] Unless otherwise indicated (e.g., for neighborhoods in Baghdad, Plaintiffs usually reference geographic details at the provincial level, so "Al Anbar" means "Al Anbar Province, Iraq" and "Wasit" means "Wasit Province, Iraq."

961.     As a result of the March 1, 2006 attack, SPC Davis was injured in his person and/or property. The Plaintiff members of the Davis Family are the survivors and/or heirs of SPC Davis and are entitled to recover for the damages SPC Davis sustained.

**B.     The March 1, 2006 RPG Attack In Al Anbar (The Christopher S. Merchant Family)**

962.     Specialist Christopher S. Merchant served in Iraq as a member of the U.S. Army National Guard. On March 1, 2006, SPC Merchant was injured in rocket propelled grenade attack in Al Anbar. SPC Merchant died on March 1, 2006 as a result of injuries sustained during the attack.

963.     The attack was committed by IRGC Sunni Terrorist Proxies, with material support and resources from the IRGC.

964.     SPC Merchant's murder would have violated the laws of war if these terrorists were subject to them because, among other reasons, the terrorist(s) who committed the attack neither wore uniforms nor otherwise identified themselves as enemy combatants.

965.     SPC Merchant was a U.S. national at the time of the attack and his death.

966.     Plaintiff Ms. Monica Merchant is the widow of SPC Merchant and a U.S. national.

967.     As a result of the March 1, 2006 attack and SPC Merchant's injuries and death, each member of the Merchant Family has experienced severe mental anguish, emotional pain and suffering, and the loss of SPC Merchant's society, companionship, and counsel.

968.     As a result of the March 1, 2006 attack, SPC Merchant was injured in his person and/or property. The Plaintiff members of the Merchant Family are the survivors and/or heirs of SPC Merchant and are entitled to recover for the damages SPC Merchant sustained.

**C.      The March 7, 2006 IED Attack In Al Anbar (The Justin R. Martone Family)**

969.    Gunnery Sergeant Justin R. Martone served in Iraq as a member of the U.S. military serving in the U.S. Marine Corps.  On March 7, 2006, GySgt Martone was injured in an IED attack in Al Anbar. GySgt Martone died on March 7, 2006 as a result of injuries sustained during the attack.

970.    The attack was committed by IRGC Sunni Terrorist Proxies, with material support and resources from the IRGC.

971.    GySgt Martone's murder would have violated the laws of war if these terrorists were subject to them because, among other reasons, the terrorist(s) who committed the attack neither wore uniforms nor otherwise identified themselves as enemy combatants, and the passive detonation system indiscriminately placed civilians at risk.

972.    GySgt Martone was a U.S. national at the time of the attack and his death.

973.    Plaintiff Mrs. Paulette Martone is the mother of GySgt Martone and a U.S. national.

974.    Plaintiff Mr. Agostine Martone Jr. is the father of GySgt Martone and a U.S. national.

975.    As a result of the March 7, 2006 attack and GySgt Martone's injuries and death, each member of the Martone Family has experienced severe mental anguish, emotional pain and suffering, and the loss of GySgt Martone's society, companionship, and counsel.

976.    As a result of the March 7, 2006 attack, GySgt Martone was injured in his person and/or property. The Plaintiff members of the Martone Family are the survivors and/or heirs of GySgt Martone and are entitled to recover for the damages GySgt Martone sustained.

**D.      The March 23, 2006 IED Attack In Al Anbar (The Brock A. Beery Family)**

977.      Staff Sergeant Brock Alan Beery served in Iraq as a member of the U.S. military serving in the U.S. Army National Guard. On March 23, 2006, SSG Beery was injured in an IED attack in Al Anbar.  SSG Beery died on March 23, 2006 as a result of injuries sustained during the attack.

978.      The attack was committed by IRGC Sunni Terrorist Proxies, with material support and resources from the IRGC.

979.      SSG Beery's murder would have violated the laws of war if these terrorists were subject to them because, among other reasons, the terrorist(s) who committed the attack neither wore uniforms nor otherwise identified themselves as enemy combatants, and the passive detonation system indiscriminately placed civilians at risk.

980.      SSG Beery was a U.S. national at the time of the attack and his death.

981.      Plaintiff Ms. Pamela Beery is the mother of SSG Beery and a U.S. national.

982.      Plaintiff Mr. Roger Beery is the father of SSG Beery and a U.S. national.

983.      Plaintiff Mr. Joel Beery is the brother of SSG Beery and a U.S. national.

984.      Plaintiff Mr. Tobey Beery is the brother of SSG Beery and a U.S. national.

985.      As a result of the March 23, 2006 attack and SSG Beery's injuries and death, each member of the Beery Family has experienced severe mental anguish, emotional pain and suffering, and the loss of SSG Beery's society, companionship, and counsel.

986.      As a result of the March 23, 2006 attack, SSG Beery was injured in his person and/or property. The Plaintiff members of the Beery Family are the survivors and/or heirs of SSG Beery and are entitled to recover for the damages SSG Beery sustained.

E.     **The April 11, 2006 Suicide Attack In Al Anbar (The Kenneth D. Hess Family)**

987.     Sergeant Kenneth Dale Hess served in Iraq as a member of the U.S. military serving in the U.S. Army. On April 11, 2006, SGT Hess was injured in a suicide bomber attack in Al Anbar.  SGT Hess died on April 11, 2006 as a result of injuries sustained during the attack.

988.     The attack was committed by IRGC Sunni Terrorist Proxies, with material support and resources from the IRGC.

989.     SGT Hess's murder would have violated the laws of war if these terrorists were subject to them because, among other reasons, the terrorist(s) who committed the attack neither wore uniforms nor otherwise identified themselves as enemy combatants.

990.     SGT Hess was a U.S. national at the time of the attack and his death.

991.     Plaintiff Mrs. April Hess is the widow of SGT Hess and a U.S. national.

992.     Plaintiff Ms. Katherine Meeks is the mother of SGT Hess and a U.S. national.

993.     As a result of the April 11, 2006 attack and SGT Hess's injuries and death, each member of the Hess Family has experienced severe mental anguish, emotional pain and suffering, and the loss of SGT Hess's society, companionship, and counsel.

994.     As a result of the April 11, 2006 attack, SGT Hess was injured in his person and/or property. The Plaintiff members of the Hess Family are the survivors and/or heirs of SGT Hess and are entitled to recover for the damages SGT Hess sustained.

F.     **The April 28, 2006 IED Attack In Al Anbar (The Edward G. Davis, III Family)**

995.     Sergeant Edward Glen Davis III served in Iraq as a member of the U.S. military serving in the U.S. Marine Corps. On April 28, 2006, SGT Davis was injured in an IED attack in Al Anbar.  SGT Davis died on April 28, 2006 as a result of injuries sustained during the attack.

996. The attack was committed by IRGC Sunni Terrorist Proxies, with material support and resources from the IRGC.

997. SGT Davis's murder would have violated the laws of war if these terrorists were subject to them because, among other reasons, the terrorist(s) who committed the attack neither wore uniforms nor otherwise identified themselves as enemy combatants, and the passive detonation system indiscriminately placed civilians at risk.

998. SGT Davis was a U.S. national at the time of the attack and his death.

999. Plaintiff Mrs. Preina Davis is the widow of SGT Davis and a U.S. national.

1000. Plaintiff Ms. Alyssa Davis is the daughter of SGT Davis and a U.S. national.

1001. Plaintiff E.D., by and through his next friend Preina Davis, is the minor son of SGT Davis and a U.S. national.

1002. Plaintiff Mr. Edward Davis Jr. is the father of SGT Davis and a U.S. national.

1003. Plaintiff Ms. Priscilla Sandoval Smith is the step-daughter of SGT Davis and a U.S. national. Ms. Sandoval Smith lived in the same household as SGT Davis for a substantial time and considered SGT Davis the functional equivalent of a biological father.

1004. As a result of the April 28, 2006 attack and SGT Davis's injuries and death, each member of the Davis Family has experienced severe mental anguish, emotional pain and suffering, and the loss of SGT Davis's society, companionship, and counsel.

1005. As a result of the April 28, 2006 attack, SGT Davis was injured in his person and/or property. The Plaintiff members of the Davis Family are the survivors and/or heirs of SGT Davis and are entitled to recover for the damages SGT Davis sustained.

### G. The May 1, 2006 Explosion Attack In Al Anbar (The Cory L. Palmer Family)

1006.   Corporal Cory Leonard Palmer served in Iraq as a member of the U.S. military serving in the U.S. Marine Corps. On May 1, 2006, Cpl Palmer was injured in an explosion in Al Anbar.  Cpl Palmer died on May 6, 2006 as a result of injuries sustained during the attack.

1007.   The attack was committed by IRGC Sunni Terrorist Proxies, with material support and resources from the IRGC.

1008.   Cpl Palmer's murder would have violated the laws of war if these terrorists were subject to them because, among other reasons, the terrorist(s) who committed the attack neither wore uniforms nor otherwise identified themselves as enemy combatants.

1009.   Cpl Palmer was a U.S. national at the time of the attack and his death.

1010.   Plaintiff Ms. Danna Palmer is the mother of Cpl Palmer and a U.S. national.

1011.   Ms. Danna Palmer also brings claims in her representative capacity on behalf of Cpl Plamer's estate.   Cpl Palmer's estate is entitled to recover economic and non-economic damages.

1012.   As a result of the May 1, 2006 attack and Cpl Palmer's injuries and death, each member of the Palmer Family has experienced severe mental anguish, emotional pain and suffering, and the loss of Cpl Palmer's society, companionship, and counsel.

1013.   As a result of the May 1, 2006 attack, Cpl Palmer was injured in his person and/or property. The Plaintiff members of the Palmer Family are the survivors and/or heirs of Cpl Palmer and are entitled to recover for the damages Cpl Palmer sustained.

### H. The May 6, 2006 IED Attack In Al Anbar (The Leon B. Deraps Family)

1014.   Lance Corporal Leon Bertrand Deraps served in Iraq as a member of the U.S. military serving in the U.S. Marine Corps. On May 6, 2006, LCpl Deraps was injured in an IED

322

attack in Al Anbar.  LCpl Deraps died on May 6, 2006 as a result of injuries sustained during the attack.

1015.   The attack was committed by IRGC Sunni Terrorist Proxies, with material support and resources from the IRGC.

1016.   LCpl Deraps's murder would have violated the laws of war if these terrorists were subject to them because, among other reasons, the terrorist(s) who committed the attack neither wore uniforms nor otherwise identified themselves as enemy combatants, and the passive detonation system indiscriminately placed civilians at risk.

1017.   LCpl Deraps was a U.S. national at the time of the attack and his death.

1018.   Plaintiff Mr. Dale Deraps is the father of LCpl Deraps and a U.S. national.

1019.   Plaintiff Mr. Cedar Deraps is the brother of LCpl Deraps and a U.S. national.

1020.   Plaintiff Ms. Dawn Cassil is the sister of LCpl Deraps and a U.S. national.

1021.   Plaintiff Ms. Regina Baepler is the sister of LCpl Deraps and a U.S. national.

1022.   Plaintiff Mrs. Shanti Johnson is the sister of LCpl Deraps and a U.S. national.

1023.   As a result of the May 6, 2006 attack and LCpl Deraps's injuries and death, each member of the Deraps Family has experienced severe mental anguish, emotional pain and suffering, and the loss of LCpl Deraps's society, companionship, and counsel.

1024.   As a result of the May 6, 2006 attack, LCpl Deraps was injured in his person and/or property. The Plaintiff members of the Deraps Family are the survivors and/or heirs of LCpl Deraps and are entitled to recover for the damages LCpl Deraps sustained.

### I.     The June 5, 2006 IED Attack In Al Anbar (The Jaime S. Jaenke Family)

1025.   Petty Officer Second Class Jaime Suzanne Jaenke served in Iraq as a member of the U.S. military serving in the U.S. Navy. On June 5, 2006, PO2 Jaenke was injured in an IED

attack in Al Anbar.  PO2 Jaenke died on June 5, 2006 as a result of injuries sustained during the attack.

1026.   The attack was committed by IRGC Sunni Terrorist Proxies, with material support and resources from the IRGC.

1027.   PO2 Jaenke's murder would have violated the laws of war if these terrorists were subject to them because, among other reasons, the terrorist(s) who committed the attack neither wore uniforms nor otherwise identified themselves as enemy combatants, and the passive detonation system indiscriminately placed civilians at risk.

1028.   PO2 Jaenke was a U.S. national at the time of the attack and his death.

1029.   Plaintiff Ms. Susan Jaenke is the mother of PO2 Jaenke and a U.S. national.

1030.   As a result of the June 5, 2006 attack and PO2 Jaenke's injuries and death, each member of the Jaenke Family has experienced severe mental anguish, emotional pain and suffering, and the loss of PO2 Jaenke's society, companionship, and counsel.

1031.   As a result of the June 5, 2006 attack, PO2 Jaenke was injured in her person and/or property. The Plaintiff members of the Jaenke Family are the survivors and/or heirs of PO2 Jaenke and are entitled to recover for the damages PO2 Jaenke sustained.

**J.      The June 9, 2006 IED Attack In Al Anbar (Brent B. Zoucha Family)**

1032.   Lance Corporal Brent Basil Zoucha served in Iraq as a member of the U.S. military serving in the U.S. Marine Corps. On June 9, 2006, LCpl Zoucha was injured in an IED attack in Al Anbar.  LCpl Zoucha died on June 9, 2006 as a result of injuries sustained during the attack.

1033.   The attack was committed by IRGC Sunni Terrorist Proxies, with material support and resources from the IRGC.

1034.   LCpl Zoucha's murder would have violated the laws of war if these terrorists were subject to them because, among other reasons, the terrorist(s) who committed the attack

neither wore uniforms nor otherwise identified themselves as enemy combatants, and the passive detonation system indiscriminately placed civilians at risk.

1035.   LCpl Zoucha was a U.S. national at the time of the attack and his death.

1036.   Plaintiff Ms. Rita Zoucha is the mother of LCpl Zoucha and a U.S. national.

1037.   Plaintiff Ms. Sherri Laska is the sister of LCpl Zoucha and a U.S. national.

1038.   As a result of the June 9, 2006 attack and LCpl Zoucha's injuries and death, each member of the Zoucha Family has experienced severe mental anguish, emotional pain and suffering, and the loss of LCpl Zoucha's society, companionship, and counsel.

1039.   As a result of the June 9, 2006 attack, LCpl Zoucha was injured in his person and/or property. The Plaintiff members of the Zoucha Family are the survivors and/or heirs of LCpl Zoucha and are entitled to recover for the damages LCpl Zoucha sustained.

**K.    The June 17, 2006 IED Attack In Al Anbar (Johnathan L. Benson Family)**

1040.   Corporal Johnathan Lee Benson served in Iraq as a member of the U.S. military serving in the U.S. Marine Corps. On June 17, 2006, Cpl Benson was injured in an IED attack in Al Anbar.  Cpl Benson died on September 9, 2006 as a result of injuries sustained during the attack.

1041.   The attack was committed by IRGC Sunni Terrorist Proxies, with material support and resources from the IRGC.

1042.   Cpl Benson's murder would have violated the laws of war if these terrorists were subject to them because, among other reasons, the terrorist(s) who committed the attack neither wore uniforms nor otherwise identified themselves as enemy combatants, and the passive detonation system indiscriminately placed civilians at risk.

1043.   Cpl Benson was a U.S. national at the time of the attack and his death.

1044.   Plaintiff Mrs. Marjorie Benson is the mother of Cpl Benson and a U.S. national.

1045.   Plaintiff Mr. Steven Benson is the father of Cpl Benson and a U.S. national.

1046.   As a result of the June 17, 2006 attack and Cpl Benson's injuries and death, each member of the Benson Family has experienced severe mental anguish, emotional pain and suffering, and the loss of Cpl Benson's society, companionship, and counsel.

1047.   As a result of the June 17, 2006 attack, Cpl Benson was injured in his person and/or property. The Plaintiff members of the Benson Family are the survivors and/or heirs of Cpl Benson and are entitled to recover for the damages Cpl Benson sustained.

**L.      The June 27, 2006 IED Attack In Al Anbar (Jacque J. Keeslar Family)**

1048.   Plaintiff Sergeant First Class Jacque J. Keeslar served in Iraq as a member of the U.S. military serving in the U.S. Army. On June 27, 2006, SFC Keeslar was injured in an IED attack in Al Anbar.  The attack severely wounded SFC Keeslar, who lost his left leg above the knee and his right leg below the knee.  As a result of the June 27, 2006 attack and his injuries, SFC Keeslar has experienced severe physical and emotional pain and suffering.

1049.   The attack was committed by IRGC Sunni Terrorist Proxies, with material support and resources from the IRGC.

1050.   The attack that injured SFC Keeslar would have violated the laws of war if these terrorists were subject to them because, among other reasons, the terrorist(s) who planted the IED neither wore uniforms nor otherwise identified themselves as enemy combatants and the passive detonation system indiscriminately placed civilians at risk.

1051.   SFC Keeslar was a U.S. national at the time of the attack.

1052.   Plaintiff Mrs. Vanessa Keeslar is the wife of SFC Keeslar and a U.S. national.

1053.   As a result of the June 27, 2006 attack and SFC Keeslar's injuries, each member of the Keeslar Family has experienced severe mental anguish, emotional pain and suffering.

**M.      The July 2, 2006 IED Attack In Al Anbar (Justin L. Noyes Family)**

1054.    Sergeant Justin Lee Noyes served in Iraq as a member of the U.S. military serving in the U.S. Marine Corps. On July 2, 2006, Sgt Noyes was injured in an IED attack in Al Anbar. Sgt Noyes died on July 2, 2006 as a result of injuries sustained during the attack.

1055.     The attack was committed by IRGC Sunni Terrorist Proxies, with material support and resources from the IRGC.

1056.    Sgt Noyes's murder would have violated the laws of war if these terrorists were subject to them because, among other reasons, the terrorist(s) who committed the attack neither wore uniforms nor otherwise identified themselves as enemy combatants, and the passive detonation system indiscriminately placed civilians at risk.

1057.    Sgt Noyes was a U.S. national at the time of the attack and his death.

1058.    Plaintiff Mrs. Stacy Bridges is the mother of Sgt Noyes and a U.S. national.

1059.    Plaintiff Mr. Mark Noyes is the father of Sgt Noyes and a U.S. national.

1060.    As a result of the July 2, 2006 attack and Sgt Noyes's injuries and death, each member of the Noyes Family has experienced severe mental anguish, emotional pain and suffering, and the loss of Sgt Noyes's society, companionship, and counsel.

1061.    As a result of the July 2, 2006 attack, Sgt Noyes was injured in his person and/or property. The Plaintiff members of the Noyes Family are the survivors and/or heirs of Sgt Noyes and are entitled to recover for the damages Sgt Noyes sustained.

**N.      The July 12, 2006 IED Attack In Al Anbar (Jerry A. Tharp Family)**

1062.    Petty Officer First Class Jerry A. Tharp served in Iraq as a member of the U.S. military serving in the U.S. Naval Reserve. On July 12, 2006, PO1 Tharp was injured in an IED attack in Al Anbar.  PO1 Tharp died on July 12, 2006 as a result of injuries sustained during the attack.

1063.   The attack was committed by IRGC Sunni Terrorist Proxies, with material support and resources from the IRGC.

1064.   Sgt Noyes's murder would have violated the laws of war if these terrorists were subject to them because, among other reasons, the terrorist(s) who committed the attack neither wore uniforms nor otherwise identified themselves as enemy combatants, and the passive detonation system indiscriminately placed civilians at risk.

1065.   PO1 Tharp was a U.S. national at the time of the attack and his death.

1066.   Plaintiff Ms. Gayle Tharp is the widow of PO1 Tharp and a U.S. national.

1067.   Plaintiff Ms. Donna Tharp is the mother of PO1 Tharp and a U.S. national.

1068.   Plaintiff Ms. Karen Tharp is the sister of PO1 Tharp and a U.S. national.

1069.   As a result of the July 12, 2006 attack and PO1 Tharp's injuries and death, each member of the Tharp Family has experienced severe mental anguish, emotional pain and suffering, and the loss of PO1 Tharp's society, companionship, and counsel.

1070.   As a result of the July 12, 2006 attack, PO1 Tharp was injured in his person and/or property. The Plaintiff members of the Tharp Family are the survivors and/or heirs of PO1 Tharp and are entitled to recover for the damages PO1 Tharp sustained.

**O.      The August 22, 2006 IED Attack In Al Anbar (John J. Darga Family)**

1071.   Chief Petty Officer Paul John Darga served in Iraq as a member of the U.S. military serving in the U.S. Navy. On August 22, 2006, CPO Darga was injured in an IED attack in Al Anbar.  CPO Darga died on August 22, 2006 as a result of injuries sustained during the attack.

1072.   The attack was committed by IRGC Sunni Terrorist Proxies, with material support and resources from the IRGC.

1073.   CPO Darga's murder would have violated the laws of war if these terrorists were subject to them because, among other reasons, the terrorist(s) who committed the attack neither

wore uniforms nor otherwise identified themselves as enemy combatants, and the passive detonation system indiscriminately placed civilians at risk.

1074.   CPO Darga was a U.S. national at the time of the attack and his death.

1075.   Plaintiff Mr. John Darga is the father of CPO Darga and a U.S. national.

1076.   As a result of the August 22, 2006 attack and CPO Darga's injuries and death, each member of the Darga Family has experienced severe mental anguish, emotional pain and suffering, and the loss of CPO Darga's society, companionship, and counsel.

1077.   As a result of the August 22, 2006 attack, CPO Darga was injured in his person and/or property. The Plaintiff members of the Darga Family are the survivors and/or heirs of CPO Darga and are entitled to recover for the damages CPO Darga sustained.

**P.      The August 30, 2006 IED Attack In Al Anbar (Joshua R. Hanson Family)**

1078.   Staff Sergeant Joshua Robert Hanson served in Iraq as a member of the U.S. military serving in the U.S. Army National Guard. On August 30, 2006, SSG Hanson was injured in an IED attack in Al Anbar.  SSG Hanson died on August 30, 2006 as a result of injuries sustained during the attack.

1079.   The attack was committed by IRGC Sunni Terrorist Proxies, with material support and resources from the IRGC.

1080.   SSG Hanson's murder would have violated the laws of war if these terrorists were subject to them because, among other reasons, the terrorist(s) who committed the attack neither wore uniforms nor otherwise identified themselves as enemy combatants, and the passive detonation system indiscriminately placed civilians at risk.

1081.   SSG Hanson was a U.S. national at the time of the attack and his death.

1082.   Plaintiff Mrs. Kathleen Hanson is the mother of SSG Hanson and a U.S. national.

1083.   Plaintiff Mr. Robert Hanson is the father of SSG Hanson and a U.S. national.

1084.   As a result of the August 30, 2006 attack and SSG Hanson's injuries and death, each member of the Hanson Family has experienced severe mental anguish, emotional pain and suffering, and the loss of SSG Hanson's society, companionship, and counsel.

1085.   As a result of the August 30, 2006 attack, SSG Hanson was injured in his person and/or property. The Plaintiff members of the Hanson Family are the survivors and/or heirs of SSG Hanson and are entitled to recover for the damages SSG Hanson sustained.

### Q.       The September 2, 2006 Mortar Attack In Babylon (Justin W. Dreese Family)

1086.   Private First Class Justin Wesley Dreese served in Iraq as a member of the U.S. military serving in the U.S. Army. On September 2, 2006, PFC Dreese was injured in a mortar attack in Babylon, Iraq.  PFC Dreese died on September 2, 2006 as a result of injuries sustained during the attack.

1087.   The attack was committed by IRGC Sunni Terrorist Proxies, with material support and resources from the IRGC.

1088.   PFC Dreese's murder would have violated the laws of war if these terrorists were subject to them because, among other reasons, the terrorist(s) who committed the attack neither wore uniforms nor otherwise identified themselves as enemy combatants.

1089.   PFC Dreese was a U.S. national at the time of the attack and his death.

1090.   Plaintiff Mrs. Kathryn Hartman is the mother of PFC Dreese and a U.S. national.

1091.   As a result of the September 2, 2006 attack and PFC Dreese's injuries and death, each member of the Dreese Family has experienced severe mental anguish, emotional pain and suffering, and the loss of PFC Dreese's society, companionship, and counsel.

1092.   As a result of the September 2, 2006 attack, PFC Dreese was injured in his person and/or property. The Plaintiff members of the Dreese Family are the survivors and/or heirs of PFC Dreese and are entitled to recover for the damages PFC Dreese sustained.

### R.     The September 3, 2006 IED Attack In Nineveh (Richard J. Henkes, II Family)

1093.   Sergeant First Class Richard Joseph Henkes II served in Iraq as a member of the U.S. military serving in the U.S. Army. On September 3, 2006, SFC Henkes was injured in an IED attack in Nineveh, Iraq.  SFC Henkes died on September 3, 2006 as a result of injuries sustained during the attack.

1094.   The attack was committed by IRGC Sunni Terrorist Proxies, with material support and resources from the IRGC.

1095.   SFC Henkes's murder would have violated the laws of war if these terrorists were subject to them because, among other reasons, the terrorist(s) who committed the attack neither wore uniforms nor otherwise identified themselves as enemy combatants, and the passive detonation system indiscriminately placed civilians at risk.

1096.   SFC Henkes was a U.S. national at the time of the attack and his death.

1097.   Plaintiff Mrs. Christine Stanton is the mother of SFC Henkes and a U.S. national.

1098.   As a result of the September 3, 2006 attack and SFC Henkes's injuries and death, each member of the Henkes Family has experienced severe mental anguish, emotional pain and suffering, and the loss of SFC Henkes's society, companionship, and counsel.

1099.   As a result of the September 3, 2006 attack, SFC Henkes was injured in his person and/or property. The Plaintiff members of the Henkes Family are the survivors and/or heirs of SFC Henkes and are entitled to recover for the damages SFC Henkes sustained.

### S.     The September 4, 2006 IED Attack In Al Anbar (Christopher Walsh Family)

1100.   Petty Officer Second Class Christopher Walsh served in Iraq as a member of the U.S. military serving in the U.S. Naval Reserve. On September 4, 2006, PO2 Walsh was injured

in an IED attack in Al Anbar. PO2 Walsh died on September 4, 2006 as a result of injuries sustained during the attack.

1101. The attack was committed by IRGC Sunni Terrorist Proxies, with material support and resources from the IRGC.

1102. PO2 Walsh's murder would have violated the laws of war if these terrorists were subject to them because, among other reasons, the terrorist(s) who committed the attack neither wore uniforms nor otherwise identified themselves as enemy combatants, and the passive detonation system indiscriminately placed civilians at risk.

1103. PO2 Walsh was a U.S. national at the time of the attack and his death.

1104. Plaintiff Mrs. Maureen Walsh is the mother of PO2 Walsh and a U.S. national.

1105. Plaintiff Ms. Erin Watson is the sister of PO2 Walsh and a U.S. national.

1106. Plaintiff Mr. Joseph Walsh is the brother of PO2 Walsh and a U.S. national.

1107. Plaintiff Ms. Meghan Turner is the sister of PO2 Walsh and a U.S. national.

1108. Plaintiff Mr. Patrick Walsh is the brother of PO2 Walsh and a U.S. national.

1109. As a result of the September 4, 2006 attack and PO2 Walsh's injuries and death, each member of the Walsh Family has experienced severe mental anguish, emotional pain and suffering, and the loss of PO2 Walsh's society, companionship, and counsel.

1110. As a result of the September 4, 2006 attack, PO2 Walsh was injured in his person and/or property. The Plaintiff members of the Walsh Family are the survivors and/or heirs of PO2 Walsh and are entitled to recover for the damages PO2 Walsh sustained.

**T. The September 13, 2006 IED Attack In Al Anbar (Jeffrey P. Shaffer Family)**

1111. Specialist Jeffrey P. Shaffer served in Iraq as a member of the U.S. military serving in the U.S. Army. On September 13, 2006, SPC Shaffer was injured in an IED attack in Al Anbar. SPC Shaffer died on September 13, 2006 as a result of injuries sustained during the attack.

1112.   The attack was committed by IRGC Sunni Terrorist Proxies, with material support and resources from the IRGC.

1113.   SPC Shaffer's murder would have violated the laws of war if these terrorists were subject to them because, among other reasons, the terrorist(s) who committed the attack neither wore uniforms nor otherwise identified themselves as enemy combatants, and the passive detonation system indiscriminately placed civilians at risk.

1114.   SPC Shaffer was a U.S. national at the time of the attack and his death.

1115.   Plaintiff Mrs. Melissa Adams is the mother of SPC Shaffer and a U.S. national.

1116.   Plaintiff Mr. Addrin Adams is the brother of SPC Shaffer and a U.S. national.

1117.   Plaintiff Mr. Mark Adams is the step-father of SPC Shaffer and a U.S. national. Mr. Adams lived in the same household as SPC Shaffer for a substantial time and considered SPC Shaffer the functional equivalent of a biological son.

1118.   As a result of the September 13, 2006 attack and SPC Shaffer's injuries and death, each member of the Shaffer Family has experienced severe mental anguish, emotional pain and suffering, and the loss of SPC Shaffer's society, companionship, and counsel.

1119.   As a result of the September 13, 2006 attack, SPC Shaffer was injured in his person and/or property. The Plaintiff members of the Shaffer Family are the survivors and/or heirs of SPC Shaffer and are entitled to recover for the damages SPC Shaffer sustained.

**U.    The September 13, 2006 Suicide Attack In Baghdad (The Marcus A. Cain Family)**

1120.   Corporal Marcus Anthony Cain served in Iraq as a member of the U.S. military serving in the U.S. Army. On September 13, 2006, CPL Cain was injured in a suicide bomber attack in Baghdad, Iraq.  CPL Cain died on September 13, 2006 as a result of injuries sustained during the attack.

1121.   The attack was committed by IRGC Sunni Terrorist Proxies, with material support and resources from the IRGC.

1122.   CPL Cain's murder would have violated the laws of war if these terrorists were subject to them because, among other reasons, the terrorist(s) who committed the attack neither wore uniforms nor otherwise identified themselves as enemy combatants.

1123.   CPL Cain was a U.S. national at the time of the attack and his death.

1124.   Plaintiff Mr. Leroy Cain Jr. is the father of CPL Cain and a U.S. national.

1125.   As a result of the September 13, 2006 attack and CPL Cain's injuries and death, each member of the Cain Family has experienced severe mental anguish, emotional pain and suffering, and the loss of CPL Cain's society, companionship, and counsel.

1126.   As a result of the September 13, 2006 attack, CPL Cain was injured in his person and/or property. The Plaintiff members of the Cain Family are the survivors and/or heirs of CPL Cain and are entitled to recover for the damages CPL Cain sustained.

## V.   The September 16, 2006 IED Attack In Al Anbar (David S. Roddy Family)

1127.   Petty Officer Second Class David Sean Roddy served in Iraq as a member of the U.S. military serving in the U.S. Navy. On September 16, 2006, PO2 Roddy was injured in an IED attack in Al Anbar.  PO2 Roddy died on September 16, 2006 as a result of injuries sustained during the attack.

1128.   The attack was committed by IRGC Sunni Terrorist Proxies, with material support and resources from the IRGC.

1129.   PO2 Roddy's murder would have violated the laws of war if these terrorists were subject to them because, among other reasons, the terrorist(s) who committed the attack neither wore uniforms nor otherwise identified themselves as enemy combatants, and the passive detonation system indiscriminately placed civilians at risk.

1130.   PO2 Roddy was a U.S. national at the time of the attack and his death.

1131.   Plaintiff Mr. Robert Roddy Jr. is the son of PO2 Roddy and a U.S. national.

1132.   As a result of the September 16, 2006 attack and PO2 Roddy's injuries and death, each member of the Roddy Family has experienced severe mental anguish, emotional pain and suffering, and the loss of PO2 Roddy's society, companionship, and counsel.

1133.   As a result of the September 16, 2006 attack, PO2 Roddy was injured in his person and/or property. The Plaintiff members of the Roddy Family are the survivors and/or heirs of PO2 Roddy and are entitled to recover for the damages PO2 Roddy sustained.

**W.   The October 6, 2006 IED Attack In Al Anbar (The Families of John E. Hale and Stephen F. Johnson)**

1134.   On October 6, 2006, Iranian Sunni Terrorist Proxies committed an IED attack in Al Anbar (the "October 6, 2006 IED Attack").

1135.   The October 6, 2006 IED Attack was committed by IRGC Sunni Terrorist Proxies, with material support and resources from the IRGC.

1136.   The October 6, 2006 IED Attack would have violated the laws of war if these terrorists were subject to them because, among other reasons, the terrorist(s) who committed the attack neither wore uniforms nor otherwise identified themselves as enemy combatants, and the passive detonation system indiscriminately placed civilians at risk.

**1.   The John E. Hale Family**

1137.   Lance Corporal John Edward Hale served in Iraq as a member of the U.S. military serving in the U.S. Marine Corps. On October 6, 2006, LCpl Hale was injured in the October 6, 2006 IED Attack.  LCpl Hale died on October 6, 2006 as a result of injuries sustained during the October 6, 2006 IED Attack.

1138.   LCpl Hale was a U.S. national at the time of the attack and his death.

1139.   Plaintiff Mr. Phillip Hale is the father of LCpl Hale and a U.S. national.

1140.   As a result of the October 6, 2006 IED Attack and LCpl Hale's injuries and death, each member of the Hale Family has experienced severe mental anguish, emotional pain and suffering, and the loss of LCpl Hale's society, companionship, and counsel.

1141.   As a result of the October 6, 2006 IED Attack, LCpl Hale was injured in his person and/or property. The Plaintiff members of the Hale Family are the survivors and/or heirs of LCpl Hale and are entitled to recover for the damages LCpl Hale sustained.

### 2. The Stephen F. Johnson Family

1142.   Lance Corporal Stephen F. Johnson served in Iraq as a member of the U.S. military serving in the U.S. Marine Corps. On October 6, 2006, LCpl Johnson was injured in the October 6, 2006 IED Attack.  LCpl Johnson died on October 6, 2006 as a result of injuries sustained during the attack.

1143.   LCpl Johnson was a U.S. national at the time of the attack and his death.

1144.   Plaintiff Ms. Lynn Johnson is the mother of LCpl Johnson and a U.S. national.

1145.   Plaintiff Mr. Stanley Johnson is the father of LCpl Johnson and a U.S. national.

1146.   Plaintiff Mrs. Eliza Bacot is the sister of LCpl Johnson and a U.S. national.

1147.   Plaintiff Mrs. Olivia Harden is the sister of LCpl Johnson and a U.S. national.

1148.   As a result of the October 6, 2006 IED Attack and LCpl Johnson's injuries and death, each member of the Johnson Family has experienced severe mental anguish, emotional pain and suffering, and the loss of LCpl Johnson's society, companionship, and counsel.

1149.   As a result of the October 6, 2006 IED Attack, LCpl Johnson was injured in his person and/or property. The Plaintiff members of the Stephen F. Johnson Family are the survivors and/or heirs of LCpl Johnson and are entitled to recover for the damages LCpl Johnson sustained.

X.     **The October 9, 2006 IED Attack In Al Anbar (The Families of Jon E.**
       **Bowman and Shelby J. Feniello)**

1150.   On October 9, 2006, Iranian Sunni Terrorist Proxies committed an IED attack in Al Anbar (the "October 9, 2006 IED Attack").

1151.   The October 9, 2006 IED Attack was committed by IRGC Sunni Terrorist Proxies, with material support and resources from the IRGC.

1152.   The October 9, 2006 IED Attack would have violated the laws of war if these terrorists were subject to them because, among other reasons, the terrorist(s) who committed the attack neither wore uniforms nor otherwise identified themselves as enemy combatants, and the passive detonation system indiscriminately placed civilians at risk.

1.     **The Jon E. Bowman Family**

1153.   Lance Corporal Jon Eric Bowman served in Iraq as a member of the U.S. military serving in the U.S. Marine Corps. On October 9, 2006, LCpl Bowman was injured in the October 9, 2006 IED Attack.  LCpl Bowman died on October 9, 2006 as a result of injuries sustained during the attack.

1154.   LCpl Bowman was a U.S. national at the time of the attack and his death.

1155.   Plaintiff Ms. Jill Puckett is the mother of LCpl Bowman and a U.S. national.

1156.   Plaintiff Ms. Ashley Bellot is the sister of LCpl Bowman and a U.S. national.

1157.   As a result of the October 9, 2006 IED Attack and LCpl Bowman's injuries and death, each member of the Bowman Family has experienced severe mental anguish, emotional pain and suffering, and the loss of LCpl Bowman's society, companionship, and counsel.

1158.   As a result of the October 9, 2006 IED Attack, LCpl Bowman was injured in his person and/or property. The Plaintiff members of the Bowman Family are the survivors and/or heirs of LCpl Bowman and are entitled to recover for the damages LCpl Bowman sustained.

### 2.     The Shelby J. Feniello Family

1159.    Private First Class Shelby James Feniello served in Iraq as a member of the U.S. military serving in the U.S. Marine Corps. On October 9, 2006, Pfc Feniello was injured in the October 9, 2006 IED Attack.  Pfc Feniello died on October 9, 2006 as a result of injuries sustained during the attack.

1160.    Pfc Feniello was a U.S. national at the time of the attack and his death.

1161.    Plaintiff Mr. Richard Feniello is the father of Pfc Feniello and a U.S. national.

1162.    As a result of the October 9, 2006 attack and Pfc Feniello's injuries and death, each member of the Feniello Family has experienced severe mental anguish, emotional pain and suffering, and the loss of Pfc Feniello's society, companionship, and counsel.

1163.    As a result of the October 9, 2006 IED Attack, Pfc Feniello was injured in his person and/or property. The Plaintiff members of the Feniello Family are the survivors and/or heirs of Pfc Feniello and are entitled to recover for the damages Pfc Feniello sustained.

### Y.     The October 17, 2006 Sniper Attack In Al Anbar (Joshua L. Booth Family)

1164.    First Lieutenant Joshua Loren Booth served in Iraq as a member of the U.S. military serving in the U.S. Marine Corps. On October 17, 2006, 1stLt Booth was injured in a sniper attack in Al Anbar.  1stLt Booth died on October 17, 2006 as a result of injuries sustained during the attack.

1165.     The attack was committed by IRGC Sunni Terrorist Proxies, with material support and resources from the IRGC.

1166.    1stLt Booth's murder would have violated the laws of war if these terrorists were subject to them because, among other reasons, the terrorist(s) who committed the attack neither wore uniforms nor otherwise identified themselves as enemy combatants.

1167.    1stLt Booth was a U.S. national at the time of the attack and his death.

1168.   Plaintiff Ms. Erica Booth is the widow of 1stLt Booth and a U.S. national.

1169.   Plaintiff G.B., by and through her next friend Erica Booth, is the minor daughter of 1stLt Booth and a U.S. national.

1170.   Plaintiff T.B., by and through his next friend Erica Booth, is the minor son of 1stLt Booth and a U.S. national.

1171.   Plaintiff Ms. Debra Booth is the mother of 1stLt Booth and a U.S. national.

1172.   As a result of the October 17, 2006 attack and 1stLt Booth's injuries and death, each member of the Booth Family has experienced severe mental anguish, emotional pain and suffering, and the loss of 1stLt Booth's society, companionship, and counsel.

1173.   As a result of the October 17, 2006 attack, 1stLt Booth was injured in his person and/or property. The Plaintiff members of the Booth Family are the survivors and/or heirs of 1stLt Booth and are entitled to recover for the damages 1stLt Booth sustained.

**Z.     The October 18, 2006 IED Attack In Diyala (Daniel A. Brozovich Family)**

1174.   Sergeant First Class Daniel A. Brozovich served in Iraq as a member of the U.S. military serving in the U.S. Army. On October 18, 2006, SFC Brozovich was injured in an IED attack in Diyala, Iraq.  SFC Brozovich died on October 18, 2006 as a result of injuries sustained during the attack.

1175.   The attack was committed by IRGC Sunni Terrorist Proxies, with material support and resources from the IRGC.

1176.   SFC Brozovich's murder would have violated the laws of war if these terrorists were subject to them because, among other reasons, the terrorist(s) who committed the attack neither wore uniforms nor otherwise identified themselves as enemy combatants, and the passive detonation system indiscriminately placed civilians at risk.

1177.   SFC Brozovich was a U.S. national at the time of the attack and his death.

1178.   Plaintiff Mrs. Mary Brozovich is the widow of SFC Brozovich and a U.S. national.

1179.   Plaintiff Mr. Ryan Brozovich is the son of SFC Brozovich and a U.S. national.

1180.   As a result of the October 18, 2006 attack and SFC Brozovich's injuries and death, each member of the Brozovich Family has experienced severe mental anguish, emotional pain and suffering, and the loss of SFC Brozovich's society, companionship, and counsel.

1181.   As a result of the October 18, 2006 attack, SFC Brozovich was injured in his person and/or property. The Plaintiff members of the Brozovich Family are the survivors and/or heirs of SFC Brozovich and are entitled to recover for the damages SFC Brozovich sustained.

**AA.   The October 21, 2006 IED Attack In Al Anbar (Nathan R. Elrod Family)**

1182.   Lance Corporal Nathan Ross Elrod served in Iraq as a member of the U.S. military serving in the U.S. Marine Corps. On October 21, 2006, LCpl Elrod was injured in an IED attack in Al Anbar.  LCpl Elrod died on October 21, 2006 as a result of injuries sustained during the attack.

1183.   The attack was committed by IRGC Sunni Terrorist Proxies, with material support and resources from the IRGC.

1184.   LCpl Elrod's murder would have violated the laws of war if these terrorists were subject to them because, among other reasons, the terrorist(s) who committed the attack neither wore uniforms nor otherwise identified themselves as enemy combatants, and the passive detonation system indiscriminately placed civilians at risk.

1185.   LCpl Elrod was a U.S. national at the time of the attack and his death.

1186.   Plaintiff Mrs. Teresa Elrod is the mother of LCpl Elrod and a U.S. national.

1187.   Plaintiff Mr. Timothy Elrod is the father of LCpl Elrod and a U.S. national.

1188.   Plaintiff Mrs. Shannon Eury is the sister of LCpl Elrod and a U.S. national.

1189.   As a result of the October 21, 2006 attack and LCpl Elrod's injuries and death, each member of the Elrod Family has experienced severe mental anguish, emotional pain and suffering, and the loss of LCpl Elrod's society, companionship, and counsel.

1190.   As a result of the October 21, 2006 attack, LCpl Elrod was injured in his person and/or property. The Plaintiff members of the Elrod Family are the survivors and/or heirs of LCpl Elrod and are entitled to recover for the damages LCpl Elrod sustained.

**BB.    The November 2, 2006 IED Attack In Al Anbar (Luke B. Holler Family)**

1191.   Lance Corporal Luke Benjamin Holler served in Iraq as a member of the U.S. military serving in the U.S. Marine Corps Reserve. On November 2, 2006, LCpl Holler was injured in an IED attack in Al Anbar.  LCpl Holler died on November 2, 2006 as a result of injuries sustained during the attack.

1192.   The attack was committed by IRGC Sunni Terrorist Proxies, with material support and resources from the IRGC.

1193.   LCpl Holler's murder would have violated the laws of war if these terrorists were subject to them because, among other reasons, the terrorist(s) who committed the attack neither wore uniforms nor otherwise identified themselves as enemy combatants, and the passive detonation system indiscriminately placed civilians at risk.

1194.   LCpl Holler was a U.S. national at the time of the attack and his death.

1195.   Plaintiff Mrs. Ruth Holler is the mother of LCpl Holler and a U.S. national.

1196.   Plaintiff Mr. John Holler Jr. is the father of LCpl Holler and a U.S. national.

1197.   Plaintiff Mr. Joseph Holler is the brother of LCpl Holler and a U.S. national.

1198.   As a result of the November 2, 2006 attack and LCpl Holler's injuries and death, each member of the Holler Family has experienced severe mental anguish, emotional pain and suffering, and the loss of LCpl Holler's society, companionship, and counsel.

1199.   As a result of the November 2, 2006 attack, LCpl Holler was injured in his person and/or property. The Plaintiff members of the Holler Family are the survivors and/or heirs of LCpl Holler and are entitled to recover for the damages LCpl Holler sustained.

**CC.   The November 5, 2006 IED Attack In Al Anbar (Jose A. Galvan Family)**

1200.   Corporal Jose Aureliano Galvan served in Iraq as a member of the U.S. military serving in the U.S. Marine Corps. On November 5, 2006, Cpl Galvan was injured in an IED attack in Al Anbar.  Cpl Galvan died on November 5, 2006 as a result of injuries sustained during the attack.

1201.   The attack was committed by IRGC Sunni Terrorist Proxies, with material support and resources from the IRGC.

1202.   Cpl Galvan's murder would have violated the laws of war if these terrorists were subject to them because, among other reasons, the terrorist(s) who committed the attack neither wore uniforms nor otherwise identified themselves as enemy combatants, and the passive detonation system indiscriminately placed civilians at risk.

1203.   Cpl Galvan was a U.S. national at the time of the attack and his death.

1204.   Plaintiff Mrs. Leticia Romo is the mother of Cpl Galvan and a U.S. national.

1205.   Plaintiff Mr. Jesse Vega is the step-father of Cpl Galvan and a U.S. national.  Mr. Vega lived in the same household as Cpl Galvan for a substantial time and considered Cpl Galvan the functional equivalent of a biological son.

1206.   As a result of the November 5, 2006 attack and Cpl Galvan's injuries and death, each member of the Galvan Family has experienced severe mental anguish, emotional pain and suffering, and the loss of Cpl Galvan's society, companionship, and counsel.

1207.   As a result of the November 5, 2006 attack, Cpl Galvan was injured in his person and/or property. The Plaintiff members of the Galvan Family are the survivors and/or heirs of Cpl Galvan and are entitled to recover for the damages Cpl Galvan sustained.

**DD.    The November 22, 2006 IED Attack In Al Anbar (Heath D. Warner Family)**

1208.   Private Heath Douglas Warner served in Iraq as a member of the U.S. military serving in the U.S. Marine Corps. On November 22, 2006, Pvt Warner was injured in an IED attack in Al Anbar.  Pvt Warner died on November 22, 2006 as a result of injuries sustained during the attack.

1209.   The attack was committed by IRGC Sunni Terrorist Proxies, with material support and resources from the IRGC.

1210.   Pvt Warner's murder would have violated the laws of war if these terrorists were subject to them because, among other reasons, the terrorist(s) who committed the attack neither wore uniforms nor otherwise identified themselves as enemy combatants, and the passive detonation system indiscriminately placed civilians at risk.

1211.   Pvt Warner was a U.S. national at the time of the attack and his death.

1212.   Plaintiff Mrs. Melissa Warner is the mother of Pvt Warner and a U.S. national.

1213.   Plaintiff Mr. Scott Warner is the father of Pvt Warner and a U.S. national.

1214.   Mr. Scott Warner also brings claims in his representative capacity on behalf of the estate of Chandler Warner, who was Pvt Warner's brother.  Chandler Warner's estate is entitled to solatium damages. Chandler Warner was a U.S. national.

1215.   Plaintiff Mr. Ashton Warner is the brother of Pvt Warner and a U.S. national.

1216.   As a result of the November 22, 2006 attack and Pvt Warner's injuries and death, each member of the Warner Family has experienced severe mental anguish, emotional pain and suffering, and the loss of Pvt Warner's society, companionship, and counsel.

1217.   As a result of the November 22, 2006 attack, Pvt Warner was injured in his person and/or property. The Plaintiff members of the Warner Family are the survivors and/or heirs of Pvt Warner and are entitled to recover for the damages Pvt Warner sustained.

**EE.   The November 28, 2006 IED Attack In Al Anbar (Jon-Erik Loney Family)**

1218.   Corporal Jon-Erik Loney served in Iraq as a member of the U.S. military serving in the U.S. Army. On November 28, 2006, CPL Loney was injured in an IED attack in Al Anbar. CPL Loney died on November 28, 2006 as a result of injuries sustained during the attack.

1219.   The attack was committed by IRGC Sunni Terrorist Proxies, with material support and resources from the IRGC.

1220.   CPL Loney's murder would have violated the laws of war if these terrorists were subject to them because, among other reasons, the terrorist(s) who committed the attack neither wore uniforms nor otherwise identified themselves as enemy combatants, and the passive detonation system indiscriminately placed civilians at risk.

1221.   CPL Loney was a U.S. national at the time of the attack and his death.

1222.   Plaintiff Mrs. Violet Kaylor is the mother of CPL Loney and a U.S. national.

1223.   Plaintiff Mr. Jim Kaylor is the step-father of CPL Loney and a U.S. national.  Mr. Kaylor lived in the same household as CPL Loney for a substantial time and considered CPL Loney the functional equivalent of a biological son.

1224.   As a result of the November 28, 2006 attack and CPL Loney's injuries and death, each member of the Loney Family has experienced severe mental anguish, emotional pain and suffering, and the loss of CPL Loney's society, companionship, and counsel.

1225.   As a result of the November 28, 2006 attack, CPL Loney was injured in his person and/or property. The Plaintiff members of the Loney Family are the survivors and/or heirs of CPL Loney and are entitled to recover for the damages CPL Loney sustained.

344

**FF.    The November 29, 2006 IED Attack In Al Anbar (Chad Watson Family)**

1226.   Plaintiff Corporal Chad Watson served in Iraq as a member of the U.S. military serving in the U.S. Marine Corps. On November 29, 2006, Cpl Watson was injured in an IED attack in Al Anbar.  The attack severely wounded Cpl Watson, who lost his right leg above the knee, suffered from serious injuries to his left ankle and foot, and suffered from shrapnel injuries to his face and right eye.  As a result of the November 29, 2006 attack and his injuries, Cpl Watson has experienced severe physical and emotional pain and suffering.

1227.   The attack was committed by IRGC Sunni Terrorist Proxies, with material support and resources from the IRGC.

1228.   The attack that injured Cpl Watson would have violated the laws of war if these terrorists were subject to them because, among other reasons, the terrorist(s) who planted the IED neither wore uniforms nor otherwise identified themselves as enemy combatants and the passive detonation system indiscriminately placed civilians at risk.

1229.   Cpl Watson was a national of the United States and a member of the armed forces at the time of the attack and all other relevant times.

**GG.    The December 1, 2006 IED Attack In Al Anbar (Robert L. Love, Jr. Family)**

1230.   Staff Sergeant Robert L. Love Jr. served in Iraq as a member of the U.S. military serving in the U.S. Army. On December 1, 2006, SSG Love was injured in an IED attack in Al Anbar.  SSG Love died on December 1, 2006 as a result of injuries sustained during the attack.

1231.    The attack was committed by IRGC Sunni Terrorist Proxies, with material support and resources from the IRGC.

1232.   SSG Love's murder would have violated the laws of war if these terrorists were subject to them because, among other reasons, the terrorist(s) who committed the attack neither

wore uniforms nor otherwise identified themselves as enemy combatants, and the passive detonation system indiscriminately placed civilians at risk.

1233.   SSG Love was a U.S. national at the time of the attack and his death.

1234.   Plaintiff Mr. Robert Love Sr. is the father of SSG Love and a U.S. national.

1235.   Plaintiff Ms. Evelyn Ford is the sister of SSG Love and a U.S. national.

1236.   As a result of the December 1, 2006 attack and SSG Love's injuries and death, each member of the Love Family has experienced severe mental anguish, emotional pain and suffering, and the loss of SSG Love's society, companionship, and counsel.

1237.   As a result of the December 1, 2006 attack, SSG Love was injured in his person and/or property. The Plaintiff members of the Love Family are the survivors and/or heirs of SSG Love and are entitled to recover for the damages SSG Love sustained.

**HH.    The December 11, 2006 IED Attack In Al Anbar (Clinton J. Miller Family)**

1238.   Lance Corporal Clinton Jon Miller served in Iraq as a member of the U.S. military serving in the U.S. Marine Corps. On December 11, 2006, LCpl Miller was injured in an IED attack in Al Anbar.  LCpl Miller died on December 11, 2006 as a result of injuries sustained during the attack.

1239.    The attack was committed by IRGC Sunni Terrorist Proxies, with material support and resources from the IRGC.

1240.   LCpl Miller's murder would have violated the laws of war if these terrorists were subject to them because, among other reasons, the terrorist(s) who committed the attack neither wore uniforms nor otherwise identified themselves as enemy combatants, and the passive detonation system indiscriminately placed civilians at risk.

1241.   LCpl Miller was a U.S. national at the time of the attack and his death.

1242.   Plaintiff Mr. Kerby Miller is the father of LCpl Miller and a U.S. national.

1243.   Plaintiff Ms. Kim Miller is the step-mother of LCpl Miller and a U.S. national.  Ms. Miller lived in the same household as LCpl Miller for a substantial time and considered LCpl Miller the functional equivalent of a biological son.

1244.   As a result of the December 11, 2006 attack and LCpl Miller's injuries and death, each member of the Clinton J. Miller Family has experienced severe mental anguish, emotional pain and suffering, and the loss of LCpl Miller's society, companionship, and counsel.

1245.   As a result of the December 11, 2006 attack, LCpl Miller was injured in his person and/or property. The Plaintiff members of the Clinton J. Miller Family are the survivors and/or heirs of LCpl Miller and are entitled to recover for the damages LCpl Miller sustained.

## II.   The December 16, 2006 Sniper Attack In Al Anbar (Nicklas J. Palmer Family)

1246.   Lance Corporal Nicklas J. Palmer served in Iraq as a member of the U.S. military serving in the U.S. Marine Corps. On December 16, 2006, LCpl Palmer was injured in a sniper attack in Al Anbar.  LCpl Palmer died on December 16, 2006 as a result of injuries sustained during the attack.

1247.   The attack was committed by IRGC Sunni Terrorist Proxies, with material support and resources from the IRGC.

1248.   LCpl Palmer's murder would have violated the laws of war if these terrorists were subject to them because, among other reasons, the terrorist(s) who committed the attack neither wore uniforms nor otherwise identified themselves as enemy combatants.

1249.   LCpl Palmer was a U.S. national at the time of the attack and his death.

1250.   Plaintiff Mrs. Rachele Palmer is the mother of LCpl Palmer and a U.S. national.

1251.   Plaintiff Mr. Brad Palmer is the father of LCpl Palmer and a U.S. national.

1252.   Plaintiff Mr. Dustin Palmer is the brother of LCpl Palmer and a U.S. national.

1253.   As a result of the December 16, 2006 attack and LCpl Palmer's injuries and death, each member of the Nicklas J. Palmer Family has experienced severe mental anguish, emotional pain and suffering, and the loss of LCpl Palmer's society, companionship, and counsel.

1254.   As a result of the December 16, 2006 attack, LCpl Palmer was injured in his person and/or property. The Plaintiff members of the Nicklas J. Paler Family are the survivors and/or heirs of LCpl Palmer and are entitled to recover for the damages LCpl Palmer sustained.

**JJ.     The December 18, 2006 Mortar Attack In Al Anbar (Kevin M. Kryst Family)**

1255.   Captain Kevin Michael Kryst served in Iraq as a member of the U.S. military serving in the U.S. Marine Corps. On December 18, 2006, Capt Kryst was injured in a mortar attack in Al Anbar.  Capt Kryst died on December 18, 2006 as a result of injuries sustained during the attack.

1256.   The attack was committed by IRGC Sunni Terrorist Proxies, with material support and resources from the IRGC.

1257.   Capt Kryst's murder would have violated the laws of war if these terrorists were subject to them because, among other reasons, the terrorist(s) who committed the attack neither wore uniforms nor otherwise identified themselves as enemy combatants.

1258.   Capt Kryst was a U.S. national at the time of the attack and his death.

1259.   Plaintiff Mr. Bradley Kryst is the brother of Capt Kryst and a U.S. national.

1260.   As a result of the December 18, 2006 attack and Capt Kryst's injuries and death, each member of the Kryst Family has experienced severe mental anguish, emotional pain and suffering, and the loss of Capt Kryst's society, companionship, and counsel.

1261.   As a result of the December 18, 2006 attack, Capt Kryst was injured in his person and/or property. The Plaintiff members of the Kryst Family are the survivors and/or heirs of Capt Kryst and are entitled to recover for the damages Capt Kryst sustained.

348

**KK.    The December 24, 2006 IED Attack In Al Anbar (Stephen L. Morris Family)**

1262.    Lance Corporal Stephen Lloyd Morris served in Iraq as a member of the U.S. military serving in the U.S. Marine Corps. On December 24, 2006, LCpl Morris was injured in an IED attack in Al Anbar.  LCpl Morris died on December 24, 2006 as a result of injuries sustained during the attack.

1263.    The attack was committed by IRGC Sunni Terrorist Proxies, with material support and resources from the IRGC.

1264.    LCpl Morris's murder would have violated the laws of war if these terrorists were subject to them because, among other reasons, the terrorist(s) who committed the attack neither wore uniforms nor otherwise identified themselves as enemy combatants, and the passive detonation system indiscriminately placed civilians at risk.

1265.    LCpl Morris was a U.S. national at the time of the attack and his death.

1266.    Plaintiff Mr. Lloyd Morris Jr. is the father of LCpl Morris and a U.S. national.

1267.    As a result of the December 24, 2006 attack and LCpl Morris's injuries and death, each member of the Morris Family has experienced severe mental anguish, emotional pain and suffering, and the loss of LCpl Morris's society, companionship, and counsel.

1268.    As a result of the December 24, 2006 attack, LCpl Morris was injured in his person and/or property. The Plaintiff members of the Morris Family are the survivors and/or heirs of LCpl Morris and are entitled to recover for the damages LCpl Morris sustained.

**LL.    The January 15, 2007 IED Attack In Nineveh (The Families of Ian C. Anderson and John E. Cooper)**

1269.    On January 15, 2007, Iranian Sunni Terrorist Proxies committed an IED attack in Nineveh, Iraq (the "January 15, 2007 IED Attack").

1270.   The January 15, 2007 IED Attack was committed by IRGC Sunni Terrorist Proxies, with material support and resources from the IRGC.

1271.   The January 15, 2007 IED Attack would have violated the laws of war if these terrorists were subject to them because, among other reasons, the terrorist(s) who committed the attack neither wore uniforms nor otherwise identified themselves as enemy combatants, and the passive detonation system indiscriminately placed civilians at risk.

### 1.    The Ian C. Anderson Family

1272.   Sergeant Ian Christian Anderson served in Iraq as a member of the U.S. military serving in the U.S. Army. SGT Anderson was injured in the January 15, 2007 IED Attack.  SGT Anderson died on January 15, 2007 as a result of injuries sustained during the attack.

1273.   SGT Anderson was a U.S. national at the time of the attack and his death.

1274.   Plaintiff Mrs. Elaine Frazier is the mother of SGT Anderson and a U.S. national.

1275.   Plaintiff Mrs. Ellen Leach is the sister of SGT Anderson and a U.S. national.

1276.   As a result of the January 15, 2007 IED Attack and SGT Anderson's injuries and death, each member of the Ian C. Anderson Family has experienced severe mental anguish, emotional pain and suffering, and the loss of SGT Anderson's society, companionship, and counsel.

1277.   As a result of the January 15, 2007 IED Attack, SGT Anderson was injured in his person and/or property. The Plaintiff members of the Ian C. Anderson Family are the survivors and/or heirs of SGT Anderson and are entitled to recover for the damages SGT Anderson sustained.

### 2. The John E. Cooper Family

1278. Staff Sergeant John E. Cooper served in Iraq as a member of the U.S. military serving in the U.S. Army. SSG Cooper was injured in the January 15, 2007 IED Attack. SSG Cooper died on January 15, 2007 as a result of injuries sustained during the attack.

1279. SSG Cooper was a U.S. national at the time of the attack and his death.

1280. Plaintiff Ms. Sherri Springate is the sister of SSG Cooper and a U.S. national.

1281. Plaintiff Mrs. Susan West is the sister of SSG Cooper and a U.S. national.

1282. As a result of the January 15, 2007 IED Attack and SSG Cooper's injuries and death, each member of the Cooper Family has experienced severe mental anguish, emotional pain and suffering, and the loss of SSG Cooper's society, companionship, and counsel.

1283. As a result of the January 15, 2007 IED Attack, SSG Cooper was injured in his person and/or property. The Plaintiff members of the Cooper Family are the survivors and/or heirs of SSG Cooper and are entitled to recover for the damages SSG Cooper sustained.

### MM. The January 19, 2007 IED Attack In Nineveh (Russell P. Borea Family)

1284. Sergeant First Class Russell P. Borea served in Iraq as a member of the U.S. military serving in the U.S. Army. On January 19, 2007, SFC Borea was injured in an IED attack in Nineveh, Iraq. SFC Borea died on January 19, 2007 as a result of injuries sustained during the attack.

1285. The attack was committed by IRGC Sunni Terrorist Proxies, with material support and resources from the IRGC.

1286. SFC Borea's murder would have violated the laws of war if these terrorists were subject to them because, among other reasons, the terrorist(s) who committed the attack neither wore uniforms nor otherwise identified themselves as enemy combatants, and the passive detonation system indiscriminately placed civilians at risk.

1287.   SFC Borea was a U.S. national at the time of the attack and his death.

1288.   Plaintiff Mr. Christopher Borea is the brother of SFC Borea and a U.S. national.

1289.   Plaintiff Ms. Kim Borea is the sister of SFC Borea and a U.S. national.

1290.   As a result of the January 19, 2007 attack and SFC Borea's injuries and death, each member of the Borea Family has experienced severe mental anguish, emotional pain and suffering, and the loss of SFC Borea's society, companionship, and counsel.

1291.   As a result of the January 19, 2007 attack, SFC Borea was injured in his person and/or property. The Plaintiff members of the Borea Family are the survivors and/or heirs of SFC Borea and are entitled to recover for the damages SFC Borea sustained.

**NN.    The January 20, 2007 IED Attack In Al Anbar (Jeffrey D. Bisson Family)**

1292.   Specialist Jeffrey Dean Bisson served in Iraq as a member of the U.S. military serving in the U.S. Army. On January 20, 2007, SPC Bisson was injured in an IED attack in Al Anbar.  SPC Bisson died on January 20, 2007 as a result of injuries sustained during the attack.

1293.   The attack was committed by IRGC Sunni Terrorist Proxies, with material support and resources from the IRGC.

1294.   SPC Bisson's murder would have violated the laws of war if these terrorists were subject to them because, among other reasons, the terrorist(s) who committed the attack neither wore uniforms nor otherwise identified themselves as enemy combatants, and the passive detonation system indiscriminately placed civilians at risk.

1295.   SPC Bisson was a U.S. national at the time of the attack and his death.

1296.   Plaintiff Mrs. Lauralee Bisson is the mother of SPC Bisson and a U.S. national.

1297.   Plaintiff Mr. Richard Bisson is the father of SPC Bisson and a U.S. national.

1298.   Plaintiff Mr. Andrew Bisson is the son of SPC Bisson and a U.S. national.

1299.   Plaintiff Mr. Christopher Bisson is the brother of SPC Bisson and a U.S. national.

1300.   As a result of the January 20, 2007 attack and SPC Bisson's injuries and death, each member of the Bisson Family has experienced severe mental anguish, emotional pain and suffering, and the loss of SPC Bisson's society, companionship, and counsel.

1301.   As a result of the January 20, 2007 attack, SPC Bisson was injured in his person and/or property. The Plaintiff members of the Bisson Family are the survivors and/or heirs of SPC Bisson and are entitled to recover for the damages SPC Bisson sustained.

**OO.   The January 20, 2007 Helicopter Attack In Diyala (Marilyn L. Gabbard Family)**

1302.   Command Sergeant Major Marilyn Lea Gabbard served in Iraq as a member of the U.S. military serving in the U.S. Army National Guard. On January 20, 2007, CSM Gabbard was injured in an attack on a helicopter in Diyala, Iraq.  CSM Gabbard died on January 20, 2007 as a result of injuries sustained during the attack.

1303.    The attack was committed by IRGC Sunni Terrorist Proxies, with material support and resources from the IRGC.

1304.   CSM Gabbard's murder would have violated the laws of war if these terrorists were subject to them because, among other reasons, the terrorist(s) who committed the attack neither wore uniforms nor otherwise identified themselves as enemy combatants.

1305.   CSM Gabbard was a U.S. national at the time of the attack and his death.

1306.   Plaintiff Ms. Marla Van Cannon is the twin sister of CSM Gabbard and a U.S. national.

1307.   Plaintiff Mr. Michael Van Cannon is the brother of CSM Gabbard and a U.S. national.

1308.   As a result of the January 20, 2007 attack and CSM Gabbard's injuries and death, each member of the Gabbard Family has experienced severe mental anguish, emotional pain and suffering, and the loss of CSM Gabbard's society, companionship, and counsel.

1309.   As a result of the January 20, 2007 attack, CSM Gabbard was injured in her person and/or property. The Plaintiff members of the Gabbard Family are the survivors and/or heirs of CSM Gabbard and are entitled to recover for the damages CSM Gabbard sustained.

### PP.   The January 23, 2007 Helicopter Attack In Baghdad (The Families of Casey Casavant, Steven A. Gernet, Ronald Johnson, and Arthur Laguna)

1310.   On January 23, 2007, Iranian Sunni Terrorist Proxies committed an attack on a helicopter in Baghdad, Iraq (the "January 23, 2007 Attack").

1311.   The January 23, 2007 Attack was committed by IRGC Sunni Terrorist Proxies, with material support and resources from the IRGC.

1312.   The January 23, 2007 Attack would have violated the laws of war if these terrorists were subject to them because, among other reasons, the terrorist(s) who committed the attack neither wore uniforms nor otherwise identified themselves as enemy combatants.

### 1.   The Casey Casavant Family

1313.   Mr. Casey Casavant served in Iraq as a civilian government contractor working for Blackwater. Mr. Casavant was injured in the January 23, 2007 Attack.  Mr. Casavant died on January 23, 2007 as a result of injuries sustained during the attack.

1314.   Mr. Casavant was a U.S. national at the time of the attack and all other relevant times.

1315.   Plaintiff Mrs. Barbara Parsons is the mother of Mr. Casavant and a U.S. national.

1316.   Plaintiff Mrs. Kristen Swanson is the sister of Mr. Casavant and a U.S. national.

1317.   As a result of the January 23, 2007 Attack and Mr. Casavant's injuries and death, each member of the Casavant Family has experienced severe mental anguish, emotional pain and suffering, and the loss of Mr. Casavant's society, companionship, and counsel.

1318.   As a result of the January 23, 2007 Attack, Mr. Casavant was injured in his person and/or property. The Plaintiff members of the Casavant Family are the survivors and/or heirs of Mr. Casavant and are entitled to recover for the damages Mr. Casavant sustained.

### 2.    The Steven A. Gernet Family

1319.   Mr. Steven A. Gernet served in Iraq as a civilian government contractor working for Blackwater. Mr. Gernet was injured in the January 23, 2007 Attack.  Mr. Gernet died on January 23, 2007 as a result of injuries sustained during the attack.

1320.   Mr. Gernet was a U.S. national at the time of the attack and all other relevant times.

1321.   Plaintiff Mrs. Jerica Johnson is the daughter of Mr. Gernet and a U.S. national.

1322.   As a result of the January 23, 2007 Attack and Mr. Gernet's injuries and death, each member of the Gernet Family has experienced severe mental anguish, emotional pain and suffering, and the loss of Mr. Gernet's society, companionship, and counsel.

1323.   As a result of the January 23, 2007 Attack, Mr. Gernet was injured in his person and/or property. The Plaintiff members of the Gernet Family are the survivors and/or heirs of Mr. Gernet and are entitled to recover for the damages Mr. Gernet sustained.

### 3.    The Ronald Johnson Family

1324.   Mr. Ronald Johnson served in Iraq as a civilian government contractor working for Blackwater. Mr. Johnson was injured in the January 23, 2007 Attack.  Mr. Johnson died on January 23, 2007 as a result of injuries sustained during the attack.

1325.   Mr. Johnson was a U.S. national at the time of the attack and all other relevant times.

1326.   Plaintiff Mr. Randall Johnson is the brother of Mr. Johnson and a U.S. national.

1327.   As a result of the January 23, 2007 Attack and Mr. Johnson's injuries and death, each member of the Ronald Johnson Family has experienced severe mental anguish, emotional pain and suffering, and the loss of Mr. Johnson's society, companionship, and counsel.

1328.   As a result of the January 23, 2007 Attack, Mr. Johnson was injured in his person and/or property. The Plaintiff members of the Ronald Johnson Family are the survivors and/or heirs of Mr. Johnson and are entitled to recover for the damages Mr. Johnson sustained.

### 4.      The Arthur Laguna Family

1329.   Chief Warrant Officer 4 Arthur Laguna served in Iraq as a civilian government contractor working for Blackwater. CW4 Laguna was injured in the January 23, 2007 Attack. CW4 Laguna died on January 23, 2007 as a result of injuries sustained during the attack.

1330.   CW4 Laguna was a U.S. national at the time of the attack and all other relevant times.

1331.   Plaintiff Mrs. Marybeth Laguna is the widow of CW4 Laguna and a U.S. national.

1332.   Plaintiff Ms. Erin Calvert is the daughter of CW4 Laguna and a U.S. national.

1333.   Plaintiff Mrs. Sheri Adams is the daughter of CW4 Laguna and a U.S. national.

1334.   Plaintiff Mrs. Tami Zerilli is the daughter of CW4 Laguna and a U.S. national.

1335.   Plaintiff Ms. Lydia Laguna is the mother of CW4 Laguna and a U.S. national.

1336.   Plaintiff Mrs. Annette Laguna-Bates is the sister of CW4 Laguna and a U.S. national.

1337.   Plaintiff Mr. Daniel Laguna Jr. is the brother of CW4 Laguna and a U.S. national.

1338.   Plaintiff Mrs. Linda Laguna-Griffin is the sister of CW4 Laguna and a U.S. national.

1339.   Plaintiff Mr. Milo Laguna is the brother of CW4 Laguna and a U.S. national.

1340.   Plaintiff Mrs. Sarah Parker is the step-daughter of CW4 Laguna and a U.S. national. Mrs. Parker lived in the same household as CW4 Laguna for a substantial time and considered CW4 Laguna the functional equivalent of a biological father.

1341.   As a result of the January 23, 2007 Attack and CW4 Laguna's injuries and death, each member of the Laguna Family has experienced severe mental anguish, emotional pain and suffering, and the loss of CW4 Laguna's society, companionship, and counsel.

1342.   As a result of the January 23, 2007 Attack, CW4 Laguna was injured in his person and/or property. The Plaintiff members of the Laguna Family are the survivors and/or heirs of CW4 Laguna and are entitled to recover for the damages CW4 Laguna sustained.

**QQ.   The January 26, 2007 IED Attack In Diyala (Alan R. Johnson Family)**

1343.   Major Alan R. Johnson served in Iraq as a member of the U.S. military serving in the U.S. Army Reserve. On January 26, 2007, MAJ Johnson was injured in an IED attack in Diyala, Iraq.  MAJ Johnson died on January 26, 2007 as a result of injuries sustained during the attack.

1344.   The attack was committed by IRGC Sunni Terrorist Proxies, with material support and resources from the IRGC.

1345.   MAJ Johnson's murder would have violated the laws of war if these terrorists were subject to them because, among other reasons, the terrorist(s) who committed the attack neither wore uniforms nor otherwise identified themselves as enemy combatants, and the passive detonation system indiscriminately placed civilians at risk.

1346.   MAJ Johnson was a U.S. national at the time of the attack and his death.

1347.   Plaintiff Ms. Victoria Johnson is the widow of MAJ Johnson and a U.S. national.

1348.   As a result of the January 26, 2007 attack and MAJ Johnson's injuries and death, each member of the Johnson Family has experienced severe mental anguish, emotional pain and suffering, and the loss of MAJ Johnson's society, companionship, and counsel.

1349.   As a result of the January 26, 2007 attack, MAJ Johnson was injured in his person and/or property. The Plaintiff members of the Alan R. Johnson Family are the survivors and/or heirs of MAJ Johnson and are entitled to recover for the damages MAJ Johnson sustained.

**RR.   The January 31, 2007 Rocket Attack In Al Anbar (Stephen D. Shannon Family)**

1350.   Corporal Stephen Daniel Shannon served in Iraq as a member of the U.S. military serving in the U.S. Army Reserve. On January 31, 2007, CPL Shannon was injured in a rocket attack in Al Anbar.  CPL Shannon died on January 31, 2007 as a result of injuries sustained during the attack.

1351.    The attack was committed by IRGC Sunni Terrorist Proxies, with material support and resources from the IRGC.

1352.   CPL Shannon's murder would have violated the laws of war if these terrorists were subject to them because, among other reasons, the terrorist(s) who committed the attack neither wore uniforms nor otherwise identified themselves as enemy combatants.

1353.   CPL Shannon was a U.S. national at the time of the attack and his death.

1354.   Plaintiff Ms. Joan Shannon is the mother of CPL Shannon and a U.S. national.

1355.   Plaintiff Mr. Daniel Shannon is the father of CPL Shannon and a U.S. national.

1356.   As a result of the January 31, 2007 attack and CPL Shannon's injuries and death, each member of the Shannon Family has experienced severe mental anguish, emotional pain and suffering, and the loss of CPL Shannon's society, companionship, and counsel.

1357.   As a result of the January 26, 2007 attack, CPL Shannon was injured in his person and/or property. The Plaintiff members of the Shannon Family are the survivors and/or heirs of CPL Shannon and are entitled to recover for the damages CPL Shannon sustained.

SS.   **The February 7, 2007 Helicopter Attack In Al Anbar (The Families of Travis D. Pfister, Thomas E. Saba, and James R. Tijerina)**

1358.   On February 7, 2007, Iranian Sunni Terrorist Proxies committed an attack on a helicopter in Al Anbar (the "February 7, 2007 Attack").

1359.   The February 7, 2007 Attack was committed the IRGC Sunni Terrorist Proxies, with material support and resources from the IRGC.

1360.   The February 7, 2007 Attack would have violated the laws of war if these terrorists were subject to them because, among other reasons, the terrorist(s) who committed the attack neither wore uniforms nor otherwise identified themselves as enemy combatants.

1.   **The Travis D. Pfister Family**

1361.   Sergeant Travis D. Pfister served in Iraq as a member of the U.S. military serving in the U.S. Marine Corps. Sgt Pfister was injured in the February 7, 2007 Attack.  Sgt Pfister died on February 7, 2007 as a result of injuries sustained during the attack.

1362.   Sgt Pfister was a U.S. national at the time of the attack and his death.

1363.   Plaintiff Mr. Joshua Pfister is the brother of Sgt Pfister and a U.S. national.

1364.   As a result of the February 7, 2007 Attack and Sgt Pfister's injuries and death, each member of the Pfister Family has experienced severe mental anguish, emotional pain and suffering, and the loss of Sgt Pfister's society, companionship, and counsel.

1365.   As a result of the February 7, 2007 Attack, Sgt Pfister was injured in his person and/or property. The Plaintiff members of the Pfister Family are the survivors and/or heirs of Sgt Pfister and are entitled to recover for the damages Sgt Pfister sustained.

### 2.        The Thomas E. Saba Family

1366.    Corporal Thomas E. Saba served in Iraq as a member of the U.S. military serving in the U.S. Marine Corps. Cpl Saba was injured in the February 7, 2007 Attack.  Cpl Saba died on February 7, 2007 as a result of injuries sustained during the attack.

1367.    Cpl Saba was a U.S. national at the time of the attack and his death.

1368.    Plaintiff Mrs. Barbara Saba is the mother of Cpl Saba and a U.S. national.

1369.    Plaintiff Mr. Anthony Saba Sr. is the father of Cpl Saba and a U.S. national.

1370.    Plaintiff Mr. Anthony Saba Jr. is the brother of Cpl Saba and a U.S. national.

1371.    Plaintiff Mrs. Mary Saba is the sister of Cpl Saba and a U.S. national.

1372.    As a result of the February 7, 2007 Attack and Cpl Saba's injuries and death, each member of the Saba Family has experienced severe mental anguish, emotional pain and suffering, and the loss of Cpl Saba's society, companionship, and counsel.

1373.    As a result of the February 7, 2007 Attack, Cpl Saba was injured in his person and/or property. The Plaintiff members of the Saba Family are the survivors and/or heirs of Cpl Saba and are entitled to recover for the damages Cpl Saba sustained.

### 3.        The James R. Tijerina Family

1374.    Sergeant James Rodney Tijerina served in Iraq as a member of the U.S. military serving in the U.S. Marine Corps. Sgt Tijerina was injured in the February 7, 2007 Attack.  Sgt Tijerina died on February 7, 2007 as a result of injuries sustained during the attack.

1375.    Sgt Tijerina was a U.S. national at the time of the attack and his death.

1376.    Plaintiff Mrs. Lynn Shaw is the sister of Sgt Tijerina and a U.S. national.

1377.    As a result of the February 7, 2007 Attack and Sgt Tijerina's injuries and death, each member of the Tijerina Family has experienced severe mental anguish, emotional pain and suffering, and the loss of Sgt Tijerina's society, companionship, and counsel.

360

1378. As a result of the February 7, 2007 Attack, Sgt Tijerina was injured in his person and/or property. The Plaintiff members of the Tijerina Family are the survivors and/or heirs of Sgt Tijerina and are entitled to recover for the damages Sgt Tijerina sustained.

**TT. The February 8, 2007 IED Attack In Al Anbar (Ross A. Clevenger Family)**

1379. Sergeant Ross Aaron Clevenger served in Iraq as a member of the U.S. military serving in the U.S. Army Reserve. On February 8, 2007, SGT Clevenger was injured in an IED attack in Al Anbar. SGT Clevenger died on February 8, 2007 as a result of injuries sustained during the attack.

1380. The attack was committed by IRGC Sunni Terrorist Proxies, with material support and resources from the IRGC.

1381. SGT Clevenger's murder would have violated the laws of war if these terrorists were subject to them because, among other reasons, the terrorist(s) who committed the attack neither wore uniforms nor otherwise identified themselves as enemy combatants, and the passive detonation system indiscriminately placed civilians at risk.

1382. SGT Clevenger was a U.S. national at the time of the attack and his death.

1383. Plaintiff Mr. Brandon Clevenger is the brother of SGT Clevenger and a U.S. national.

1384. Plaintiff Mrs. Nancy Clevenger is the step-mother of SGT Clevenger and a U.S. national. Mrs. Clevenger lived in the same household as SGT Clevenger for a substantial time and considered SGT Clevenger the functional equivalent of a biological son.

1385. As a result of the February 8, 2007 attack and SGT Clevenger's injuries and death, each member of the Clevenger Family has experienced severe mental anguish, emotional pain and suffering, and the loss of SGT Clevenger's society, companionship, and counsel.

1386.   As a result of the February 8, 2007 attack, SGT Clevenger was injured in his person and/or property. The Plaintiff members of the Clevenger Family are the survivors and/or heirs of SGT Clevenger and are entitled to recover for the damages SGT Clevenger sustained.

**UU.   The February 11, 2007 IED Attack In Al Anbar (Russell A. Kurtz Family)**

1387.   Sergeant Russell A. Kurtz served in Iraq as a member of the U.S. military serving in the U.S. Army. On February 11, 2007, SGT Kurtz was injured in an IED attack in Al Anbar. SGT Kurtz died on February 11, 2007 as a result of injuries sustained during the attack.

1388.    The attack was committed by IRGC Sunni Terrorist Proxies, with material support and resources from the IRGC.

1389.   SGT Kurtz's murder would have violated the laws of war if these terrorists were subject to them because, among other reasons, the terrorist(s) who committed the attack neither wore uniforms nor otherwise identified themselves as enemy combatants, and the passive detonation system indiscriminately placed civilians at risk.

1390.   SGT Kurtz was a U.S. national at the time of the attack and his death.

1391.   Plaintiff Mr. Roger Kurtz is the father of SGT Kurtz and a U.S. national.

1392.   Plaintiff Ms. Stephanie Kurtz is the sister of SGT Kurtz and a U.S. national.

1393.   As a result of the February 11, 2007 attack and SGT Kurtz's injuries and death, each member of the Kurtz Family has experienced severe mental anguish, emotional pain and suffering, and the loss of SGT Kurtz's society, companionship, and counsel.

1394.   As a result of the February 11, 2007 attack, SGT Kurtz was injured in his person and/or property. The Plaintiff members of the Kurtz Family are the survivors and/or heirs of SGT Kurtz and are entitled to recover for the damages SGT Kurtz sustained.

**VV.    The February 14, 2007 IED Attack In Diyala (The Families of Ronnie G. Madore, Jr. and Carl L. Seigart)**

1395.    On February 14, 2007, Iranian Sunni Terrorist Proxies committed an IED attack in Diyala, Iraq (the "February 14, 2007 IED Attack").

1396.    The February 14, 2007 IED Attack was committed by IRGC Sunni Terrorist Proxies, with material support and resources from the IRGC.

1397.    The February 14, 2007 IED Attack would have violated the laws of war if these terrorists were subject to them because, among other reasons, the terrorist(s) who committed the attack neither wore uniforms nor otherwise identified themselves as enemy combatants, and the passive detonation system indiscriminately placed civilians at risk.

**1.    The Ronnie G. Madore, Jr. Family**

1398.    Specialist Ronnie Gene Madore Jr. served in Iraq as a member of the U.S. military serving in the U.S. Army. SPC Madore was injured in the February 14, 2007 IED Attack.  SPC Madore died on February 14, 2007 as a result of injuries sustained during the attack.

1399.    SPC Madore was a U.S. national at the time of the attack and his death.

1400.    Plaintiff Mrs. Connie Madore is the mother of SPC Madore and a U.S. national.

1401.    Plaintiff Mr. Ronnie Madore is the father of SPC Madore and a U.S. national.

1402.    As a result of the February 14, 2007 IED Attack and SPC Madore's injuries and death, each member of the Madore Family has experienced severe mental anguish, emotional pain and suffering, and the loss of SPC Madore's society, companionship, and counsel.

1403.    As a result of the February 14, 2007 IED Attack, SPC Madore was injured in his person and/or property. The Plaintiff members of the Madore Family are the survivors and/or heirs of SPC Madore and are entitled to recover for the damages SPC Madore sustained.

### 2.      The Carl L. Seigart Family

1404.   Sergeant Carl Leonard Seigart served in Iraq as a member of the U.S. military serving in the U.S. Army. SGT Seigart was injured in the February 14, 2007 IED Attack.  SGT Seigart died on February 14, 2007 as a result of injuries sustained during the attack.

1405.   SGT Seigart was a U.S. national at the time of the attack and his death.

1406.   Plaintiff Ms. Darlene Seigart is the mother of SGT Seigart and a U.S. national.

1407.   As a result of the February 14, 2007 IED Attack and SGT Seigart's injuries and death, each member of the Seigart Family has experienced severe mental anguish, emotional pain and suffering, and the loss of SGT Seigart's society, companionship, and counsel.

1408.   As a result of the February 14, 2007 IED Attack, SGT Seigart was injured in his person and/or property. The Plaintiff members of the Seigart Family are the survivors and/or heirs of SGT Seigart and are entitled to recover for the damages SGT Seigart sustained.

### WW.   The February 18, 2007 IED Attack In Al Anbar (Brett A. Witteveen Family) and Kelly D. Youngblood)

1409.   Private First Class Brett A. Witteveen served in Iraq as a member of the U.S. military serving in the U.S. Marine Corps. On February 18, 2007, PFC Witteveen was injured in an IED attack in Al Anbar. PFC Witteveen died on February 18, 2007 as a result of injuries sustained during the attack.

1410.   The attack was committed by IRGC Sunni Terrorist Proxies, with material support and resources from the IRGC.

1411.   PFC Witteveen's murder would have violated the laws of war if these terrorists were subject to them because, among other reasons, the terrorist(s) who committed the attack neither wore uniforms nor otherwise identified themselves as enemy combatants, and the passive detonation system indiscriminately placed civilians at risk.

1412.   PFC Witteveen was a U.S. national at the time of the attack and his death.

1413.   Plaintiff Mr. Richard Witteveen is the father of PFC Witteveen and a U.S. national.

1414.   Plaintiff Ms. Heather Kaufman is the sister of PFC Witteveen and a U.S. national.

1415.   Plaintiff Mr. Trent Witteveen is the brother of PFC Witteveen and a U.S. national.

1416.   As a result of the February 18, 2007 attack and PFC Witteveen's injuries and death, each member of the Witteveen Family has experienced severe mental anguish, emotional pain and suffering, and the loss of PFC Witteveen's society, companionship, and counsel.

1417.   As a result of the February 18, 2007 attack, PFC Witteveen was injured in his person and/or property. The Plaintiff members of the Witteveen Family are the survivors and/or heirs of PFC Witteveen and are entitled to recover for the damages PFC Witteveen sustained.

## XX.   The February 18, 2007 Sniper Attack In Al Anbar (Kelly D. Youngblood Family)

1418.   Private First Class Kelly David Youngblood served in Iraq as a member of the U.S. military serving in the U.S. Army. On February 18, 2007, PFC Youngblood was injured in a sniper attack in Al Anbar.  PFC Youngblood died on February 18, 2007 as a result of injuries sustained during the attack.

1419.   The attack was committed by IRGC Sunni Terrorist Proxies, with material support and resources from the IRGC.

1420.   PFC Youngblood's murder would have violated the laws of war if these terrorists were subject to them because, among other reasons, the terrorist(s) who committed the attack neither wore uniforms nor otherwise identified themselves as enemy combatants.

1421.   PFC Youngblood was a U.S. national at the time of the attack and his death.

1422.   Plaintiff Ms. Kristen Simon is the mother of PFC Youngblood and a U.S. national.

1423.   Plaintiff Mr. Richard Gervasi II is the brother of PFC Youngblood and a U.S. national.

1424.   As a result of the February 18, 2007 attack and PFC Youngblood's injuries and death, each member of the Youngblood Family has experienced severe mental anguish, emotional pain and suffering, and the loss of PFC Youngblood's society, companionship, and counsel.

1425.   As a result of the February 18, 2007 attack, PFC Youngblood was injured in his person and/or property. The Plaintiff members of the Youngblood Family are the survivors and/or heirs of PFC Youngblood and are entitled to recover for the damages PFC Youngblood sustained.

### YY.   The March 5, 2007 IED Attack In Saladin (Justin M. Estes Family)

1426.   Staff Sergeant Justin Michael Estes served in Iraq as a member of the U.S. military serving in the U.S. Army. On March 5, 2007, SSG Estes was injured in an IED attack in Saladin, Iraq.  SSG Estes died on March 5, 2007 as a result of injuries sustained during the attack.

1427.   The attack was committed by IRGC Sunni Terrorist Proxies, with material support and resources from the IRGC.

1428.   SSG Estes's murder would have violated the laws of war if these terrorists were subject to them because, among other reasons, the terrorist(s) who committed the attack neither wore uniforms nor otherwise identified themselves as enemy combatants, and the passive detonation system indiscriminately placed civilians at risk.

1429.   SSG Estes was a U.S. national at the time of the attack and his death.

1430.   Plaintiff Ms. Diane Salyers is the mother of SSG Estes and a U.S. national.

1431.   Plaintiff Ms. Kelli Winkler is the sister of SSG Estes and a U.S. national.

1432.   Plaintiff Ms. Norma Estes is the sister of SSG Estes and a U.S. national.

1433.   As a result of the March 5, 2007 attack and SSG Estes's injuries and death, each member of the Estes Family has experienced severe mental anguish, emotional pain and suffering, and the loss of SSG Estes's society, companionship, and counsel.

1434.   As a result of the March 5, 2007 attack, SSG Estes was injured in his person and/or property. The Plaintiff members of the Estes Family are the survivors and/or heirs of SSG Estes and are entitled to recover for the damages SSG Estes sustained.

### ZZ.   The March 17, 2007 IED Attack In Diyala (Benjamin L. Sebban Family)

1435.   Sergeant First Class Benjamin L. Sebban served in Iraq as a member of the U.S. military serving in the U.S. Army. On March 17, 2007, SFC Sebban was injured in an IED attack in Diyala, Iraq.  SFC Sebban died on March 17, 2007 as a result of injuries sustained during the attack.

1436.   The attack was committed by IRGC Sunni Terrorist Proxies, with material support and resources from the IRGC.

1437.   SFC Sebban's murder would have violated the laws of war if these terrorists were subject to them because, among other reasons, the terrorist(s) who committed the attack neither wore uniforms nor otherwise identified themselves as enemy combatants, and the passive detonation system indiscriminately placed civilians at risk.

1438.   SFC Sebban was a U.S. national at the time of the attack and his death.

1439.   Plaintiff Mr. Daniel Sebban is the brother of SFC Sebban and a U.S. national.

1440.   As a result of the March 17, 2007 attack and SFC Sebban's injuries and death, each member of the Sebban Family has experienced severe mental anguish, emotional pain and suffering, and the loss of SFC Sebban's society, companionship, and counsel.

1441.   As a result of the March 17, 2007 attack, SFC Sebban was injured in his person and/or property. The Plaintiff members of the Sebban Family are the survivors and/or heirs of SFC Sebban and are entitled to recover for the damages SFC Sebban sustained.

**AAA.   The March 23, 2007 IED Attack In Al Anbar (Greg N. Riewer Family)**

1442.   Staff Sergeant Greg Ninerd Riewer served in Iraq as a member of the U.S. military serving in the U.S. Army National Guard. On March 23, 2007, SSG Riewer was injured in an IED attack in Al Anbar.  SSG Riewer died on March 23, 2007 as a result of injuries sustained during the attack.

1443.    The attack was committed by IRGC Sunni Terrorist Proxies, with material support and resources from the IRGC.

1444.   SSG Riewer's murder would have violated the laws of war if these terrorists were subject to them because, among other reasons, the terrorist(s) who committed the attack neither wore uniforms nor otherwise identified themselves as enemy combatants, and the passive detonation system indiscriminately placed civilians at risk.

1445.   SSG Riewer was a U.S. national at the time of the attack and his death.

1446.   Plaintiff Ms. Janice Riewer is the mother of SSG Riewer and a U.S. national.

1447.   Plaintiff Mr. Richard Riewer is the father of SSG Riewer and a U.S. national.

1448.   As a result of the March 23, 2007 attack and SSG Riewer's injuries and death, each member of the Riewer Family has experienced severe mental anguish, emotional pain and suffering, and the loss of SSG Riewer's society, companionship, and counsel.

1449.   As a result of the March 23, 2007 attack, SSG Riewer was injured in his person and/or property. The Plaintiff members of the Riewer Family are the survivors and/or heirs of SSG Riewer and are entitled to recover for the damages SSG Riewer sustained.

**BBB.   The April 4, 2007 IED Attack In Baghdad (Joseph H. Cantrell, IV Family)**

1450.   Corporal Joseph Herman Cantrell IV served in Iraq as a member of the U.S. military serving in the U.S. Army. On April 4, 2007, CPL Cantrell was injured in an IED attack in Baghdad, Iraq.  CPL Cantrell died on April 4, 2007 as a result of injuries sustained during the attack.

1451.   The attack was committed by IRGC Sunni Terrorist Proxies, with material support and resources from the IRGC.

1452.   CPL Cantrell's murder would have violated the laws of war if these terrorists were subject to them because, among other reasons, the terrorist(s) who committed the attack neither wore uniforms nor otherwise identified themselves as enemy combatants, and the passive detonation system indiscriminately placed civilians at risk.

1453.   CPL Cantrell was a U.S. national at the time of the attack and his death.

1454.   Plaintiff Mr. Joseph Cantrell III is the father of CPL Cantrell and a U.S. national.

1455.   Plaintiff Ms. Sondra Adkins is the mother of CPL Cantrell and a U.S. national.

1456.   As a result of the April 4, 2007 attack and CPL Cantrell's injuries and death, each member of the Cantrell Family has experienced severe mental anguish, emotional pain and suffering, and the loss of CPL Cantrell's society, companionship, and counsel.

1457.   As a result of the April 4, 2007 attack, CPL Cantrell was injured in his person and/or property. The Plaintiff members of the Cantrell Family are the survivors and/or heirs of CPL Cantrell and are entitled to recover for the damages CPL Cantrell sustained.

**CCC.   The April 7, 2007 IED Attack In Diyala (The Families of Jonathan D. Grassbaugh, Levi K. Hoover, and Rodney L. McCandless)**

1458.   On April 7, 2007, Iranian Sunni Terrorist Proxies committed an IED attack in Diyala, Iraq (the "April 7, 2007 IED Attack").

1459.  The April 7, 2007 IED Attack was committed by IRGC Sunni Terrorist Proxies, with material support and resources from the IRGC.

1460.  The April 7, 2007 IED Attack would have violated the laws of war if these terrorists were subject to them because, among other reasons, the terrorist(s) who committed the attack neither wore uniforms nor otherwise identified themselves as enemy combatants, and the passive detonation system indiscriminately placed civilians at risk.

### 1.     The Jonathan D. Grassbaugh Family

1461.  Captain Jonathan D. Grassbaugh served in Iraq as a member of the U.S. military serving in the U.S. Army. CPT Grassbaugh was injured in the April 7, 2007 IED Attack.  CPT Grassbaugh died on April 7, 2007 as a result of injuries sustained during the attack.

1462.  CPT Grassbaugh was a U.S. national at the time of the attack and his death.

1463.  Plaintiff Mrs. Patricia Grassbaugh is the mother of CPT Grassbaugh and a U.S. national.

1464.  As a result of the April 7, 2007 IED Attack and CPT Grassbaugh's injuries and death, each member of the Grassbaugh Family has experienced severe mental anguish, emotional pain and suffering, and the loss of CPT Grassbaugh's society, companionship, and counsel.

1465.  As a result of the April 7, 2007 IED Attack, CPT Grassbaugh was injured in his person and/or property. The Plaintiff members of the Grassbaugh Family are the survivors and/or heirs of CPT Grassbaugh and are entitled to recover for the damages CPT Grassbaugh sustained.

### 2.     The Levi K. Hoover Family

1466.  Specialist Levi Kennith Hoover served in Iraq as a member of the U.S. military serving in the U.S. Army. SPC Hoover was injured in the April 7, 2007 IED Attack.  SPC Hoover died on April 7, 2007 as a result of injuries sustained during the attack.

1467.  SPC Hoover was a U.S. national at the time of the attack and his death.

1468.   Plaintiff Mrs. Belinda Brewster is the mother of SPC Hoover and a U.S. national.

1469.   As a result of the April 7, 2007 IED Attack and SPC Hoover's injuries and death, each member of the Hoover Family has experienced severe mental anguish, emotional pain and suffering, and the loss of SPC Hoover's society, companionship, and counsel.

1470.   As a result of the April 7, 2007 IED Attack, SPC Hoover was injured in his person and/or property. The Plaintiff members of the Hoover Family are the survivors and/or heirs of SPC Hoover and are entitled to recover for the damages SPC Hoover sustained.

### 3.      The Rodney L. McCandless Family

1471.   Private First Class Rodney Lynn McCandless served in Iraq as a member of the U.S. military serving in the U.S. Army. PFC McCandless was injured in the April 7, 2007 IED Attack.  PFC McCandless died on April 7, 2007 as a result of injuries sustained during the attack.

1472.   PFC McCandless was a U.S. national at the time of the attack and his death.

1473.   Plaintiff Ms. Chassity McCandless is the sister of PFC McCandless and a U.S. national.

1474.   Plaintiff Mr. Ronald Sumner is the brother of PFC McCandless and a U.S. national.

1475.   As a result of the April 7, 2007 IED Attack and PFC McCandless's injuries and death, each member of the McCandless Family has experienced severe mental anguish, emotional pain and suffering, and the loss of PFC McCandless's society, companionship, and counsel.

1476.   As a result of the April 7, 2007 IED Attack, PFC McCandless was injured in his person and/or property. The Plaintiff members of the McCandless Family are the survivors and/or heirs of PFC McCandless and are entitled to recover for the damages PFC McCandless sustained.

### DDD.  The April 14, 2007 IED Attack In Al Anbar (The Families of Joshua A. Schmit and Brandon L. Wallace)

1477.   On April 14, 2007, Iranian Sunni Terrorist Proxies committed an IED attack in Al Anbar (the "April 14, 2007 IED Attack").

1478.   The April 14, 2007 IED Attack was committed by IRGC Sunni Terrorist Proxies, with material support and resources from the IRGC.

1479.   The April 14, 2007 IED Attack would have violated the laws of war if these terrorists were subject to them because, among other reasons, the terrorist(s) who committed the attack neither wore uniforms nor otherwise identified themselves as enemy combatants, and the passive detonation system indiscriminately placed civilians at risk.

### 1.  The of Joshua A. Schmit Family

1480.   Sergeant Joshua Andrew Schmit served in Iraq as a member of the U.S. military serving in the U.S. Army. SGT Schmit was injured the April 14, 2007 IED Attack.  SGT Schmit died on April 14, 2007 as a result of injuries sustained during the attack.

1481.   SGT Schmit was a U.S. national at the time of the attack and his death.

1482.   Plaintiff Ms. Kimberly Schmit is the mother of SGT Schmit and a U.S. national.

1483.   As a result of the April 14, 2007 IED Attack and SGT Schmit's injuries and death, each member of the Schmit Family has experienced severe mental anguish, emotional pain and suffering, and the loss of SGT Schmit's society, companionship, and counsel.

1484.   As a result of the April 14, 2007 IED Attack, SGT Schmit was injured in his person and/or property. The Plaintiff members of the Schmit Family are the survivors and/or heirs of SGT Schmit and are entitled to recover for the damages SGT Schmit sustained.

### 2. The Brandon L. Wallace Family

1485.   Sergeant Brandon L. Wallace served in Iraq as a member of the U.S. military serving in the U.S. Army.  SGT Wallace was injured in the April 14, 2007 IED Attack.  SGT Wallace died on April 14, 2007 as a result of injuries sustained during the attack.

1486.   SGT Wallace was a U.S. national at the time of the attack and his death.

1487.   Plaintiff Ms. Robin Wallace is the mother of SGT Wallace and a U.S. national.

1488.   Plaintiff Mr. Rickey Wallace is the father of SGT Wallace and a U.S. national.

1489.   Plaintiff Ms. Rachel Tucker is the sister of SGT Wallace and a U.S. national.

1490.   Plaintiff Ms. Sarah Wallace is the sister of SGT Wallace and a U.S. national.

1491.   As a result of the April 14, 2007 IED Attack and SGT Wallace's injuries and death, each member of the Wallace Family has experienced severe mental anguish, emotional pain and suffering, and the loss of SGT Wallace's society, companionship, and counsel.

1492.   As a result of the April 14, 2007 IED Attack, SGT Wallace was injured in his person and/or property. The Plaintiff members of the Wallace Family are the survivors and/or heirs of SGT Wallace and are entitled to recover for the damages SGT Wallace sustained.

### EEE.   The April 23, 2007 IED Attack In Al Anbar (The Families of Kenneth E. Locker, Jr. and Brice A. Pearson)

1493.   On April 23, 2007, Iranian Sunni Terrorist Proxies committed an IED attack in Al Anbar (the "April 23, 2007 Al Anbar IED Attack").

1494.   The April 23, 2007 Al Anbar IED Attack was committed by IRGC Sunni Terrorist Proxies, with material support and resources from the IRGC.

1495.   The April 23, 2007 Al Anbar IED Attack would have violated the laws of war if these terrorists were subject to them because, among other reasons, the terrorist(s) who

committed the attack neither wore uniforms nor otherwise identified themselves as enemy

combatants, and the passive detonation system indiscriminately placed civilians at risk.

### 1.     The Kenneth E. Locker, Jr. Family

1496.   Staff Sergeant Kenneth Edward Locker Jr. served in Iraq as a member of the U.S.

military serving in the U.S. Army. SSG Locker was injured in the April 23, 2007 Al Anbar IED

Attack.  SSG Locker died on April 23, 2007 as a result of injuries sustained during the attack.

1497.   SSG Locker was a U.S. national at the time of the attack and his death.

1498.   Plaintiff Mr. Kenneth Locker Sr. is the father of SSG Locker and a U.S. national.

1499.   Plaintiff Mrs. Carmon Petters is the sister of SSG Locker and a U.S. national.

1500.   As a result of the April 23, 2007 Al Anbar IED Attack and SSG Locker's injuries

and death, each member of the Locker Family has experienced severe mental anguish, emotional

pain and suffering, and the loss of SSG Locker's society, companionship, and counsel.

1501.   As a result of the April 23, 2007 Al Anbar IED Attack, SSG Locker was injured

in his person and/or property. The Plaintiff members of the Locker Family are the survivors

and/or heirs of SSG Locker and are entitled to recover for the damages SSG Locker sustained.

### 2.     The Brice A. Pearson Family

1502.   Sergeant Brice A. Pearson served in Iraq as a member of the U.S. military serving

in the U.S. Army.  SGT Pearson was injured in the April 23, 2007 Al Anbar IED Attack.  SGT

Pearson died on April 23, 2007 as a result of injuries sustained during the attack.

1503.   SGT Pearson was a U.S. national at the time of the attack and his death.

1504.   Plaintiff Ms. Leslie White is the mother of SGT Pearson and a U.S. national.

1505.   Plaintiff Mr. Jeremy Pearson is the brother of SGT Pearson and a U.S. national.

1506.   As a result of the April 23, 2007 IED Al Anbar Attack and SGT Pearson's injuries and death, each member of the Pearson Family has experienced severe mental anguish, emotional pain and suffering, and the loss of SGT Pearson's society, companionship, and counsel.

1507.   As a result of the April 23, 2007 IED Al Anbar Attack, SGT Pearson was injured in his person and/or property. The Plaintiff members of the Pearson Family are the survivors and/or heirs of SGT Pearson and are entitled to recover for the damages SGT Pearson sustained.

**FFF.   The April 23, 2007 IED Attack In Diyala (Michael J. Rodriguez Family)**

1508.   Specialist Michael J. Rodriguez served in Iraq as a member of the U.S. military serving in the U.S. Army. On April 23, 2007, SPC Rodriguez was injured in an IED attack in Diyala, Iraq.  SPC Rodriguez died on April 23, 2007 as a result of injuries sustained during the attack.

1509.    The attack was committed by IRGC Sunni Terrorist Proxies, with material support and resources from the IRGC.

1510.   SPC Rodriguez's murder would have violated the laws of war if these terrorists were subject to them because, among other reasons, the terrorist(s) who committed the attack neither wore uniforms nor otherwise identified themselves as enemy combatants, and the passive detonation system indiscriminately placed civilians at risk.

1511.   SPC Rodriguez was a U.S. national at the time of the attack and his death.

1512.   Plaintiff Ms. Lorie Southerland is the mother of SPC Rodriguez and a U.S. national.

1513.   As a result of the April 23, 2007 attack and SPC Rodriguez's injuries and death, each member of the Rodriguez Family has experienced severe mental anguish, emotional pain and suffering, and the loss of SPC Rodriguez's society, companionship, and counsel.

1514.   As a result of the April 23, 2007 attack, SPC Rodriguez was injured in his person and/or property. The Plaintiff members of the Rodriguez Family are the survivors and/or heirs of SPC Rodriguez and are entitled to recover for the damages SPC Rodriguez sustained.

**GGG.  The May 6, 2007 IED Attack In Diyala (Jason R. Harkins Family)**

1515.   Sergeant Jason Robert Harkins served in Iraq as a member of the U.S. military serving in the U.S. Army.  On May 6, 2007, SGT Harkins was injured in an IED attack in Diyala, Iraq.  SGT Harkins died on May 6, 2007 as a result of injuries sustained during the attack.

1516.   The attack was committed by IRGC Sunni Terrorist Proxies, with material support and resources from the IRGC.

1517.   SGT Harkins's murder would have violated the laws of war if these terrorists were subject to them because, among other reasons, the terrorist(s) who committed the attack neither wore uniforms nor otherwise identified themselves as enemy combatants, and the passive detonation system indiscriminately placed civilians at risk.

1518.   SGT Harkins was a U.S. national at the time of the attack and his death.

1519.   Plaintiff Ms. April Harkins is the mother of SGT Harkins and a U.S. national.

1520.   Plaintiff Mr. Robert Harkins Jr. is the father of SGT Harkins and a U.S. national.

1521.   As a result of the May 6, 2007 attack and SGT Harkins's injuries and death, each member of the Harkins Family has experienced severe mental anguish, emotional pain and suffering, and the loss of SGT Harkins's society, companionship, and counsel.

1522.   As a result of the May 6, 2007 attack, SGT Harkins was injured in his person and/or property. The Plaintiff members of the Harkins Family are the survivors and/or heirs of SGT Harkins and are entitled to recover for the damages SGT Harkins sustained.

**HHH.  The May 14, 2007 Sniper Attack In Al Anbar (Jeffrey D. Walker Family)**

1523.   Lance Corporal Jeffrey Davis Walker served in Iraq as a member of the U.S. military serving in the U.S. Marine Corps. On May 14, 2007, LCpl Walker was injured in a sniper attack in Al Anbar.  LCpl Walker died on May 14, 2007 as a result of injuries sustained during the attack.

1524.   The attack was committed by IRGC Sunni Terrorist Proxies, with material support and resources from the IRGC.

1525.   LCpl Walker's murder would have violated the laws of war if these terrorists were subject to them because, among other reasons, the terrorist(s) who committed the attack neither wore uniforms nor otherwise identified themselves as enemy combatants.

1526.   LCpl Walker was a U.S. national at the time of the attack and his death.

1527.   Plaintiff C.Y., by and through his next friend Dana Young, is the minor son of LCpl Walker and a U.S. national.

1528.   Plaintiff Ms. Teresa Pinner is the mother of LCpl Walker and a U.S. national.

1529.   Plaintiff Mr. James Walker is the father of LCpl Walker and a U.S. national.

1530.   Plaintiff Ms. Kasey Walker is the sister of LCpl Walker and a U.S. national.

1531.   Plaintiff Mrs. Kelly Murray is the sister of LCpl Walker and a U.S. national.

1532.   As a result of the May 14, 2007 attack and LCpl Walker's injuries and death, each member of the Walker Family has experienced severe mental anguish, emotional pain and suffering, and the loss of LCpl Walker's society, companionship, and counsel.

1533.   As a result of the May 14, 2007 attack, LCpl Walker was injured in his person and/or property. The Plaintiff members of the Walker Family are the survivors and/or heirs of LCpl Walker and are entitled to recover for the damages LCpl Walker sustained.

### III.    The May 18, 2007 IED Attack In Baghdad (Anselmo Martinez, III Family)

1534.    Sergeant Anselmo Martinez III served in Iraq as a member of the U.S. military serving in the U.S. Army. On May 18, 2007, SGT Martinez was injured in an IED attack in Baghdad, Iraq.  SGT Martinez died on May 18, 2007 as a result of injuries sustained during the attack.

1535.    The attack was committed by IRGC Sunni Terrorist Proxies, with material support and resources from the IRGC.

1536.    SGT Martinez's murder would have violated the laws of war if these terrorists were subject to them because, among other reasons, the terrorist(s) who committed the attack neither wore uniforms nor otherwise identified themselves as enemy combatants, and the passive detonation system indiscriminately placed civilians at risk.

1537.    SGT Martinez was a U.S. national at the time of the attack and his death.

1538.    Plaintiff Mr. Anselmo Martinez Jr. is the father of SGT Martinez and a U.S. national.

1539.    Plaintiff Ms. Galdina Ibarra is the sister of SGT Martinez and a U.S. national.

1540.    As a result of the May 18, 2007 attack and SGT Martinez's injuries and death, each member of the Martinez Family has experienced severe mental anguish, emotional pain and suffering, and the loss of SGT Martinez's society, companionship, and counsel.

1541.    As a result of the May 18, 2007 attack, SGT Martinez was injured in his person and/or property. The Plaintiff members of the Martinez Family are the survivors and/or heirs of SGT Martinez and are entitled to recover for the damages SGT Martinez sustained.

**JJJ.    The May 22, 2007 IED Attack In Baghdad (Robert J. Montgomery, Jr. Family)**

1542.    Sergeant Robert Joe Montgomery Jr. served in Iraq as a member of the U.S. military serving in the U.S. Army. On May 22, 2007, SGT Montgomery was injured in an IED attack in Baghdad, Iraq.  SGT Montgomery died on May 22, 2007 as a result of injuries sustained during the attack.

1543.    The attack was committed by IRGC Sunni Terrorist Proxies, with material support and resources from the IRGC.

1544.    SGT Montgomery's murder would have violated the laws of war if these terrorists were subject to them because, among other reasons, the terrorist(s) who committed the attack neither wore uniforms nor otherwise identified themselves as enemy combatants, and the passive detonation system indiscriminately placed civilians at risk.

1545.    SGT Montgomery was a U.S. national at the time of the attack and his death.

1546.    Plaintiff Mr. Micah Montgomery is the brother of SGT Montgomery and a U.S. national.

1547.    As a result of the May 22, 2007 attack and SGT Montgomery's injuries and death, each member of the Montgomery Family has experienced severe mental anguish, emotional pain and suffering, and the loss of SGT Montgomery's society, companionship, and counsel.

1548.    As a result of the May 22, 2007 attack, SGT Montgomery was injured in his person and/or property. The Plaintiff members of the Montgomery Family are the survivors and/or heirs of SGT Montgomery and are entitled to recover for the damages SGT Montgomery sustained.

### KKK. The May 28, 2007 IED Attack In Diyala (The Families of Zachary D. Baker, James E. Summers, III, and Kile G. West)

1549.   On May 28, 2007, Iranian Sunni Terrorist Proxies committed an IED attack in Diyala, Iraq (the "May 28, 2007 IED Attack").

1550.   The May 28, 2007 IED Attack was committed by IRGC Sunni Terrorist Proxies, with material support and resources from the IRGC.

1551.   The May 28, 2007 IED Attack would have violated the laws of war if these terrorists were subject to them because, among other reasons, the terrorist(s) who committed the attack neither wore uniforms nor otherwise identified themselves as enemy combatants, and the passive detonation system indiscriminately placed civilians at risk.

### 1.  The Zachary D. Baker Family

1552.   Corporal Zachary David Baker served in Iraq as a member of the U.S. military serving in the U.S. Army. CPL Baker was injured in the May 28, 2007 IED Attack.  CPL Baker died on May 28, 2007 as a result of injuries sustained during the attack.

1553.   CPL Baker was a U.S. national at the time of the attack and his death.

1554.   Plaintiff Ms. Christina Baker is the widow of CPL Baker and a U.S. national.

1555.   As a result of the May 28, 2007 IED Attack and CPL Baker's injuries and death, each member of the Baker Family has experienced severe mental anguish, emotional pain and suffering, and the loss of CPL Baker's society, companionship, and counsel.

1556.   As a result of the May 28, 2007 IED Attack, CPL Baker was injured in his person and/or property. The Plaintiff members of the Baker Family are the survivors and/or heirs of CPL Baker and are entitled to recover for the damages CPL Baker sustained.

### 2.    The James E. Summers, III Family

1557.    Corporal James E. Summers III served in Iraq as a member of the U.S. military serving in the U.S. Army.  CPL Summers was injured in the May 28, 2007 IED Attack.  CPL Summers died on May 28, 2007 as a result of injuries sustained during the attack.

1558.    CPL Summers was a U.S. national at the time of the attack and his death.

1559.    Plaintiff Sergeant Michael Summers is the brother of CPL Summers and a U.S. national.

1560.    As a result of the May 28, 2007 IED Attack and CPL Summers's injuries and death, each member of the Summers Family has experienced severe mental anguish, emotional pain and suffering, and the loss of CPL Summers's society, companionship, and counsel.

1561.    As a result of the May 28, 2007 IED Attack, CPL Summers was injured in his person and/or property. The Plaintiff members of the Summers Family are the survivors and/or heirs of CPL Summers and are entitled to recover for the damages CPL Summers sustained.

### 3.    The Kile G. West Family

1562.    First Lieutenant Kile G. West served in the May 28, 2007 IED Attack.  1LT West died on May 28, 2007 as a result of injuries sustained during the attack.

1563.    1LT West was a U.S. national at the time of the attack and his death.

1564.    Plaintiff Ms. Nanette West is the mother of 1LT West and a U.S. national.

1565.    Plaintiff Mr. Clark West is the father of 1LT West and a U.S. national.

1566.    Plaintiff Ms. Kelli Anderson is the sister of 1LT West and a U.S. national.

1567.    Plaintiff Ms. Kara West is the sister of 1LT West and a U.S. national.

1568.    Plaintiff Mr. Carter West is the brother of 1LT West and a U.S. national.

1569.   As a result of the May 28, 2007 IED Attack and 1LT West's injuries and death, each member of the West Family has experienced severe mental anguish, emotional pain and suffering, and the loss of 1LT West's society, companionship, and counsel.

1570.   As a result of the May 28, 2007 IED Attack, 1LT West was injured in his person and/or property. The Plaintiff members of the West Family are the survivors and/or heirs of 1LT West and are entitled to recover for the damages 1LT West sustained.

**LLL.   The June 2, 2007 IED Attack In Nineveh (Jeremiah D. Costello Family)**

1571.   Corporal Jeremiah David Costello served in Iraq as a member of the U.S. military serving in the U.S. Army. On June 2, 2007, CPL Costello was injured in an IED attack in Nineveh, Iraq.  CPL Costello died on June 2, 2007 as a result of injuries sustained during the attack.

1572.   The attack was committed by IRGC Sunni Terrorist Proxies, with material support and resources from the IRGC.

1573.   CPL Costello's murder would have violated the laws of war if these terrorists were subject to them because, among other reasons, the terrorist(s) who committed the attack neither wore uniforms nor otherwise identified themselves as enemy combatants, and the passive detonation system indiscriminately placed civilians at risk.

1574.   CPL Costello was a U.S. national at the time of the attack and his death.

1575.   Plaintiff Ms. Lillian Costello is the daughter of CPL Costello and a U.S. national.

1576.   Plaintiff Mrs. Debra Springman is the mother of CPL Costello and a U.S. national.

1577.   As a result of the June 2, 2007 attack and CPL Costello's injuries and death, each member of the Costello Family has experienced severe mental anguish, emotional pain and suffering, and the loss of CPL Costello's society, companionship, and counsel.

1578.   As a result of the June 2, 2007 attack, CPL Costello was injured in his person and/or property. The Plaintiff members of the Costello Family are the survivors and/or heirs of CPL Costello and are entitled to recover for the damages CPL Costello sustained.

**MMM.        The June 2, 2007 IED Attack In Saladin (Dariek E. Dehn Family)**

1579.   Sergeant Dariek E. Dehn served in Iraq as a member of the U.S. military serving in the U.S. Army. On June 2, 2007, SGT Dehn was injured in an IED attack in Saladin, Iraq.  SGT Dehn died on June 2, 2007 as a result of injuries sustained during the attack.

1580.   The attack was committed by IRGC Sunni Terrorist Proxies, with material support and resources from the IRGC.

1581.   SGT Dehn's murder would have violated the laws of war if these terrorists were subject to them because, among other reasons, the terrorist(s) who committed the attack neither wore uniforms nor otherwise identified themselves as enemy combatants, and the passive detonation system indiscriminately placed civilians at risk.

1582.   SGT Dehn was a U.S. national at the time of the attack and his death.

1583.   Plaintiff Mr. David Dehn Jr. is the brother of SGT Dehn and a U.S. national.

1584.   As a result of the June 2, 2007 attack and SGT Dehn's injuries and death, each member of the Dehn Family has experienced severe mental anguish, emotional pain and suffering, and the loss of SGT Dehn's society, companionship, and counsel.

1585.   As a result of the June 2, 2007 attack, SGT Dehn was injured in his person and/or property. The Plaintiff members of the Dehn Family are the survivors and/or heirs of SGT Dehn and are entitled to recover for the damages SGT Dehn sustained.

**NNN. The June 12, 2007 RPG Attack In Diyala (Damon G. LeGrand Family)**

1586.   Corporal Damon Glenn LeGrand served in Iraq as a member of the U.S. military serving in the U.S. Army. On June 12, 2007, CPL LeGrand was injured in an RPG attack in Diyala, Iraq.  CPL LeGrand died on June 12, 2007 as a result of injuries sustained during the attack.

1587.   The attack was committed by IRGC Sunni Terrorist Proxies, with material support and resources from the IRGC.

1588.   CPL LeGrand's murder would have violated the laws of war if these terrorists were subject to them because, among other reasons, the terrorist(s) who committed the attack neither wore uniforms nor otherwise identified themselves as enemy combatants.

1589.   CPL LeGrand was a U.S. national at the time of the attack and his death.

1590.   Plaintiff Mrs. Ashley Rawlings is the widow of CPL LeGrand and a U.S. national.

1591.   Plaintiff K.L., by and through her next friend Ashley Rawlings, is the minor daughter of CPL LeGrand and a U.S. national.

1592.   Plaintiff Ms. Glenna LeGrand is the mother of CPL LeGrand and a U.S. national.

1593.   Plaintiff M.L., by and through her next friend Ashley Rawlings, is the minor step-daughter of CPL LeGrand and a U.S. national.  Miss LeGrand lived in the same household as CPL LeGrand for a substantial time and considered CPL LeGrand the functional equivalent of a biological father.

1594.   As a result of the June 12, 2007 attack and CPL LeGrand's injuries and death, each member of the LeGrand Family has experienced severe mental anguish, emotional pain and suffering, and the loss of CPL LeGrand's society, companionship, and counsel.

1595.   As a result of the June 12, 2007 attack, CPL LeGrand was injured in his person and/or property. The Plaintiff members of the LeGrand Family are the survivors and/or heirs of CPL LeGrand and are entitled to recover for the damages CPL LeGrand sustained.

**OOO.  The June 19, 2007 IED Attack In Diyala (Darryl W. Linder Family)**

1596.   Corporal Darryl Wardlaw Linder served in Iraq as a member of the U.S. military serving in the U.S. Army. On June 19, 2007, CPL Linder was injured in an IED attack in Diyala, Iraq.  CPL Linder died on June 19, 2007 as a result of injuries sustained during the attack.

1597.    The attack was committed by IRGC Sunni Terrorist Proxies, with material support and resources from the IRGC.

1598.   CPL Linder's murder would have violated the laws of war if these terrorists were subject to them because, among other reasons, the terrorist(s) who committed the attack neither wore uniforms nor otherwise identified themselves as enemy combatants, and the passive detonation system indiscriminately placed civilians at risk.

1599.   CPL Linder was a U.S. national at the time of the attack and his death.

1600.   Plaintiff Mr. Darryl Linder is the father of CPL Linder and a U.S. national.

1601.   As a result of the June 19, 2007 attack and CPL Linder's injuries and death, each member of the Linder Family has experienced severe mental anguish, emotional pain and suffering, and the loss of CPL Linder's society, companionship, and counsel.

1602.   As a result of the June 19, 2007 attack, CPL Linder was injured in his person and/or property. The Plaintiff members of the Linder Family are the survivors and/or heirs of CPL Linder and are entitled to recover for the damages CPL Linder sustained.

**PPP. The July 17, 2007 IED Attack In Saladin (Patrick L. Wade Family)**

1603.   Chief Petty Officer Patrick L. Wade served in Iraq as a member of the U.S. military serving in the U.S. Navy. On July 17, 2007, CPO Wade was injured in an IED attack in Saladin, Iraq.  CPO Wade died on July 17, 2007 as a result of injuries sustained during the attack.

1604.   The attack was committed by IRGC Sunni Terrorist Proxies, with material support and resources from the IRGC.

385

1605.   CPO Wade's murder would have violated the laws of war if these terrorists were subject to them because, among other reasons, the terrorist(s) who committed the attack neither wore uniforms nor otherwise identified themselves as enemy combatants, and the passive detonation system indiscriminately placed civilians at risk.

1606.   CPO Wade was a U.S. national at the time of the attack and his death.

1607.   Plaintiff Ms. Shirley Wade is the mother of CPO Wade and a U.S. national.

1608.   Plaintiff Mr. Gary Wade is the brother of CPO Wade and a U.S. national.

1609.   As a result of the July 17, 2007 attack and CPO Wade's injuries and death, each member of the Wade Family has experienced severe mental anguish, emotional pain and suffering, and the loss of CPO Wade's society, companionship, and counsel.

1610.   As a result of the July 17, 2007 attack, CPO Wade was injured in his person and/or property. The Plaintiff members of the Wade Family are the survivors and/or heirs of CPO Wade and are entitled to recover for the damages CPO Wade sustained.

**QQQ. The July 20, 2007 IED Attack In Diyala (Rhett A. Butler Family)**

1611.   Corporal Rhett Allen Butler served in Iraq as a member of the U.S. military serving in the U.S. Army. On July 20, 2007, CPL Butler was injured in an IED attack in Diyala, Iraq.  CPL Butler died on July 20, 2007 as a result of injuries sustained during the attack

1612.   The attack was committed by IRGC Sunni Terrorist Proxies, with material support and resources from the IRGC.

1613.   CPL Butler's murder would have violated the laws of war if these terrorists were subject to them because, among other reasons, the terrorist(s) who committed the attack neither wore uniforms nor otherwise identified themselves as enemy combatants, and the passive detonation system indiscriminately placed civilians at risk.

1614.   CPL Butler was a U.S. national at the time of the attack and his death.

1615.   Plaintiff Ms. Shawna Westbrook is the sister of CPL Butler and a U.S. national.

1616.   As a result of the July 20, 2007 attack and CPL Butler's injuries and death, each member of the Butler Family has experienced severe mental anguish, emotional pain and suffering, and the loss of CPL Butler's society, companionship, and counsel.

1617.   As a result of the July 20, 2007 attack, CPL Butler was injured in his person and/or property. The Plaintiff members of the Butler Family are the survivors and/or heirs of CPL Butler and are entitled to recover for the damages CPL Butler sustained.

### RRR.  The July 24, 2007 IED Attack In Diyala (The Families of Robert A. Lynch and Matthew R. Zindars)

1618.   On July 24, 2007, Iranian Sunni Terrorist Proxies committed an IED attack in Diyala, Iraq (the "July 24, 2007 IED Attack").

1619.   The July 24, 2007 IED Attack was committed by IRGC Sunni Terrorist Proxies, with material support and resources from the IRGC.

1620.   The July 24, 2007 IED Attack would have violated the laws of war if these terrorists were subject to them because, among other reasons, the terrorist(s) who committed the attack neither wore uniforms nor otherwise identified themselves as enemy combatants, and the passive detonation system indiscriminately placed civilians at risk.

### 1.      The Robert A. Lynch Family

1621.   Lance Corporal Robert A. Lynch served in Iraq as a member of the U.S. military serving in the U.S. Marine Corps. LCpl Lynch was injured in the July 24, 2007 IED Attack.  LCpl Lynch died on July 24, 2007 as a result of injuries sustained during the attack.

1622.   LCpl Lynch was a U.S. national at the time of the attack and his death.

1623.   Plaintiff Dr. Michael Lynch III is the brother of LCpl Lynch and a U.S. national.

1624.   As a result of the July 24, 2007 IED Attack and LCpl Lynch's injuries and death, each member of the Lynch Family has experienced severe mental anguish, emotional pain and suffering, and the loss of LCpl Lynch's society, companionship, and counsel.

1625.   As a result of the July 24, 2007 IED Attack, LCpl Lynch was injured in his person and/or property. The Plaintiff members of the Lynch Family are the survivors and/or heirs of LCpl Lynch and are entitled to recover for the damages LCpl Lynch sustained.

### 2.      The Matthew R. Zindars Family

1626.   Corporal Matthew Ross Zindars served in Iraq as a member of the U.S. military serving in the U.S. Marine Corps. Cpl Zindars was injured in an IED attack the July 24, 2007 IED Attack.  Cpl Zindars died on July 24, 2007 as a result of injuries sustained during the attack.

1627.   Cpl Zindars was a U.S. national at the time of the attack and his death.

1628.   Plaintiff Ms. Lynn Zindars is the mother of Cpl Zindars and a U.S. national.

1629.   Plaintiff Mr. Kenneth Zindars is the father of Cpl Zindars and a U.S. national.

1630.   As a result of the July 24, 2007 IED Attack and Cpl Zindars's injuries and death, each member of the Zindars Family has experienced severe mental anguish, emotional pain and suffering, and the loss of Cpl Zindars's society, companionship, and counsel.

1631.   As a result of the July 24, 2007 IED Attack, Cpl Zindars was injured in his person and/or property. The Plaintiff members of the Zindars Family are the survivors and/or heirs of Cpl Zindars and are entitled to recover for the damages Cpl Zindars sustained.

### SSS. The July 26, 2007 IED Attack In Diyala (Michael A. Baloga Family)

1632.   Private Second Class Michael Andrew Baloga served in Iraq as a member of the U.S. military serving in the U.S. Army. On July 26, 2007, PV2 Baloga was injured in an IED attack in Diyala, Iraq.  PV2 Baloga died on July 26, 2007 as a result of injuries sustained during the attack.

1633.   The attack was committed by IRGC Sunni Terrorist Proxies, with material support and resources from the IRGC.

1634.   PV2 Baloga's murder would have violated the laws of war if these terrorists were subject to them because, among other reasons, the terrorist(s) who committed the attack neither wore uniforms nor otherwise identified themselves as enemy combatants, and the passive detonation system indiscriminately placed civilians at risk.

1635.   PV2 Baloga was a U.S. national at the time of the attack and his death.

1636.   Plaintiff Mrs. Linda Baloga is the step-mother of PV2 Baloga and a U.S. national. Mrs. Baloga lived in the same household as PV2 Baloga for a substantial time and considered PV2 Baloga the functional equivalent of a biological son.

1637.   As a result of the July 26, 2007 attack and PV2 Baloga's injuries and death, each member of the Baloga Family has experienced severe mental anguish, emotional pain and suffering, and the loss of PV2 Baloga's society, companionship, and counsel.

1638.   As a result of the July 26, 2007 attack, PV2 Baloga was injured in his person and/or property. The Plaintiff members of the Baloga Family are the survivors and/or heirs of PV2 Baloga and are entitled to recover for the damages PV2 Baloga sustained.

**TTT. The August 11, 2007 IED Attack In Baghdad (William D. Scates Family)**

1639.   Staff Sergeant William Daniel Scates served in Iraq as a member of the U.S. military serving in the U.S. Army. On August 11, 2007, SSG Scates was injured in an IED attack in Baghdad, Iraq.  SSG Scates died on August 11, 2007 as a result of injuries sustained during the attack.

1640.   The attack was committed by IRGC Sunni Terrorist Proxies, with material support and resources from the IRGC.

1641.   SSG Scates's murder would have violated the laws of war if these terrorists were subject to them because, among other reasons, the terrorist(s) who committed the attack neither wore uniforms nor otherwise identified themselves as enemy combatants, and the passive detonation system indiscriminately placed civilians at risk.

1642.   SSG Scates was a U.S. national at the time of the attack and his death.

1643.   Plaintiff Mrs. Shannon Owens is the sister of SSG Scates and a U.S. national.

1644.   As a result of the August 11, 2007 attack and SSG Scates's injuries and death, each member of the Scates Family has experienced severe mental anguish, emotional pain and suffering, and the loss of SSG Scates's society, companionship, and counsel.

1645.   As a result of the August 11, 2007 attack, SSG Scates was injured in his person and/or property. The Plaintiff members of the Scates Family are the survivors and/or heirs of SSG Scates and are entitled to recover for the damages SSG Scates sustained.

**UUU. The August 30, 2007 IED Attack In Nineveh (Daniel E. Scheibner Family)**

1646.   Sergeant First Class Daniel E. Scheibner served in Iraq as a member of the U.S. military serving in the U.S. Army. On August 30, 2007, SFC Scheibner was injured in an IED attack in Nineveh, Iraq.  SFC Scheibner died on August 30, 2007 as a result of injuries sustained during the attack.

1647.    The attack was committed by IRGC Sunni Terrorist Proxies, with material support and resources from the IRGC.

1648.   SFC Scheibner's murder would have violated the laws of war if these terrorists were subject to them because, among other reasons, the terrorist(s) who committed the attack neither wore uniforms nor otherwise identified themselves as enemy combatants, and the passive detonation system indiscriminately placed civilians at risk.

1649.   SFC Scheibner was a U.S. national at the time of the attack and his death.

1650.   Plaintiff Ms. Ann Scheibner is the widow of SFC Scheibner and a U.S. national.

1651.   Plaintiff Mr. Tyler Scheibner is the son of SFC Scheibner and a U.S. national.

1652.   Plaintiff Ms. Louise Scheibner is the mother of SFC Scheibner and a U.S. national.

1653.   Plaintiff Mr. David Scheibner is the brother of SFC Scheibner and a U.S. national.

1654.   Plaintiff Ms. Diane Cottrell is the sister of SFC Scheibner and a U.S. national.

1655.   As a result of the August 30, 2007 attack and SFC Scheibner's injuries and death, each member of the Scheibner Family has experienced severe mental anguish, emotional pain and suffering, and the loss of SFC Scheibner's society, companionship, and counsel.

1656.   As a result of the August 30, 2007 attack, SFC Scheibner was injured in his person and/or property. The Plaintiff members of the Scheibner Family are the survivors and/or heirs of SFC Scheibner and are entitled to recover for the damages SFC Scheibner sustained.

**VVV. The September 7, 2007 IED Attack In Nineveh (Jason J. Hernandez Family)**

1657.   Corporal Jason John Hernandez served in Iraq as a member of the U.S. military serving in the U.S. Army. On September 7, 2007, CPL Hernandez was injured in an IED attack in Nineveh, Iraq.  CPL Hernandez died on September 7, 2007 as a result of injuries sustained during the attack.

1658.   The attack was committed by IRGC Sunni Terrorist Proxies, with material support and resources from the IRGC.

1659.   CPL Hernandez's murder would have violated the laws of war if these terrorists were subject to them because, among other reasons, the terrorist(s) who committed the attack neither wore uniforms nor otherwise identified themselves as enemy combatants, and the passive detonation system indiscriminately placed civilians at risk.

1660.   CPL Hernandez was a U.S. national at the time of the attack and his death.

1661.   Plaintiff Mr. John Hernandez is the father of CPL Hernandez and a U.S. national.

1662.   Plaintiff Ms. Angela Hernandez is the sister of CPL Hernandez and a U.S. national.

1663.   As a result of the September 7, 2007 attack and CPL Hernandez's injuries and death, each member of the Jason J. Hernandez Family has experienced severe mental anguish, emotional pain and suffering, and the loss of CPL Hernandez's society, companionship, and counsel.

1664.   As a result of the September 7, 2007 attack, CPL Hernandez was injured in his person and/or property. The Plaintiff members of the Jason J. Hernandez Family are the survivors and/or heirs of CPL Hernandez and are entitled to recover for the damages CPL Hernandez sustained.

### WWW. The September 14, 2007 IED Attack In Baghdad (Jonathan Rivadeneira Family)

1665.   Specialist Jonathan Rivadeneira served in Iraq as a member of the U.S. military serving in the U.S. Army. On September 14, 2007, SPC Rivadeneira was injured in an IED attack in Baghdad, Iraq.  SPC Rivadeneira died on September 14, 2007 as a result of injuries sustained during the attack.

1666.   The attack was committed by IRGC Sunni Terrorist Proxies, with material support and resources from the IRGC.

1667.   SPC Rivadeneira's murder would have violated the laws of war if these terrorists were subject to them because, among other reasons, the terrorist(s) who committed the attack neither wore uniforms nor otherwise identified themselves as enemy combatants, and the passive detonation system indiscriminately placed civilians at risk.

1668.   SPC Rivadeneira was a U.S. national at the time of the attack and his death.

1669.   Plaintiff Ms. Heather Nied is the widow of SPC Rivadeneira and a U.S. national.

1670.   As a result of the September 14, 2007 attack and SPC Rivadeneira's injuries and death, each member of the Rivadeneira Family has experienced severe mental anguish, emotional pain and suffering, and the loss of SPC Rivadeneira's society, companionship, and counsel.

1671.   As a result of the September 14, 2007 attack, SPC Rivadeneira was injured in his person and/or property. The Plaintiff members of the Rivadeneira Family are the survivors and/or heirs of SPC Rivadeneira and are entitled to recover for the damages SPC Rivadeneira sustained.

**XXX. The September 14, 2007 IED Attack In Diyala (Terry D. Wagoner Family)**

1672.   Staff Sergeant Terry Daniel Wagoner served in Iraq as a member of the U.S. military serving in the U.S. Army. On September 14, 2007, SSG Wagoner was injured in an IED attack in Diyala, Iraq.  SSG Wagoner died on September 14, 2007 as a result of injuries sustained during the attack.

1673.   The attack was committed by IRGC Sunni Terrorist Proxies, with material support and resources from the IRGC.

1674.   SSG Wagoner's murder would have violated the laws of war if these terrorists were subject to them because, among other reasons, the terrorist(s) who committed the attack neither wore uniforms nor otherwise identified themselves as enemy combatants, and the passive detonation system indiscriminately placed civilians at risk.

1675.   SSG Wagoner was a U.S. national at the time of the attack and his death.

1676.   Plaintiff Ms. Katherine Wagoner is the widow of SSG Wagoner and a U.S. national.

1677.   As a result of the September 14, 2007 attack and SSG Wagoner's injuries and death, each member of the Wagoner Family has experienced severe mental anguish, emotional pain and suffering, and the loss of SSG Wagoner's society, companionship, and counsel.

1678.   As a result of the September 14, 2007 attack, SSG Wagoner was injured in his person and/or property. The Plaintiff members of the Wagoner Family are the survivors and/or heirs of SSG Wagoner and are entitled to recover for the damages SSG Wagoner sustained.

**YYY. The September 18, 2007 IED Attack In Diyala (Nicholas P. Olson Family)**

1679.   Corporal Nicholas Paul Olson served in Iraq as a member of the U.S. military serving in the U.S. Army. On September 18, 2007, CPL Olson was injured in an IED attack in Diyala, Iraq.  CPL Olson died on September 18, 2007 as a result of injuries sustained during the attack.

1680.   The attack was committed by IRGC Sunni Terrorist Proxies, with material support and resources from the IRGC.

1681.   CPL Olson's murder would have violated the laws of war if these terrorists were subject to them because, among other reasons, the terrorist(s) who committed the attack neither wore uniforms nor otherwise identified themselves as enemy combatants, and the passive detonation system indiscriminately placed civilians at risk.

1682.   CPL Olson was a U.S. national at the time of the attack and his death.

1683.   Plaintiff M.O., by and through her next friend Kevin Harrington, is the minor daughter of CPL Olson and a U.S. national.

1684.   Plaintiff Mr. Raymond Olson is the father of CPL Olson and a U.S. national.

1685.   As a result of the September 18, 2007 attack and CPL Olson's injuries and death, each member of the Olson Family has experienced severe mental anguish, emotional pain and suffering, and the loss of CPL Olson's society, companionship, and counsel.

1686.   As a result of the September 18, 2007 attack, CPL Olson was injured in his person and/or property. The Plaintiff members of the Olson Family are the survivors and/or heirs of CPL Olson and are entitled to recover for the damages CPL Olson sustained.

**ZZZ. The October 14, 2007 IED Attack In Baghdad (Justin S. Monschke Family)**

1687.   Sergeant First Class Justin S. Monschke served in Iraq as a member of the U.S. military serving in the U.S. Army. On October 14, 2007, SFC Monschke was injured in an IED attack in Baghdad, Iraq.  SFC Monschke died on October 14, 2007 as a result of injuries sustained during the attack.

1688.   The attack was committed by IRGC Sunni Terrorist Proxies, with material support and resources from the IRGC.

1689.   SFC Monschke's murder would have violated the laws of war if these terrorists were subject to them because, among other reasons, the terrorist(s) who committed the attack neither wore uniforms nor otherwise identified themselves as enemy combatants, and the passive detonation system indiscriminately placed civilians at risk.

1690.   SFC Monschke was a U.S. national at the time of the attack and his death.

1691.   Plaintiff Ms. Ashley Monschke is the daughter of SFC Monschke and a U.S. national.

1692.   Plaintiff Mrs. Patty Jett is the mother of SFC Monschke and a U.S. national.

1693.   As a result of the October 14, 2007 attack and SFC Monschke's injuries and death, each member of the Monschke Family has experienced severe mental anguish, emotional pain and suffering, and the loss of SFC Monschke's society, companionship, and counsel.

1694.   As a result of the October 14, 2007 attack, SFC Monschke was injured in his person and/or property. The Plaintiff members of the Monschke Family are the survivors and/or heirs of SFC Monschke and are entitled to recover for the damages SFC Monschke sustained.

**AAAA. The October 24, 2007 IED Attack In Nineveh (Robin L. Towns, Sr. Family)**

1695.   Sergeant First Class Robin L. Towns Sr. served in Iraq as a member of the U.S. military serving in the U.S. Army National Guard. On October 24, 2007, SFC Towns was injured

in an IED attack in Nineveh, Iraq.  SFC Towns died on October 24, 2007 as a result of injuries sustained during the attack.

1696.   The attack was committed by IRGC Sunni Terrorist Proxies, with material support and resources from the IRGC.

1697.   SFC Towns's murder would have violated the laws of war if these terrorists were subject to them because, among other reasons, the terrorist(s) who committed the attack neither wore uniforms nor otherwise identified themselves as enemy combatants, and the passive detonation system indiscriminately placed civilians at risk.

1698.   SFC Towns was a U.S. national at the time of the attack and his death.

1699.   Plaintiff Mrs. Shelia Towns is the widow of SFC Towns and a U.S. national.

1700.   As a result of the October 24, 2007 attack and SFC Towns's injuries and death, each member of the Towns Family has experienced severe mental anguish, emotional pain and suffering, and the loss of SFC Towns's society, companionship, and counsel.

1701.   As a result of the October 24, 2007 attack, SFC Towns was injured in his person and/or property. The Plaintiff members of the Towns Family are the survivors and/or heirs of SFC Towns and are entitled to recover for the damages SFC Towns sustained.

**BBBB. The November 14, 2007 IED Attack In Diyala (Kenneth R. Booker Family)**

1702.   Sergeant Kenneth Raymond Booker served in Iraq as a member of the U.S. military serving in the U.S. Army. On November 14, 2007, SGT Booker was injured in an IED attack in Diyala, Iraq.  SGT Booker died on November 14, 2007 as a result of injuries sustained during the attack.

1703.   The attack was committed by IRGC Sunni Terrorist Proxies, with material support and resources from the IRGC.

1704.   SGT Booker's murder would have violated the laws of war if these terrorists were subject to them because, among other reasons, the terrorist(s) who committed the attack neither wore uniforms nor otherwise identified themselves as enemy combatants, and the passive detonation system indiscriminately placed civilians at risk.

1705.   SGT Booker was a U.S. national at the time of the attack and his death.

1706.   Plaintiff Mr. Charles Booker is the father of SGT Booker and a U.S. national.

1707.   Plaintiff Mrs. Brenda Booker is the step-mother of SGT Booker and a U.S. national. Mrs. Booker lived in the same household as SGT Booker for a substantial time and considered SGT Booker the functional equivalent of a biological son.

1708.   As a result of the November 14, 2007 attack and SGT Booker's injuries and death, each member of the Booker Family has experienced severe mental anguish, emotional pain and suffering, and the loss of SGT Booker's society, companionship, and counsel.

1709.   As a result of the November 14, 2007 attack, SGT Booker was injured in his person and/or property. The Plaintiff members of the Booker Family are the survivors and/or heirs of SGT Booker and are entitled to recover for the damages SGT Booker sustained.

**CCCC. The December 20, 2007 Suicide Attack In Diyala (Jeremy E. Ray Family)**

1710.   First Lieutenant Jeremy Edward Ray served in Iraq as a member of the U.S. military serving in the U.S. Army. On December 20, 2007, 1LT Ray was injured in a suicide bomber attack in Diyala, Iraq.  1LT Ray died on December 20, 2007 as a result of injuries sustained during the attack.

1711.   The attack was committed by IRGC Sunni Terrorist Proxies, with material support and resources from the IRGC.

1712.   1LT Ray's murder would have violated the laws of war if these terrorists were subject to them because, among other reasons, the terrorist(s) who committed the attack neither wore uniforms nor otherwise identified themselves as enemy combatants.

1713.   1LT Ray was a U.S. national at the time of the attack and his death.

1714.   Plaintiff Ms. Deborah Ray is the mother of 1LT Ray and a U.S. national.

1715.   Plaintiff Mr. Walter Ray is the father of 1LT Ray and a U.S. national.

1716.   As a result of the December 20, 2007 attack and 1LT Ray's injuries and death, each member of the Ray Family has experienced severe mental anguish, emotional pain and suffering, and the loss of 1LT Ray's society, companionship, and counsel.

1717.   As a result of the December 20, 2007 attack, 1LT Ray was injured in his person and/or property. The Plaintiff members of the Ray Family are the survivors and/or heirs of 1LT Ray and are entitled to recover for the damages 1LT Ray sustained.

**DDDD. The January 5, 2008 IED Attack In Diyala (Jason F. Lemke Family)**

1718.   Corporal Jason Floyd Lemke served in Iraq as a member of the U.S. military serving in the U.S. Army. On January 5, 2008, CPL Lemke was injured in an IED attack in Diyala, Iraq.  CPL Lemke died on January 5, 2008 as a result of injuries sustained during the attack.

1719.   The attack was committed by IRGC Sunni Terrorist Proxies, with material support and resources from the IRGC.

1720.   CPL Lemke's murder would have violated the laws of war if these terrorists were subject to them because, among other reasons, the terrorist(s) who committed the attack neither wore uniforms nor otherwise identified themselves as enemy combatants, and the passive detonation system indiscriminately placed civilians at risk.

1721.   CPL Lemke was a U.S. national at the time of the attack and his death.

1722.   Plaintiff Ms. Jill Frederiksen is the sister of CPL Lemke and a U.S. national.

398

1723.   As a result of the January 5, 2008 attack and CPL Lemke's injuries and death, each member of the Lemke Family has experienced severe mental anguish, emotional pain and suffering, and the loss of CPL Lemke's society, companionship, and counsel.

1724.   As a result of the January 5, 2008 attack, CPL Lemke was injured in his person and/or property. The Plaintiff members of the Lemke Family are the survivors and/or heirs of CPL Lemke and are entitled to recover for the damages CPL Lemke sustained.

### EEEE. The January 9, 2008 IED Attack In Diyala (The Families of Jonathan K. Dozier, Zachary W. McBride, and Matthew I. Pionk)

1725.   On January 9, 2008, Iranian Sunni Terrorist Proxies committed an IED attack in Diyala, Iraq (the "January 9, 2008 IED Attack").

1726.   The January 9, 2008 IED Attack was committed by IRGC Sunni Terrorist Proxies, with material support and resources from the IRGC.

1727.   The January 9, 2008 IED Attack would have violated the laws of war if these terrorists were subject to them because, among other reasons, the terrorist(s) who committed the attack neither wore uniforms nor otherwise identified themselves as enemy combatants, and the passive detonation system indiscriminately placed civilians at risk.

### 1.    The Jonathan K. Dozier Family

1728.   Sergeant First Class Jonathan Kilian Dozier served in Iraq as a member of the U.S. military serving in the U.S. Army. SFC Dozier was injured in the January 9, 2008 IED Attack. SFC Dozier died on January 9, 2008 as a result of injuries sustained during the attack.

1729.   SFC Dozier was a U.S. national at the time of the attack and his death.

1730.   Plaintiff Ms. Martha Cabe is the mother of SFC Dozier and a U.S. national.

1731.   As a result of the January 9, 2008 IED Attack and SFC Dozier's injuries and death, each member of the Dozier Family has experienced severe mental anguish, emotional pain and suffering, and the loss of SFC Dozier's society, companionship, and counsel.

1732.   As a result of the January 9, 2008 IED Attack, SFC Dozier was injured in his person and/or property. The Plaintiff members of the Dozier Family are the survivors and/or heirs of SFC Dozier and are entitled to recover for the damages SFC Dozier sustained.

### 2.      The Zachary W. McBride Family

1733.   Sergeant Zachary Wade McBride served in Iraq as a member of the U.S. military serving in the U.S. Army. SGT McBride was injured in the January 9, 2008 IED Attack.  SGT McBride died on January 9, 2008 as a result of injuries sustained during the attack.

1734.   SGT McBride was a U.S. national at the time of the attack and his death.

1735.   Plaintiff Mrs. Laura McBride is the mother of SGT McBride and a U.S. national.

1736.   Plaintiff Mr. Marshall McBride is the father of SGT McBride and a U.S. national.

1737.   Plaintiff Ms. Sarah Lambert is the sister of SGT McBride and a U.S. national.

1738.   As a result of the January 9, 2008 IED Attack and SGT McBride's injuries and death, each member of the McBride Family has experienced severe mental anguish, emotional pain and suffering, and the loss of SGT McBride's society, companionship, and counsel.

1739.   As a result of the January 9, 2008 IED Attack, SGT McBride was injured in his person and/or property. The Plaintiff members of the McBride Family are the survivors and/or heirs of SGT McBride and are entitled to recover for the damages SGT McBride sustained.

### 3.      The Matthew I. Pionk Family

1740.   Sergeant First Class Matthew Ignatius Pionk served in Iraq as a member of the U.S. military serving in the U.S. Army. SFC Pionk was injured in the January 9, 2008 IED Attack.  SFC Pionk died on January 9, 2008 as a result of injuries sustained during the attack.

1741.   SFC Pionk was a U.S. national at the time of the attack and his death.

1742.   Plaintiff Ms. Melanie Pionk is the widow of SFC Pionk and a U.S. national.

1743.   Plaintiff Ms. Ashley Pionk is the daughter of SFC Pionk and a U.S. national.

1744.   Plaintiff B.P., by and through his next friend Melanie Pionk, is the son of SFC Pionk and a U.S. national.

1745.   Plaintiff Mr. Dillon Pionk is the son of SFC Pionk and a U.S. national.

1746.   Plaintiff Mr. Joshua Pionk is the brother of SFC Pionk and a U.S. national.

1747.   As a result of the January 9, 2008 IED Attack and SFC Pionk's injuries and death, each member of the Pionk Family has experienced severe mental anguish, emotional pain and suffering, and the loss of SFC Pionk's society, companionship, and counsel.

1748.   As a result of the January 9, 2008 IED Attack, SFC Pionk was injured in his person and/or property. The Plaintiff members of the Pionk Family are the survivors and/or heirs of SFC Pionk and are entitled to recover for the damages SFC Pionk sustained.

**FFFF. The January 12, 2008 IED Attack In Ninveh (Keith E. Lloyd Family)**

1749.   Private First Class Keith Everette Lloyd served in Iraq as a member of the U.S. military serving in the U.S. Army. On January 12, 2008, PFC Lloyd was injured in an IED attack in Nineveh, Iraq.  PFC Lloyd died on January 12, 2008 as a result of injuries sustained during the attack.

1750.   The attack was committed by IRGC Sunni Terrorist Proxies, with material support and resources from the IRGC.

1751.   PFC Lloyd's murder would have violated the laws of war if these terrorists were subject to them because, among other reasons, the terrorist(s) who committed the attack neither wore uniforms nor otherwise identified themselves as enemy combatants, and the passive detonation system indiscriminately placed civilians at risk.

1752.   PFC Lloyd was a U.S. national at the time of the attack and his death.

1753.   Plaintiff Mr. Thomas Lloyd is the brother of PFC Lloyd and a U.S. national.

1754.   As a result of the January 12, 2008 attack and PFC Lloyd's injuries and death, each member of the Keith E. Lloyd Family has experienced severe mental anguish, emotional pain and suffering, and the loss of PFC Lloyd's society, companionship, and counsel.

1755.   As a result of the January 12, 2008 attack, PFC Lloyd was injured in his person and/or property. The Plaintiff members of the Keith E. Lloyd Family are the survivors and/or heirs of PFC Lloyd and are entitled to recover for the damages PFC Lloyd sustained.

### GGGG. The January 28, 2008 IED Attack In Nineveh (The Families of James E. Craig, Evan A. Marshall, and Joshua A.R. Young)

1756.   On January 28, 2008, Iranian Sunni Terrorist Proxies committed an IED attack in Nineveh, Iraq (the "January 28, 2008 IED Attack").

1757.   The January 28, 2008 IED Attack was committed by IRGC Sunni Terrorist Proxies, with material support and resources from the IRGC.

1758.   The January 28, 2008 IED Attack would have violated the laws of war if these terrorists were subject to them because, among other reasons, the terrorist(s) who committed the attack neither wore uniforms nor otherwise identified themselves as enemy combatants, and the passive detonation system indiscriminately placed civilians at risk.

### 1.    The James E. Craig Family

1759.   Sergeant James Edward Craig served in Iraq as a member of the U.S. military serving in the U.S. Army. SGT Craig was injured in the January 28, 2008 IED Attack.  SGT Craig died on January 28, 2008 as a result of injuries sustained during the attack.

1760.   SGT Craig was a U.S. national at the time of the attack and his death.

1761.   Plaintiff Mrs. Natalie Jackson is the widow of SGT Craig and a U.S. national.

1762. Plaintiff Ms. Phyllis Craig is the mother of SGT Craig and a U.S. national.

1763. Plaintiff Mr. Joel Sexton-Craig is the father of SGT Craig and a U.S. national.

1764. Plaintiff Mrs. Kelly Inman is the sister of SGT Craig and a U.S. national.

1765. Plaintiff Ms. Menesia Spade is the sister of SGT Craig and a U.S. national.

1766. Plaintiff Ms. Rachael Putman is the sister of SGT Craig and a U.S. national.

1767. As a result of the January 28, 2008 IED Attack and SGT Craig's injuries and death, each member of the Craig Family has experienced severe mental anguish, emotional pain and suffering, and the loss of SGT Craig's society, companionship, and counsel.

1768. As a result of the January 28, 2008 IED Attack, SGT Craig was injured in his person and/or property. The Plaintiff members of the Craig Family are the survivors and/or heirs of SGT Craig and are entitled to recover for the damages SGT Craig sustained.

### 2. The Evan A. Marshall Family

1769. Corporal Evan Andrew Marshall served in Iraq as a member of the U.S. military serving in the U.S. Army. CPL Marshall was injured in the January 28, 2008 IED Attack. CPL Marshall died on January 28, 2008 as a result of injuries sustained during the attack.

1770. CPL Marshall was a U.S. national at the time of the attack and his death.

1771. Plaintiff Ms. Sheila Marshall is the mother of CPL Marshall and a U.S. national.

1772. Plaintiff Mr. Andrew Marshall is the father of CPL Marshall and a U.S. national.

1773. As a result of the January 28, 2008 IED Attack and CPL Marshall's injuries and death, each member of the Marshall Family has experienced severe mental anguish, emotional pain and suffering, and the loss of CPL Marshall's society, companionship, and counsel.

1774. As a result of the January 28, 2008 IED Attack, CPL Marshall was injured in his person and/or property. The Plaintiff members of the Marshall Family are the survivors and/or heirs of CPL Marshall and are entitled to recover for the damages CPL Marshall sustained.

### 3.    The Joshua A.R. Young Family

1775.    Private First Class Joshua Anthony Richard Young served in Iraq as a member of the U.S. military serving in the U.S. Army. PFC Young was injured in the January 28, 2008 IED Attack.  PFC Young died on January 28, 2008 as a result of injuries sustained during the attack.

1776.    PFC Young was a U.S. national at the time of the attack and his death.

1777.    Plaintiff Ms. Brandi Yanez is the sister of PFC Young and a U.S. national.

1778.    As a result of the January 28, 2008 IED Attack and PFC Young's injuries and death, each member of the Young Family has experienced severe mental anguish, emotional pain and suffering, and the loss of PFC Young's society, companionship, and counsel.

1779.    As a result of the January 28, 2008 IED Attack, PFC Young was injured in his person and/or property. The Plaintiff members of the Young Family are the survivors and/or heirs of PFC Young and are entitled to recover for the damages PFC Young sustained.

### HHHH. The March 10, 2008 IED Attack In Diyala (The Families of Phillip R. Anderson and Torre R. Mallard)

1780.    On March 10, 2008, Iranian Sunni Terrorist Proxies committed an IED attack in Diyala, Iraq (the "March 10, 2008 IED Attack").

1781.    The March 10, 2008 IED Attack was committed by IRGC Sunni Terrorist Proxies, with material support and resources from the IRGC.

1782.    The March 10, 2008 IED Attack would have violated the laws of war if these terrorists were subject to them because, among other reasons, the terrorist(s) who committed the attack neither wore uniforms nor otherwise identified themselves as enemy combatants, and the passive detonation system indiscriminately placed civilians at risk.

404

### 1. The Phillip R. Anderson Family

1783. Sergeant Phillip R. Anderson served in Iraq as a member of the U.S. military serving in the U.S. Army. SGT Anderson was injured the March 10, 2008 IED Attack. SGT Anderson died on March 10, 2008 as a result of injuries sustained during the attack.

1784. SGT Anderson was a U.S. national at the time of the attack and his death.

1785. Plaintiff Mr. Kenneth Anderson is the father of SGT Anderson and a U.S. national.

1786. As a result of the March 10, 2008 IED Attack and SGT Anderson's injuries and death, each member of the Phillip R. Anderson Family has experienced severe mental anguish, emotional pain and suffering, and the loss of SGT Anderson's society, companionship, and counsel.

1787. As a result of the March 10, 2008 IED Attack, SGT Anderson was injured in his person and/or property. The Plaintiff members of the Phillip R. Anderson Family are the survivors and/or heirs of SGT Anderson and are entitled to recover for the damages SGT Anderson sustained.

### 2. The Torre R. Mallard Family

1788. Captain Torre Ramoine Mallard served in Iraq as a member of the U.S. military serving in the U.S. Army. CPT Mallard was injured in the March 10, 2008 IED Attack. CPT Mallard died on March 10, 2008 as a result of injuries sustained during the attack.

1789. CPT Mallard was a U.S. national at the time of the attack and his death.

1790. Plaintiff Ms. Robin Mallard is the mother of CPT Mallard and a U.S. national.

1791. Plaintiff Mr. Mose Mallard III is the father of CPT Mallard and a U.S. national.

1792. Plaintiff Mr. Terrence Mallard is the brother of CPT Mallard and a U.S. national.

1793.   As a result of the March 10, 2008 IED Attack and CPT Mallard's injuries and death, each member of the Mallard Family has experienced severe mental anguish, emotional pain and suffering, and the loss of CPT Mallard's society, companionship, and counsel.

1794.   As a result of the March 10, 2008 IED Attack, CPT Mallard was injured in his person and/or property. The Plaintiff members of the Mallard Family are the survivors and/or heirs of CPT Mallard and are entitled to recover for the damages CPT Mallard sustained.

**IIII. The March 30, 2008 IED Attack In Al Anbar (William G. Hall Family)**

1795.   Lieutenant Colonel William Gregory Hall served in Iraq as a member of the U.S. military serving in the U.S. Marine Corps. On March 30, 2008, LtCol Hall was injured in an IED attack in Al Anbar.  LtCol Hall died on March 30, 2008 as a result of injuries sustained during the attack.

1796.   The attack was committed by IRGC Sunni Terrorist Proxies, with material support and resources from the IRGC.

1797.   LtCol Hall's murder would have violated the laws of war if these terrorists were subject to them because, among other reasons, the terrorist(s) who committed the attack neither wore uniforms nor otherwise identified themselves as enemy combatants, and the passive detonation system indiscriminately placed civilians at risk.

1798.   LtCol Hall was a U.S. national at the time of the attack and his death.

1799.   Plaintiff Ms. Xiomara Hall is the widow of LtCol Hall and a U.S. national.

1800.   Plaintiff G.H., by and through her next friend Xiomara Hall, is the minor daughter of LtCol Hall and a U.S. national.

1801.   Plaintiff Ms. Mildred Hall is the mother of LtCol Hall and a U.S. national.

1802.   Plaintiff Mrs. Dolores Wilson is the sister of LtCol Hall and a U.S. national.

1803.   Plaintiff Ms. Margie Bell is the sister of LtCol Hall and a U.S. national.

1804. Plaintiff Mr. Cristian Arias is the step-son of LtCol Hall and a U.S. national. Mr. Arias lived in the same household as LtCol Hall for a substantial time and considered LtCol Hall the functional equivalent of a biological father.

1805. Plaintiff Mr. Xavier Arias is the step-son of LtCol Hall and a U.S. national. Mr. Arias lived in the same household as LtCol Hall for a substantial time and considered LtCol Hall the functional equivalent of a biological father.

1806. As a result of the March 30, 2008 attack and LtCol Hall's injuries and death, each member of the William G. Hall Family has experienced severe mental anguish, emotional pain and suffering, and the loss of LtCol Hall's society, companionship, and counsel.

1807. As a result of the March 30, 2008 attack, LtCol Hall was injured in his person and/or property. The Plaintiff members of the William G. Hall Family are the survivors and/or heirs of LtCol Hall and are entitled to recover for the damages LtCol Hall sustained.

**JJJJ. The April 9, 2008 IED Attack in Saladin (Anthony L. Capra, Jr. Family)**

1808. Technical Sergeant Anthony ("Tony") L. Capra, Jr. served in Iraq in the U.S. Air Force. On April 9, 2008, Tech. Sgt. Capra was injured in an IED attack in Golden Hills in Saladin Province, Iraq. Tech. Sgt. Capra died on April 9, 2008 as a result of injuries sustained during the attack.

1809. The attack was committed by IRGC Sunni Terrorist Proxies, with material support and resources from the IRGC.

1810. Tech. Sgt. Capra's murder would have violated the laws of war if these terrorists were subject to them because, among other reasons, the terrorist(s) who committed the attack neither wore uniforms nor otherwise identified themselves as enemy combatants, and the passive detonation system indiscriminately placed civilians at risk.

1811. Tech. Sgt. Capra was a U.S. national at the time of the attack and his death.

407

1812.    Plaintiff Angie Capra is the widow of Tech. Sgt. Capra and a U.S. national.

1813.    Plaintiff Anthony ("Tony") Capra, Sr. is the father of Tech. Sgt. Capra and a U.S. national.

1814.    Plaintiff Sharon Capra is the mother of Tech. Sgt. Capra and a U.S. national.

1815.    Plaintiff Mark Capra is the son of Tech. Sgt. Capra and a U.S. national.

1816.    Plaintiff Victoria Capra is the daughter of Tech. Sgt. Capra and a U.S. national.

1817.    Plaintiff A.C., by and through her next friend Angie Capra, is the minor daughter of Tech. Sgt. Capra and a U.S. national.

1818.    Plaintiff J.C., by and through his next friend Angie Capra, is the minor son of Tech. Sgt. Capra and a U.S. national.

1819.    Plaintiff S.C., by and through his next friend Angie Capra, is the minor son of Tech. Sgt. Capra and a U.S. national.

1820.    Plaintiff Danielle Capra is the sister of Tech. Sgt. Capra and a U.S. national.

1821.    Plaintiff Emily Capra is the sister of Tech. Sgt. Capra and a U.S. national.

1822.    Plaintiff Jacob Capra is the brother of Tech. Sgt. Capra and a U.S. national.

1823.    Plaintiff Joanna Capra is the sister of Tech. Sgt. Capra and a U.S. national.

1824.    Plaintiff Joseph Capra is the brother of Tech. Sgt. Capra and a U.S. national.

1825.    Plaintiff Julia-Anne Capra is the sister of Tech. Sgt. Capra and a U.S. national.

1826.    Plaintiff Michael Capra is the brother of Tech. Sgt. Capra and a U.S. national.

1827.    Plaintiff Rachel Lee is the sister of Tech. Sgt. Capra and a U.S. national.

1828.    Plaintiff Sarah Johnson is the sister of Tech. Sgt. Capra and a U.S. national.

1829.   As a result of the April 9, 2008 attack and Tech. Sgt. Capra's injuries and death, each member of the Capra Family has experienced severe mental anguish, emotional pain and suffering, and the loss of Tech. Sgt. Capra's society, companionship, and counsel.

1830.   As a result of the April 9, 2008 attack, Tech. Sgt. Capra was injured in his person and/or property. The Plaintiff members of the Capra are the survivors and/or heirs of Tech. Sgt. Capra and are entitled to recover for the damages Tech. Sgt. Capra sustained.

**KKKK. The April 14, 2008 IED Attack In Al Anbar (Dean D. Opicka Family)**

1831.   Lance Corporal Dean D. Opicka served in Iraq as a member of the U.S. military serving in the U.S. Marine Corps Reserve. On April 14, 2008, LCpl Opicka was injured in an IED attack in Al Anbar.  LCpl Opicka died on April 14, 2008 as a result of injuries sustained during the attack.

1832.    The attack was committed by IRGC Sunni Terrorist Proxies, with material support and resources from the IRGC.

1833.   LCpl Opicka's murder would have violated the laws of war if these terrorists were subject to them because, among other reasons, the terrorist(s) who committed the attack neither wore uniforms nor otherwise identified themselves as enemy combatants, and the passive detonation system indiscriminately placed civilians at risk.

1834.   LCpl Opicka was a U.S. national at the time of the attack and his death.

1835.   Plaintiff Ms. Donna Opicka is the mother of LCpl Opicka and a U.S. national.

1836.   Plaintiff Mr. Daniel Opicka is the brother of LCpl Opicka and a U.S. national.

1837.   As a result of the April 14, 2008 attack and LCpl Opicka's injuries and death, each member of the Opicka Family has experienced severe mental anguish, emotional pain and suffering, and the loss of LCpl Opicka's society, companionship, and counsel.

1838.   As a result of the April 14, 2008 attack, LCpl Opicka was injured in his person and/or property. The Plaintiff members of the Opicka Family are the survivors and/or heirs of LCpl Opicka and are entitled to recover for the damages LCpl Opicka sustained.

**LLLL. The June 25, 2008 IED Attack In Nineveh (Alejandro A. Dominguez Family)**

1839.   Sergeant Alejandro A. Dominguez served in Iraq as a member of the U.S. military serving in the U.S. Army. On June 25, 2008, SGT Dominguez was injured in an IED attack in Nineveh, Iraq.  SGT Dominguez died on June 25, 2008 as a result of injuries sustained during the attack.

1840.   The attack was committed by IRGC Sunni Terrorist Proxies, with material support and resources from the IRGC.

1841.   SGT Dominguez's murder would have violated the laws of war if these terrorists were subject to them because, among other reasons, the terrorist(s) who committed the attack neither wore uniforms nor otherwise identified themselves as enemy combatants, and the passive detonation system indiscriminately placed civilians at risk.

1842.   SGT Dominguez was a U.S. national at the time of the attack and his death.

1843.   Plaintiff I.O., by and through his next friend Julia Ward, is the minor son of SGT Dominguez and a U.S. national.

1844.   Plaintiff Ms. Elia Dominguez is the mother of SGT Dominguez.  She is, and has been at all relevant times, a permanent resident of the United States.

1845.   Plaintiff Mr. Antonio Dominguez is the father of SGT Dominguez and a U.S. national.

1846.   Plaintiff Mrs. Elia Ortiz is the sister of SGT Dominguez and a U.S. national.

410

1847.   As a result of the June 25, 2008 attack and SGT Dominguez's injuries and death, each member of the Dominguez Family has experienced severe mental anguish, emotional pain and suffering, and the loss of SGT Dominguez's society, companionship, and counsel.

1848.   As a result of the June 25, 2008 attack, SGT Dominguez was injured in his person and/or property. The Plaintiff members of the Dominguez Family are the survivors and/or heirs of SGT Dominguez and are entitled to recover for the damages SGT Dominguez sustained.

**MMMM. The September 24, 2008 Suicide Attack In Diyala (Michael J. Medders Family)**

1849.   Captain Michael Joseph Medders served in Iraq as a member of the U.S. military serving in the U.S. Army. On September 24, 2008, CPT Medders was injured in a suicide bomber attack in Diyala, Iraq.  CPT Medders died on September 24, 2008 as a result of injuries sustained during the attack.

1850.   The attack was committed by IRGC Sunni Terrorist Proxies, with material support and resources from the IRGC.

1851.   CPT Medders's murder would have violated the laws of war if these terrorists were subject to them because, among other reasons, the terrorist(s) who committed the attack neither wore uniforms nor otherwise identified themselves as enemy combatants. CPT Medders was a U.S. national at the time of the attack and his death.

1852.   Plaintiff Mrs. Katherine Shrader is the sister of CPT Medders and a U.S. national.

1853.   As a result of the September 24, 2008 attack and CPT Medders's injuries and death, each member of the Medders Family has experienced severe mental anguish, emotional pain and suffering, and the loss of CPT Medders's society, companionship, and counsel.

1854.   As a result of the September 24, 2008 attack, CPT Medders was injured in his person and/or property. The Plaintiff members of the Medders Family are the survivors and/or heirs of CPT Medders and are entitled to recover for the damages CPT Medders sustained.

**NNNN. The November 14, 2008 IED Attack In Al Anbar (Aaron M. Allen Family)**

1855.   Corporal Aaron Michael Allen served in Iraq as a member of the U.S. military serving in the U.S. Marine Corps. On November 14, 2008, Cpl Allen was injured in an IED attack in Al Anbar.  Cpl Allen died on November 14, 2008 as a result of injuries sustained during the attack.

1856.    The attack was committed by IRGC Sunni Terrorist Proxies, with material support and resources from the IRGC.

1857.   Cpl Allen's murder would have violated the laws of war if these terrorists were subject to them because, among other reasons, the terrorist(s) who committed the attack neither wore uniforms nor otherwise identified themselves as enemy combatants, and the passive detonation system indiscriminately placed civilians at risk.

1858.   Cpl Allen was a U.S. national at the time of the attack and his death.

1859.   Plaintiff Ms. Mary Allen is the mother of Cpl Allen and a U.S. national.

1860.   As a result of the November 14, 2008 attack and Cpl Allen's injuries and death, each member of the Allen Family has experienced severe mental anguish, emotional pain and suffering, and the loss of Cpl Allen's society, companionship, and counsel.

1861.   As a result of the November 14, 2008 attack, Cpl Allen was injured in his person and/or property. The Plaintiff members of the Allen Family are the survivors and/or heirs of Cpl Allen and are entitled to recover for the damages Cpl Allen sustained.

**OOOO. The December 4, 2008 Suicide Attack In Nineveh (John J. Savage Family)**

1862.   Sergeant John Jared Savage served in Iraq as a member of the U.S. military serving in the U.S. Army. On December 4, 2008, SGT Savage was injured in a suicide bomber attack in Nineveh, Iraq.  SGT Savage died on December 4, 2008 as a result of injuries sustained during the attack.

1863.   The attack was committed by IRGC Sunni Terrorist Proxies, with material support and resources from the IRGC.

1864.   SGT Savage's murder would have violated the laws of war if these terrorists were subject to them because, among other reasons, the terrorist(s) who committed the attack neither wore uniforms nor otherwise identified themselves as enemy combatants.

1865.   SGT Savage was a U.S. national at the time of the attack and his death.

1866.   Plaintiff Mr. John Savage is the father of SGT Savage and a U.S. national.

1867.   As a result of the December 4, 2008 attack and SGT Savage's injuries and death, each member of the Savage Family has experienced severe mental anguish, emotional pain and suffering, and the loss of SGT Savage's society, companionship, and counsel.

1868.   As a result of the December 4, 2008 attack, SGT Savage was injured in his person and/or property. The Plaintiff members of the Savage Family are the survivors and/or heirs of SGT Savage and are entitled to recover for the damages SGT Savage sustained.

**PPPP. The April 10, 2009 Suicide Attack In Nineveh (The Families of Edward W. Forrest, Jr., Bryan E. Hall, Jason G. Pautsch, and Gary L. Woods, Jr.)**

1869.   On April 10, 2009, Iranian Sunni Terrorist Proxies committed a suicide bomber attack in Nineveh, Iraq (the "April 10, 2009 Attack").

1870.   The April 10, 2009 Attack was committed by IRGC Sunni Terrorist Proxies, with material support and resources from the IRGC.

### 1.  The Edward W. Forrest, Jr. Family

1871.  Sergeant Edward W. Forrest Jr. served in Iraq as a member of the U.S. military serving in the U.S. Army. SGT Forrest was injured in the April 10, 2009 Attack.  SGT Forrest died on April 10, 2009 as a result of injuries sustained during the attack.

1872.  SGT Forrest was a U.S. national at the time of the attack and his death.

1873.  Plaintiff Ms. Stephanie Forrest is the widow of SGT Forrest and a U.S. national.

1874.  Plaintiff B.F., by and through his next friend Stephanie Forrest, is the minor son of SGT Forrest and a U.S. national.

1875.  Plaintiff J.F., by and through his next friend Stephanie Forrest, is the minor son of SGT Forrest and a U.S. national.

1876.  As a result of the April 10, 2009 Attack and SGT Forrest's injuries and death, each member of the Forrest Family has experienced severe mental anguish, emotional pain and suffering, and the loss of SGT Forrest's society, companionship, and counsel.

1877.  As a result of the April 10, 2009 Attack, SGT Forrest was injured in his person and/or property. The Plaintiff members of the Forrest Family are the survivors and/or heirs of SGT Forrest and are entitled to recover for the damages SGT Forrest sustained.

### 2.  The Bryan E. Hall Family

1878.  Sergeant First Class Bryan Edward Hall served in Iraq as a member of the U.S. military serving in the U.S. Army. SFC Hall was injured the April 10, 2009 Attack.  SFC Hall died on April 10, 2009 as a result of injuries sustained during the attack.

1879.  SFC Hall was a U.S. national at the time of the attack and his death.

1880.  Plaintiff Ms. Rachel Hall is the widow of SFC Hall and a U.S. national.

1881.  Plaintiff A.H., by and through her next friend Rachel Hall, is the minor daughter of SFC Hall and a U.S. national.

1882.   As a result of the April 10, 2009 Attack and SFC Hall's injuries and death, each member of the Hall Family has experienced severe mental anguish, emotional pain and suffering, and the loss of SFC Hall's society, companionship, and counsel.

1883.   As a result of the April 10, 2009 Attack, SFC Hall was injured in his person and/or property. The Plaintiff members of the Bryan E. Hall Family are the survivors and/or heirs of SFC Hall and are entitled to recover for the damages SFC Hall sustained.

### 3.   The Jason G. Pautsch Family

1884.   Corporal Jason Graham Pautsch served in Iraq as a member of the U.S. military serving in the U.S. Army. CPL Pautsch was injured in the April 10, 2009 Attack.  CPL Pautsch died on April 10, 2009 as a result of injuries sustained during the attack.

1885.   CPL Pautsch was a U.S. national at the time of the attack and his death.

1886.   Plaintiff Mr. Josef Pautsch is the brother of CPL Pautsch and a U.S. national.

1887.   As a result of the April 10, 2009 Attack and CPL Pautsch's injuries and death, each member of the Pautsch Family has experienced severe mental anguish, emotional pain and suffering, and the loss of CPL Pautsch's society, companionship, and counsel.

1888.   As a result of the April 10, 2009 Attack, CPL Pautsch was injured in his person and/or property. The Plaintiff members of the Pautsch Family are the survivors and/or heirs of CPL Pautsch and are entitled to recover for the damages CPL Pautsch sustained.

### 4.   The Gary L. Woods, Jr. Family

1889.   Staff Sergeant Gary Lee Woods Jr. served in Iraq as a member of the U.S. military serving in the U.S. Army. SSG Woods was injured in the April 10, 2009 Attack.  SSG Woods died on April 10, 2009 as a result of injuries sustained during the attack.

1890.   SSG Woods was a U.S. national at the time of the attack and his death.

1891.   Plaintiff Ms. Becky Johnson is the mother of SSG Woods and a U.S. national.

1892.   Plaintiff Ms. Britteny Woods is the sister of SSG Woods and a U.S. national.

1893.   As a result of the April 10, 2009 Attack and SSG Woods's injuries and death, each member of the Woods Family has experienced severe mental anguish, emotional pain and suffering, and the loss of SSG Woods's society, companionship, and counsel.

1894.   As a result of the April 10, 2009 Attack, SSG Woods was injured in his person and/or property. The Plaintiff members of the Woods Family are the survivors and/or heirs of SSG Woods and are entitled to recover for the damages SSG Woods sustained.

**QQQQ. The July 21, 2010 IED Attack In Diyala (Michael L. Runyan Family)**

1895.   First Lieutenant Michael Louis Runyan served in Iraq as a member of the U.S. military serving in the U.S. Army. On July 21, 2010, 1LT Runyan was injured in an IED attack in Diyala, Iraq.  1LT Runyan died on July 21, 2010 as a result of injuries sustained during the attack.

1896.   The attack was committed by IRGC Sunni Terrorist Proxies, with material support and resources from the IRGC.

1897.   1LT Runyan's murder would have violated the laws of war if these terrorists were subject to them because, among other reasons, the terrorist(s) who committed the attack neither wore uniforms nor otherwise identified themselves as enemy combatants, and the passive detonation system indiscriminately placed civilians at risk.

1898.   1LT Runyan was a U.S. national at the time of the attack and his death.

1899.   Plaintiff Mr. Alex Runyan is the brother of 1LT Runyan and a U.S. national.

1900.   As a result of the July 21, 2010 attack and 1LT Runyan's injuries and death, each member of the Runyan Family has experienced severe mental anguish, emotional pain and suffering, and the loss of 1LT Runyan's society, companionship, and counsel.

1901.   As a result of the July 21, 2010 attack, 1LT Runyan was injured in his person and/or property. The Plaintiff members of the Runyan Family are the survivors and/or heirs of 1LT Runyan and are entitled to recover for the damages 1LT Runyan sustained.

## XI.   THE ISLAMIC REVOLUTIONARY GUARD CORPS, AL-QAEDA, AND THEIR AFFILIATES KILLED AND INJURED PLAINTIFFS AND THEIR FAMILY MEMBERS THROUGH ACTS OF INTERNATIONAL TERRORISM IN AFGHANISTAN THAT RELIED UPON THE MATERIAL SUPPORT OF THE ISLAMIC REVOLUTIONARY GUARD CORPS, AL-QAEDA, AL-QAEDA-IN-IRAQ, AND THE TALIBAN

1902.   The **Afghanistan Plaintiffs** are American civilians, servicemembers, and contractors serving in Afghanistan, and their family members, who were killed or injured in terrorist attacks committed by al-Qaeda, the Taliban, including its Haqqani Network, or other al-Qaeda affiliates that were members of the al-Qaeda/Taliban Syndicate, all of which Hezbollah, the Qods Force, and the Regular IRGC funded, armed, and logistically supported through the illicit MTN Irancell, TCI, and MCI cash and technology flows enabled by Defendants.

1903.   Each Plaintiff who suffered injury because of an attack by the al-Qaeda/Taliban Syndicate in Afghanistan from 2007 through 2011 was injured because of Defendants' direct aid to Hezbollah, the Qods Force, and the Regular IRGC, all of which flowed through such IRGC components to aid the al-Qaeda/Taliban Syndicate in Afghanistan as they executed their nationwide anti-American terror campaign to expel the United States from the country.

1904.   The IRGC provided key aid to the al-Qaeda/Taliban Syndicate from 2006 through today.  The IRGC specifically provided al-Qaeda and the Taliban, including its Haqqani Network, weapons, funds, training, logistical support, communications technology, safe haven, and assistance with narcotics trafficking, which raised money for their shared terrorist enterprise against America, all of which al-Qaeda and its allies used to fund and execute the al-Qaeda/Taliban Syndicate attacks in Afghanistan that injured Plaintiffs.

417

1905.   The embargoed dual-use American technology – including thousands of secure American smartphones every year – hundreds of millions of U.S. Dollars annually, and vast network of logistical and operational support for the Irancell and TCI fronts that MTN Group provided to their counterparties controlled by the IRGC flowed through to al-Qaeda, the Taliban, including its Haqqani Network, and injured each Plaintiff through transfers made by the IRGC to the al-Qaeda/Taliban Syndicate

**A.    The April 12, 2007 IED Attack In Ghazni (The Families of Casey D. Combs And David Alexander Stephens)**

1906.   On April 12, 2007 the Haqqani Network, a part of the Taliban, committed an IED attack in Ghazni Province, Afghanistan (the "April 12, 2007 IED Attack").

1907.   On information and belief, the bomb that the Taliban detonated during the attack was:  (i) based on a signature al-Qaeda IED design; (ii) assembled and tested by al-Qaeda bombmakers at one of al-Qaeda's IED manufacturing sites managed and funded by al-Qaeda/Taliban terrorist Sirajuddin Haqqani; (iii) designed to detonate precursor ingredients that were "cooked" by al-Qaeda chemists; and (iv) provided to the Taliban by al-Qaeda operatives in order to facilitate the Taliban's attack.

1908.   The April 12, 2007 IED Attack would have violated the laws of war if these terrorists were subject to them because, among other reasons, the terrorist(s) who committed the attack neither wore uniforms nor otherwise identified themselves as enemy combatants.

**1.    The Casey D. Combs Family**

1909.   Staff Sergeant Casey D. Combs served in Afghanistan as a member of the U.S. Army.  On April 12, 2007, SSG Combs was injured in the April 12, 2007 IED Attack SSG Combs died on April 12, 2007 as a result of injuries sustained during the attack.

1910.   SSG Combs was a U.S. national at the time of the attack and his death.

1911.   Plaintiff Amber Dawn Moreland is the widow of SSG Combs and a U.S. national.

1912.   Plaintiff T.D.C., by and through his next friend Amber Dawn Moreland, is the minor son of SSG Combs and a U.S. national.

1913.   Plaintiff Hallie May Combs is the daughter of SSG Combs and a U.S. national.

1914.   As a result of the April 12, 2007 Attack, SSgt Combs was injured in his person and/or property. The Plaintiff members of the Combs Family are the survivors and/or heirs of SSgt Combs and are entitled to recover for the damages Combs sustained.

1915.   As a result of the April 12, 2007 Attack and SSG Combs's injuries and death, each member of the Combs Family has experienced severe mental anguish, emotional pain and suffering.

## 2.      The David Alexander Stephens Family

1916.   Sergeant David Alexander Stephens served in Afghanistan as a member of the U.S. Army.  On April 12, 2007, SGT Stephens was injured in an the April 12, 2007 Attack.  SGT Stephens died on April 12, 2007 as a result of injuries sustained during the attack.

1917.   SGT Stephens was a U.S. national at the time of the attack and his death.

1918.   Plaintiff Megan Stephens is the widow of SGT Stephens and a U.S. national.

1919.   Plaintiff S.M.S., by and through her next friend Megan Stephens, is the minor daughter of SGT Stephens and a U.S. national.

1920.   As a result of the April 12, 2007 Attack and SGT Stephens's injuries and death, each member of the Stephens Family has experienced severe mental anguish, emotional pain and suffering.

### B.     The May 30, 2007 Rocket Propelled Grenade Attack in Helmand (The Jesse Blamires Family)

1921.   On May 30, 2007 the Taliban committed a rocket propelled grenade attack in Helmand Province, Afghanistan. ("May 30, 2007 Attack").

1922.   The May 30, 2007 Attack would have violated the laws of war if these terrorists were subject to them because, among other reasons, the terrorist(s) who committed the attack neither wore uniforms nor otherwise identified themselves as enemy combatants.

1923.   Sergeant Jesse Blamires served in Afghanistan as a member of the U.S. Army. On May 30, 2007, SGT Blamires was injured in the May 30, 2007 Attack.  SGT Blamires died on May 30, 2007 as a result of injuries sustained during the attack.

1924.   SGT Blamires was a U.S. national at the time of the attack and his death.

1925.   Plaintiff Kimberly Robin Blamires is the widow of SGT Blamires and a U.S. national.

1926.   Plaintiff D.L.B., by and through her next friend Kimberly Robin Blamires, is the minor daughter of SGT Blamires and a U.S. national.

1927.   Plaintiff Kalli Brianna Blamires is the daughter of SGT Blamires and a U.S. national.

1928.   Plaintiff Craig Allen Blamires is the father of SGT Blamires and a U.S. national.

1929.   Plaintiff Sandra Lee Blamires is the mother of SGT Blamires and a U.S. national.

1930.   Plaintiff Beau Allen Blamires is the brother of SGT Blamires and a U.S. national.

1931.   Plaintiff Eric Shawn Allen Blamires is the brother of SGT Blamires and a U.S. national.

1932.   Plaintiff Ethan Allen Blamires is the brother of SGT Blamires and a U.S. national.

1933.   Plaintiff Neil Allen Blamires is the brother of SGT Blamires and a U.S. national.

1934.   Plaintiff Julie Jeanne McGraw is the sister of SGT Blamires and a U.S. national.

1935.   As a result of the May 30, 2007 Attack and SGT Blamires's injuries and death, each member of the Blamires Family has experienced severe mental anguish, emotional pain and suffering.

### C.   The June 9, 2007 IED Attack In Khost (The Darryl Wallace Family)

1936.   On June 9, 2007, the Haqqani Network, a part of the Taliban, committed an IED attack in Khost Province, Afghanistan (the "June 9, 2007 Attack").

1937.   On information and belief, the bomb that the Taliban detonated during the attack was:  (i) based on a signature al-Qaeda IED design; (ii) assembled and tested by al-Qaeda bombmakers at one of al-Qaeda's IED manufacturing sites managed and funded by al-Qaeda/Taliban terrorist Sirajuddin Haqqani; (iii) designed to detonate precursor ingredients that were "cooked" by al-Qaeda chemists; and (iv) provided to the Taliban by al-Qaeda operatives in order to facilitate the Taliban's attack.

1938.   The June 9, 2007 Attack would have violated the laws of war if these terrorists were subject to them because, among other reasons, the terrorist(s) who committed the attack neither wore uniforms nor otherwise identified themselves as enemy combatants.

1939.   Plaintiff Sergeant Darryl Wallace served in Afghanistan as a member of the U.S. Army.  On June 9, 2007, SGT Wallace was injured in the June 9, 2007 Attack.  The attack severely wounded SGT Wallace, who lost both of his legs and suffered from crushed hips and pelvis, a broken lower back, a ruptured spleen, a broken left forearm requiring metal plates and over 100 screws, crushed facial bones requiring reconstructive surgery, and post-traumatic stress disorder.  As a result of the June 9, 2007 attack and his injuries, SGT Wallace has experienced severe physical and emotional pain and suffering.

1940.    SGT Wallace was a U.S. national at the time of the attack, and remains one to this day.

1941.    Plaintiff Tiffany Wallace is the wife of SGT Wallace and a U.S. national.

1942.    Plaintiff C.W., by and through his next friend Tiffany Wallace, is the minor son of SGT Wallace and a U.S. national.

1943.    As a result of the June 9, 2007 Attack and SGT Wallace's injuries, each member of the Blamires Family has experienced severe mental anguish, emotional pain and suffering.

**D.    The June 17, 2007 IED Attack In Kandahar (The Christopher D. Henderson Family)**

1944.    On June 17, 2007, the Taliban committed an IED attack in Kandahar Province, Afghanistan (the "June 17, 2007 Attack").

1945.    On information and belief, the bomb that the Taliban detonated during the attack was:  (i) based on a signature al-Qaeda IED design; (ii) assembled and tested by al-Qaeda bombmakers at one of al-Qaeda's IED manufacturing sites managed and funded by al-Qaeda/Taliban terrorist Sirajuddin Haqqani; (iii) designed to detonate precursor ingredients that were "cooked" by al-Qaeda chemists; and (iv) provided to the Taliban by al-Qaeda operatives in order to facilitate the Taliban's attack.

1946.    The June 9, 2007 Attack would have violated the laws of war if these terrorists were subject to them because, among other reasons, the terrorist(s) who committed the attack neither wore uniforms nor otherwise identified themselves as enemy combatants.

1947.    Sergeant First Class Christopher D. Henderson served in Afghanistan as a member of the U.S. Army.  On June 17, 2007, SFC Henderson was injured in the June 9, 2007. SFC Henderson died on June 17, 2007 as a result of injuries sustained during the attack.

1948.    SFC Henderson was a U.S. national at the time of the attack and his death.

1949.   Plaintiff James D. Henderson is the father of SFC Henderson and a U.S. national.

1950.   Plaintiff Cynthia Henderson is the mother of SFC Henderson and a U.S. national.

1951.   Plaintiff Athena Gordon is the sister of SFC Henderson and a U.S. national.

1952.   As a result of the June 17, 2007 Attack and SFC Henderson's injuries and death, each member of the Henderson Family has experienced severe mental anguish, emotional pain and suffering.

### E.   The July 6, 2007 IED Attack In Paktika (The Thomas P. McGee Family)

1953.   On July 6, 2007, the Haqqani Network, a part of the Taliban, committed an IED attack in Paktika Province, Afghanistan (the "July 6, 2007 Attack").

1954.   On information and belief, the bomb that the Taliban detonated during the attack was:  (i) based on a signature al-Qaeda IED design; (ii) assembled and tested by al-Qaeda bombmakers at one of al-Qaeda's IED manufacturing sites managed and funded by al-Qaeda/Taliban terrorist Sirajuddin Haqqani; (iii) designed to detonate precursor ingredients that were "cooked" by al-Qaeda chemists; and (iv) provided to the Taliban by al-Qaeda operatives in order to facilitate the Taliban's attack.

1955.   The July 6, 2007 Attack would have violated the laws of war if these terrorists were subject to them because, among other reasons, the terrorist(s) who committed the attack neither wore uniforms nor otherwise identified themselves as enemy combatants.

1956.   Sergeant Thomas P. McGee served in Afghanistan as a member of the U.S. Army. On July 6, 2007, SGT McGee was injured in the July 6, 2007 Attack.  SGT McGee died on July 6, 2007 as a result of injuries sustained during the attack

1957.   SGT McGee was a U.S. national at the time of the attack and his death.

1958.   Plaintiff Sylvia McGee is the mother of SGT McGee and a U.S. national.

1959.   Plaintiff Thomas McGee is the father of SGT McGee and a U.S. national.

1960.   Plaintiff Corey McGee is the brother of SGT McGee and a U.S. national.

1961.   As a result of the July 6, 2007 Attack and SGT McGee's injuries and death, each member of the McGee Family has experienced severe mental anguish, emotional pain and suffering.

**F.      The July 23, 2007 IED Attack In Kabul (The Families of Michael S. Curry, Adam J. Davis, And Travon T. Johnson)**

1962.   On July 23, 2007 the Haqqani Network, a part of the Taliban and al-Qaeda (an FTO) acting together in the Kabul Attack Network, committed an IED attack in Kabul Province, Afghanistan (the "July 23, 2007 Attack").

1963.   On information and belief, the bomb that the Taliban detonated during the attack was:  (i) based on a signature al-Qaeda IED design; (ii) assembled and tested by al-Qaeda bombmakers at one of al-Qaeda's IED manufacturing sites managed and funded by al-Qaeda/Taliban terrorist Sirajuddin Haqqani; (iii) designed to detonate precursor ingredients that were "cooked" by al-Qaeda chemists; and (iv) provided to the Taliban by al-Qaeda operatives in order to facilitate the Taliban's attack.

1964.   The July 23, 2007 Attack would have violated the laws of war if these terrorists were subject to them because, among other reasons, the terrorist(s) who committed the attack neither wore uniforms nor otherwise identified themselves as enemy combatants.

**1.      The Michael S. Curry Family**

1965.   First Sergeant Michael S. Curry Jr. served in Afghanistan as a member of the U.S. Army.  On July 23, 2007, 1SG Curry was injured in the July 23, 2007 Attack.  1SG Curry died on July 23, 2007 as a result of injuries sustained during the attack.

1966.   1SG Curry was a U.S. national at the time of the attack and his death.

1967.   Plaintiff Lavette Curry is the sister of 1SG Curry and a U.S. national.

424

1968. Plaintiff Niki Martin is the sister of 1SG Curry and a U.S. national.

1969. As a result of the July 23, 2007 Attack and 1SG Curry's injuries and death, each member of the Curry Family has experienced severe mental anguish, emotional pain and suffering.

### 2. The Adam J. Davis Family

1970. Specialist Adam J. Davis served in Afghanistan as a member of the U.S. Army. On July 23, 2007, SPC Davis was injured in the July 23, 2007 Attack. SPC Davis died on July 23, 2007 as a result of injuries sustained during the attack.

1971. SPC Davis was a U.S. national at the time of the attack and his death.

1972. Plaintiff Tracy Lee Carrico is the mother of SPC Davis and a U.S. national.

1973. Plaintiff Timothy Davis is the father of SPC Davis and a U.S. national.

1974. Plaintiff Stephanie Frances Bova is the sister of SPC Davis and a U.S. national.

1975. As a result of the July 23, 2007 Attack and SPC Davis's injuries and death, each member of the Davis Family has experienced severe mental anguish, emotional pain and suffering.

### 3. The Travon T. Johnson Family

1976. Sergeant Travon T. Johnson served in Afghanistan as a member of the U.S. Army. On July 23, 2007, SGT Johnson was injured in the July 23, 2007 Attack. SGT Johnson died on July 23, 2007 as a result of injuries sustained during the attack.

1977. SGT Johnson was a U.S. national at the time of the attack and his death.

1978. Plaintiff Billie Shotlow is the mother of SGT Johnson and a U.S. national.

1979. Plaintiff Michael Shotlow is the step-father of SGT Johnson and a U.S. national. Michael Shotlow lived in the same household as SGT Johnson for a substantial time and considered SGT Johnson the functional equivalent of a biological son.

425

1980.   As a result of the July 23, 2007 Attack and SGT Johnson's injuries and death, each member of the Johnson Family has experienced severe mental anguish, emotional pain and suffering.

### G.     The August 26, 2007 Attack In Paktika (The Nicholas R. Carnes Family)

1981.   On August 26, 2007, the Haqqani Network, a part of the Taliban, committed small arms fire attack in Paktika Province, Afghanistan (the "August 26, 2007 Attack").

1982.   The August 26, 2007 Attack would have violated the laws of war if these terrorists were subject to them because, among other reasons, the terrorist(s) who committed the attack neither wore uniforms nor otherwise identified themselves as enemy combatants.

1983.   Staff Sergeant Nicholas R. Carnes served in Afghanistan as a member of the U.S. Army National Guard.  On August 26, 2007, SSG Carnes was injured in the August 26, 2007 Attack.  SSG Carnes died on August 26, 2007 as a result of injuries sustained during the attack.

1984.   SSG Carnes was a U.S. national at the time of the attack and his death.

1985.   Plaintiff WrayJean Carnes is the mother of SSG Carnes and a U.S. national.

1986.   Plaintiff Amanda Nicole Manasra is the sister of SSG Carnes and a U.S. national.

1987.   As a result of the August 26, 2007 Attack and SSG Carnes's injuries and death, each member of the Carnes Family has experienced severe mental anguish, emotional pain and suffering.

### H.     The August 28, 2007 IED Attack In Paktia (The Cory Clark Family)

1988.   On August 28, 2007, the Haqqani Network (a part of the Taliban) and al-Qaeda (an FTO) acting together in a joint al-Qaeda-Taliban cell committed an IED attack in Paktia Province, Afghanistan (the "August 27, 2007 Attack").

1989.   On information and belief, the bomb that the Taliban detonated during the attack was:  (i) based on a signature al-Qaeda IED design; (ii) assembled and tested by al-Qaeda

426

bombmakers at one of al-Qaeda's IED manufacturing sites managed and funded by al-Qaeda/Taliban terrorist Sirajuddin Haqqani; (iii) designed to detonate precursor ingredients that were "cooked" by al-Qaeda chemists; and (iv) provided to the Taliban by al-Qaeda operatives in order to facilitate the Taliban's attack.

1990.   The August 28, 2007 Attack would have violated the laws of war if these terrorists were subject to them because, among other reasons, the terrorist(s) who committed the attack neither wore uniforms nor otherwise identified themselves as enemy combatants.

1991.   Sergeant Cory Clark served in Afghanistan as a member of the U.S. Army.  On August 28, 2007, SGT Clark was injured the August 28, 2007 Attack.  SGT Clark died on August 28, 2007 as a result of injuries sustained during the attack.

1992.   SGT Clark was a U.S. national at the time of the attack and his death.

1993.   Plaintiff Wrenita Randall is the mother of SGT Clark and a U.S. national.

1994.   Plaintiff Ediena McGee is the sister of SGT Clark and a U.S. national.

1995.   As a result of the August 28, 2007 Attack and SGT Clark's injuries and death, each member of the Clark Family has experienced severe mental anguish, emotional pain and suffering.

**I.      The October 23, 2007 Attack In Kunar (The Larry I. Rougle Family)**

1996.   On October 23, 2007, the Taliban committed an attack involving small arms fire in Kunar Province, Afghanistan (the "October 23, 2007 Attack").

1997.   The October 23, 2007 Attack would have violated the laws of war if these terrorists were subject to them because, among other reasons, the terrorist(s) who committed the attack neither wore uniforms nor otherwise identified themselves as enemy combatants.

1998.   Staff Sergeant Larry I. Rougle served in Afghanistan as a member of the U.S. Army.  On October 23, 2007, SSG Rougle was injured in the October 23, 2007 Attack.  SSG Rougle died on October 23, 2007 as a result of injuries sustained during the attack.

1999.   SSG Rougle was a U.S. national at the time of the attack and his death.

2000.   Plaintiff Nancy Rougle is the mother of SSG Rougle and a U.S. national.

2001.   As a result of the October 23, 2007 Attack and SSG Rougle's injuries and death, each member of the Rougle Family has experienced severe mental anguish, emotional pain and suffering.

**J.       The November 2, 2007 Attack In Uruzgan (The Johnny C. Walls Family)**

2002.   On November 2, 2007, the Taliban committed a sniper attack in Uruzgan Province, Afghanistan (the "November 2, 2007 Attack").

2003.   The November 2, 2007 Attack would have violated the laws of war if these terrorists were subject to them because, among other reasons, the terrorist(s) who committed the attack neither wore uniforms nor otherwise identified themselves as enemy combatants.

2004.   Sergeant First Class Johnny C. Walls served in Afghanistan as a member of the U.S. Army.  On November 2, 2007, SFC Walls was injured in the November 2, 2007 Attack.  SFC Walls died on November 2, 2007 as a result of injuries sustained during the attack.

2005.   SFC Walls was a U.S. national at the time of the attack and his death.

2006.   Plaintiff Harvey Lane Walls is the brother of SFC Walls and a U.S. national.

2007.   As a result of the November 2, 2007 Attack and SFC Walls's injuries and death, each member of the Walls Family has experienced severe mental anguish, emotional pain and suffering.

**K.** **The November 10, 2007 Attack In Kapisa (The Patrick F. Kutschbach Family)**

2008.   On November 10, 2007, the Taliban committed a rocket propelled grenade attack in Kapisa Province, Afghanistan (the "November 10, 2007 Attack").

2009.   The November 10, 2007 Attack would have violated the laws of war if these terrorists were subject to them because, among other reasons, the terrorist(s) who committed the attack neither wore uniforms nor otherwise identified themselves as enemy combatants.

2010.   Staff Sergeant Patrick F. Kutschbach served in Afghanistan as a member of the U.S. Army.  On November 10, 2007, SSG Kutschbach was injured in the November 10, 2007 Attack.  SSG Kutschbach died on November 10, 2007 as a result of injuries sustained during the attack.

2011.   SSG Kutschbach was a U.S. national at the time of the attack and his death.

2012.   Plaintiff Ginger Kutschbach is the widow of SSG Kutschbach and a U.S. national.

2013.   Plaintiff B.T.K., by and through his next friend Ginger Kutschbach, is the minor son of SSG Kutschbach and a U.S. national.

2014.   As a result of the November 10, 2007 Attack and SSG Kutschbach's injuries and death, each member of the Kutschbach Family has experienced severe mental anguish, emotional pain and suffering.

**L.** **The November 12, 2007 Attack In Paktika (The Adrian E. Hike Family)**

2015.   On November 12, 2007, the Haqqani Network (a part of the Taliban) committed an IED attack in Paktika Province, Afghanistan (the "November 12, 2007 Attack").

2016.   On information and belief, the bomb that the Taliban detonated during the attack was:  (i) based on a signature al-Qaeda IED design; (ii) assembled and tested by al-Qaeda bombmakers at one of al-Qaeda's IED manufacturing sites managed and funded by al-

429

Qaeda/Taliban terrorist Sirajuddin Haqqani; (iii) designed to detonate precursor ingredients that were "cooked" by al-Qaeda chemists; and (iv) provided to the Taliban by al-Qaeda operatives in order to facilitate the Taliban's attack.

2017.   The November 12, 2007 Attack would have violated the laws of war if these terrorists were subject to them because, among other reasons, the terrorist(s) who committed the attack neither wore uniforms nor otherwise identified themselves as enemy combatants.

2018.   Sergeant Adrian E. Hike served in Afghanistan as a member of the U.S. Army. On November 12, 2007, SGT Hike was injured in the November 12, 2007 Attack.  SGT Hike died on November 12, 2007 as a result of injuries sustained during the attack.

2019.   SGT Hike was a U.S. national at the time of the attack and his death.

2020.   Plaintiff Robert A. Bird is the step-father of SGT Hike and a U.S. national. Robert A. Bird lived in the same household as SGT Hike for a substantial time and considered SGT Hike the functional equivalent of a biological son.

2021.   As a result of the November 12, 2007 Attack and SGT Hike's injuries and death, each member of the Hike Family has experienced severe mental anguish, emotional pain and suffering.

**M.     The December 9, 2007 Attack In Helmand (The Tanner J. O'Leary Family)**

2022.   On December 9, 2007, the Taliban committed an IED attack in Helmand Province, Afghanistan (the "December 9, 2007 Attack").

2023.   On information and belief, the bomb that the Taliban detonated during the attack was:  (i) based on a signature al-Qaeda IED design; (ii) assembled and tested by al-Qaeda bombmakers at one of al-Qaeda's IED manufacturing sites managed and funded by al-Qaeda/Taliban terrorist Sirajuddin Haqqani; (iii) designed to detonate precursor ingredients that

were "cooked" by al-Qaeda chemists; and (iv) provided to the Taliban by al-Qaeda operatives in order to facilitate the Taliban's attack.

2024.   The December 9, 2007 Attack would have violated the laws of war if these terrorists were subject to them because, among other reasons, the terrorist(s) who committed the attack neither wore uniforms nor otherwise identified themselves as enemy combatants.

2025.   Corporal Tanner J. O'Leary served in Afghanistan as a member of the U.S. Army. On December 9, 2007, CPL O'Leary was injured in the December 9, 2007 Attack.  CPL O'Leary died on December 9, 2007 as a result of injuries sustained during the attack.

2026.   CPL O'Leary was a U.S. national at the time of the attack and his death.

2027.   Plaintiff Carmen Louise O'Leary is the mother of CPL O'Leary and a U.S. national.

2028.   As a result of the December 9, 2007 Attack and CPL O'Leary's injuries and death, each member of the O'Leary Family has experienced severe mental anguish, emotional pain and suffering.

**N.    The December 12, 2007 Attack In Paktika (The Joshua C. Blaney Family)**

2029.   On December 12, 2007, the Haqqani Network, a part of the Taliban, committed an IED attack in Paktika Province, Afghanistan (the "December 12, 2007 Attack").

2030.   On information and belief, the bomb that the Taliban detonated during the attack was:  (i) based on a signature al-Qaeda IED design; (ii) assembled and tested by al-Qaeda bombmakers at one of al-Qaeda's IED manufacturing sites managed and funded by al-Qaeda/Taliban terrorist Sirajuddin Haqqani; (iii) designed to detonate precursor ingredients that were "cooked" by al-Qaeda chemists; and (iv) provided to the Taliban by al-Qaeda operatives in order to facilitate the Taliban's attack.

2031.   The December 12, 2007 Attack would have violated the laws of war if these terrorists were subject to them because, among other reasons, the terrorist(s) who committed the attack neither wore uniforms nor otherwise identified themselves as enemy combatants.

2032.   Sergeant Joshua C. Blaney served in Afghanistan as a member of the U.S. Army. On December 12, 2007, SGT Blaney was injured in the December 12, 2007 Attack.  SGT Blaney died on December 12, 2007 as a result of injuries sustained during the attack.

2033.   SGT Blaney was a U.S. national at the time of the attack and his death.

2034.   Plaintiff Charles Edward Blaney is the father of SGT Blaney and a U.S. national.

2035.   Plaintiff Dianne Belk Massey is the mother of SGT Blaney and a U.S. national.

2036.   Plaintiff Carley Blaney is the sister of SGT Blaney and a U.S. national.

2037.   As a result of the December 12, 2007 Attack and SGT Blaney's injuries and death, each member of the Blaney Family has experienced severe mental anguish, emotional pain and suffering.

### O.   The January 2, 2008 Attack In Khost (The Families of Richard J. Berrettini and Collin J. Bowen)

2038.   On January 2, 2008 the Haqqani Network, a part of the Taliban, committed an IED attack in Khost Province, Afghanistan (the "January 2, 2008 Attack").

2039.   On information and belief, the bomb that the Taliban detonated during the attack was:  (i) based on a signature al-Qaeda IED design; (ii) assembled and tested by al-Qaeda bombmakers at one of al-Qaeda's IED manufacturing sites managed and funded by al-Qaeda/Taliban terrorist Sirajuddin Haqqani; (iii) designed to detonate precursor ingredients that were "cooked" by al-Qaeda chemists; and (iv) provided to the Taliban by al-Qaeda operatives in order to facilitate the Taliban's attack.

2040.   The January 2, 2008 Attack would have violated the laws of war if these terrorists were subject to them because, among other reasons, the terrorist(s) who committed the attack neither wore uniforms nor otherwise identified themselves as enemy combatants.

### 1.      The Richard J. Berrettini Family

2041.   Lieutenant Colonel Richard J. Berrettini served in Afghanistan as a member of the U.S. Army National Guard.  On January 2, 2008, LTC Berrettini was injured in the January 2, 2008 Attack.  LTC Berrettini died on January 11, 2008 as a result of injuries sustained during the attack.

2042.   LTC Berrettini was a U.S. national at the time of the attack and his death.

2043.   Plaintiff Jane Berrettini is the widow of LTC Berrettini and a U.S. national.

2044.   Plaintiff Vincent Berrettini is the son of LTC Berrettini and a U.S. national.

2045.   Plaintiff Christopher Berrettini is the son of LTC Berrettini and a U.S. national.

2046.   Plaintiff Nello Berrettini is the brother of LTC Berrettini and a U.S. national.

2047.   As a result of the January 2, 2008 Attack and LTC Berrettini's injuries and death, each member of the Berrettini Family has experienced severe mental anguish, emotional pain and suffering.

### 2.      The Collin J. Bowen Family

2048.   Sergeant First Class Collin J. Bowen served in Afghanistan as a member of the U.S. Army National Guard.  On January 2, 2008, SFC Bowen was injured in the January 2, 2008 Attack.  SFC Bowen died on March 14, 2008 as a result of injuries sustained during the attack.

2049.   SFC Bowen was a U.S. national at the time of the attack and his death.

2050.   Plaintiff Michael Bowen is the father of SFC Bowen and a U.S. national.

2051.   As a result of the January 2, 2008 Attack and SFC Bowen's injuries and death, each member of the Bowen Family has experienced severe mental anguish, emotional pain and suffering.

**P.      The January 9, 2008 Attack In Helmand (The David Drakulich Family)**

2052.   On January 9, 2008, the Taliban committed an IED attack in Helmand Province, Afghanistan (the "January 9, 2008 Attack").

2053.   On information and belief, the bomb that the Taliban detonated during the attack was:  (i) based on a signature al-Qaeda IED design; (ii) assembled and tested by al-Qaeda bombmakers at one of al-Qaeda's IED manufacturing sites managed and funded by al-Qaeda/Taliban terrorist Sirajuddin Haqqani; (iii) designed to detonate precursor ingredients that were "cooked" by al-Qaeda chemists; and (iv) provided to the Taliban by al-Qaeda operatives in order to facilitate the Taliban's attack.

2054.   The January 9, 2008 Attack would have violated the laws of war if these terrorists were subject to them because, among other reasons, the terrorist(s) who committed the attack neither wore uniforms nor otherwise identified themselves as enemy combatants.

2055.   Sergeant David Drakulich served in Afghanistan as a member of the U.S. Army. On January 9, 2008, SGT Drakulich was injured in the January 9, 2008 Attack.  SGT Drakulich died on January 9, 2008 as a result of injuries sustained during the attack.

2056.   SGT Drakulich was a U.S. national at the time of the attack and his death.

2057.   Plaintiff Antoinette Drakulich is the mother of SGT Drakulich and a U.S. national.

2058.   Plaintiff Joseph Drakulich is the father of SGT Drakulich and a U.S. national.

2059.   Plaintiff Thomas Drakulich is the brother of SGT Drakulich and a U.S. national.

2060.   Plaintiff Dana Drakulich-King is the sister of SGT Drakulich and a U.S. national.

2061.   As a result of the January 9, 2008 Attack and SGT Drakulich's injuries and death, each member of the Drakulich Family has experienced severe mental anguish, emotional pain and suffering.

### Q.   The January 14, 2008 Attack In Kabul (The Thor Hesla Family)

2062.   On January 14, 2008, al-Qaeda (an FTO) and the Taliban, with al-Qaeda providing and training the suicide bomber, committed a complex attack involving suicide bombing, small arms fire, and grenades in Kabul Province, Afghanistan (the "January 14, 2008 Attack").

2063.   The January 14, 2008 Attack was committed by the al-Qaeda (an FTO) and the Taliban acting together in a joint al-Qaeda-Taliban cell with al-Qaeda providing, indoctrinating, and training the bomber, who was deployed by the Taliban. On information and belief, the suicide bomber who detonated the bomb during the attack was:  (i) indoctrinated by al-Qaeda regarding the purported religious justification that permitted the attack; (ii) trained by al-Qaeda regarding al-Qaeda's tactics, techniques, and procedures for suicide bombers; (iii) deployed by al-Qaeda to Afghanistan in order to attack Americans there; and (iv) a member of al-Qaeda under al-Qaeda training procedures for suicide attackers, as a result of the bomber pledging loyalty to al-Qaeda to create a point of no return. raining the suicide bomber.

2064.   On information and belief, the bomb that the Taliban detonated during the attack was:  (i) based on a signature al-Qaeda IED design; (ii) assembled and tested by al-Qaeda bombmakers at one of al-Qaeda's IED manufacturing sites managed and funded by al-Qaeda/Taliban terrorist Sirajuddin Haqqani; (iii) designed to detonate precursor ingredients that were "cooked" by al-Qaeda chemists; and (iv) provided to the Taliban by al-Qaeda operatives in order to facilitate the Taliban's attack.

2065.   The January 14, 2008 Attack would have violated the laws of war if these terrorists were subject to them because, among other reasons, the terrorist(s) who committed the attack neither wore uniforms nor otherwise identified themselves as enemy combatants.

2066.   Thor Hesla served in Afghanistan as a civilian contractor for BearingPoint Management & Technology Consultants, contracting with USAID.  On January 14, 2008, Mr. Hesla was injured in the January 14, 2008 Attack.  Mr. Hesla died on January 14, 2008 as a result of injuries sustained during the attack.

2067.   Mr. Hesla was a U.S. national at the time of the attack and his death.

2068.   Plaintiff Maren Hesla is the sister of Mr. Hesla and a U.S. national.

2069.   As a result of the January 14, 2008 Attack and Mr. Hesla's injuries and death, each member of the Hesla Family has experienced severe mental anguish, emotional pain and suffering.

**R.      The April 29, 2008 Attack In Parwan (The Jonathan Yelner Family)**

2070.   On April 29, 2008, the Taliban committed an IED attack in Parwan Province, Afghanistan (the "April 29, 2008 Attack").

2071.   On information and belief, the bomb that the Taliban detonated during the attack was:  (i) based on a signature al-Qaeda IED design; (ii) assembled and tested by al-Qaeda bombmakers at one of al-Qaeda's IED manufacturing sites managed and funded by al-Qaeda/Taliban terrorist Sirajuddin Haqqani; (iii) designed to detonate precursor ingredients that were "cooked" by al-Qaeda chemists; and (iv) provided to the Taliban by al-Qaeda operatives in order to facilitate the Taliban's attack.

2072.   The April 29, 2008 Attack would have violated the laws of war if these terrorists were subject to them because, among other reasons, the terrorist(s) who committed the attack neither wore uniforms nor otherwise identified themselves as enemy combatants.

436

2073.   Senior Airman Jonathan Yelner served in Afghanistan as a member of the U.S. Air Force.  On April 29, 2008, SrA Yelner was injured in the April 29, 2008 Attack.  SrA Yelner died on April 29, 2008 as a result of injuries sustained during the attack.

2074.   SrA Yelner was a U.S. national at the time of the attack and his death.

2075.   Plaintiff Bruce Yelner is the father of SrA Yelner and a U.S. national.

2076.   As a result of the April 29, 2008 attack and SrA Yelner's injuries and death, each member of the Yelner Family has experienced severe mental anguish, emotional pain and suffering.

**S.      The May 9, 2008 Attack In Kapisa (The Isaac Palomarez Family)**

2077.   On May 9, 2008, the Taliban committed an IED attack in Kapisa Province, Afghanistan (the "May 9, 2008 Attack").

2078.   On information and belief, the bomb that the Taliban detonated during the attack was:  (i) based on a signature al-Qaeda IED design; (ii) assembled and tested by al-Qaeda bombmakers at one of al-Qaeda's IED manufacturing sites managed and funded by al-Qaeda/Taliban terrorist Sirajuddin Haqqani; (iii) designed to detonate precursor ingredients that were "cooked" by al-Qaeda chemists; and (iv) provided to the Taliban by al-Qaeda operatives in order to facilitate the Taliban's attack.

2079.   The May 9, 2008 Attack would have violated the laws of war if these terrorists were subject to them because, among other reasons, the terrorist(s) who committed the attack neither wore uniforms nor otherwise identified themselves as enemy combatants.

2080.   Sergeant Isaac Palomarez served in Afghanistan as a member of the U.S. Army. On May 9, 2008, SGT Palomarez was injured in the May 9, 2008 Attack.  SGT Palomarez died on May 9, 2008 as a result of injuries sustained during the attack.

2081.   SGT Palomarez was a U.S. national at the time of the attack and his death.

437

2082.   Plaintiff Elma Garza Palomarez is the mother of SGT Palomarez and a U.S. national.

2083.   Plaintiff Candido Palomarez III is the brother of SGT Palomarez and a U.S. national.

2084.   Plaintiff Omar Palomarez is the brother of SGT Palomarez and a U.S. national.

2085.   Plaintiff Rene Palomarez is the brother of SGT Palomarez and a U.S. national.

2086.   Rene Palomarez also brings claims in his representative capacity on behalf of Plaintiff Candido Palomarez Jr.'s estate.  Candido Palomarez Jr. was the father of SGT Palomarez and was a U.S. national at the time of his death.  Candido Palomarez Jr.'s estate is entitled to recover solatium damages.

2087.   As a result of the May 9, 2008 Attack and SGT Palomarez's injuries and death, each member of the Palomarez Family has experienced severe mental anguish, emotional pain and suffering.

**T.      The May 9, 2008 Attack In Paktika (The Ara T. Deysie Family)**

2088.   On May 9, 2008 the Haqqani Network, a part of the Taliban, committed a rocket propelled grenade attack in Paktika Province, Afghanistan. ("May 9, 2008 Rocket Attack").

2089.   The May 9, 2008 Rocket Attack would have violated the laws of war if these terrorists were subject to them because, among other reasons, the terrorist(s) who committed the attack neither wore uniforms nor otherwise identified themselves as enemy combatants.

2090.   Private First Class Ara T. Deysie served in Afghanistan as a member of the U.S. Army.  On May 9, 2008, PFC Deysie was injured in the May 9, 2008 Rocket Attack.  PFC Deysie died on May 9, 2008 as a result of injuries sustained during the attack.

2091.   PFC Deysie was a U.S. national at the time of the attack and his death.

2092.   Plaintiff Lori Deysie is the mother of PFC Deysie and a U.S. national.

438

2093.   Plaintiff Erisa Deysie is the sister of PFC Deysie and a U.S. national.

2094.   Plaintiff Sidnee Deysie is the sister of PFC Deysie and a U.S. national.

2095.   As a result of the May 9, 2008 Rocket Attack and PFC Deysie's injuries and death, each member of the Deysie Family has experienced severe mental anguish, emotional pain and suffering.

### U.    The May 20, 2008 Attack In Ghazni (The Jeffrey F. DePrimo Family)

2096.   On May 20, 2008, the Haqqani Network, a part of the Taliban, committed an IED attack in Ghazni Province, Afghanistan (the "May 20, 2008 Attack").

2097.   On information and belief, the bomb that the Taliban detonated during the attack was:  (i) based on a signature al-Qaeda IED design; (ii) assembled and tested by al-Qaeda bombmakers at one of al-Qaeda's IED manufacturing sites managed and funded by al-Qaeda/Taliban terrorist Sirajuddin Haqqani; (iii) designed to detonate precursor ingredients that were "cooked" by al-Qaeda chemists; and (iv) provided to the Taliban by al-Qaeda operatives in order to facilitate the Taliban's attack.

2098.   The May 20, 2008 Attack would have violated the laws of war if these terrorists were subject to them because, among other reasons, the terrorist(s) who committed the attack neither wore uniforms nor otherwise identified themselves as enemy combatants.

2099.   First Lieutenant Jeffrey F. DePrimo served in Afghanistan as a member of the U.S. Army National Guard.  On May 20, 2008, 1LT DePrimo was injured in the May 20, 2008 Attack.  1LT DePrimo died on May 20, 2008 as a result of injuries sustained during the attack.

2100.   1LT DePrimo was a U.S. national at the time of the attack and his death.

2101.   Plaintiff Helen DePrimo is the mother of 1LT DePrimo and a U.S. national.

2102.   Plaintiff Joseph DePrimo is the father of 1LT DePrimo and a U.S. national.

2103.   Plaintiff Jodi Calabro is the sister of 1LT DePrimo and a U.S. national.

439

2104.   Plaintiff Danielle Fediw is the sister of 1LT DePrimo and a U.S. national.

2105.   As a result of the May 20, 2008 Attack and 1LT DePrimo's injuries and death, each member of the DePrimo Family has experienced severe mental anguish, emotional pain and suffering.

### V.       The May 28, 2008 Attack In Paktia (The Chad M. Trimble Family)

2106.   On May 28, 2008, the Haqqani Network, a part of the Taliban, committed an IED attack in Paktia Province, Afghanistan (the "May 28, 2008 Attack").

2107.   On information and belief, the bomb that the Taliban detonated during the attack was:  (i) based on a signature al-Qaeda IED design; (ii) assembled and tested by al-Qaeda bombmakers at one of al-Qaeda's IED manufacturing sites managed and funded by al-Qaeda/Taliban terrorist Sirajuddin Haqqani; (iii) designed to detonate precursor ingredients that were "cooked" by al-Qaeda chemists; and (iv) provided to the Taliban by al-Qaeda operatives in order to facilitate the Taliban's attack.

2108.   The May 28, 2008 Attack would have violated the laws of war if these terrorists were subject to them because, among other reasons, the terrorist(s) who committed the attack neither wore uniforms nor otherwise identified themselves as enemy combatants.

2109.   Private First Class Chad M. Trimble served in Afghanistan as a member of the U.S. Army.  On May 28, 2008, PFC Trimble was injured in the May 28, 2008 Attack.  PFC Trimble died on May 28, 2008 as a result of injuries sustained during the attack.

2110.   PFC Trimble was a U.S. national at the time of the attack and his death.

2111.   Plaintiff Nancy M. Trimble is the mother of PFC Trimble and a U.S. national.

2112.   Plaintiff Timothy M. Trimble is the father of PFC Trimble and a U.S. national.

2113.   Plaintiff Rosanna Trimble is the widow of PFC Trimble and a U.S. national.

2114.   Plaintiff Micaela Trimble is the daughter of PFC Trimble and a U.S. national.

2115.   Plaintiff Steffani Trimble is the daughter of PFC Trimble and a U.S. national.

2116.   As a result of the May 28, 2008 Attack and PFC Trimble's injuries and death, each member of the Trimble Family has experienced severe mental anguish, emotional pain and suffering.

**W.    The May 31, 2008 Attack In Nangarhar (The James M. Finley Family)**

2117.   On May 31, 2008, the Taliban committed an IED attack in Nangarhar Province, Afghanistan (the "May 31, 2008 Attack").

2118.   On information and belief, the bomb that the Taliban detonated during the attack was:  (i) based on a signature al-Qaeda IED design; (ii) assembled and tested by al-Qaeda bombmakers at one of al-Qaeda's IED manufacturing sites managed and funded by al-Qaeda/Taliban terrorist Sirajuddin Haqqani; (iii) designed to detonate precursor ingredients that were "cooked" by al-Qaeda chemists; and (iv) provided to the Taliban by al-Qaeda operatives in order to facilitate the Taliban's attack.

2119.   The May 31, 2008 Attack would have violated the laws of war if these terrorists were subject to them because, among other reasons, the terrorist(s) who committed the attack neither wore uniforms nor otherwise identified themselves as enemy combatants.

2120.   Specialist James M. Finley served in Afghanistan as a member of the U.S. Army. On May 31, 2008, SPC Finley was injured in an the May 31, 2008 Attack.  SPC Finley died on May 31, 2008 as a result of injuries sustained during the attack.

2121.   SPC Finley was a U.S. national at the time of the attack and his death.

2122.   Plaintiff Gerald W. Finley is the father of SPC Finley and a U.S. national.

2123.   Plaintiff John M. Finley is the brother of SPC Finley and a U.S. national.

2124.   Plaintiff Joshua M. Finley is the brother of SPC Finley and a U.S. national.

2125.   Plaintiff Jennifer M. Lefors is the sister of SPC Finley and a U.S. national.

2126.   As a result of the May 31, 2008 Attack and SPC Finley's injuries and death, each member of the Finley Family has experienced severe mental anguish, emotional pain and suffering.

**X.      The June 3, 2008 Attack In Paktia (The Scott Hagerty Family)**

2127.   On June 3, 2008, the Haqqani Network (a part of the Taliban) and al-Qaeda (an FTO), acting together in a joint al-Qaeda-Taliban cell, committed an IED attack in Paktia Province, Afghanistan (the "June 3, 2008 Attack").

2128.   On information and belief, the bomb that the Taliban detonated during the attack was:  (i) based on a signature al-Qaeda IED design; (ii) assembled and tested by al-Qaeda bombmakers at one of al-Qaeda's IED manufacturing sites managed and funded by al-Qaeda/Taliban terrorist Sirajuddin Haqqani; (iii) designed to detonate precursor ingredients that were "cooked" by al-Qaeda chemists; and (iv) provided to the Taliban by al-Qaeda operatives in order to facilitate the Taliban's attack.

2129.   The June 3, 2008 Attack would have violated the laws of war if these terrorists were subject to them because, among other reasons, the terrorist(s) who committed the attack neither wore uniforms nor otherwise identified themselves as enemy combatants.

2130.   Major Scott Hagerty served in Afghanistan as a member of the U.S. Army Reserve.  On June 3, 2008, MAJ Hagerty was injured in the June 3, 2008 Attack.  MAJ Hagerty died on June 3, 2008 as a result of injuries sustained during the attack.

2131.   MAJ Hagerty was a U.S. national at the time of the attack and his death.

2132.   Plaintiff Lynne Farmer is the sister of MAJ Hagerty and a U.S. national.

2133.   As a result of the June 3, 2008 Attack and MAJ Hagerty's injuries and death, each member of the Hagerty Family has experienced severe mental anguish, emotional pain and suffering.

442

### Y.        The June 8, 2008 Attack In Logar (Kevin McCloskey)

2134.    On June 8, 2008, the Haqqani Network, a part of the Taliban, committed an IED attack in Logar Province, Afghanistan (the "June 8, 2008 Attack").

2135.    On information and belief, the bomb that the Taliban detonated during the attack was:  (i) based on a signature al-Qaeda IED design; (ii) assembled and tested by al-Qaeda bombmakers at one of al-Qaeda's IED manufacturing sites managed and funded by al-Qaeda/Taliban terrorist Sirajuddin Haqqani; (iii) designed to detonate precursor ingredients that were "cooked" by al-Qaeda chemists; and (iv) provided to the Taliban by al-Qaeda operatives in order to facilitate the Taliban's attack.

2136.    The June 8, 2008 Attack would have violated the laws of war if these terrorists were subject to them because, among other reasons, the terrorist(s) who committed the attack neither wore uniforms nor otherwise identified themselves as enemy combatants.

2137.    Plaintiff Corporal Kevin McCloskey served in Afghanistan as a member of the U.S. Army.  On June 8, 2008, CPL McCloskey was injured in the June 8, 2008 Attack.  The attack severely wounded CPL McCloskey, who suffered the loss of both his legs, vision loss in his right eye, burns all over his body, and a traumatic brain injury.

2138.    CPL McCloskey was a U.S. national at the time of the attack and remains one to this day.

2139.    As a result of the June 8, 2008 Attack and his injuries, CPL McCloskey has experienced severe physical and emotional pain and suffering.

### Z.        The June 18, 2008 Attack In Paktika (The Marc A. Retmier Family)

2140.    On June 18, 2008, the Haqqani Network, a part of the Taliban, committed a rocket attack in Paktika Province, Afghanistan (the "June 18, 2008 Attack").

2141.  The June 18, 2008 Attack would have violated the laws of war if these terrorists were subject to them because, among other reasons, the terrorist(s) who committed the attack neither wore uniforms nor otherwise identified themselves as enemy combatants.

2142.  Hospitalman Marc A. Retmier served in Afghanistan as a member of the U.S. Navy.  On June 18, 2008, HM Retmier was injured in the June 18, 2008 Attack.  HM Retmier died on June 18, 2008 as a result of injuries sustained during the attack.

2143.  HM Retmier was a U.S. national at the time of the attack and his death.

2144.  Plaintiff Joy L. Retmier is the mother of HM Retmier and a U.S. national.

2145.  Plaintiff Steven C. Retmier is the father of HM Retmier and a U.S. national.

2146.  Plaintiff Mason D. Retmier is the brother of HM Retmier and a U.S. national.

2147.  Plaintiff Matthew S. Retmier is the brother of HM Retmier and a U.S. national.

2148.  As a result of the June 18, 2008 Attack and HM Retmier's injuries and death, each member of the Retmier Family has experienced severe mental anguish, emotional pain and suffering.

**AA.    The June 21, 2008 Attack In Kandahar (The James J. Walton Family)**

2149.  On June 18, 2008, the Taliban committed a complex attack involving an IED and small arms fire in Kandahar Province, Afghanistan (the "June 21, 2008 Attack").

2150.  On information and belief, the bomb that the Taliban detonated during the attack was:  (i) based on a signature al-Qaeda IED design; (ii) assembled and tested by al-Qaeda bombmakers at one of al-Qaeda's IED manufacturing sites managed and funded by al-Qaeda/Taliban terrorist Sirajuddin Haqqani; (iii) designed to detonate precursor ingredients that were "cooked" by al-Qaeda chemists; and (iv) provided to the Taliban by al-Qaeda operatives in order to facilitate the Taliban's attack.

2151.   The June 21, 2008 Attack would have violated the laws of war if these terrorists were subject to them because, among other reasons, the terrorist(s) who committed the attack neither wore uniforms nor otherwise identified themselves as enemy combatants.

2152.   Lieutenant Colonel James J. Walton served in Afghanistan as a member of the U.S. Army.  On June 21, 2008, LTC Walton was injured in the June 21, 2008 Attack.  LTC Walton died on June 21, 2008 as a result of injuries sustained during the attack.

2153.   LTC Walton was a U.S. national at the time of the attack and his death.

2154.   Plaintiff Sarah Moschler Walton is the widow of LTC Walton and a U.S. national.

2155.   As a result of the June 21, 2008 Attack and LTC Walton's injuries and death, each member of the Walton Family has experienced severe mental anguish, emotional pain and suffering.

**BB.    The June 26, 2008 Attack In Logar (The Families of Matthew L. Hilton and Mark C. Palmateer)**

2156.   On June 26, 2008 the Haqqani Network, a part of the Taliban, committed a complex attack involving IEDs, small arms fire, and rocket propelled grenades in Logar Province, Afghanistan (the "June 26, 2008 Attack").

2157.   On information and belief, the bomb that the Taliban detonated during the attack was:  (i) based on a signature al-Qaeda IED design; (ii) assembled and tested by al-Qaeda bombmakers at one of al-Qaeda's IED manufacturing sites managed and funded by al-Qaeda/Taliban terrorist Sirajuddin Haqqani; (iii) designed to detonate precursor ingredients that were "cooked" by al-Qaeda chemists; and (iv) provided to the Taliban by al-Qaeda operatives in order to facilitate the Taliban's attack.

445

2158.   The June 26, 2008 Attack would have violated the laws of war if these terrorists were subject to them because, among other reasons, the terrorist(s) who committed the attack neither wore uniforms nor otherwise identified themselves as enemy combatants.

### 1.      The Matthew L. Hilton Family

2159.   Sergeant First Class Matthew L. Hilton served in Afghanistan as a member of the U.S. Army National Guard.  On June 26, 2008, SFC Hilton was injured in the June 26, 2008 Attack.  SFC Hilton died on June 26, 2008 as a result of injuries sustained during the attack.

2160.   SFC Hilton was a U.S. national at the time of the attack and his death.

2161.   Plaintiff Mary Hilton is the widow of SFC Hilton and a U.S. national.

2162.   Plaintiff Jeanine Hilton is the sister of SFC Hilton and a U.S. national.

2163.   Plaintiff Brent C. Robinson is the step-son of SFC Hilton and a U.S. national. Brent Robinson lived in the same household as SFC Hilton for a substantial time and considered SFC Hilton the functional equivalent of a biological father.

2164.   Plaintiff Michael Pluger is the step-father of SFC Hilton and a U.S. national. Michael Pluger lived in the same household as SFC Hilton for a substantial time and considered SFC Hilton the functional equivalent of a biological son.

2165.   As a result of the June 26, 2008 Attack and SFC Hilton's injuries and death, each member of the Hilton Family has experienced severe mental anguish, emotional pain and suffering.

### 2.      The Mark C. Palmateer Family

2166.   Sergeant Mark C. Palmateer served in Afghanistan as a member of the U.S. Army National Guard.  On June 26, 2008, SGT Palmateer was injured in the June 26, 2008 Attack. SGT Palmateer died on June 26, 2008 as a result of injuries sustained during the attack.

2167.   SGT Palmateer was a U.S. national at the time of the attack and his death.

446

2168.   Plaintiff Christopher Alexander Palmateer is the brother of SGT Palmateer and a U.S. national.

2169.   Plaintiff Marjorie Vail is the sister of SGT Palmateer and a U.S. national.

2170.   As a result of the June 26, 2008 Attack and SGT Palmateer's injuries and death, each member of the Palmateer Family has experienced severe mental anguish, emotional pain and suffering.

### CC.   The June 28, 2008 Attack In Zabul (The Estell L. Turner Family)

2171.   On June 28, 2008, the Haqqani Network, a part of the Taliban, committed an IED attack in Zabul Province, Afghanistan (the "June 28, 2008 Attack").

2172.   On information and belief, the bomb that the Taliban detonated during the attack was:  (i) based on a signature al-Qaeda IED design; (ii) assembled and tested by al-Qaeda bombmakers at one of al-Qaeda's IED manufacturing sites managed and funded by al-Qaeda/Taliban terrorist Sirajuddin Haqqani; (iii) designed to detonate precursor ingredients that were "cooked" by al-Qaeda chemists; and (iv) provided to the Taliban by al-Qaeda operatives in order to facilitate the Taliban's attack.

2173.   The June 28, 2008 Attack would have violated the laws of war if these terrorists were subject to them because, among other reasons, the terrorist(s) who committed the attack neither wore uniforms nor otherwise identified themselves as enemy combatants.

2174.   Specialist Estell L. Turner served in Afghanistan as a member of the U.S. Army. On June 28, 2008, SPC Turner was injured in the June 28, 2008 Attack.  SPC Turner died on July 2, 2008 as a result of injuries sustained during the attack.

2175.   SPC Turner was a U.S. national at the time of the attack and his death.

2176.   Plaintiff Lyda Nieshe is the step-daughter of SPC Turner and a U.S. national. Lyda Nieshe lived in the same household as SPC Turner for a substantial time and considered SPC Turner the functional equivalent of a biological father.

2177.   Plaintiff Leah Turner is the widow of SPC Turner and a U.S. national.

2178.   As a result of the June 28, 2008 Attack and SPC Turner's injuries and death, each member of the Turner Family has experienced severe mental anguish, emotional pain and suffering.

**DD.    The July 13, 2008 Attack In Helmand (The Mitchell W. Young Family)**

2179.   On July 13, 2008, the Taliban committed an IED attack in Helmand Province, Afghanistan (the "July 13, 2008 IED Attack").

2180.   On information and belief, the bomb that the Taliban detonated during the attack was:  (i) based on a signature al-Qaeda IED design; (ii) assembled and tested by al-Qaeda bombmakers at one of al-Qaeda's IED manufacturing sites managed and funded by al-Qaeda/Taliban terrorist Sirajuddin Haqqani; (iii) designed to detonate precursor ingredients that were "cooked" by al-Qaeda chemists; and (iv) provided to the Taliban by al-Qaeda operatives in order to facilitate the Taliban's attack.

2181.   The July 13, 2008 IED Attack would have violated the laws of war if these terrorists were subject to them because, among other reasons, the terrorist(s) who committed the attack neither wore uniforms nor otherwise identified themselves as enemy combatants.

2182.   Master Sergeant Mitchell W. Young served in Afghanistan as a member of the U.S. Army.  On July 13, 2008, MSG Young was injured in the July 13, 2008 Attack.  MSG Young died on July 13, 2008 as a result of injuries sustained during the attack.

2183.   MSG Young was a U.S. national at the time of the attack and his death.

2184.   Plaintiff Robyn Young is the widow of MSG Young and a U.S. national.

448

2185.   As a result of the July 13, 2008 IED Attack and MSG Young's injuries and death, each member of the Young Family has experienced severe mental anguish, emotional pain and suffering.

### EE.   The July 13, 2008 Attack In Nuristan (The Jason M. Bogar, Jonathan P. Brostrom, Israel Garcia, Jason D. Hovater, Pruitt A. Rainey, And Gunnar Zwilling Families)

2186.   On July 13, 2008 the Taliban and al-Qaeda, an FTO, committed a complex attack involving small arms fire, IEDs, and rocket propelled grenades in Nuristan Province, Afghanistan (the "July 13, 2008 Attack").

2187.   On information and belief, the bomb that the Taliban detonated during the attack was:  (i) based on a signature al-Qaeda IED design; (ii) assembled and tested by al-Qaeda bombmakers at one of al-Qaeda's IED manufacturing sites managed and funded by al-Qaeda/Taliban terrorist Sirajuddin Haqqani; (iii) designed to detonate precursor ingredients that were "cooked" by al-Qaeda chemists; and (iv) provided to the Taliban by al-Qaeda operatives in order to facilitate the Taliban's attack.

2188.   The July 13, 2008 Attack would have violated the laws of war if these terrorists were subject to them because, among other reasons, the terrorist(s) who committed the attack neither wore uniforms nor otherwise identified themselves as enemy combatants.

### 1.   The Jason M. Bogar Family

2189.   Corporal Jason M. Bogar served in Afghanistan as a member of the U.S. Army. On July 13, 2008, CPL Bogar was injured in the July 13, 2008 Attack.  CPL Bogar died on July 13, 2008 as a result of injuries sustained during the attack.

2190.   CPL Bogar was a U.S. national at the time of the attack and his death.

2191.   Plaintiff Carlene Cross is the mother of CPL Bogar and a U.S. national.

2192.   Plaintiff Micael D. Bogar is the sister of CPL Bogar and a U.S. national.

449

2193.   Plaintiff Carise Martindale is the sister of CPL Bogar and a U.S. national.

2194.   Plaintiff Michael Bogar is the father of CPL Bogar and a U.S. national.

2195.   As a result of the July 13, 2008 Attack and CPL Bogar's injuries and death, each member of the Bogar Family has experienced severe mental anguish, emotional pain and suffering.

### 2.      The Jonathan P. Brostrom Family

2196.   First Lieutenant Jonathan P. Brostrom served in Afghanistan as a member of the U.S. Army.  On July 13, 2008, 1LT Brostrom was injured in the July 13, 2008 Attack.  1LT Brostrom died on July 13, 2008 as a result of injuries sustained during the attack.

2197.   1LT Brostrom was a U.S. national at the time of the attack and his death.

2198.   Plaintiff David Brostrom is the father of 1LT Brostrom and a U.S. national.

2199.   Plaintiff Mary Jo Brostrom is the mother of 1LT Brostrom and a U.S. national.

2200.   Plaintiff Blake D. Brostrom is the brother of 1LT Brostrom and a U.S. national.

2201.   Plaintiff Jase Brostrom is the son of 1LT Brostrom and a U.S. national.

2202.   As a result of the July 13, 2008 Attack and 1LT Brostrom's injuries and death, each member of the Brostrom Family has experienced severe mental anguish, emotional pain and suffering.

### 3.      The Israel Garcia Family

2203.   Sergeant Israel Garcia served in Afghanistan as a member of the U.S. Army.  On July 13, 2008, SGT Garcia was injured in the July 13, 2008 Attack.  SGT Garcia died on July 13, 2008 as a result of injuries sustained during the attack.

2204.   SGT Garcia was a U.S. national at the time of the attack and his death.

2205.   Plaintiff Lesly Yohana Garcia is the widow of SGT Garcia and a U.S. national.

2206. Plaintiff Maricruz Garcia Velasquez is the mother of SGT Garcia and a U.S. national.

2207. Plaintiff Victor Garcia is the father of SGT Garcia and a U.S. national.

2208. Plaintiff Ramsses Garcia is the brother of SGT Garcia and a U.S. national.

2209. As a result of the July 13, 2008 Attack and SGT Garcia's injuries and death, each member of the Garcia Family has experienced severe mental anguish, emotional pain and suffering.

### 4. The Jason D. Hovater Family

2210. Specialist Jason D. Hovater served in Afghanistan as a member of the U.S. Army. On July 13, 2008, SPC Hovater was injured in the July 13, 2008 Attack. SPC Hovater died on July 13, 2008 as a result of injuries sustained during the attack.

2211. SPC Hovater was a U.S. national at the time of the attack and his death.

2212. Plaintiff Jenna R. Vanosdale is the widow of SPC Hovater and a U.S. national.

2213. As a result of the July 13, 2008 Attack and SPC Hovater's injuries and death, each member of the Hovater Family has experienced severe mental anguish, emotional pain and suffering.

### 5. The Pruitt A. Rainey Family

2214. Corporal Pruitt A. Rainey served in Afghanistan as a member of the U.S. Army. On July 13, 2008, CPL Rainey was injured in the July 13, 2008 Attack. CPL Rainey died on July 13, 2008 as a result of injuries sustained during the attack.

2215. CPL Rainey was a U.S. national at the time of the attack and his death.

2216. Plaintiff Renda L. Riggins is the mother of CPL Rainey and a U.S. national.

2217.   As a result of the July 13, 2008 Attack and CPL Rainey's injuries and death, each member of the Rainey Family has experienced severe mental anguish, emotional pain and suffering.

### 6.   The Gunnar Zwilling Family

2218.   Corporal Gunnar Zwilling served in Afghanistan as a member of the U.S. Army. On July 13, 2008, CPL Zwilling was injured in the July 13, 2008 Attack.  CPL Zwilling died on July 13, 2008 as a result of injuries sustained during the attack.

2219.   CPL Zwilling was a U.S. national at the time of the attack and his death.

2220.   Plaintiff Alexander Zwilling is the brother of CPL Zwilling and a U.S. national.

2221.   Plaintiff Kathy G. Lay, brings claims in her representative capacity on behalf of Kurt Zwilling's estate.  Kurt Zwilling was the father of CPL Zwilling and was a national of the United States.  Kurt Zwilling's estate is entitled to recover economic and non-economic damages.

2222.   As a result of the July 13, 2008 Attack and CPL Zwilling's injuries and death, each member of the Zwilling Family has experienced severe mental anguish, emotional pain and suffering.

### FF.   The July 21, 2008 Attack In Helmand (The Ivan Wilson Family)

2223.   On July 21, 2008, the Taliban committed an IED attack in Helmand Province, Afghanistan (the "July 21, 2008 Attack").

2224.   On information and belief, the bomb that the Taliban detonated during the attack was:  (i) based on a signature al-Qaeda IED design; (ii) assembled and tested by al-Qaeda bombmakers at one of al-Qaeda's IED manufacturing sites managed and funded by al-Qaeda/Taliban terrorist Sirajuddin Haqqani; (iii) designed to detonate precursor ingredients that

were "cooked" by al-Qaeda chemists; and (iv) provided to the Taliban by al-Qaeda operatives in order to facilitate the Taliban's attack.

2225.   The July 21, 2008 Attack would have violated the laws of war if these terrorists were subject to them because, among other reasons, the terrorist(s) who committed the attack neither wore uniforms nor otherwise identified themselves as enemy combatants.

2226.   Lance Corporal Ivan Wilson served in Afghanistan as a member of the U.S. Marine Corps.  On July 21, 2008, LCpl Wilson was injured in the July 21, 2008 Attack.  LCpl Wilson died on July 21, 2008 as a result of injuries sustained during the attack.

2227.   LCpl Wilson was a U.S. national at the time of the attack and his death.

2228.   Plaintiff Denise Wilson is the mother of LCpl Wilson and a U.S. national.

2229.   As a result of the July 21, 2008 Attack and LCpl Wilson's injuries and death, each member of the Wilson Family has experienced severe mental anguish, emotional pain and suffering.

## GG.   The August 1, 2008 Attack In Khost (The Ryan P. Baumann Family)

2230.   On August 1, 2008, the Haqqani Network, a part of the Taliban, committed an IED attack in Khost Province, Afghanistan (the "August 1, 2008 Khost Attack").

2231.   On information and belief, the bomb that the Taliban detonated during the attack was:  (i) based on a signature al-Qaeda IED design; (ii) assembled and tested by al-Qaeda bombmakers at one of al-Qaeda's IED manufacturing sites managed and funded by al-Qaeda/Taliban terrorist Sirajuddin Haqqani; (iii) designed to detonate precursor ingredients that were "cooked" by al-Qaeda chemists; and (iv) provided to the Taliban by al-Qaeda operatives in order to facilitate the Taliban's attack.

2232.   The August 1, 2008 Khost Attack would have violated the laws of war if these terrorists were subject to them because, among other reasons, the terrorist(s) who committed the attack neither wore uniforms nor otherwise identified themselves as enemy combatants.

2233.   Sergeant Ryan P. Baumann served in Afghanistan as a member of the U.S. Army. On August 1, 2008, SGT Baumann was injured in the August 1, 2008 Khost Attack.  SGT Baumann died on August 1, 2008 as a result of injuries sustained during the attack.

2234.   SGT Baumann was a U.S. national at the time of the attack and his death.

2235.   Plaintiff Cindy Jeanne Lohman is the mother of SGT Baumann and a U.S. national.

2236.   Plaintiff Gary Edward Lohman is the step-father of SGT Baumann and a U.S. national.  Gary Edward Lohman lived in the same household as SGT Baumann for a substantial time and considered SGT Baumann the functional equivalent of a biological son.

2237.   As a result of the August 1, 2008 Khost Attack and SGT Baumann's injuries and death, each member of the Baumann Family has experienced severe mental anguish, emotional pain and suffering.

**HH.   The August 1, 2008 Attack In Kunar (The Jair De Jesus Garcia Family)**

2238.   On August 1, 2008 the Taliban committed an IED attack in Kunar Province, Afghanistan (the "August 1, 2008 Kunar Attack").

2239.   On information and belief, the bomb that the Taliban detonated during the attack was:  (i) based on a signature al-Qaeda IED design; (ii) assembled and tested by al-Qaeda bombmakers at one of al-Qaeda's IED manufacturing sites managed and funded by al-Qaeda/Taliban terrorist Sirajuddin Haqqani; (iii) designed to detonate precursor ingredients that were "cooked" by al-Qaeda chemists; and (iv) provided to the Taliban by al-Qaeda operatives in order to facilitate the Taliban's attack.

2240.   The August 1, 2008 Kunar Attack would have violated the laws of war if these terrorists were subject to them because, among other reasons, the terrorist(s) who committed the attack neither wore uniforms nor otherwise identified themselves as enemy combatants.

2241.   Private Jair De Jesus Garcia served in Afghanistan as a member of the U.S. Army. On August 1, 2008, PVT Garcia was injured in the August 1, 2008 Kunar Attack.  PVT Garcia died on August 1, 2008 as a result of injuries sustained during the attack.

2242.   PVT Garcia was a U.S. national at the time of the attack and his death.

2243.   Plaintiff Maria L. Avneri is the mother of PVT Garcia and a U.S. national.

2244.   Plaintiff Eduardo G. Garcia is the brother of PVT Garcia and a U.S. national.

2245.   Plaintiff Jacob Avneri is the step-father of PVT Garcia and a U.S. national.  Jacob Avneri lived in the same household as PVT Garcia for a substantial time and considered PVT Garcia the functional equivalent of a biological son.

2246.   As a result of the August 1, 2008 Attack and PVT Garcia's injuries and death, each member of the Garcia Family has experienced severe mental anguish, emotional pain and suffering.

## II.   The August 22, 2008 Attack In Ghazni (The Brian Studer Family)

2247.   On August 22, 2008 the Haqqani Network, a part of the Taliban, committed an IED attack in Ghazni Province, Afghanistan (the "August 22, 2008 Attack").

2248.   On information and belief, the bomb that the Taliban detonated during the attack was:  (i) based on a signature al-Qaeda IED design; (ii) assembled and tested by al-Qaeda bombmakers at one of al-Qaeda's IED manufacturing sites managed and funded by al-Qaeda/Taliban terrorist Sirajuddin Haqqani; (iii) designed to detonate precursor ingredients that were "cooked" by al-Qaeda chemists; and (iv) provided to the Taliban by al-Qaeda operatives in order to facilitate the Taliban's attack.

2249.   The August 22, 2008 Attack would have violated the laws of war if these terrorists were subject to them because, among other reasons, the terrorist(s) who committed the attack neither wore uniforms nor otherwise identified themselves as enemy combatants.

2250.   Staff Sergeant Brian Studer served in Afghanistan as a member of the U.S. Army. On August 22, 2008, SSG Studer was injured in the August 22, 2008 Attack.  SSG Studer died on August 22, 2008 as a result of injuries sustained during the attack.

2251.   SSG Studer was a U.S. national at the time of the attack and his death.

2252.   Plaintiff Crystal DeLeo is the sister of SSG Studer and a U.S. national.

2253.   As a result of the August 22, 2008 Attack and SSG Studer's injuries and death, each member of the Studer Family has experienced severe mental anguish, emotional pain and suffering.

**JJ.      The September 17, 2008 Attack In Paktika (The Jason A. Vazquez Family)**

2254.   On September 17, 2008 the Haqqani Network, a part of the Taliban, committed an IED attack in Paktika Province, Afghanistan (the "September 17, 2008 Attack").

2255.   On information and belief, the bomb that the Taliban detonated during the attack was:  (i) based on a signature al-Qaeda IED design; (ii) assembled and tested by al-Qaeda bombmakers at one of al-Qaeda's IED manufacturing sites managed and funded by al-Qaeda/Taliban terrorist Sirajuddin Haqqani; (iii) designed to detonate precursor ingredients that were "cooked" by al-Qaeda chemists; and (iv) provided to the Taliban by al-Qaeda operatives in order to facilitate the Taliban's attack.

2256.   The September 17, 2008 Attack would have violated the laws of war if these terrorists were subject to them because, among other reasons, the terrorist(s) who committed the attack neither wore uniforms nor otherwise identified themselves as enemy combatants.

2257.   Staff Sergeant Jason A. Vazquez served in Afghanistan as a member of the U.S. Army National Guard.  On September 17, 2008, SSG Vazquez was injured in the September 17, 2008 Attack.  SSG Vazquez died on September 17, 2008 as a result of injuries sustained during the attack.

2258.   SSG Vazquez was a U.S. national at the time of the attack and his death.

2259.   Plaintiff Jose Antonio Vazquez Sr. is the father of SSG Vazquez and a U.S. national.

2260.   Plaintiff Janice Vazquez is the sister of SSG Vazquez and a U.S. national.

2261.   Plaintiff Jose Vazquez Jr. is the brother of SSG Vazquez and a U.S. national.

2262.   As a result of the September 17, 2008 Attack and SSG Vazquez's injuries and death, each member of the Vazquez Family has experienced severe mental anguish, emotional pain and suffering.

**KK.   The September 20, 2008 Attack In Kunar (The Nathan M. Cox Family)**

2263.   On September 20, 2008 the Taliban committed an IED attack in Kunar Province, Afghanistan (the "September 20, 2008 Attack").

2264.   On information and belief, the bomb that the Taliban detonated during the attack was:  (i) based on a signature al-Qaeda IED design; (ii) assembled and tested by al-Qaeda bombmakers at one of al-Qaeda's IED manufacturing sites managed and funded by al-Qaeda/Taliban terrorist Sirajuddin Haqqani; (iii) designed to detonate precursor ingredients that were "cooked" by al-Qaeda chemists; and (iv) provided to the Taliban by al-Qaeda operatives in order to facilitate the Taliban's attack.

2265.   The September 20, 2008 Attack would have violated the laws of war if these terrorists were subject to them because, among other reasons, the terrorist(s) who committed the attack neither wore uniforms nor otherwise identified themselves as enemy combatants.

2266.   Staff Sergeant Nathan M. Cox served in Afghanistan as a member of the U.S. Army.  On September 20, 2008, SSG Cox was injured in the September 20, 2008 Attack.  SSG Cox died on September 20, 2008 as a result of injuries sustained during the attack.

2267.   SSG Cox was a U.S. national at the time of the attack and his death.

2268.   Plaintiff Hannah Cox is the sister of SSG Cox and a U.S. national.

2269.   As a result of the September 20, 2008 Attack and SSG Cox's injuries and death, each member of the Cox Family has experienced severe mental anguish, emotional pain and suffering.

**LL.    The September 29, 2008 Attack In Helmand (The Jamie S. Nicholas Family)**

2270.   On September 29, 2008 the Taliban committed an IED attack in Helmand Province, Afghanistan (the "September 29, 2008 Attack").

2271.   On information and belief, the bomb that the Taliban detonated during the attack was:  (i) based on a signature al-Qaeda IED design; (ii) assembled and tested by al-Qaeda bombmakers at one of al-Qaeda's IED manufacturing sites managed and funded by al-Qaeda/Taliban terrorist Sirajuddin Haqqani; (iii) designed to detonate precursor ingredients that were "cooked" by al-Qaeda chemists; and (iv) provided to the Taliban by al-Qaeda operatives in order to facilitate the Taliban's attack.

2272.   The September 29, 2008 Attack would have violated the laws of war if these terrorists were subject to them because, among other reasons, the terrorist(s) who committed the attack neither wore uniforms nor otherwise identified themselves as enemy combatants.

2273.   Sergeant First Class Jamie S. Nicholas served in Afghanistan as a member of the U.S. Army.  On September 29, 2008, SFC Nicholas was injured in the September 29, 2008 Attack.  SFC Nicholas died on September 29, 2008 as a result of injuries sustained during the attack.

2274.   SFC Nicholas was a U.S. national at the time of the attack and his death.

2275.   Plaintiff Michelle M. Nicholas is the widow of SFC Nicholas and a U.S. national.

2276.   As a result of the September 29, 2008 Attack and SFC Nicholas's injuries and death, each member of the Nicholas Family has experienced severe mental anguish, emotional pain and suffering.

**MM.   The October 14, 2008 Attack In Kunar (The Cory J. Bertrand Family)**

2277.   On October 14, 2008 the Taliban committed an IED attack in Kunar Province, Afghanistan (the "October 14, 2008 Attack").

2278.   The October 14, 2008 Attack was committed by [INSERT FTO] (an FTO) and the Taliban acting together in a joint al-Qaeda-Taliban cell with al-Qaeda providing, indoctrinating, and training the bomber, who was deployed by the Taliban. On information and belief, the suicide bomber who detonated the bomb during the attack was:  (i) indoctrinated by al-Qaeda regarding the purported religious justification that permitted the attack; (ii) trained by al-Qaeda regarding al-Qaeda's tactics, techniques, and procedures for suicide bombers; (iii) deployed by al-Qaeda to Afghanistan in order to attack Americans there; and (iv) a member of al-Qaeda under al-Qaeda training procedures for suicide attackers, as a result of the bomber pledging loyalty to al-Qaeda to create a point of no return. raining the suicide bomber.

2279.   On information and belief, the bomb that the Taliban detonated during the attack was:  (i) based on a signature al-Qaeda IED design; (ii) assembled and tested by al-Qaeda bombmakers at one of al-Qaeda's IED manufacturing sites managed and funded by al-Qaeda/Taliban terrorist Sirajuddin Haqqani; (iii) designed to detonate precursor ingredients that were "cooked" by al-Qaeda chemists; and (iv) provided to the Taliban by al-Qaeda operatives in order to facilitate the Taliban's attack.

2280.   The October 14, 2008 Attack would have violated the laws of war if these terrorists were subject to them because, among other reasons, the terrorist(s) who committed the attack neither wore uniforms nor otherwise identified themselves as enemy combatants.

2281.   Specialist Cory J. Bertrand served in Afghanistan as a member of the U.S. Army. On October 14, 2008, SPC Bertrand was injured in the October 14, 2008 Attack.  SPC Bertrand died on October 14, 2008 as a result of injuries sustained during the attack.

2282.   SPC Bertrand was a U.S. national at the time of the attack and his death.

2283.   Plaintiff Charlotte Allen is the mother of SPC Bertrand and a U.S. national.

2284.   Plaintiff Austin Nelams is the brother of SPC Bertrand and a U.S. national.

2285.   Plaintiff Matthew Allen is the step-father of SPC Bertrand and a U.S. national. Matthew Allen lived in the same household as SPC Bertrand for a substantial time and considered SPC Bertrand the functional equivalent of a biological son.

2286.   As a result of the October 14, 2008 Attack and SPC Bertrand's injuries and death, each member of the Bertrand Family has experienced severe mental anguish, emotional pain and suffering.

## NN.   The October 22, 2008 Attack In Helmand (The Adrian Robles Family)

2287.   On October 22, 2008 the Taliban committed an IED attack in Helmand Province, Afghanistan (the "October 22, 2008 Attack").

2288.   On information and belief, the bomb that the Taliban detonated during the attack was:  (i) based on a signature al-Qaeda IED design; (ii) assembled and tested by al-Qaeda bombmakers at one of al-Qaeda's IED manufacturing sites managed and funded by al-Qaeda/Taliban terrorist Sirajuddin Haqqani; (iii) designed to detonate precursor ingredients that were "cooked" by al-Qaeda chemists; and (iv) provided to the Taliban by al-Qaeda operatives in order to facilitate the Taliban's attack.

2289.   The October 22, 2008 Attack would have violated the laws of war if these terrorists were subject to them because, among other reasons, the terrorist(s) who committed the attack neither wore uniforms nor otherwise identified themselves as enemy combatants.

2290.   Corporal Adrian Robles served in Afghanistan as a member of the U.S. Marine Corps.  On October 22, 2008, Cpl Robles was injured in the October 22, 2008 Attack.  Cpl Robles died on October 22, 2008 as a result of injuries sustained during the attack.

2291.   Cpl Robles was a U.S. national at the time of the attack and his death.

2292.   Plaintiff Cesar Robles is the father of Cpl Robles and a U.S. national.

2293.   Plaintiff Yolanda Robles is the mother of Cpl Robles and a U.S. national.

2294.   As a result of the October 22, 2008 Attack and Cpl Robles's injuries and death, each member of the Robles Family has experienced severe mental anguish, emotional pain and suffering.

**OO.    The October 27, 2008 Attack In Baghlan (The Kevin D. Grieco Family)**

2295.   On October 27, 2008 the Taliban committed a suicide bombing attack in Baghlan Province, Afghanistan (the "October 27, 2008 Attack").

2296.   The October 27, 2008 Attack was committed by al-Qaeda (an FTO) and the Taliban acting together in a joint al-Qaeda-Taliban cell with al-Qaeda providing, indoctrinating, and training the bomber, who was deployed by the Taliban. On information and belief, the suicide bomber who detonated the bomb during the attack was:  (i) indoctrinated by al-Qaeda regarding the purported religious justification that permitted the attack; (ii) trained by al-Qaeda regarding al-Qaeda's tactics, techniques, and procedures for suicide bombers; (iii) deployed by al-Qaeda to Afghanistan in order to attack Americans there; and (iv) a member of al-Qaeda under al-Qaeda training procedures for suicide attackers, as a result of the bomber pledging loyalty to al-Qaeda to create a point of no return. raining the suicide bomber.

461

2297.   On information and belief, the bomb that the Taliban detonated during the attack was:  (i) based on a signature al-Qaeda IED design; (ii) assembled and tested by al-Qaeda bombmakers at one of al-Qaeda's IED manufacturing sites managed and funded by al-Qaeda/Taliban terrorist Sirajuddin Haqqani; (iii) designed to detonate precursor ingredients that were "cooked" by al-Qaeda chemists; and (iv) provided to the Taliban by al-Qaeda operatives in order to facilitate the Taliban's attack.

2298.   The October 27, 2008 Attack would have violated the laws of war if these terrorists were subject to them because, among other reasons, the terrorist(s) who committed the attack neither wore uniforms nor otherwise identified themselves as enemy combatants.

2299.   Staff Sergeant Kevin D. Grieco served in Afghanistan as a member of the U.S. Army National Guard.  On October 27, 2008, SSG Grieco was injured in the October 27, 2008 Attack.  SSG Grieco died on October 27, 2008 as a result of injuries sustained during the attack.

2300.   SSG Grieco was a U.S. national at the time of the attack and his death.

2301.   Plaintiff Linda K. Grieco is the mother of SSG Grieco and a U.S. national.

2302.   Plaintiff Ralph Grieco is the father of SSG Grieco and a U.S. national.

2303.   Plaintiff Jennifer Grieco Burch is the sister of SSG Grieco and a U.S. national.

2304.   As a result of the October 27, 2008 Attack and SSG Grieco's injuries and death, each member of the Grieco Family has experienced severe mental anguish, emotional pain and suffering.

**PP.    The November 13, 2008 Attack In Nangarhar (The Jonnie L. Stiles Family)**

2305.   On November 13, 2008 the Taliban committed an IED attack in Nangarhar Province, Afghanistan (the "November 13, 2008 Attack").

2306.   On information and belief, the bomb that the Taliban detonated during the attack was:  (i) based on a signature al-Qaeda IED design; (ii) assembled and tested by al-Qaeda

bombmakers at one of al-Qaeda's IED manufacturing sites managed and funded by al-Qaeda/Taliban terrorist Sirajuddin Haqqani; (iii) designed to detonate precursor ingredients that were "cooked" by al-Qaeda chemists; and (iv) provided to the Taliban by al-Qaeda operatives in order to facilitate the Taliban's attack.

2307.   The November 13, 2008 Attack would have violated the laws of war if these terrorists were subject to them because, among other reasons, the terrorist(s) who committed the attack neither wore uniforms nor otherwise identified themselves as enemy combatants.

2308.   Sergeant Jonnie L. Stiles served in Afghanistan as a member of the U.S. Army National Guard.  On November 13, 2008, SGT Stiles was injured in the November 13, 2008 Attack.  SGT Stiles died on November 13, 2008 as a result of injuries sustained during the attack.

2309.   SGT Stiles was a U.S. national at the time of the attack and his death.

2310.   Plaintiff Launa Lee Chavez is the widow of SGT Stiles and a U.S. national.

2311.   Plaintiff Charles Lynn Stiles is the father of SGT Stiles and a U.S. national.

2312.   Plaintiff Kenneth J. Stiles is the brother of SGT Stiles and a U.S. national.

2313.   Plaintiff Natalie Michelle Schoening is the sister of SGT Stiles and a U.S. national.

2314.   Plaintiff Cecilia Stiles is the step-mother of SGT Stiles and a U.S. national. Cecilia Stiles lived in the same household as SGT Stiles for a substantial time and considered SGT Stiles the functional equivalent of a biological son.

2315.   As a result of the November 13, 2008 Attack and SGT Stiles's injuries and death, each member of the Stiles Family has experienced severe mental anguish, emotional pain and suffering.

**QQ.   The January 9, 2009 Attack In Zabul (The Families of Joseph M. Hernandez and Jason R. Parsons)**

2316.   On January 9, 2009 the Haqqani Network, a part of the Taliban, committed an IED attack in Zabul Province, Afghanistan (the "January 9, 2009 Attack").

2317.   On information and belief, the bomb that the Taliban detonated during the attack was:  (i) based on a signature al-Qaeda IED design; (ii) assembled and tested by al-Qaeda bombmakers at one of al-Qaeda's IED manufacturing sites managed and funded by al-Qaeda/Taliban terrorist Sirajuddin Haqqani; (iii) designed to detonate precursor ingredients that were "cooked" by al-Qaeda chemists; and (iv) provided to the Taliban by al-Qaeda operatives in order to facilitate the Taliban's attack.

2318.   The January 9, 2009 Attack would have violated the laws of war if these terrorists were subject to them because, among other reasons, the terrorist(s) who committed the attack neither wore uniforms nor otherwise identified themselves as enemy combatants.

### 1.   The Joseph M Hernandez Family

2319.   Corporal Joseph M. Hernandez served in Afghanistan as a member of the U.S. Army.  On January 9, 2009, CPL Hernandez was injured in the January 9, 2009 Attack.  CPL Hernandez died on January 9, 2009 as a result of injuries sustained during the attack.

2320.   CPL Hernandez was a U.S. national at the time of the attack and his death.

2321.   Plaintiff Jessie Hernandez is the father of CPL Hernandez and a U.S. national.

2322.   As a result of the January 9, 2009 Attack and CPL Hernandez's injuries and death, each member of the Hernandez Family has experienced severe mental anguish, emotional pain and suffering.

### 2. The Jason R. Parsons Family

2323.   Sergeant Jason R. Parsons served in Afghanistan as a member of the U.S. Army. On January 9, 2009, SGT Parsons was injured in the January 9, 2009 Attack.  SGT Parsons died on January 9, 2009 as a result of injuries sustained during the attack.

2324.   SGT Parsons was a U.S. national at the time of the attack and his death.

2325.   Plaintiff Garland Parsons is the father of SGT Parsons and a U.S. national.

2326.   Plaintiff Cathy Parsons is the step-mother of SGT Parsons and a U.S. national. Cathy Parsons lived in the same household as SGT Parsons for a substantial time and considered SGT Parsons the functional equivalent of a biological son.

2327.   As a result of the January 9, 2009 Attack and SGT Parsons's injuries and death, each member of the Parsons Family has experienced severe mental anguish, emotional pain and suffering.

### RR.   The January 17, 2009 Attack In Kabul (The Simone A. Robinson Family)

2328.   On January 17, 2009 the Kabul Attack Network committed an IED attack in Kabul Province, Afghanistan (the "January 17, 2009 IED Attack").

2329.   On information and belief, the bomb that the Taliban detonated during the attack was:  (i) based on a signature al-Qaeda IED design; (ii) assembled and tested by al-Qaeda bombmakers at one of al-Qaeda's IED manufacturing sites managed and funded by al-Qaeda/Taliban terrorist Sirajuddin Haqqani; (iii) designed to detonate precursor ingredients that were "cooked" by al-Qaeda chemists; and (iv) provided to the Taliban by al-Qaeda operatives in order to facilitate the Taliban's attack.

2330.   The January 17, 2009 IED Attack would have violated the laws of war if these terrorists were subject to them because, among other reasons, the terrorist(s) who committed the attack neither wore uniforms nor otherwise identified themselves as enemy combatants.

2331.    Sergeant Simone A. Robinson served in Afghanistan as a member of the U.S. Army National Guard.  On January 17, 2009, SGT Robinson was injured in the January 17, 2009 IED Attack.  SGT Robinson died on March 1, 2009 as a result of injuries sustained during the attack.

2332.    SGT Robinson was a U.S. national at the time of the attack and her death.

2333.    Plaintiff Regina Byther is the mother of SGT Robinson and a U.S. national.

2334.    Plaintiff N.W., by and through her next friend Regina Byther, is the minor daughter of SGT Robinson and a U.S. national.

2335.    As a result of the January 17, 2009 IED Attack and SGT Robinson's injuries and death, each member of the Robinson Family has experienced severe mental anguish, emotional pain and suffering.

**SS.    The January 17, 2009 Attack In Kunar (The Ezra Dawson Family)**

2336.    On January 17, 2009 the Taliban committed an attack on a helicopter in Kunar Province, Afghanistan (the "January 17, 2009 Attack").

2337.    The January 17, 2009 Attack was committed by [INSERT FTO] (an FTO) and the Taliban acting together in a joint al-Qaeda-Taliban cell with al-Qaeda providing, indoctrinating, and training the bomber, who was deployed by the Taliban. On information and belief, the suicide bomber who detonated the bomb during the attack was:  (i) indoctrinated by al-Qaeda regarding the purported religious justification that permitted the attack; (ii) trained by al-Qaeda regarding al-Qaeda's tactics, techniques, and procedures for suicide bombers; (iii) deployed by al-Qaeda to Afghanistan in order to attack Americans there; and (iv) a member of al-Qaeda under al-Qaeda training procedures for suicide attackers, as a result of the bomber pledging loyalty to al-Qaeda to create a point of no return. raining the suicide bomber.

2338.   On information and belief, the bomb that the Taliban detonated during the attack was:  (i) based on a signature al-Qaeda IED design; (ii) assembled and tested by al-Qaeda bombmakers at one of al-Qaeda's IED manufacturing sites managed and funded by al-Qaeda/Taliban terrorist Sirajuddin Haqqani; (iii) designed to detonate precursor ingredients that were "cooked" by al-Qaeda chemists; and (iv) provided to the Taliban by al-Qaeda operatives in order to facilitate the Taliban's attack.

2339.   The January 17, 2009 Attack would have violated the laws of war if these terrorists were subject to them because, among other reasons, the terrorist(s) who committed the attack neither wore uniforms nor otherwise identified themselves as enemy combatants.

2340.   Sergeant Ezra Dawson served in Afghanistan as a member of the U.S. Army.  On January 17, 2009, SGT Dawson was injured in the January 17, 2009 Attack.  SGT Dawson died on January 17, 2009 as a result of injuries sustained during the attack.

2341.   SGT Dawson was a U.S. national at the time of the attack and his death.

2342.   Plaintiff Eva Farr-Wallace is the mother of SGT Dawson and a U.S. national.

2343.   Plaintiff Calvin D. Jamison is the father of SGT Dawson and a U.S. national.

2344.   Plaintiff Atarah Wright is the sister of SGT Dawson and a U.S. national.

2345.   As a result of the January 17, 2009 Attack and SGT Dawson's injuries and death, each member of the Dawson Family has experienced severe mental anguish, emotional pain and suffering.

**TT.    The February 8, 2009 Attack In Helmand (The Jared W. Southworth Family)**

2346.   On February 8, 2009 the Taliban committed an IED attack in Helmand Province, Afghanistan (the "February 8, 2009 Attack").

2347.   The February 8, 2009 Attack was committed by [INSERT FTO] (an FTO) and the Taliban acting together in a joint al-Qaeda-Taliban cell with al-Qaeda providing, indoctrinating, and training the bomber, who was deployed by the Taliban. On information and belief, the suicide bomber who detonated the bomb during the attack was:  (i) indoctrinated by al-Qaeda regarding the purported religious justification that permitted the attack; (ii) trained by al-Qaeda regarding al-Qaeda's tactics, techniques, and procedures for suicide bombers; (iii) deployed by al-Qaeda to Afghanistan in order to attack Americans there; and (iv) a member of al-Qaeda under al-Qaeda training procedures for suicide attackers, as a result of the bomber pledging loyalty to al-Qaeda to create a point of no return. raining the suicide bomber.

2348.   On information and belief, the bomb that the Taliban detonated during the attack was:  (i) based on a signature al-Qaeda IED design; (ii) assembled and tested by al-Qaeda bombmakers at one of al-Qaeda's IED manufacturing sites managed and funded by al-Qaeda/Taliban terrorist Sirajuddin Haqqani; (iii) designed to detonate precursor ingredients that were "cooked" by al-Qaeda chemists; and (iv) provided to the Taliban by al-Qaeda operatives in order to facilitate the Taliban's attack.

2349.   The February 8, 2009 Attack would have violated the laws of war if these terrorists were subject to them because, among other reasons, the terrorist(s) who committed the attack neither wore uniforms nor otherwise identified themselves as enemy combatants.

2350.   First Lieutenant Jared W. Southworth served in Afghanistan as a member of the U.S. Army National Guard.  On February 8, 2009, 1LT Southworth was injured in the February 8, 2009 Attack.  1LT Southworth died on February 8, 2009 as a result of injuries sustained during the attack.

2351.   1LT Southworth was a U.S. national at the time of the attack and his death.

2352.   Plaintiff Chrissy Prado is the widow of 1LT Southworth and a U.S. national.

2353.   Plaintiff A.M.S., by and through her next friend Chrissy Prado, is the minor daughter of 1LT Southworth and a U.S. national.

2354.   Plaintiff C.S.S., by and through her next friend Chrissy Prado, is the minor daughter of 1LT Southworth and a U.S. national.

2355.   Plaintiff Owen M. Southworth is the son of 1LT Southworth and a U.S. national.

2356.   Plaintiff Logan M. Southworth is the son of 1LT Southworth and a U.S. national.

2357.   Plaintiff Kimberly Southworth is the mother of 1LT Southworth and a U.S. national.

2358.   Plaintiff Robert Southworth is the father of 1LT Southworth and a U.S. national.

2359.   Plaintiff Christina Nikole Guerrero is the sister of 1LT Southworth and a U.S. national.

2360.   Plaintiff Michael Southworth is the brother of 1LT Southworth and a U.S. national.

2361.   As a result of the February 8, 2009 Attack and 1LT Southworth's injuries and death, each member of the Southworth Family has experienced severe mental anguish, emotional pain and suffering.

**UU.   The February 10, 2009 Attack In Khost (The Jason R. Watson Family)**

2362.   On February 10, 2009 the Haqqani Network, a part of the Taliban, committed an IED attack in Khost Province, Afghanistan (the "February 10, 2009 Attack").

2363.   On information and belief, the bomb that the Taliban detonated during the attack was:  (i) based on a signature al-Qaeda IED design; (ii) assembled and tested by al-Qaeda bombmakers at one of al-Qaeda's IED manufacturing sites managed and funded by al-Qaeda/Taliban terrorist Sirajuddin Haqqani; (iii) designed to detonate precursor ingredients that

469

were "cooked" by al-Qaeda chemists; and (iv) provided to the Taliban by al-Qaeda operatives in order to facilitate the Taliban's attack.

2364.   The February 10, 2009 Attack would have violated the laws of war if these terrorists were subject to them because, among other reasons, the terrorist(s) who committed the attack neither wore uniforms nor otherwise identified themselves as enemy combatants.

2365.   Private First Class Jason R. Watson served in Afghanistan as a member of the U.S. Army.  On February 10, 2009, PFC Watson was injured in the February 10, 2009 Attack. PFC Watson died on February 10, 2009 as a result of injuries sustained during the attack.

2366.   PFC Watson was a U.S. national at the time of the attack and his death.

2367.   Plaintiff Robert Watson Jr. is the father of PFC Watson and a U.S. national.

2368.   As a result of the February 10, 2009 Attack and PFC Watson's injuries and death, each member of the Watson Family has experienced severe mental anguish, emotional pain and suffering.

**VV.    The February 20, 2009 Attack In Uruzgan (The Jeremy E. Bessa Family)**

2369.   On February, 2009 the Taliban committed a complex attack involving an IED and small arms fire in Uruzgan Province, Afghanistan (the "February 20, 2009 Attack").

2370.   On information and belief, the bomb that the Taliban detonated during the attack was:  (i) based on a signature al-Qaeda IED design; (ii) assembled and tested by al-Qaeda bombmakers at one of al-Qaeda's IED manufacturing sites managed and funded by al-Qaeda/Taliban terrorist Sirajuddin Haqqani; (iii) designed to detonate precursor ingredients that were "cooked" by al-Qaeda chemists; and (iv) provided to the Taliban by al-Qaeda operatives in order to facilitate the Taliban's attack.

2371.   The February 20, 2009 Attack would have violated the laws of war if these terrorists were subject to them because, among other reasons, the terrorist(s) who committed the attack neither wore uniforms nor otherwise identified themselves as enemy combatants.

2372.   Staff Sergeant Jeremy E. Bessa served in Afghanistan as a member of the U.S. Army.  On February 20, 2009, SSG Bessa was injured in the February 20, 2009 Attack.  SSG Bessa died on February 20, 2009 as a result of injuries sustained during the attack.

2373.   SSG Bessa was a U.S. national at the time of the attack and his death.

2374.   Plaintiff Julie Bessa is the mother of SSG Bessa and a U.S. national.

2375.   Plaintiff Bryana Elyse Bessa is the sister of SSG Bessa and a U.S. national.

2376.   Plaintiff Joel D. Bessa is the brother of SSG Bessa and a U.S. national.

2377.   As a result of the February 20, 2009 Attack and SSG Bessa's injuries and death, each member of the Bessa Family has experienced severe mental anguish, emotional pain and suffering.

**WW.   The March 8, 2009 Attack In Paktika (The Kevin A. Dupont Family)**

2378.   On March 8, 2009 the Haqqani Network, a part of the Taliban, committed an IED attack in Paktika Province, Afghanistan (the "March 8, 2009 Attack").

2379.   On information and belief, the bomb that the Taliban detonated during the attack was:  (i) based on a signature al-Qaeda IED design; (ii) assembled and tested by al-Qaeda bombmakers at one of al-Qaeda's IED manufacturing sites managed and funded by al-Qaeda/Taliban terrorist Sirajuddin Haqqani; (iii) designed to detonate precursor ingredients that were "cooked" by al-Qaeda chemists; and (iv) provided to the Taliban by al-Qaeda operatives in order to facilitate the Taliban's attack.

2380.   The March 8, 2009 Attack would have violated the laws of war if these terrorists were subject to them because, among other reasons, the terrorist(s) who committed the attack neither wore uniforms nor otherwise identified themselves as enemy combatants.

2381.   Sergeant First Class Kevin A. Dupont served in Afghanistan as a member of the U.S. Army.  On March 8, 2009, SFC Dupont was injured in the March 8, 2009 Attack.  SFC Dupont died on June 17, 2009 as a result of injuries sustained during the attack.

2382.   SFC Dupont was a U.S. national at the time of the attack and his death.

2383.   Plaintiff Lisa Murawski-Dupont is the widow of SFC Dupont and a U.S. national.

2384.   Plaintiff Mark P. Dupont is the brother of SFC Dupont and a U.S. national.

2385.   As a result of the March 8, 2009 Attack and SFC Dupont's injuries and death, each member of the Dupont Family has experienced severe mental anguish, emotional pain and suffering.

## XX.   The March 15, 2009 Attack In Helmand (The Norman L. Cain III Family)

2386.   On March 15, 2009 the Taliban committed an IED attack in Helmand Province, Afghanistan (the "March 15, 2009 Attack").

2387.   On information and belief, the bomb that the Taliban detonated during the attack was:  (i) based on a signature al-Qaeda IED design; (ii) assembled and tested by al-Qaeda bombmakers at one of al-Qaeda's IED manufacturing sites managed and funded by al-Qaeda/Taliban terrorist Sirajuddin Haqqani; (iii) designed to detonate precursor ingredients that were "cooked" by al-Qaeda chemists; and (iv) provided to the Taliban by al-Qaeda operatives in order to facilitate the Taliban's attack.

2388.   The March 15, 2009 Attack would have violated the laws of war if these terrorists were subject to them because, among other reasons, the terrorist(s) who committed the attack neither wore uniforms nor otherwise identified themselves as enemy combatants.

2389.   Specialist Norman L. Cain III served in Afghanistan as a member of the U.S. Army National Guard.  On March 15, 2009, SPC Cain was injured in the March 15, 2009 Attack. SPC Cain died on March 15, 2009 as a result of injuries sustained during the attack.

2390.   SPC Cain was a U.S. national at the time of the attack and his death.

2391.   Plaintiff Brigette Peterson is the widow of SPC Cain and a U.S. national.

2392.   Plaintiff T.C., by and through his next friend Brigette Peterson is the minor son of SPC Cain and a U.S. national.

2393.   Plaintiff Andrew Bower is the brother of SPC Cain and a U.S. national.

2394.   Plaintiff F.S., by and through her next friend Brigette Peterson, is the minor step-daughter of SPC Cain and a U.S. national.  F.S. lived in the same household as SPC Cain for a substantial time and considered SPC Cain the functional equivalent of a biological father.

2395.   As a result of the March 15, 2009 Attack and SPC Cain's injuries and death, each member of the Cain Family has experienced severe mental anguish, emotional pain and suffering.

**YY.   The March 20, 2009 Attack In Kabul (The Roslyn Schulte Family)**

2396.   On March 20, 2009 the Taliban (including the Haqqani Network) and al-Qaeda (an FTO) acting together as a joint cell in the Kabul Attack Network committed an IED attack in Kabul Province, Afghanistan (the "March 20, 2009 Attack").

2397.   On information and belief, the bomb that the Taliban detonated during the attack was:  (i) based on a signature al-Qaeda IED design; (ii) assembled and tested by al-Qaeda bombmakers at one of al-Qaeda's IED manufacturing sites managed and funded by al-Qaeda/Taliban terrorist Sirajuddin Haqqani; (iii) designed to detonate precursor ingredients that were "cooked" by al-Qaeda chemists; and (iv) provided to the Taliban by al-Qaeda operatives in order to facilitate the Taliban's attack.

2398.   The March 20, 2009 Attack would have violated the laws of war if these terrorists were subject to them because, among other reasons, the terrorist(s) who committed the attack neither wore uniforms nor otherwise identified themselves as enemy combatants.

2399.   First Lieutenant Roslyn Schulte served in Afghanistan as a member of the U.S. Air Force.  On May 20, 2009, 1st Lt Schulte was injured in the March 20, 2009 Attack.  1st Lt Schulte died on May 20, 2009 as a result of injuries sustained during the attack.

2400.   1st Lt Schulte was a U.S. national at the time of the attack and her death.

2401.   Plaintiff Robert Schulte is the father of 1st Lt Schulte and a U.S. national.

2402.   Plaintiff Susie Schulte is the mother of 1st Lt Schulte and a U.S. national.

2403.   Plaintiff Todd Schulte is the brother of 1st Lt Schulte and a U.S. national.

2404.   As a result of the May 20, 2009 Attack and 1st Lt Schulte's injuries and death, each member of the Schulte Family has experienced severe mental anguish, emotional pain and suffering.

**ZZ.    The March 26, 2009 Attack In Kapisa (The Mark E. Stratton II Family)**

2405.   On March 26, 2009 the Kabul Attack Network committed a suicide bombing attack in Kapisa Province, Afghanistan (the "March 26, 2009 Attack").

2406.   The March 26, 2009 Attack was committed by al-Qaeda (an FTO) and the Taliban acting together in a joint al-Qaeda-Taliban cell with al-Qaeda providing, indoctrinating, and training the bomber, who was deployed by the Taliban. On information and belief, the suicide bomber who detonated the bomb during the attack was:  (i) indoctrinated by al-Qaeda regarding the purported religious justification that permitted the attack; (ii) trained by al-Qaeda regarding al-Qaeda's tactics, techniques, and procedures for suicide bombers; (iii) deployed by al-Qaeda to Afghanistan in order to attack Americans there; and (iv) a member of al-Qaeda under al-Qaeda

training procedures for suicide attackers, as a result of the bomber pledging loyalty to al-Qaeda to create a point of no return. raining the suicide bomber.

2407.   On information and belief, the device that the suicide bomber during the attack was:  (i) based on a signature al-Qaeda IED design; (ii) assembled and tested by al-Qaeda bombmakers at one of al-Qaeda's IED manufacturing sites managed and funded by al-Qaeda/Taliban terrorist Sirajuddin Haqqani; (iii) designed to detonate precursor ingredients that were "cooked" by al-Qaeda chemists; and (iv) provided to the Taliban by al-Qaeda operatives in order to facilitate the Taliban's attack.

2408.   The March 26, 2009 Attack would have violated the laws of war if these terrorists were subject to them because, among other reasons, the terrorist(s) who committed the attack neither wore uniforms nor otherwise identified themselves as enemy combatants.

2409.   Lieutenant Colonel Mark E. Stratton II served in Afghanistan as a member of the U.S. Air Force.  On May 26, 2009, Lt Co Stratton was injured in the March 26, 2009 Attack.  Lt Co Stratton died on May 26, 2009 as a result of injuries sustained during the attack.

2410.   Lt Co Stratton was a U.S. national at the time of the attack and his death.

2411.   Plaintiff Janice Cochran York is the mother of Lt Co Stratton and a U.S. national.

2412.   Plaintiff Franklin Little is the brother of Lt Co Stratton and a U.S. national.

2413.   Plaintiff Michael Stratton is the brother of Lt Col Stratton and a U.S. national.

2414.   Plaintiff Steven Stratton is the brother of Lt Col Stratton and a U.S. national.

2415.   Plaintiff Deborah Young is the step-mother of Lt Col Stratton and a U.S. national. Deborah Young lived in the same household as Lt Col Stratton for a substantial time and considered Lt Col Stratton the functional equivalent of a biological son.

2416.    As a result of the May 26, 2009 Attack and Lt Co Stratton's injuries and death, each member of the Stratton Family has experienced severe mental anguish, emotional pain and suffering.

**AAA.    The June 2, 2009 Attack In Paktia (The Jonathan O'Neill Family and Estate)**

2417.    On June 2, 2009 the Haqqani Network (a part of the Taliban) and al-Qaeda (an FTO) acting together in a joint al-Qaeda-Taliban cell committed a complex attack involving an IED and small arms fire in Paktia Province, Afghanistan (the "June 2, 2009 Attack").

2418.    On information and belief, the bomb that the Taliban detonated during the attack was:  (i) based on a signature al-Qaeda IED design; (ii) assembled and tested by al-Qaeda bombmakers at one of al-Qaeda's IED manufacturing sites managed and funded by al-Qaeda/Taliban terrorist Sirajuddin Haqqani; (iii) designed to detonate precursor ingredients that were "cooked" by al-Qaeda chemists; and (iv) provided to the Taliban by al-Qaeda operatives in order to facilitate the Taliban's attack.

2419.    The June 2, 2009 Attack would have violated the laws of war if these terrorists were subject to them because, among other reasons, the terrorist(s) who committed the attack neither wore uniforms nor otherwise identified themselves as enemy combatants.

2420.    Specialist Jonathan O'Neill served in Afghanistan as a member of the U.S. Army. On June 2, 2009, SPC O'Neill was injured in the June 2, 2009 Attack.  SPC O'Neill died on June 15, 2009 as a result of injuries sustained during the attack.

2421.    SPC O'Neill was a U.S. national at the time of the attack and his death.

2422.    Plaintiff Jacqueline O'Neill is the mother of SPC O'Neill and a U.S. national.

2423.    Plaintiff Jacqueline O'Neill brings claims in both her personal capacity and her representative capacity on behalf of SPC O'Neill's estate.  SPC O'Neill's estate is entitled to recover economic and non-economic damages.

476

2424.   Plaintiff Robert O'Neill is the father of SPC O'Neill and a U.S. national.

2425.   Plaintiff Brian O'Neill is the brother of SPC O'Neill and a U.S. national.

2426.   Plaintiff Kaitlyn O'Neill is the sister of SPC O'Neill and a U.S. national.

2427.   Plaintiff Matthew O'Neill is the brother of SPC O'Neill and a U.S. national.

2428.   As a result of the June 2, 2009 Attack and SPC O'Neill's injuries and death, each member of the O'Neill Family has experienced severe mental anguish, emotional pain and suffering.

**BBB.   The June 4, 2009 Attack In Zabul (The Jeffrey Jordan Family)**

2429.   On June 4, 2009 the Haqqani Network, part of the Taliban, committed a complex attack involving IEDs and small arms fire in Zabul Province, Afghanistan (the "June 4, 2009 Attack").

2430.   On information and belief, the bomb that the Taliban detonated during the attack was:  (i) based on a signature al-Qaeda IED design; (ii) assembled and tested by al-Qaeda bombmakers at one of al-Qaeda's IED manufacturing sites managed and funded by al-Qaeda/Taliban terrorist Sirajuddin Haqqani; (iii) designed to detonate precursor ingredients that were "cooked" by al-Qaeda chemists; and (iv) provided to the Taliban by al-Qaeda operatives in order to facilitate the Taliban's attack.

2431.   The June 4, 2009 Attack would have violated the laws of war if these terrorists were subject to them because, among other reasons, the terrorist(s) who committed the attack neither wore uniforms nor otherwise identified themselves as enemy combatants.

2432.   Sergeant Jeffrey Jordan served in Afghanistan as a member of the U.S. Army National Guard.  On June 4, 2009, SGT Jordan was injured in the June 4, 2009 Attack.  SGT Jordan died on June 4, 2009 as a result of injuries sustained during the attack.

2433.   SGT Jordan was a U.S. national at the time of the attack and his death.

2434.   Plaintiff Lacey Jordan is the widow of SGT Jordan and a U.S. national.

2435.   Plaintiff T.J.J., by and through his next friend Lacey Jordan, is the minor son of SGT Jordan and a U.S. national.

2436.   As a result of the June 4, 2009 Attack and SGT Jordan's injuries and death, each member of the Jordan Family has experienced severe mental anguish, emotional pain and suffering.

### CCC.   The June 5, 2009 Attack In Helmand (Paul Michael Schaus)

2437.   On June 5, 2009 the Taliban committed an IED attack in Helmand Province, Afghanistan (the "June 5, 2009 Attack").

2438.   On information and belief, the bomb that the Taliban detonated during the attack was:  (i) based on a signature al-Qaeda IED design; (ii) assembled and tested by al-Qaeda bombmakers at one of al-Qaeda's IED manufacturing sites managed and funded by al-Qaeda/Taliban terrorist Sirajuddin Haqqani; (iii) designed to detonate precursor ingredients that were "cooked" by al-Qaeda chemists; and (iv) provided to the Taliban by al-Qaeda operatives in order to facilitate the Taliban's attack.

2439.   The June 5, 2009 Attack would have violated the laws of war if these terrorists were subject to them because, among other reasons, the terrorist(s) who committed the attack neither wore uniforms nor otherwise identified themselves as enemy combatants.

2440.   Plaintiff Corporal Paul Schaus served in Afghanistan as a member of the U.S. Marine Corps.  On June 5, 2009 Cpl Schaus was injured in the June 5, 2009 Attack.  The attack severely wounded Cpl Schaus, who suffers from an above-knee amputation of both legs, a skin graph on the left hand and left forearm, and a left ring finger amputation.

2441.   Cpl Schaus was a U.S. national at the time of the attack and remains one to this day.

2442.   As a result of the June 5, 2009 Attack and his injuries, Cpl Schaus has experienced severe physical and emotional pain and suffering.

**DDD.  The June 19, 2009 Attack In Kandahar (The Paul G. Smith Family)**

2443.   On June 19, 2009 the Taliban committed an IED attack in Kandahar Province, Afghanistan (the "June 19, 2009 Attack").

2444.   On information and belief, the bomb that the Taliban detonated during the attack was:  (i) based on a signature al-Qaeda IED design; (ii) assembled and tested by al-Qaeda bombmakers at one of al-Qaeda's IED manufacturing sites managed and funded by al-Qaeda/Taliban terrorist Sirajuddin Haqqani; (iii) designed to detonate precursor ingredients that were "cooked" by al-Qaeda chemists; and (iv) provided to the Taliban by al-Qaeda operatives in order to facilitate the Taliban's attack.

2445.   The June 19, 2009 Attack would have violated the laws of war if these terrorists were subject to them because, among other reasons, the terrorist(s) who committed the attack neither wore uniforms nor otherwise identified themselves as enemy combatants.

2446.   Staff Sergeant Paul G. Smith served in Afghanistan as a member of the U.S. Army National Guard.  On June 19, 2009, SSG Smith was injured in the June 19, 2009 Attack. SSG Smith died on June 19, 2009 as a result of injuries sustained during the attack.

2447.   SSG Smith was a U.S. national at the time of the attack and his death.

2448.   Plaintiff Kim Smith is the widow of SSG Smith and a U.S. national.

2449.   Plaintiff Sarah Ngiraibiochel is the step-daughter of SSG Smith and a U.S. national.  Sarah Ngiraibiochel lived in the same household as SSG Smith for a substantial time and considered SSG Smith the functional equivalent of a biological father.

2450.   Plaintiff Benjiman Smith is the son of SSG Smith and a U.S. national.

479

2451.   As a result of the June 19, 2009 Attack and SSG Smith's injuries and death, each member of the Smith Family has experienced severe mental anguish, emotional pain and suffering.

**EEE.   The June 20, 2009 Attack In Khost (The John D. Blair Family)**

2452.   On June 20, 2009 the Haqqani Network, a part of the Taliban, committed a rocket propelled grenade attack in Khost Province, Afghanistan (the "June 20, 2009 Attack").

2453.   On information and belief, the bomb that the Taliban detonated during the attack was:  (i) based on a signature al-Qaeda IED design; (ii) assembled and tested by al-Qaeda bombmakers at one of al-Qaeda's IED manufacturing sites managed and funded by al-Qaeda/Taliban terrorist Sirajuddin Haqqani; (iii) designed to detonate precursor ingredients that were "cooked" by al-Qaeda chemists; and (iv) provided to the Taliban by al-Qaeda operatives in order to facilitate the Taliban's attack.

2454.   The June 20, 2009 Attack would have violated the laws of war if these terrorists were subject to them because, among other reasons, the terrorist(s) who committed the attack neither wore uniforms nor otherwise identified themselves as enemy combatants.

2455.   First Sergeant John D. Blair served in Afghanistan as a member of the U.S. Army National Guard.  On June 20, 2009, 1SG Blair was injured in the June 20, 2009 Attack.  1SG Blair died on June 20, 2009 as a result of injuries sustained during the attack.

2456.   1SG Blair was a U.S. national at the time of the attack and his death.

2457.   Plaintiff Donna Blair is the widow of 1SG Blair and a U.S. national.

2458.   Plaintiff Dallas Bryant is the step-son of 1SG Blair and a U.S. national.  Dallas Bryant lived in the same household as 1SG Blair for a substantial time and considered 1SG Blair the functional equivalent of a biological father.

2459.   Plaintiff Georgia Priest is the step-daughter of 1SG Blair and a U.S. national. Georgia Priest lived in the same household as 1SG Blair for a substantial time and considered 1SG Blair the functional equivalent of a biological father.

2460.   As a result of the June 20, 2009 Attack and 1SG Blair's injuries and death, each member of the Blair Family has experienced severe mental anguish, emotional pain and suffering.

### FFF.   The June 21, 2009 Attack In Parwan (The Ricky D. Jones Family)

2461.   On June 21, 2009 the Taliban committed a rocket attack in Parwan Province, Afghanistan (the "June 21, 2009 Attack").

2462.   On information and belief, the bomb that the Taliban detonated during the attack was:  (i) based on a signature al-Qaeda IED design; (ii) assembled and tested by al-Qaeda bombmakers at one of al-Qaeda's IED manufacturing sites managed and funded by al-Qaeda/Taliban terrorist Sirajuddin Haqqani; (iii) designed to detonate precursor ingredients that were "cooked" by al-Qaeda chemists; and (iv) provided to the Taliban by al-Qaeda operatives in order to facilitate the Taliban's attack.

2463.   The June 21, 2009 Attack would have violated the laws of war if these terrorists were subject to them because, among other reasons, the terrorist(s) who committed the attack neither wore uniforms nor otherwise identified themselves as enemy combatants.

2464.   Sergeant Ricky D. Jones served in Afghanistan as a member of the U.S. Army. On June 21, 2009, SGT Jones was injured in the June 21, 2009 Attack.  SGT Jones died on June 21, 2009 as a result of injuries sustained during the attack.

2465.   SGT Jones was a U.S. national at the time of the attack and his death.

2466.   Plaintiff Fredda Lynn Jones is the widow of SGT Jones and a U.S. national.

2467.   Plaintiff J.J., by and through his next friend Fredda Lynn Jones, is the minor son of SGT Jones and a U.S. national.

2468.   Plaintiff K.J., by and through his next friend Fredda Lynn Jones, is the minor son of SGT Jones and a U.S. national.

2469.   Plaintiff I'Kemeyon Crow is the step-son of SGT Jones and a U.S. national. I'Kemeyon Crow lived in the same household as SGT Jones for a substantial time and considered SGT Jones the functional equivalent of a biological father.

2470.   Plaintiff M.R.W., by and through his next friend Cecilia Washington, is the minor son of SGT Jones and a U.S. national.

2471.   Plaintiff Sheila McCary is the mother of SGT Jones and a U.S. national.

2472.   Plaintiff Jasmine Jones is the sister of SGT Jones and a U.S. national.

2473.   As a result of the June 21, 2009 Attack and SGT Jones's injuries and death, each member of the Jones Family has experienced severe mental anguish, emotional pain and suffering.

### GGG.   The July 2, 2009 Attack In Helmand (The Charles Seth Sharp Family)

2474.   On July 2, 2009 the Taliban committed a small arms fire attack in Helmand Province, Afghanistan (the "July 2, 2009 Attack").

2475.   The July 2, 2009 Attack would have violated the laws of war if these terrorists were subject to them because, among other reasons, the terrorist(s) who committed the attack neither wore uniforms nor otherwise identified themselves as enemy combatants.

2476.   Lance Corporal Charles Seth Sharp served in Afghanistan as a member of the U.S. Marine Corps.  On July 2, 2009, LCpl Sharp was injured in the July 2, 2009 Attack.  LCpl Sharp died on July 2, 2009 as a result of injuries sustained during the attack.

2477.   LCpl Sharp was a U.S. national at the time of the attack and his death.

2478.   Plaintiff Reuben Eric Sharp is the father of LCpl Sharp and a U.S. national.

2479.   Plaintiff Angela Preston is the mother of LCpl Sharp and a U.S. national.

2480.   Plaintiff A.P., by and through his next friend Angela Preston, is the minor brother of LCpl Sharp and a U.S. national.

2481.   Plaintiff Gus Preston is the step-father of LCpl Sharp and a U.S. national.  Gus Preston lived in the same household as LCpl Sharp for a substantial time and considered LCpl Sharp the functional equivalent of a biological son.

2482.   As a result of the July 2, 2009 Attack and LCpl Sharp's injuries and death, each member of the Sharp Family has experienced severe mental anguish, emotional pain and suffering.

### HHH.  The July 6, 2009 Attack In Kunduz (The Families of Chester W. Hosford and Derwin Williams)

2483.   On July 6, 2009 the Taliban committed an IED attack in Kunduz Province, Afghanistan (the "July 6, 2009 Attack").

2484.   On information and belief, the bomb that the Taliban detonated during the attack was:  (i) based on a signature al-Qaeda IED design; (ii) assembled and tested by al-Qaeda bombmakers at one of al-Qaeda's IED manufacturing sites managed and funded by al-Qaeda/Taliban terrorist Sirajuddin Haqqani; (iii) designed to detonate precursor ingredients that were "cooked" by al-Qaeda chemists; and (iv) provided to the Taliban by al-Qaeda operatives in order to facilitate the Taliban's attack.

2485.   The July 6, 2009 Attack would have violated the laws of war if these terrorists were subject to them because, among other reasons, the terrorist(s) who committed the attack neither wore uniforms nor otherwise identified themselves as enemy combatants.

### 1.    The Chester W. Hosford Family

2486.   Sergeant Chester W. Hosford served in Afghanistan as a member of the U.S. Army National Guard.  On July 6, 2009, SGT Hosford was injured in the July 6, 2009 Attack. SGT Hosford died on July 6, 2009 as a result of injuries sustained during the attack.

2487.   SGT Hosford was a U.S. national at the time of the attack and his death.

2488.   Plaintiff Tristyn Anthony Vinson-Hosford is the son of SGT Hosford and a U.S. national.

2489.   As a result of the July 6, 2009 Attack and SGT Hosford's injuries and death, each member of the Hosford Family has experienced severe mental anguish, emotional pain and suffering.

### 2.    The Derwin Williams Family

2490.   First Lieutenant Derwin Williams served in Afghanistan as a member of the U.S. Army National Guard.  On July 6, 2009, 1LT Williams was injured in the July 6, 2009 Attack. 1LT Williams died on July 6, 2009 as a result of injuries sustained during the attack.

2491.   1LT Williams was a U.S. national at the time of the attack and his death.

2492.   Plaintiff Felicia Williams is the widow of 1LT Williams and a U.S. national.

2493.   Plaintiff Derlysa Williams is the daughter of 1LT Williams and a U.S. national.

2494.   Plaintiff Vanecia Mitchell is the step-daughter of 1LT Williams and a U.S. national.  Vanecia Mitchell lived in the same household as 1LT Williams for a substantial time and considered 1LT Williams the functional equivalent of a biological father.

2495.   Plaintiff Victoria Boyd is the step-daughter of 1LT Williams and a U.S. national. Victoria Boyd lived in the same household as 1LT Williams for a substantial time and considered 1LT Williams the functional equivalent of a biological father.

2496.   As a result of the July 6, 2009 Attack and 1LT Williams's injuries and death, each member of the Williams Family has experienced severe mental anguish, emotional pain and suffering.

### III.   The July 7, 2009 Attack In Herat (The Christopher M. Talbert Family)

2497.   On July 7, 2009 the Taliban committed an IED attack in Herat Province, Afghanistan (the "July 7, 2009 Attack").

2498.   On information and belief, the bomb that the Taliban detonated during the attack was:  (i) based on a signature al-Qaeda IED design; (ii) assembled and tested by al-Qaeda bombmakers at one of al-Qaeda's IED manufacturing sites managed and funded by al-Qaeda/Taliban terrorist Sirajuddin Haqqani; (iii) designed to detonate precursor ingredients that were "cooked" by al-Qaeda chemists; and (iv) provided to the Taliban by al-Qaeda operatives in order to facilitate the Taliban's attack.

2499.   The July 7, 2009 Attack would have violated the laws of war if these terrorists were subject to them because, among other reasons, the terrorist(s) who committed the attack neither wore uniforms nor otherwise identified themselves as enemy combatants.

2500.   Specialist Christopher M. Talbert served in Afghanistan as a member of the U.S. Army National Guard.  On July 7, 2009, SPC Talbert was injured in the July 7, 2009 Attack. SPC Talbert died on July 7, 2009 as a result of injuries sustained during the attack.

2501.   SPC Talbert was a U.S. national at the time of the attack and his death.

2502.   Plaintiff Jeffrey Scott Kuykendall is the brother of SPC Talbert and a U.S. national.

2503.   Plaintiff Larry Kuykendall is the brother of SPC Talbert and a U.S. national.

485

2504.   As a result of the July 7, 2009 Attack and SPC Talbert's injuries and death, each member of the Talbert Family has experienced severe mental anguish, emotional pain and suffering.

**JJJ.     The July 20, 2009 Attack In Wardak (The Andrew Jay Roughton Family)**

2505.   On July 20, 2009 the Haqqani Network, a part of the Taliban, committed a complex attack involving IEDs, small arms fire, and rocket propelled grenades in Wardak Province, Afghanistan (the "July 20, 2009 Attack").

2506.   On information and belief, the bomb that the Taliban detonated during the attack was:  (i) based on a signature al-Qaeda IED design; (ii) assembled and tested by al-Qaeda bombmakers at one of al-Qaeda's IED manufacturing sites managed and funded by al-Qaeda/Taliban terrorist Sirajuddin Haqqani; (iii) designed to detonate precursor ingredients that were "cooked" by al-Qaeda chemists; and (iv) provided to the Taliban by al-Qaeda operatives in order to facilitate the Taliban's attack.

2507.   The July 20, 2009 Attack would have violated the laws of war if these terrorists were subject to them because, among other reasons, the terrorist(s) who committed the attack neither wore uniforms nor otherwise identified themselves as enemy combatants.

2508.   Specialist Andrew Jay Roughton served in Afghanistan as a member of the U.S. Army.  On July 20, 2009, SPC Roughton was injured in the July 20, 2009 Attack.  SPC Roughton died on July 20, 2009 as a result of injuries sustained during the attack.

2509.   SPC Roughton was a U.S. national at the time of the attack and his death.

2510.   Plaintiff Mark Roughton is the father of SPC Roughton and a U.S. national.

2511.   As a result of the July 20, 2009 Attack and SPC Roughton's injuries and death, each member of the Roughton Family has experienced severe mental anguish, emotional pain and suffering.

486

**KKK.  The July 22, 2009 Attack In Zabul (The Joshua J. Rimer Family)**

2512.    On July 22, 2009 the Haqqani Network, a part of the Taliban, committed an IED attack in Zabul Province, Afghanistan (the "July 22, 2009 Attack").

2513.    On information and belief, the bomb that the Taliban detonated during the attack was:  (i) based on a signature al-Qaeda IED design; (ii) assembled and tested by al-Qaeda bombmakers at one of al-Qaeda's IED manufacturing sites managed and funded by al-Qaeda/Taliban terrorist Sirajuddin Haqqani; (iii) designed to detonate precursor ingredients that were "cooked" by al-Qaeda chemists; and (iv) provided to the Taliban by al-Qaeda operatives in order to facilitate the Taliban's attack.

2514.    The July 22, 2009 Attack would have violated the laws of war if these terrorists were subject to them because, among other reasons, the terrorist(s) who committed the attack neither wore uniforms nor otherwise identified themselves as enemy combatants.

2515.    Sergeant Joshua J. Rimer served in Afghanistan as a member of the U.S. Army. On July 22, 2009, SGT Rimer was injured in the July 22, 2009 Attack.  SGT Rimer died on July 22, 2009 as a result of injuries sustained during the attack.

2516.    SGT Rimer was a U.S. national at the time of the attack and his death.

2517.    Plaintiff Donna Rimer is the mother of SGT Rimer and a U.S. national.

2518.    Plaintiff James Rimer is the father of SGT Rimer and a U.S. national.

2519.    Plaintiff Shannon Fenton is the sister of SGT Rimer and a U.S. national.

2520.    As a result of the July 22, 2009 Attack and SGT Rimer's injuries and death, each member of the Rimer Family has experienced severe mental anguish, emotional pain and suffering.

**LLL.   The August 1, 2009 Attack In Kandahar (The Jonathan Michael Walls Family)**

2521.   On August 1, 2009 the Taliban committed an attack involving an IED and rocket propelled grenades in Kandahar Province, Afghanistan (the "August 1, 2009 Attack").

2522.   On information and belief, the bomb that the Taliban detonated during the attack was:  (i) based on a signature al-Qaeda IED design; (ii) assembled and tested by al-Qaeda bombmakers at one of al-Qaeda's IED manufacturing sites managed and funded by al-Qaeda/Taliban terrorist Sirajuddin Haqqani; (iii) designed to detonate precursor ingredients that were "cooked" by al-Qaeda chemists; and (iv) provided to the Taliban by al-Qaeda operatives in order to facilitate the Taliban's attack.

2523.   The August 1, 2009 Attack would have violated the laws of war if these terrorists were subject to them because, among other reasons, the terrorist(s) who committed the attack neither wore uniforms nor otherwise identified themselves as enemy combatants.

2524.   Corporal Jonathan Michael Walls served in Afghanistan as a member of the U.S. Army.  On August 1, 2009, CPL Walls was injured in the August 1, 2009 Attack.  CPL Walls died on August 1, 2009 as a result of injuries sustained during the attack.

2525.   CPL Walls was a U.S. national at the time of the attack and his death.

2526.   Plaintiff Steven Walls Sr. is the father of CPL Walls and a U.S. national.

2527.   Plaintiff Lisa Hicks is the mother of SGT Walls and a U.S. national.

2528.   Plaintiff Michael Skoufalos is the brother of SGT Walls and a U.S. national.

2529.   As a result of the August 1, 2009 Attack and CPL Walls's injuries and death, each member of the Walls Family has experienced severe mental anguish, emotional pain and suffering.

**MMM.  The August 2, 2009 Attack In Wardak (The Alejandro Granado III Family)**

2530.   On August 2, 2009 the Haqqani Network, a part of the Taliban, committed an IED attack in Wardak Province, Afghanistan (the "August 2, 2009 Attack").

2531.   On information and belief, the bomb that the Taliban detonated during the attack was:  (i) based on a signature al-Qaeda IED design; (ii) assembled and tested by al-Qaeda bombmakers at one of al-Qaeda's IED manufacturing sites managed and funded by al-Qaeda/Taliban terrorist Sirajuddin Haqqani; (iii) designed to detonate precursor ingredients that were "cooked" by al-Qaeda chemists; and (iv) provided to the Taliban by al-Qaeda operatives in order to facilitate the Taliban's attack.

2532.   The August 2, 2009 Attack would have violated the laws of war if these terrorists were subject to them because, among other reasons, the terrorist(s) who committed the attack neither wore uniforms nor otherwise identified themselves as enemy combatants.

2533.   Sergeant First Class Alejandro Granado III served in Afghanistan as a member of the U.S. Army National Guard.  On August 2, 2009, SFC Granado was injured in the August 2, 2009 Attack.  SFC Granado died on August 2, 2009 as a result of injuries sustained during the attack.

2534.   SFC Granado was a U.S. national at the time of the attack and his death.

2535.   Plaintiff Hasson Granado is the son of SFC Granado and a U.S. national.

2536.   As a result of the August 2, 2009 Attack and SFC Granado's injuries and death, each member of the Granado Family has experienced severe mental anguish, emotional pain and suffering.

**NNN.  The August 7, 2009 Attack In Kapisa (The Matthew Freeman Family)**

2537.   On August 7, 2009 the Taliban committed a sniper attack in Kapisa Province, Afghanistan (the "August 7, 2009 Attack").

2538.  The August 7, 2009 Attack would have violated the laws of war if these terrorists were subject to them because, among other reasons, the terrorist(s) who committed the attack neither wore uniforms nor otherwise identified themselves as enemy combatants.

2539.  Captain Matthew Freeman served in Afghanistan as a member of the U.S. Marine Corps.  On August 7, 2009, Capt Freeman was injured in the August 7, 2009 Attack.  Capt Freeman died on August 7, 2009 as a result of injuries sustained during the attack.

2540.  Capt Freeman was a U.S. national at the time of the attack and his death.

2541.  Plaintiff Lisa Lee Freeman is the mother of Capt Freeman and a U.S. national.

2542.  Plaintiff Virginia Wiedower is the sister of Capt Freeman and a U.S. national.

2543.  As a result of the August 7, 2009 Attack and Capt Freeman's injuries and death, each member of the Freeman Family has experienced severe mental anguish, emotional pain and suffering.

**OOO.  The August 7, 2009 Attack In Wardak (The Jerry Randall Evans Jr. Family)**

2544.  On August 7, 2009 the Haqqani Network, a part of the Taliban, committed an IED attack in Wardak Province, Afghanistan (the "August 7, 2009 IED Attack").

2545.  On information and belief, the bomb that the Taliban detonated during the attack was:  (i) based on a signature al-Qaeda IED design; (ii) assembled and tested by al-Qaeda bombmakers at one of al-Qaeda's IED manufacturing sites managed and funded by al-Qaeda/Taliban terrorist Sirajuddin Haqqani; (iii) designed to detonate precursor ingredients that were "cooked" by al-Qaeda chemists; and (iv) provided to the Taliban by al-Qaeda operatives in order to facilitate the Taliban's attack.

2546.  The August 7, 2009 IED Attack would have violated the laws of war if these terrorists were subject to them because, among other reasons, the terrorist(s) who committed the attack neither wore uniforms nor otherwise identified themselves as enemy combatants.

2547.   Sergeant Jerry Randall Evans Jr. served in Afghanistan as a member of the U.S. Army.  On August 7, 2009, SGT Evans was injured in the August 7, 2009 IED Attack.  SGT Evans died on August 7, 2009 as a result of injuries sustained during the attack.

2548.   SGT Evans was a U.S. national at the time of the attack and his death.

2549.   Plaintiff L.D., by and through his next friend Britani Lee, is the minor son of SGT Evans and a U.S. national.

2550.   Plaintiff Jerry Randall Evans Sr. is the father of SGT Evans and a U.S. national.

2551.   Plaintiff Martha Ann Evans is the mother of SGT Evans and a U.S. national.

2552.   Plaintiff Larissa Ann Barnhart is the sister of SGT Evans and a U.S. national.

2553.   Plaintiff Brittany Evans is the sister of SGT Evans and a U.S. national.

2554.   Plaintiff Crystal Nicole Evans is the sister of SGT Evans and a U.S. national.

2555.   Plaintiff Jonathan Dewayne Rogers is the brother of SGT Evans and a U.S. national.

2556.   As a result of the August 7, 2009 IED Attack and SGT Evans's injuries and death, each member of the Evans Family has experienced severe mental anguish, emotional pain and suffering.

**PPP.   The August 16, 2009 Attack In Herat (The Nicholas R. Roush Family)**

2557.   On August 16, 2009 the Taliban committed an IED attack in Herat Province, Afghanistan (the "August 16, 2009 Attack").

2558.   On information and belief, the bomb that the Taliban detonated during the attack was:  (i) based on a signature al-Qaeda IED design; (ii) assembled and tested by al-Qaeda bombmakers at one of al-Qaeda's IED manufacturing sites managed and funded by al-Qaeda/Taliban terrorist Sirajuddin Haqqani; (iii) designed to detonate precursor ingredients that

were "cooked" by al-Qaeda chemists; and (iv) provided to the Taliban by al-Qaeda operatives in order to facilitate the Taliban's attack.

2559.   The August 16, 2009 Attack would have violated the laws of war if these terrorists were subject to them because, among other reasons, the terrorist(s) who committed the attack neither wore uniforms nor otherwise identified themselves as enemy combatants.

2560.   Corporal Nicholas R. Roush served in Afghanistan as a member of the U.S. Army.  On August 16, 2009, CPL Roush was injured in the August 16, 2009 Attack.  CPL Roush died on August 16, 2009 as a result of injuries sustained during the attack.

2561.   CPL Roush was a U.S. national at the time of the attack and his death.

2562.   Plaintiff Donna Mae Roush is the mother of CPL Roush and a U.S. national.

2563.   Plaintiff Robert Graham Roush Jr. is the father of CPL Roush and a U.S. national.

2564.   Plaintiff Kyle Roush is the brother of CPL Roush and a U.S. national.

2565.   Plaintiff Robert Roush III is the brother of CPL Roush and a U.S. national.

2566.   As a result of the August 16, 2009 Attack and CPL Roush's injuries and death, each member of the Roush Family has experienced severe mental anguish, emotional pain and suffering.

**QQQ.  The August 18, 2009 Attack In Kandahar (The Jonathan Christopher Yanney Family)**

2567.   On August 18, 2009 the Taliban committed an IED attack in Kandahar Province, Afghanistan (the "August 18, 2009 Attack").

2568.   On information and belief, the bomb that the Taliban detonated during the attack was:  (i) based on a signature al-Qaeda IED design; (ii) assembled and tested by al-Qaeda bombmakers at one of al-Qaeda's IED manufacturing sites managed and funded by al-Qaeda/Taliban terrorist Sirajuddin Haqqani; (iii) designed to detonate precursor ingredients that

were "cooked" by al-Qaeda chemists; and (iv) provided to the Taliban by al-Qaeda operatives in order to facilitate the Taliban's attack.

2569.   The August 18, 2009 Attack would have violated the laws of war if these terrorists were subject to them because, among other reasons, the terrorist(s) who committed the attack neither wore uniforms nor otherwise identified themselves as enemy combatants.

2570.   Private First Class Jonathan Christopher Yanney served in Afghanistan as a member of the U.S. Army.  On August 18, 2009, PFC Yanney was injured in the August 18, 2009 Attack.  PFC Yanney died on August 18, 2009 as a result of injuries sustained during the attack.

2571.   PFC Yanney was a U.S. national at the time of the attack and his death.

2572.   Plaintiff Russell Glenn Yanney is the father of PFC Yanney and a U.S. national.

2573.   As a result of the August 18, 2009 Attack and PFC Yanney's injuries and death, each member of the Yanney Family has experienced severe mental anguish, emotional pain and suffering.

**RRR.  The August 20, 2009 Attack In Wardak (The Justin R. Pellerin Family)**

2574.   On August 20, 2009 the Haqqani Network, a part of the Taliban, committed an IED attack in Wardak Province, Afghanistan (the "August 20, 2009 Attack").

2575.   On information and belief, the bomb that the Taliban detonated during the attack was:  (i) based on a signature al-Qaeda IED design; (ii) assembled and tested by al-Qaeda bombmakers at one of al-Qaeda's IED manufacturing sites managed and funded by al-Qaeda/Taliban terrorist Sirajuddin Haqqani; (iii) designed to detonate precursor ingredients that were "cooked" by al-Qaeda chemists; and (iv) provided to the Taliban by al-Qaeda operatives in order to facilitate the Taliban's attack.

2576.   The August 20, 2009 Attack would have violated the laws of war if these terrorists were subject to them because, among other reasons, the terrorist(s) who committed the attack neither wore uniforms nor otherwise identified themselves as enemy combatants.

2577.   Specialist Justin R. Pellerin served in Afghanistan as a member of the U.S. Army. On August 20, 2009, SPC Pellerin was injured in the August 20, 2009 Attack.  SPC Pellerin died on August 20, 2009 as a result of injuries sustained during the attack.

2578.   SPC Pellerin was a U.S. national at the time of the attack and his death.

2579.   Plaintiff Chelsey Pellerin is the widow of SPC Pellerin and a U.S. national.

2580.   As a result of the August 20, 2009 attack and SPC Pellerin's injuries and death, each member of the Pellerin Family has experienced severe mental anguish, emotional pain and suffering.

**SSS.   The August 21, 2009 Attack In Kunar (The Matthew Ingram Family)**

2581.   On August 21, 2009 the Taliban and al-Qaeda (an FTO) acting together in a joint al-Qaeda-Taliban cell committed a complex attack involving an IED and small arms fire in Wardak Province, Afghanistan (the "August 21, 2009 Attack").

2582.   On information and belief, the bomb that the Taliban detonated during the attack was:  (i) based on a signature al-Qaeda IED design; (ii) assembled and tested by al-Qaeda bombmakers at one of al-Qaeda's IED manufacturing sites managed and funded by al-Qaeda/Taliban terrorist Sirajuddin Haqqani; (iii) designed to detonate precursor ingredients that were "cooked" by al-Qaeda chemists; and (iv) provided to the Taliban by al-Qaeda operatives in order to facilitate the Taliban's attack.

2583.   The August 21, 2009 Attack would have violated the laws of war if these terrorists were subject to them because, among other reasons, the terrorist(s) who committed the attack neither wore uniforms nor otherwise identified themselves as enemy combatants.

2584.   Sergeant Matthew Ingram served in Afghanistan as a member of the U.S. Army. On August 21, 2009, SGT Ingram was injured in the August 21, 2009 Attack.  SGT Ingram died on August 21, 2009 as a result of injuries sustained during the attack.

2585.   SGT Ingram was a U.S. national at the time of the attack and his death.

2586.   Plaintiff Holly Ingram is the widow of SGT Ingram and a U.S. national.

2587.   Plaintiff C.A.I., by and through her next friend Holly Ingram, is the minor daughter of SGT Ingram and a U.S. national.

2588.   As a result of the August 21, 2009 Attack and SGT Ingram's injuries and death, each member of the Ingram Family has experienced severe mental anguish, emotional pain and suffering.

**TTT.   The August 27, 2009 Attack In Kandahar (The Matthew E. Wildes Family)**

2589.   On August 27, 2009 the Taliban committed an IED attack in Kandahar Province, Afghanistan (the "August 27, 2009 Attack").

2590.   On information and belief, the bomb that the Taliban detonated during the attack was:  (i) based on a signature al-Qaeda IED design; (ii) assembled and tested by al-Qaeda bombmakers at one of al-Qaeda's IED manufacturing sites managed and funded by al-Qaeda/Taliban terrorist Sirajuddin Haqqani; (iii) designed to detonate precursor ingredients that were "cooked" by al-Qaeda chemists; and (iv) provided to the Taliban by al-Qaeda operatives in order to facilitate the Taliban's attack.

2591.   The August 27, 2009 Attack would have violated the laws of war if these terrorists were subject to them because, among other reasons, the terrorist(s) who committed the attack neither wore uniforms nor otherwise identified themselves as enemy combatants.

2592.   Private First Class Matthew E. Wildes served in Afghanistan as a member of the U.S. Army.  On August 27, 2009, PFC Wildes was injured in the August 27, 2009 Attack.  PFC Wildes died on August 27, 2009 as a result of injuries sustained during the attack.

2593.   PFC Wildes was a U.S. national at the time of the attack and his death.

2594.   Plaintiff Clint Coleman Wildes is the father of PFC Wildes and a U.S. national.

2595.   Plaintiff Jamie E. Surles is the sister of PFC Wildes and a U.S. national.

2596.   As a result of the August 27, 2009 Attack and PFC Wildes's injuries and death, each member of the Wildes Family has experienced severe mental anguish, emotional pain and suffering.

**UUU.  The August 31, 2009 Attack In Kandahar (The Tyler R. Walsh Family)**

2597.   On August 31, 2009 the Taliban committed an IED attack in Kandahar Province, Afghanistan (the "August 31, 2009 Attack").

2598.   On information and belief, the bomb that the Taliban detonated during the attack was:  (i) based on a signature al-Qaeda IED design; (ii) assembled and tested by al-Qaeda bombmakers at one of al-Qaeda's IED manufacturing sites managed and funded by al-Qaeda/Taliban terrorist Sirajuddin Haqqani; (iii) designed to detonate precursor ingredients that were "cooked" by al-Qaeda chemists; and (iv) provided to the Taliban by al-Qaeda operatives in order to facilitate the Taliban's attack.

2599.   The August 31, 2009 Attack would have violated the laws of war if these terrorists were subject to them because, among other reasons, the terrorist(s) who committed the attack neither wore uniforms nor otherwise identified themselves as enemy combatants.

2600.   Specialist Tyler R. Walshe served in Afghanistan as a member of the U.S. Army. On August 31, 2009, SPC Walshe was injured in the August 31, 2009 Attack.  SPC Walshe died on August 31, 2009 as a result of injuries sustained during the attack.

2601.   SPC Walshe was a U.S. national at the time of the attack and his death.

2602.   Plaintiff Dawn Vietti is the mother of SPC Walshe and a U.S. national.

2603.   Plaintiff Danny Vietti is the brother of SPC Walshe and a U.S. national.

2604.   Plaintiff Paul Vietti is the step-father of SPC Walshe and a U.S. national.  Paul
Vietti lived in the same household as SPC Walshe for a substantial time and considered SPC
Walshe the functional equivalent of a biological son.

2605.   Plaintiff Eric Allen Vietti is the brother of SPC Walshe and a U.S. national.

2606.   As a result of the August 31, 2009 Attack and SPC Walshe's injuries and death,
each member of the Walshe Family has experienced severe mental anguish, emotional pain and
suffering.

**VVV.   The September 4, 2009 Attack In Paktika (The Darryn D. Andrews Family)**

2607.   On September 4, 2009 the Haqqani Network (a part of the Taliban) and al-Qaeda
(an FTO) acting together in a joint al-Qaeda-Taliban cell committed a complex attack involving
an IED and rocket propelled grenades in Paktika Province, Afghanistan (the "September 4, 2009
Attack").

2608.   On information and belief, the bomb that the Taliban detonated during the attack
was:  (i) based on a signature al-Qaeda IED design; (ii) assembled and tested by al-Qaeda
bombmakers at one of al-Qaeda's IED manufacturing sites managed and funded by al-
Qaeda/Taliban terrorist Sirajuddin Haqqani; (iii) designed to detonate precursor ingredients that
were "cooked" by al-Qaeda chemists; and (iv) provided to the Taliban by al-Qaeda operatives in
order to facilitate the Taliban's attack.

2609.   The September 4, 2009 Attack would have violated the laws of war if these
terrorists were subject to them because, among other reasons, the terrorist(s) who committed the
attack neither wore uniforms nor otherwise identified themselves as enemy combatants.

2610.   Second Lieutenant Darryn D. Andrews served in Afghanistan as a member of the U.S. Army.  On September 4, 2009, 2LT Andrews was injured in the September 4, 2009 Attack. 2LT Andrews died on September 4, 2009 as a result of injuries sustained during the attack.

2611.   2LT Andrews was a U.S. national at the time of the attack and his death.

2612.   Plaintiff Robert Andrews is the father of 2LT Andrews and a U.S. national.

2613.   Plaintiff Sondra Andrews is the mother of 2LT Andrews and a U.S. national.

2614.   As a result of the September 4, 2009 Attack and 2LT Andrews's injuries and death, each member of the Andrews Family has experienced severe mental anguish, emotional pain and suffering.

### WWW. The September 12, 2009 Attack In Wardak (The Nekl B. Allen and Daniel L. Cox Families)

2615.   On September 12, 2009 the Haqqani Network, a part of the Taliban, committed a complex attack involving an IED and small arms fire in Wardak Province, Afghanistan (the "September 12, 2009 Attack").

2616.   On information and belief, the bomb that the Taliban detonated during the attack was:  (i) based on a signature al-Qaeda IED design; (ii) assembled and tested by al-Qaeda bombmakers at one of al-Qaeda's IED manufacturing sites managed and funded by al-Qaeda/Taliban terrorist Sirajuddin Haqqani; (iii) designed to detonate precursor ingredients that were "cooked" by al-Qaeda chemists; and (iv) provided to the Taliban by al-Qaeda operatives in order to facilitate the Taliban's attack.

2617.   The September 12, 2009 Attack would have violated the laws of war if these terrorists were subject to them because, among other reasons, the terrorist(s) who committed the attack neither wore uniforms nor otherwise identified themselves as enemy combatants.

### 1.    The Nekl B. Allen Family

2618.   Staff Sergeant Nekl B. Allen served in Afghanistan as a member of the U.S. Army.  On September 12, 2009, SSG Allen was injured in the September 12, 2009 Attack.  SSG Allen died on September 12, 2009 as a result of injuries sustained during the attack.

2619.   SSG Allen was a U.S. national at the time of the attack and his death.

2620.   Plaintiff Rana Goodrich Allen is the sister of SSG Allen and a U.S. national.

2621.   Plaintiff Amy Allen is the widow of SSG Allen and a U.S. national.

2622.   Plaintiff Daniel Allen is the father of SSG Allen and a U.S. national.

2623.   As a result of the September 12, 2009 Attack and SSG Allen's injuries and death, each member of the Allen Family has experienced severe mental anguish, emotional pain and suffering.

### 2.    The Daniel L. Cox Family

2624.   Corporal Daniel L. Cox served in Afghanistan as a member of the U.S. Army.  On September 12, 2009, CPL Cox was injured in the September 12, 2009 Attack.  CPL Cox died on September 12, 2009 as a result of injuries sustained during the attack.

2625.   CPL Cox was a U.S. national at the time of the attack and his death.

2626.   Plaintiff Kim B. Cox is the father of CPL Cox and a U.S. national.

2627.   Plaintiff Sharon J. Cox is the mother of CPL Cox and a U.S. national.

2628.   Plaintiff Shannon Butler is the sister of CPL Cox and a U.S. national.

2629.   As a result of the September 12, 2009 Attack and CPL Cox's injuries and death, each member of the Cox Family has experienced severe mental anguish, emotional pain and suffering.

**XXX.   The September 14, 2009 Attack In Helmand (The David T. Wright II Family)**

2630.   On September 14, 2009 the Taliban committed an IED attack in Helmand Province, Afghanistan (the "September 14, 2009 Attack").

2631.   On information and belief, the bomb that the Taliban detonated during the attack was:  (i) based on a signature al-Qaeda IED design; (ii) assembled and tested by al-Qaeda bombmakers at one of al-Qaeda's IED manufacturing sites managed and funded by al-Qaeda/Taliban terrorist Sirajuddin Haqqani; (iii) designed to detonate precursor ingredients that were "cooked" by al-Qaeda chemists; and (iv) provided to the Taliban by al-Qaeda operatives in order to facilitate the Taliban's attack.

2632.   The September 14, 2009 Attack would have violated the laws of war if these terrorists were subject to them because, among other reasons, the terrorist(s) who committed the attack neither wore uniforms nor otherwise identified themselves as enemy combatants.

2633.   First Lieutenant David T. Wright II served in Afghanistan as a member of the U.S. Army.  On September 14, 2009, 1LT Wright was injured in the September 14, 2009 Attack. 1LT Wright died on September 14, 2009 as a result of injuries sustained during the attack.

2634.   1LT Wright was a U.S. national at the time of the attack and his death.

2635.   Plaintiff Regina Michele Wright is the mother of 1LT Wright and a U.S. national.

2636.   As a result of the September 14, 2009 Attack and 1LT Wright's injuries and death, each member of the Wright Family has experienced severe mental anguish, emotional pain and suffering.

**YYY.   The September 24, 2009 Attack In Zabul (The Edward Bernard Smith Family)**

2637.   On September 24, 2009 the Haqqani Network, a part of the Taliban, committed an IED attack in Zabul Province, Afghanistan (the "September 24, 2009 Attack").

2638.   On information and belief, the bomb that the Taliban detonated during the attack was:  (i) based on a signature al-Qaeda IED design; (ii) assembled and tested by al-Qaeda bombmakers at one of al-Qaeda's IED manufacturing sites managed and funded by al-Qaeda/Taliban terrorist Sirajuddin Haqqani; (iii) designed to detonate precursor ingredients that were "cooked" by al-Qaeda chemists; and (iv) provided to the Taliban by al-Qaeda operatives in order to facilitate the Taliban's attack.

2639.   The September 24, 2009 Attack would have violated the laws of war if these terrorists were subject to them because, among other reasons, the terrorist(s) who committed the attack neither wore uniforms nor otherwise identified themselves as enemy combatants.

2640.   Staff Sergeant Edward Bernard Smith served in Afghanistan as a member of the U.S. Army.  On September 24, 2009, SSG Smith was injured in the September 24, 2009 Attack. SSG Smith died on September 24, 2009 as a result of injuries sustained during the attack.

2641.   SSG Smith was a U.S. national at the time of the attack and his death.

2642.   Plaintiff Jamie Smith is the widow of SSG Smith and a U.S. national.

2643.   Plaintiff Robert Earl Smith is the brother of SSG Smith and a U.S. national.

2644.   Plaintiff Thelma Smith is the sister of SSG Smith and a U.S. national.

2645.   Plaintiff Annette Parrish is the grandmother of SSG Smith and a U.S. national. Annette Parrish lived in the same household as SSG Smith for a substantial time and considered SSG Smith the functional equivalent of a biological son.

2646.   Plaintiff DeAnndrea Luney is the step-daughter of SSG Smith and a U.S. national. DeAnndrea Luney lived in the same household as SSG Smith for a substantial time and considered SSG Smith the functional equivalent of a biological father.

2647.   Plaintiff Deiontay Welch is the step-son of SSG Smith and a U.S. national. Deiontay Welch lived in the same household as SSG Smith for a substantial time and considered SSG Smith the functional equivalent of a biological father.

2648.   Plaintiff Steven Flowers Jr. is the brother of SSG Smith and a U.S. national.

2649.   Plaintiff Craig Smith is the brother of SSG Smith and a U.S. national.

2650.   As a result of the September 24, 2009 Attack and SSG Smith's injuries and death, each member of the Smith Family has experienced severe mental anguish, emotional pain and suffering.

**ZZZ.   The September 30, 2009 Attack In Khost (The Alex French IV Family)**

2651.   On September 30, 2009, al-Qaeda and Haqqani Network terrorists, acting together as a joint cell for the Kabul Attack Network, committed a suicide bombing attack in Khost Province, Afghanistan (the "September 30, 2009 Attack").

2652.   The September 30, 2009 Attack was committed by al-Qaeda (an FTO) and the Taliban acting together in a joint al-Qaeda-Taliban cell with al-Qaeda providing, indoctrinating, and training the bomber, who was deployed by the Taliban. On information and belief, the suicide bomber who detonated the bomb during the attack was:  (i) indoctrinated by al-Qaeda regarding the purported religious justification that permitted the attack; (ii) trained by al-Qaeda regarding al-Qaeda's tactics, techniques, and procedures for suicide bombers; (iii) deployed by al-Qaeda to Afghanistan in order to attack Americans there; and (iv) a member of al-Qaeda under al-Qaeda training procedures for suicide attackers, as a result of the bomber pledging loyalty to al-Qaeda to create a point of no return. raining the suicide bomber.

2653.   On information and belief, the device that the suicide bomber detonated during the attack was:  (i) based on a signature al-Qaeda IED design; (ii) assembled and tested by al-Qaeda bombmakers at one of al-Qaeda's IED manufacturing sites managed and funded by al-

Qaeda/Taliban terrorist Sirajuddin Haqqani; (iii) designed to detonate precursor ingredients that were "cooked" by al-Qaeda chemists; and (iv) provided to the Taliban by al-Qaeda operatives in order to facilitate the Taliban's attack.

2654.   The September 30, 2009 Attack would have violated the laws of war if these terrorists were subject to them because, among other reasons, the terrorist(s) who committed the attack neither wore uniforms nor otherwise identified themselves as enemy combatants.

2655.   Staff Sergeant Alex French IV served in Afghanistan as a member of the U.S. Army National Guard.  On September 30, 2009, SSG French was injured in the September 30, 2009 Attack.  SSG French died on September 30, 2009 as a result of injuries sustained during the attack.

2656.   SSG French was a U.S. national at the time of the attack and his death.

2657.   Plaintiff Gwendolyn French is the mother of SSG French and a U.S. national.

2658.   Plaintiff Laquitta French is the sister of SSG French and a U.S. national.

2659.   Plaintiff Latoya French is the sister of SSG French and a U.S. national.

2660.   As a result of the September 30, 2009 Attack and SSG French's injuries and death, each member of the French Family has experienced severe mental anguish, emotional pain and suffering.

**AAAA. The October 2, 2009 Attack In Logar (The Ryan C. Adams Family)**

2661.   On October 2, 2009 the Haqqani Network, a part of the Taliban, committed a rocket propelled grenade attack in Logar Province, Afghanistan (the "October 2, 2009 Attack").

2662.   The October 2, 2009 Attack would have violated the laws of war if these terrorists were subject to them because, among other reasons, the terrorist(s) who committed the attack neither wore uniforms nor otherwise identified themselves as enemy combatants.

2663.   Sergeant Ryan C. Adams served in Afghanistan as a member of the U.S. Army National Guard.  On October 2, 2009, SGT Adams was injured in the October 2, 2009 Attack. SGT Adams died on October 2, 2009 as a result of injuries sustained during the attack.

2664.   SGT Adams was a U.S. national at the time of the attack and his death.

2665.   Plaintiff Jalane Ardith Adams is the mother of SGT Adams and a U.S. national.

2666.   Plaintiff Peter Adams is the father of SGT Adams and a U.S. national.

2667.   Plaintiff Amanda Boone is the sister of SGT Adams and a U.S. national.

2668.   As a result of the October 2, 2009 Attack and SGT Adams's injuries and death, each member of the Adams Family has experienced severe mental anguish, emotional pain and suffering.

**BBBB. The October 7, 2009 Attack In Helmand (The George W. Cauley Family)**

2669.   On October 7, 2009 the Taliban committed an IED attack in Helmand Province, Afghanistan (the "October 7, 2009 Attack").

2670.   On information and belief, the bomb that the Taliban detonated during the attack was:  (i) based on a signature al-Qaeda IED design; (ii) assembled and tested by al-Qaeda bombmakers at one of al-Qaeda's IED manufacturing sites managed and funded by al-Qaeda/Taliban terrorist Sirajuddin Haqqani; (iii) designed to detonate precursor ingredients that were "cooked" by al-Qaeda chemists; and (iv) provided to the Taliban by al-Qaeda operatives in order to facilitate the Taliban's attack.

2671.   The October 7, 2009 Attack would have violated the laws of war if these terrorists were subject to them because, among other reasons, the terrorist(s) who committed the attack neither wore uniforms nor otherwise identified themselves as enemy combatants.

504

2672.   Specialist George W. Cauley served in Afghanistan as a member of the U.S. Army National Guard.  On October 7, 2009, SPC Cauley was injured in the October 7, 2009 Attack.  SPC Cauley died on October 10, 2009 as a result of injuries sustained during the attack.

2673.   SPC Cauley was a U.S. national at the time of the attack and his death.

2674.   Plaintiff Gloria Jean Cauley is the mother of SPC Cauley and a U.S. national.

2675.   Plaintiff Richard Allen Cauley is the father of SPC Cauley and a U.S. national.

2676.   As a result of the October 7, 2009 Attack and SPC Cauley's injuries and death, each member of the Cauley Family has experienced severe mental anguish, emotional pain and suffering.

**CCCC. The October 9, 2009 Attack In Helmand (The Aaron J. Taylor Family)**

2677.   On October 9, 2009 the Taliban committed an IED attack in Helmand Province, Afghanistan (the "October 9, 2009 Attack").

2678.   On information and belief, the bomb that the Taliban detonated during the attack was:  (i) based on a signature al-Qaeda IED design; (ii) assembled and tested by al-Qaeda bombmakers at one of al-Qaeda's IED manufacturing sites managed and funded by al-Qaeda/Taliban terrorist Sirajuddin Haqqani; (iii) designed to detonate precursor ingredients that were "cooked" by al-Qaeda chemists; and (iv) provided to the Taliban by al-Qaeda operatives in order to facilitate the Taliban's attack.

2679.   The October 9, 2009 Attack would have violated the laws of war if these terrorists were subject to them because, among other reasons, the terrorist(s) who committed the attack neither wore uniforms nor otherwise identified themselves as enemy combatants.

2680.   Staff Sergeant Aaron J. Taylor served in Afghanistan as a member of the U.S. Marine Corps.  On October 9, 2009, SSgt Taylor was injured in the October 9, 2009 Attack. SSgt Taylor died on October 9, 2009 as a result of injuries sustained during the attack.

505

2681.   SSgt Taylor was a U.S. national at the time of the attack and his death.

2682.   Plaintiff Clifford Taylor is the father of SSgt Taylor and a U.S. national.

2683.   Plaintiff Kyle Taylor is the brother of SSgt Taylor and a U.S. national.

2684.   As a result of the October 9, 2009 Attack and SSgt Taylor's injuries and death, each member of the Taylor Family has experienced severe mental anguish, emotional pain and suffering.

### DDD. The October 15, 2009 Attack In Kandahar (The Brandon M. Styer Family)

2685.   On October 15, 2009 the Taliban committed an IED attack in Kandahar Province, Afghanistan (the "October 15, 2009 Attack").

2686.   On information and belief, the bomb that the Taliban detonated during the attack was:  (i) based on a signature al-Qaeda IED design; (ii) assembled and tested by al-Qaeda bombmakers at one of al-Qaeda's IED manufacturing sites managed and funded by al-Qaeda/Taliban terrorist Sirajuddin Haqqani; (iii) designed to detonate precursor ingredients that were "cooked" by al-Qaeda chemists; and (iv) provided to the Taliban by al-Qaeda operatives in order to facilitate the Taliban's attack.

2687.   The October 15, 2009 Attack would have violated the laws of war if these terrorists were subject to them because, among other reasons, the terrorist(s) who committed the attack neither wore uniforms nor otherwise identified themselves as enemy combatants.

2688.   Private First Class Brandon M. Styer served in Afghanistan as a member of the U.S. Army.  On October 15, 2009, PFC Styer was injured in the October 15, 2009 Attack.  PFC Styer died on October 15, 2009 as a result of injuries sustained during the attack.

2689.   PFC Styer was a U.S. national at the time of the attack and his death.

2690.   Plaintiff Jill Myers is the mother of PFC Styer and a U.S. national.

2691.   Plaintiff Alyssa Marie Styer is the sister of PFC Styer and a U.S. national.

506

2692.   Plaintiff John Anderson Hall is the step-father of PFC Styer and a U.S. national. John Anderson Hall lived in the same household as PFC Styer for a substantial time and considered PFC Styer the functional equivalent of a biological son.

2693.   As a result of the October 15, 2009 Attack and PFC Styer's injuries and death, each member of the Styer Family has experienced severe mental anguish, emotional pain and suffering.

**EEEE. The October 16, 2009 Attack In Ghazni (The Anthony G. Green Family)**

2694.   On October 16, 2009 the Haqqani Network, a part of the Taliban, committed an IED attack in Ghazni Province, Afghanistan (the "October 16, 2009 Attack").

2695.   On information and belief, the bomb that the detonated during the attack was:  (i) based on a signature al-Qaeda IED design; (ii) assembled and tested by al-Qaeda bombmakers at one of al-Qaeda's IED manufacturing sites managed and funded by al-Qaeda/Taliban terrorist Sirajuddin Haqqani; (iii) designed to detonate precursor ingredients that were "cooked" by al-Qaeda chemists; and (iv) provided to the Taliban by al-Qaeda operatives in order to facilitate the Taliban's attack.

2696.   The October 16, 2009 Attack would have violated the laws of war if these terrorists were subject to them because, among other reasons, the terrorist(s) who committed the attack neither wore uniforms nor otherwise identified themselves as enemy combatants.

2697.   Sergeant Anthony G. Green served in Afghanistan as a member of the U.S. Army National Guard.  On October 16, 2009, SGT Green was injured in the October 16, 2009 Attack. SGT Green died on October 16, 2009 as a result of injuries sustained during the attack.

2698.   SGT Green was a U.S. national at the time of the attack and his death.

2699.   Plaintiff Almuth Cornelius Green Jr. is the father of SGT Green and a U.S. national.

507

2700.   Plaintiff Patricia C. Green is the mother of SGT Green and a U.S. national.

2701.   Plaintiff Jesse Green is the brother of SGT Green and a U.S. national.

2702.   As a result of the October 16, 2009 Attack and SGT Green's injuries and death, each member of the Green Family has experienced severe mental anguish, emotional pain and suffering.

### FFFF. The October 16, 2009 Attack In Kandahar (The Christopher Rudzinski Family)

2703.   On October 16, 2009 the Taliban committed an IED attack in Kandahar Province, Afghanistan (the "October 16, 2009 Kandahar Attack").

2704.   On information and belief, the bomb that the Taliban detonated during the attack was:  (i) based on a signature al-Qaeda IED design; (ii) assembled and tested by al-Qaeda bombmakers at one of al-Qaeda's IED manufacturing sites managed and funded by al-Qaeda/Taliban terrorist Sirajuddin Haqqani; (iii) designed to detonate precursor ingredients that were "cooked" by al-Qaeda chemists; and (iv) provided to the Taliban by al-Qaeda operatives in order to facilitate the Taliban's attack.

2705.   The October 16, 2009 Kandahar Attack would have violated the laws of war if these terrorists were subject to them because, among other reasons, the terrorist(s) who committed the attack neither wore uniforms nor otherwise identified themselves as enemy combatants.

2706.   Staff Sergeant Christopher Rudzinski served in Afghanistan as a member of the U.S. Army.  On October 16, 2009, SSG Rudzinski was injured in the October 16, 2009 Kandahar Attack.  SSG Rudzinski died on October 16, 2009 as a result of injuries sustained during the attack.

2707.   SSG Rudzinski was a U.S. national at the time of the attack and his death.

2708.   Plaintiff R.A.R., by and through his next friend Caroline Rudzinski, is the minor son of SSG Rudzinski and a U.S. national.

2709.   As a result of the October 16, 2009 Kandahar Attack and SSG Rudzinski's injuries and death, each member of the Rudzinski Family has experienced severe mental anguish, emotional pain and suffering.

**GGGG. The October 17, 2009 Attack In Kandahar (The Michael A. Dahl Jr. Family)**

2710.   On October 17, 2009 the Taliban committed an IED attack in Kandahar Province, Afghanistan (the "October 17, 2009 Attack").

2711.   On information and belief, the bomb that the Taliban detonated during the attack was:  (i) based on a signature al-Qaeda IED design; (ii) assembled and tested by al-Qaeda bombmakers at one of al-Qaeda's IED manufacturing sites managed and funded by al-Qaeda/Taliban terrorist Sirajuddin Haqqani; (iii) designed to detonate precursor ingredients that were "cooked" by al-Qaeda chemists; and (iv) provided to the Taliban by al-Qaeda operatives in order to facilitate the Taliban's attack.

2712.   The October 17, 2009 Attack would have violated the laws of war if these terrorists were subject to them because, among other reasons, the terrorist(s) who committed the attack neither wore uniforms nor otherwise identified themselves as enemy combatants.

2713.   Specialist Michael A. Dahl Jr. served in Afghanistan as a member of the U.S. Army.  On October 17, 2009, SPC Dahl was injured in the October 17, 2009 Attack.  SPC Dahl died on October 17, 2009 as a result of injuries sustained during the attack.

2714.   SPC Dahl was a U.S. national at the time of the attack and his death.

2715.   Plaintiff Patricia Dahl is the mother of SPC Dahl and a U.S. national.

2716.   Plaintiff Angel Dahl is the brother of SPC Dahl and a U.S. national.

2717.   As a result of the October 17, 2009 Attack and SPC Dahl's injuries and death, each member of the Dahl Family has experienced severe mental anguish, emotional pain and suffering.

**HHHH. The October 20, 2009 Attack In Helmand (The David R. Baker Family)**

2718.   On October 20, 2009 the Taliban committed an IED attack in Helmand Province, Afghanistan (the "October 20, 2009 Attack").

2719.   On information and belief, the bomb that the Taliban detonated during the attack was:  (i) based on a signature al-Qaeda IED design; (ii) assembled and tested by al-Qaeda bombmakers at one of al-Qaeda's IED manufacturing sites managed and funded by al-Qaeda/Taliban terrorist Sirajuddin Haqqani; (iii) designed to detonate precursor ingredients that were "cooked" by al-Qaeda chemists; and (iv) provided to the Taliban by al-Qaeda operatives in order to facilitate the Taliban's attack.

2720.   The October 20, 2009 Attack would have violated the laws of war if these terrorists were subject to them because, among other reasons, the terrorist(s) who committed the attack neither wore uniforms nor otherwise identified themselves as enemy combatants.

2721.   Lance Corporal David R. Baker served in Afghanistan as a member of the U.S. Marine Corps.  On October 20, 2009, LCpl Baker was injured in the October 20, 2009 Attack. LCpl Baker died on October 20, 2009 as a result of injuries sustained during the attack.

2722.   LCpl Baker was a U.S. national at the time of the attack and his death.

2723.   Plaintiff Mark Baker is the father of LCpl Baker and a U.S. national.

2724.   Plaintiff Mark David Baker is the brother of LCpl Baker and a U.S. national.

2725.   Plaintiff Taylor Genovese is the sister of LCpl Baker and a U.S. national.

2726.   Plaintiff Rebecca E. Baker is the step-mother of LCpl Baker and a U.S. national. Rebecca E. Baker lived in the same household as LCpl Baker for a substantial time and considered LCpl Baker the functional equivalent of a biological son.

2727.   As a result of the October 20, 2009 Attack and LCpl Baker's injuries and death, each member of the Baker Family has experienced severe mental anguish, emotional pain and suffering.

### IIII.   The October 23, 2009 Attack In Kandahar (The Eric N. Lembke Family)

2728.   On October 23, 2009 the Taliban committed an IED attack in Kandahar Province, Afghanistan (the "October 23, 2009 Attack").

2729.   On information and belief, the bomb that the Taliban detonated during the attack was:  (i) based on a signature al-Qaeda IED design; (ii) assembled and tested by al-Qaeda bombmakers at one of al-Qaeda's IED manufacturing sites managed and funded by al-Qaeda/Taliban terrorist Sirajuddin Haqqani; (iii) designed to detonate precursor ingredients that were "cooked" by al-Qaeda chemists; and (iv) provided to the Taliban by al-Qaeda operatives in order to facilitate the Taliban's attack.

2730.   The October 23, 2009 Attack would have violated the laws of war if these terrorists were subject to them because, among other reasons, the terrorist(s) who committed the attack neither wore uniforms nor otherwise identified themselves as enemy combatants.

2731.   Specialist Eric N. Lembke served in Afghanistan as a member of the U.S. Army. On October 23, 2009, SPC Lembke was injured in the October 23, 2009 Attack.  SPC Lembke died on October 23, 2009 as a result of injuries sustained during the attack.

2732.   SPC Lembke was a U.S. national at the time of the attack and his death.

2733.   Plaintiff Robert Roland Lembke is the brother of SPC Lembke and a U.S. national.

2734.   Plaintiff Mashelle Lembke is the widow of SPC Lembke and a U.S. national.

2735.   Plaintiff Alexis M. Lembke is the daughter of SPC Lembke and a U.S. national.

2736.   Plaintiff T.N.L., by and through his next friend Mashelle Lembke, is the minor son of SPC Lembke and a U.S. national.

2737.   As a result of the October 23, 2009 Attack and SPC Lembke's injuries and death, each member of the Lembke Family has experienced severe mental anguish, emotional pain and suffering.

**JJJJ. The October 25, 2009 Attack In Laghman (The Brandon K. Steffey Family)**

2738.   On October 25, 2009 the Taliban committed an IED attack in Laghman Province, Afghanistan (the "October 25, 2009 Attack").

2739.   On information and belief, the bomb that the Taliban detonated during the attack was:  (i) based on a signature al-Qaeda IED design; (ii) assembled and tested by al-Qaeda bombmakers at one of al-Qaeda's IED manufacturing sites managed and funded by al-Qaeda/Taliban terrorist Sirajuddin Haqqani; (iii) designed to detonate precursor ingredients that were "cooked" by al-Qaeda chemists; and (iv) provided to the Taliban by al-Qaeda operatives in order to facilitate the Taliban's attack.

2740.   The October 25, 2009 Attack would have violated the laws of war if these terrorists were subject to them because, among other reasons, the terrorist(s) who committed the attack neither wore uniforms nor otherwise identified themselves as enemy combatants.

2741.   Specialist Brandon K. Steffey served in Afghanistan as a member of the U.S. Army.  On October 25, 2009, SPC Steffey was injured in the October 25, 2009 Attack.  SPC Steffey died on October 25, 2009 as a result of injuries sustained during the attack.

2742.   SPC Steffey was a U.S. national at the time of the attack and his death.

2743.   Plaintiff Rachel Humpf is the mother of SPC Steffey and a U.S. national.

512

2744.   Plaintiff Dennis Steffey is the father of SPC Steffey and a U.S. national.

2745.   Plaintiff Heather Jackson is the sister of SPC Steffey and a U.S. national.

2746.   Plaintiff David Humpf is the step-father of SPC Steffey and a U.S. national. David Humpf lived in the same household as SPC Steffey for a substantial time and considered SPC Steffey the functional equivalent of a biological son.

2747.   Plaintiff Andrea Steffey is the widow of SPC Steffey and a U.S. national.

2748.   Plaintiff A.G.S., by and through her next friend Andrea Steffey, is the minor daughter of SPC Steffey and a U.S. national.

2749.   As a result of the October 25, 2009 Attack and SPC Steffey's injuries and death, each member of the Steffey Family has experienced severe mental anguish, emotional pain and suffering.

**KKKK.   The October 27, 2009 Attack In Kandahar (The Brian Bates Jr. Family)**

2750.   On October 27, 2009 the Taliban committed an IED attack in Kandahar Province, Afghanistan (the "October 27, 2009 Bates Attack").

2751.   On information and belief, the bomb that the Taliban detonated during the attack was:  (i) based on a signature al-Qaeda IED design; (ii) assembled and tested by al-Qaeda bombmakers at one of al-Qaeda's IED manufacturing sites managed and funded by al-Qaeda/Taliban terrorist Sirajuddin Haqqani; (iii) designed to detonate precursor ingredients that were "cooked" by al-Qaeda chemists; and (iv) provided to the Taliban by al-Qaeda operatives in order to facilitate the Taliban's attack.

2752.   The October 27, 2009 Bates Attack would have violated the laws of war if these terrorists were subject to them because, among other reasons, the terrorist(s) who committed the attack neither wore uniforms nor otherwise identified themselves as enemy combatants.

2753.   Private First Class Brian Bates Jr. served in Afghanistan as a member of the U.S. Army.  On October 27, 2009, PFC Bates was injured in the October 27, 2009 Bates Attack.  PFC Bates died on October 27, 2009 as a result of injuries sustained during the attack.

2754.   PFC Bates was a U.S. national at the time of the attack and his death.

2755.   Plaintiff Enjolie Bates is the widow of PFC Bates and a U.S. national.

2756.   Plaintiff B.B., by and through his next friend Enjolie Bates, is the minor son of PFC Bates and a U.S. national.

2757.   Plaintiff R.B., by and through her next friend Enjolie Bates, is the minor daughter of PFC Bates and a U.S. national.

2758.   Plaintiff Marline Tully is the mother of PFC Bates and a U.S. national.

2759.   As a result of the October 27, 2009 Bates Attack and PFC Bates's injuries and death, each member of the Bates Family has experienced severe mental anguish, emotional pain and suffering.

### LLLL. The October 27, 2009 Attack In Kandahar (The Families of Fernando De La Rosa, Issac B. Jackson, and Patrick O. Williamson)

2760.   On October 27 the Taliban committed an IED attack in Kandahar Province, Afghanistan (the "October 27, 2009 Attack").

2761.   On information and belief, the bomb that the Taliban detonated during the attack was:  (i) based on a signature al-Qaeda IED design; (ii) assembled and tested by al-Qaeda bombmakers at one of al-Qaeda's IED manufacturing sites managed and funded by al-Qaeda/Taliban terrorist Sirajuddin Haqqani; (iii) designed to detonate precursor ingredients that were "cooked" by al-Qaeda chemists; and (iv) provided to the Taliban by al-Qaeda operatives in order to facilitate the Taliban's attack.

2762.   The October 27, 2009 Attack would have violated the laws of war if these terrorists were subject to them because, among other reasons, the terrorist(s) who committed the attack neither wore uniforms nor otherwise identified themselves as enemy combatants.

### 1.   The Fernando De La Rosa Family

2763.   Sergeant Fernando De La Rosa served in Afghanistan as a member of the U.S. Army.  On October 27, 2009, SGT De La Rosa was injured in the October 27, 2009 Attack. SGT De La Rosa died on October 27, 2009 as a result of injuries sustained during the attack.

2764.   SGT De La Rosa was a U.S. national at the time of the attack and his death.

2765.   Plaintiff Rolando De La Rosa is the father of SGT De La Rosa and a U.S. national.

2766.   As a result of the October 27, 2009 Attack and SGT De La Rosa's injuries and death, each member of the De La Rosa Family has experienced severe mental anguish, emotional pain and suffering.

### 2.   The Issac B. Jackson Family

2767.   Sergeant Issac B. Jackson served in Afghanistan as a member of the U.S. Army. On October 27, 2009, SGT Jackson was injured in the October 27, 2009 Attack.  SGT Jackson died on October 27, 2009 as a result of injuries sustained during the attack.

2768.   SGT Jackson was a U.S. national at the time of the attack and his death.

2769.   Plaintiff Christal A. Thomas-Kariker is the mother of SGT Jackson and a U.S. national.

2770.   Plaintiff Jeremy Jackson is the brother of SGT Jackson and a U.S. national.

2771.   Plaintiff Larry Jackson is the brother of SGT Jackson and a U.S. national.

2772.   Plaintiff Edward Kariker is the step-father of SGT Jackson and a U.S. national. Edward Kariker lived in the same household as SGT Jackson for a substantial time and considered SGT Jackson the functional equivalent of a biological son.

2773.   As a result of the October 27, 2009 Attack and SGT Jackson's injuries and death, each member of the Jackson Family has experienced severe mental anguish, emotional pain and suffering.

### 3.      The Patrick O. Williamson Family

2774.   Sergeant Patrick O. Williamson served in Afghanistan as a member of the U.S. Army.  On October 27, 2009, SGT Williamson was injured in the October 27, 2009 Attack.  SGT Williamson died on October 27, 2009 as a result of injuries sustained during the attack.

2775.   SGT Williamson was a U.S. national at the time of the attack and his death.

2776.   Plaintiff Leon Williamson III is the father of SGT Williamson and a U.S. national.

2777.   Plaintiff Sybil B. Williamson is the mother of SGT Williamson and a U.S. national.

2778.   As a result of the October 27, 2009 attack and SGT Williamson's injuries and death, each member of the Williamson Family has experienced severe mental anguish, emotional pain and suffering.

### MMMM. The November 4, 2009 Attack In Paktika (The Julian L. Berisford Family)

2779.   On November 4, 2009 the Haqqani Network, a part of the Taliban, committed a complex attack involving small arms fire and rocket propelled grenades in Paktika Province, Afghanistan (the "November 4, 2009 Attack").

2780.   On information and belief, the bomb that the Taliban detonated during the attack was:  (i) based on a signature al-Qaeda IED design; (ii) assembled and tested by al-Qaeda

bombmakers at one of al-Qaeda's IED manufacturing sites managed and funded by al-Qaeda/Taliban terrorist Sirajuddin Haqqani; (iii) designed to detonate precursor ingredients that were "cooked" by al-Qaeda chemists; and (iv) provided to the Taliban by al-Qaeda operatives in order to facilitate the Taliban's attack.

2781.   The November 4, 2009 Attack would have violated the laws of war if these terrorists were subject to them because, among other reasons, the terrorist(s) who committed the attack neither wore uniforms nor otherwise identified themselves as enemy combatants.

2782.   Specialist Julian L. Berisford served in Afghanistan as a member of the U.S. Army.  On November 4, 2009, SPC Berisford was injured in the November 4, 2009 Attack.  SPC Berisford died on November 4, 2009 as a result of injuries sustained during the attack.

2783.   SPC Berisford was a U.S. national at the time of the attack and his death.

2784.   Plaintiff Gina Berisford is the widow of SPC Berisford and a U.S. national.

2785.   Plaintiff M.B., by and through her next friend Gina Berisford, is the minor daughter of SPC Berisford and a U.S. national.

2786.   Plaintiff Shelley Guthrie is the mother of SPC Berisford and a U.S. national.

2787.   As a result of the November 4, 2009 Attack and SPC Berisford's injuries and death, each member of the Berisford Family has experienced severe mental anguish, emotional pain and suffering.

**NNNN. The November 13, 2009 Attack In Helmand (The Shawn P. Hefner Family)**

2788.   On November 13, 2009 the Taliban committed an IED attack in Helmand Province, Afghanistan (the "November 13, 2009 Helmand Attack").

2789.   On information and belief, the bomb that the Taliban detonated during the attack was:  (i) based on a signature al-Qaeda IED design; (ii) assembled and tested by al-Qaeda bombmakers at one of al-Qaeda's IED manufacturing sites managed and funded by al-

Qaeda/Taliban terrorist Sirajuddin Haqqani; (iii) designed to detonate precursor ingredients that were "cooked" by al-Qaeda chemists; and (iv) provided to the Taliban by al-Qaeda operatives in order to facilitate the Taliban's attack.

2790.   The November 13, 2009 Helmand Attack would have violated the laws of war if these terrorists were subject to them because, among other reasons, the terrorist(s) who committed the attack neither wore uniforms nor otherwise identified themselves as enemy combatants.

2791.   Lance Corporal Shawn P. Hefner served in Afghanistan as a member of the U.S. Marine Corps.  On November 13, 2009, LCpl Hefner was injured in the November 13, 2009 Helmand Attack.  LCpl Hefner died on November 13, 2009 as a result of injuries sustained during the attack.

2792.   LCpl Hefner was a U.S. national at the time of the attack and his death.

2793.   Plaintiff Robin Hefner is the mother of LCpl Hefner and a U.S. national.

2794.   Plaintiff Brandon Dale Hefner is the brother of LCpl Hefner and a U.S. national.

2795.   Plaintiff Jessica Meagan Hefner is the sister of LCpl Hefner and a U.S. national.

2796.   As a result of the November 13, 2009 Helmand Attack and LCpl Hefner's injuries and death, each member of the Hefner Family has experienced severe mental anguish, emotional pain and suffering.

### OOOO. The November 13, 2009 Attack In Wardak (The Christopher J. Coffland Family)

2797.   On November 13, 2009 the Taliban committed an IED attack in Wardak Province, Afghanistan (the "November 13, 2009 Wardak Attack").

2798.   On information and belief, the bomb that the Taliban detonated during the attack was:  (i) based on a signature al-Qaeda IED design; (ii) assembled and tested by al-Qaeda

518

bombmakers at one of al-Qaeda's IED manufacturing sites managed and funded by al-Qaeda/Taliban terrorist Sirajuddin Haqqani; (iii) designed to detonate precursor ingredients that were "cooked" by al-Qaeda chemists; and (iv) provided to the Taliban by al-Qaeda operatives in order to facilitate the Taliban's attack.

2799.   The November 13, 2009 Wardak Attack would have violated the laws of war if these terrorists were subject to them because, among other reasons, the terrorist(s) who committed the attack neither wore uniforms nor otherwise identified themselves as enemy combatants.

2800.   Corporal Christopher J. Coffland served in Afghanistan as a member of the U.S. Army Reserve.  On November 13, 2009, CPL Coffland was injured in the November 13, 2009 Wardak Attack.  CPL Coffland died on November 13, 2009 as a result of injuries sustained during the attack.

2801.   CPL Coffland was a U.S. national at the time of the attack and his death.

2802.   Plaintiff Antoinette Mary Coffland is the mother of CPL Coffland and a U.S. national.

2803.   Plaintiff David Lee Coffland is the father of CPL Coffland and a U.S. national.

2804.   Plaintiff Laurie Ann Bartlett is the sister of CPL Coffland and a U.S. national.

2805.   Plaintiff Karen Ann Bresnahan is the sister of CPL Coffland and a U.S. national.

2806.   Plaintiff David Lee Coffland, Jr. is the brother of CPL Coffland and a U.S. national.

2807.   Plaintiff Lynn Marie Coffland is the sister of CPL Coffland and a U.S. national.

2808.   As a result of the November 13, 2009 Wardak Attack and CPL Coffland's injuries and death, each member of the Coffland Family has experienced severe mental anguish, emotional pain and suffering.

**PPPP. The November 19, 2009 Attack In Zabul (The John J. Cleaver Family)**

2809.   On November 19, 2009, a joint al-Qaeda/Taliban cell acting as the Kabul Attack Network committed a suicide bombing attack in Zabul Province, Afghanistan (the "November 19, 2009 Attack").

2810.   The November 19, 2009 Attack was committed by al-Qaeda (an FTO) and the Taliban acting together in a joint al-Qaeda-Taliban cell with al-Qaeda providing, indoctrinating, and training the bomber, who was deployed by the Taliban. On information and belief, the suicide bomber who detonated the bomb during the attack was:  (i) indoctrinated by al-Qaeda regarding the purported religious justification that permitted the attack; (ii) trained by al-Qaeda regarding al-Qaeda's tactics, techniques, and procedures for suicide bombers; (iii) deployed by al-Qaeda to Afghanistan in order to attack Americans there; and (iv) a member of al-Qaeda under al-Qaeda training procedures for suicide attackers, as a result of the bomber pledging loyalty to al-Qaeda to create a point of no return. raining the suicide bomber.

2811.   On information and belief, the device that the bomber detonated during the attack was:  (i) based on a signature al-Qaeda IED design; (ii) assembled and tested by al-Qaeda bombmakers at one of al-Qaeda's IED manufacturing sites managed and funded by al-Qaeda/Taliban terrorist Sirajuddin Haqqani; (iii) designed to detonate precursor ingredients that were "cooked" by al-Qaeda chemists; and (iv) provided to the Taliban by al-Qaeda operatives in order to facilitate the Taliban's attack.

2812.   The November 19, 2009 Attack would have violated the laws of war if these terrorists were subject to them because, among other reasons, the terrorist(s) who committed the attack neither wore uniforms nor otherwise identified themselves as enemy combatants.

2813.   Staff Sergeant John J. Cleaver served in Afghanistan as a member of the U.S. Army.  On November 19, 2009, SSG Cleaver was injured in the November 19, 2009 Attack. SSG Cleaver died on November 19, 2009 as a result of injuries sustained during the attack.

2814.   SSG Cleaver was a U.S. national at the time of the attack and his death.

2815.   Plaintiff Kim Sola is the widow of SSG Cleaver and a U.S. national.

2816.   Plaintiff Aidan Cleaver is the son of SSG Cleaver and a U.S. national.

2817.   Plaintiff Collin Cleaver is the son of SSG Cleaver and a U.S. national.

2818.   As a result of the November 19, 2009 Attack and SSG Cleaver's injuries and death, each member of the Cleaver Family has experienced severe mental anguish, emotional pain and suffering.

### QQQQ. The November 22, 2009 Attack In Kandahar (The Marcus A. Tynes Family)

2819.   On November 22, 2009 the Taliban committed an IED attack in Kandahar Province, Afghanistan (the "November 22, 2009 Attack").

2820.   On information and belief, the bomb that the Taliban detonated during the attack was:  (i) based on a signature al-Qaeda IED design; (ii) assembled and tested by al-Qaeda bombmakers at one of al-Qaeda's IED manufacturing sites managed and funded by al-Qaeda/Taliban terrorist Sirajuddin Haqqani; (iii) designed to detonate precursor ingredients that were "cooked" by al-Qaeda chemists; and (iv) provided to the Taliban by al-Qaeda operatives in order to facilitate the Taliban's attack.

2821.   The November 22, 2009 Attack would have violated the laws of war if these terrorists were subject to them because, among other reasons, the terrorist(s) who committed the attack neither wore uniforms nor otherwise identified themselves as enemy combatants.

2822.   Private First Class Marcus A. Tynes served in Afghanistan as a member of the U.S. Army.  On November 22, 2009, PFC Tynes was injured in the November 22, 2009 Attack. PFC Tynes died on November 22, 2009 as a result of injuries sustained during the attack.

2823.   PFC Tynes was a U.S. national at the time of the attack and his death.

2824.   Plaintiff Dana Atlas is the mother of PFC Tynes and a U.S. national.

2825.   Plaintiff S.A.A., by and through her next friend Dana Atlas, is the minor sister of PFC Tynes and a U.S. national.

2826.   Plaintiff S.R.A., by and through her next friend Dana Atlas, is the minor sister of PFC Tynes and a U.S. national.

2827.   Plaintiff Johannes Atlas is the brother of PFC Tynes and a U.S. national.

2828.   As a result of the November 22, 2009 Attack and PFC Tynes's injuries and death, each member of the Tynes Family has experienced severe mental anguish, emotional pain and suffering.

**RRRR. The November 23, 2009 Attack In Kandahar (The Jason A. McLeod Family)**

2829.   On November 23, 2009 the Taliban committed a mortar attack in Kandahar Province, Afghanistan (the "November 23, 2009 Attack").

2830.   On information and belief, the bomb that the Taliban detonated during the attack was:  (i) based on a signature al-Qaeda IED design; (ii) assembled and tested by al-Qaeda bombmakers at one of al-Qaeda's IED manufacturing sites managed and funded by al-Qaeda/Taliban terrorist Sirajuddin Haqqani; (iii) designed to detonate precursor ingredients that

were "cooked" by al-Qaeda chemists; and (iv) provided to the Taliban by al-Qaeda operatives in order to facilitate the Taliban's attack.

2831.   The November 23, 2009 Attack would have violated the laws of war if these terrorists were subject to them because, among other reasons, the terrorist(s) who committed the attack neither wore uniforms nor otherwise identified themselves as enemy combatants.

2832.   Sergeant Jason A. McLeod served in Afghanistan as a member of the U.S. Army. On November 23, 2009, SGT McLeod was injured in the November 23, 2009 Attack.  SGT McLeod died on November 23, 2009 as a result of injuries sustained during the attack.

2833.   SGT McLeod was a U.S. national at the time of the attack and his death.

2834.   Plaintiff Aimee Wood is the widow of SGT McLeod and a U.S. national.

2835.   Plaintiff J.M., by and through her next friend Aimee Wood, is the minor daughter of SGT McLeod and a U.S. national.

2836.   Plaintiff Barbara Hanke is the mother of SGT McLeod and a U.S. national.

2837.   Plaintiff Gregory McLeod is the father of SGT McLeod and a U.S. national.

2838.   Plaintiff Jacqueline McLeod is the sister of SGT McLeod and a U.S. national.

2839.   Plaintiff Justin McLeod is the brother of SGT McLeod and a U.S. national.

2840.   As a result of the November 23, 2009 Attack and SGT McLeod's injuries and death, each member of the McLeod Family has experienced severe mental anguish, emotional pain and suffering.

**SSSS. The November 23, 2009 Attack In Zabul (The Matthew A. Pucino Family)**

2841.   On November 23, 2009 the Haqqani Network, a part of the Taliban, committed an IED attack in Zabul Province, Afghanistan (the "November 23, 2009 Zabul Attack").

2842.   On information and belief, the bomb that the Taliban detonated during the attack was:  (i) based on a signature al-Qaeda IED design; (ii) assembled and tested by al-Qaeda

bombmakers at one of al-Qaeda's IED manufacturing sites managed and funded by al-Qaeda/Taliban terrorist Sirajuddin Haqqani; (iii) designed to detonate precursor ingredients that were "cooked" by al-Qaeda chemists; and (iv) provided to the Taliban by al-Qaeda operatives in order to facilitate the Taliban's attack.

2843.   The November 23, 2009 Zabul Attack would have violated the laws of war if these terrorists were subject to them because, among other reasons, the terrorist(s) who committed the attack neither wore uniforms nor otherwise identified themselves as enemy combatants.

2844.   Staff Sergeant Matthew A. Pucino served in Afghanistan as a member of the U.S. Army National Guard.  On November 23, 2009, SSG Pucino was injured in the November 23, 2009 Zabul Attack.  SSG Pucino died on November 23, 2009 as a result of injuries sustained during the attack.

2845.   SSG Pucino was a U.S. national at the time of the attack and his death.

2846.   Plaintiff Albert W. Pucino Jr. is the father of SSG Pucino and a U.S. national.

2847.   Plaintiff Kathryn M. Pucino is the mother of SSG Pucino and a U.S. national.

2848.   Plaintiff Lisa M. Haglof is the sister of SSG Pucino and a U.S. national.

2849.   Plaintiff Melissa A. Pucino is the sister of SSG Pucino and a U.S. national.

2850.   As a result of the November 23, 2009 Zabul Attack and SSG Pucino's injuries and death, each member of the Pucino Family has experienced severe mental anguish, emotional pain and suffering.

## CLAIMS FOR RELIEF

**COUNT ONE:  VIOLATION OF THE ANTI-TERRORISM ACT, 18 U.S.C. § 2333(a)
[All Defendants:  Primary Liability, 18 U.S.C. § 2339A Predicate]**

2851.   Plaintiffs incorporate their factual allegations above.

2852.   MTN Group, MTN Irancell, Phuthuma Nhleko, and Irene Charnley[425] provided

material support to the IRGC, including its Hezbollah Division and Qods Force,[426] al-Qaeda, al-

Qaeda-in-Iraq, Ansar al-Islam, and the Taliban, including its Haqqani Network,[427] in violation of

18 U.S.C. § 2339A.  They did so negotiating, executing, performing under, and fraudulently

concealing MTN's secret Security Cooperation Agreement with the IRGC, and by making

payments, or causing payments to be made, to the IRGC, including its Hezbollah Division and

Qods Force, al-Qaeda, al-Qaeda-in-Iraq, Ansar al-Islam, and the Taliban, including its Haqqani

Network, that financed such FTOs' and SDGT's terrorist attacks, and by providing management,

financial, operational, and strategic communications services to the Hezbollah and the Qods

Force, and, in the case of MTN Group, by deactivating MTN's transmission masts to assist the

Taliban's, including its Haqqani Network's, counterintelligence activities and undermine U.S.

---

[425] Phuthuma Nhleko and Irene Charnley at all times served MTN Group and MTN's affiliates and therefore their acts, omissions, and knowledge is imputed to MTN Group.  All references to "Phuthuma Nhleko" and "Irene Charnley" in Counts One through Six below are inclusive of MTN Group, unless otherwise specified.

[426] All references to the "IRGC" in Counts One through Six below are inclusive of Hezbollah and the Qods Force, unless otherwise specified.  *See supra* Part I.A.2 (explaining that the Hezbollah Division and Qods Force are both parts of the IRGC).  When Plaintiffs refer to the IRGC operatives inside of Iraq, Plaintiffs refer exclusively to terrorists from the IRGC's Hezbollah Division and Qods Force, which are the two IRGC components that conduct terrorist operations outside of Iran's borders.  *See id.*

[427] All references to the "Taliban" in Counts One through Six below are inclusive of the Haqqani Network, unless otherwise specified.  *See supra* Part V.A.2 (explaining that the Haqqani Network is part of the Taliban).  Attacks committed by the Taliban also include attacks committed by the Kabul Attack Network and joint Taliban-al-Qaeda cells, which definitionally reflect Taliban involvement.  *See supra* Parts V.A.3; V.B.3.

counterinsurgency efforts in Afghanistan.  Defendants' payments took the form of currency or monetary instruments or financial securities, which qualified as material support under 18 U.S.C. § 2339A(b)(1).  MTN Group's manipulation of MTN's cellular signals, and Phuthuma Nhleko's and Irene Charnley's management, financial, operational, and strategic communications services for the IRGC's benefit also provided a service; assistance derived from scientific, technical, or other specialized knowledge; communications equipment; facilities; and personnel (that is, the persons who carried out the Haqqani Network's cell tower deactivation requests, or the persons who transferred management, financial, and operational services and knowledge to the above FTOs and SDGTs, and who executed the strategic communications and disinformation campaigns that helped fraudulently conceal the secret Security Cooperation Agreement from MTN Group's shareholders until March 28, 2012), which likewise qualified as material support.

2853.   Defendants knew or recklessly disregarded that their material support would be used by the IRGC, including its Hezbollah Division and Qods Force, al-Qaeda, al-Qaeda-in-Iraq, Ansar al-Islam, and the Taliban, including its Haqqani Network, in the preparation for, or in carrying out, the destruction of U.S. property by fire or explosive, conspiracy to murder in a foreign country, killing and attempted killing of U.S. employees performing official duties, hostage taking, damaging U.S. government property, killing U.S. nationals abroad, use of weapons of mass destruction, commission of acts of terrorism transcending national boundaries, bombing government facilities, financing terrorism, and receiving training from FTOs.  Those acts by the IRGC, including its Hezbollah Division and Qods Force, al-Qaeda, al-Qaeda-in-Iraq, Ansar al-Islam, and the Taliban, including its Haqqani Network, in turn, violated the criminal laws of the United States, or would have violated those laws had they been committed within the jurisdiction of the United States, including 18 U.S.C. §§ 844(f)(2) or (3), 956(a)(1), 1114, 1203,

1361, 2332, 2332a, 2332b, 2332f, 2339C(a)(1)(B), and 2339D, respectively.  Defendants also disguised the nature of their support, in further violation of 18 U.S.C. § 2339A.

2854.   Defendants' conduct, by providing material support to groups that were committing terrorist acts against Americans, involved violent acts and acts dangerous to human life.  Defendants' conduct therefore gives rise to primary liability under 18 U.S.C. § 2333(a).[428] Defendants' support for the IRGC, including its Hezbollah Division and Qods Force, al-Qaeda, al-Qaeda-in-Iraq, Ansar al-Islam, and the Taliban, including its Haqqani Network appears, as an objective matter, to have been intended (a) to intimidate or coerce the civilian populations of Iran,[429] Iraq, Afghanistan, the United States, and other Coalition nations, (b) to influence the policy of the U.S., Iraq, Afghan, and other Coalition governments by intimidation and coercion, and (c) to affect the conduct of the U.S., Iraq, Afghan, and other Coalition governments by mass destruction, assassination, and kidnapping.

2855.   Defendants' provision of material support to the IRGC, including its Hezbollah Division and Qods Force, al-Qaeda, al-Qaeda-in-Iraq, Ansar al-Islam, and the Taliban, including its Haqqani Network occurred primarily outside the territorial jurisdiction of the United States.

2856.   Plaintiffs are U.S. nationals who were injured in their persons, properties, and/or businesses by reason of Defendants' conduct.  Plaintiffs suffered economic, physical, and emotional injuries proximately caused by Defendants' conduct; are the survivors and/or heirs of U.S. nationals who suffered such injuries; or both.

---

[428] *See*, *e.g.*, *Wultz v. Islamic Republic of Iran*, 755 F. Supp. 2d 1, 48-49 (D.D.C. 2010) (violation of material-support statutes, even without any "subjective intent" to further terrorist objectives, meets statutory definition of "international terrorism" based on such support's "objective 'external appearance'"); *Burnett v. Al Baraka Inv. & Dev. Corp.*, 274 F. Supp. 2d 86, 106-07 (D.D.C. 2003) (similar).

[429] Defendants enabled the IRGC's terrorism against Iran's population.

2857.   As a result of Defendants' violation of 18 U.S.C. §§ 2333(a) and 2339A,

Plaintiffs are entitled to recover economic and non-economic damages, including solatium

damages.

### COUNT TWO:  VIOLATION OF THE ANTI-TERRORISM ACT, 18 U.S.C. § 2333(a)
### [All Defendants:  Primary Liability, 18 U.S.C. § 2339B Predicate]

2858.   Plaintiffs incorporate their factual allegations above.

2859.   MTN Group, MTN Irancell, Phuthuma Nhleko, and Irene Charnley provided

material support to Hezbollah and al-Qaeda (through al-Qaeda member Sirajuddin Haqqani), in

violation of 18 U.S.C. § 2339B.  MTN Group and MTN Irancell did so by making cash and in-

kind payments to Hezbollah, al-Qaeda, and al-Qaeda-in-Iraq.  MTN Group's and MTN Irancell's

payments took the form of currency or monetary instruments or financial securities, which

qualified as material support under 18 U.S.C. § 2339A(b)(1).  MTN Group, Phuthuma Nhleko,

and Irene Charnley also did by providing global management consulting, logistics, financial, and

communications agent services to Hezbollah to provide Hezbollah secure cell phones,

embargoed American communications and network computing technologies, illicit financial,

consulting, and technical services (e.g., remote IT from the United States to keep everything

working in a Hezbollah data center outside of Beirut), strategic communications and

disinformation services, all to undermine U.S. counterterrorism efforts in Iraq, Iran, Lebanon,

and Afghanistan pursuant to Defendants' contractual obligation, and/or performance to satisfy

MTN's obligation, to the IRGC under the  secret Security Cooperation Agreement that

Defendants fraudulently concealed until March 28, 2012, all of which also provided Hezbollah

with a service; assistance derived from scientific, technical or other specialized knowledge;

communications equipment; facilities; and personnel (that is, the persons who carried out

Hezbollah's cell phone acquisition requests, or the persons who transferred management,

financial, and operational services and knowledge to Hezbollah, and who executed the strategic

communications and disinformation campaigns that provided cover and concealment to

Hezbollah and fraudulently concealed Hezbollah's secret Security Cooperation Agreement with

MTN Group, MTN Irancell, Phuthuma Nhleko, and Irene Charnley[430] until March 28, 2012), all

of which likewise qualified as material support.  MTN further disguised the nature of its support,

in further violation of 18 U.S.C. § 2339B.

2860.   The United States has designated Hezbollah and al-Qaeda an FTOs under 8

U.S.C. § 1189 since 1997 and 1999, respectively.  At all times since that designation, MTN

Group, MTN Irancell, Phuthuma Nhleko, and Irene Charnley, knew or recklessly disregarded

that Hezbollah and al-Qaeda were designated FTOs and/or that Hezbollah and al-Qaeda had

engaged in acts of terrorism against the United States.

2861.   MTN Group's, MTN Irancell's, Phuthuma Nhleko's, and Irene Charnley's

conduct, by providing material support to designated FTOs, involved violent acts and acts

dangerous to human life.  MTN Group's, MTN Irancell's, Phuthuma Nhleko's, and Irene

Charnley's conduct therefore gives rise to primary liability under 18 U.S.C. § 2333(a).  MTN

Group's, MTN Irancell's, Phuthuma Nhleko's, and Irene Charnley's support for Hezbollah and

al-Qaeda appears, as an objective matter, to have been intended (a) to intimidate or coerce the

civilian populations of Iraq, Lebanon, Afghanistan, the United States, and other Coalition

nations, (b) to influence the policy of the U.S., Iraq, Lebanon, Afghanistan, and other Coalition

governments by intimidation and coercion, and (c) to affect the conduct of the U.S., Iraq,

---

[430] Irene Charnley knew of the secret Security Cooperation Agreement, helped secure the
Agreement, concealed the Agreement, and performed under the Agreement.  Through Irene
Charnley's performance, Irene Charnley made herself a party to the Agreement all the same as if
she had originally signed it alongside Phuthuma Nhleko.

Lebanon, Afghanistan, and other Coalition governments by mass destruction, assassination, and kidnapping.

2862.   MTN Group's, MTN Irancell's, Phuthuma Nhleko's, and Irene Charnley's provision of material support to Hezbollah and al-Qaeda occurred primarily outside the territorial jurisdiction of the United States.

2863.   Plaintiffs are U.S. nationals who were injured in their persons, properties, and/or businesses by reason of MTN Group's, MTN Irancell's, Phuthuma Nhleko's, and Irene Charnley's conduct.  Plaintiffs suffered economic, physical, and emotional injuries proximately caused by MTN Group's, MTN Irancell's, Phuthuma Nhleko's, and Irene Charnley's conduct; are the survivors and/or heirs of U.S. nationals who suffered such injuries; or both.

2864.   As a result of MTN Group's, MTN Irancell's, Phuthuma Nhleko's, and Irene Charnley's violation of 18 U.S.C. §§ 2333(a) and 2339B, Plaintiffs are entitled to recover economic and non-economic damages, including solatium damages.

### COUNT THREE:  VIOLATION OF THE ANTI-TERRORISM ACT, 18 U.S.C. § 2333(a) [All Defendants:  Primary Liability, 18 U.S.C. § 2339C Predicate]

2865.   Plaintiffs incorporate their factual allegations above.

2866.   Defendants, by making payments to the IRGC, including its Hezbollah Division and Qods Force, al-Qaeda, al-Qaeda-in-Iraq, and Taliban, including its Haqqani Network, that financed such FTOs' and/or SDGTs' terrorist attacks, unlawfully and willfully provided funds to a terrorist group, in violation of 18 U.S.C. § 2339C(a)(1)(A).  Defendants knew or recklessly disregarded that the IRGC, including its Hezbollah Division and Qods Force, al-Qaeda, al-Qaeda-in-Iraq, and Taliban, including its Haqqani Network, would use those funds in full or in part to carry out acts constituting an offense within the scope of the International Convention for the Suppression of Terrorist Bombings, as implemented by the United States at 18 U.S.C. §

2332f, including by delivering, placing, discharging, or detonating explosives or other lethal devices in, into, or against places of public use and government facilities, with the intent to cause death or serious bodily injury.

2867.   Defendants, by making payments to the IRGC, including its Hezbollah Division and Qods Force, al-Qaeda, al-Qaeda-in-Iraq, and Taliban, including its Haqqani Network, that financed the IRGC's al-Qaeda's, al-Qaeda-in-Iraq's, and Taliban's, including its Haqqani Network's, terrorist attacks, unlawfully and willfully provided funds to a terrorist group, in violation of 18 U.S.C. § 2339C(a)(1)(B).  Defendants knew or recklessly disregarded that the IRGC, including its Hezbollah Division and Qods Force, al-Qaeda, al-Qaeda-in-Iraq, and Taliban, including its Haqqani Network, would use those funds in full or in part to carry out acts intended to cause death or serious bodily injury to civilians and/or others not taking an active part in the hostilities in a situation of armed conflict, and that the IRGC's al-Qaeda's, al-Qaeda-in-Iraq's, and Taliban's, including its Haqqani Network's, purpose was to intimidate the U.S., Iraqi, and Afghan populations and to compel the U.S., Iraqi, and Afghan governments to effect a withdrawal of U.S. forces from Iraq and Afghanistan.

2868.   Defendants' provision of funds to the the IRGC, including its Hezbollah Division and Qods Force, al-Qaeda, al-Qaeda-in-Iraq, and Taliban, including its Haqqani Network, involved violent acts and acts dangerous to human life.  Defendants' conduct therefore gives rise to primary liability under 18 U.S.C. § 2333(a).  Defendants' support for the IRGC, including its Hezbollah Division and Qods Force, al-Qaeda, al-Qaeda-in-Iraq, and Taliban, including its Haqqani Network, appears, as an objective matter, to have been intended (a) to intimidate or coerce the civilian populations of Afghanistan, the United States, and other Coalition nations, (b) to influence the policy of the U.S., Afghan, and other Coalition governments by intimidation and

531

coercion, and (c) to affect the conduct of the U.S., Afghan, and other Coalition governments by mass destruction, assassination, and kidnapping.

2869.  Defendants' provision of funds to the IRGC, including its Hezbollah Division and Qods Force, al-Qaeda, al-Qaeda-in-Iraq, and Taliban, including its Haqqani Network, occurred primarily outside the territorial jurisdiction of the United States.

2870.  Plaintiffs are U.S. nationals who were injured in their persons, properties, and/or businesses by reason of Defendants' conduct.  Plaintiffs suffered economic, physical, and emotional injuries proximately caused by Defendants' conduct; are the survivors and/or heirs of U.S. nationals who suffered such injuries; or both.

2871.  As a result of Defendants' violation of 18 U.S.C. §§ 2333(a) and 2339C, Plaintiffs are entitled to recover economic and non-economic damages, including solatium damages.

## JURY DEMAND

2872.   In accordance with Federal Rule of Civil Procedure 38(b), Plaintiffs demand a

trial by jury on all issues so triable.

## PRAYER FOR RELIEF

2873.   Plaintiffs request that the Court:

(a)   Enter judgment against Defendants finding them jointly and severally liable under

   the Anti-Terrorism Act, 18 U.S.C. § 2333;

(b)   Award Plaintiffs compensatory and punitive damages to the maximum extent

   permitted by law, and treble any compensatory damages awarded under the Anti-

   Terrorism Act pursuant to 18 U.S.C. § 2333(a);

(c)   Award Plaintiffs their attorney's fees and costs incurred in this action, pursuant to

   18 U.S.C. § 2333(a);

(d)   Award Plaintiffs prejudgment interest; and

(e)   Award Plaintiffs any such further relief the Court deems just and proper.

Dated:  March 27, 2022

Respectfully submitted,

*/s/ Ryan R. Sparacino*

Ryan R. Sparacino (D.C. Bar. No. 493700)
Eli J. Kay-Oliphant (D.C. Bar. No. 503235)
Shuman Sohrn (*pro hac vice*)
Sparacino PLLC
1920 L Street, NW, Suite 8358
Washington, D.C. 20036
Tel:  (202) 629-3530
ryan.sparacino@sparacinopllc.com
eli.kay-oliphant@sparacinopllc.com
shuman.sohrn@sparacinopllc.com

*Counsel for Plaintiffs*