# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| GUY L. DAVIS, *et al.*,<br><br><br>*Plaintiffs*,<br>v.<br><br>MTN IRANCELL TELECOMMUNICATIONS SERVICES COMPANY, *et al.*,<br><br>*Defendants*. | Case No.: 1:22-cv-00829-RDM<br><br>ORAL ARGUMENT REQUESTED |

## MEMORANDUM OF LAW IN SUPPORT OF MTN GROUP LIMITED, PHUTHUMA NHLEKO, AND IRENE CHARNLEY'S MOTION TO DISMISS THE COMPLAINT

# TABLE OF CONTENTS

                                                                                                    Page

TABLE OF AUTHORITIES ........................................................................................ iii

PRELIMINARY STATEMENT ................................................................................... 1

BACKGROUND ......................................................................................................... 3

    A.    MTN Group Is a Foreign Telecommunications Company that Operates Exclusively Outside the United States, and South African Nationals Phuthuma Nhleko and Irene Charnley Are Its Former Executives. ...................................................................................... 4

    B.    MTN Group Participated in a Joint Venture to Expand Mobile Phone Service for Iranians. ........................................................................ 5

    C.    Plaintiffs or Their Family Members Were Injured in Iraq or Afghanistan by Attacks Allegedly Sustained by a Terrorist Alliance. ................................................................................................... 7

    D.    Plaintiffs Allege that, by Participating in Irancell and Helping to Support a Mobile Phone Network, MTN Group Directly Enabled Terrorist Attacks in Iraq and Afghanistan. ................................................ 9

        1.    Plaintiffs' Theory Equates Investing in a Telecommunications Company in Iran with Directly Enabling Terrorist Attacks by Various Global Terrorist Groups. ..................................................................................... 9

        2.    Plaintiffs Also Allege that Unnamed "Agents" of "MTN" Sourced U.S. Equipment and Services for Irancell.................... 12

    E.    Plaintiffs Also Allege that the Taliban Violently Extorted MTN Afghanistan. .............................................................................................. 14

LEGAL STANDARD ................................................................................................. 15

ARGUMENT .............................................................................................................. 16

    I.    The Court Should Dismiss the Claims Against MTN Group and the Individual Defendants for Lack of Personal Jurisdiction. .................................. 16

    A.    The Court Lacks Personal Jurisdiction over MTN Group. ...................... 18

        1.    Plaintiffs Cannot Establish that MTN Group Had Minimum Contacts with the United States. .................................................. 18

            a)    MTN Group Did Not Expressly Aim Its Actions at the United States. .......................................................... 18

            b)    MTN Group Did Not Purposefully Avail Itself of the U.S. Forum. .............................................................. 21

2.      Plaintiffs' Claims Do Not Arise Out of or Relate to the Alleged U.S. Contacts. ................................................................ 32

B.      The Court Lacks Personal Jurisdiction over the Individual Defendants. ................................................................................ 37

II.    Plaintiffs Fail to State Any Claim for ATA Liability. ........................................... 39

A.      The Iraq Plaintiffs Fail to State a Claim Under the ATA. ....................... 39

1.      An objective observer would not conclude that the MTN Defendants' participation in Irancell was motivated by terroristic intent. .......................................................................... 40

2.      The Iraq Plaintiffs fail to plead that the MTN Defendants committed a predicate criminal act under the ATA. ................... 43

3.      The MTN Defendants' participation in the Irancell joint venture was not violent or dangerous to human life. .................. 46

4.      The Complaint does not adequately plead that the MTN Defendants proximately caused the Iraq Plaintiffs' injuries. ........ 48

B.      The Afghanistan Plaintiffs Fail to State a Claim Under the ATA. .......... 53

C.      The Complaint Does Not Adequately Plead that the Individual Defendants Are Liable for MTN Group's Alleged Acts. ........................ 57

III.   The ATA's Statute of Limitations Bars All Plaintiffs' Claims ............................. 58

A.      The Iraq Plaintiffs' Claims Are Time-Barred. ........................................ 59

B.      The Afghanistan Plaintiffs' Claims Are Time-Barred. ............................ 60

CONCLUSION ................................................................................................................ 61

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Abdus-Sabur v. Hope Vill., Inc.*,
  221 F. Supp. 3d 3 (D.D.C. 2016) ............................................................................4

*Acosta Orellana v. CropLife Int'l*,
  711 F. Supp. 2d 81 (D.D.C. 2010) .........................................................................25

*Acosta Orellana v. CropLife Int'l*,
  740 F. Supp. 2d 33 (D.D.C. 2010) .........................................................................25

*AGS Int'l Servs. S.A. v. Newmont USA Ltd.*,
  346 F. Supp. 2d 64 (D.D.C. 2004) .........................................................................24

*Amidax Trading Grp. v. S.W.I.F.T. SCRL*,
  671 F.3d 140 (2d Cir. 2011) ....................................................................................3

*Ashcroft v. Iqbal*,
  556 U.S. 662 (2009) ..............................................................................15, 16, 28

*Atchley v. AstraZeneca UK Ltd.*,
  22 F.4th 204 (D.C. Cir. 2022) ...............................................................32, 48, 51

*Badwal v. Bd. of Trs. of Univ. of D.C.*,
  139 F. Supp. 3d 295 (D.D.C. 2015) .......................................................................16

*Bartlett v. Société Générale de Banque au Liban SAL*,
  2020 WL 7089448 (E.D.N.Y. Nov. 25, 2020) ...............................................30–31

*Bell Atl. Corp. v. Twombly*,
  550 U.S. 544 (2007) ..........................................................................................15, 16

*Bonilla-Santiago v. BLB Privatized Hous., LLC*,
  2022 WL 990681 (D.D.C. Mar. 31, 2022) .............................................................24

*Borg-Warner Acceptance Corp. v. Lovett & Tharpe, Inc.*,
  786 F.2d 1055 (11th Cir. 1986) .............................................................................31

*Brink v. Cont'l Cas. Co.*,
  2021 WL 7907065 (D.D.C. Dec. 27, 2021) ...........................................................33

*Bristol-Myers Squibb Co. v. Super. Ct. of Cal.*,
  137 S. Ct. 1773 (2017) ...........................................................................................35

\* *Cabrera v. Black & Veatch Special Projects Corp.*,
  2021 WL 3508091 (D.D.C. July 30, 2021)............................................................19, 20, 55

*Calder v. Jones*,
  465 U.S. 783 (1984)......................................................................................................18

*Cambridge Holdings Grp., Inc. v. Fed. Ins. Co.*,
  357 F. Supp. 2d 89 (D.D.C. 2004).................................................................................39

*Campbell v. Nat'l Union Fire Ins.*,
  130 F. Supp. 3d 236 (D.D.C. 2015)...............................................................................28

\* *Charles Schwab Corp. v. Bank of Am. Corp.*,
  883 F.3d 68 (2d Cir. 2018)...............................................................................23, 25, 26

*In re Chiquita Brand Int'l, Inc.*,
  284 F. Supp. 3d 1284 (S.D. Fla. 2018) .........................................................................42

*Cmty. Fin. Grp. v. Stanbic Bank Ltd.*,
  2015 WL 4164763 (S.D.N.Y. July 10, 2015) ...............................................................31

*D'Onofrio v. SFX Sports Grp., Inc.*,
  534 F. Supp. 2d 86 (D.D.C. 2008).................................................................................26

*Daimler AG v. Bauman*,
  571 U.S. 117 (2014)......................................................................................................17

*Day v. Cornèr Bank (Overseas) Ltd.*,
  789 F. Supp. 2d 150 (D.D.C. 2011)...............................................................................31

*Est. of Klieman v. Palestinian Auth.*,
  923 F.3d 1115 (D.C. Cir. 2019) ...............................................................................16, 17

*Firestone v. Firestone*,
  75 F.3d 1205 (D.C. Cir. 1996) ......................................................................................59

*First Chi. Int'l v. United Exch. Co.*,
  836 F.2d 1375 (D.C. Cir. 1988) .............................................................................. *passim*

*Ford Motor Co. v. Mont. Eighth Jud. Dist. Ct.*,
  141 S. Ct. 1017 (2021)........................................................................................33, 36, 37

*Four Seasons Solar Prods. Corp. v. Southwall Techs., Inc.*,
  100 F. App'x 12 (2d Cir. 2004) .....................................................................................59

*Freeman v. HSBC Holdings PLC*,
  413 F. Supp. 3d 67 (E.D.N.Y. 2019) ............................................................................55

*Gonzalez v. Google LLC,*
  2 F.4th 871 (9th Cir. 2021) ...............................................................................41, 42

*Goodyear Dunlop Tires Operations, S.A. v. Brown,*
  564 U.S. 915 (2011).................................................................................................17

*Greene v. Long Island R.R.,*
  280 F.3d 224 (2d Cir. 2002).....................................................................................24

*Griffith Labs. Inc. v. Kancor Ingredients Ltd.,*
  2017 WL 514188 (N.D. Ill. Feb. 8, 2017) ...............................................................35

*Gucci Am., Inc. v. Weixing Li,*
  135 F. Supp. 3d 87 (S.D.N.Y. 2015)........................................................................31

*Hanson v. Denckla,*
  357 U.S. 235 (1958).................................................................................................26

*Helicopteros Nacionales de Colombia, S.A. v. Hall,*
  466 U.S. 408 (1984).................................................................................................33

*Heller v. Nicholas Applegate Cap. Mgmt., LLC,*
  498 F. Supp. 2d 100 (D.D.C. 2007).....................................................................22–23

*Herero People's Reparations Corp. v. Deutsche Bank AG,*
  2003 U.S. Dist. LEXIS 27086 (D.D.C. June 30, 2003)...........................................28

\* *Honickman v. BLOM Bank SAL,*
  6 F.4th 487 (2d Cir. 2021) ...................................................................................4, 44

*In-Flight Devices Corp. v. Van Dusen Air, Inc.,*
  466 F.2d 220 (6th Cir. 1972) ...................................................................................32

*Inv. Co. Inst. v. United States,*
  550 F. Supp. 1213 (D.D.C. 1982).............................................................................29

*Jazini v. Nissan Motor Co.,*
  148 F.3d 181 (2d Cir. 1998)......................................................................................28

*Kaempe v. Myers,*
  367 F.3d 958 (D.C. Cir. 2004)...............................................................................3, 15

*Kaplan v. Cent. Bank of the Islamic Republic of Iran,*
  2019 WL 2103424 (D.D.C. May 14, 2019)..............................................................27

*Keeton v. Hustler Magazine, Inc.,*
  465 U.S. 770 (1984).................................................................................................37

\* *Kemper v. Deutsche Bank AG,*
    911 F.3d 383 (7th Cir. 2018) ......................................................... *passim*

*Klein v. Toupin,*
    2006 WL 997959 (D.D.C. Apr. 14, 2006) ...............................................26

*Levi v. Brown & Williamson Tobacco Corp.,*
    851 F. Supp. 2d 8 (D.D.C. 2012) .........................................................16

*Lexmark Int'l, Inc. v. Static Control Components, Inc.,*
    572 U.S. 118 (2014) ..............................................................................48

*In re LIBOR-Based Fin. Instruments Antitrust Litig.,*
    2019 WL 1331830 (S.D.N.Y. Mar. 25, 2019) .....................................25

*Licci ex rel. Licci v. Lebanese Can. Bank, SAL,*
    984 N.E.2d 893 (N.Y. 2012) ...................................................27, 28, 30

*Linde v. Arab Bank, PLC,*
    882 F.3d 314 (2d Cir. 2018) ................................................................42

*Livnat v. Palestinian Auth.,*
    851 F.3d 45 (D.C. Cir. 2017) ..............................................................15

*Maryland v. Universal Elections,*
    787 F. Supp. 2d 408 (D. Md. 2011) ....................................................55

*McWilliams Ballard, Inc. v. Broadway Mgmt. Co.,*
    636 F. Supp. 2d 1 (D.D.C. 2009) ...........................................22, 24, 55

*In re Merrill Lynch Ltd. P'ships Litig.,*
    154 F.3d 56 (2d Cir. 1998) ............................................................59, 60

*Mouzon v. Radiancy, Inc.,*
    85 F. Supp. 3d 361 (D.D.C. 2015) ......................................................37

*Neighbors of Casino San Pablo v. Salazar,*
    773 F. Supp. 2d 141 (D.D.C. 2011) ..............................................24, 56

*Nike, Inc. v. Wu,*
    349 F. Supp. 3d 346 (S.D.N.Y. 2018) .................................................31

*O'Neill v. Asat Trust Reg., 2001,*
    714 F.3d 659 (2d Cir. 2013) ................................................................19

*O'Sullivan v. Deutsche Bank AG,*
    2019 WL 1409446 (S.D.N.Y. Mar. 28, 2019) .........................46, 47, 48

*Off. Comm. of Unsecured Creditors of Arcapita v. Bahrain Islamic Bank,*
   549 B.R. 56 (S.D.N.Y. 2016) ......................................................................... 29

*Ofisi v. Al Shamal Islamic Bank,*
   2019 WL 1255096 (D.D.C. Mar. 19, 2019) ................................................ 19

\* *Owens v. BNP Paribas, S.A.,*
   897 F.3d 266 (D.C. Cir. 2018) ........................................................... *passim*

*Owens v. Republic of Sudan,*
   864 F.3d 751 (D.C. Cir. 2017) ..................................................................... 58

*Pinkett v. Dr. Leonard's Healthcare Corp.,*
   2019 WL 1992904 (D.D.C. May 6, 2019) ............................................ 21, 22

*Precision Assocs., Inc. v. Panalpina World Transp. (Holding) Ltd.,*
   2011 WL 7053807 (E.D.N.Y. Jan. 4, 2011) ............................................... 25

*Ralls Corp. v. Comm. on Foreign Inv.,*
   758 F.3d 296 (D.C. Cir. 2014) ..................................................................... 29

\* *Rothstein v. UBS AG,*
   708 F.3d 82 (2d Cir. 2013) ................................................................. *passim*

*Rush v. Savchuk,*
   444 U.S. 320 (1980) .......................................................................... 21, 22

*Scandinavian Satellite Sys., AS v. Prime TV Ltd.,*
   291 F.3d 839 (D.C. Cir. 2002) ..................................................................... 24

*SongByrd, Inc. v. Est. of Grossman,*
   206 F.3d 172 (2d Cir. 2000) ......................................................................... 36

*Sparrow v. Interbay Funding, L.L.C.,*
   2006 WL 2844254 (D.D.C. 2006) .......................................................... 3, 38

*Sprint Commc'ns Co. v. FCC,*
   76 F.3d 1221 (D.C. Cir. 1996) ..................................................................... 59

*Stansell v. BGP, Inc.,*
   2011 WL 1296881 (M.D. Fla. Mar. 31, 2011) ........................................... 55

*Stranahan Gear Co. v. NL Indus.,*
   800 F.2d 53 (3d Cir. 1986) ..................................................................... 31–32

*Strauss v. Credit Lyonnais, S.A.,*
   2007 WL 2296832 (E.D.N.Y. Aug. 6, 2007) ............................................. 58

*Tera Grp., Inc. v. Citigroup, Inc.*,
   2018 WL 4732426 (S.D.N.Y. Sept. 28, 2018) ....................................................22

\* *In re Terrorist Attacks on Sept. 11, 2001*,
   538 F.3d 71 (2d Cir. 2008) ..............................................................18, 19, 20

*In re Terrorist Attacks on Sept. 11, 2001*,
   714 F.3d 118 (2d Cir. 2013) ...................................................................19, 48

*Thompson Hine LLP v. Smoking Everywhere, Inc.*,
   840 F. Supp. 2d 138 (D.D.C. 2012) .........................................................29, 32

*Toumazou v. Turkish Republic of N. Cyprus*, 71 F. Supp. 3d 7 (D.D.C. 2014)............................21

*Trisvan v. Heyman*,
   305 F. Supp. 3d 381 (E.D.N.Y. 2018) .............................................................56

*Underwriting Members of Lloyd's Syndicate 2 v. Al Rajhi Bank*,
   779 F. App'x 66 (2d Cir. 2019) ...................................................................19

*United Servs. Auto. Ass'n v. New Day Fin., LLC*,
   2018 WL 1899807 (W.D. Tex. Mar. 8, 2018) ......................................................35

*United States v. Bestfoods*,
   524 U.S. 51 (1998) ................................................................................23

*United States ex rel. Keaveney v. SRA Int'l, Inc.*,
   219 F. Supp. 3d 129 (D.D.C. 2016) ...............................................................15

*Vasquez v. Hong Kong & Shanghai Banking Corp.*,
   477 F. Supp. 3d 241 (S.D.N.Y. 2020)..........................................................27, 30

\* *Walden v. Fiore*,
   571 U.S. 277 (2014).........................................................................17, 27, 33

*Waldman v. Palestine Liberation Org.*,
   835 F.3d 317 (2d Cir. 2016)....................................................................19, 34

*Weiss v. Nat'l Westminster Bank, PLC*,
   993 F.3d 144 (2d Cir. 2021).............................................................40, 42, 48

*Wiedmaier v. OpenTable, Inc.*,
   2020 WL 2838594 (D.D.C. June 1, 2020) .........................................................15

*Williams v. Donovan*,
   219 F. Supp. 3d 167 (D.D.C. 2016) ..............................................................15

*Williams v. Romarm, SA*,
   756 F.3d 777 (D.C. Cir. 2014) ..................................................................36

*World-Wide Volkswagen Corp. v. Woodson*,
    444 U.S. 286 (1980)......................................................................................27

*Wultz v. Islamic Republic of Iran*,
    755 F. Supp. 2d 1 (D.D.C. 2010) .............................................................41, 42

*United States ex rel. Yelverton v. Fed. Ins. Co.*,
    831 F.3d 585 (D.C. Cir. 2016)..................................................................59

*Zapata v. HSBC Holdings PLC*,
    414 F. Supp. 3d 342 (E.D.N.Y. 2019) .......................................40, 48, 56

*Zurich Am. Life Ins. v. Nagel*,
    2021 WL 5225947 (S.D.N.Y. Nov. 10, 2021)........................................33

**Statutes**

18 U.S.C. § 2331(1)(A)...........................................................................43, 46

18 U.S.C. § 2331(1)(B).............................................................40, 42, 54, 55

18 U.S.C. § 2333(a) .........................................................................................39

18 U.S.C. § 2333(d)(2) ...................................................................................44

18 U.S.C. § 2335(a) .........................................................................................58

18 U.S.C. § 2339A ....................................................................................43, 44

18 U.S.C. § 2339B ....................................................................................43, 44

18 U.S.C. § 2339C ....................................................................................43, 44

D.C. Code § 13-423 .........................................................................................29

**Rules**

Fed. R. Civ. P. 4(k)(2)....................................................................................16

Fed. R. Civ. P. 4(k)(2)(B)..............................................................................16

Fed. R. Civ. P. 9(b) .........................................................................................59

Fed. R. Civ. P. 12(b)(2)..................................................................................15

Fed. R. Civ. P. 12(b)(6)..................................................................................15

## PRELIMINARY STATEMENT

In two Anti-Terrorism Act ("ATA") actions filed in this District on the same day, Plaintiffs sue MTN Group, a South African telecommunications company, and two of its former executives (the "Individual Defendants"), based on MTN Group's indirect investment in an Iranian telecommunications company.[1] Plaintiffs claim that when MTN Group acquired an indirect, minority, non-controlling stake in MTN Irancell ("Irancell"), a joint venture building a mobile phone network in Iran, it actually joined the Islamic Revolutionary Guard Corps ("IRGC") and virtually every Shia and Sunni terrorist group in the Middle East and South Asia in a sprawling, decades-long plot to use terrorist violence to drive the United States from the region. In this case, Plaintiffs allege that, because other indirect shareholders in Irancell had an alleged covert affiliation with the IRGC, the company's profits amounted to direct support of terrorist groups operating outside Iran. Plaintiffs thus claim that MTN Group and two of its former executives (together, the "MTN Defendants") are liable for directly committing acts of international terrorism that injured U.S. forces in Iraq and Afghanistan.

Plaintiffs' claims suffer from two overarching and irredeemable flaws. *First*, Plaintiffs are attempting to sue *South African* defendants in the United States over conduct that allegedly occurred *in the Middle East and South Asia*. Under settled constitutional principles, the Court lacks jurisdiction over MTN Group and the Individual Defendants. *Second,* Plaintiffs' factual allegations

---

[1] Both of these cases include large swaths of allegations copied verbatim from another materially identical suit that the same counsel filed in the Eastern District of New York nearly a year ago. *See Zobay v. MTN Group Ltd.*, No. 1:21-CV-03503-CBA (E.D.N.Y.). Immediately after filing this motion to dismiss, MTN Group and the Individual Defendants will move under 28 U.S.C. § 1404(a) to transfer venue in these two cases to the Eastern District of New York. The MTN Defendants suggest that the Court first address their transfer motion, which if granted would obviate the need for this Court to rule on the motion to dismiss.

do not support the notion that a leading telecommunication company (or its executives) committed acts of international terrorism. The Complaint thus fails to state a claim under the ATA.

The Complaint's threshold defect is that the Court lacks personal jurisdiction over the MTN Defendants: MTN Group has no U.S. presence or operations, and the Individual Defendants are citizens of and reside in South Africa. None of them are alleged to have done anything in the United States. Ample precedent thwarts Plaintiffs' theory that MTN Group's indirect investment in an Iranian telecommunications company was expressly aimed at the United States. And precedent likewise defeats Plaintiffs' alternative theory that "agents" of some "MTN" entity procured U.S. technology for Irancell, since they plead no facts indicating that MTN Group controlled any agents who did so. The Complaint is similarly silent about the Individual Defendants, who are not alleged to have had any interaction with the United States or to have directed any agents. Even if the supposed agents' U.S. contacts could somehow be imputed to MTN Group, moreover, those contacts—international wire transactions that allegedly passed through the United States only fortuitously, and telecommunications equipment sourced from the United States—do not demonstrate any purposeful availment, and are too far removed from the attacks in Iraq and Afghanistan to say Plaintiffs' claims arise from or relate to those contacts.

Even if this Court had jurisdiction to hear Plaintiffs' claims against the MTN Defendants, all of those claims would still have to be dismissed for failure to state a claim under the ATA. Plaintiffs allege that MTN Group itself and two of its former executives perpetrated acts of international terrorism. That remarkable assertion fails for numerous reasons. For example, under the ATA, a defendant is responsible for committing "international terrorism" only if it appears to act with the motives of a terrorist, such as intimidating a civilian population. Here, Plaintiffs' own allegations are that MTN Group acted for business reasons, which, as courts in this District and

elsewhere have held, defeats an ATA direct-liability claim. To meet the separate requirement of pleading a predicate crime, Plaintiffs try to plead that MTN Group "knowingly" supported terrorists, but to do so the Complaint misstates its own sources and engages in other pleading tactics that courts reject, including by relying on U.S. government actions that long *postdate* the relevant attacks. The Complaint also cannot meet the further requirement of proximate cause by trying to connect an investment in a telecommunications joint venture in Iran to militia attacks in Iraq and Afghanistan—a significant flaw that has led other courts to dismiss similar ATA claims based on business dealings with Iranian state-owned enterprises. Finally, these complaints were filed twelve years after the most recent attack at issue, and are therefore time-barred.

Plaintiffs and their families have made tremendous sacrifices on behalf of the United States and the people of Iraq and Afghanistan. The MTN Defendants sympathize with them. But the MTN Defendants have no connection to Plaintiffs' injuries, or to this forum. Put simply, Plaintiffs have sued the wrong defendants in the wrong court based on insufficient allegations, and the Court should dismiss all claims against the MTN Defendants.

## BACKGROUND

The Complaint spans hundreds of pages and incorporates hundreds more by reference. The background below distills the allegations against the MTN Defendants, relying on the non-conclusory factual allegations in the Complaint (which are treated as true only for purposes of this motion) and providing context from the materials Plaintiffs cite. This recitation disregards unsupported inferences, legal conclusions, and allegations contradicted by documents the Complaint incorporates by reference. *See*, *e.g.*, *Kaempe v. Myers*, 367 F.3d 958, 963 (D.C. Cir. 2004); *Sparrow v. Interbay Funding, L.L.C.*, 2006 WL 2844254, at *3 (D.D.C. Sept. 29, 2006); *see also Amidax Trading Grp. v. S.W.I.F.T. SCRL*, 671 F.3d 140, 146–47 (2d Cir. 2011).

To understand the lengthy Complaint, two points should be highlighted:

*First,* the sources Plaintiffs incorporate often contradict the Complaint's characterizations. For instance, Plaintiffs describe Irancell's majority shareholders as IRGC fronts, but they cite U.S.-government sources which do not support that description. *See infra* pp. 9–12. Particularly where Plaintiffs rely upon sources that undermine or refute their claims, this Court may consider those materials in deciding Defendants' motion to dismiss.[2]

*Second*, the Complaint uses the term "MTN" loosely, obfuscating who allegedly did what. Plaintiffs describe "MTN" as an amalgamation of "MTN Group . . . together with its subsidiaries," Dkt. 1 at 49 (¶ 56), and Irancell, *see id.* at 225 (¶ 600). As to Afghanistan, Plaintiffs use the term to describe "conduct that was implemented on the ground by MTN Afghanistan and approved by . . . MTN Group," and as to Iraq and Iran, the term refers to "conduct that was implemented on the ground by MTN Irancell and approved by . . . MTN Group." *Id.* at 128 (¶ 429). Plaintiffs structure their complaint this way despite acknowledging that MTN Group holds only a non-controlling stake in Irancell. *See id.* at 132 (¶ 443). It is thus necessary when reading the Complaint to review critically which entity an allegation actually concerns.

A.   **MTN Group Is a Foreign Telecommunications Company that Operates Exclusively Outside the United States, and South African Nationals Phuthuma Nhleko and Irene Charnley Are Its Former Executives.**

Founded at the dawn of South African democracy in 1994, MTN Group is a South African company listed on the Johannesburg Stock Exchange. Dkt. 1 at 49 (¶ 56). Today, it is one of the largest companies in Africa and a leading provider of mobile telecommunications and network services, with more than 272 million subscribers. MTN Group and its subsidiaries do not operate in the United States. MTN Group instead serves a diverse range of countries in Africa and a few

---

[2] *See, e.g.*, *Abdus-Sabur v. Hope Vill., Inc.*, 221 F. Supp. 3d 3, 10 n.3 (D.D.C. 2016) (taking notice of government documents); *see also Honickman v. BLOM Bank SAL*, 6 F.4th 487, 499–502 (2d Cir. 2021).

countries in the Middle East, including underserved populations in the developing world who have historically lacked access to reliable and affordable connectivity, and the economic, educational, and other opportunities that connectivity brings. As part of this mission, MTN Group and its affiliates have "wad[ed] into nations dealing with war, sanctions and strife," *id.* at 206 (¶ 552), to bring connectivity where "no one else [will] go[]," Ex. A at 5 (Alexandra Wexler, *Telecom Giant Pushes into Dangerous Areas*, Wall St. J. (Aug. 10, 2019), *cited at* Dkt. 1 at 206 (¶ 552 n.171)).

Phuthuma Nhleko and Irene Charnley—both South African nationals who currently reside in South Africa—are former executives of MTN Group. Dkt. 1 at 50 (¶¶ 58–59). Mr. Nhleko served as MTN Group's President and CEO, *id.* at 50, 161 (¶¶ 58, 434), and Ms. Charnley served as MTN Group's Commercial Director, *id.* at 50 (¶ 59).

## B. MTN Group Participated in a Joint Venture to Expand Mobile Phone Service for Iranians.

In 2005, MTN International (Mauritius) Ltd.—an indirect subsidiary of MTN Group—acquired a minority equity stake in a business venture that aimed to build Iran's second-ever mobile phone network.[3] Dkt. 1 at 114–15, 161–64, 173–74, 265 (¶¶ 263–264, 434–436, 439, 443, 469, 697). That business venture, known as Irancell, later secured a 15-year license to build and operate a new network. *See id.* at 188 (¶ 506). As part of its investment, MTN Group, through MTN Mauritius, paid a €300 million license fee to regulators. *Id.* at 135, 139, 188, 198 (¶ 452, 464, 506, 539).

---

[3] While Plaintiffs allege that MTN Group itself is a shareholder in the Irancell joint venture, *see* Dkt. 1 at 49 (¶ 57), the *Turkcell* complaint—which Plaintiffs here cite and from which they borrow their allegations concerning Irancell's formation—alleges that MTN Mauritius purchased the minority stake in Irancell. *See* Ex. B at 10–11 (Complaint ¶¶ 21–22, *Turkcell Iletisim Hizmetleri A.S. v. MTN Grp., Ltd.*, No. 1:12-cv-00479 (D.D.C. Mar. 28, 2012) ("*Turkcell* Complaint"), *cited at* Dkt. 1 at 197 (¶ 538)); *see also* Dkt. 1 at 173–74 (¶ 469) (incorporating alleged MTN Group memorandum stating that "MTN International (Mauritius) Limited acquired a 49% equity interest in Irancell").

Irancell was a joint venture between Iran Electronic Development Company ("IEDC"), with a majority (51%) stake, and MTN Mauritius, with a minority (49%) stake. *Id.* at 49, 173–74 (¶¶ 57, 469).[4] Plaintiffs acknowledge that, as the parent of the "junior partner," MTN Group was "not in charge" of Irancell. *Id.* at 49, 168 (¶¶ 57, 453). While MTN Group provided technical support to the network, *see, e.g.*, *id.* at 202, 233–34 (¶¶ 543, 699), and had the right to sign off on business plans, budgets, accountings, and acquisitions, *see id.* at 168–69 (¶ 454), the Iranian shareholders held "all decision-making authority," *id.* at 132 (¶ 443).

Plaintiffs allege that MTN Group invested in this new network because Iran's telecommunications sector offered a "unique opportunity for telecommunications investors," *id.* at 150 (¶ 383) (emphasis omitted), and an "important" opportunity for "MTN's growth," *id.* at 203 (¶ 545). According to the Complaint, Iran's "telecoms sector" was "one of the most significant 'virgin' mobile opportunities in the world." *Id.* at 171–72 (¶ 464). The sector had "expanded rapidly" in the early 2000s, but "[w]ith a population of some [70 million people] and a mobile-phone penetration rate of below 5%," the sector "still [had] room for expansion." *Id.* at 144, 150 (¶¶ 365, 383).

Over the years, Irancell has grown into Iran's second-largest mobile phone operator, *see id.* at 193–94 (¶ 525), providing mobile phone services to millions of Iranian consumers, *see id.* at 176–77, 179, 228 (¶¶ 476, 480, 611). In the medium term, however, MTN Group intends to exit Iran, as part of a broader company strategy to focus on the African market. *See id.* at 196 (¶ 532).

---

[4] Plaintiffs allege that Iran Electronics Industries ("IEI") and Bonyad Mostazafan were direct shareholders in Irancell, Dkt. 1 at 49 (¶ 57), but sources they rely upon state that IEDC was the majority owner, *see, e.g.*, Ex. C at 8 (U.S. Dep't of Treasury, Press Release, *Treasury Targets Vast Supreme Leader Patronage Network and Iran's Minister of Intelligence* (Nov. 18, 2020) ("*Treasury Targets Vast Supreme Leader Patronage Network*"), http://tiny.cc/pdinuz, *cited at* Dkt. 1 at 139 (¶ 343 n.109)). Plaintiffs' claims would be no stronger even if these other entities were the direct shareholders.

The Complaint fails to link MTN Group's investment in a major mobile phone network to Plaintiffs' alleged injuries in militant attacks.

### C.   Plaintiffs or Their Family Members Were Injured in Iraq or Afghanistan by Attacks Allegedly Sustained by a Terrorist Alliance.

The Complaint alleges that Plaintiffs or their family members were injured or killed in 95 attacks (from 2006 to 2010) in Iraq—where no MTN entity operates—and 97 attacks (from 2007 to 2009) in Afghanistan. Dkt. 1 at 346–566 (¶¶ 946–2850). The attacks varied in tactics and were committed in different regions by disparate Sunni militant groups.

Plaintiffs, however, attribute their injuries to the "IRGC's terrorist enterprise"—a "transnational terrorist alliance" described as "a NATO for terrorists"—whose object was the expulsion of Americans from the Middle East. *Id.* at 33, 39–41, 77–78 (¶¶ 4, 26, 29–30, 137–138). Plaintiffs claim that this alliance operated for more than two decades and involved terrorist groups spanning the Middle East and South Asia. *Id.* at 41, 43–44, 77–78, 79–80 (¶¶ 30, 40, 137–139, 143–144). According to Plaintiffs, this alliance was devised by the IRGC, *id.* at 43–44 (¶¶ 40), a military force that operates separate from and parallel to Iran's regular armed forces, Ex. D at 18 (Cong. Rsch. Serv., *Iran's Foreign and Defense Policies* 13 (last updated Jan. 11, 2021) ("*Iran's Foreign and Defense Policies*"), http://tiny.cc/mgbnuz).

The Complaint alleges that Iran acted through three groups in forming this alliance: the "Regular IRGC," which oversaw all of the IRGC's activities in Iran, including its "maintenance of various fronts and cover companies, charities, and foundations," Dkt. 1 at 77 (¶ 136); the Qods Force, the IRGC's "external security operations division," responsible for organizing and aiding Iranian-backed terrorist groups outside Iran, *id.* at 76 (¶ 135); and Lebanese Hezbollah, *id.* (¶ 134). Plaintiffs allege that the "Regular IRGC" funneled money and equipment to the Qods Force and Hezbollah, which in turn funded and equipped cells of Islamist militias, which, supported by

Hezbollah, launched violent attacks to further the IRGC's terrorist enterprise. Plaintiffs often try to collapse these three entities into one, describing the Qods Force and Hezbollah as "subordinate branch[es]" of the IRGC, *id.* at 56, 242 (¶¶ 81, 653), and repeating an unwieldy mantra for most references: "IRGC, including its Hezbollah Division and Qods Force." At the same time, the Complaint insists on distinguishing between the "Regular IRGC" and the Qods Force. *Id.* at 34, 76–77, 346–47, 449 (¶¶ 8, 132, 135–136, 946–947, 1902–1903).

Despite the well-known (and often violent) sectarian differences between Iran—a majority Shia nation—and Sunni militant groups, Plaintiffs claim that the IRGC united Shia and Sunni groups across the region in one overarching terrorist enterprise.[5] Plaintiffs allege that they were injured in attacks by Sunni groups who received aid from the IRGC. The Complaint alleges that the attacks in Iraq that injured Plaintiffs were committed by Sunni militant "proxies" from Ansar al-Islam, al-Nusra Front, and al-Qaeda, which they collectively label the "IRGC Sunni Terrorist Proxies." *Id.* at 79–80, 346–449 (¶¶ 143–144, 946–1901).[6] Meanwhile, the attacks in Afghanistan that injured Plaintiffs were allegedly committed by Sunni militants from al-Qaeda, the Taliban, and the Haqqani Network, *id.* at 449–566 (¶¶ 1902–2850), with indirect support from Hezbollah, *see id.* at 79–80 (¶ 143).

---

[5] According to the Congressional Research Service, "Iran opposes Sunni terrorist groups that work against Iran's core interests, such as the Islamic State." Ex. D at 9 (*Iran's Foreign and Defense Policies* 4). The same report explains that Iran and al-Qaeda are likewise mostly at odds, noting that "analyses have characterized the relationship between Iran and Al Qaeda as 'an on-again, off-again marriage of convenience pockmarked by bouts of bitter acrimony.'" *Id.* (citation omitted).

[6] The Complaint also refers several times to Shia "joint cells," a term that Plaintiffs' counsel coined in the *Zobay* complaint to describe a supposed coalition of fighters from various Shia militias that opposed U.S. forces in Iraq with the backing of Hezbollah. Given that Plaintiffs in this case attribute their injuries to attacks by Sunni groups, these allegations appear to be a vestige of Plaintiffs' counsel's complaint in *Zobay*, from which Plaintiffs here have copied liberally.

D. **Plaintiffs Allege that, by Participating in Irancell and Helping to Support a Mobile Phone Network, MTN Group Directly Enabled Terrorist Attacks in Iraq and Afghanistan.**

1. **Plaintiffs' Theory Equates Investing in a Telecommunications Company in Iran with Directly Enabling Terrorist Attacks by Various Global Terrorist Groups.**

Plaintiffs claim that by simply making a minority, non-controlling investment in Irancell, MTN Group itself committed terrorist acts. *See* Dkt. 1 at 557–64 (¶¶ 2851–2871) (alleging three counts of violating the ATA's direct-liability provision). And they assert that, by helping secure that investment and helping Irancell run, the Individual Defendants likewise committed terrorist acts. *See id.*; *see also, e.g.*, *id.* at 46 (¶ 48) (alleging that the Individual Defendants provided "management consulting" to Irancell's "Iranian Shareholders"); *id.* at 173–74 (¶ 469) (alleging that the Individual Defendants "helped MTN Group secure the Irancell joint venture"). To try to connect MTN Group's investment in an Iranian mobile phone network to attacks in Iraq and Afghanistan, Plaintiffs allege that IEDC's two shareholders—Bonyad Mostazafan and IEI—were commercial "fronts" for the Regular IRGC. *See id.* at 77 (¶ 136). Plaintiffs thus theorize that when Irancell distributed the profits it earned from Iranian mobile phone subscribers, some of that money went indirectly to the Regular IRGC. *See, e.g.*, *id.* at 188–89 (¶¶ 507–509). And because the Iranian government allegedly supports terror groups abroad, Plaintiffs contend that MTN Group knowingly supported all attacks that various Sunni terrorist groups committed in Afghanistan and Iraq. *See id.* at 80, 189, 272– 73 (¶¶ 144–145, 509, 721).

The materials Plaintiffs incorporate present a different narrative. According to a U.S. government report, Bonyad Mostazafan is a state-directed charitable and commercial enterprise with a "multi-billion dollar economic empire" of "energy, mining, logistics, information technology, and financial services" firms that is "owned or controlled by" the Office of the Supreme Leader of Iran. Ex. C at 2, 4 (*Treasury Targets Vast Supreme Leader Patronage*

*Network*). Similarly, the U.S. government views IEI as an electronics manufacturer that is "owned or controlled" by Iran's Ministry of Defense for Armed Forces Logistics ("MODAFL"), not the IRGC. Ex. E at 2 (U.S. Dep't of Treasury, Press Release, *Treasury Designates Iranian Military Firms* (Sept. 17, 2008) ("*Treasury Designates Iranian Military Firms*"), https://tinyurl.com/yc59xjar, *cited at* Dkt. 1 at 142 (¶ 355 n.113)). Other sources in the Complaint note that IEI sold "many consumer goods," including "personal computers, scanners, telephone sets and intercoms, [and] mobile phones."[7]

Plaintiffs nonetheless claim that IEI and Bonyad Mostazafan's indirect investment in Irancell was part of an effort by the Regular IRGC to use "companies and institutions" that Iran's government owned or controlled to invest in "broad swaths of the Iranian economy." Dkt. 1 at 134–37 (¶¶ 331–335). And they contend that when Mr. Nhleko, on MTN Group's behalf, signed a letter agreement with Irancell's Iranian shareholders in 2005 outlining the terms of its investment, MTN Group was pledging (on behalf of itself and every one of its affiliates) to support the IRGC and assume a role in its terrorist enterprise. *Id.* at 45, 161, 164–66, 169 (¶¶ 44, 434, 444–446, 457).

The 2005 Letter Agreement on which Plaintiffs rely makes no mention of the IRGC or terrorism and addresses only business terms. *See* Ex. G (Letter Agreement, Sept. 18, 2005 ("Letter Agreement")).[8] Plaintiffs seize on a single reference to "security" in the document, Dkt. 1 at 229 (¶ 613), which called on "MTN" to "cooperat[e]" with the "Iranian shareholders" on "defensive, security and political" issues "*in South Africa*," Ex. G at 3 (Letter Agreement) (emphasis added).

---

[7] Ex. F at 4 (Ali Alfoneh, *How Intertwined Are the Revolutionary Guards in Iran's Economy?*, Am. Enter. Inst. for Pub. Pol'y Rsch. (Oct. 22, 2007) ("*How Intertwined Are the Revolutionary Guards in Iran's Economy?*"), https://tinyurl.com/muun4m7n, *cited at* Dkt. 1 at 264–65 (¶ 696 & n.261)).

[8] Plaintiffs appear to have intended to attach the Letter Agreement to their Complaint, *see* Dkt. 1 at 164 (¶ 443), but did not do so. Because Plaintiffs incorporate the Agreement by reference, we have attached a copy as an exhibit in support of this motion.

Despite the Agreement's plain language, Plaintiffs hypothesize that it reflected an intent to further a sprawling terrorist campaign involving virtually every terrorist group *in the Middle East and South Asia*. *See* Dkt. 1 at 240 (¶ 649). But Plaintiffs' allegations about this clause incorporate the *Turkcell* Complaint, *see supra* note 3, which says nothing about aiding IRGC terrorism. Instead, the *Turkcell* Complaint at most alleges that MTN Group committed to "use[] its high-level political influence within the South African government" to offer Iran "support for . . . the procurement of high-tech defense equipment." Ex. B at 4 (*Turkcell* Complaint ¶ 4). The Complaint itself claims, albeit in sparser terms, that the focus of the "security" clause was the South African government.[9]

Plaintiffs' portrayal of the Irancell stakeholders as "fronts" of the IRGC reflects a broad pattern of twisting the sources cited in the Complaint. For example:

- ***IEI Not Designated for Ties to the IRGC or Terrorism.*** Plaintiffs assert that IEI was an IRGC front, Dkt. 1 at 141 (¶ 349), that was "fully owned by the IRGC," *id.* at 142 (¶ 356), and whose "express purpose" was to support the IRGC's terrorist activities, *id.* at 141 (¶ 350). The 2008 U.S. government designation that Plaintiffs cite in support of these allegations, however, says only that IEI was "owned or controlled by Iran's MODAFL," and supported "Iran's nuclear and ballistic missile programs."[10] The designation does not mention any link between IEI and the IRGC or terrorism, even while it described *other* Iranian military firms as supplying the IRGC.

---

[9] *Compare* Dkt. 1 at 199 (¶ 541) ("MTN's executives '[t]ogether [] promised [the Iranian agents] that South Africa would deliver "heaven, earth, and the fish," meaning whatever military equipment [Iran] desired.'" (alterations in original)) *with* Ex. B at 27 (*Turkcell* Complaint ¶ 93) (MTN Executives and South African defense officials "met with members from the Iranian Ministry of Defense," and "promised the [Iranian] Minister of Defense that South Africa would deliver 'heaven, earth, and the fish,' meaning whatever military equipment he desired"). Plaintiffs likewise distort an internal memorandum as stating that "MTN would need to serve as a weapons supplier for its Iranian counterparties if it wanted to win and maintain its position in the joint venture." Dkt. 1 at 176 (¶ 476). What the memorandum actually said is that in 2007, MTN Group faced "serious blowback" *from Iran* because "it is highly unlikely that *the Government of South Africa* will be prepared to sign any defence agreements or deliver defence materials to Iran." *Id.* at 177 (¶ 476) (emphasis added). The memorandum thus suggests that Iran permitted MTN Group to invest in Irancell in the hope that the South African government—not MTN Group—would provide defense support to Iran.

[10] Ex. E at 2 (*Treasury Designates Iranian Military Firms*).

- ***Bonyad Mostazafan Not Designated for Ties to the IRGC or Terrorism.*** Plaintiffs assert that Bonyad Mostazafan "was and is a front for Hezbollah, the Qods Force, and Regular IRGC," and "served as a central hub" for "Iran's terrorist enterprise," *id.* at 138 (¶¶ 338–339), citing a 2020 U.S. government designation in support of this statement, *id.* at 139–40 (¶ 343 n.109) (citing *Treasury Targets Vast Supreme Leader Patronage Network*). But that document highlights that Bonyad Mostazafan was never a designated entity during the period relevant to the Complaint. *Id.* (¶ 343). When the U.S. government did designate Bonyad Mostazafan, it was for ties to the "Supreme Leader of Iran"[11]—not because of the IRGC or any ties to terrorism.

- ***Designation of an Unrelated Bonyad.*** Plaintiffs contend that a 2010 designation put MTN Group on notice that the IRGC "relied upon illicit commercial transactions, including through Bonyads like Bonyad Mostazafan, to facilitate Iran's terrorist enterprise." *Id.* at 136 (¶ 334). That designation never mentioned Bonyad Mostazafan. Ex. H (U.S. Dep't of Treasury, Press Release, *Fact Sheet: Treasury Designates Iranian Entities Tied to the IRGC and IRISL* (Dec. 21, 2010) ("*Treasury Designates Iranian Entities Tied to the IRGC*"), https://tinyurl.com/4nnjmbbu, *cited at* Dkt. 1 at 136 (¶ 334 n.105).[12] And it came after the last attack that injured any Plaintiff, which occurred in July 2010. *See* Dkt. 1 at 448 (¶ 1895).

In sum, despite the Complaint's repeated misstatements of its own sources, the sources themselves reveal that the United States never designated or sanctioned Irancell, and never designated or sanctioned IEI or Bonyad Mostazafan for alleged ties to the IRGC or terrorism.

### 2. Plaintiffs Also Allege that Unnamed "Agents" of "MTN" Sourced U.S. Equipment and Services for Irancell.

In addition to alleging that the IRGC benefited indirectly from revenue Irancell generated from its mobile phone subscribers, Plaintiffs allege that "agents" of "MTN" helped Irancell source "dual-use" U.S. telecommunications equipment and technology services for Irancell. Dkt. 1 at 236 (¶ 636). Plaintiffs contend that this procurement also contributed to the IRGC's terrorist enterprise, and supports personal jurisdiction in the United States over the MTN Defendants.

---

[11] Ex. C at 2 (*Treasury Targets Vast Supreme Leader Patronage Network*).

[12] Iranian bonyads are "quasi-official organizations controlled by . . . current and past government officials and clerics," which "receive benefits from the Iranian government but are not required to have their budgets publicly approved." Ex. H at 3 (*Treasury Designates Iranian Entities Tied to the IRGC*). In 2010, "[t]hey account[ed] for a significant portion of Iran's non-petroleum economy." *Id.*

***Alleged Agents.*** According to the Complaint, "MTN" relied upon "U.S. agents" to source embargoed goods from the United States, *id.* at 236, 237 (¶¶ 636, 638–639, 642), and "MTN and/or MTN's agents" obtained "technology support services" for Irancell through "U.S. agents," *id.* at 237 (¶ 643); *see also id.* at 229 (¶ 614). The Complaint does not name these alleged "agents" or make factual allegations as to how MTN Group controlled them.

In another section, Plaintiffs allege that an "MTN" affiliate *may* have retained a company called "Exit40" to "help source" U.S. goods. *Id.* at 158 (¶ 421). But Plaintiffs make no factual allegations showing that MTN Group controlled either Exit40 or any other "agent," purchased any U.S. technology itself, or directed that any equipment be sourced specifically from the United States.

***Goods and Services.*** The "technology and equipment" that these "agents" allegedly obtained comprised items that any telecommunications company would need, such as "computer equipment," *id.* at 195 (¶ 526); "routers and numerous switches . . . to route communications traffic," Ex. I at 7 (Steve Stecklow, *Exclusive: Iranian Cell-Phone Carrier Obtained Banned U.S. Tech*, Reuters (June 4, 2012), http://tiny.cc/8einuz, *cited at* Dkt. 1 at 193–94 (¶ 525 & n.154)); and "smart phones," Dkt. 1 at 195 (¶ 529). Plaintiffs also allege that the agents procured "encryption technologies," Dkt. 1 at 195 (¶ 528), and help "servic[ing] MTN Irancell's enterprise-level computers and associated networks," *id.* at 237 (¶ 641).

The Complaint does not allege that MTN Group provided any telecommunications equipment to the IRGC, the Qods Force, Hezbollah, or any Shia or Sunni militia group. Instead, Plaintiffs try to connect the technology that "MTN" allegedly procured for Irancell to the attacks in Iraq and Afghanistan, by asserting that when MTN Group helped improve Irancell's network, the IRGC's own "cellular-phone capabilities" benefited. *Id.* at 193, 265 (¶¶ 523, 699). In particular,

the Complaint alleges that the IRGC used encryption technology of the sort that Irancell sourced to communicate with Hezbollah, though not in connection with any attack at issue. *See id.* at 47, 195, 266 (¶¶ 49, 528, 700). The Complaint also alleges that, of the "American smart phones" that "MTN" supplied to Irancell, the IRGC gave hundreds to Hezbollah. *See id.* at 195 (¶ 529).

> **Banking.** Plaintiffs also allege that, to pay for this technology, "MTN and/or MTN's agents routed millions of dollars" to other "agents" in wires that passed "through the New York banking system," *id.* at 236 (¶ 639). The Complaint alleges that "purchasing agents working for the IRGC" and "acting at the direction of MTN Group and its IRGC . . . ally" wired "more than $5 million . . . to associates in the U.S. who purchased embargoed technology." *Id.* (¶ 638).

Plaintiffs also allege that MTN Group used the U.S. financial system in other contexts. For example, the Complaint alleges that in 2007, the MTN Defendants facilitated the Irancell deal by paying a $400,000 "bribe" to the Iranian Deputy Foreign Minister. *Id.* at 198–99, 233 (¶¶ 539, 629). Although the alleged payment was wired outside the United States, Plaintiffs allege that, because the Iranian official requested U.S. dollars, the "wire instruction" must have at some point "caused a bank in the United States to send" money to his account in the U.A.E. *Id.* at 188 (¶ 504).

### E.     Plaintiffs Also Allege that the Taliban Violently Extorted MTN Afghanistan.

In addition to the attacks in Iraq, the Complaint also encompasses attacks in Afghanistan from 2007 to 2009. While Plaintiffs allege that the IRGC indirectly aided those attacks, *see, e.g.*, Dkt. 1 at 449–50 (¶¶ 1902–1905), they also import allegations about Afghanistan from a different lawsuit against MTN Group, *Cabrera v. Black & Veatch Special Projects Corp.*, No. 1:19-cv-03833 (D.D.C.). Borrowing from the *Cabrera* complaint, Plaintiffs allege that the Taliban violently forced MTN Afghanistan (which is not a defendant here) to shut down its cell towers in Afghanistan, and pay so-called taxes, Dkt. 1 at 206–20 (¶¶ 553–585), or else face Taliban attacks on its staff and network, *see* Ex. J at 156–57, 164, 167 (Amended Complaint ¶¶ 294–295, 311,

318, *Cabrera*, No. 1:19-cv-03833 (D.D.C. June 5, 2020) ("*Cabrera* Complaint")). As for the Individual Defendants, Plaintiffs allege in conclusory fashion that Mr. Nhleko "approved" MTN Afghanistan's conduct, Dkt. 1 at 221 (¶ 589), and that he and Ms. Charnley "intended to harm American interests in Afghanistan," *id.* at 207 (¶ 555). They allege no facts supporting these assertions.

## LEGAL STANDARD

Because the MTN Defendants move to dismiss for lack of personal jurisdiction on the pleadings, the same general standard of review governs their motions to dismiss under Federal Rules of Civil Procedure 12(b)(2) and 12(b)(6). "To survive a motion to dismiss under [Rule] 12(b)(6), a plaintiff bears the burden to plead 'enough facts to state a claim to relief that is plausible on its face.'" *Wiedmaier v. OpenTable, Inc.*, 2020 WL 2838594, at *2 (D.D.C. June 1, 2020) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). Plaintiffs also bear the burden of "mak[ing] a *prima facie* showing of the pertinent jurisdictional facts." *Livnat v. Palestinian Auth.*, 851 F.3d 45, 56–57 (D.C. Cir. 2017) (citation omitted). In both contexts, the Court considers only Plaintiffs' well-pleaded factual allegations. *Ashcroft v. Iqbal*, 556 U.S. 662, 678–79 (2009). While the Court must "accept as true all of the complaint's factual allegations and draw all reasonable inferences in favor of the plaintiffs," *Owens v. BNP Paribas, S.A.*, 897 F.3d 266, 272 (D.C. Cir. 2018), it "will not accept 'inferences drawn by plaintiffs if such inferences are unsupported by the facts set out in the complaint' or 'legal conclusions cast in the form of factual allegations,'" *Kaempe v. Myers*, 367 F.3d 958, 963 (D.C. Cir. 2004) (citation omitted).

"Facial plausibility requires that 'the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged.'" *Williams v. Donovan*, 219 F. Supp. 3d 167, 172 (D.D.C. 2016) (citation omitted). Plaintiffs "must plead enough facts 'to raise a right to relief above the speculative level.'" *Id.* (citation omitted). Plaintiffs

fail to state a claim when they "offer[] 'labels and conclusions' or 'a formulaic recitation of the elements of a cause of action,'" *Levi v. Brown & Williamson Tobacco Corp.*, 851 F. Supp. 2d 8, 10 (D.D.C. 2012) (citation omitted), *aff'd*, 528 F. App'x 4 (D.C. Cir. 2013); "merely tender[] 'naked assertion[s]' devoid of 'further factual enhancement,'" *id.* (citation omitted); or rely upon allegations that are "directly contradicted by the" sources "attached to their . . . Complaint," *United States ex rel. Keaveney v. SRA Int'l, Inc.*, 219 F. Supp. 3d 129, 144 (D.D.C. 2016). "[I]n spite of the requirement that the Court draw all reasonable inferences in the plaintiff's favor, some factual allegations will render certain inferences unreasonable," and "the Court cannot draw an inference that stands in direct conflict with the facts as alleged in the Complaint," *Badwal v. Bd. of Trs. of Univ. of D.C.*, 139 F. Supp. 3d 295, 311 (D.D.C. 2015). Courts have repeatedly rejected attempts "to file a facially implausible complaint and discover their way into a plausible claim" as "exactly the type of pleading that *Twombly* and *Iqbal* are designed to address," *Levi*, 851 F. Supp. 2d at 11 (collecting cases), especially when there is an "obvious alternative explanation" for the events alleged, *Twombly*, 550 U.S. at 567.

Because Plaintiffs still have not met their burden to plead personal jurisdiction or any plausible claim, the Court should dismiss all claims against the MTN Defendants.

## ARGUMENT

## I.    The Court Should Dismiss the Claims Against MTN Group and the Individual Defendants for Lack of Personal Jurisdiction.

The Complaint fails to establish personal jurisdiction under Federal Rule of Civil Procedure 4(k)(2), the sole basis for jurisdiction that it invokes over the MTN Defendants. Rule 4(k)(2) acts as a federal long-arm statute, *Est. of Klieman v. Palestinian Auth.*, 923 F.3d 1115, 1120 (D.C. Cir. 2019), and requires that "exercising jurisdiction [be] consistent with the United States Constitution and laws," Fed. R. Civ. P. 4(k)(2)(B). To be consistent with the Constitution,

the exercise of jurisdiction must "comport[] with the limits imposed by federal due process," *Walden v. Fiore*, 571 U.S. 277, 283 (2014) (citation omitted), given the defendant's contacts with the United States as a whole, *see Klieman*, 923 F.3d at 1120. To satisfy due process, Plaintiffs must establish either general or specific jurisdiction over each defendant. *Goodyear Dunlop Tires Operations, S.A. v. Brown*, 564 U.S. 915, 919 (2011).

Neither MTN Group nor the Individual Defendants are subject to general jurisdiction. MTN Group is incorporated and has its principal place of business outside the United States, Dkt. 1 at 49 (¶ 56), and does not operate—much less is "at home"—here. *Daimler AG v. Bauman*, 571 U.S. 117, 139 (2014). The Individual Defendants, who are nationals of and reside in South Africa, are likewise not "at home" in the United States. *Id.*

All that remains, then, is specific jurisdiction, which Plaintiffs again fail to sufficiently plead. Specific jurisdiction "focuses on 'the relationship among the defendant, the forum, and the litigation,'" *Walden*, 571 U.S. at 284 (citation omitted), and is "confined to adjudication of 'issues deriving from, or connected with, the very controversy that establishes jurisdiction,'" *Goodyear*, 564 U.S. at 919 (citation omitted). To demonstrate specific jurisdiction, a plaintiff must plead (1) that the defendant has "minimum contacts" with the forum, (2) that those contacts are suit-related (meaning plaintiff's claims arise from or relate to those contacts), and (3) that the exercise of jurisdiction would "not offend traditional notions of fair play and substantial justice." *Id.* at 923–24 (citation omitted). Even as alleged, Plaintiffs' claims do not arise out of or relate to any "minimum contacts" that either MTN Group or the Individual Defendants purposefully created with the United States.

### A.     The Court Lacks Personal Jurisdiction over MTN Group.

#### 1.     Plaintiffs Cannot Establish that MTN Group Had Minimum Contacts with the United States.

MTN Group's alleged suit-related conduct occurred entirely abroad. Plaintiffs identify two theories for why MTN Group can nonetheless be sued in the United States—direct targeting and purposeful availment—but neither succeeds in establishing specific jurisdiction.

##### a)     MTN Group Did Not Expressly Aim Its Actions at the United States.

Plaintiffs assert that MTN Group "expressly aimed" or "directed" its conduct at the United States by supporting terrorist attacks against U.S. nationals in Iraq and Afghanistan. Dkt. 1 at 226–29 (¶¶ 604–613). While jurisdiction can in limited circumstances be based on an intentional tort "expressly aimed" at the forum, *see Calder v. Jones*, 465 U.S. 783, 789–90 (1984), the Supreme Court clarified in *Walden* that the defendant's actions must be expressly aimed at the forum *itself*, not just at a forum resident. 571 U.S. at 285. The Complaint comes nowhere close to pleading that MTN Group's own alleged actions were expressly aimed at the United States.

Case law forecloses Plaintiffs' "targeting" theory of jurisdiction. In *Terrorist Attacks*—a foundational case on targeting in the ATA context upon which courts in this District have relied—victims of the September 11 attacks sued four Saudi princes, alleging that "the Princes supported Muslim charities knowing that their money would be diverted to al Qaeda, which then used the money to finance" attacks on Americans. *In re Terrorist Attacks on Sept. 11, 2001*, 538 F.3d 71, 94 (2d Cir. 2008), *abrogated on other grounds by Samantar v. Yousuf*, 560 U.S. 305 (2010). Rejecting that theory, the Second Circuit held that "[e]ven if the four princes were reckless in monitoring how their donations were spent, or could and did foresee that the recipients of their donations would attack targets in the United States, that would be insufficient to ground the exercise of personal jurisdiction." *Id.* at 94–95. Such contacts with the United States, the court

held, were "far too attenuated" to meet the plaintiffs' burden of pleading "'intentional . . . actions expressly aimed'" at the United States. *Id.* at 95. The Second Circuit more recently reiterated that "providing indirect funding to an organization that was openly hostile to the United States" is not "the type of intentional conduct" that "constitute[s] purposeful direction of activities at the forum." *Waldman v. Palestine Liberation Org.*, 835 F.3d 317, 339 (2d Cir. 2016) (citing *Terrorist Attacks*, 538 F.3d at 95–96). This conclusion holds true, the court noted, even if the funders "could and did foresee" that the recipients would use the funds "to finance the September 11 attacks." *Id.*[13]

Courts in this District have agreed. *See Ofisi v. Al Shamal Islamic Bank*, 2019 WL 1255096, at *7–8 (D.D.C. Mar. 19, 2019) (refusing "[t]o impute al Qaeda's purposeful contacts with the United States to [defendant] in the absence of the latter's own relevant forum contacts") (citing *In re Terrorist Attacks on Sept. 11, 2001*, 714 F.3d 659, 668, 675–76 (2d Cir. 2013) (applying *Terrorist Attacks*, 538 F.3d 71)); *Cabrera v. Black & Veatch Special Projects Corp.*, 2021 WL 3508091, at *12 (D.D.C. July 30, 2021) (rep. & recommendation) (citing *Terrorist Attacks*, 538 F.3d at 93, 95).

The Complaint's attempt to connect MTN Group's minority investment in Irancell to attacks on Americans is likewise "far too attenuated" to establish that MTN Group engaged in "intentional actions expressly aimed at" the United States. Plaintiffs allege that MTN Group joined

---

[13] After *Terrorist Attacks*, the Second Circuit held that a targeting theory *might* be viable against officials of charitable organizations who "*directly* provided financial and other resources to al Qaeda knowing that al Qaeda was engaged in a global campaign of terror directed at the United States." *O'Neill v. Asat Trust Reg., 2001*, 714 F.3d 659, 678 (2d Cir. 2013); *see also Underwriting Members of Lloyd's Syndicate 2 v. Al Rajhi Bank*, 779 F. App'x 66, 68–69 (2d Cir. 2019) ("The inclusion of allegations related to Al Rajhi Bank's specific intent to further terrorism in the United States . . . distinguishes the present case from those in which we have not granted personal jurisdiction . . . ."). Even in these cases, allegations of direct support to al-Qaeda or a specific intent to further terrorism only sufficed to gain access to jurisdictional discovery. More importantly, these cases confirm that allegations of *indirect* funding of terrorists, based on a foreseeability theory, fail to plead a basis for personal jurisdiction or even jurisdictional discovery.

a joint venture with IEDC, whose shareholders, IEI and Bonyad Mostazafan, were supposedly "fronts" for the Regular IRGC, and that the Regular IRGC in turn supported militia attacks in Iraq and Afghanistan through the Qods Force and Hezbollah. Dkt. 1 at 33–34, 49 (¶¶ 5, 8, 57). That theory fails on its own terms because the Complaint fails to support Plaintiffs' conclusory assertion that IEI and Bonyad Mostazafan were known IRGC fronts. *See supra* pp. 9–12; *infra* pp. 43–45. That defect aside, the most Plaintiffs have tried to allege is that MTN Group knew that its business partners had ties to the Regular IRGC, and that it was foreseeable that some of the revenue Irancell generated from Iranian subscribers might further the Qods Force's support for Shia and Sunni militias in Iraq and, still more remotely, for Sunni militias in Afghanistan. This roundabout theory is even weaker than the claims of indirectly and foreseeably funding al-Qaeda and the September 11 attacks that the Second Circuit previously rejected as a basis for personal jurisdiction.

The Complaint also fails in its effort to shoehorn in allegations from another case that concern the alleged acts of non-party MTN Afghanistan. Plaintiffs claim that MTN Group "intended to harm American interests in Afghanistan" when it allegedly "approved" and "caused" funds "to be directly paid to the Haqqani Network," Dkt. 1 at 207, 212–13 (¶¶ 555, 568–569), and "followed the Taliban's instructions . . . by shutting down towers[]," *id.* at 214–15 (¶¶ 574). Yet the magistrate judge in *Cabrera v. Black & Veatch Special Projects Corp.*—the case from which Plaintiffs here borrow their allegations about MTN Afghanistan—rejected an identical targeting theory. 2021 WL 3508091, at *12. As the magistrate judge explained, the most that was alleged was that the Taliban extorted MTN Afghanistan into making protection payments and shutting down cellular towers, and that harm to Americans was a foreseeable result. *See id.*; *compare* Dkt. 1 at 206–20, 226–27 (¶¶ 552–585, 604), *with* Ex. J at 155–68, 174–75 (*Cabrera* Complaint ¶¶ 291–321, 334–336). As discussed above, however, "[f]oreseeability alone is not enough to confer

20

jurisdiction" under a targeting theory. *Cabrera*, 2021 WL 3508091, at \*12 (citing *Terrorist Attacks*, 538 F.3d at 93). The magistrate judge in *Cabrera* thus concluded that MTN Afghanistan's alleged acts "at the Taliban's behest" were "'far too attenuated'" from attacks on Americans "'to establish personal jurisdiction in American courts.'" *Id.* (quoting *Terrorist Attacks*, 538 F.3d at 95). This Court should reach the same conclusion.

> **b)   MTN Group Did Not Purposefully Avail Itself of the U.S. Forum.**

Plaintiffs fare no better on their backup theory that MTN Group, which does no business in the United States, purposefully availed itself of the benefits of doing business here. This alternative theory fails for two reasons: it relies mainly on flawed jurisdiction-by-agency allegations, and those allegations in any event do not adequately plead purposeful availment.

> **1)   Plaintiffs' failure to adequately plead agency forecloses their theory of purposeful availment.**

Nowhere does the Complaint allege that MTN Group itself purchased U.S. equipment for Irancell's benefit. Instead, Plaintiffs allege only that "MTN"—a catchall term that could refer to any MTN entity or even Irancell—or its "agents" did so. But this theory has two fundamental defects: Plaintiffs employ impermissible group pleading and fail to allege an agency relationship between MTN Group and any particular "agent" that had these supposed U.S. contacts. These flaws defeat Plaintiffs' central purposeful-availment theory.

**1.** To begin with, Plaintiffs do not identify the principal on whose behalf the agents were allegedly acting. Under "settled" law, "a plaintiff cannot satisfy the minimum pleading requirements under Rule 8 . . . by lumping all the defendants together" and "providing no factual basis to distinguish their conduct." *Toumazou v. Turkish Republic of N. Cyprus*, 71 F. Supp. 3d 7, 21 (D.D.C. 2014) (citation omitted). And such group pleading is particularly inappropriate when trying to allege personal jurisdiction, which "must be met as to each defendant." *Rush v. Savchuk*,

444 U.S. 320, 332 (1980); *Pinkett v. Dr. Leonard's Healthcare Corp.*, 2019 WL 1992904, at *2 (D.D.C. May 6, 2019); *accord Tera Grp., Inc. v. Citigroup, Inc.*, 2018 WL 4732426, at *2 (S.D.N.Y. Sept. 28, 2018) ("This group pleading—conflating UBS AG and UBS Securities LLC as 'UBS'—fails to establish personal jurisdiction over 'each defendant.'" (quoting *Rush*, 444 U.S. at 332)).

Yet in trying to plead that MTN Group is subject to personal jurisdiction here, Plaintiffs impermissibly rely on group pleading. Aside from one conclusory allegation that "MTN Group and its IRGC[] ally" directed certain IRGC agents, Dkt. 1 at 236 (¶ 638), Plaintiffs' agency allegations use the catch-all "MTN," *id.* at 236-37 (¶¶ 636–637, 639–643)—a term that Plaintiffs say includes various entities whose "conduct that was implemented on the ground by MTN Irancell,"[14] *id.* at 160 (¶ 429). Plaintiffs try to impute such conduct to MTN Group by alleging that it "approved" Irancell's actions. *Id.* But Plaintiffs acknowledge that MTN Group did not control Irancell beyond limited veto rights, which are inapplicable here. *See id.* at 49, 164, 168 (¶¶ 57, 443, 454). By failing to distinguish between separate corporate entities, Plaintiffs obscure whether the principal on whose behalf these unnamed "agents" allegedly sourced U.S. goods was really MTN Group or Irancell. Plaintiffs thus leave the Court unable to determine whether MTN Group— or another entity—was the one that allegedly directed any given "agent." Without that allegation, Plaintiffs' agency theory cannot succeed. *See Heller v. Nicholas Applegate Cap. Mgmt., LLC*, 498 F. Supp. 2d 100, 111 (D.D.C. 2007) (assessing agency theory of jurisdiction under the

---

[14] As one illustration, the Complaint alleges that "MTN Irancell relied upon one or more U.S. persons to service MTN Irancell's enterprise-level computers and associated networks," Dkt 1 at 237 (¶ 641), but then goes on to allege that "MTN, or agents acting at MTN's direction, sourced embargoed technology" and that "MTN and/or MTN's agents routed" payments "to its U.S. agents in order to pay for the technology support it illegally obtained for the IRGC," *id.* (¶¶ 641, 643). At least here, Plaintiffs appear to be using "MTN" to refer to only Irancell, not MTN Group.

transacting-business arm of the D.C. long-arm statute, which is coextensive with the Due Process Clause); *Charles Schwab Corp. v. Bank of Am. Corp.*, 883 F.3d 68, 85–86 (2d Cir. 2018) (assessing agency theory of jurisdiction under due-process analysis).

Similarly, Plaintiffs' allegations that some "MTN" affiliate or "cut-out" may have retained "Exit40" to "help source" U.S. goods, Dkt. 1 at 158 (¶¶ 421–422), not only fail to clearly identify the specific principal who allegedly directed Exit40's actions, but also suggest that the principal might not even be an MTN affiliate. Indeed, Plaintiffs speculate that Exit40 was retained by any one of "MTN Group, MTN Dubai, or MTN Mauritius, or a cut-out acting on their behalf, so that Exit40 would serve as MTN Group's, MTN Dubai's, MTN's Irancell's and [*Telecommunications of Iran ('TCI')*]'s agent or cut-out," *id.* at 158 (¶ 422) (emphasis added), without explaining how an MTN entity could have the power to direct an agent for TCI, an entirely different company. Plaintiffs then allege that "MTN Group personnel, MTN Dubai, or an MTN subsidiary, affiliate, *agents, cut-out, or business partner*" paid "Exit40 in order to cause Exit40 to procure the embargoed American technologies." *Id*. (¶ 423) (emphasis added). By conflating MTN Group, legally separate affiliates, and unrelated companies, Plaintiffs fail to make even a minimal allegation of a principal-agent relationship between MTN Group and Exit40.

Nor can Plaintiffs excuse their group pleading by claiming, again in conclusory fashion, that MTN Group "disregarded the corporate form." *Id.* at 161 (¶ 434). Given the "general principle of corporate law deeply ingrained in our economic and legal systems that a parent corporation (so-called because of control through ownership of another corporation's stock) is not liable for the acts of its subsidiaries" or affiliates, *United States v. Bestfoods*, 524 U.S. 51, 61 (1998) (citation omitted), courts will not collapse separate corporate entities unless a plaintiff pleads *facts* showing "(1) unity of ownership and interest between the entities, and (2) either use of the corporate form

to perpetrate fraud or wrong, or other considerations of justice and equity [that] justify" veil piercing, *Bonilla-Santiago v. BLB Privatized Hous., LLC*, 2022 WL 990681, at \*7 (D.D.C. Mar. 31, 2022).[15] Plaintiffs come nowhere close to pleading such facts. Instead, they give three examples of MTN Group officers or directors directing acts of subsidiaries.[16] Those examples are not enough. As the D.C. Circuit has recognized, "ownership, alone, of capital stock in one corporation by another, does not create an identity of corporate interest between the two companies." *Scandinavian Satellite Sys., AS v. Prime TV Ltd.*, 291 F.3d 839, 846 (D.C. Cir. 2002) (citation omitted); *see also Greene v. Long Island R.R.*, 280 F.3d 224, 234 (2d Cir. 2002) (even a "parent's 100% ownership of [a] subsidiary and active participation in or control of the subsidiary's board of directors" is not enough to pierce the corporate veil). Because "[a] parent corporation does not lose the benefits of limited liability by taking an active interest in the affairs of its subsidiary," Plaintiffs' allegations that MTN Group stayed involved in its subsidiaries' businesses do not carry the heavy burden of pleading that the Court should disregard the corporate form. *AGS Int'l Servs. S.A. v. Newmont USA Ltd.*, 346 F. Supp. 2d 64, 92 (D.D.C. 2004) (citation omitted).

**2.** Group pleading aside, *see supra* pp. 21–23, the Complaint offers no non-conclusory allegations supporting agency. To plead jurisdiction on an agency theory, Plaintiffs must allege facts showing that (1) the purported agent "is subject to the [nonresident] principal's right of control; (2) the agent has a duty to act primarily for the benefit of the principal; and (3) the agent

---

[15] "[T]he difference between federal alter ego law and D.C. alter ego law is immaterial." *McWilliams Ballard, Inc. v. Broadway Mgmt. Co.*, 636 F. Supp. 2d 1, 7–8 (D.D.C. 2009).

[16] Plaintiffs' fourth example—that MTN Group signed its letter agreement to invest in Irancell "on behalf of every 'MTN' entity," Dkt. 1 at 161 (¶ 434)—is neither stated in that agreement nor inferable from its text, *see* Ex. G (Letter Agreement). The Court should ignore Plaintiffs' "legal conclusion[] masquerading as fact[]." *Neighbors of Casino San Pablo v. Salazar*, 773 F. Supp. 2d 141, 147 n.11 (D.D.C.), *aff'd* 442 F. App'x 579 (D.C. Cir. 2011)).

holds a power to alter the legal relations of the principal." *Acosta Orellana v. CropLife Int'l*, 740 F. Supp. 2d 33, 39 (D.D.C. 2010). "'[B]are allegation[s]' of . . . agency," however, are "insufficient to establish personal jurisdiction." *First Chi. Int'l v. United Exch. Co.*, 836 F.2d 1375, 1378–79 (D.C. Cir. 1988) (citation omitted); *accord Charles Schwab*, 883 F.3d at 85–86. Yet all that Plaintiffs offer are sparse allegations that a defendant "directed" its alleged agents' actions, which are too "bare" to "impute[]" the agent's actions to the defendant. *Charles Schwab*, 883 F.3d at 86.[17] Plaintiffs allege, for instance, that "purchasing agents working for the IRGC" "act[ed] at the direction of MTN Group and its IRGC[] ally," Dkt. 1 at 236 (¶ 638)—a naked legal conclusion devoid of factual allegations that cannot demonstrate the "essential element of control." *Acosta Orellana v. CropLife Int'l*, 711 F. Supp. 2d 81, 112 (D.D.C. 2010).

Plaintiffs likewise fail to plead facts showing that MTN Group directed or controlled Exit40. At best, the Complaint alleges, solely on "information and belief," that (1) MTN Group "caused the retention of Exit40" so that Exit40 would serve as an "agent or cut-out" for MTN Group, MTN Dubai, MTN Irancell and TCI; and (2) MTN Group "caused" "MTN Group personnel, MTN Dubai, or an MTN subsidiary, affiliate, agents, cut-out, or business partner" to make payments "in order to cause Exit40" to procure embargoed technology. Dkt. 1 at 158 (¶¶ 422–423). Those "conclusory assertions" are "insufficient to 'constitute the prima facie showing necessary to carry the burden of establishing personal jurisdiction,'" including because they are "bare assertions" stated only "upon information and belief." *Klein v. Toupin*, 2006 WL

---

[17] *Accord Precision Assocs., Inc. v. Panalpina World Transp. (Holding) Ltd.*, 2011 WL 7053807, at \*40 (E.D.N.Y. Jan. 4, 2011) ("Conclusory restatements of the elements of agency will not suffice . . . ."), *adopted*, 2012 WL 3307486 (E.D.N.Y. Aug. 13, 2012); *In re LIBOR-Based Fin. Instruments Antitrust Litig.*, 2019 WL 1331830, at \*10 (S.D.N.Y. Mar. 25, 2019) ("[L]egal conclusions that defendants 'knew of,' 'directed,' and/or 'benefited' from their subsidiaries or affiliates' transactions . . . are insufficient to establish personal jurisdiction over defendants.").

997959, at *2 (D.D.C. Apr. 14, 2006) (citation omitted); *see also D'Onofrio v. SFX Sports Grp., Inc.*, 534 F. Supp. 2d 86, 92 (D.D.C. 2008) (declining to adopt jurisdictional theory that would "permit the exercise of jurisdiction whenever a plaintiff has made conclusory allegations, on information and belief, that defendants have directed or supervised activities of subordinates who have taken some action in the [forum]" (cleaned up)). Indeed, Plaintiffs' "bare" allegations that MTN Group "caused" Exit40's actions "shed[] no light on the relationship" between MTN Group and Exit40, much less that it meets elements of a principal-agent relationship. *Charles Schwab*, 883 F.3d at 86; *see First Chi.*, 836 F.2d at 1378–79 ("bare" assertions of agency do not suffice).

Finally, in the few instances where the Complaint does attempt to "shed light on" "MTN's" purported agency relationships, it alleges that "MTN's agents" did not operate in the United States, and that "MTN" instead obtained equipment through "Chinese, Middle Eastern and Iranian firms" and individuals, Dkt. 1 at 194 (¶ 526), including a certain "Akbari" and three associated U.A.E. entities, *see id.* at 237 (¶ 641). Far from showing that "MTN" controlled the alleged "agents" with U.S. contacts, these allegations suggest that several layers of interactions separated "MTN" from the United States. Plaintiffs thus fail to create, even through their speculative allegations, a clear relationship of control necessary to justify "imput[ing]" the alleged U.S. "contacts" of "agents" of an unspecified "MTN" entity to MTN Group. *Charles Schwab*, 883 F.3d at 86.

> 2)     **Even if agency were adequately pleaded, Plaintiffs fail to allege purposeful availment of the benefits and protections of the United States.**

In addition to failing to plead agency, the Complaint fails to plead that MTN Group purposefully availed itself of the United States. A defendant purposefully avails itself of a forum's benefits only when it seeks out a forum so that it can do business or conduct some other activity there. *See Hanson v. Denckla*, 357 U.S. 235, 253 (1958). The basic premise of purposeful availment is that a party should not be held to answer in a forum unless that party can "reasonably

26

anticipate being haled into court there," *World-Wide Volkswagen Corp. v. Woodson*, 444 U.S. 286, 297 (1980), because it purposefully "*reach[ed] out* beyond [its own] [jurisdiction] and into another," *Walden*, 571 U.S. at 285 (emphasis added) (citation omitted). Plaintiffs' two purposeful-availment theories—that MTN Group made use of the U.S. banking system and that it reached into the United States to procure goods and technology—fail to meet this standard.

  ***Banking.*** Plaintiffs' banking allegations do not plead a substantial U.S. nexus. The Complaint fails to show that, by allegedly making or directing payments that allegedly touched the New York banking system, MTN Group purposefully availed itself of the U.S. forum.

  Where courts have found personal jurisdiction based on a defendant's use of U.S. wires to effect transfers, the defendants have been foreign banks that used *their own* correspondent bank accounts to carry out a "course of dealing" in which the stability of the U.S. financial system was an important component.[18] *Licci ex rel. Licci v. Lebanese Can. Bank, SAL*, 984 N.E.2d 893, 900 (N.Y. 2012), *answers to certified questions applied*, 732 F.3d 161 (2d Cir. 2013); *see also Kaplan v. Cent. Bank of the Islamic Republic of Iran*, 2019 WL 2103424, at *2 (D.D.C. May 14, 2019) (citing *Licci*). *Licci* and similar cases have established that, if the defendant has made "repeated use of such an account, purposeful availment may be inferred from the sheer volume," or from other factors suggesting that the use of U.S.-based bank accounts was deliberate. *Vasquez v. Hong Kong & Shanghai Banking Corp.*, 477 F. Supp. 3d 241, 257–58 (S.D.N.Y. 2020). Courts apply this standard to gauge whether the defendant specifically sought out a feature of the forum, such as "New York's dependable and transparent banking system, the dollar as a stable and fungible

---

[18] "A correspondent bank account is a domestic bank account held by a foreign bank, similar to a personal checking account used for deposits, payments and transfers of funds." *Vasquez v. Hong Kong & Shanghai Banking Corp.*, 477 F. Supp. 3d 241, 246 n.2 (S.D.N.Y. 2020) (cleaned up). "These accounts help to facilitate the flow of money worldwide, often for transactions that otherwise have no other connection to New York, or indeed to the United States." *Id.* (cleaned up).

currency, and the predictable jurisdictional and commercial law of New York and the United States." *Licci*, 732 F.3d at 168 (citation omitted). In *Licci*, for instance, the foreign bank's use of its own New York correspondent bank account to provide millions of dollars to a charity that allegedly served as the financial arm of Hezbollah indicated that the bank's use of the account was no coincidence but rather was what "enabled" the bank "to retain [the organization] as a customer." *Id.* at 171 (citation omitted).

Here, the Complaint fails to specify whether MTN Group even knew, much less intended, that any of the transferred funds would touch New York. Plaintiffs recite in conclusory fashion the standard set out in *Licci*, claiming without elaboration that MTN Group "benefited from the New York financial system, and New York laws," and "knew that the New York financial system imparted extra value to every transaction." Dkt. 1 at 232 (¶ 624). But that "[t]hreadbare recital[] of the elements" of purposeful availment through use of the wires "do[es] not suffice." *Campbell v. Nat'l Union Fire Ins.*, 130 F. Supp. 3d 236, 247 (D.D.C. 2015) (quoting *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009)). Plaintiffs must instead plead "supporting facts" to buttress their "conclusory statements." *Herero People's Reparations Corp. v. Deutsche Bank AG*, 2003 U.S. Dist. LEXIS 27086, at *33 n.18 (D.D.C. June 30, 2003) (quoting *Jazini v. Nissan Motor Co.*, 148 F.3d 181, 185 (2d Cir. 1998)). They have not done so. In short, any routing of foreign transfers through New York was "fortuitous," *Licci*, 732 F.3d at 171, so the Complaint's transfer allegations fail to show the kind of "deliberate" use of wires that might justify a finding of purposeful availment.

*First*, nothing in the Complaint comes close to demonstrating that MTN Group controlled "purchasing agents *working for the IRGC*," who allegedly "wired more than $5 million" to associates in the United States to procure technology. Dkt. 1 at 236 (¶ 638). Plaintiffs assert that MTN Group "direct[ed]" those agents, *id.*, but shed no light on how MTN Group could have

controlled someone else's agents. At most, Plaintiffs' allegation of direction is a "conclusion[] . . . unsupported by the facts alleged," which the Court should ignore. *Ralls Corp. v. Comm. on Foreign Inv.*, 758 F.3d 296, 315 (D.C. Cir. 2014).

Even if these agents' contacts could somehow be imputed to MTN Group, the Complaint would still fail to allege that MTN Group owned, or had any say in the use of, the accounts in "the New York banking system." Dkt. 1 at 236 (¶ 639). At its core, the Complaint alleges only that foreign wires between foreign parties might have involved some bank's correspondent accounts in New York. *See id.* at 188, 233, 237 (¶¶ 504, 628, 642–643). But this sort of "adventitious" touchpoint with New York's banking system, over which MTN Group had no "control," cannot constitute purposeful availment. *Inv. Co. Inst. v. United States*, 550 F. Supp. 1213, 1218 (D.D.C. 1982); [19] *accord Off. Comm. of Unsecured Creditors of Arcapita v. Bahrain Islamic Bank*, 549 B.R. 56, 66 (S.D.N.Y. 2016).

*Second*, Plaintiffs surmise that MTN Group used the U.S. banking system in other contexts, but their factual allegations do not support that supposition. Although Plaintiffs allege that MTN Group "approved hundreds of millions of U.S. dollars" in protection payments to the Taliban, Dkt. 1 at 212 (¶ 568), the Complaint never alleges that the alleged payments were actually U.S.-dollar denominated; it only approximates what the payments would allegedly have *totaled* in dollars, *see id.* at 212–13 (¶¶ 568–569). The Complaint likewise alleges only that MTN Group guaranteed a "Citibank" loan that was "*worth* $1 billion," *id.* at 231 (¶ 619) (emphasis added), but it does not allege that the loan was denominated or drawn down in U.S. dollars, or even issued by a Citibank

---

[19] Subsection (a)(1) of the D.C. long-arm statute—which permits the exercise of personal jurisdiction over a person "transacting any business in the District of Columbia," D.C. Code § 13-423—is "coextensive with the due process clause" of the Fourteenth Amendment. *Thompson Hine LLP v. Smoking Everywhere, Inc.*, 840 F. Supp. 2d 138, 141 (D.D.C. 2012).

branch in the United States.[20] The same problem plagues the allegation that MTN Group "reached into the United States" to "repatriat[e]" funds from Iran to South Africa through "European Banks." *Id.* at 231–32 (¶¶ 621–622). This contention rests on reporting that quotes only the *value* of the funds in U.S. dollars, and nowhere suggests that the transfers were denominated in U.S. dollars or touched the United States. Ex. K (CommsUpdate, *MTN Extracts First Cash from Iran*, (Dec. 14, 2016), 2016 WLNR 38124973, *cited at* Dkt. 1 at 231 (¶ 621)). Indeed, Plaintiffs allege that MTN Group relied on "banking relationships with U.S. financial institutions *and/or financial institutions with U.S. subsidiaries or offices* . . . to facilitate the repatriation of funds." Dkt. 1 at 232 (¶ 623) (emphasis added). Plaintiffs thus concede that the repatriation might have occurred through European banks.

*Third*, setting aside these two categories of inadequately pleaded wire allegations, all that Plaintiffs ultimately allege is a single transfer of $400,000, which MTN Group allegedly paid to secure its investment in the Irancell joint venture. *Id.* at 198–99, 233 (¶¶ 539, 627). That transfer is not of a high enough volume or frequency to support purposeful availment, even under the standard courts apply to a foreign bank's use of *its own* New York correspondent bank account, and thus cannot support personal jurisdiction. *See Vasquez*, 477 F. Supp. 3d at 257–58 (holding that three wire transfers were insufficient to support an inference of purposeful availment). By contrast, courts have concluded that "wire transfers . . . that numbered in the dozens and totaled several million dollars" were "deliberate and recurring activity" constituting purposeful availment. *Licci*, 732 F.3d at 171; *accord Bartlett v. Société Générale de Banque au Liban SAL*, 2020 WL 7089448, at *5 (E.D.N.Y. Nov. 25, 2020) (transactions "number[ing] in the dozens and total[ing]

---

[20] This allegation is particularly weak, given that MTN Group was merely the guarantor for an affiliate's loan—not the borrower. The allegation accordingly fails to show that MTN Group, rather than the affiliate that procured the loan, availed itself of the U.S. forum.

millions of dollars" were sufficient for personal jurisdiction).[21] The alleged routing of a single transaction through a New York correspondent bank account much more closely resembles a "random, isolated, or fortuitous" forum contact, which does not support jurisdiction. *Licci*, 732 F.3d at 171 (citation omitted); *see Cmty. Fin. Grp. v. Stanbic Bank Ltd.*, 2015 WL 4164763, at *4 (S.D.N.Y. July 10, 2015) (a single wire transfer of $350,000 in fraudulent funds through the defendant bank's correspondent account, where not initiated by the bank, was insufficient to support personal jurisdiction).

*U.S. Equipment.* Plaintiffs' second theory of purposeful availment—that "MTN" obtained embargoed U.S. goods and technology for the IRGC—likewise fails.

The Complaint does not demonstrate that MTN Group "actively conduct[ed]" transactions in the forum, as required to plead purposeful availment. *E.g.*, *Day v. Cornèr Bank (Overseas) Ltd.*, 789 F. Supp. 2d 150, 158 (D.D.C. 2011). As noted above, this purported basis for jurisdiction is an inadequately pleaded agency theory and should be disregarded. In any event, MTN Group's role in the alleged procurement of U.S. goods and technology—to the extent it can be discerned from the opaque chain of random events alleged, *see e.g.*, Dkt. 1 at 236 (¶ 638); *supra* pp. 25–26— is akin to a passive participant who merely places orders according to the sellers' terms. *See Borg-Warner Acceptance Corp. v. Lovett & Tharpe, Inc.*, 786 F.2d 1055, 1058, 1062 & n.5 (11th Cir. 1986) (the defendant was a "passive purchaser" of goods in the forum, and even visiting the forum to return noncompliant goods did not constitute purposeful availment); *Stranahan Gear Co. v. NL Indus.*, 800 F.2d 53, 59 (3d Cir. 1986) (two visits to forum "fail[ed] to establish vigorous

---

[21] *See also Nike, Inc. v. Wu*, 349 F. Supp. 3d 346, 356 (S.D.N.Y. 2018) (transfers made through correspondent accounts "on hundreds of occasions to the tune of millions of dollars" were sufficient for personal jurisdiction); *Gucci Am., Inc. v. Weixing Li*, 135 F. Supp. 3d 87, 94–96 (S.D.N.Y. 2015) ("nearly a dozen" transfers through a correspondent account, in conjunction with establishment of New York office and marketing, were sufficient to support personal jurisdiction).

negotiating or dictating of contract terms and departure from the passive buyer role required to make this court's exercise of jurisdiction fair and reasonable" (citation omitted)); *In-Flight Devices Corp. v. Van Dusen Air, Inc.*, 466 F.2d 220, 233 (6th Cir. 1972) ("The buyer . . . is frequently a relatively passive party, simply placing an order, accepting the seller's price and terms as stated in his product advertising and agreeing only to pay a sum upon receipt of the goods or services.").

MTN Group's role stands in contrast to that of a defendant who actively seeks a forum's benefits. For instance, courts have held that a defendant that "voluntarily and deliberately . . . contract[s]" with a forum resident through "communicat[ions] . . . in the [forum]," over "an appreciable period of time," subjects itself to personal jurisdiction there. *Thompson Hine LLP v. Smoking Everywhere, Inc.*, 840 F. Supp. 2d 138, 142 (D.D.C. 2012) (collecting cases); *accord Atchley v. AstraZeneca UK Ltd.*, 22 F.4th 204, 233 (D.C. Cir. 2022) (finding purposeful availment where foreign defendants "reached into the [forum] to contract with . . . affiliated" in-forum manufacturers and then "[c]ontinuously over a period of years" maintained a "collaborative relationship" with those manufacturers to sell their goods abroad).

Here, by contrast, the Complaint nowhere alleges that MTN Group engaged in negotiations in the United States, communicated with anyone in the United States, or was party to any agreement with U.S. counterparties. Rather, it alleges that the IRGC's "purchasing agents" worked with their "associates in the U.S.," who were the ones that "purchased embargoed technology." Dkt. 1 at 236 (¶ 638). Although Plaintiffs make a conclusory assertion that these transactions took place "at the direction of MTN Group," *id.*, the Complaint acknowledges that MTN Group was "not in charge" of Irancell, *id.* at 49 (¶ 57), let alone in control of agents of the IRGC.

## 2.    Plaintiffs' Claims Do Not Arise Out of or Relate to the Alleged U.S. Contacts.

Plaintiffs' jurisdictional allegations independently fail because their ATA claims do not "arise out of or relate to" MTN Group's supposed U.S. contacts. *Helicopteros Nacionales de*

*Colombia, S.A. v. Hall,* 466 U.S. 408, 414 (1984). That requirement asks whether the defendant's forum contacts caused, or otherwise have a "strong 'relationship'" with, the plaintiff's claims. *Ford Motor Co. v. Mont. Eighth Jud. Dist. Ct.*, 141 S. Ct. 1017, 1028 (2021) (citation omitted); *see Walden*, 571 U.S. at 283–84 (requiring that defendant's "suit-related conduct" create a "substantial connection" with the forum). Because that strong relationship is "the 'essential foundation' of specific jurisdiction," *Ford*, 141 S. Ct. at 1028 (citation omitted), jurisdiction is lacking when a defendant's contacts are "unrelated to," *Brink v. Cont'l Cas. Co*., 2021 WL 7907065, at *7 (D.D.C. Dec. 27, 2021), or "too remotely 'related to'" a plaintiff's claims, *Zurich Am. Life Ins. v. Nagel*, 2021 WL 5225947, at *7 (S.D.N.Y. Nov. 10, 2021).

As an initial matter, Plaintiffs do not even try to allege that their claim based on alleged payments to the Taliban and tower deactivations, *see infra* § II.B, arises from or relates to any purposeful availment of the United States. Plaintiffs never link their allegations about loans whose amounts were publicly reported in U.S. dollars—which cannot plead purposeful availment in any case, *supra* pp. 29–30—to allegedly illicit payments. Nor do Plaintiffs claim that the tower deactivations had anything to do with any supposed U.S. contact; they merely contend that abiding by the Taliban's violent demands foreseeably harmed Americans, which is not enough to support Plaintiffs' targeting theory of jurisdiction, *supra* § II.B.

Plaintiffs' claim of jurisdiction as to their Irancell-based theories of liability, which is premised on the Complaint's allegations that MTN Group paid a "bribe" and helped Irancell procure U.S. equipment, is no more successful. Plaintiffs' claims do not arise from or relate to these alleged actions.

***Payments.*** The alleged $400,000 bribe has nothing to do with Plaintiffs' claims. Plaintiffs allege that MTN Group paid "a consulting firm owned by" an "associate" of Iran's "Deputy

33

Foreign Minister" to secure its spot in Irancell. Dkt. 1 at 173, 198–99 (¶¶ 467, 539). While the Complaint labels this in conclusory terms a "bribe[] to the Qods Force agents" through an IRGC "cutout," *id.* at 173–74, 233 (¶¶ 469, 629), it alleges no facts that connect the consulting firm to the IRGC or explain why the Deputy Foreign Minister was an IRGC "cutout." And they make no effort to connect either one to the groups that allegedly harmed Plaintiffs. Nor does the Complaint attempt to show how a $400,000 alleged bribe to a Deputy Foreign Minister in 2007 could have any relationship to attacks in Iraq a year prior or three years later, *see id.* at 349–81 (¶¶ 962–1268) (thirty-five of the servicemembers or contractors were attacked in 2006)—particularly considering the vast resources at the disposal of Iran and the IRGC. *See Rothstein v. UBS AG*, 708 F.3d 82, 97 (2d Cir. 2013) (noting Iran's "billions of dollars in reserve"); Dkt. 1 at 134–35 (¶ 332) (describing the IRGC's "control over broad swaths of the Iranian economy"). Thus, even if the "bribe" passed through accounts in New York and that could constitute purposeful availment, *but see supra* pp. 30–31, it would not create "a substantial connection" between the United States and "the terror attacks in [Iraq and Afghanistan]." *Waldman*, 835 F.3d at 341.

Nor could payments that "purchasing agents working for the IRGC" allegedly "wired . . . into America"—purportedly "acting at the direction of MTN Group," Dkt. 1 at 236 (¶ 638)—create such a connection, particularly given that the majority of the attacks alleged to have injured Plaintiffs occurred before 2009, *see id.* at 346–556 (¶¶ 946–2850) (listing 2006–2010 Iraq attacks and 2007–2009 Afghanistan attacks). The alleged payments, which occurred "[b]etween 2009 and 2012," *id.* at 236 (¶ 638), can have no relation to challenged acts that predate them.

***U.S. Equipment.*** The alleged procurement of "smartphones, servers, network computing systems," and "associated technical support services," Dkt. 1 at 151 (¶ 386), is similarly unmoored from Plaintiffs' ATA claims. While the Complaint observes that these technologies improved

Irancell's network and thereby improved the IRGC's own "cellular-phone capabilities," *id.* at 193, 265–66 (¶¶ 523, 699); *supra* pp. 13–14, it never connects that improvement to any attack. And because Plaintiffs fail to allege that any attack involved the encryption technology "MTN" allegedly also sourced,[22] any alleged role MTN Group played in procuring that technology is not suit-related. *See Bristol-Myers Squibb Co. v. Super. Ct. of Cal.*, 137 S. Ct. 1773, 1781 (2017) (rejecting "spurious" approach that allowed specific jurisdiction based on "forum contacts that are unrelated to [plaintiffs'] claims"); *United Servs. Auto. Ass'n v. New Day Fin., LLC*, 2018 WL 1899807, at *5 (W.D. Tex. Mar. 8, 2018) (court lacked specific jurisdiction over defendant providing certain products in forum where claims based on "completely unrelated" products), *adopted*, 2018 WL 1905113 (W.D. Tex. Mar. 27, 2018); *Griffith Labs. Inc. v. Kancor Ingredients Ltd.*, 2017 WL 514188, at *3–4 (N.D. Ill. Feb. 8, 2017) (sales of one product in forum insufficient to establish specific jurisdiction over defendant for claims arising out of different product).[23]

Nor are the allegations that MTN Group supplied smartphones to Irancell suit-related. The "technology and equipment" MTN Group allegedly procured for Irancell comprised items common to all telecommunications companies, such as "smartphones, servers, network computing systems," and "associated technical support services." Dkt. 1 at 151 (¶ 386); *supra* pp. 13–14. Thus, although Plaintiffs attempt to connect smartphones to terrorist attacks, the Complaint's factual allegations support the obvious and benign conclusion that any alleged supply of smartphones to Irancell related to running a mobile phone network in Iran.

At most, these technology allegations amount to a claim that procuring U.S.-origin goods

---

[22] *See generally* Dkt. 1 at 348–556 (¶¶ 951–2842).

[23] Plaintiffs' allegations that MTN Group issued American depository receipts, Dkt. 1 at 50–51 (¶ 63), had a "relationship with the Bank of New York," *id.* at 231 (¶ 619), and guaranteed a loan by MTN Mauritius, *id.*, are also irrelevant to jurisdiction, because they have no conceivable connection to Plaintiffs' injuries. *See Bristol-Myers*, 137 S. Ct. at 1781.

was a distant cause of Plaintiffs' injuries. Plaintiffs nowhere allege that any server, router, or other network computing system went any further than Irancell. Plaintiffs thus allege only that this technology helped Irancell's network run more effectively, *see* Dkt. 1 at 193, 265–66 (¶¶ 523, 699); *supra* pp. 13–14, at most indirectly benefitting the IRGC. But alleging that any action that helps Irancell relates to terrorist acts by entities all over the Middle East and South Asia is far too boundless a theory to comport with due process. *See Ford,* 141 S. Ct. at 1026 (personal-jurisdiction requirement that defendant's contacts must be suit-related "incorporates real limits, as it must to adequately protect defendants foreign to a forum"). And the allegation that the shareholders in Irancell's majority partner *might* have obtained cell phones from Irancell "to aid the IRGC[]," *e.g.*, Dkt. 1 at 237 (¶ 642), provides a similarly thin connection to the attacks given that one of those shareholders, IEI, was itself a cell phone manufacturer, *see supra* p. 10. Those misappropriated cell phones would still then have to pass from IEI and Bonyad Mostazafan to the IRGC, to the Qods Force, then to Hezbollah, and eventually to the Sunni militants in Iraq and Afghanistan before any alleged involvement in the relevant attacks.

Any "connection" between MTN Group and Plaintiffs' alleged harm would thus be far too "tenuous" for specific jurisdiction, *Williams v. Romarm, SA*, 756 F.3d 777, 786 (D.C. Cir. 2014), even if Plaintiffs had established that MTN Group's acts could "be viewed as a 'but for' cause" of their injuries, *SongByrd, Inc. v. Est. of Grossman*, 206 F.3d 172, 181 (2d Cir. 2000).

* * *

As the Supreme Court recently observed, the personal jurisdiction requirement that a defendant's contacts must be suit-related conduct "incorporates real limits, as it must to adequately protect defendants foreign to a forum." *Ford*, 141 S. Ct. at 1026. Plaintiffs' theory, however, would expand jurisdiction without limit. Plaintiffs contend that the IRGC "control[led] broad swaths of

the Iranian economy," Dkt. 1 at 134–35 (¶ 332), and that "every dollar in profit" that allegedly indirectly benefitted the IRGC "inevitably helped" its global terrorist enterprise, *id.* at 189 (¶ 508). If personal jurisdiction were to exist over MTN Group merely on that basis, then it would seemingly exist over any other foreign company that does any business in Iran. Any such company could be randomly chosen and sued in the United States for any alleged attack that the IRGC supports around the world, so long as Plaintiffs can claim that some wire transfer associated with that business at some point touched a U.S. bank account, or some unidentified phantom "agent" sourced products from the United States. That theory is inconsistent with courts' recognition, in the ATA context, that the Iranian government has "legitimate agencies, operations, and programs to fund," and that not all funds sent to Iran are meant help finance terrorism. *Owens*, 897 F.3d at 275–76 (quoting *Rothstein*, 708 F.3d at 97). It is also inconsistent with the "real limits" that due process places on the exercise of personal jurisdiction over foreign defendants. *Ford*, 141 S. Ct. at 1026.

### B.    The Court Lacks Personal Jurisdiction over the Individual Defendants.

Plaintiffs likewise fail to demonstrate that personal jurisdiction exists over the Individual Defendants. Because "[e]ach defendant's contacts with the forum State must be assessed individually," *Keeton v. Hustler Magazine, Inc.*, 465 U.S. 770, 781 n.13 (1984), the Individual Defendants' "contacts with the forum state must be assessed based on [their] actions—separately from [MTN Group's] contacts with the forum," *Mouzon v. Radiancy, Inc.*, 85 F. Supp. 3d 361, 372 (D.D.C. 2015). But Plaintiffs generally give little basis to distinguish the Individual Defendants' actions from those of MTN Group. *See, e.g.*, Dkt. 1 at 45–46 (¶¶ 44–45) (alleging that MTN Group and an Individual Defendant signed agreement with Irancell's Iranian shareholder); *id.* at 173, 181–82 (¶¶ 467, 485) (alleging that MTN Group and Individual Defendants authorized alleged bribery payments); *id.* at 182–83 (¶¶ 488–489) (alleging that MTN Group and Individual

Defendants engaged third parties to procure U.S. technology); *id.* at 214, 221 (¶¶ 572–573, 589) (alleging that MTN Group and Individual Defendants authorized MTN Afghanistan to make payments to the Taliban and shut down its towers). For the same reasons that those allegations fail to plead that MTN Group is subject to personal jurisdiction, *see supra* § I.A, they fail to plead that the Individual Defendants are subject to personal jurisdiction. In the handful of places where the Complaint alleges actions taken only by the Individual Defendants, it fails to plead any act that could give rise to personal jurisdiction. These few allegations of specific conduct by the Individual Defendants describe acts occurring entirely outside of the United States, with no connection to this forum.[24] The most that Plaintiffs allege is that the Mr. Nhleko signed the Letter Agreement with Irancell's Iranian shareholder that mentioned the word "security," and thus, according to Plaintiffs, "expressly aimed" their actions "at the United States." Dkt. 1 at 226–28 (¶¶ 604–607). This allegation does not suffice to show intentional targeting of the forum, for the reasons already explained. *Supra* § I.A.1.a. Nor does it support the extraordinary inference that executives of a publicly traded multinational company "target[ed] the United States" by enabling a "campaign of anti-American" violence "with the specific intent of killing *Americans* in particular." Dkt. 1 at 226–28 (¶¶ 604–607); *see Sparrow v. Interbay Funding, L.L.C.*, 2006 WL 2844254, at *3 (D.D.C. 2006) ("[T]he court is not required to accept as true 'allegations that are merely conclusory, unwarranted deductions of fact, or unreasonable inferences.'" (citation omitted)); *Cambridge*

---

[24] *See, e.g.*, Dkt. 1 at 46 (¶ 48) (providing "management consulting" to Irancell's indirect shareholders); *id.* at 192–93 (¶¶ 521–522) (allegedly "conceal[ing]" the existence of MTN Group's "security" agreement with Irancell's Iranian shareholder); *id.* at 173–74 (¶ 469) (authorizing the payment of consultancy agreements related to the Irancell investment); *id.* at 175–79 (¶¶ 471, 473–478) (issuing and receiving internal memoranda regarding Irancell); *id.* at 44–45, 179–80 (¶¶ 43, 481) (speaking with MTN Group's investors about the risks associated with the Irancell joint venture); *id.* at 163–64 (¶¶ 441–442) (corresponding with certain Iranians); *id.* at 230–31 (¶ 617) (earning compensation due to MTN Group's investment in Irancell).

*Holdings Grp., Inc. v. Fed. Ins. Co.*, 357 F. Supp. 2d 89, 96 (D.D.C. 2004) (rejecting "unreasonable inferences from what appear to be relatively straight-forward facts"). Plaintiffs therefore fail to allege that the Individual Defendants have suit-related minimum contacts with the United States, as they must to plead specific jurisdiction.

## II.     Plaintiffs Fail to State Any Claim for ATA Liability.

Plaintiffs' failure to plead a basis for personal jurisdiction defeats their claims at the threshold. But Plaintiffs also fail to state a claim under the ATA. All three counts of the Complaint claim that the MTN Defendants directly violated the ATA in one of two ways: All Plaintiffs allege that the MTN Defendants directly violated the ATA by working with Irancell to allegedly support attacks in Iraq and Afghanistan, and the Afghanistan Plaintiffs also claim that the MTN Defendants violated the ATA by allegedly making protection payments and acceding to demands to shut down cell towers to purportedly aid the Taliban in Afghanistan. To state a direct-liability claim under the ATA, 18 U.S.C. § 2333(a), Plaintiffs needed to plausibly plead that MTN Group's—and, by extension, the Individual Defendants'—alleged minority investment in and operation of a telecommunications joint venture was an "act of international terrorism," that proximately caused the militia attacks in Iraq and Afghanistan that injured Plaintiffs. *See id.*; *Owens*, 897 F.3d at 270; *Rothstein*, 708 F.3d at 94–95. Because precedent in this District and others forecloses Plaintiffs' theory of liability, the Court should dismiss all claims against the MTN Defendants accordingly.

### A.     The Iraq Plaintiffs Fail to State a Claim Under the ATA.

The Iraq Plaintiffs claim that the MTN Defendants directly violated the ATA when MTN Group invested in and allegedly supplied telecommunications equipment to Irancell. Plaintiffs' Irancell theory fails, however, because MTN Group's—and, by extension, the Individual Defendants'—alleged participation in a telecommunications joint venture in Iran is not an act of

international terrorism, and it did not proximately cause militia attacks in Iraq.[25] Because the Iraq Plaintiffs' claims depend entirely on this first theory of liability, the Court should dismiss the Iraq Plaintiffs' claims in their entirety.[26]

### 1. An objective observer would not conclude that the MTN Defendants' participation in Irancell was motivated by terroristic intent.

An act is not "international terrorism" unless it "appear[s] to be intended" to achieve one of three terroristic aims: "to intimidate or coerce a civilian population," "to influence the policy of a government by intimidation or coercion," or "to affect the conduct of a government by mass destruction, assassination, or kidnapping." 18 U.S.C. § 2331(1)(B). A defendant's apparent intent "is not a question of . . . subjective intent but rather a question of what its intent objectively appeared to be." *Weiss v. Nat'l Westminster Bank, PLC*, 993 F.3d 144, 161 (2d Cir. 2021). Plaintiffs must therefore allege facts that would lead an "objective observer" to conclude that the MTN Defendants' actions were "'intended' to intimidate civilians or influence a government"— and "not [just] that the incidents that injured [Plaintiffs] meet this standard." *Zapata v. HSBC Holdings PLC*, 414 F. Supp. 3d 342, 358–59 (E.D.N.Y. 2019), *aff'd*, 825 F. App'x 55 (2d Cir. 2020).

An objective observer would not conclude that the MTN Defendants intended to achieve any terroristic goal when MTN Group allegedly participated in, and supplied equipment for, Irancell. To the contrary, the Complaint is replete with allegations of a *commercial* intent: "reap[ing] billions in easy profits," if the MTN Defendants "remained aligned with the interests of

---

[25] Because Plaintiffs' claims against the Individual Defendants are based solely on their roles as MTN Group executives, the following arguments focus on Plaintiffs' allegations against the MTN Defendants. But the same arguments apply equally to the Individual Defendants and, to aid the Court, the motion highlights particular pleading failures as they relate to the Individual Defendants.

[26] The same pleading defects preclude the Afghanistan Plaintiffs from stating any ATA claim based on the same allegations regarding MTN Group's participation in the Irancell venture.

their" joint venture partners, Dkt. 1 at 35 (¶ 10); "lock[ing] in the single best international telecoms market opportunity in decades," *id.* at 38 (¶ 22); and "dominat[ing]" some of "the most lucrative 'virgin' mobile phone market opportunit[ies] in the world at the time," *id.* at 161–62 (¶¶ 435–436).

Courts regularly dismiss direct-liability ATA claims when the complaint alleges a similar non-terroristic intent. For example, the Seventh Circuit has held that, because a document incorporated into a complaint "state[d] that Deutsche Bank built its sanctions-evading business because it was 'lucrative,'" an "objective observer" would conclude that the bank's "interactions with [sanctioned] Iranian entities were motivated by economics, not by a desire to 'intimidate or coerce.'" *Kemper v. Deutsche Bank AG*, 911 F.3d 383, 390 (7th Cir. 2018). Similarly, the Ninth Circuit recently held that allegations that "Google shared advertising revenue with ISIS . . . d[id] not permit the inference that Google's actions objectively appear to have been intended to intimidate or coerce civilians," because the complaint alleged that "Google's actions were motivated . . . by economic self-enrichment." *Gonzalez v. Google LLC*, 2 F.4th 871, 900 (9th Cir. 2021). As the court explained: the complaint "did not allege that Google shared ISIS's vision and objectives," only that "Google split ad revenue with ISIS in furtherance of its own financial best interest." *Id.* at 900–01. A court in the Eastern District of New York similarly held that HSBC's alleged provision of money laundering services to violent cartels did not meet the ATA's apparent-intent requirement, because "Plaintiffs' complaint unmistakably sets forth . . . a plausible alternative explanation for HSBC's conduct: greed." *Zapata*, 414 F. Supp. 3d at 358–59. The Second Circuit affirmed for substantially the same reasons. 825 F. App'x at 56.[27]

---

[27] In 2010, a court in this District found the apparent intent requirement adequately pleaded where the Bank of China facilitated transactions that were specifically "used 'for . . . executing terrorist attacks.'" *Wultz v. Islamic Republic of Iran*, 755 F. Supp. 2d 1, 18, 48–49 (D.D.C. 2010). Despite recognizing that "mere financial support" of a terrorist organization does not establish the requisite apparent intent, the court ruled that plaintiffs met the pleading requirement by alleging the bank

The Complaint cannot avoid this case law by trying to label MTN Group's alleged dealings with state-controlled Iranian businesses as "sanctions-busting." Dkt. 1 at 33 (¶ 3). That is exactly the tactic the Seventh Circuit rejected in *Kemper*, holding that alleging that a defendant engaged in "sanctions-evading business" with Iranian companies—for economic reasons—does not meet the ATA's apparent-intent requirement. 911 F.3d at 390. Indeed, the Second Circuit has held that even "providing financial services to a known terrorist organization" does not without more "manifest the apparent intent required by § 2331(1)(B)." *Linde v. Arab Bank, PLC*, 882 F.3d 314, 326 (2d Cir. 2018). Allegations that MTN Group helped entities that were *not* designated for terrorism evade sanctions cannot suffice. *See supra* pp. 9–12; *infra* pp. 43–45.

Finally, Plaintiffs have not met the ATA's apparent-intent requirement for an additional, independent reason: As explained in the following section, the Complaint fails to plausibly plead that the MTN Defendants knew (or even, for that matter, had any reason to know) that they were assisting terrorist attacks by participating in Irancell. *See Weiss*, 993 F.3d at 161 (holding that a bank with no knowledge that it was transferring funds to "charities [that] themselves were engaged in terrorism," or that "the transfers were designated for that purpose," could not be found to have "exhibited the appearance that [it] intended to intimidate or coerce a population or a government").

---

had been "expressly warned" that its actions were facilitating terrorist attacks. *Id.* at 49. Another decision held that alleged protection payments made to the FARC could satisfy the apparent intent requirement if it was "reasonably foreseeable" that the payments would "enhance [its] terror capabilities." *In re Chiquita Brand Int'l, Inc.*, 284 F. Supp. 3d 1284, 1319 (S.D. Fla. 2018). If these cases mean to suggest that merely providing funds to a terrorist organization meets the apparent-intent requirement when it is foreseeable that doing so will help terrorists, they are inconsistent with § 2331(1)(B)'s text and three more recent court of appeals decisions. *See Linde v. Arab Bank, PLC*, 882 F.3d 314, 326 (2d Cir. 2018) ("[T]he provision of material support to a terrorist organization does not invariably equate to an act of international terrorism," because it may not "manifest the apparent intent required by § 2331(1)(B)."); *Kemper*, 911 F.3d at 390 (focusing on the actual alleged motive of even "wrongful actions" by the defendant); *Gonzalez*, 2 F.4th at 900 (same).

### 2. The Iraq Plaintiffs fail to plead that the MTN Defendants committed a predicate criminal act under the ATA.

To plead "international terrorism," Plaintiffs also must allege that the MTN Defendants' acts violated U.S. criminal law (or would have done so if committed in the United States). 18 U.S.C. § 2331(1)(A). To try to satisfy that element, Plaintiffs claim the MTN Defendants provided material support to terrorism (*id.* § 2339A), material support to an FTO (§ 2339B), and terrorist financing (*id.* § 2339C). Dkt. 1 at 557, 560–61, 562–63 (¶¶ 2852, 2859–2860, 2866). All three crimes require a showing that this support or financing was provided "knowingly."

The Complaint, however, does not allege that the MTN Defendants provided material support for the commission of terrorist acts, much less that that they did so knowingly. Nor does it allege that, by making an investment in Irancell, the MTN Defendants supported, much less knew they were supporting, designated FTOs. The most the Complaint even tries to allege is that MTN Group indirectly owned a minority stake in, and helped procure telecommunications equipment for, Iran's second-largest mobile phone operator, which was partially owned by Iranian state-controlled entities—neither of which the United States sanctioned for alleged ties to terrorism. *See supra* pp. 5–6, 9–12.

While Plaintiffs assert that it was "widely understood" that Bonyad Mostazafan and IEI were terrorist fronts for the IRGC, and that the IRGC had taken over the Iranian telecommunications sector, *e.g.*, Dkt. 1 at 138, 141, 255 (¶¶ 338–339, 351, 672), they rely on a U.S. government designation of IEI for its alleged support for Iran's ballistic and nuclear missile programs—not Iran-backed terrorism in Iraq and Afghanistan;[28] a designation of Bonyad Mostazafan for its ties to Iran's Supreme Leader—not terrorism—more than a decade after the

---

[28] Ex. E (*Treasury Designates Iranian Military Firms*).

latest attack that injured Plaintiffs;[29] and an academic publication[30] and advocacy organization's congressional testimony[31] from years after all of the attacks at issue. *See supra* p. 12; *cf. Honickman v. BLOM Bank SAL*, 6 F.4th 487, 501–02 (2d Cir. 2021) (plaintiff cannot establish an ATA defendant was "generally aware" it was playing a role in terrorist activity by relying on sources that postdate the attacks that injured the plaintiffs).[32]

Plaintiffs further undermine their theory that it was "widely understood" that MTN Group's investment in and cooperation with Irancell aided alleged terrorist fronts by describing the lengths to which the IRGC went to conceal its involvement in commercial enterprises. The Complaint asserts that the IRGC's "tradecraft emphasizes concealment and cover above all other operational imperatives," and that maintaining "cover" and "concealment" were "absolute requirements" for "any successful operation by terrorists." Dkt. 1 at 126 (¶¶ 300–301). The Second Circuit recently dismissed ATA aiding-and-abetting claims on similar knowledge grounds, holding that a complaint's allegations that an organization "maintained a 'cover' in public undermines the plausibility of [the p]laintiffs' theory that [the defendant] understood these organizations' true nature and activities from the public record at the time." *Honickman*, 6 F.4th at 502. It would be

---

[29] Ex. C (*Treasury Targets Vast Supreme Leader Patronage Network*).

[30] Ex. L at 20 (Monika Gill, *Capitalism, Commerce, Communications, and the Corps*, Def. Strategy Commc'ns, Autumn 2020 ("*Capitalism, Commerce, and the Corps*"), https://tinyurl.com/2p9yawer, *cited at* Dkt. 1 at 54 (¶ 74)).

[31] Ex. M (Statement of Jonathan Schanzer Vice President for Research, Found. for Defense of Democracies, Comm. on House Foreign Affairs, Subcomm. on Terrorism, Proliferation, and Trade, Subcomm. on the Middle E. and N. Africa, *Hamas and Terrorism*, Congressional Testimony via FDCH (Sept. 9, 2014), 2014 WLNR 24926764, *cited at* Dkt. 1 at 138–39 (¶ 341)).

[32] Though *Honickman* discussed this principle in connection with the "general awareness" element of an ATA aiding-and-abetting liability claim, such a claim likewise requires the assistance to terrorism to be provided "knowingly." 18 U.S.C. § 2333(d)(2). The same principle necessarily applies to the "knowledge" required for an ATA direct-liability claim predicated on alleged violations of 18 U.S.C. §§ 2339A–2339C: a plaintiff cannot plausibly establish that a defendant knew at the time that it was providing support or financing to terrorism by pointing to sources that postdate the defendant's conduct and the plaintiff's injury.

unreasonable to infer that the MTN Defendants knew that Irancell's majority shareholders were allegedly engaged in anti-American terrorism in Afghanistan and Iraq from materials that postdated every attack at issue, did not implicate MTN Group's alleged joint venture partners in alleged acts of terrorism, and described the lengths to which the IRGC and its alleged front companies went to conceal their involvement in terrorist activities.

Nor can Plaintiffs ground their direct-liability claims on allegations that MTN Group won the Irancell bid by making a "direct contractual promise to the IRGC . . . to aid [its] terrorist enterprise" in a document that Plaintiffs call a "Security Cooperation Agreement" but on its face is called a "Letter Agreement" among shareholders. Dkt. 1 at 170 (¶ 462); *see also id.* at 164–65 (¶¶ 443–445). The Complaint's attempt to plead that MTN Group made any such promise to the IRGC is based on a blatant mischaracterization of the 2005 Letter Agreement, which is plainly not a contract with the IRGC but a shareholder agreement between "MTN" and the "local shareholders of Irancell." Ex. G at 2 (Letter Agreement). As one would expect in a commercial joint venture agreement, the Letter Agreement specifies how the parties will divide equity and fund licensing fees, and notes which commercial activities will require "MTN's" approval as the minority investor. *Id.*

Ignoring all that, the Complaint relies on supposed "indicia" that the Letter Agreement was actually "drafted by the IRGC," *id.* at 164–65 (¶ 444), and asks this Court to draw patently unreasonable inferences on that basis. The first two "indicia" are the "reference to God at the start of the Agreement" and "the inclusion of the Islamic calendar date." *Id.* It is unreasonable—and offensive—to imply that terrorists were involved in a commercial contract in an Islamic country

because the contract refers to God and the Islamic calendar.[33] Plaintiffs further find it suspicious that the Agreement refers to "Iranian shareholders" without naming them, *id.* at 167 (¶ 451), but the Complaint alleges who those shareholders were and that they were enterprises with significant legitimate operations, *see supra* pp. 9–12. Plaintiffs also emphasize a "blank space" which *could* have been used to add "handwritten . . . terms," Dkt. 1 at 164–65 (¶ 444), but do not allege that there were such terms, or provide any reason to infer that a blank space is nefarious. *See id.*

In short, Plaintiffs cannot rely on a contract with no connection to the IRGC to infer that the MTN Defendants knew they were reaching an agreement with the IRGC to support terrorism.

### 3. The MTN Defendants' participation in the Irancell joint venture was not violent or dangerous to human life.

To constitute an act of "international terrorism," a defendant's actions must also have "involved violent acts or acts dangerous to human life." 18 U.S.C. § 2331(1)(A). Had the MTN Defendants engaged in commercial transactions with sanctioned Iranian state enterprises (which separately aided terror groups), even those transactions would not have been "inherently violent or dangerous" within the meaning of the ATA. *O'Sullivan v. Deutsche Bank AG*, 2019 WL 1409446, at *8 (S.D.N.Y. Mar. 28, 2019). In *O'Sullivan*, the court dismissed plaintiffs' claim that a defendant's "provision of banking services" to sanctioned Iranian companies, which later used the funds to support Iraqi militias, was "dangerous to human life, particularly because the factual allegations delineating relationships between those services and the terrorist attacks at issue are so attenuated." *Id.* That was the case even though the United States had designated one of the bank's customers as a Specially Designated Global Terrorist that facilitated transfers of "hundreds of

---

[33] The reference to God, called the "*basmalah*," is customary in Muslim-majority countries and "introduces all formal documents and transactions." Ex. N (Encyc. Britannica, *Basmalah*, https://tinyurl.com/bdessftb (last visited May 26, 2022)).

millions of dollars to Hezbollah." *Id.* at *2. The Seventh Circuit took a similar approach in *Kemper*, explaining that "doing business with [Iranian] companies" that allegedly are linked to terrorism but "that have significant legitimate operations is not necessarily" violent or dangerous to human life, even if "the business dealings may violate U.S. sanctions," especially when "the sanctions at issue cover more than terrorism-related transactions." 911 F.3d at 390.

The reasoning of *O'Sullivan* and *Kemper* apply even more forcefully here. All of the Iraq Plaintiffs' claims rely on the implausible theory that the MTN Defendants' investments in and work on behalf of Irancell flowed through MTN Group's joint venture partners to the IRGC, from the IRGC to the Qods Force, then to Hezbollah, and from Hezbollah to the Sunni insurgents in Iraq that allegedly killed or injured Plaintiffs. But unlike in *O'Sullivan*, the U.S. Government sources on which Plaintiffs rely show that the Iranian shareholders in Irancell were *never* designated for links to terrorism. *See supra* pp. 9–12, 43–45. Plaintiffs' sources further make clear that those shareholders had "significant legitimate operations." *Kemper*, 911 F.3d at 390; *see* Ex. F at 4 (*How Intertwined Are the Revolutionary Guards in Iran's Economy?*) (describing IEI as selling "many consumer goods," including "mobile phones" and "SIM cards" for Iranian consumers); Ex. C at 2 (*Treasury Targets Vast Supreme Leader Patronage Network*) (describing Bonyad Mostazafan as holding a "multi-billion dollar economic empire" of "energy, mining, logistics, information technology, and financial services" firms).

At most, the Complaint alleges that MTN Group obtained a minority stake in Irancell, Dkt. 1 at 164 (¶ 443); paid a bribe to secure that role, *id.* at 187 (¶ 502); paid a license fee on behalf of its joint venture partners to operate a cellular network in Iran, *id.* at 188 (¶ 506); helped procure equipment and services for Irancell through unnamed "agents," *id.* at 236 (¶¶ 636–39); and shared revenue earned from the sale of mobile phone service to Iranian subscribers, *id.* at 187 (¶ 500).

The Individual Defendants allegedly provided Irancell "management consulting" services, *id.* at 46 (¶ 48), and worked on behalf of MTN Group to facilitate its business with Irancell. These are not "inherently violent or dangerous" acts. *O'Sullivan*, 2019 WL 1409446, at *8; *cf. Weiss*, 993 F.3d at 162 (explaining that providing support to terrorists could "involve violence or endanger" life where "transfers were 'explicitly identified as payments for suicide bombings'" (citation omitted)).

4.      **The Complaint does not adequately plead that the MTN Defendants proximately caused the Iraq Plaintiffs' injuries.**

Stating a direct-liability claim under the ATA requires more than just alleging that the MTN Defendants committed an act of "international terrorism" (which the Complaint fails to do for several independent reasons). Plaintiffs also must allege facts plausibly showing that their injuries occurred "by reason of" (i.e., were "proximately caused" by) the MTN Defendants' own conduct. *See Owens*, 897 F.3d at 270, 273; *accord Rothstein*, 708 F.3d at 95; *see also Atchley*, 22 F.4th at 225–26. But courts have routinely held that doing business with companies owned or controlled by a state sponsor of terrorism, like Iran, does not proximately cause every attack later committed by groups that state sponsors. *See Owens*, 897 F.3d at 275–76 (citing *Rothstein*, 708 F.3d at 97); *Kemper*, 911 F.3d at 392–93.

The ATA's proximate-causation requirement "bars suits for alleged harm that is 'too remote' from the defendant's [allegedly] unlawful conduct." *Lexmark Int'l, Inc. v. Static Control Components, Inc.*, 572 U.S. 118, 133 (2014) (citation omitted). It limits a defendant's liability to acts that "were a substantial factor in the sequence of events" that led to a plaintiffs' injuries, and only when those injures "were reasonably foreseeable or anticipated as a natural consequence of defendants' conduct." *Atchley*, 22 F.4th at 226 (cleaned up); *accord Rothstein* 708 F.3d at 91, 95. Thus, "when a defendant is more than one step removed from a terrorist act or organization,"

proximate causation requires "plaintiffs suing under the ATA [to] allege some facts demonstrating a substantial connection between the defendant and terrorism." *Owens*, 897 F.3d at 275 (discussing *Rothstein*). And when an "independent intermediary"—especially a state-owned entity with "legitimate agencies, operations, and programs to fund"—separates a defendant from the attack that injured the plaintiff, "the need for additional allegations supporting substantiality is all the more acute." *Id.* at 275–76 (quoting *Rothstein*, 708 F.3d 97); *accord Kemper*, 911 F.3d at 393 ("When one of the links on a causal chain is a sovereign state, the need for facts specifically connecting a defendant's actions to the ultimate terrorist attack is especially acute.").

Doing business with an entity that has legitimate operations, which *in turn* provides resources to terrorists, is thus "insufficient for the purposes of establishing proximate causation." *Terrorist Attacks*, 714 F.3d at 124. Courts have also dismissed claims brought against companies that allegedly provided services to entities involved in legitimate *and* violent illicit enterprises, where plaintiffs failed to allege a "direct link" between the defendant's conduct "and the acts of violence perpetrated against" plaintiffs. *E.g.*, *Zapata*, 414 F. Supp. 3d at 356–57, 357 n.10 ("The Cartels may commit acts of terrorism, but . . . they are, first and foremost, organized crime syndicates. Though the Cartels' main activities are certainly not the 'legitimate . . . operations and programs' of a sovereign state, nor are they international terrorism." (citations omitted) (quoting *Rothstein*, 708 F.3d at 97)). Absent additional allegations directly tying a defendant's actions to the attack, the intermediary's decision to support terrorism breaks the chain of responsible causation. That is true even if the intermediary is owned or operated by a foreign government that the United States has designated as a state sponsor of terrorism. *See, e.g.*, *Owens*, 897 F.3d at 275–76; *Rothstein*, 708 F.3d at 97; *Kemper*, 911 F.3d at 392–94.

49

Thus, in *Owens*, the D.C. Circuit held that BNP Paribas ("BNPP"), a French bank, did not proximately cause al-Qaeda attacks in Kenya and Tanzania by doing business with U.S.-sanctioned Sudanese state banks. *See Owens*, 897 F.3d at 269, 273, 276. The plaintiffs' unsuccessful theory in *Owens* was even more direct than the one Plaintiffs allege here. The *Owens* plaintiffs claimed that BNPP processed U.S. dollar-denominated transactions on behalf of Sudanese state-owned banks that "transmitted the funds from BNPP directly to al Qaeda," and that the funds "were necessary to carry out the embassy bombings" that injured the plaintiffs. *Id.* at 276. Yet the plaintiffs' allegations were not enough to show a "proximate causal relationship between the cash transferred by [BNPP] to [Sudan] and the terrorist attacks by [al Qaeda] that injured plaintiffs." *Id.* (alteration in original) (quoting *Rothstein*, 708 F.3d at 97). Foreign governments and even state sponsors of terrorism, the court explained, have "legitimate agencies, operations, and programs to fund," so absent plausible allegations that BNPP's money was "in fact sent to [al Qaeda] or that [Sudan] would have been unable to fund the attacks by [al Qaeda] without the cash provided by [BNPP]," the allegation that BNPP did sanctions-evading business with Sudanese state-owned banks was insufficient to plausibly plead that BNPP proximately caused plaintiffs' injuries. *Id.* (alteration in original) (quoting *Rothstein*, 708 F.3d at 97); *see also Kemper*, 911 F.3d at 386–89, 393–94 (Deutsche Bank did not cause Shia militia attacks in Iraq by processing transactions for Iranian state banks that "provid[ed] financial services to the [IRGC]," because "a sovereign's affirmative choice to engage in a wrongful act will usually supersede a third-party's choice to do business with the sovereign" (citing *Rothstein*, 708 F.3d at 97)). Under *Owens*, the MTN Defendants' business dealings with Irancell—from which Plaintiffs allege IRGC terrorist fronts allegedly diverted funds and equipment to the Qods Force, which itself provided

money and support to Hezbollah, which aided Sunni insurgents—are too far removed from the Sunni militant attacks in Afghanistan and Iraq to have proximately caused Plaintiffs' injuries.

Plaintiffs' allegations stand in stark contrast to those the D.C. Circuit has upheld as adequate to satisfy the proximate cause element at the motion to dismiss stage. In *Atchley*, the D.C. Circuit concluded that plaintiffs had adequately alleged proximate causation because the defendants had supplied medicines and cash to the Iraqi Ministry of Health despite allegedly knowing that the Ministry was "thoroughly dominated" and completely "overtaken" by the exact terrorist militia, Jaysh al-Mahdi, that injured plaintiffs, and thus "functioned more as a terrorist apparatus than a health organization." *Atchley*, 22 F.4th at 227–28. In concluding that the Iraqi Ministry of Health was "not an independent intermediary" like the Sudanese and Iranian state-owned entities in *Owens* and *Rothstein*, the D.C. Circuit noted that plaintiffs had cited "contemporaneous reports in mainstream media" that had described how "the Ministry employed about 70,000 Jaysh al-Mahdi" fighters and how its facilities had been used as "terrorist bases." *Id.* at 209, 228. Plaintiffs make no comparable allegations that Irancell or its Iranian shareholders were "thoroughly dominated" by the Afghan or Iraqi Sunni militias that attacked them. Instead, the Complaint acknowledges that Irancell was a commercial venture that "provided 2G and 3G connections and fixed wireless internet services" to Iranian subscribers and that the Iranian shareholders in it had legitimate operations and programs to fund. *See supra* pp. 9–12.[34]

Given the Iranian government's intervening role in causing the attacks, the need was "all the more acute" for Plaintiffs to allege additional facts showing a substantial connection between the MTN Defendants and the attacks in Iraq that injured Plaintiffs, but Plaintiffs have not done so. *Owens*, 897 F.3d at 276 (citing *Rothstein*, 708 F.3d at 97). Plaintiffs cannot claim that MTN Group

---

[34] Ex. L at 20 (*Capitalism, Commerce, and the Corps*).

proximately caused the 2006–2010 attacks in Iraq without (at least) plausibly pleading that MTN Group provided money that ended up in the hands of the Sunni insurgents, or that Iran, with its billions in cash reserves, *see Rothstein*, 708 F.3d at 96–97, or the IRGC, with its "expanding influence and control over broad[] segments of the Iranian economy," *see* Dkt. 1 at 136 (¶ 334), could not have financed these attacks without MTN Group. Plaintiffs similarly do not allege that the Individual Defendants caused or participated in any attacks or that the attacks could not have happened but for their purported conduct. Plaintiffs do not and could not make such allegations, and so cannot claim that, despite all the alleged intervening criminal acts standing between the MTN Defendants and the Sunni insurgent attacks in Iraq and Afghanistan, their injuries occurred "by reason of" the MTN Defendants' actions. *See Kemper*, 911 F.3d at 393–94; *see also, e.g.*, *Owens*, 897 F.3d at 276 (processing transfers for Sudanese state banks did not proximately cause al-Qaeda attacks even though Sudan supported al-Qaeda).

Plaintiffs also try a different tack and allege that MTN Group pledged "secret [s]ecurity [c]ooperation" with Irancell's other shareholders when it won the right to invest in Irancell. *See* Dkt. 1 at 45 (¶¶ 44–45). According to the Complaint, "agents" of some "MTN" entity fulfilled that pledge by procuring embargoed dual-use equipment for Irancell and its shareholders. *Id.* at 237 (¶ 641).

These procurement allegations are no more successful than Plaintiffs' core theory. As discussed, Plaintiffs' vague allegations that unnamed "agents" of some "MTN" entity—possibly Irancell itself—procured telecommunications equipment for Irancell's network do not actually say anything about MTN Group's conduct. *See supra* pp. 21–26. Nor do Plaintiffs even try to tie most of the equipment to any attack. The closest the Complaint comes is a vague allegation that the MTN Defendants "transferred (or facilitated the transfer of) thousands" of mobile phones and

encryption technology to Irancell, and that the IRGC used such "untraceable communication lines" to communicate with the Qods Force and Hezbollah, "corrupt politicians," "local organized crime allies" and "[t]errorist [p]roxies." *See* Dkt. 1 at 110, 271 (¶¶ 251, 718); *see also supra* pp. 34–36.

Yet these allegations suffer from the same problem as Plaintiffs' core theory: MTN Group allegedly supplied telecommunications equipment *to Irancell*, and (according to the Complaint) Iranian state actors separately made an affirmative choice to misuse that equipment. Moreover, Plaintiffs do not even allege that encryption technology, network computing hardware and software, or information technology services played any role in any of the attacks at issue. Plaintiffs cannot plausibly infer that "thousands" of cell phones were necessary to Iran's campaign of supporting a vast terrorist alliance when Iran itself had access to millions of such phones, *see, e.g.*, Dkt. 1 at 176–78, 228 (¶¶ 476, 480, 611), and IEI, one of the supposed IRGC "fronts," itself manufactured and sold mobile phones, *see supra* p. 10. Plaintiffs' causal theory is even more attenuated with respect to the Individual Defendants—who allegedly provided "high-end management consulting" services and "strategic communications and crisis prevention efforts" *to Irancell*. Dkt. 1 at 46, 281 (¶¶ 48, 747).

### B.      The Afghanistan Plaintiffs Fail to State a Claim Under the ATA.

Like the Iraq Plaintiffs, the Afghanistan Plaintiffs cannot state any ATA claim based on the theory that the MTN Defendants committed "act[s] of international terrorism" and caused attacks in Afghanistan by investing in and allegedly supplying Irancell, especially where the purported causal chain linking MTN Group's investment in Irancell to attacks conducted by Sunni terrorists in Afghanistan is even more attenuated. *See supra* § II.A.

The Afghanistan Plaintiffs' second and separate theory—that the MTN Defendants committed "act[s] of international terrorism" by allegedly permitting MTN Afghanistan (which is not a defendant) to pay protection money and shut off their cell towers in response to violent

extortionate demands by the Taliban, *see* Dkt. 1 at 206–20 (¶¶ 552–585)—similarly fails to state an ATA claim. Again, to plead a direct-liability claim under the ATA, the Afghanistan Plaintiffs must allege that the MTN Defendants' own actions "appear to be intended" to achieve one of the terrorist aims enumerated in 18 U.S.C. § 2331(1)(B). *See supra* § II.A.1. But no objective observer could reasonably conclude that the MTN Defendants' alleged response to the Taliban's threats was intended to achieve any of these terroristic goals.

Plaintiffs' own characterization of MTN Afghanistan's conduct forecloses such a conclusion. As the Plaintiffs themselves allege, far from sharing Sunni terrorists' and the IRGC's anti-American animus, MTN Afghanistan allegedly made "protection payments" to the Taliban, and agreed to shut down mobile phone towers, in response to extortionist threats "that terrorists commanded by Sirajuddin Haqqani would destroy some of MTN's cell phone towers." Dkt. 1 at 207 (¶ 555). Indeed, the Taliban allegedly made good on its threats: cell towers became a "key battleground," and carriers faced an "onslaught" of "crippling attacks," which "bl[e]w towers completely out of the ground." Ex. O (Jon Boone, *Taliban Target Mobile Phone Masts to Prevent Tipoffs from Afghan Civilians*, Guardian (Nov. 11, 2011), *cited at* Dkt. 1 at 215 (¶ 575 n.177)); *see also* Dkt. 1 at 210 (¶ 562) (recounting multiple "significant" attacks on mobile phone companies). An act done with an apparent intent of avoiding attacks, protecting employees, and preserving the ability to serve customers—or even to "save money" from having to rebuild destroyed cell towers, *id.* at 216 (¶ 577)—lacks any "objective" indicia of a "desire to intimidate or coerce." *Kemper*, 911 F.3d at 390; *see also* Dkt. 1 at 207–08, 214 (¶¶ 556–557, 573) (alleging that MTN Afghanistan's apparent purpose in protecting its equipment and personnel was to "buy peace" and "security" and avoid "be[ing] seen as taking sides").

A magistrate judge in this District reviewing nearly identical claims that foreign companies

made "protection payments" to the Taliban, recommended dismissing plaintiffs' direct-liability ATA claims for failure to meet the statute's apparent-intent requirement. As the magistrate judge explained, "[a]side from legally conclusory allegations that defendants had the requisite appearance of intent," plaintiffs had only alleged "two [alternative] goals that an objective observer could view as motivating Defendants' protection payments: maximizing profits and ensuring their own safety." *Cabrera*, 2021 WL 3508091, at *19. The companies' "at most" "deliberate[]" indifferen[ce] . . . to the risk that [their] transferred funds would end up in the hands of terrorists," could "not lead an objective observer to reasonably infer that Defendants' goal was to intimidate or coerce a government or civilian population." *Id.* (cleaned up) (quoting *Freeman v. HSBC Holdings PLC*, 413 F. Supp. 3d 67, 92 (E.D.N.Y. 2019)); *see also Stansell v. BGP, Inc.*, 2011 WL 1296881, at *9 (M.D. Fla. Mar. 31, 2011) (allegations that defendant made payments to the FARC to conduct its business "without fear of terrorist acts," "would not lead an objective observer to conclude Defendants intended to achieve any one of the elements listed in § 2331(1)(B)").

Plaintiffs also fail to adequately allege that Irene Charnley undertook *any* act related to MTN Afghanistan's alleged support for the Taliban. *See* Dkt. 1 at 205–23 (¶¶ 551–593). A corporate officer cannot be held individually liable for a corporation's torts unless, at a minimum, the officer "had direct, personal participation in or personally authorized the conduct found to violate the statute." *Maryland v. Universal Elections*, 787 F. Supp. 2d 408, 415 (D. Md. 2011) (citation omitted); *see McWilliams Ballard, Inc. v. Broadway Mgmt. Co.*, 636 F. Supp. 2d 1, 9 (D.D.C. 2009) (officer cannot be liable "based merely on the officer's position in the corporation" (citation omitted)). Yet aside from conclusory assertions that "MTN Group, Phuthuma Nhleko, and Irene Charnley caused MTN Group . . . to route monthly payments to" the Taliban and that "MTN Group, Phuthuma Nhleko, and Irene Charnley intended to harm American interests in

Afghanistan," Dkt. 1 at 207 (¶ 555), Plaintiffs fail to allege that Ms. Charnley played a role in MTN Afghanistan's purported payments to the Taliban or shutdowns of MTN Afghanistan's transmission masts. This Court need not accept Plaintiffs' "legal conclusions masquerading as fact[]." *Neighbors of Casino San Pablo v. Salazar*, 773 F. Supp. 2d 141, 147 n.11 (D.D.C.), *aff'd* 442 F. App'x 579 (D.C. Cir. 2011); *see Trisvan v. Heyman*, 305 F. Supp. 3d 381, 407 (E.D.N.Y. 2018) (plaintiffs failed to state a claim against corporate officers because their allegations merely "assum[ed]" the officers "must have been complicit based on their managerial positions").

Consistent with the reasoning in *Cabrera*, the Afghanistan Plaintiffs' allegations that the Taliban violently extorted MTN Afghanistan fail to establish that the MTN Defendants appeared to intend to "intimidate or coerce" any civilian population or government or that Ms. Charnley undertook *any* act that, let alone an act of international terrorism, with regard to MTN Afghanistan's purported support for the Taliban. Because their second (and last) theory of liability also fails, the Afghanistan Plaintiffs' claims should be dismissed.[35]

---

[35] Because Plaintiffs fail to allege that the MTN Defendants committed any act of international terrorism, the analysis of their direct liability claims can end there. We note, however, that Plaintiffs' sweeping theory of liability also cannot be reconciled with the ATA's proximate causation requirement. Plaintiffs "would effectively hold [the MTN Defendants] liable for all [Taliban] violence" in Afghanistan—"precisely the kind of unlimited, sprawling, and speculative liability that proximate cause forbids." *Zapata*, 414 F. Supp. 3d at 357. For example, Plaintiffs rely heavily on allegations that all telecommunications carriers in Afghanistan complied with Taliban shutdown orders, but they do not plead any details tying specific attacks, in specific areas, to shutdowns of *MTN Afghanistan* towers. *See, e.g.*, Dkt. 1 at 213 (¶ 570); Ex. P (Paul Vecchiato, *MTN Concerned by Afghanistan Threats*, ITWeb Cape Town (Feb. 28, 2008) ("*MTN Concerned by Afghanistan Threats*"), https://tinyurl.com/2a7ec88d, *cited at* Dkt. 1 at 213 (¶ 570)). A claim that the MTN Defendants are causally responsible for attacks spanning several years and tens of provinces across a country roughly the size of Texas, in which all major cell carriers faced the same threats is far from establishing the requisite "sufficient directness" between a defendant's alleged acts and a plaintiff's injuries. *Owens*, 897 F.3d at 273 & n.8.

**C.    The Complaint Does Not Adequately Plead that the Individual Defendants Are Liable for MTN Group's Alleged Acts.**

For the reasons stated above, Plaintiffs have failed to state a valid claim against the Individual Defendants. The Complaint also fails with respect to the Individual Defendants for an additional reason: the ATA does not provide a basis for holding corporate employees liable for their employer's alleged acts. Until recently, courts assumed that corporate employees could be personally liable for a corporation's alleged statutory violation, if the employee had "direct, personal participation in" the tort. *City Select Auto Sales, Inc. v. David Randall Assocs., Inc.*, 885 F.3d 154, 160 (3d Cir. 2018) (quoting *Texas v. Am. Blastfax, Inc.*, 164 F. Supp. 2d 892, 898 (W.D. Tex. 2001)). More recently, however, two circuits have questioned that assumption, applying *Central Bank of Denver, N.A. v. First Interstate Bank of Denver, N.A.*, 511 U.S. 164 (1994)—which rejected the default incorporation of common-law liability standards in a federal tort statute. The Third Circuit in *City Select* explained that "individuals ordinarily are shielded from personal liability when they do business in a corporate form, and it should not lightly be inferred that Congress intended to disregard this shield." 885 F.3d. at 159 (cleaned up). Thus, "'statutory silence' as to the continuing availability of common-law liability arguably 'means there is none.'" *Id.* at 161 (quoting *Boim v. Holy Land Found. for Relief & Dev.*, 549 F.3d 685, 689 (7th Cir. 2008) (en banc)). Though it ultimately did not need to resolve this question, the court "doubt[ed]" that "common-law personal-participation liability is available against corporate officers" under the federal statute at issue. *Id.* at 160; *accord Arwa Chiropractic, P.C. v. Med-Care Diabetic & Med. Supplies, Inc.*, 961 F.3d 942, 947 (7th Cir. 2020) ("The personal-participation standard has been criticized as resting on the challenged assumption that traditional forms of common-law personal liability remain available under federal statutes by default.").

The ATA never says that corporate employees may be sued for acts taken in a corporate capacity, which is exactly what Plaintiffs seek to do here. Plaintiffs allege that the Individual Defendants are liable for "acting on behalf of Defendant MTN Group," Dkt. 1 at 45 (¶ 44), for what they allegedly "caused MTN Group" to do, *id.* at 46 (¶ 47), or for corporate acts they allegedly "knew of, and approved," *id.* at 173–74 (¶ 469). These claims are legally insufficient because nothing in the ATA overcomes the principle that an individual is not subject to civil liability under a federal statute for actions undertaken in his or her "corporate capacity rather than his [or her] personal one." *City Select*, 885 F.3d at 159.[36]

## III.    The ATA's Statute of Limitations Bars All Plaintiffs' Claims.

All of Plaintiffs' ATA claims are time-barred. Plaintiffs did not file their Complaint until 2022, twelve years after the last attack alleged in the Complaint—and thus twelve years after the last Plaintiff's cause of action accrued.[37] Dkt, 1 at 33 (¶ 1) (describing Plaintiffs as injured by attacks that occurred "between 2006 and 2010"); *id.* at 348–556 (¶¶ 951–2850) (identifying attacks). By the time Plaintiffs filed this case, the ATA's generous 10-year statute of limitations had run. *See* 18 U.S.C. § 2335(a) (suit "shall not be maintained unless commenced within 10 years after the date the cause of action accrued").

---

[36] As noted above, some courts have permitted suits against corporate officers under federal civil statutes based on the officer's personal participation in the corporation's allegedly tortious acts. Those courts have not, however, engaged with the Supreme Court's *Central Bank* decision, which the Third and Seventh Circuits have indicated undermine this view.

[37] Plaintiffs' ATA claims accrue at the time of injury. *See Owens v. Republic of Sudan*, 864 F.3d 751, 800 (D.C. Cir. 2017) ("[T]he plaintiffs' causes of action arose on . . . the date of the embassy bombings."), *vacated on other grounds sub nom. Opati v. Republic of Sudan*, 140 S. Ct. 1601 (2020); *Strauss v. Credit Lyonnais, S.A.*, 2007 WL 2296832, at *6 (E.D.N.Y. Aug. 6, 2007) (stating in the context of an ATA claim that "[n]ormally, a cause of action accrues on the date a party is injured").

Plaintiffs seek to avoid this problem by claiming that the MTN Defendants "fraudulently concealed" their supposed dealings with the IRGC, *see, e.g.*, Dkt. 1 at 36–37, 45–46, 211, 229–30 (¶¶ 14, 45, 567, 615), until "their fraudulently concealed secret deal was publicly exposed to the world on March 28, 2012," *id.* at 238 (¶ 645). To plead fraudulent concealment as a basis to toll the statute of limitations, Plaintiffs must adequately allege "(1) that defendants engaged in a course of conduct designed to conceal evidence of their alleged wrongdoing and that (2) the plaintiffs were not on actual or constructive notice of that evidence, despite (3) their exercise of diligence." *United States ex rel. Yelverton v. Fed. Ins. Co.*, 831 F.3d 585, 591 (D.C. Cir. 2016) (citation omitted); *In re Merrill Lynch Ltd. P'ships Litig.*, 154 F.3d 56, 60 (2d Cir. 1998).

## A. The Iraq Plaintiffs' Claims Are Time-Barred.

The Iraq Plaintiffs' attempt to plead fraudulent concealment fails for two independent reasons. *First*, fraudulent concealment generally "requires that the defendant make an affirmative misrepresentation tending to prevent discovery of the wrongdoing." *Firestone v. Firestone*, 75 F.3d 1205, 1209 (D.C. Cir. 1996). "[T]he defendant's silence is not ordinarily enough." *Sprint Commc'ns Co. v. FCC*, 76 F.3d 1221, 1226 (D.C. Cir. 1996). Yet Plaintiffs' Irancell-related claim of fraudulent concealment—the only claim the Iraq Plaintiffs can make—is merely that the 2005 shareholder agreement was "locked in a safe," Dkt. 1 at 45–46 (¶ 45)—i.e., that it was not disclosed, not that the MTN Defendants made some affirmative representation about it.[38]

---

[38] Plaintiffs assert that "[e]ver since" the 2005 agreement was disclosed in 2012, the MTN Defendants "variously lied, dissembled, intimidated witnesses, and/or destroyed evidence." Dkt. 1 at 45–46 (¶ 45). But at that point, the agreement Plaintiffs claim was the critical piece of information had been disclosed, so nothing was concealed any longer. Regardless, these generic allegations are insufficiently pleaded under Federal Rule of Civil Procedure 9(b). *Firestone*, 76 F.3d at 1211 ("Parties pleading fraudulent concealment 'must plead with particularity the facts giving rise to the fraudulent concealment . . . .'" (citation omitted)); *Four Seasons Solar Prods. Corp. v. Southwall Techs., Inc.*, 100 F. App'x 12, 13 (2d Cir. 2004) (allegations of fraudulent concealment "should specify the time, place, speaker, and sometimes content of the alleged misrepresentations" (citation omitted)).

*Second*, fraudulent concealment tolls the statute of limitations only if it "prevented [the plaintiffs'] discovery of the nature of the claim within the limitations period." *Merrill Lynch*, 154 F.3d at 60. Plaintiffs' theory of the MTN Defendants' liability is that anyone "exposed to the media" or that "learn[s] about Iran" would have known that Irancell's Iranian shareholders were linked to the IRGC. Dkt. 1 at 240 (¶ 649); *see also id.* at 257 (¶ 677) ("From 2005 through 2016, accounts from prominent Western media sources also reported on the direct link between the Iranian telecom, communications, and information technology sectors and the IRGC."). To be clear, that theory is baseless and contradicted by the very sources Plaintiffs cite. *See supra* pp. 9–12, 43–45. But on *Plaintiffs' own theory*, all of the information needed to bring the Iraq Plaintiffs' claims was publicly available long before 2012.

### B.     The Afghanistan Plaintiffs' Claims Are Time-Barred.

Setting aside Plaintiffs' attempt to plead that the Irancell Letter Agreement was fraudulently concealed, that concerns only Plaintiffs' Irancell-related claims.[39] Plaintiffs' claims based on MTN Afghanistan's alleged dealings with the Taliban are also time-barred. *See supra* § III.A. The Complaint's allegations about the Taliban's demands for MTN Afghanistan to shut off its network at night are based on public reports beginning in 2008. *See, e.g.*, Ex. P (*MTN Concerned by Afghanistan Threats*, *cited at* Dkt. 1 at 213 (¶ 570)); Ex. Q (Agence France-Presse, *Taliban shut down cell phones in Afghan province* (Mar. 25, 2011), *cited at* Dkt. 1 at 213–14 (¶ 571)). And Plaintiffs' allegations of protection payments to the Taliban were publicized in the same period.[40] Plaintiff s cannot possibly argue that they were not on notice starting at least

---

[39] The same statute-of-limitations pleading defect precludes the Afghanistan Plaintiffs from stating an ATA claim based on the same allegations about MTN Group's participation in Irancell.

[40] The Complaint does not acknowledge this public reporting, but in *Cabrera*, Plaintiffs' counsel cited press reports from 2009 and 2010 alleging these protection payments. *See, e.g.*, Ex. R (Can

fourteen years ago when they rely upon publicly available sources describing MTN Afghanistan's alleged payments to, and shut down of transmission masts at the order of, the Taliban from as early as 2008.

## CONCLUSION

For the reasons stated above, the Court should dismiss the claims against Defendants MTN Group, Phuthuma Nhleko, and Irene Charnley.

---

Marey, *How the Taliban Has Turned Extortion into a Gold Mine*, Deutsche-Press Agentur GmbH (June 7, 2009), https://tinyurl.com/2npxtr9j, *cited at* Ex. J at 53–54, 155– 56 (*Cabrera* Complaint ¶¶ 79, 293)); Ex. S (Yaroslav Trofimov, *Cell Carriers Bow to Taliban Threat*, Wall St. J. (Mar. 24, 2010), https://tinyurl.com/yc885kr4, *cited at* Ex. J at 155– 56 (*Cabrera* Complaint ¶ 293)).

Dated: May 26, 2022                                        Respectfully submitted,


s/ *David M. Zionts*                                       s/ *Timothy P. Harkness*
David M. Zionts (D.C. Bar No. 995170)                     Timothy P. Harkness (D.D.C. Bar No.
Jordan Moran (D.C. Bar No. 888273537)                     NY 0331)
Michael S. Goudey (D.C. Bar No. 1617698)*                 Kimberly H. Zelnick (D.D.C. Bar No.
Covington & Burling LLP                                    NY 0325)
One CityCenter                                            Scott A. Eisman (D.D.C. Bar No.
850 Tenth Street N.W.                                     NY 0326)
Washington, DC 20001                                      Freshfields Bruckhaus Deringer US LLP
Telephone: (202) 662-5987                                 601 Lexington Avenue, 31st Floor
Facsimile: (202) 778-5987                                 New York, New York 10022
dzionts@cov.com                                           Telephone: (212) 277-4000
jmoran@cov.com                                            timothy.harkness@freshfields.com
mgoudey@cov.com                                           kimberly.zelnick@freshfields.com
                                                          scott.eisman@freshfields.com

Benjamin S. Haley (D.C. Bar. No. 500103)
Covington & Burling (Pty) Ltd.
Rosebank Link
173 Oxford Road, 7th Floor
Johannesburg 2196, South Africa
Telephone: +27 (11) 944-6914
bhaley@cov.com

*Application for admission forthcoming.                   *Counsel for Defendants MTN Group
                                                          Limited, Phuthuma Nhleko, and Irene
                                                          Charnley*